*Formatted for Electronic Distribution*                                    *For Publication*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF VERMONT**

_____

**In re:**
**FIBERMARK, INC.,**
**FIBERMARK NORTH AMERICA, INC., and**          **Chapter 11 Case**
**FIBERMARK INTERNATIONAL HOLDINGS, INC.,**     **# 04-10463**
                                    **Debtors.**          **Jointly Administered**
_____

Filed & Entered
On Docket
08/16/05

## MEMORANDUM OF DECISION
### GRANTING MOTIONS TO UNSEAL EXAMINER'S REPORT,
### GRANTING ALTERNATIVE RELIEF OF REDACTION AND LEDGER
### AND DENYING MOTIONS TO KEEP EXAMINER'S REPORT UNDER SEAL

Harvey R. Miller, Esq., in his capacity as the examiner in this case, filed a report early last month which included conclusions that two members of the Official Committee of Unsecured Creditors (the "Committee") and the Committee's counsel had breached certain fiduciary duties. Those Committee members and their counsel now seek to keep the Examiner's report ("the Report") under seal. The primary issue presented is whether these parties have shown that the contents of the Report warrant an exception to the general rule, under 11 U.S.C. § 107, that all court documents should be public. They also argue that the Report should be kept under seal because the Examiner has improperly included in the Report certain information that is protected under the attorney client privilege and work product doctrine.

For the reasons set forth below the Court finds that (1) the evidentiary protection arguments are distinct from those under § 107; (2) this is the appropriate time for the Court to consider both assertions of protection  under the attorney client privilege and work product doctrine as well as whether the Report should be under seal; (3) it is appropriate to redact certain information in the Report based upon attorney client privilege and the work product doctrine; (4) the Report does not qualify for exception from the general rule that all court documents should be public records; (5) to the extent the Report might be misconstrued to reflect judicial findings or determinations, that can be remedied by the inclusion of a ledger on the Report; and (6) as a consequence of these findings the Court will enter on the docket other documents and records in this case that have been confidential to date. Therefore, the Court will enter the Report on the docket, with certain text redacted and a cautionary ledger affixed, and enter other related documents on the docket thereafter, pursuant to separate order.

## PERTINENT PROCEDURAL HISTORY

When the Debtors filed the instant chapter 11 cases on March 31, 2004, it appeared to all parties and the Court as if the Debtors were poised to emerge from chapter 11 by the end of 2004. The Debtors, the U.S. Trustee, the Committee and the primary secured creditor were proceeding in a remarkably

collaborative fashion and projected that a Joint Plan of Reorganization would be filed in the fall and confirmed by year's end. All proceeded according to that schedule through the filing of a Joint Disclosure Statement and Plan in November, 2004. However, in January, 2005 the issue of corporate governance of the post-confirmation entity caused the collaboration to begin to disintegrate.[1]  A stalemate occurred which ultimately derailed the reorganization process and led the Debtors to withdraw their plan on March 21, 2005 (doc. # 1332).   Based upon a number of allegations by several parties against several other parties (including principals of the Debtor and the members of the Committee), coupled with the Debtors' inability to proceed with their case under the cloud of these many allegations and the stalemate over post-confirmation governance, the Court issued an Order to Show Cause (doc. # 1354) directing parties to present arguments as to why an examiner should not be appointed to investigate all of the allegations, and make recommendations, on both the alleged breaches of fiduciary duty and the revitalization of the Debtors' reorganization.

   The Debtors, the U.S. Trustee, the Committee, Wilmington Trust Company ("Wilmington Trust"), Silver Point Capital LP ("Silver Point"), AIG Global Investment Corp. ("AIG"), Post Advisory Group LLC ("Post"), and Alex Kwader ("Kwader," the CEO of FiberMark) (collectively, the "interested parties") all filed papers supporting (to varying extents) the appointment of an examiner (see docs # 1393, 1392, 1396, 1342 [fn 3], 1377, 1395, and 1399, respectively).   After consulting with the interested parties, the U.S. Trustee recommended and the Court appointed Mr. Harvey R. Miller to serve as examiner.  (Mr. Miller is hereafter referred to as "the Examiner").   Prior to making this recommendation, the U.S. Trustee had consulted with all key players and conducted its own independent inquiry into the Examiner's competence and disinterestedness, as set forth in the statement filed with the Court on April 18, 2005 (doc. # 1409).   No party objected to the Examiner's selection or questioned his expertise to serve in this capacity.   All interested parties participated in a hearing defining the scope of the Examiner's duties on April 19, 2005, and agreed to the scope of the Examiner's duties.   An Order was entered later that day articulating the scope of duties, timeframe and fee cap for this appointment (doc. # 1422).   That order provided:

   1.   The United States Trustee's Office is directed to appoint an independent examiner to conduct an investigation into the following matters:
      a.   the transfer of the Debtors' executives' claims, including but not limited to, the claims of Alex Kwader, and other persons who were employees of the Debtors at the time of the transfer of their claim(s), to Silver Point Capital, L.P. ("Silver Point"), the nature

---

[1] For a more thorough discussion of the details of these events see Debtors' Notice of Intent, filed January 17, 2005 (doc. #1025) and Order Denying Debtors' Motion for Order Establishing Expedited Procedures For, and Safeguarding Estate Resources Sought to be Used in Connection with, Resolving Claims Trading Issues that Have Aggravated Intercreditor Dispute and Halted Plan Confirmation Process, filed April 13, 2005 (doc. # 1403).

and extent of the disclosure of those transfers and whether breach(es) of fiduciary duties to the estate resulted;

b.   the transfer of the claim of former committee member Solutions Dispersions, Inc. to Silver Point;

c.   the quality of the "screening wall" Silver Point, and the other members of the Creditors' Committee, established in accordance with this Court's Order Approving Specified Information Blocking Procedures and Permitting Trading in Securities of the Debtors Upon Establishment of a Screening Wall (doc. # 684) (the "Trading Order"), whether it was breached, and whether the Trading Order was violated;

d.   the dispute among Committee members regarding corporate governance issues and whether any Committee member breached its fiduciary duty to act in the best interest of all creditors; and

e.   any other matter the Examiner deems necessary and relevant to the complete and full investigation of the four enumerated areas included herein.

2.   In order to meet his or her responsibilities, the Examiner has the authority to retain counsel, to issue subpoenas, and to require document production and conduct examinations under FED. R. BANKR. P. 2004, provided the Examiner exercises this authority in a manner which is consistent with the Examiner's obligation to complete the investigation in a prompt and cost-effective fashion.

3.   The Official Committee of Unsecured Creditors and its members, Alex Kwader and other individuals who were employed by the Debtors when his or her individual claims were transferred to Silver Point, representatives of Solutions Dispersions, Inc. and all other parties in interest who have information that the Examiner deems relevant to this investigation shall cooperate fully with the Examiner.

4.   The Examiner shall commence his or her investigation immediately upon the Court's approval of the United States Trustee's appointment of the Examiner.

5.   The Examiner shall be compensated at ordinary hourly rates, with compensation to be paid in accordance with 11 U.S.C. § 330(a)(1), the Federal Rules of Bankruptcy Procedure, the District of Vermont Local Rules and the United States Trustee Fee Guidelines.

6.   The compensation of the Examiner, including the compensation of his or her professionals' and the expenses of both, are limited and shall not exceed $200,000. Application and allowance of said fees will be paid under 11 U.S.C. § 330 as set forth in ¶ 5, supra. This limitation may be modified upon motion of the Examiner and for good cause shown. No compensation shall be paid to the Examiner or the Examiner's professionals without prior approval of the Court.

7.   In the event that the Examiner finds that a Committee member or any other party has violated the Trading Order, has breached fiduciary duties, or has acted to intentionally thwart the plan confirmation process in these cases, the Examiner shall include in the report recommendations regarding

(a)   how the culpable conduct should affect the allocation of the cost of the Examiner;

(b)   whether such conduct warrants the imposition of sanctions against any such party, including without limitation, the avoidance of

claims transfers or subordination of claims; and (c) any such other recommendations the Examiner has based upon the totality of his or her findings.

8.  As set forth in its Exclusivity Order of even date, no proposed plans or disclosure statements may be filed by any party during the Examiner's forty- five (45) day investigation period, except that the Debtors may file a consensual plan during this time (with consensual defined to include the unanimous consent of all members of the Official Committee of Unsecured Creditors).

9.  The Examiner shall file his or her report with the Court by 4:00 P.M. on June 8, 2005.

(doc. # 1422).

On May 10, 2005, counsel to the Committee filed an emergency motion asking for guidance from the Court on how to respond to the Examiner's request for production of documents because the Committee was split on whether to turn over the documents requested (doc. # 1460). Two members of the Committee supported waiving any applicable privileges and two members did not want to waive any applicable privileges as to third parties. (May 10th Tr. at pp. 17-23; 25-26). Under the Committee bylaws, in order to act the Committee had to have a majority vote; due to the deadlock between its members, the Committee was not able to advise its counsel how to respond to the Examiner's demand. In light of this, and the Examiner's fairly short investigation period, Akin Gump sought the Court's guidance on how to respond to the request for documents on an emergency basis and in its own name.

After hearing argument from Committee counsel and all members of the Committee, the Court determined that time was of the essence, it was not clear what, if any, allegedly protected information the Examiner would ultimately include in his report, and an expedient remedy was required. Accordingly, in the interest of avoiding significant delay and expense, and preserving the issue until the Report was filed, the Court directed the Committee and its counsel to deliver all of the requested documents to the Examiner, stated that turnover to the Examiner of any documents that were protected by the work product doctrine or attorney client privilege would not constitute a waiver of such privileges *vis a vis* third parties, and reserved for a future (undisclosed) date the determination of whether any of the documents turned over were in fact protected from disclosure by either the attorney client privilege or work product doctrine. The Court signed and entered an Amended Order Supplementing its Order Directing the Appointment of an Examiner on May 13, 2005 (doc. #1470). That Order specifically provided:

1.  That the Examiner's report pursuant to the Examiner Order (the "Examiner's Report") shall be confidential and filed with the Court under seal subject to further Order of the Court.

2.  At the time of the filing of the Examiner's Report, the Examiner shall serve a copy of the Examiner's Report upon the Office of the United States Trustee, the debtors, General Electric Capital Corporation as

administrative agent for the debtors' postpetition lenders, the Official Committee of Unsecured Creditors, Silver Point, AIG Global Investment Corp. ("AIG") , Post Advisory Group, LLC ("Post") and Wilmington Trust Company ("Wilmington") as members of the Committee and as claimants against the debtors and their respective attorneys.  All recipients of the Examiner's Report shall hold and maintain the Examiner's Report subject to the confidentiality provided by this Order and shall not distribute or otherwise publicize the Examiner's Report subject to further Order of the Court.

3.     The Examiner's investigation shall be deemed conducted for all purposes pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure.

4.     The Committee, each Committee member, Akin Gump, as attorneys for the Committee, and all other parties from whom the Examiner has requested, subpoenaed or will request production of documents, emails, correspondence, etc. (the "Documents") shall promptly produce the Documents requested consistent with Rule 2004 of the Federal Rules of Bankruptcy Procedure.  Such production of Documents to the Examiner **shall not be deemed to constitute a waiver of any privilege, doctrine, right, or immunity pertaining to such Documents (collectively, the "Privileges") with respect to any third party.**

5.     Notwithstanding anything to the contrary herein, to the extent that any Committee member reasonably believes that any requested Document falls within the Privileges held by it individually, the Committee member may withhold such Document(s) subject to the production of a privilege log and subject to any further order of the Court.

6.     Nothing contained in this Order shall prejudice the right of the Examiner to seek to compel production of Documents withheld on the grounds of Privileges.

(doc. # 1470) (emphasis added).

The Examiner subsequently requested an extension of time for the filing of his report and an increase in the cost cap for completion of his investigation and report, upon his representation that the matters in issue were more complicated and the investigation was more time consuming than had originally been anticipated.  All interested parties consented and the relief was granted (see docs. ## 1497, 1504 and 1515).  The Examiner filed the Report under seal on July 8, 2005 (and served it on all interested parties on or just after this date) (doc. # 1623).  The Report included the Examiner's conclusions that certain parties had breached their fiduciary duties and that these breaches had caused injury to creditors and to the Debtors' reorganization process.  Pursuant to the Order appointing him, the Examiner made recommendations to the Court that included who should pay the costs of the investigation and what remedies might be appropriate to compensate parties injured by the breaches of duty he identified. Pursuant to the May 13th Order, the Report was not circulated to the public, was under temporary seal, and

was available only to the interested parties and other parties identified in prior orders of the Court (e.g., the primary secured lender, principals of the Debtors, local and primary counsel for each party).

At a hearing held on July 12, 2005, Silver Point made an oral motion to unseal the Report. The U.S. Trustee and the Debtors voiced support for that motion. AIG, Post and Akin Gump (hereafter referred to as the "Seal Proponents") opposed unsealing the Report and argued in favor of keeping the Report under seal. The Debtors asserted that the Report needed to be unsealed immediately so they could include references to the Report in the Disclosure Statement, emphasizing that this was absolutely critical to both its business operations and its reorganization process. Silver Point agreed and insisted that time was of the essence. Silver Point zealously argued that since the allegations against it (which contributed to the decision to appoint an examiner) were public that it was critical to publicize the conclusions exonerating it. Silver Point, the U.S. Trustee, the Debtors, and Mr. Kwader contend that the Report should be public and are referred to herein as the "Public Assess Proponents." Since the determination of this issue was time sensitive, the Court entered a scheduling order directing that motions, responses and replies be filed by August 2nd and set a hearing for oral argument on whether to unseal the Report for August 4, 2005.[2] At the conclusion of the five hour hearing on August 4th, the Court took the matter under advisement.

## JURISDICTION

The Court has jurisdiction over the various motions under 28 U.S.C. §§ 157(b)(2)(A) and 1334.

## DISCUSSION

Unfortunately, neither the Bankruptcy Code nor case law provides guidance on the issue of how an examiner's report may be used nor on when the integrity of the bankruptcy system requires an examiner's report to be made public, even if that report is highly critical of some parties. The facts, circumstances and procedural posture of this case are distinguishable from those presented in all of the decisions the parties have cited and the Court has found. Therefore, the Court addresses this combination of issues, as a case of first impression, directing its attention to the unique facts, circumstances, legal arguments and procedural posture presented, taking into account the Public Access Proponents' assertion of critical urgency and the risk and sensitivity the Seal Proponents assert to be stake.

### 1. The evidentiary protections are distinct from the § 107(b) exceptions.

Notwithstanding the arguments of the Seal Proponents to the contrary, the Court finds that the arguments regarding protection of communications based upon attorney client privilege and protection of documents based upon work product doctrine are distinct from the question of whether the Report should be kept from the public based upon one of the exceptions set forth in § 107(b). The Court is aware of

---

[2] Notwithstanding the modest page limits set for such documents in the local rules, and the 10 page expansion of that limit set by order for all parties' responses, the papers filed in connection with this hearing were voluminous (two parties filed papers that, with exhibits, exceeded 500 pages).

only one published decision addressing the relationship between these disclosure protections and § 107, In re 50-Off Stores, Inc., 213 B.R. 646, 655 (Bankr. W.D. Tex. 1997), and it respectfully disagrees with the rationale of that Court on this issue. The Court finds nothing in the text of § 107(b) that would encompass an analysis of attorney client privilege or the work product doctrine. The text of § 107(b) defines the exception to § 107(a) narrowly; it provides:

> § 107. Public access to papers.
> . . .
> (b) On request of a party in interest, the bankruptcy court shall, and on the bankruptcy court's own motion, the bankruptcy court may—
>> (1) protect an entity with respect to a trade secret or confidential research, development, or commercial information; or
>> (2) protect a person with respect to scandalous or defamatory matter contained in a paper filed in a case under this title.

The plain language does not refer to confidential communications between an attorney and client or to the work product of an attorney. Moreover, the Court finds no reason to strain the language of the statute to include either of these evidentiary principles when they are entitled to deference, independent of § 107. As a leading treatise on the topic points out

> An independent judiciary and the sacrosanctity of the confidential relationship between a lawyer and a client are bastions of an ordered liberty. . . The attorney client privilege is the oldest of the testimonial privileges protecting confidential communications. It was accepted as early as the reign of Elizabeth I.. . . The rationale that today justifies the privilege is that an attorney may give reasonably informed professional advice only when information is given in confidence to the attorney by the client.

The Attorney client Privilege and the Work-Product Doctrine, 4th Ed. Edna Selan Epstein, ABA Section of Litigation, 2001, pp 2-3. The Court agrees with the rationale set forth in In re Rapkin v. Roque, et al, 87 F.Supp. 2d 140, 143 (D. Conn. 2000) that "the public interest in preserving the attorney client privilege ordinarily outweighs the presumption of access to judicial documents," and finds no statutory basis for forcing this inquiry into the narrow parameters of § 107.

### 2. This is the appropriate time for the Court to consider assertions of privilege and work product and whether to seal.

The Seal Proponents assert that the Examiner has included in the Report information that is protected from disclosure under the work product doctrine and attorney client privilege, that these protections have not been waived, and that they are raising it in a timely fashion.

Before turning to whether the Seal Proponents have demonstrated that the Report discloses materials subject to protection, the Court must determine if the Committee has waived the privilege. Based upon the record of the hearing held on May 10th and the May 13th Order, the Court finds that the Committee as a whole, as well as Wilmington Trust and Silver Point individually, waived the attorney

client privilege for the purpose of the Examiner's investigation. The Committee specifically reserved its privileges as to third parties (Tr. at p. 33). The Court further finds that the Committee's waiver of its protection under these two evidentiary principles for purposes of the Examiner's investigation was based upon a reasonable expectation that the materials and communications disclosed to the Examiner would be used by him in his investigation, might well form the basis for the Report but would not be quoted or revealed in the Report. All parties claimed they wanted a transparent process and none of the Seal Proponents identified anything in the record which constitutes a reservation of privilege as to the investigation. In re McKesson HBOC, Inc., 2005 WL 934331 *2 (N.D. Ca. March 31, 2005). Therefore, the Court must analyze whether the Report discloses materials protected by these principles, assess whether the party invoking the privilege has met its burden of proof, and ascertain whether releasing the Report in its current form would eviscerate the protection granted in the May 13th Order *vis a vis* third parties.

The procedural background of this case is not markedly different from the posture of the Baldwin United case where the court directed the debtor to grant an examiner access to all information relevant to the examiner's investigation of the matters set forth in the order appointing the examiner, directed the examiner not to disclose the contents of any privileged document to any third parties (except as necessary for the conduct of the investigation), and held that the debtor's delivery of materials to the examiner did not constitute a waiver of privilege as to any third parties. In re Baldwin United Corp, 46 B.R. 314, 315 (Bankr. S.D. Ohio 1985). The two points that distinguish Baldwin from this case are (1) the target of the Baldwin United examiner was the debtor;[3] and (2) the access question was whether certain third parties who had sued the debtor were entitled to access to the documents turned over to the examiner. Notwithstanding these distinctions, the case is instructive because the Baldwin United court bases its holding that the examiner need not release his discovery material on (a) the movant's failure to object to the order which appointed the examiner and directed all documents be kept confidential, and (b) the essential role of the confidentiality order in the examiner's ability to complete his investigation. Baldwin United at 315-316. The Seal Proponents argue that the Court's May 13th Order provides them with the same protection that was the foundation of the Baldwin United ruling. This is incorrect. While the rationale for this Court's order resembled the Baldwin United order to the extent it (a) directed parties to deliver to the Examiner everything he requested, and (b) was issued predominately to expedite the investigation, it differed from the Baldwin United order in the critical respect that it gave no assurance of permanent protection. See May 10th Tr. at pp. 26-27. This Court's Order unequivocally protected any materials subject to privilege from disclosure to third parties (doc. # 1470, ¶ 4); but it did not protect

---

[3] The instant analysis is focused solely on the Report since no party has requested access to the materials that were delivered to the Examiner and underlie the Report and his conclusions, in this contested matter.

anything from disclosure to the Examiner and did not make any determination as to what documents or disclosures were protected by evidentiary privilege.[4]

Here, the Court *sua sponte,* temporarily, and prophylacticly sealed the Report. The initial sealing was temporary, and granted for expedience without any findings or conclusions as to the contents of the Report. The Seal Proponents' reliance upon the May 13th Order as permanent protection from disclosure is neither supported by the record nor reasonable.[5] SEC v. Thestreet.com, 273 F.3d 222, 230-31 (2d Cir. 2001) (protective orders that are on their face temporary or limited may not justify reliance by the parties). Records sealed by a court should remain sealed **if** the Court [found] a compelling reason for sealing them. In re Ionosphere Clubs, Inc., 156 B.R. 414, 434 (Bankr. S.D.N.Y. 1993), aff'd, 17 F.3d 500 (2d Cir. 1994) (emphasis added). The Court has not yet made any finding that there was a compelling reason to seal the document. Neither it nor any of the parties had even seen the Report – indeed, the Examiner had probably not even begun drafting it – at the time the Order was entered directing the Examiner to file the Report under seal. The Court made no specific findings under Fed. R. Bankr. P. 9018, §107(b), or Rule 26 that would make the current question of whether to seal the Report tantamount to a "modification" of the Court's May 13th Order. Rather, the Court imposed the seal to obviate the additional time and expense of privilege logs and indicated that it would address any assertions of attorney client privilege or work product doctrine at a future date. That day has arrived and the Court is now considering the arguments regarding a need for protection from disclosure.

The Court concludes that the posture of this case is now the same as the posture of a request to seal an unsealed document. It is the first motion made in connection with whether the Report should be public since the Report was completed filed. The Court therefore looks at the Report "fresh" having kept the question open until all parties could review the Report and file the papers now before the Court, as envisioned at the May 10th hearing when the temporary seal was prospectively imposed. Since this is the procedural equivalent of an initial motion to seal, the Seal Proponents have the burden of proof to demonstrate grounds for an exception under § 107(b). Goldstein v. Forbes (In re Cendant Corp.), 260 F.3d 183, 194 (3d Cir. 2001).

---

[4] The Baldwin-United court also addressed the applicability of the Garner doctrine in examining the right of a creditors' committee to withhold information from its constituents based upon the protection of the attorney client privilege. It held that "the Garner doctrine strikes the appropriate balance between the creditors' right to information and the committee's need for confidentiality, and hence should be applied to requests for privileged information from the committee which represents them." Baldwin-United at 805. Since Public Access Proponents seek to have the report released to the public, rather than to particular creditors, or a particular class of creditors or bondholders, the Court finds the Garner doctrine is not probative in the analysis of the instant dispute.

[5] The May 13th Order specifically provided that "to the extent any Committee member reasonably believes that any requested Document falls within the Privileges held by it individually, the Committee member may withhold such Document(s) subject to the production of a privilege log and subject to any further order of the Court." ¶5. The record reflects that no Committee member submitted a privilege log prior to the papers filed in connection with the instant Motions to Unseal.

**3. Certain information in the Report must be redacted based upon privilege.**

Having found that the privilege was not waived as to third parties and that publication of quotes from, or direct disclosure of, privileged materials would violate the protection from disclosure to third parties, the Court turns to the issue of whether the attorney client privilege has been properly and sufficiently asserted. To satisfy the burden of establishing the privilege, the party invoking the privilege cannot rely on conclusory assertions, but rather must proffer competent evidence to demonstrate that its privilege claims are well founded. See von Bulow by Auersperg v. von Bulow, 811 F.2d 136, 146 (2d Cir.), cert. denied sub nom., 481 U.S. 1015 (1987).

### A. Assertion of Protection from Disclosure under the Attorney Client Privilege

The attorney client privilege serves interests of justice, and, thus, is worthy of maximum legal protection. In re Rorer, 32 F.3d 851, 862 (3d Cir. 1994) (citing Haines v. Liggett Group Inc., 975 F.2d 81 (3d Cir. 1992)). "The rationale for the [attorney client] privilege is that confidentiality enhances the value of client-lawyer communications and hence the efficacy of legal services." Restatement (Third), The Law Governing Lawyers § 68 comment c (2000). The purpose of the attorney client privilege is "to encourage full and frank communication between attorneys and their clients" and "the privilege exists to protect not only the giving of professional advice to those who can act on it but also the giving of information to the lawyer to enable him to give sound and informed advice." In re Upjohn Co. v. United States, 449 U.S. 383, 389-91 (1981). The privilege protecting evidence relating to communications between attorney and client is intended to ensure that a client remains free from apprehension that consultations with a legal adviser will be disclosed. Hunt v. Blackburn, 128 U.S. 464, 469 (1888). However, not all communications between an attorney and client are protected by this privilege. Only those that fall within the established parameters of the privilege qualify for protection. In re Baldwin-United Corp., 38 B.R. 802, 804 (Bankr. S.D. Ohio 1984). To establish the right to protection, the party asserting the privilege must demonstrate the presence of all the predicates of the privilege, via,:

1.    A communication;

2.    made between privileged parties;

3.    in confidence;

4.    for the purpose of seeking, obtaining or providing legal assistance to the client.

Restatement (Third), The Law Governing Lawyers § 68 (2000); see also, Restatement (Third), The Law Governing Lawyers § 68 comment c (2000). Additionally, in order for the privilege to be effective, it must have been asserted and not waived. Peat, Marwick, Mitchell & Co. v. West, 748 F.2d 540, 541 (10th Cir.1984), cert. dismissed, 469 U.S. 1199 (1985) (assertion of privilege must be timely and must also be accompanied by sufficient information to allow the court to rule intelligently on the privilege claim); Marx v. Kelly Hart & Hallman, P.C., 929 F.2d 8, 12 (1st Cir. 1991) (failure to make a timely

objection on privilege grounds may result in holding that any or all objections have been waived). The privilege belongs to and must be raised by the client. In re von Bulow, 828 F.2d 94, 100 (2d Cir.) ("the privilege belongs solely to the client"). It can be asserted only by the client (or one authorized to do so on the client's behalf). AIG and Post have both asserted the privilege on behalf of the Committee.[6]

A claim of privilege is not determined merely by a showing that the contents emanated from a confidential communication between client and attorney, but rather requires that the client convince the Court, based upon principles of federal common law, that the subject communication satisfies each element of the privilege. In re Blier Cedar Company, Inc., 10 B.R. 993, 997 (Bankr. Me. 1981). Hence, the Examiner's mere reciting of information that he learned or conclusions he opined based upon his investigation are not protected by attorney client privilege.

Courts apply the attorney client privilege only when necessary because it withholds relevant information from the judicial process. In re Tri-State Outdoor Media Group, Inc., 283 B.R. 358, 361 (Bankr M.D. Ga. 2002). The attorney client privilege is to be narrowly construed. In re Baldwin-United, 38 B.R. at 804 (citing United Sates v. Goldfarb, 328 F.2d 280, 282 (6th Cir.), cert. denied, 377 U.S. 976 (1964)).

The party asserting the privilege has the burden of affirmatively raising the privilege and has the burden of proof. That burden is not, of course, discharged by "mere conclusory or *ipse dixit* assertions." In re Bonanno, 344 F.2d 830, 833 (2d Cir. 1965). Post has not submitted a privilege log. As noted in a separate order of even date, the privilege logs filed by Akin Gump on August 5, 2005 (the "Akin Catalogs") are untimely, insufficient, and not under consideration. AIG has provided the Court with a carefully detailed privilege log. The Court has analyzed and considered each entry on the AIG log. After considering the arguments the Seal Proponents presented in their papers and at oral argument, as well as the AIG log, the Court finds that the Seal Proponents have demonstrated all of the elements necessary for protection with respect to only a relatively small number of the allegedly privileged disclosures. The Court finds several of the disclosures alleged to be protected communications were either not made in confidence or were not made for the purpose of obtaining or providing legal advice to the client.[7] It is

---

[6]   Although no party has specifically asserted that the privilege is not available to the Committee, the Court specifically finds, for the reasons set forth in In re Baldwin-United, 38 B.R. 802 ( Bankr S.D. Ohio, 1984), that (a) the privilege is available to a creditors committee in a chapter 11 case and (b) that privilege may not be asserted as a shield to protect against disclosure of fraud or other misconduct on the part of the committee or its attorneys. Baldwin-United at 805, n 1 [citations omitted]. Since neither the merit of the Report nor the soundness any of its conclusions are before the Court at this time, it need not address the validity of the privilege in connection with the Examiner's findings of breaches of fiduciary duty by any members of the Committee or its counsel herein.

[7]   The Court has scrutinized each claim of attorney client privilege set forth in the papers and affidavits filed by the interested parties, as well as AIG's privilege log, against the text of the Report.  In weighing the value of articulating the details of the Court's analysis of each claim against the need for prompt resolution of the seal and privilege issues so that the case could move forward, the Court has opted to include just examples rather than an exhaustive list.

critical to begin our analysis with the premise that the client in this case is the Committee, not the individual members of the Committee. This is not in dispute. See Tr. of August 4th hrg at p. 79; retainer agreement (doc. #192, Declaration of Fred S. Hodara); and Order (doc. # 239). Therefore, only communications wherein the Committee is the client are eligible for protection under the attorney client privilege.

Moreover, the attorney client privilege does not attach simply by reason of the relationship but depends on the specific contents of the communication. In re Blier Cedar Company, Inc., 10 B.R. 993, 1002 (Bankr. Me. 1981). Many of the passages in the Report which the Seal Proponents claim to be protected by attorney client privilege deal with the inter-creditor disputes involving the post-confirmation governance issues. Many of the provisions of the Report which AIG asserts to be protected by the privilege relate to conflicts among members of the Committee, strategy for maneuvering other members to one's perspective and the various governance issues. These matters are not protected from disclosure by the privilege because (a) they are not communications with the Committee, which is Akin Gump's only client in this proceeding; and (b) they are not directed at protecting the interests of the Committee or its constituents, but rather at advancing or reconciling the needs of individual Committee members. None of the Seal Proponents have presented any case law or statutory support for the proposition that Akin Gump's advice regarding these matters are of concern to the constituency the Committee represents, which is a prerequisite to protection under the attorney client privilege. The Court finds, in reliance upon the Second Circuit law on this issue, particularly in Adlman, Kovel, supra, and Grand Jury Subpoena, supra, that it is not.

The Public Access Proponents have suggested that the presence of third parties negates eligibility for protection from disclosure. This is incorrect. The Court has found several communications involving third parties that do meet the criteria for protection, for example, (a) where the communication between Akin Gump and the Committee included the Committee's financial advisor or Akin Gump was communicating solely and directly to the Committee's financial advisor, and (b) AIG (the party asserting the privilege) has demonstrated that the communication was intended to facilitate the provision of legal service by the attorney to the client. See United States v. Adlman, 68 F.3d 1495, 1499 (2d Cir. 1995), In re Tri-State Outdoor Media Group, Inc., 283 B.R. at 362. The Second Circuit made clear in the Kovel case that the presence of an accountant or financial advisor, whether hired by the lawyer or the clients, does not destroy the privilege, any more than would the presence of a linguist when needed to translate legal papers in a foreign language. If the financial advisor's presence is necessary, or at least highly useful, for the effective consultation between the client and the lawyer which the privilege is designed to permit, according to the Kovel court, then the presence of the financial advisor in the communication loop does not negate the protection. In re Kovel, 296 F.2d 918, 922 (2d Cir. 1961). The Second Circuit went

on to point out that "What is vital to the privilege is that the communication be made in confidence for the purpose of obtaining legal advice from the lawyer. If what is sought is not legal advice . . . no privilege exists [internal citations omitted]." <u>Kovel</u> at 922.

The attorney client privilege grants protection only to those communications where the advisor's role was to assist the attorney in rendering legal advice; if a communication was merely to aid the Committee in making a business decision it is outside the scope of the attorney client privilege. <u>See Adlman</u>, 68 F.3d at 1500. The Court finds the corporate governance issue to be a business decision for the post-confirmation owners of the Debtors, not a legal issue to be addressed by the Committee.

Where Akin Gump was conferring with co-counsel, the Committee's advisors, or individual Committee members about the divergence of opinions regarding corporate governance issues, the Court finds Akin Gump was not advising its client and/or not pursuing legal issues on behalf of its client. Accordingly, those passages have not been redacted. For example, AIG seeks to have the following excerpt redacted as attorney client privileged:

> The distaste felt by Wilmington as a result of Mr. Musante's conduct was so strong that six months later, on October 27, 2004, when Skadden sent an e-mail questioning the payment of indenture trustee fees under the plan, Mr. McGinley wrote to Mr. Hodara: "This gives me a terrible flavor/reminder of Mr. Musante and our original conversation (which I apprised you of) at the first meeting with the debtors in Skadden's offices." Mr. Hodara responded that "[t]his is not coming from Musante, this is Skadden on its own."

Examiner's report at p. 46, asserted privileges ## 10 and 11.[8] Such conversations by and among the various Committee members with Akin Gump about other Committee members do not satisfy the requisite elements to be afforded the attorney client privilege. By contrast, where Akin Gump was communicating with the Committee chair or co-counsel with regard to the obligation of the Committee to disclose suspicions of violation of the trading order, that activity was a duty of the Committee and hence the Court finds that it is privileged communication and it has been redacted.

The attorney client privilege protects communications by an attorney to co-counsel or others involved with the attorney's legal services to the client, as long as those communications embody the attorney's legal advice. Thus, communications among attorneys at Akin Gump or between Akin Gump attorneys and their local counsel, are protected, to the extent the communication constitutes legal advice for the benefit of the client. <u>In re Empire Blue Cross Blue Shield</u>, 1999 WL 1006312, *3 (S.D.N.Y. Nov. 4, 1999).

The Court will release a version of the Report, under seal, as an Appendix to this decision that reflects those portions of the Report to be redacted. The Court denies AIG's request to redact all

---

[8] All references to the Examiner's report are to the Corrected version of July 29, 2005.

remaining portions of the Report allegedly protected by the attorney client privilege because it has failed

to establish that the communications were (1) between privileged parties; (2) made in confidence; or (3)

made for the purpose of obtaining or giving legal advice to the client.

### B. Assertion of Protection from Disclosure under the Work Product Doctrine

"The work product doctrine, codified for the federal courts in FED. R. CIV. P. 26(b)(3) is intended

to preserve a zone of privacy in which a lawyer can prepare and develop legal theories and strategy 'with

an eye toward litigation,' free from unnecessary intrusion by his adversaries."  Hickman v. Taylor, 329

U.S. 495, 510-511 (1947).  To be protected by the work product doctrine, the subject materials must

present three essential traits; they must be:

1.     documents and tangible things otherwise discoverable;

2.     prepared in anticipation of litigation or in the context of a credible prospect of litigation; and

3.     by or for another party of that party's representative.

In contrast to the attorney client privilege, the protection under the work product doctrine is not absolute;

it is subject to only qualified protection.  Hickman v. Taylor, 329 U.S. at 511; see also, FED. R. CIV. P.

26(b)(3).  The Second Circuit has taken a relatively expansive view of this protection.  It has rejected the

requirement that a document must be prepared *exclusively* in anticipation of litigation to be work product

protected, and extends work product protection even to documents that were created primarily for a

business purpose.  It holds that in order to qualify for this evidentiary protection, the party seeking

protection must show the relevance of the document to anticipated litigation. See United States v.

Adlman, 134 F.3d 1194, 1202 (2d Cir. 1998) and FED. R. CIV. P. 26(b)(3).[9]  Once the elements of the

doctrine are established, the burden shifts to the party seeking discovery of the document to demonstrate a

substantial need for the work product material and a hardship in obtaining the needed material by

alternative, less intrusive means. The greatest protection is afforded to an attorney's mental opinions, trial

strategy and mental impressions, often referred to as "opinion work product."  See FED. R. CIV. P.

26(b)(3).  But, even opinion work product protection is only available if the party asserting the protection

demonstrates that the subject materials meet the definition of work product.  In re Tri-State Outdoor

Media Group, 283 B.R. at 363.  Special treatment for opinion work product is justified because "at its

core, the work product doctrine shelters the mental processes of the attorney, providing a privileged area

within which he can analyze and prepare his client's case."  United States v. Nobles, 422 U.S. 225, 238

---

[9]  Fed R. Civ. P. 26(b0(3) provides in relevant part "a party may obtain discovery of documents and tangible things otherwise discoverable . . . and prepared in anticipation of litigation or for trial by or for another party or by or for that party's representative . . . only upon a showing that the party seeking discovery has substantial need of the material in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means. In ordering discovery of such materials, when the required showing has been made, **the court shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation**." [emphasis added]

(1975). Some cases have suggested that opinion work product protection is absolute and never subject to discovery, but that position has not been adopted by the Second Circuit. In re Upjohn Co. v. United States, 449 U.S. at 400-02; In re Martin Marietta Corp., 856 F.2d 619, 626 (4th Cir. 1988), cert. denied, 490 U.S. 1011 (1989); United States v. Adlman, 134 F.3d at 1204. The work product rule is always assessed under federal law when it is put into issue in the federal courts. In re Empire Blue Cross Blue Shield, 1999 WL 1006312, *1 (S.D.N.Y. Nov. 4, 1999).

Silver Point argues that AIG failed to timely assert its right to protection of these materials and that, even if it did, any protection under the work product doctrine dissolved upon the dissolution of the Committee. Though neither the case law nor the statute is very clear on this point, the Court finds that none of the Public Access Proponents have carried their burden of establishing grounds for either of these waiver theories. The Court finds that the Order entered on May 13th included protection for work product materials from 3rd parties and acknowledged a waiver of the protection *vis a vis* the Examiner.[10]

We begin our analysis of this topic with the premise that the Committee exists to represent the interests of all creditors in the case, not just to represent its members' own interests. In re Johns-Mansville Corp., 26 B.R. 919, 925-26 (Bankr. S.D.N.Y. 1983). Thus, the work product doctrine does not protect work done by the Committee's counsel for the benefit of individual members of the Committee. In this case, it has not always been easy to delineate which communications or efforts by Akin Gump were intended to provide legal advice to, and guard the interests of, the Committee *qua* representative of all creditors and when it was providing legal strategy advice or guidance for the benefit of a particular member(s) of the Committee. The line is particularly blurry with regard to the communications with, and work done for, AIG, since AIG was both the chair of the Committee and at the center of disputes with the other members of the Committee regarding, for example, corporate governance issues. Since the Court is not making any determination as to the validity of the Examiner's conclusions at this time, and opinion work product deserves the highest level of protection, the Court has reviewed AIG's requests for redaction as to these types of information in the light most favorable to AIG when the question was close. The Court has redacted the quotes included in the Report that iterate communications between Akin Gump and its co-counsel, or Akin Gump and the Committee's Advisors, or Akin Gump and AIG where a fair reading (i.e., without consideration of the Examiner's conclusions) would lead an objective party to conclude that the disclosure is: (1) legal advice; (2) related to a topic that might be the subject of litigation (e.g., plan confirmation or breach of the trading wall); and (3) involves AIG in what appears to be its

---

[10] There is a well established principle of implied waiver in the Second Circuit that arises when a party puts a particular matter "in issue." To the extent the Public Access Proponents have inferred that even if there are some portions of the Examiner's report that might be subject to protection under the work product doctrine, the Seal Proponents have waived their right to assert this because they have, by their consent to the Examiner's investigation into alleged breaches of fiduciary duty, put the advice of Akin Gump into issue. The Court finds that the record is not sufficient to support such a finding.

capacity as chair of the Committee.  The Court has declined to redact communications which, even though they may be in the nature of legal advice, do not appear to be on behalf of or for the benefit of all creditors or the Committee as a representative of the estate's interests, or to address topics that would appear to be reasonably expected to be the subject of litigation by the Committee (e.g., those that address corporate governance issues).  By way of illustration, AIG identified the following statement as protected from disclosure under the work product doctrine:

> The memorandum included sections on some of the main corporate governance issues in dispute and discussed AIG's position and Delaware law on each issue, but did not discuss Silver Point's positions as to those issues.  The memorandum paints a picture of AIG's position as reasonable but does not give the opposing views.

(Examiner's report p. 161, asserted privilege #66).  The Court does not find this to be protected from disclosure under the work product doctrine.  Not only does this portion of the Report fail to disclose the actual contents of the memorandum, but the description of the memorandum given by both AIG and the Examiner fail to support the contention that the memorandum was in the nature of legal advice on behalf of or for the benefit of all creditors or the Committee as a whole.  AIG also sought redaction of the following excerpt:

> Mr. Wollmuth responded:
> Tough to evaluate.  I really am not sure what is best for the client.  I think negotiations could take place after hitting the wall, but it is a big mess if it does.  On the other hand, as proposed between the indenture and the revisions to the charter and rights agreement, we are all pretty much at the mercy of SP.  What do you think the odds are if we fight in court?

(Examiner's report p. 209, asserted privilege 77).  This passage demonstrates the posturing by and among the Committee members on the corporate governance dispute.  There is nothing to suggest that Akin Gump's mental processes analyzing and preparing the corporate governance issues furthered their client's case, United States v. Nobles, 422 U.S. at 238, and hence, this passage likewise fails to warrant protection from disclosure under the work product doctrine.

    The Court finds that, with respect to many of the assertions of work product, the Seal Proponents have failed to demonstrate that they were prepared in the context of a credible prospect of litigation and, with respect to others, that the work done by Akin was for the entire Committee.  Those that meet the criteria for protection will be redacted.  Those that do not meet the criteria for protection shall be part of the Report that will be released from seal pursuant to this decision.

    The Court concludes this analysis by noting on a global basis that while some of the underlying documents the Examiner worked from may be confidential based upon the attorney client privilege or work product doctrine, the Examiner's impressions of those documents or summary of events based upon

those documents are not. Many of the requests for redaction fall into this category and the Court declines to redact them as it does not find them to be protected. For example, AIG asserts the following should be redacted: "On March 7 and 8, 2005, Akin attorneys discussed in a series of e-mails whether the Trading Order would apply to the trade claims…" (Examiner's report p. 224, asserted privilege 93). This is nothing more than a summary and does not disclose any information protected by the work product doctrine. Likewise, "AIG also indicated that it would contact the U.S. Trustee independent from Akin's efforts to discuss the investigation of Silver Point's trading activity" (Examiner's report p. 239, asserted privilege 98), presents a summary of events. None of the Seal Proponents have demonstrated that the summary of differences in position among the members of the Committee regarding the creation of the by-laws were created in anticipation of litigation or that there was a credible prospect of litigation over the content of the by-laws. The Court finds the Examiner's references to these summaries are not protected from disclosure by the work product doctrine.

The Court will redact from public access those portions of the Report that the Seal Proponents assert to be protected and which the Court finds meet the definition of work product.

## **4. The Report must be a public record under § 107.**

In the Second Circuit, documents which are part of the court record should not remain under seal absent the most compelling reasons. In re Ionosphere Clubs, Inc., 156 B.R. at 434 (citing Joy v. North, 692 F 2d 880, 893 (1982), cert. denied, 460 U.S. 1051 (1983)). The salient question is whether the Seal Proponents have met their burden for keeping the Report out of the public domain. The Seal Proponents' motion must be considered in light of their consent to the appointment of an examiner, to the selection of this particular Examiner, and to the scope and nature of the Examiner's investigation. The thrust of their motion is that the Report contains erroneous, scandalous, or defamatory conclusions, and discloses information subject to protection under the attorney client privilege or work product doctrine. Since the Court has already addressed the privilege argument by redaction, it limits the analysis of the Motion to Seal to the principles of, and case law construing, § 107.

### *A.      The Burden of Proof Under § 107*

The Public Access Proponents argue that the Seal Proponents have the burden of proof to establish the requirements of § 107(b) because the Court has not previously made any findings under § 107(b). The Seal Proponents insist that the Public Access Proponents have the burden of proof to establish a compelling need or extraordinary circumstances to modify the Court's May 13th Order which directed that the Report be filed under seal (see doc. # 1470). In this assertion, the Seal Proponents mistakenly rely on a series of cases where courts have considered whether to modify a previously entered protective order or seal order. In particular, they rely upon Martindell v. Int'l Tel & Tel. Corp., 594 F.2d 291, 296 (2d Cir.

1979), where the Second Circuit held that the district court should not modify a protective order under Rule 26(c) "absent a showing of improvidence in the grant[ing] of [the] order or some extraordinary circumstance or compelling need;" on SEC v. Thestreet.com, 273 F.3d at 230, where the Second Circuit held that certain protective orders entitled to a presumption against modification; and on Palmieri v. State of New York, 779 F.2d 861, 865 (2d Cir. 1985) where the Second Circuit held that it was presumptively unfair for courts to modify protective orders which assure confidentiality and upon which the parties have reasonably relied.   The flaw in this logic is that in each of these cases the court had made particular findings warranting a seal, prior to the motions at issue. The Seal Proponents assert that they relied upon the Court's May 13th Order and produced materials which they otherwise would not have produced had they not had permanent protection from disclosure of privileged materials.   For the reasons set forth above, the Court finds any such reliance to have been unsupported by the record and unreasonable.

Since this is the first time the Court is being asked to make a determination as to whether the Report should be sealed under § 107, based upon the contents of the Report, the burden is on the parties seeking to seal the report to demonstrate grounds for deviating from the general rule of public access under § 107(a).  Thus, the Seal Proponents have the burden of proof. [11]

### B.     The Presumption of Public Access Applies

In this country, courts have recognized a strong presumption of public access to judicial records. See Nixon v. Warner Communications, Inc., 435 U.S. 589, 597 (1978); Video Software Dealers Ass'n v. Orion Pictures Corp. (In re Orion Pictures Corp.), 21 F.3d 24, 26 (2d Cir. 1994).   The preference for public access has been described as rooted in the public's first amendment right to know about the administration of justice.   In re Orion Pictures Corp., 21 F.3d at 26.   It helps safeguard "the integrity, quality, and respect in our judicial system," In re Analytical Sys., 83 B.R. 833, 835 (Bankr. N.D. Ga.

---

[11] Assuming *arguendo* the Public Access Proponents have the burden of proof, they have carried it. The Public Access Proponents have demonstrated extraordinary circumstance and compelling need for having the Report available to the public.   First and foremost, Alex Kwader and Silver Point, without objection from any of the parties in interest, have demonstrated a compelling need to clear their names from public accusations of ethical defalcations.   Disclosure of the Report is particularly appropriate under the facts of this case where the allegations that prompted the appointment of the Examiner were made publicly by those parties that now advocate the Report stay under seal.   The seriousness of the allegations and the fact that they were made in the public forum persuade the Court that §107(a) requires allowing public access to the Report so that Examiner's exoneration of Mr. Kwader and Silver Point is as public as the charges against them.   The Debtors have also demonstrated extraordinary circumstance and compelling need.   As a result of the Examiner's findings and conclusions, the Debtors have asserted that they expect to create a litigation trust for the purpose of pursuing relief against certain parties in connection with the matters disclosed in the Report.   The terms and purpose of that trust will be greatly compromised in the disclosure statement and plan process if the Debtors are unable to refer the creditors to the Report.   The Court is convinced that anything less than full disclosure of the Report (with appropriate redactions) would deprive creditors of a meaningful opportunity to evaluate the Debtors' proposed litigation trust.   Moreover, the Debtors need to be able to explain the cause for the delay in their reorganization and the Report provides essential information on this point.   Lastly, the U.S. Trustee has argued a compelling need for transparency in the bankruptcy process.   The Court agrees that it is important to allow public access to the Report to enable those that have participated in these and other bankruptcy proceedings, to decide how to conduct themselves and to draw their own conclusions from the Report, in the interest of promoting  transparency in judicial proceedings, in general, and integrity of the bankruptcy system, in particular.

1987), and permits the public to "keep a watchful eye on the workings of public agencies." <u>Nixon</u>, 435 U.S. at 598.

This policy of open inspection, codified generally in §107(a) of the Bankruptcy Code, evidences Congress's strong desire to preserve the public's right of access to judicial records in bankruptcy proceedings. Section 107(a) of the Bankruptcy Code provides

> (a) Except as provided in subsection (b) of this section, a paper filed in a case under this title and the dockets of a bankruptcy court are public records and open to examination by an entity at reasonable times without charge.

11 U.S.C. § 107(a). By enacting § 107, Congress "promulgated an express statutory scheme addressing public access to papers filed in bankruptcy courts." <u>United States of America v. Continental Airlines, Inc. (In re Continental)</u>, 150 B.R. 334, 337 (D. Del. 1993). The plain language of § 107(a) establishes standards for those documents which are filed with the court and there is no question that the plain language of § 1106(4)(A) contemplates that an examiner's report or statement of his investigation shall be filed with the Court. "Absent compelling circumstances all documents filed in bankruptcy cases should be available to the public." <u>In re Hemple</u>, 295 B.R. 200, 202 (Bankr. D. Vt. 2003). As other courts have found, examiner's reports are entitled to the § 107(a) presumption. <u>Gitto v. Worcester Telegram & Gazette, Corp. (In re Gitto Global Corp.)</u>, 2005 WL 1027348, *4-5 (D. Mass. May 2, 2005) (This provision [§107(a)] is meant to cover all papers filed with the bankruptcy court including an examiner's report).[12]

Having found that the presumption of public access applies to the Report, and that the Seal Proponents have the burden of proof under § 107, the Court examines whether the Seal Proponents have met their burden of proof to rebut that presumption and have proved facts and circumstances sufficient to warrant an exception to the general public access rule.

### C.   § 107(b) Exceptions to the Public Access Rule

Congress has recognized that under certain circumstances it is necessary and proper to make an exception to the general policy of public access. Section 107(b) provides a statutory exception to the broad principle and presumption of § 107(a):

> (b)   On request of a party in interest, the bankruptcy court shall, and on the bankruptcy court's own motion, the bankruptcy court may--
>
> (1)   protect an entity with respect to a trade secret or confidential research, development, or commercial information; or
>
> (2)   protect a person with respect to scandalous or defamatory matter contained in a paper filed in a case under this title.

---

[12] There is no dispute that the underlying documents the Examiner relied upon are not subject to §107(a) inquiry at this time because they have not been filed. <u>In re Ionosphere Clubs, Inc.</u>, 156 B.R. at 433. No party in interest seeks to have the underlying documents made publicly accessible. There is no reason why those documents cannot be kept confidential and the Report made public. <u>See In re Grand Jury Subpoena Duces Tecum Dated April 19, 1991</u>, 945 F.2d 1221, 1225(2d Cir. 1991).

11 U.S.C. § 107(b).  While sealing is the exception rather than the rule, In re Analytical Systems, Inc., 83 B.R. at 835; In re Nunn, 49 B.R. 963, 964 (Bankr. E.D. Va.1985), the decision whether to seal bankruptcy court records lies within the discretion of the bankruptcy court. In re Sherman-Noyes & Prairie Apts. Real Estate Inv. P'ship, 59 B.R. 905, 909 (Bankr. N.D. Ill.1986); Hope ex rel. Clark v. Pearson (In re Hope), 38 B.R. 423, 424 (Bankr. M.D. Ga. 1984).  The courts have zealously upheld the public's right to access and narrowly construed the exceptions.  In re Lawlor, 2003 WL 21288634, *1 (Bankr. D. Vt. 2003) (citing In re Analytical Sys., Inc., 83 B.R. at 835; In Epic Assocs. V, 54 B.R. 445, 448 (Bankr. E.D. Va.1985)).  That information might "conceivably" or "possibly" fall within a protected category is not sufficient to seal documents.  In re Gitto/Global Corp., 321 B.R. 367, 374 (Bankr. D. Mass. 2005).

If the §107(b) exceptions do not apply, the inquiry is complete and the Court's decision will favor public access.  Phar-Mor, Inc. v. Defendants Named Under Seal (In re Phar-Mor, Inc.), 191 B.R. 675, 678 (Bankr. N.D. Ohio 1995).  That is precisely the situation presented.

### (i) The Relief Requested under § 107(b)(1)

There is no dispute that the trade secret exception to public access is not implicated in this case, except with respect to Exhibit H to the Report which contains confidential information belonging exclusively to Silver Point.  At the request of Silver Point and with no objections from any other party, the Court will order Exhibit H to the Report to be sealed.

The Seal Proponents argue that the communications protected by the attorney client privilege and materials subject to the work product privilege fall within the ambit of "confidential research, development or commercial information."[13]  Commercial information has been defined as information which would cause "an unfair advantage to competitors by providing them information as to the commercial operations of the debtor."  In re Orion Pictures Corp., 21 F.3d at 27;  Ad Hoc Protective Comm. for 10 1/2% Debenture Holders v. Itel Corp. (In re Itel Corp.), 17 B.R. 942, 944 (9th Cir. BAP 1982).  The parties in interest have cited, and the Court's independent research has revealed, only one case that supports the Sealed Proponents' reasoning. In In re 50-Off Stores, Inc., 213 B.R. 646, 655 (Bankr. W.D. Tex. 1997), the bankruptcy court found that privileged materials fall within this exception. As noted above, given the context of "confidential research" within the plain language of the statute, the Court respectfully disagrees with the rationale of the 50-Off court on this particular issue.[14]  The Court

---

[13]  Their argument continues that because the Examiner's report "is replete with" references to allegedly confidential information the entire Report should be sealed.  The Court has found that several passages in the Report that they identify as protected from disclosure under evidentiary privilege are within the scope of such protection, see section 3 supra. and that protection can be afforded by means of redaction.  Therefore, the Court rejects this argument as a basis for sealing the Report.

[14]  The 50-Off Stores, Inc. court noted that it had been unable to find any cases specifically applying § 107(b) to attorney client privilege and work product.  See 213 B.R. at 656 n. 14.

finds that the Seal Proponents have not established that any of the criteria under §107(b)(1) apply to the Report in this case.

### (ii) The Relief Requested under § 107(b)(2)

For purposes of section 107(b) (and Rule 9018), scandalous or defamatory material has been defined as material that would cause "a reasonable person to alter their [sic] opinion of [a party] based on the statements therein, taking those statements in the context in which they appear." In re Phar-Mor, Inc., 191 B.R. at 679 (citation omitted). Information that is prejudicial or embarrassing is not necessarily scandalous or defamatory. Id; See also, In re Gitto/Global Corp., 321 B.R. at 374; In re Hope, 38 B.R. at 424-25; In re Analytical Systems, Inc., 83 B.R. at 836.

The Seal Proponents allege that the Examiner's language is inflammatory, defamatory, and intemperate. We must distinguish between critical and defamatory. The Court and parties relied upon the experience and expertise of the Examiner to be the basis of a thorough and astute investigation and a cogent and sound report. Since he investigated alleged breaches of fiduciary duty by well respected professionals, it was clear that the Report might be negative and strongly worded. It was within the Examiner's prerogative to present his observations, opinions and conclusions candidly and descriptively. The Examiner was not appointed to determine the truth; he was appointed to conduct an investigation, using broad discovery powers, and to present conclusions and recommendations to the Court, based upon his observations, opinions and analysis. That is a rather typical examiner assignment. In re Apex Oil, 101 B.R. 92, 98 (Bankr. E.D. Mo. 1989). His offering of his opinion is just that. The fact that his ultimate assessment of what happened in this case influenced his choice of words and tone in the Report is not surprising or de facto inappropriate. It is his opinion that the Court solicited, in effect, on the advice and consent of all parties. The Seal Proponents' allegations that the Report goes too far or that the Examiner's conclusions are not supported by the facts go to the merits of the Report. Such allegations are not relevant to this inquiry under § 107. The Court makes no finding that the Examiner's conclusions are the only conclusions that could objectively be drawn from the data or that his conclusions are correct. The Court does find that there is no evidence in the record to persuade it that the Examiner's choice of words was malicious or capricious.

With the consent of all interested parties, the Examiner was asked to exercise independent judgment, conduct a comprehensive investigation of very sensitive and serious allegations, prepare a report summarizing and documenting his conclusions, and make recommendations as to remedies for any breaches he identified. All interested parties supported his appointment, the scope of his duties and the expansion of the timeframe and price of his work. A similar situation was presented in the In re Ionosphere case and there the District court held that once parties consent to the process they cannot attack its validity later because they do not like the result:

> The parties voluntarily entered into [the stipulations] in order to facilitate
> discovery  . . . Plaintiffs are now attempting to abrogate the agreement…
> Plaintiff cannot now attempt to undo what they have willingly wrought
> .

In re Ionosphere Clubs, Inc., 156 B.R. at 434 (citing Zenith Radio Corp. v. Matsushita Electric Indus. Co., 529 F.Supp. 866, 894 (E.D. Pa 1981)).

The Seal Proponents assert, in varying degrees, that the Examiner's conclusions are incorrect, are not supported by the evidence, or ignore contrary evidence. The merits of the Examiner's conclusions are not salient in the Court's assessment of whether the Report should be publicly available. The Court has undertaken its analysis of whether to seal the Report without regard to the content or accuracy of the Examiner's opinions, analysis and conclusions. Those will be addressed if and when the merits of the Examiner's conclusions are properly before the Court.

The Report includes conclusions that are quite critical of certain conduct by some parties, and in some instances, the Examiner formulates his position with strong words. These statements represent the Examiner's opinion, not the truth with a capital "T." It is not shocking that it is those parties whom the Examiner criticizes that seek to have the Report sealed permanently. However, the Examiner conducted an investigation which all parties in interest agreed was appropriate. He appears to have conducted a thorough investigation; the record indicates that he relied upon 650,000 documents and conducted numerous 2004 examinations and interviews. His efforts and the underlying rationale for the investigation in the first instance would be undermined if the information is forever sealed and not available for the review of the Debtors' creditors and the public at large. Moreover, the Court is confident that the parties in interest will have an opportunity to refute the Examiner's opinions and conclusions. The fact that those opinions and conclusions may cause some embarrassment to certain individuals or entities does not support sealing the Report:

> The private interest at stake here, i.e., protecting attorneys and other
> professionals from presumably valid criticism is de minimus. Obviously,
> these highly sophisticated professionals are well-suited and fully able to
> rebut and refute any assertions regarding their fee applications.

In re Continental Airlines, 150 B.R. at 341, n.14. The exception to public disclosure under §107 was never "intended to save the debtor or its creditors from embarrassment, or to protect their privacy in light of countervailing statutory, constitutional, and policy concerns." In re Itel Corp., 17 B.R. at 944; In re Muma Servs. Inc., 279 B.R. 478, 484 (Bankr. D. Del. 2002).[15]   The Seal Proponents have failed to prove

---

[15] AIG and Post claim that they will suffer harm to their business reputations if the Examiner's report is publicly available and that constitutes defamation per se. However, under Vermont law, there must be some showing of actual harm to the one claiming defamation. Lent v. Huntoon, 143 Vt. 539, 549 (1983). There is no evidence before the Court detailing how or to what extent AIG or Post would be damaged if the Examiner's report is publicly available.

the Report is scandalous or defamatory, failed to sustain their burden of proof under § 107(b)(2) and thus have failed to persuade the Court that the Report should be kept from the public under that provision.[16]

### (iii) Allegations of Bias

Under the facts of this case, where the Court appointed the Examiner to investigate the conduct of the members of the Committee to determine whether any member breached its fiduciary duties, where all of the parties to be investigated supported the appointment of an Examiner, and raised no objection to the appointment of the Examiner, the Court will not entertain AIG's allegations, at this time, that the Examiner is biased.  Based upon the record of this matter, such allegations appear to be unfounded, disingenuous and motivated by pure self-interest. Consequently, AIG's objection to the unsealing of the Report on this basis is overruled.

### 5. The inclusion of a ledger on the Report addresses potential misconstruction of the Report.

This Court adopts the insights voiced so eloquently by the Gitto court; it is not unmindful or unsympathetic to the concerns raised by the Seal Proponents that: (a) the Report may be mischaracterized, (b) information in the Report may be misconstrued, and (c) the Report may be interpreted as having the imprimatur of this Court.  321 B.R. at 377.  The Seal Proponents' worry that the public at large and the Debtors' creditors in particular may leap to unsubstantiated conclusions of culpability is not without basis. Neither is it sufficient to warrant sealing a document that belongs in the public domain.  To be clear, the Report does not have the endorsement of this Court.  The Report constitutes the opinions, analysis and conclusions of the Examiner, who conducted the investigation the Court directed him to complete.  The Seal Proponents will have an opportunity to respond to the Examiner's investigation or conclusions.  In the meantime, it is just and proper that the Court address the risk of erroneous interpretation. Accordingly, to minimize the likelihood that the public will misconstrue the import of the Report, the Court grants AIG the alternative relief it requests and will place the following cautionary ledger on every page of the redacted version of the Report being released to the  public:

> *The statements and conclusions in this report have not been adopted or accepted by the Court, and constitute only the opinions of the Examiner. No portion of this report has been admitted into evidence. Several parties dispute the accuracy of the contents of this report. The publication of this report is without prejudice to the right of any party to challenge the statements contained in the report.*

The Court finds that this ledger is sufficient to address the Seal Proponents' concerns that the general public or the Debtors' creditors will mischaracterize the weight and reliability to be afforded the

---

[16] Certain communications quoted verbatim in the Report, as referenced previously in this opinion, are privileged attorney client communications or are protected under the work product doctrine and will be redacted from the Report prior to its being released to the public, but those are independent of the allegations of defamation.

Examiner's opinions, analysis and conclusions. Although § 107 speaks in terms of sealing documents, it specifically authorizes the court to "protect a person" from the consequences of having sensitive information publicly available.

In sum, although the Court finds that the Seal Proponents have failed to prove that the contents of the Report fit the criteria specified in § 107(b), it finds that the risk of misinterpretation of the Report is sufficiently real, and the Examiner's analysis and conclusions are sufficiently serious, that, in the interest of justice and under § 105, it is proper to add this cautionary ledger to the Report prior to entering the Report on the docket.

### 6. This decision will result in the release of other court documents and transcripts.

The findings of protection based upon attorney client privilege and the work product doctrine apply to the Report only, as there is no request for access to any other materials related to the Examiner in this contested matter.  The documents delivered to the Examiner, his notes, records of his investigation and all other underlying materials, as well as the versions of the Report showing what the Examiner submitted and what the Court redacted remain confidential.  Each party with access to, or familiarity with, these items has access subject to a confidentiality order and that order is still in effect. The Court will issue a separate order directing which documents and transcripts related to the Examiner's investigation and the Report will also be entered on the docket, under the rationale set forth in this decision, in the near future.

## CONCLUSION

The Court has considered all arguments presented by the parties with respect to sealing the Report, unsealing the Report, the work product doctrine and attorney client privilege, and deliberately rejects any arguments that it did not address specifically herein.

For the reasons set forth above the Court finds: (1) the evidentiary protections under the attorney client privilege and work product doctrine are distinct from § 107; (2) this is the appropriate time for the Court to consider assertions of attorney client privilege and protection under the work product doctrine and whether the Report should be under seal; (3) certain information in the Report must be redacted based upon attorney client privilege and work product; (4) the Report does not qualify for exception from the general rule that all court documents should be public records; (5) to the extent the Report might be misconstrued to reflect judicial findings or determinations, that can be remedied by the inclusion of a ledger on the Report; and (6) as a consequence of these findings, the Court will enter on the docket certain other documents and records in this case. Therefore, the Court will enter on the docket the Report (with certain text redacted and a cautionary ledger affixed) and thereafter enter certain related documents on the docket, pursuant to separate order.

Accordingly, the Court grants the motions to unseal the Report,[17] grants the alternative relief sought by AIG for a cautionary ledger on each page of the Report, grants the motion for protection against disclosure of those portions of the Report that are protected by the attorney client privilege and work product doctrine, by redaction, and denies the motions to place the Report under permanent seal pursuant to § 107.

The Court will separately issue, under seal, an Appendix showing which portions of the Report will be redacted from the public document.  Pursuant to a separate order addressing Akin Gump's oral motion for an emergency stay, the Court will enter the redacted Examiner's Report on the docket shortly following entry of this Order unless no stay is requested or this Court or the District Court enters an Order directing otherwise.

This constitutes the Court's findings of fact and conclusions of law.


August 16, 2005                                             Colleen A. Brown
Burlington, Vermont                                        United States Bankruptcy Judge

---

[17]  With the exception of Exhibit H which will remain under seal pursuant to the unopposed request of Silver Point.