UNITED STATES BANKRUPTCY COURT
DISTRICT OF VERMONT

| | |
|---|---|
| In re: | ) |
| | ) |
| FiberMark, Inc., | ) Case No. 04-10463 cab |
| FiberMark North America, Inc., and | ) *Chapter 11* |
| FiberMark International Holdings LLC, | ) Jointly Administered |
| | ) |
| Debtors. | ) |

---

## DISCLOSURE STATEMENT WITH RESPECT TO AMENDED JOINT PLAN OF REORGANIZATION UNDER CHAPTER 11, TITLE 11, UNITED STATES CODE OF FIBERMARK, INC., ET AL., DEBTORS

---

SKADDEN, ARPS, SLATE, MEAGHER &
    FLOM LLP
Four Times Square
New York, New York 10036-6522
Telephone:  (212) 735-3000
Facsimile:  (212) 735-2000

- and -

OBUCHOWSKI & EMENS-BUTLER
P.O. Box 60, 1542 Vt. Rt. 107
Bethel, Vermont 05032
Telephone: (802) 234-6244
Facsimile: (802) 234-6245

Dated: November 1, 2005                          Co-Counsel for Debtors

**DISCLAIMER**

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS PROVIDED FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE AMENDED JOINT PLAN OF REORGANIZATION UNDER CHAPTER 11, TITLE 11, UNITED STATES CODE OF FIBERMARK, INC., ET AL., DEBTORS (THE "PLAN"). THE INFORMATION MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN. NO PERSON MAY GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS, OTHER THAN THE INFORMATION AND REPRESENTATIONS CONTAINED IN THIS DISCLOSURE STATEMENT, REGARDING THE PLAN OR THE SOLICITATION OF ACCEPTANCES OF THE PLAN.

ALL CREDITORS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN AND THE EXHIBITS ANNEXED TO THE PLAN. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER THE DATE HEREOF.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE UNITED STATES BANKRUPTCY CODE AND RULE 3016 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-BANKRUPTCY LAW. THIS DISCLOSURE STATEMENT HAS BEEN NEITHER APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC"), NOR HAS THE SEC PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN. PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING SECURITIES OR CLAIMS OF FIBERMARK, INC., FIBERMARK NORTH AMERICA, INC., AND FIBERMARK INTERNATIONAL HOLDINGS LLC SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH THEY WERE PREPARED.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS. THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST OR EQUITY INTERESTS IN FIBERMARK, INC., FIBERMARK NORTH AMERICA, INC., AND FIBERMARK INTERNATIONAL HOLDINGS LLC.

FIBERMARK FILES ANNUAL, QUARTERLY AND CURRENT REPORTS, PROXY STATEMENTS AND OTHER INFORMATION WITH THE SEC, WHICH DOCUMENTS ARE AVAILABLE FOR INSPECTION AND COPYING AT THE PUBLIC REFERENCE ROOM OF THE SEC AND ARE ALSO AVAILABLE FROM THE SEC'S WEB SITE AT WWW.SEC.GOV. THE PLAN CONTEMPLATES THAT FROM AND AFTER THE EFFECTIVE DATE, FIBERMARK WILL CEASE FILING SUCH PUBLIC REPORTS. IN ADDITION, THE NEW COMMON STOCK OF FIBERMARK AS CONSTITUTED AFTER THE EFFECTIVE DATE WILL NO LONGER BE QUOTED FOR TRADING ON ANY NATIONAL INTERDEALER QUOTATION SYSTEM OR LISTED FOR TRADING ON ANY NATIONAL SECURITIES EXCHANGE, AND AS A CONSEQUENCE HOLDERS OF THE NEW COMMON STOCK MAY FIND IT DIFFICULT TO EFFECT TRADES IN THE NEW COMMON STOCK, QUOTES FOR THE NEW COMMON STOCK MAY BE HARD TO OBTAIN, AND THE LIQUIDITY OF THE NEW COMMON STOCK MAY BE SEVERELY ADVERSELY EFFECTED.

# TABLE OF CONTENTS

Page

I. INTRODUCTION ....................................................................................................................... 1

II. PREVIOUS PLAN HISTORY ..................................................................................................... 2

III. OVERVIEW OF THE NEW PLAN............................................................................................. 3
    A. General Structure of the Plan ............................................................................................... 3
    B. Summary of Treatment of Claims and Interests under the Plan........................................... 4

IV. PLAN VOTING INSTRUCTIONS AND PROCEDURES ......................................................... 13
    A. Notice to Holders of Claims and Interests.......................................................................... 13
    B. Voting Rights ...................................................................................................................... 14
    C. Solicitation Materials.......................................................................................................... 14
    D. Voting Procedures, Ballots, and Voting Deadline.............................................................. 15
    E. Special Notice Concerning Releases Associated with Voting ............................................ 16
    F. Special Notice Concerning Right to Elect Distribution of New Common Stock of Reorganized FiberMark....... 16
    G. Confirmation Hearing and Deadline for Objections to Confirmation ................................ 17

V. GENERAL INFORMATION CONCERNING THE DEBTORS ............................................... 17
    A. Overview of Business Operations ....................................................................................... 17
    B. Organizational Structure ..................................................................................................... 18
    C. Corporate History................................................................................................................ 18
    D. North American Operations ................................................................................................. 20
    E. German Operations .............................................................................................................. 23
    F. Operational Matters ............................................................................................................ 25
    G. Management and Employees ............................................................................................... 28
    H. Debtors' Capital Structure .................................................................................................. 35
    I. Summary of Assets ............................................................................................................. 37
    J. Historical Financial Information ......................................................................................... 37
    K. Events Leading to Commencement of the Chapter 11 Case ............................................... 37
    L. Business Plan ...................................................................................................................... 37

VI. CHAPTER 11 CASE.................................................................................................................. 38
    A. Continuation of Business; Stay of Litigation ..................................................................... 38
    B. First Day Orders ................................................................................................................. 38
    C. Retention of Professionals .................................................................................................. 39
    D. Official Committees ............................................................................................................ 39
    E. Post-Petition and Post-Confirmation Funding.................................................................... 40
    F. Other Material Matters Addressed During the Chapter 11 Case ......................................... 41
    G. Plan Process ........................................................................................................................ 44
    H. Appointment and Report of Examiner ................................................................................ 46

VII. SUMMARY OF THE PLAN OF REORGANIZATION ............................................................ 51
    A. Overall Structure of the Plan .............................................................................................. 51
    B. Substantive Consolidation .................................................................................................. 52
    C. Constituency Settlement...................................................................................................... 53
    D. Certain Objections to Constituency Settlement .................................................................. 56
    E. Reorganized Capital Structure Created by Plan ................................................................. 58
    F. Classification and Treatment of Claims and Interests ........................................................ 59
    G. Reservation of Rights Regarding Claims ........................................................................... 72
    H. Allowed Claims, Distribution Rights and Objections to Claims........................................ 72
    I. Disposition of Executory Contracts and Unexpired Leases ............................................... 76
    J. Revesting of Assets; Release of Liens ................................................................................ 78
    K. Post-Effective Date Restructuring Transactions................................................................. 78
    L. Post-Consummation Corporate Structure, Management and Operation ............................. 78
    M. Releases, Discharge, Injunctions, Exculpation and Indemnification.................................. 83

| | | |
|---|---|---|
| N. | Preservation of Rights of Action; Resulting Claim Treatment | 87 |
| O. | Retention of Jurisdiction | 89 |
| P. | Amendment, Alteration and Revocation of Plan | 90 |
| Q. | Plan Implementing Documents | 91 |
| R. | Confirmation and/or Consummation | 91 |
| VIII. | CERTAIN RISK FACTORS TO BE CONSIDERED | 93 |
| A. | General Considerations | 93 |
| B. | Certain Bankruptcy Considerations | 93 |
| C. | Claims Estimations | 94 |
| D. | Conditions Precedent to Consummation; Timing | 94 |
| E. | Inherent Uncertainty of Financial Projections | 94 |
| F. | Certain Risk Factors Relating to Securities to be Issued Under the Plan | 94 |
| G. | Competition | 96 |
| H. | Raw Materials | 97 |
| I. | Market Conditions | 97 |
| J. | Seasonality | 97 |
| K. | Environmental and Other Regulations | 97 |
| L. | Reliance on Key Personnel | 97 |
| M. | Risks Related to Foreign Operations | 98 |
| N. | Leverage | 98 |
| O. | Litigation | 99 |
| P. | Adverse Publicity | 99 |
| Q. | Certain Tax Considerations | 99 |
| IX. | APPLICABILITY OF FEDERAL AND OTHER SECURITIES LAWS | 99 |
| A. | Offer and Sale of New Securities: Bankruptcy Code Exemption | 99 |
| B. | Subsequent Transfers of New Securities | 100 |
| X. | CERTAIN U.S. FEDERAL TAX CONSEQUENCES OF THE PLAN | 101 |
| A. | General | 101 |
| B. | U.S. Federal Income Tax Consequences to the Debtors | 102 |
| C. | U.S. Federal Income Tax Consequences to Claim Holders | 103 |
| D. | Information Reporting and Backup Withholding | 105 |
| E. | Importance of Obtaining Professional Tax Assistance | 106 |
| XI. | FEASIBILITY OF THE PLAN AND BEST INTERESTS OF CREDITORS | 106 |
| A. | Feasibility of the Plan | 106 |
| B. | Acceptance of the Plan | 107 |
| C. | Best Interests Test | 107 |
| D. | Liquidation Analysis | 108 |
| E. | Valuation of the Reorganized Debtors | 108 |
| F. | Application of the "Best Interests" of Creditors Test to the Liquidation Analysis and the Valuation | 109 |
| G. | Confirmation Without Acceptance of All Impaired Classes: The "Cramdown" Alternative | 109 |
| XII. | ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN | 110 |
| A. | Alternative Plan(s) of Reorganization | 110 |
| B. | Liquidation under Chapter 7 or Chapter 11 | 110 |
| XIII. | THE SOLICITATION; VOTING PROCEDURES | 111 |
| A. | Parties in Interest Entitled to Vote | 111 |
| B. | Classes Entitled to Vote to Accept or Reject the Plan | 111 |
| C. | Solicitation Order | 111 |
| D. | Waivers of Defects, Irregularities, Etc. | 111 |
| E. | Withdrawal of Ballots; Revocation | 112 |
| F. | Special Instructions for Holders of Noteholder Claims | 112 |
| G. | Voting Rights of Disputed Claimants | 112 |
| H. | Further Information; Additional Copies | 112 |

**TABLE OF APPENDICES**

Appendix A       Amended Joint Plan of Reorganization Under Chapter 11, Title 11, United States Code of FiberMark, Inc., et al., Debtors

Appendix B       Pro Forma Financial Projections

Appendix C       Corporate Structure Chart

Appendix D       Liquidation Analysis

Appendix E       Commitment Letter for Exit Facility

Appendix F       Conclusions of Examiner

Appendix G       AIGGIC, Post, and Silver Point Support Letters

**DISCLOSURE STATEMENT WITH RESPECT TO**
**AMENDED JOINT PLAN OF REORGANIZATION UNDER CHAPTER 11, TITLE 11,**
**UNITED STATES CODE OF FIBERMARK, INC., ET AL., DEBTORS**

## I.     INTRODUCTION

The debtors and debtors-in-possession in the above-referenced chapter 11 case include publicly-held FiberMark, Inc. ("FiberMark") and its two wholly-owned United States subsidiaries, FiberMark North America, Inc. ("FNA") and FiberMark International Holdings LLC ("FIH") (FiberMark, FNA and FIH collectively, the "Debtors").

The Debtors submit this disclosure statement (this "Disclosure Statement") pursuant to Section 1125 of Title 11 of the United States Code (the "Bankruptcy Code"), for use in the solicitation of votes on the Amended Joint Plan of Reorganization Under Chapter 11, Title 11, United States Code of FiberMark, Inc., et al., Debtors, dated November 1, 2005 (the "Plan"). A copy of the Plan is attached as Appendix A to this Disclosure Statement. All capitalized terms used in this Disclosure Statement but not otherwise defined herein have the meanings ascribed to such terms in the Plan.

**The Plan supersedes and replaces the Joint Plan of Reorganization Under Chapter 11, Title 11, United States Code of FiberMark, Inc., et al., Debtors, dated December 17, 2004, as modified (the "Previous Plan"), which was withdrawn by the Debtors as a result of intercreditor disputes that rendered the Previous Plan unconfirmable.**

This Disclosure Statement sets forth certain information regarding the Debtors' pre-petition operating and financial history, their reasons for seeking protection and reorganization under chapter 11, significant events that have occurred during the Chapter 11 Case and the anticipated organization, operations, and financing of the Debtors upon their successful emergence from chapter 11. This Disclosure Statement also describes certain terms and provisions of the Plan, certain effects of confirmation of the Plan, certain risk factors associated with the Plan and the securities to be issued under the Plan, and the manner in which distributions will be made under the Plan. In addition, this Disclosure Statement discusses the confirmation process and the voting procedures that holders of Claims entitled to vote under the Plan must follow for their votes to be counted.

By order dated October 27, 2005, the Bankruptcy Court has approved this Disclosure Statement as containing "adequate information" in accordance with Section 1125 of the Bankruptcy Code, to enable a hypothetical, reasonable investor typical of holders of Claims against, or Interests in, the Debtors to make an informed judgment as to whether to accept or reject the Plan; and has authorized its use in connection with the solicitation of votes with respect to the Plan. **APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT, HOWEVER, CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR MERITS OF THE PLAN.** No solicitation of votes may be made except pursuant to this Disclosure Statement and Section 1125 of the Bankruptcy Code. In voting on the Plan, holders of Claims entitled to vote should not rely on any information relating to the Debtors and their businesses, other than that contained in this Disclosure Statement, the Plan, and all appendices or exhibits hereto and thereto.

Pursuant to the provisions of the Bankruptcy Code, only classes of claims or interests that are (i) "impaired" by a plan of reorganization and (ii) entitled to receive a distribution under such plan are entitled to vote on the plan. In the Debtors' cases, only Claims in Classes 4, 5, 6, 7, 8, 9, and 10 are impaired by and entitled to receive a distribution under the Plan, and only the holders of Claims in those Classes are entitled to vote to accept or reject the Plan. Claims in Classes 1, 2, 3, and 14 are unimpaired by the Plan, and the holders thereof are conclusively presumed to have accepted the Plan. Claims or Interests in Classes 11, 12, 13, and 15, which receive nothing under the Plan, are deemed to have rejected the Plan and the holders of Claims or Interests in each of such Classes are not entitled to vote.

FOR A DESCRIPTION OF THE PLAN AND VARIOUS RISKS AND OTHER FACTORS PERTAINING TO THE PLAN, PLEASE SEE ARTICLE VII OF THIS DISCLOSURE STATEMENT, ENTITLED "SUMMARY OF THE PLAN OF REORGANIZATION," AND ARTICLE VIII OF THIS DISCLOSURE STATEMENT, ENTITLED "CERTAIN RISK FACTORS TO BE CONSIDERED."

THIS DISCLOSURE STATEMENT CONTAINS SUMMARIES OF CERTAIN PROVISIONS OF THE PLAN, CERTAIN STATUTORY PROVISIONS, CERTAIN DOCUMENTS RELATING TO THE PLAN, CERTAIN EVENTS THAT HAVE OCCURRED IN THE CHAPTER 11 CASE, AND CERTAIN FINANCIAL INFORMATION. ALTHOUGH THE DEBTORS BELIEVE THAT ALL SUCH SUMMARIES ARE FAIR AND ACCURATE AS OF THE DATE HEREOF, SUCH SUMMARIES ARE QUALIFIED TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF UNDERLYING DOCUMENTS AND TO THE EXTENT THAT THEY MAY CHANGE AS

PERMITTED BY THE PLAN AND APPLICABLE LAW. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT, EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. THE DEBTORS DO NOT WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN, INCLUDING THE FINANCIAL INFORMATION, IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

NOTHING CONTAINED HEREIN WILL BE DEEMED TO CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY, OR BE DEEMED CONCLUSIVE ADVICE ON THE TAX OR OTHER LEGAL EFFECTS OF THE REORGANIZATION AS TO HOLDERS OF ALLOWED CLAIMS OR INTERESTS. YOU SHOULD CONSULT YOUR PERSONAL COUNSEL OR TAX ADVISOR WITH RESPECT TO ANY QUESTIONS OR CONCERNS REGARDING TAX, SECURITIES, OR OTHER LEGAL CONSEQUENCES OF THE PLAN.

CERTAIN OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS BY ITS NATURE FORWARD LOOKING AND CONTAINS ESTIMATES, ASSUMPTIONS, AND PROJECTIONS THAT MAY BE MATERIALLY DIFFERENT FROM ACTUAL, FUTURE RESULTS. Except with respect to the pro forma financial projections set forth in Appendix B annexed hereto (the "Projections") and except as otherwise specifically and expressly stated herein, this Disclosure Statement does not reflect any events that may occur subsequent to the date hereof and that may have a material impact on the information contained in this Disclosure Statement. The Debtors do not undertake any obligation to, and do not intend to, update the Projections; thus, the Projections will not reflect the impact of any subsequent events not already accounted for in the assumptions underlying the Projections. Further, the Debtors do not anticipate that any amendments or supplements to this Disclosure Statement will be distributed to reflect such occurrences. Accordingly, the delivery of this Disclosure Statement will not under any circumstance imply that the information herein is correct or complete as of any time subsequent to the date hereof. Moreover, the Projections are based on assumptions that, although believed to be reasonable by the Debtors, may differ from actual results.

**THE DEBTORS BELIEVE THAT THE PLAN WILL ENABLE THE DEBTORS TO SUCCESSFULLY REORGANIZE AND ACCOMPLISH THE OBJECTIVES OF CHAPTER 11 AND THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF THE DEBTORS AND THE HOLDERS OF CLAIMS IN CLASSES 4, 5, 6, 7, 8, 9, AND 10. THE DEBTORS URGE SUCH HOLDERS TO VOTE TO ACCEPT THE PLAN.**

## II. PREVIOUS PLAN HISTORY

On November 12, 2004, the Debtors filed their first proposed joint plan of reorganization (as subsequently amended, the "Previous Plan"). The Previous Plan proposed to satisfy the claims of unsecured creditors through a distribution of (a) equity in the Reorganized Debtors ("New Common Stock") and (b) notes issued by the Reorganized Debtors ("New Notes"), which in combination were estimated to have a value of approximately 70% of the unsecured creditors' respective claims. The Previous Plan was negotiated with, and endorsed by, the Creditors Committee. On December 23, 2004, upon authorization by the Bankruptcy Court, the Debtors began the process of soliciting acceptances with respect to the Previous Plan. At that time, the Debtors expected that the Previous Plan would be confirmed on January 27, 2005, and expected to emerge from chapter 11 by March 31, 2005. However, as a result of an intercreditor dispute among the three noteholder members of the Creditors Committee, relating to post-emergence corporate governance and their relative rights in the reorganized corporation – issues having nothing to do with the Debtors, their businesses, operations or financial condition – the confirmation process with respect to the Previous Plan was delayed and ultimately completely derailed. Concluding that they could not emerge from chapter 11 under the terms of the Previous Plan, the Debtors withdrew the Previous Plan on March 21, 2005.

By that time, the intercreditor dispute had become even more contentious. In response to the resulting allegations of wrongdoing, the Bankruptcy Court appointed Harvey R. Miller, nationally recognized as a premier bankruptcy lawyer and financial advisor, to serve as an independent examiner under the provisions of the Bankruptcy Code (the "Examiner"). The Bankruptcy Court directed the Examiner to investigate the allegations, determine whether any wrongdoing had in fact occurred, and make recommendations to the Bankruptcy Court. On July 8, 2005, the Examiner filed his report (the "Examiner's Report") under seal, setting forth the results of his investigation. A redacted version of the Examiner's Report was subsequently unsealed on August 19, 2005. Among other things, the Examiner's Report contained findings that certain members of the Creditors Committee had violated their fiduciary duties to unsecured creditors and that certain

advisors to the Creditors Committee failed to discharge their duties to represent the Creditors Committee in an objective, independent, and disinterested manner. Specifically, the Examiner's Report indicated that AIG Global Investment Corp. (individually and together with its affiliates, agents, officers, directors, employees, representatives, and all accounts and funds managed or controlled thereby, "AIGGIC") and Post Advisory Group, LLC (individually and together with its affiliates, agents, officers, directors, employees, representatives, and all accounts and funds managed or controlled thereby, "Post") had breached their fiduciary duties to unsecured creditors and that Akin Gump Strauss Hauer & Feld LLP ("Akin") failed to discharge its duties to represent the Creditors Committee in an objective, independent, and disinterested manner. The report found no violations of fiduciary duties on the part of any other member or former member of the Creditors Committee – including Silver Point Capital, L.P. (individually and together with its affiliates, agents, officers, directors, employees, representatives, and all accounts and funds managed or controlled thereby, "Silver Point") and Solutions Dispersions, Inc. – or on the part of any member of the Debtors' management, including Alex Kwader. The report also put forth recommended remedies. *The Examiner's Report, including the findings relating to breach of fiduciary duty and the consequences thereof as well as the recommended remedies, has not been endorsed by the Bankruptcy Court or any other court, and the parties faulted in the report dispute the accuracy of the report.*

The Debtors have now filed the Plan, which supersedes and replaces the Previous Plan. The Plan is similar in many respects to the Previous Plan. There are, however, some differences. The Debtors' unsecured creditors, including holders of Noteholder Claims and General Unsecured Claims, will notice the most significant change. Whereas the Previous Plan offered a combination of New Common Stock and New Notes to unsecured creditors, the Plan now offers an all-Cash payment estimated to equal 70% of Allowed Claim amounts. For any unsecured creditor interested in owning equity in the reorganized company, the Plan provides for an election to receive New Common Stock and a partial Cash payment estimated to have an aggregate value of 62% of Allowed Claim amounts. This treatment results from a settlement negotiated among AIGGIC, Post, Silver Point, and the Debtors, the purpose of which is to address the issues identified in the Examiner's Report and provide for a recovery for unsecured creditors that fairly approximates the value they would have received under the Previous Plan, had it not been derailed by the intercreditor dispute.

### III. OVERVIEW OF THE NEW PLAN

The following is a brief overview of the material provisions of the Plan and is qualified in its entirety by reference to the full text of the Plan. For a more detailed description of the terms and provisions of the Plan, see Article VII of this Disclosure Statement, entitled "Summary of the Plan of Reorganization."

The Plan provides for the classification and treatment of Claims against and Interests in the Debtors, based upon a joint plan structure supported by substantive consolidation principles. The Plan designates thirteen Classes of Claims and two Classes of Interests. These Classes take into account the differing nature and priority under the Bankruptcy Code of the various Claims and Interests.

The Debtors believe that the Plan presents the best means currently available for their emergence from chapter 11.

### A. General Structure of the Plan

The Plan is structured as a joint plan, pursuant to substantive consolidation, and is predicated upon a settlement proposed by AIGGIC, Post, Silver Point, and the Debtors that will obviate the need for litigation to pursue the issues identified in the Examiner's Report.

Claims are treated generally in accordance with the priorities established under the Bankruptcy Code. Claims that have priority status under the Bankruptcy Code or that are secured by valid liens on collateral are to be paid in full or reinstated as provided in the Plan. Non-priority, unsecured Claims will receive an all-Cash payment estimated to equal 70% of the amount of each Claim, consisting of Distribution Cash, Settlement Cash, and the Stock Purchase Payment. Alternatively, any holder of a non-priority, unsecured Claim may elect to receive a Pro Rata distribution of New Common Stock to be created and issued under the Plan, Distribution Cash, and Settlement Cash, providing an estimated aggregate recovery of approximately 62% per Claim, based upon certain assumptions described below. Because holders of non-priority, unsecured Claims will not be paid in full, the holders of Old FiberMark Common Stock will receive no distributions under the Plan, and all shares of Old FiberMark Common Stock will be cancelled.

The following is an overview of certain material terms of the Plan:

- The Debtors will be reorganized pursuant to the Plan and will continue in operation, achieving the objectives of chapter 11 for the benefit of their creditors, customers, suppliers, employees, and communities.

- Holders of Administrative Claims, Priority Tax Claims, and Other Priority Claims will be paid in full as required by the Bankruptcy Code, unless otherwise agreed by the holders of such claims.

- The GECC Credit Facility Claim will be paid in full.

- The GECC Equipment Financing Claim and the Banc One Equipment Financing Claim will be substantially reinstated and paid pursuant to their preexisting terms.

- The Coated Paper Sale/Leaseback Claim will be paid in continuing monthly payments in lieu of the balloon payment required by the governing documents.

- Holders of Lowville Grant Claims who vote in favor of the Plan will have their Claims reinstated on certain conditions. If they vote against the Plan, their Claims will be treated as Other Secured Claims in Class 8 if secured or as General Unsecured Claims in Class 10 if unsecured.

- The Constituency Settlement will be implemented, resolving all Constituency Causes of Action against AIGGIC and Post, all Litigation Rights against AIGGIC, Post, and Silver Point, and the Individual Causes of Action of Silver Point, AIGGIC, and Post against each other.

- As a result of the Constituency Settlement, the holders of Noteholder Claims and General Unsecured Claims will receive an all-Cash distribution estimated to equal 70% of the amount of their Allowed Claims, which was the recovery level estimated under the Previous Plan. Alternatively, any holder of a Noteholder Claim or General Unsecured Claim who desires to receive New Common Stock may elect a distribution that includes both New Common Stock and Cash, resulting in an estimated aggregate recovery of 62% of the amount of the electing holder's Allowed Claim.

- The holders of Convenience Claims, which are Claims not exceeding $5,000 in amount (including any in an amount greater than $5,000 that is reduced to $5,000 by an amended Proof of Claim filed on or before the Distribution Record Date), will be paid in full.

- With the exception of the issues resolved in the Constituency Settlement, the Reorganized Debtors will retain all Litigation Rights (which include rights to seek to avoid preferential transfers) and will have authority to pursue all Litigation Rights for the benefit of their reorganized Estates. Litigation Rights do not include Constituency Causes of Action or Individual Causes of Action.

- Old FiberMark Common Stock will be cancelled and no distributions of any kind will be made to holders of such Old FiberMark Common Stock.

- The Reorganized Debtors will obtain an Exit Facility to satisfy the DIP Facility Claim and the German Guaranty Claim, support other payments required to be made under the Plan, pay transaction costs, and fund working capital and general corporate purposes of the Reorganized Debtors following their emergence.

- The Debtors have not included in the Plan any provisions that will require the consent of any Creditors Committee in order for the Debtors to confirm or effectuate the Plan.

## B. Summary of Treatment of Claims and Interests under the Plan

The table below summarizes the classification and treatment of the pre-petition Claims and Interests under the Plan. Estimated Claim amounts assume a calculation date of December 31, 2005, except that Noteholder Claims and General Unsecured Claims are calculated as of the Petition Date. Estimated percentage recoveries are also set forth below for certain Classes of Claims. Estimated percentage recoveries have been calculated based upon a number of assumptions,

including the estimated amount of Allowed Claims in each Class and the value ascribed to the New Common Stock and the Distribution Cash to be issued under the Plan.

For certain Classes of Claims, the actual amounts of Allowed Claims could materially exceed or could be materially less than the estimated amounts shown in the table that follows. The Debtors have substantially completed the review and analysis of all Proofs of Claim filed in the Chapter 11 Case. Estimated Claim amounts for each Class set forth below are based upon the Debtors' review of their books and records and Proofs of Claim filed to date. With respect to Classes 9 and 10, if the aggregate amount of Allowed General Unsecured Claims equals $12,381,123.97, the holders of Allowed Claims in Classes 9 and 10 will receive an all-Cash distribution having an estimated value equal to 70% of such Allowed Claims, subject to their right to elect to receive a combination of New Common Stock and Cash having an estimated aggregate value equal to 62% of such Allowed Claims. If the aggregate amount of Allowed General Unsecured Claims exceeds $12,381,123.97, the value of such distributions will be less than the estimated 70%, or less than the estimated aggregate 62% in the case of holders electing a combination of New Common Stock and Cash. Accordingly, for these reasons, no representation can be or is being made with respect to whether the estimated percentage recoveries shown in the table below for Classes 9 and 10 will actually be realized by the holders of Allowed Claims in those Classes.

The reorganization value of the Reorganized Debtors is assumed for the purposes of the Plan to be between approximately $210 million and $240 million, with a midpoint value of $225 million. Based upon the reorganization value of the Debtors' businesses and total net debt of approximately $107.2 million, the assumed range of equity values for the Reorganized Debtors approximates $102.8 million to $132.8 million, with a midpoint value of $117.8 million. Assuming a distribution of 10 million shares upon consummation of the Plan, the imputed estimate of the range of equity value on a per share basis is $10.28 to $13.28, with a midpoint value of $11.78. It has been alleged that the equity value of the Reorganized Debtors would be higher if the Plan provided for the reorganized company to emerge as a public company rather than a private company. The Debtors do not agree that any premium should be assigned to the value of the Reorganized Debtors if they were a public company upon emergence. In addition, the Debtors would note that the higher costs of maintaining a public company versus a private company would negatively affect the equity value.

The foregoing valuations are based on numerous assumptions including, among other things, an assumption that the operating results projected for the Reorganized Debtors will be achieved in all material respects, including revenue growth and improvements in operating margins, earnings, and cash flow. The valuation assumptions also consider, among other matters, (a) market valuation information concerning certain publicly traded securities of certain other companies that are considered relevant, (b) certain general economic and industry information considered relevant to the businesses of the Reorganized Debtors, and (c) such other investigations and analyses deemed necessary or appropriate.

**The valuation assumptions are not a prediction or reflection of post-Confirmation trading prices of the New Common Stock. Such securities may trade at substantially lower or higher prices because of a number of factors, including, but not limited to, those discussed in Article VIII herein. The trading prices of securities issued under a plan of reorganization are subject to many unforeseeable circumstances and therefore cannot be predicted.**

| Class Description | Treatment under Plan |
|---|---|
| Administrative Claims<br><br>Estimated Allowed Claims (exclusive of ordinary course operational expenses and the DIP Facility Claim and the German Guaranty Claim):<br>Approximately $9,209,000<br><br>Estimated DIP Facility Claim:<br>Approximately $3,753,000 in revolving loans<br>Approximately $10,493,000 in letters of credit<br><br>Estimated German Guaranty Claim:<br>Approximately $12,068,000 | An Administrative Claim is a Claim for payment of an administrative expense of a kind specified in Section 503(b) or 1114(e)(2) of the Bankruptcy Code and entitled to priority pursuant to Section 507(a)(1) of the Bankruptcy Code, including, but not limited to, (a) the actual, necessary costs and expenses incurred after the Petition Date of preserving the Estates and operating the businesses of the Debtors, including, without limitation, wages, salaries, or commissions for services rendered after the commencement of the Chapter 11 Case, (b) obligations under the Key Employee Protection Order, (c) Professional Fee Claims, (d) Substantial Contribution Claims, (e) all fees and charges assessed against the Estates under Section 1930 of Title 28 of the United States Code, (f) all Allowed Claims for reclamation under Section 546(c)(2)(A) of the Bankruptcy Code, (g) Cure payments for executory contracts and unexpired leases that are assumed under Section 365 of the Bankruptcy Code, (h) the Claim of Empire State Development Corporation pursuant to the Order Under 11 U.S.C. § 365(a) Authorizing Assumption of Grant Disbursement Agreement with Empire State Development Corporation on Negotiated Terms entered on August 24, 2004, (i) the DIP Facility Claim, and (j) the German Guaranty Claim. |

| Class Description | Treatment under Plan |
|---|---|
| | Under the Plan, except as otherwise provided for therein, and subject to the requirements of Sections 12.1 through 12.3 of the Plan, on, or as soon as reasonably practicable after, the latest of (i) the Effective Date, (ii) the date such Administrative Claim becomes an Allowed Administrative Claim, or (iii) the date such Administrative Claim becomes payable pursuant to any agreement between a Debtor and the holder of such Administrative Claim, the holder of each such Allowed Administrative Claim will receive (A) Cash equal to the unpaid portion of such Allowed Administrative Claim or (B) such different treatment as the applicable Debtor and such holder agree upon in writing; *provided*, *however*, that Allowed Administrative Claims with respect to liabilities incurred by a Debtor in the ordinary course of business during the Chapter 11 Case will be paid in the ordinary course of business in accordance with the terms and conditions of any agreements relating thereto. <br><br>Under the Plan, the holders of the Allowed DIP Facility Claim will receive, on the later of the Effective Date or the date on which such DIP Facility Claim becomes payable pursuant to any agreement between the Debtors and the holders of such DIP Facility Claim (i) Cash equal to the full amount of such Allowed DIP Facility Claim or (ii) such different treatment as the Debtors and such holders agree upon in writing; *provided*, *however*, that in respect of any letters of credit issued and undrawn under the DIP Facility, unless GECC or an applicable affiliate is a lender under the Exit Facility and permits such letters of credit to be rolled over and treated as letters of credit issued under the Exit Facility, the Debtors will be required to either, with the consent of GECC: (A) cash collateralize such letters of credit in an amount equal to 103% of the undrawn amount of any such letters of credit, (B) return any such letters of credit to the applicable fronting bank undrawn and marked "cancelled," or (C) provide a "back-to-back" letter of credit to the issuing bank in a form and issued by an institution reasonably satisfactory to such issuing bank, in an amount equal to 103% of the then undrawn amount of such letters of credit. <br><br>Under the Plan, the holders of the Allowed German Guaranty Claim will receive, on the later of the Effective Date or the date on which such German Guaranty Claim becomes payable pursuant to any agreement between the Debtors and the holders of such German Guaranty Claim (i) Cash equal to the full amount of such Allowed German Guaranty Claim or (ii) such different treatment as to which the Debtors and such holders agree upon in writing. <br><br>Administrative Claims are not classified and are treated as required by the Bankruptcy Code. The holders of such Claims are not entitled to vote on the Plan. <br><br>Estimated Percentage Recovery: 100% |
| Priority Tax Claims <br><br>Estimated Allowed Claims: <br>Approximately $624,000 | Priority Tax Claims are Claims of governmental units for taxes that are entitled to priority pursuant to Section 507(a)(8) of the Bankruptcy Code. <br><br>Under the Plan, each holder of an Allowed Priority Tax Claim will receive, as will have been determined by the Debtors in their sole discretion, either (i) on, or as soon as reasonably practicable after, the later of the Effective Date or the date on which such Claim becomes an Allowed Claim, Cash equal to the unpaid portion of such Allowed Priority Tax Claim, (ii) such different treatment as the applicable Debtor and such holder agree upon in writing, or (iii) deferred Cash payments having a value, as of the Effective Date, equal to such Allowed Priority Tax Claim, over a period not exceeding six (6) years after the date of assessment of such Allowed Priority Tax Claim. <br><br>Priority Tax Claims are not classified and are treated as required by the Bankruptcy Code. The holders of such Claims are not entitled to vote on the Plan. |

| Class Description | Treatment under Plan |
|---|---|
| | Estimated Percentage Recovery: 100% |
| Class 1, Other Priority Claims<br><br>Estimated Allowed Claims:<br>Approximately $0.00 | Class 1 consists of all Other Priority Claims against the Debtors, which are Claims against the Debtors entitled to priority pursuant to Section 507(a) of the Bankruptcy Code, other than Priority Tax Claims or Administrative Claims.<br><br>The Plan provides that on, or as soon as reasonably practicable after, the latest of (i) the Effective Date, (ii) the date on which such Other Priority Claim becomes an Allowed Other Priority Claim, or (iii) the date on which such Other Priority |
| | Claim becomes payable pursuant to any agreement between the applicable Debtor and the holder of such Other Priority Claim, each holder of an Allowed Other Priority Claim will receive, in full satisfaction, settlement, release and discharge of and in exchange for such Allowed Other Priority Claim, either (A) Cash equal to the unpaid portion of such Allowed Other Priority Claim or (B) such other different treatment as the applicable Debtor and such holder agree upon in writing.<br><br>Other Priority Claims are Unimpaired. The holders of such Claims are, therefore, not entitled to vote on the Plan.<br><br>Estimated Percentage Recovery: 100% |
| Class 2, GECC Credit Facility Claim<br><br>Estimated Allowed Claim:<br>Approximately $0.00 | Class 2 consists of the GECC Credit Facility Claim, which is the Claim existing under the Credit Agreement dated as of November 12, 2003 (as amended from time to time) among FNA, FiberMark Lahnstein GMBH & Co. OHG and FiberMark Gessner GMBH & Co. OHG as borrowers, certain other credit parties signatory thereto, General Electric Capital Corporation as administrative agent, certain lenders signatory thereto, Bayerische Hypo- und Vereinsbank AG as fronting lender, and certain other parties signatory thereto; and related documents, agreements, and instruments.<br><br>Under the Plan, the holders of the Allowed GECC Credit Facility Claim will receive, on the later of the Effective Date or the date on which such GECC Credit Facility Claim becomes payable pursuant to any agreement between the Debtors and the holders of such GECC Credit Facility Claim, (i) Cash equal to the full amount of such Allowed GECC Credit Facility Claim, or (ii) such different treatment as the Debtors and such holders agree upon in writing; *provided, however*, that in respect of any letters of credit issued and undrawn under the Credit Agreement giving rise to the GECC Credit Facility Claim, unless GECC or an applicable affiliate is a lender under the Exit Facility and permits such letters of credit to be rolled over and treated as letters of credit issued under the Exit Facility, the Debtors will be required to either, with the consent of GECC: (A) cash collateralize such letters of credit in an amount equal to 103% of the undrawn amount of any such letters of credit, (B) return any such letters of credit to the applicable fronting bank undrawn and marked "cancelled," or (C) provide a "back-to-back" letter of credit to the issuing bank in a form and issued by an institution reasonably satisfactory to such issuing bank, in an amount equal to 103% of the then undrawn amount of such letters of credit.<br><br>The GECC Credit Facility Claim is Unimpaired. The holder of such Claim is, therefore, not entitled to vote on the Plan.<br><br>Estimated Percentage Recovery: 100% |
| Class 3, Convenience Claims<br><br>Estimated Allowed Claims:<br>Approximately $836,000 | Class 3 consists of all Convenience Claims, which are Claims in an amount equal to or less than $5,000, including any Claim in an amount greater than $5,000 that is reduced to $5,000 by an amended Proof of Claim filed on or before the Distribution Record Date, which Claims are not Administrative Claims, Priority Tax Claims, Other Priority Claims, GECC Credit Facility Claims, GECC Equipment Financing Claims, Banc One Equipment Financing Claims, Coated |

| Class Description | Treatment under Plan |
|---|---|
| | Paper Sale/Leaseback Claims, Lowville Grant Claims, Other Secured Claims, Noteholder Claims, General Unsecured Claims, Intercompany Claims, Subordinated Claims, or Non-Compensatory Damages Claims.<br><br>The Plan provides that, on, or as soon as reasonably practicable after, the later of the Effective Date or the date on which such Claim becomes an Allowed Claim, each holder of an Allowed Convenience Claim, will receive Cash in an amount equal to the lesser of (i) the Allowed amount of such Claim or (ii) $5,000.<br><br>Convenience Claims are Unimpaired. The holders of such Claims are, therefore, not entitled to vote on the Plan.<br>Estimated Percentage Recovery: 100% |
| Class 4, GECC Equipment Financing Claim<br><br>Estimated Allowed Claim:<br>Approximately $903,495 (collateral includes $1 million in an undrawn letter of credit that has been included in the Debtors' estimate of the DIP Facility Claim in respect of letters of credit) | Class 4 consists of the GECC Equipment Financing Claim, which is the Claim existing under the Master Security Agreement dated as of September 19, 2000 (as amended from time to time) between FiberMark and CIT Group/Equipment Financing, Inc.; the Schedule of Indebtedness and Collateral No. 1 dated as of October 25, 2000; and related documents, agreements, and instruments; all as assigned by CIT Group/Equipment Financing, Inc. to General Electric Capital Corporation; after application of adequate protection payments made under the Stipulation Providing Adequate Protection for Secured Manufacturing Equipment Loan of General Electric Capital Corporation filed on May 21, 2004, as approved by order of the Bankruptcy Court entered on May 28, 2004.<br><br>Under the Plan, the legal, equitable, and contractual rights of the holder of the GECC Equipment Financing Claim will be Reinstated in accordance with the provisions of Section 1124(2) of the Bankruptcy Code; *provided, however,* that any contractual right that does not pertain to the payment when due of principal and interest on the obligation on which such Claim is based, including, but not limited to, financial covenant ratios, negative pledge covenants, covenants or restrictions on merger or consolidation, covenants regarding corporate existence, or covenants prohibiting certain transactions or actions contemplated by the Plan or conditioning such transactions or actions on certain factors, will not be enforceable as to any breach that occurred on or prior to the Effective Date or any breach determined by reference back to a date preceding the Effective Date.<br><br>The GECC Equipment Financing Claim is Impaired. The holder of such Claim is, therefore, entitled to vote on the Plan.<br><br>Estimated Percentage Recovery: 100% |
| Class 5, Banc One Equipment Financing Claim<br><br>Estimated Allowed Claim:<br>Approximately $4,077,000 (after giving effect to the payment due by January 1, 2006) | Class 5 consists of the Banc One Equipment Financing Claim, which is the Claim of Banc One Leasing Corporation, now known as Chase Equipment Leasing Inc., or any affiliate thereof, existing under the Equipment Financing Agreement between FiberMark and Jules and Associates, Inc., dated as of December 13, 1999; Schedule 1 thereto dated as of July 5, 2000, Schedule 2 thereto dated as of September 13, 2000, and Schedule 3 thereto dated as of December 21, 2000; and related documents, agreements, and instruments; all as assigned by Jules and Associates, Inc. to Banc One Leasing Corporation or any affiliate thereof; after application of adequate protection payments made under the Stipulation Providing Adequate Protection for Secured Manufacturing Equipment Loan of Banc One Leasing Corporation filed on June 25, 2004, as approved by order of the Bankruptcy Court entered on July 1, 2004.<br><br>The Plan provides that the legal, equitable, and contractual rights of the holder of the Banc One Equipment Financing Claim, including those relating to the payment when due of principal and interest on the obligation on which such Claim is based and the protection, maintenance, location, or insurance of or on the collateral securing such Claim, will be Reinstated in accordance with the provisions of Section 1124(2) of the Bankruptcy Code; provided, however, that any contractual right that does not pertain to the payment when due of principal and interest or said preservation of the collateral, including, but not limited to, |

| Class Description | Treatment under Plan |
|---|---|
| | contractual rights pertaining to financial covenant ratios, negative pledge covenants, covenants or restrictions on merger or consolidation, covenants regarding corporate existence, or covenants prohibiting certain transactions or actions contemplated by the Plan or conditioning such transactions or actions on certain factors, will not be enforceable as to any breach that occurred on or prior to the Effective Date or any breach determined by reference back to a date preceding the Effective Date.<br><br>The Banc One Equipment Financing Claim is Impaired. The holder of such Claim is, therefore, entitled to vote on the Plan.<br><br>Estimated Percentage Recovery: 100% |
| Class 6, Coated Paper Sale/Leaseback Claim<br><br>Estimated Allowed Claim:<br>Approximately $740,000 | Class 6 consists of the Coated Paper Sale/Leaseback Claim, which is the Claim existing under the Project Agreement among FiberMark DSI, Inc. (a predecessor in interest to FNA), FiberMark, and Coated Paper, LLC dated as of October 3, 2002; the Supplemental Agreement between such parties dated as of January 29, 2003; and various related documents, agreements, and instruments; after application of adequate protection payments made under the Stipulation Providing for Post-Petition Adequate Protection or Real Property Lease Payments to Coated Paper, LLC filed on June 25, 2004, as approved by order of the Bankruptcy Court entered on July 1, 2004, the Stipulation Providing for Additional Adequate Protection Payments to Coated Paper, LLC Pending Effective Date of Plan filed on February 3, 2005, as approved by order of the Bankruptcy Court entered on February 4, 2005, and the Stipulation Providing for Post-Petition Adequate Protection or Payment in Lieu of Tax to County of Lewis Industrial Development Agency filed on April 19, 2005, as approved by order of the Bankruptcy Court entered on April 25, 2005.<br><br>Under the Plan, the holder of the Allowed Coated Paper Sale/Leaseback Claim will (i) retain the Liens securing such Allowed Claim and (ii) receive the remaining amount of such Allowed Claim, with interest at the non-default contract rate, in monthly Cash payments of the same amount as historically paid by the Debtors under the documents governing such Allowed Claim, in lieu of the final balloon payment otherwise required by such documents.<br><br>The Coated Paper Sale/Leaseback Claim is Impaired. The holder of such Claim is, therefore, entitled to vote on the Plan.<br><br>Estimated Percentage Recovery: 100% |
| Class 7, Lowville Grant Claims<br><br>Estimated Allowed Claims:<br>Approximately $0.00 (an estimated $810,000 million in contingent Claims that are not expected to become due) | Class 7 consists of the Lowville Grant Claims, which are the Claims existing under the Grant Agreement for CDBG Funds dated as of March 11, 2003 among FNA as grantee, FiberMark as guarantor, and County of Lewis Industrial Development Agency as funding agency, providing grant funds of $100,000; the Grant Agreement dated as of March 11, 2003 between FNA as grantee and County of Lewis Industrial Development Agency as funding agency, providing grant funds of $250,000; the Grant Agreement for Small Cities CDBG Funds dated as of March 11, 2003 among FNA as grantee, FiberMark as guarantor, and County of Lewis as funding agency, and the associated Security Agreement dated as of March 11, 2003 between FNA as debtor and County of Lewis as secured party, providing grant funds of $750,000; the Grant Agreement for Empire State Development Funds dated as of October 27, 2003, between FNA as grantee and County of Lewis Industrial Development Agency as funding agency, providing grant funds of $150,000; and the Grant Agreement for Empire State Development Funds dated as of October 27, 2003, between FNA as grantee and County of Lewis Industrial Development Agency as funding agency, providing grant funds of $250,000.<br><br>The Plan provides that a vote in favor of the Plan by the holder of a Lowville Grant Claim will constitute (i) the agreement by such holder that the Reorganized Debtors will be obligated to pay such holder's Claim only if they fail to maintain |

| Class Description | Treatment under Plan |
|---|---|
| | requisite levels of employment at their facility in Lowville, New York and (ii) the express waiver by such holder of any other breach, event of default or other act or omission giving rise to an obligation to pay the Claim. Subject to and as modified by such agreement and waiver, the legal, equitable, and contractual rights of the holder of a Lowville Grant Claim voting in favor of the Plan will be Reinstated in accordance with the provisions of Section 1124(2) of the Bankruptcy Code; *provided, however,* that any contractual right that does not pertain to the payment when due of principal and interest on the obligation on which any such Claim is based, including, but not limited to, financial covenant ratios, negative pledge covenants, covenants or restrictions on merger or consolidation, covenants regarding corporate existence, or covenants prohibiting certain transactions or actions contemplated by the Plan or conditioning such transactions or actions on certain factors, will not be enforceable as to any breach that occurred on or prior to the Effective Date or any breach determined by reference back to a date preceding the Effective Date.<br><br>A vote against the Plan by the holder of a Lowville Grant Claim will result in the treatment of such holder's Claim as an Other Secured Claim in Class 8 if and to the extent such Claim is a Secured Claim or as a General Unsecured Claim in Class 10 if and to the extent such Claim is not a Secured Claim.<br><br>Estimated Percentage Recovery: Subject to vote. |
| Class 8, Other Secured Claims<br><br>Estimated Allowed Claims: Approximately $127,000 | Class 8 consists of Other Secured Claims, which are Secured Claims arising prior to the Petition Date against any of the Debtors, other than a GECC Credit Facility Claim, a GECC Equipment Financing Claim, a Banc One Equipment Financing Claim, or a Coated Paper Sale/Leaseback Claim. Any Lowville Grant Claim that is a Secured Claim will be treated as an Other Secured Claim if the holder of such Claim voted against the Plan.<br><br>Class 8 contains separate sub-Classes for each Other Secured Claim against any of the Debtors. Each sub-Class is deemed to be a separate Class for all purposes under the Bankruptcy Code, including for voting purposes.<br><br>The Plan provides that on the Effective Date, as will have been determined by the Debtors in their sole discretion, either (i) the legal, equitable, and contractual rights of each holder of an Allowed Other Secured Claim will be Reinstated in accordance with the provisions of Section 1124(2) of the Bankruptcy Code; *provided, however,* that any contractual right that does not pertain to the payment when due of principal and interest on the obligation on which such Claim is based, including, but not limited to, financial covenant ratios, negative pledge covenants, covenants or restrictions on merger or consolidation, covenants regarding corporate existence, or covenants prohibiting certain transactions or actions contemplated by the Plan or conditioning such transactions or actions on certain factors, will not be enforceable as to any breach that occurred on or prior to the Effective Date or any breach determined by reference back to a date preceding the Effective Date; (ii) each holder of an Allowed Other Secured Claim will (A) retain the Liens securing such Allowed Other Secured Claim and (B) receive deferred Cash payments totaling at least the amount of such Allowed Other Secured Claim, of a value, as of the Effective Date, of at least the value of such holder's interest in the Estate's interest in such property; (iii) the collateral securing such Allowed Other Secured Claim will be surrendered to the holder of such Allowed Other Secured Claim; or (iv) each holder of an Allowed Other Secured Claim will be paid in full on the Effective Date.<br><br>Other Secured Claims are Impaired. The holders of such Claims are, therefore, entitled to vote on the Plan.<br><br>Estimated Percentage Recovery: 100% |
| Class 9, Noteholder Claims | Class 9 consists of Noteholder Claims, which are Claims arising from or relating to the FiberMark Notes, other than any Indenture Trustee Expenses. |

| Class Description | Treatment under Plan |
|---|---|
| Estimated Allowed Claims: Approximately $345,629,166.67 | Under the Plan, and as a result of the Constituency Settlement, each holder of an Allowed Noteholder Claim as of the Distribution Record Date (other than AIGGIC, Post, and Silver Point) will receive on the Distribution Date, an all-Cash payment consisting of a Pro Rata share of the Distribution Cash, Settlement Cash, and Stock Purchase Payment that is estimated to equal 70% of each such holder's Allowed Claim, subject to the capped amounts of the Distribution Cash, Settlement Cash, and Stock Purchase Price.

Alternatively, any holder of an Allowed Noteholder Claim as of the Voting Record Date (other than AIGGIC, Post, and Silver Point) that desires to receive equity in the reorganized company may elect to receive on the Distribution Date a Pro Rata share of New Common Stock, Distribution Cash, and Settlement Cash that is estimated by the Debtors to have an aggregate value equal to 62% of such holder's Allowed Claim, subject to the capped amounts of the Distribution Cash and Settlement Cash. Because all of the FiberMark Notes are represented by one or more global certificates held by DTC, any holder of a Noteholder Claim wishing to make the election must direct the actual record holder of its FiberMark Notes who is a DTC Participant to make such election on its behalf. Such election must be made by the DTC Participant through the DTC's PTOP procedures on or before the date of commencement of the Confirmation Hearing.

The treatment of the Allowed Noteholder Claims held by AIGGIC, Post, and Silver Point are separately described in Section 4.3(f) of the Plan.

Noteholder Claims are Impaired. The holders of such Claims are, therefore, entitled to vote on the Plan. |
| Class 10, General Unsecured Claims

Estimated Allowed Claims: Approximately $12,381,123.97

(The actual amounts of Allowed Claims for Class 10 could materially exceed or could be materially less than the estimated amounts shown herein). | Class 10 consists of General Unsecured Claims, which are Claims in an amount greater than $5,000 that are not Administrative Claims, Priority Tax Claims, Other Priority Claims, GECC Credit Facility Claims, GECC Equipment Financing Claims, Banc One Equipment Financing Claims, Coated Paper Sale/Leaseback Claims, Lowville Grant Claims, Convenience Claims, Other Secured Claims, Noteholder Claims, Intercompany Claims, Subordinated Claims, or Non-Compensatory Damages Claims. This definition specifically includes, without limitation, rejection damages Claims, non-priority employee Claims, non-priority tax Claims, environmental Claims, indemnification Claims, trade vendor Claims, customer Claims, escheat Claims, and litigation Claims.

Under the Plan, and as a result of the Constituency Settlement, each holder of an Allowed General Unsecured Claim as of the Distribution Record Date (other than Silver Point) will receive on the Distribution Date, an all-Cash payment consisting of a Pro Rata share of the Distribution Cash, Settlement Cash, and Stock Purchase Payment that is estimated to equal 70% of each such holder's Allowed Claim, subject to the capped amounts of the Distribution Cash, Settlement Cash, and Stock Purchase Price.

Alternatively, any holder of an Allowed General Unsecured Claim as of the Voting Record Date (other than Silver Point) that desires to receive equity in the reorganized company may elect on its Ballot to receive on the Distribution Date a Pro Rata share of New Common Stock, Distribution Cash, and Settlement Cash that is estimated by the Debtors to have an aggregate value equal to 62% of such holder's Allowed Claim, subject to the capped amounts of the Distribution Cash and Settlement Cash. The election must be made no later than the Voting Deadline.

The treatment of the Allowed General Unsecured Claims held by Silver Point are separately described in Section 4.3(g) of the Plan.

General Unsecured Claims are Impaired. The holders of such Claims are, therefore, entitled to vote on the Plan. |

| Class Description | Treatment under Plan |
|---|---|
| Class 11, Intercompany Claims<br><br>Estimated Allowed Claims:<br>Approximately $158,176,029.97 | Class 11 consists of Intercompany Claims, which are Claims arising prior to the Petition Date against any of the Debtors by another Debtor. Intercompany Claims do not include Claims against any of the Debtors by a non-Debtor subsidiary or affiliate of a Debtor, which Claims will be treated as General Unsecured Claims.<br><br>Under the Plan, no holder of an Intercompany Claim will receive or retain any property of the Debtors under the Plan on account of such Claim; *provided, however*, that, if necessary for tax planning purposes, Intercompany Claims may be capitalized, satisfied, or preserved either directly or indirectly or in whole or part. Any Intercompany Claim, or portion thereof, that is not so capitalized, satisfied, or preserved will be discharged as of the Effective Date.<br><br>Holders of Intercompany Claims are Impaired and will receive no distribution under the Plan. The holders of such Claims are, therefore, deemed to have rejected the Plan and are not entitled to vote on the Plan.<br><br>Estimated Percentage Recovery: 0% |
| Class 12, Subordinated Claims<br><br>Estimated Allowed Claims:<br>Approximately $0.00 | Class 12 consists of Subordinated Claims, which are Claims that are subordinated pursuant to Sections 510(b) or (c) of the Bankruptcy Code, which will include any Claim arising from the rescission of a purchase or sale of any Old Security, any Claim for damages arising from the purchase or sale of an Old Security, or any Claim for reimbursement, contribution, or indemnification on account of any such Claim.<br><br>Under the Plan, holders of Subordinated Claims will not receive or retain any property of the Debtors on account of such Claims. All Subordinated Claims will be discharged as of the Effective Date.<br><br>Subordinated Claims are Impaired and will receive no distribution under the Plan. The holders of such Claims are, therefore, deemed to have rejected the Plan and are not entitled to vote on the Plan.<br><br>Estimated Percentage Recovery: 0% |
| Class 13, Non-Compensatory Damages Claims<br><br>Estimated Allowed Claims:<br>Approximately $0.00 | Class 13 consists of Non-Compensatory Damages Claims, which are Claims against any of the Debtors for any fine, penalty, or forfeiture, or multiple, exemplary, or punitive damages, to the extent that such fine, penalty, forfeiture, or damage is not compensation for actual pecuniary loss suffered by the holder of such Claim, including any such claim based upon, arising from, or relating to any cause of action whatsoever (including, without limitation, violation of law, personal injury, or wrongful death, whether secured or unsecured, liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising in law, equity or otherwise). The term does not include any Claim that might otherwise constitute a Non-Compensatory Damages Claim but for a Final Order allowing such Claim to be an Administrative Claim, DIP Facility Claim, Priority Tax Claim, Other Priority Claim, Convenience Claim, GECC Credit Agreement Claim, Other Secured Claim, General Unsecured Claim, Noteholder Claim, Intercompany Claim, or Subordinated Claim.<br><br>Under the Plan, the holders of Non-Compensatory Damages Claims will not receive or retain any property on account of such Claims. All Non-Compensatory Damages Claims will be discharged as of the Effective Date.<br><br>Non-Compensatory Damages Claims are Impaired and will receive no distribution under the Plan. The holders of such Claims are, therefore, deemed to have rejected the Plan and are not entitled to vote on the Plan.<br><br>Estimated Percentage Recovery: 0% |

| Class Description | Treatment under Plan |
|---|---|
| Class 14, Subsidiary Interests | Class 14 consists of Subsidiary Interests, which are all of the issued and outstanding shares of stock or membership interests of the Subsidiary Debtors as of the Petition Date, which stock and interests are owned by FiberMark.<br><br>For the deemed benefit of the holders of the New Common Stock, FiberMark, Inc. will retain its equity interests in FNA and FIH.<br><br>Subsidiary Interests are Unimpaired. The holders of such Interests are, therefore, not entitled to vote on the Plan. |
| Class 15, FiberMark Interests | Class 15 consists of FiberMark Interests, which are all equity interests in FiberMark, including, without limitation, any preferred stock, the Old FiberMark Common Stock, the Old FiberMark Stock Options, together with any warrants, conversion rights, rights of first refusal, or other rights, contractual or otherwise, to acquire or receive any stock or other equity ownership interests in FiberMark, and any contracts, subscriptions, commitments, or agreements pursuant to which a party was or could have been entitled to receive shares, securities, or other ownership interests in FiberMark prior to the Effective Date.<br><br>Under the Plan, all FiberMark Interests of any kind, including, without limitation, the Old FiberMark Common Stock, the FiberMark Options, or any warrants or other agreements to acquire the same (whether or not arising under or in connection with any employment agreement), will be cancelled as of the Effective Date and the holders thereof will not receive or retain any property under the Plan on account of such Interests.<br><br>FiberMark Interests are Impaired and will receive no distribution under the Plan. The holders of such Interests are, therefore, deemed to have rejected the Plan and are not entitled to vote on the Plan.<br><br>Estimated Percentage Recovery: 0% |

As set forth above, estimated Claim amounts assume a calculation date of December 31, 2005, except that Noteholder Claims and General Unsecured Claims are calculated as of the Petition Date. The calculation date is not necessarily the Effective Date of the Plan. The Effective Date will occur after the Confirmation Date, when the conditions precedent to the occurrence of the Effective Date are satisfied. The Effective Date may not actually occur for two to six weeks or longer after the Confirmation Date, particularly with the intervening holiday season. Therefore, it is possible that, although the Debtors expect a Confirmation Date before the end of 2005, the Effective Date may not occur until the beginning of 2006.

THE DEBTORS BELIEVE THAT THE PLAN PROVIDES THE BEST RECOVERIES POSSIBLE FOR HOLDERS OF CLAIMS AGAINST THE DEBTORS AND THUS <u>STRONGLY</u> <u>RECOMMEND</u> THAT YOU VOTE TO <u>ACCEPT</u> THE PLAN.

## IV. PLAN VOTING INSTRUCTIONS AND PROCEDURES

### A. Notice to Holders of Claims and Interests

Approval by the Bankruptcy Court of this Disclosure Statement means that the Bankruptcy Court has found that this Disclosure Statement contains information of a kind and in sufficient and adequate detail to enable holders of Claims to make an informed judgment about whether to accept or reject the Plan. THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE EITHER A GUARANTEE OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR THEREIN OR AN ENDORSEMENT OF THE PLAN BY THE BANKRUPTCY COURT.

IF THE PLAN IS APPROVED BY THE REQUISITE VOTE OF HOLDERS OF CLAIMS ENTITLED TO VOTE AND IS SUBSEQUENTLY CONFIRMED BY THE BANKRUPTCY COURT, THE PLAN WILL BIND ALL HOLDERS OF CLAIMS AGAINST, AND INTERESTS IN, THE DEBTORS, WHETHER OR NOT THEY WERE

ENTITLED TO VOTE OR DID VOTE ON THE PLAN AND WHETHER OR NOT THEY RECEIVE OR RETAIN ANY DISTRIBUTIONS OR PROPERTY UNDER THE PLAN. THUS ALL HOLDERS OF CLAIMS AGAINST THE DEBTORS ENTITLED TO VOTE ARE ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND ITS APPENDICES AND EXHIBITS CAREFULLY AND IN THEIR ENTIRETY BEFORE DECIDING TO VOTE TO EITHER ACCEPT OR REJECT THE PLAN.

THIS DISCLOSURE STATEMENT AND THE PLAN ARE THE ONLY DOCUMENTS AUTHORIZED BY THE BANKRUPTCY COURT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN. No solicitation of votes may be made except after distribution of this Disclosure Statement, and no person has been authorized to distribute any information concerning the Debtors other than the information contained herein or therein. No such information should be relied upon in making a determination to vote to accept or reject the Plan.

## B. Voting Rights

Pursuant to the provisions of the Bankruptcy Code, only holders of claims and interests in classes that are (a) treated as "impaired" by a plan of reorganization and (b) entitled to receive a distribution under such plan are entitled to vote on the plan. In the Chapter 11 Case, under the Plan, only holders of Claims in Classes 4, 5, 6, 7, 8, 9, and 10 are entitled to vote on the Plan. Claims and Interests in other Classes are either Unimpaired or their holders are deemed to have accepted the Plan, or they are receiving no distributions under the Plan and their holders are deemed to have rejected the Plan.

Notwithstanding the foregoing, only holders of Allowed Claims in the voting Classes are entitled to vote on the Plan. A Claim which is unliquidated, contingent, or disputed is not an Allowed Claim and is, therefore, not entitled to vote, unless and until the amount is estimated or determined, or the dispute is determined, resolved, or adjudicated in the Bankruptcy Court or another court of competent jurisdiction, or pursuant to agreement with the Debtors. However, the Bankruptcy Court may deem a contingent, unliquidated, or disputed Claim to be allowed on a provisional basis, for purposes only of voting on the Plan. If your Claim is contingent, unliquidated, or disputed, you will receive instructions for seeking temporary allowance of your Claim for voting purposes and it will be your responsibility to obtain an order provisionally allowing your Claim.

Holders of Allowed Claims in the voting Classes may vote on the Plan only if they are holders as of October 24, 2005, at 5:00 p.m. Eastern Time, the voting record date established by the Bankruptcy Court (the "Voting Record Date").

## C. Solicitation Materials

In soliciting votes for the Plan pursuant to this Disclosure Statement, the Debtors, through their voting agent Logan & Company, Inc. (the "Voting Agent" or "Logan"), will send to holders of Claims who are entitled to vote copies of (a) the Disclosure Statement and Plan, (b) the notice of, among other things, (i) the date, time, and place of the hearing to consider confirmation of the Plan and related matters and (ii) the deadline for filing objections to confirmation of the Plan (the "Confirmation Hearing Notice"), (c) one or more ballots (and return envelopes) to be used in voting to accept or to reject the Plan, and (d) other materials as authorized by the Bankruptcy Court.

If you are the holder of a Claim who is entitled to vote, but you did not receive a ballot, or if your ballot is damaged or illegible, or if you have any questions concerning voting procedures, you may contact the following:

LOGAN & COMPANY, INC.
546 VALLEY ROAD
UPPER MONTCLAIR, NEW JERSEY 07043
TELEPHONE: (973) 509-3190
ATTENTION: MARITZA MARTINEZ
EMAIL: mmartinez@loganandco.com

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
FOUR TIMES SQUARE
NEW YORK, NEW YORK 10036
TELEPHONE: 212-735-4065
ATTENTION: LUISA BONACHEA
EMAIL: lbonache@skadden.com

**D.      Voting Procedures, Ballots, and Voting Deadline**

After carefully reviewing the Plan, this Disclosure Statement, and the detailed instructions accompanying your ballot, you are asked to indicate your acceptance or rejection of the Plan by voting in favor of or against the Plan on the accompanying ballot.  You should complete and sign your original ballot (copies will not be accepted) and return it as instructed in the envelope provided.

Each ballot has been coded to reflect the Class of Claims it represents.  Accordingly, in voting to accept or reject the Plan, you must use only the coded ballot or ballots sent to you with this Disclosure Statement.

With respect to Noteholder Claims, special voting instructions apply to beneficial owners, nominees of beneficial owners, and securities clearing agencies.  Those special instructions will accompany the ballot provided to holders of Noteholder Claims.  Those instructions may be different from the general instructions contained herein.  In the event of an inconsistency, the special instructions that accompany the ballot should be followed.

IN ORDER FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE PROPERLY COMPLETED AS SET FORTH ABOVE AND IN ACCORDANCE WITH THE VOTING INSTRUCTIONS ON THE BALLOT AND RECEIVED NO LATER THAN NOVEMBER 22, 2005, AT 4:00 P.M. EASTERN TIME (THE "VOTING DEADLINE") BY THE FOLLOWING:

LOGAN & COMPANY, INC.
ATTENTION:  FIBERMARK, INC., ET AL.
546 VALLEY ROAD
UPPER MONTCLAIR, NEW JERSEY 07043

UNLESS OTHERWISE PROVIDED IN THE INSTRUCTIONS ACCOMPANYING THE BALLOTS, FAXED BALLOTS WILL NOT BE ACCEPTED.  BALLOTS THAT ARE RECEIVED BUT NOT SIGNED WILL NOT BE COUNTED.  BALLOTS THAT ARE SIGNED BUT DO NOT SPECIFY WHETHER THE HOLDER ACCEPTS OR REJECTS THE PLAN WILL BE COUNTED AS AN ACCEPTANCE.   DO NOT RETURN ANY STOCK CERTIFICATES, DEBT INSTRUMENTS, OR OTHER EVIDENCES OF YOUR CLAIM WITH YOUR BALLOT.

If you have any questions about (a) the procedure for voting your Claim, (b) the packet of materials that you have received, or (c) the amount of your Claim, or if you wish to obtain, at your own expense unless otherwise specifically required by Bankruptcy Rule 3017(d), an additional copy of the Plan, this Disclosure Statement, or any appendices or exhibits to such documents, please contact:

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
FOUR TIMES SQUARE
NEW YORK, NEW YORK 10036
TELEPHONE: (212) 735-4065
ATTENTION: LUISA BONACHEA
EMAIL: lbonache@skadden.com

For further information and general instruction on voting to accept or reject the Plan, see Article XIII of this Disclosure Statement and the instructions accompanying your ballot.

THE DEBTORS URGE ALL HOLDERS OF CLAIMS ENTITLED TO VOTE TO EXERCISE THEIR RIGHT BY COMPLETING THEIR BALLOTS AND RETURNING THEM BY THE VOTING DEADLINE.

**E.      Special Notice Concerning Releases Associated with Voting**

      1.      Releases by Holders of Claims that Vote to Accept the Plan

Pursuant to the Plan, each holder of a Claim that affirmatively votes in favor of the Plan will be deemed to forever release, waive, and discharge all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, and liabilities whatsoever (other than for fraud, breach of fiduciary duty, willful misconduct, or gross negligence) against the directors, officers, or employees of any of the Debtors serving during the pendency of the Chapter 11 Case (collectively, the "Claimholder Releasees"), in connection with or related to the Debtors, the Chapter 11 Case, or the Plan (other than the rights under the Plan and the contracts, instruments, releases, indentures, other agreements, or documents delivered thereunder), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereunder arising, in law, equity, or otherwise, that are based in whole or part on any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors or the Reorganized Debtors, the Chapter 11 Case, or the Plan.

Creditors may have independent claims against one or more of the Claimholder Releasees. The Debtors have no actual knowledge of any such claims, but cannot warrant to creditors that they do not exist. Because a vote in favor of the Plan will release whatever creditor claims do exist, if any, against Claimholder Releasees, creditors should consult their own counsel for information and advice as to whether any such claims exist and the value or merit of any such claims. If a creditor does not wish to give the releases contemplated under the Plan, then the creditor should vote to reject the Plan or abstain from voting on the Plan. Any party in interest may object to the proposed third party release provisions. The Debtors have the burden of proof at the Confirmation Hearing to satisfy the applicable standards for third party releases.

Except with respect to Claimholder Releasees, all holders of Claims will retain their respective Individual Causes of Action, and no such Individual Cause of Action will be impaired by the Plan or by a vote in favor of the Plan or the receipt of any distributions under the Plan.

      2.      Releases in Favor of Holders of Claims that Vote to Accept the Plan

The foregoing third party release is reciprocal. The Plan provides that each of the Claimholder Releasees will be deemed to forever release, waive, and discharge any claims, obligations, suits, judgments, damages, demands, rights, causes of action, and liabilities whatsoever (other than for fraud, breach of fiduciary duty, willful misconduct, or gross negligence) taking place on or prior to the Effective Date in any way relating to the Debtors or the Reorganized Debtors, the Chapter 11 Case, or the Plan, that such Claimholder Releasees may hold in their individual capacities against each holder of a Claim that affirmatively votes in favor of the Plan. This provision of the Plan will not constitute, and will not be deemed to effect, a release by the Debtors or the Reorganized Debtors of any claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, and liabilities held by the Debtors or the Reorganized Debtors.

**F.      Special Notice Concerning Right to Elect Distribution of New Common Stock of Reorganized FiberMark**

      1.      Election Procedures for Holders of Noteholder Claims (Other than AIGGIC, Post, and Silver Point)

Under the New Plan, as a result of the Constituency Settlement, each holder of an Allowed Noteholder Claim will receive on the Distribution Date an all-Cash payment consisting of a Pro Rata share of Distribution Cash, Settlement Cash, and Stock Purchase Payment that is estimated to equal 70% of each such holder's Allowed Claim, subject to the capped amounts of the Distribution Cash, Settlement Cash, and Stock Purchase Price.

Alternatively, any holder of an Allowed Noteholder Claim (other than AIGGIC, Post, and Silver Point) that desires to receive equity in Reorganized FiberMark may elect to receive on the Distribution Date a Pro Rata share of New Common Stock, Distribution Cash, and Settlement Cash (the "Alternate Distribution") that is estimated by the Debtors to have an aggregate value equal to 62% of such holder's Allowed Claim, subject to the capped amounts of the Distribution Cash and Settlement Cash. To make the election, it is not necessary that you vote in favor of the New Plan or that you vote at all on the New Plan.

The deadline for electing the Alternate Distribution is December 2, 2005, the date of commencement of the Confirmation Hearing. All of the FiberMark Notes are held in book-entry form and are represented by one or more global certificates held by DTC. Accordingly, all elections to receive the Alternate Distribution must be made on behalf of the

beneficial owners of the FiberMark Notes by the DTC Participant through which the FiberMark Notes of such beneficial owners are held. Only elections made by DTC Participants through the DTC's PTOP procedures will be accepted. Any beneficial owner of FiberMark Notes who desires to elect to receive the Alternate Distribution with respect to Noteholder Claims represented by its FiberMark Notes must contact the DTC Participant through which such beneficial owner holds its interest in the FiberMark Notes and request that such DTC Participant make the election on such beneficial owner's behalf through the DTC's PTOP procedures. The burden is on the beneficial owner to contact its DTC Participant and to ensure that such DTC Participant timely and properly acts on its behalf. The Debtors have no obligations in that regard and no liability for any party's failure to timely and properly make the election. At the time of the election, the position of the beneficial owner will be frozen, the beneficial owner's FiberMark Notes will be deemed to have been tendered and surrendered in exchange for the right to receive the Alternate Distribution, and no subsequent trading of the beneficial owner's interest in the FiberMark Notes will be recognized. If an election to receive the Alternate Distribution is not made for a beneficial owner by December 2, 2005, the beneficial owner will receive the all-Cash distribution.

The Debtors reserve the right, in their sole and absolute discretion, to determine the timeliness and adequacy of all elections to receive the Alternate Distribution, and the Debtors' judgment on such matters will be final and conclusive on all parties.

2. Election Procedures for Holders of General Unsecured Claims (Other than Silver Point)

Under the Plan, as a result of the Constituency Settlement, each holder of an Allowed General Unsecured Claim will receive on the Distribution Date an all-Cash payment consisting of a Pro Rata share of Distribution Cash, Settlement Cash, and Stock Purchase Payment that is estimated to equal 70% of each such holder's Allowed Claim, subject to the capped amounts of the Distribution Cash, Settlement Cash, and Stock Purchase Price.

Alternatively, any holder of an Allowed General Unsecured Claim as of October 24, 2005, the applicable Distribution Record Date, that desires to receive equity in Reorganized FiberMark may elect, by checking the appropriate box on the Ballot provided to such holder, to receive on the Distribution Date a Pro Rata share of New Common Stock, Distribution Cash, and Settlement Cash that is estimated by the Debtors to have an aggregate value equal to 62% of such holder's Allowed Claim, subject to the capped amounts of the Distribution Cash and Settlement Cash.

To be recognized, the election must have been clearly marked on the Ballot and the Ballot must be returned by no later than November 22, 2005, the Voting Deadline, in accordance with the instructions contained in the Ballot. The election will be irrevocable and binding on the holder identified on the Ballot. All resulting distributions of New Common Stock, Distribution Cash, and Settlement Cash will be made in the name of the holder identified on the Ballot and will be delivered to the address contained on the Ballot. For purposes of the election, no transfer of Claim made after October 24, 2005, the applicable Distribution Record Date, will be recognized. Any holder that fails to return a Ballot by November 22, 2005, the Voting Deadline, or that timely returns a Ballot without marking the election will receive the all-Cash distribution.

G. **Confirmation Hearing and Deadline for Objections to Confirmation**

Pursuant to Section 1128 of the Bankruptcy Code and Bankruptcy Rule 3017(c), the Bankruptcy Court has scheduled a Confirmation Hearing for December 2, 2005, at 10:30 a.m. Eastern Time. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the adjournment date made at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing. Objections to Confirmation of the Plan must be made in writing and must specify in detail the name and address of the objector, all grounds for the objection, and the amount and Class of the Claim. Any such objection must be filed with the Bankruptcy Court on or before November 22, 2005, at 12:00 noon Eastern Time. Objections to Confirmation of the Plan are governed by Bankruptcy Rule 9014.

## V. GENERAL INFORMATION CONCERNING THE DEBTORS

A. **Overview of Business Operations**

FiberMark is the publicly-owned parent of a family of companies (collectively, the "Company") organized and operating in the United States under the auspices of the Debtors and in Europe under the auspices of non-Debtor foreign direct and indirect subsidiaries. The Company is a leading producer of specialty fiber-based materials meeting industrial and consumer needs worldwide. Through its technical capabilities, innovation, and a service orientation, the Company holds

leadership positions in many of its primary markets. Using its versatile manufacturing capabilities – comprising papermaking, synthetic/nonwoven material technology, saturating, coating, and other finishing processes – the Company generates products such as filter media; base materials for specialty tapes, electrical and graphic arts applications, wallcovering, and sandpaper; and covering materials for office and school supplies, book production/publishing, printing, and premium packaging.

The Company manufactures its engineered materials using a wide range of fibers and raw materials, including wood pulp, recycled paper, cotton, glass, polyester, and other synthetic fibers. The Company's products, sold in roll or sheet form, range from lighter-weight papers to high-density pressboards, often with high value-added finishes processes. The Company sells most of its products directly to customers through its internal sales force. These customers, often called converters, manufacture components or finished products such as automotive oil filters, specialized masking tapes, electrical transformers, books, and pressboard ring binders. In some markets, the Company sells its materials through distributors or paper merchants.

As a specialty fiber-based materials producer and marketer, the Company manufactures and converts specialty papers, pressboards, nonwoven materials, and combinations of various materials, operating in two segments: North American operations and German operations, consistent with the internal management structure for the Company's business. The North American operations, which include the Debtors and the Debtors' affiliates in the United Kingdom, France, and Hong Kong, are focused on publishing and packaging, technical specialties, and office products, and accounted for 52% of the Company's consolidated revenue during the year ended December 31, 2004. The German operations, which include the Debtors' affiliates in Germany, are focused on the production of technical specialties, including filter media, masking tape base, wallcovering base, printing substrates, and abrasive base materials, and accounted for 48% of the Company's consolidated revenue during the year ended December 31, 2004.

## B.     Organizational Structure

The Company's corporate structure is reflected in Appendix C attached hereto. FiberMark's direct subsidiaries include FNA and FIH, which are Debtors in the Chapter 11 Case, and FiberMark Red Bridge International Ltd., FiberMark SARL, Specialty Paperboard (Hong Kong) Ltd., and FiberMark Beteiligungs GmbH, which are not Debtors in the Chapter 11 Case. FiberMark's indirect subsidiaries are owned primarily through FIH and are not Debtors in the Chapter 11 Case. They include FiberMark Lahnstein GmbH & Co., OHG and FiberMark Gessner GmbH & Co., OHG, through which the Company's German operations are conducted.

## C.     Corporate History

The Company was created in 1989 through a management-led buyout of the Specialty Paperboard division of Boise Cascade Corporation, resulting in the establishment of Specialty Paperboard, Inc., the predecessor in interest to FiberMark. The Company's initial manufacturing operations were conducted at facilities acquired in Brattleboro, Vermont; Beaver Falls, New York; and Sheldon Springs, Vermont. On March 27, 1997, Specialty Paperboard, Inc. changed its name to FiberMark, Inc.

Since its inception, the Company has undertaken a series of acquisitions, divestitures, and consolidations designed to broaden and deepen its product and market capabilities, lower its manufacturing costs, lessen its dependence on certain raw materials, and improve its operational flexibility. Such acquisitions, divestitures, and consolidations include the following:

- On January 30, 1991, the Company agreed to sell to Rock-Tenn Company its Sheldon Springs, Vermont facility, known as the Missisquoi mill.

- On June 30, 1994, the Company acquired substantially all of the assets and liabilities of the Endura Products division of W.R. Grace & Co., which was engaged in the manufacture, conversion, saturation, and coating of specialty papers. The Company acquired facilities in Quakertown, Pennsylvania and Owensboro, Kentucky as a result of this transaction.

- On March 22, 1995, the Company sold the assets of its Lewis Mill located in Beaver Falls, New York and its gasket business to Armstrong World Industries Inc.

- On October 31, 1996, the Company acquired all of the outstanding stock of CPG Investors Inc., which was the operator of five paper mills and the manufacturer of a diverse portfolio of specialty fiber-based products for industrial and technical markets. As a result of this transaction, the Company acquired facilities in Fitchburg, Massachusetts; Warren Glen, New Jersey; Hughesville, New Jersey; Richmond, Virginia; and Rochester, Michigan.

- On October 31, 1996, the Company acquired all of the outstanding stock of Arcon Holdings, which was the operator of a converting facility and the manufacturer of colored binding and stripping tapes and edge cover materials sold primarily into the office products, checkbook, and book binding markets. The converting facility, located on leased property in Oceanside, New York, was consolidated with other operations of the Company during the fourth quarter of 1997.

- On November 1, 1996, the Company sold to Thomas Tape Co., Ltd. assets previously owned by Arcon Coating Mills, Inc. ("Arcon") that were used exclusively in the operation of, or related exclusively to, Arcon's Thomas Tape Division. Among the assets sold to Thomas Tape Co., Ltd. was a manufacturing site in Springfield, Ohio.

- On November 19, 1997, the Company announced its intention to close its Owensboro, Kentucky facility and consolidate production demands with several other of its mills. The Owensboro mill was closed on January 14, 1998.

- Effective January 1, 1998, the Company acquired Steinbeis Gessner GmbH, a leading producer of specialty fiber-based materials sold into the filtration, technical specialties, and durable specialties markets, which is now known as FiberMark Gessner GmbH & Co., OHG.

- On November 4, 1998, the Company announced plans to cease operations at the latex mill in Beaver Falls, New York facility. The Company closed the facility on January 29, 1999, and subsequently sold it to LTX Fibre Corporation on December 13, 2001.

- Effective August 1, 1999, the Company acquired Papierfabrik Lahnstein, GmbH, a leading European manufacturer of specialty papers and nonwoven materials used for wallcoverings, security papers, self-adhesive labels, and flooring overlays, which is now known as FiberMark Lahnstein GmbH & Co., OHG.

- On August 1, 1999, the Company initiated a project to install a new paper machine at its Warren Glen, New Jersey facility.

- On September 1, 2000, the Company entered into an agreement with Ahlstrom Paper Group to sell certain filter media production technology and equipment and a portion of the filter media volume manufactured at the Richmond, Virginia facility. The Company completed the transfer of the remaining volume at the Richmond facility to other facilities and closed the Richmond facility in June 2001.

- On April 18, 2001, the Company acquired Rexam DSI, a leading global manufacturer of specialty decorative covering materials serving the publishing, stationery, and premium packaging markets, with a focus on latex-saturated paper products. As a result of this transaction, the Company acquired facilities in Lowville, New York; Brownville, New York; West Springfield, Massachusetts; Johnston, Rhode Island; Reading, Pennsylvania; South Hadley, Massachusetts; and Bolton, England.

- During the fourth quarter of 2001, the Company ceased operations at its Fitchburg, Massachusetts facility.

- On September 17, 2001, the Company also sold the balance of it engine filter media business and equipment to Ahlstrom Corporation and ceased operations at its Rochester, Michigan facility in the second quarter of 2002.

- On December 31, 2002, the Company concluded a series of transactions with Ahlstrom Corp., pursuant to which it sold to Ahlstrom most of its North American industrial filter media business and its German disposable nonwoven tablecloth business and purchased from Ahlstrom a vacuum bag filter media business.

- On June 15, 2004, the Company obtained permission from the Bankruptcy Court to continue its efforts to sell the following idle facilities: its hydroelectric power facility in West Springfield, Massachusetts; its paper mill in Rochester, Michigan; and its paper coating/converting facility in Johnston, Rhode Island. The three sale transactions have since closed.

- On July 20, 2005, the Company obtained permission from the Bankruptcy Court to implement the strategic initiatives described in the Debtors' Motion for Order Under 11 U.S.C. §§ 105(a) and 363(b) Authorizing (i) Implementation of Strategic Cost Reduction Program and (ii) Related Relief dated June 23, 2005. The proposed strategic cost reduction program contemplates, in the discretion of and on the timetable determined by the Debtors, the closure of the Debtors' papermaking facility located in Hughesville, New Jersey, and the elimination of one of the Debtors' papermaking machines located in Warren Glen, New Jersey. Additionally, the program involves the transfer of certain product lines from the New Jersey plants to other of the Debtors' papermaking facilities and/or paper machines. The Debtors' current intention, subject to business developments, is to effectuate this restructuring by the end of the fourth quarter of 2005.

**D.      North American Operations**

The Company's North American operations consist of seven production sites (four paper mills and three converting operations) in the northeastern United States, owned by the Debtors, and one converting operation in the United Kingdom, owned by non-Debtor FiberMark Red Bridge International Ltd. Additionally, the Company has a customer service/administrative site in South Hadley, Massachusetts, and a technical center in West Springfield, Massachusetts. The Company's corporate headquarters and one production site are located in Brattleboro, Vermont.

A significant portion of the Company's North American papermaking operations is used to supply its converting operations with base materials. The remainder of the Company's North American paper machine production and most of its converting production is sold to customers, typically manufacturers known as converters, with a small portion sold through agents and distributors. The majority of the Company's North American markets and product lines are mature, serving niche markets. In some markets, the Company has experienced structural revenue losses tied to product substitutions, including technology-based products, plastics, and lower-quality materials.

As stated above, the Company's North American operations are focused on three primary product families: publishing and packaging, technical specialties, and office products. A description of each product family follows.

1.      Publishing and Packaging

Publishing and packaging is the largest product family within the Company's North American operations, representing 42% of 2004 North American net sales. This product group is primarily derived from the Company's April 2001 acquisition of Rexam DSI. The Company's covering materials are predominantly used in the book publishing and luxury packaging industries. The Company adds multiple coatings and embossing patterns to impart a full range of decorative treatments to its latex-saturated decorative covering materials. The Company's colored saturated products are sold under a variety of trade names, including Kivar®, Skivertex®, and Lexotone®, which are well-known worldwide within the Company's markets, particularly in publishing. In graphic white saturated grades, the Company competes in the higher end segments of the book cover and photo/scrapbook album markets. The Company's Kivar Performa Type 2 is a recognized, premier brand for use in textbook covers, and is specified by a majority of state governments in the United States. The Company's United Kingdom converting operation markets a line of coated cloth materials, specialty papers, nonwoven materials, and ancillary products to the bookbinding/book publishing, packaging, and security markets. These products are marketed under the umbrella of the FiberMark Red Bridge name, and include products such as Arbelave®, Library Buckram, and Balmoral®.

(a)    Products

The Company has developed some niche markets for its latex-saturated products in applications such as wallpaper, due to competitive advantages related to environmental impact, ink receptivity, and durability. The customer base of the publishing and packaging product family tends to be quite diverse, consisting of leading high-end publishing, printing and packaging companies. The following chart summarizes the decorative covering materials the Company produces to serve these niche markets and typical customer categories:

| Materials/Products | End Products/Markets | Typical Customers |
|---|---|---|
| *Book Publishing and Premium Packaging Markets* | | • Leading publishers/printers<br>• Manufacturers/converters<br>• Specialty distributors and agents |
| • Colored saturated paper<br>  • Lightweight<br>  • Heavyweight<br>• Graphic white saturated paper<br>• Cloth covering materials<br>• Saturated base<br>• Bonded leather | • Covering materials for hardbound books (elementary/high school textbooks, photo albums, scrapbooks, and sample books)<br>• Self-supporting covers for softbound books<br>• Premium packaging coverings (luxury goods and media, such as DVD and CD sets)<br>• Menus | |
| *Other Decorative Specialties* | | |
| • Latex-saturated base: white and color | • Wallcovering<br>• Binding materials, jeans labels, and game boards | |

(b)    Competitors

The Company's direct competitors in the publishing and packaging markets include Industrial Coatings Group, Inc., Ecological Fibers, Inc., Monadnock Paper Mills, Inc., Guarro, an Arjo Wiggins subsidiary (division of WORMS & Cie.), and BN International B.V.  These companies compete in different geographic markets and specific publishing niches. In both publishing and packaging, the Company competes with decorative materials including commodity papers (such as colored kraft), other decorative papers and nonwoven materials, vinyl, vinyl/paper combinations, coated cloth, bonded leather, and premium materials such as wood, metal and leather.  In the U.S. wallcovering market, the Company competes primarily with other substrate manufacturers such as Monadnock Paper Mills, Inc. and producers of vinyl, paper-based wallcovering, and nonwoven materials.

(c)    Manufacturing

The Company manufactures paper-based materials at its facilities in Warren Glen and Hughesville, New Jersey; Brownville, New York; and Brattleboro, Vermont.  The Company's converting operations purchase base paper from these facilities, and cloth from its United Kingdom converting operation in Bolton, England.  The Company also purchases cloth from third-party sources, particularly for use by its United Kingdom converting facility.  The Company's converting facilities in Lowville, New York; Quakertown, Pennsylvania; Reading, Pennsylvania; and Bolton, England can latex-saturate, coat, emboss, and apply other finishes to its base materials to create a wide array of decorative covering materials.

2.    Technical Specialties

Technical specialties represented 23% of the net sales from the Company's 2004 North American operations. The technical specialties product family serves the most diverse range of markets in the Company's North American operations with a wide array of products.

(a)     Products

The Company's primary products, detailed below, are base materials used in saturated masking tapes, matboard for picture framing, and electrical insulation materials for transformers. These materials may be sold in raw paper form or may be saturated and/or coated.

| Materials/Products | End Products/Markets | Typical Customers |
|---|---|---|
| *Tape Substrates* | | |
| • Base for masking tape and other pressure sensitive tapes<br>• Raw<br>• Saturated | • Masking tape (general purposes and painting aid)<br>• Automotive OEM and repair<br>• Building construction/renovation<br>• Carrier and bandoliering materials<br>• Medical (first aid; indicator) | • Pressure sensitive (and diversified) tape manufacturers/ converters<br>• Electronic components manufacturers |
| *Electrical/Electronics* | | |
| • Insulating base<br>• Electronic component carrier material | • Electrical distribution transformers<br>• Chips and other electronic components manufacturing | • Manufacturers of electrical transformer components<br>• Manufacturers of chips and other electronic components |
| *Graphic Arts/Specialty Printing* | | |
| • Archival quality, acid free paper and boards; cover materials for storing, presenting information, or materials<br><br>• Security paper | • Matboard for picture mounting/framing<br>• Archival filing and storage products<br><br><br>• Identity cards/materials and tickets | • Manufacturers of mounting and framing supplies<br>• Manufacturers of conservation storage and presentation supplies<br>• Specialty security/ticket manufacturers/printers |
| *Home/Commercial* | | |
| • Abrasive backing material<br>• Latex-treated material<br><br>• Label base: synthetic and imitation leather | • Sandpaper: hand and machine sanding<br>• Wallboard joining<br><br>• Labels for seat belts, infant car seats, and jeans | • Coated abrasives manufacturers<br>• Drywall materials manufacturers<br>• Label manufacturers/converters |
| *Commercial/Industrial* | | |
| • Wet strength<br>• Absorbent materials | • Industrial process<br>• Blotter; humidity indicator, battery fabrication process | • Specialty distributors<br>• Specialty distributors and manufacturers |

(b)     Competitors

The Company's competitors that serve various technical specialties markets include a mix of large integrated manufacturers and smaller independent companies, such as Arjo Wiggins (division of WORMS & Cie.), International Paper Co., Brownville Specialty Paper Products Inc., Crocker Technical Papers, Inc., FiberComposites (division of Ahlstrom Corp.), Kimberly Clark Corp., MeadWestvaco Corp., and Smurfit Munksjo AB. In some of its niche markets, the Company competes with various small competitors, typically none of which has a dominant market position. In many product lines, manufacturers of substitute materials, such as polyethylene or vinyl, are also considered competitors.

(c)     Manufacturing

The Company manufactures the base technical specialties materials in its Warren Glen and Hughesville, New Jersey facilities and at its Brattleboro, Vermont facility. In addition, the Company purchases some base materials from third-party suppliers. Specifically, the Company relies on both third-party and internal resources to supply its converting facility in Quakertown, Pennsylvania. These base materials are typically saturated, coated, and embossed within the Company's facilities and, in some cases, by the Company's customers.

3. Office Products

Office products represented 35% of net sales from the Company's 2004 North American operations. The Company's office products include pressboards, other cover materials, and binding tapes used by its customers primarily in the manufacturing of paper-based supplies used in the office, home, or school. In addition, a portion of the Company's cover materials is marketed to the graphic design community for a variety of promotional applications.

(a) Products

The major components of this product family, associated end products/markets, and typical customers are noted in the following chart:

| Materials/Products | End Products/Markets | Typical Customers |
|---|---|---|
| • Specialty cover materials (heavyweight and lighter-weight) for products that present, bind, store, or preserve information | • Binding: data and ring binders and notebooks<br>• Filing/active use: file folders, pressboard folders, and other filing products<br>• Presentation: document/report covers, folders<br>• Diaries, date books, and planners | • Diversified or specialized manufacturers/converters of school, home, and office supplies<br>• Paper merchants (selling to printers)<br>• Checkbook printers/manufacturers |
| • Binding tapes: edge binding and reinforcing<br>• Primarily coated synthetic nonwoven materials | • Filing products, checkbooks, and memo pads | |

(b) Competitors

The Company's competitors in the office products market include a mix of large integrated manufacturers and smaller independent companies, which include International Paper Co., Brownville Specialty Paper Products Inc., Crocker Technical Papers, Inc., Fox River Paper Co., and MeadWestvaco Corp. In addition, the manufacturers of certain substitute materials, such as polyethylene or vinyl, compete in some of the Company's office products markets. The Company's competitors for binding tapes include Southern Label Company, Northeast Paper Converting Company, and Kimberly Clark Corp. (a base materials supplier).

(c) Manufacturing

The Company manufactures the base materials for this product group primarily in its Brattleboro, Vermont facility, and, to a lesser extent, in its Warren Glen and Hughesville, New Jersey facilities. The Company's U.S. converting operations may supply sheeting, embossing, coating, or other finishing steps for these base materials. The Company's Quakertown, Pennsylvania converting facility produces most of its binding tape materials using synthetic nonwoven material (Tyvek®) purchased from DuPont. The Company coats, colors, and/or saturates this material for office supplies, books, and related products.

E. German Operations

The Company's German operations are not involved in the Chapter 11 Case. The German operations are focused on the production of technical specialties, including filter media, masking tape base, wallcovering base, printing substrates, and abrasive base materials. Such operations are highly profitable and provide significant intercompany support to the Debtors.

The Company's German operations consist of FiberMark Gessner, located in Bavaria, Germany, and FiberMark Lahnstein, located northwest of Frankfurt in Rhineland-Palatinate, Germany.

1. Technical Specialties

All of the German operations are reported in the technical specialties product family. Filter media, primarily for automotive/transportation and vacuum bag filtration, accounts for a significant portion of the Company's German operations through FiberMark Gessner. Although the Company markets these products worldwide, the majority is sold within Europe, with significant business in Asia Pacific, the U.S., and, to a lesser degree, Latin America.

(a) Products

The following chart summarizes the materials produced and marketed worldwide through the Company's German operations, associated end products or markets, and the types of customers.

| Materials/Products | End Products/Markets | Typical Customers |
|---|---|---|
| *Filter Media for Transportation Filtration (car, truck, heavy-duty equipment, train, jet, etc.)* | | |
| • Saturated and unsaturated paper that may be reinforced with cotton or synthetic fibers<br>• Synthetic/nonwoven meltblown<br>• Composite materials | • Liquid filters:<br>fuel, lube, and hydraulic oil<br>• Air filters:<br>engine and vehicle passenger cabin | • Leading filter manufacturers (sold into/to OEM, OES, and after-markets) |
| *Filter Media for Home/Commercial Filtration* | | |
| • Paper and synthetic: nonwoven meltblown<br>• Synthetic air filter media | • Vacuum cleaner bags (OEM, OES, and after-market)<br>• Industrial filtration, ventilation, air-conditioning, and process air filtration | • Manufacturers/converters of vacuum cleaners or bags<br>• Producers of industrial filter element and filter sets |
| *Home/Commercial* | | |
| • Nonwoven wallcovering base<br>• Abrasive base<br>• Printing substrates: specialty nonwoven/synthetic content materials<br>• Security paper<br><br>• Overlay and other flooring materials | • Wallcovering/wallpaper<br>• Sandpaper: hand and machine<br>• Graphic arts/printing: menus, promotional items, maps, durable documents, and labels<br>• Identity: cards, licenses, tickets, registrations, and stock certificates<br>• Laminated imitation wood veneer flooring | • Wallcovering manufacturers<br>• Coated abrasives manufacturers<br>• Paper merchants (servicing printing industry)<br><br>• Paper merchants (servicing printing industry)<br>• Flooring manufacturers |
| *Tape Substrates* | | |
| • Masking tape base<br> • Raw (unsaturated)<br> • Saturated<br><br>• Other tape base | • Masking tape for general purposes and painting:<br> • Automotive OEM and repair<br> • Building construction/renovation<br>• Application tape to transfer vinyl lettering for signage | • Leading tape manufacturers, worldwide, particularly in Europe and Asia Pacific<br><br>• Self-adhesive coaters (tape manufacturers) |

(b) Competitors

The Company's largest competitors in the transportation filtration market are FiberComposites, a division of Ahlstrom Corp., and Hollingsworth & Vose/Binzer. The Company's primary competitors in vacuum filter media include Monadnock Paper Mills, Inc. in the United States and Neu Kaliss Spezialpapier GmbH and MB Papeleras Especiales S.A. in Europe. The Company's competitors in the tape substrate market include integrated manufacturers, such as Kimberly-Clark Corp., Wausau-Mosinee Paper Corp., Paper Line S.p.A., Ahlstrom Corp., and MeadWestvaco Corp. The Company also competes with various small competitors, none of which has a dominant market position. In the tape market, some of the Company's customers have the ability to saturate tape base materials, a service that the Company provides to many of its tape base customers.

The Company's competitors in other technical markets, such as abrasive and nonwoven wallcovering base, include a mix of large integrated manufacturers and smaller independent companies, including Arjo Wiggins (division of WORMS & Cie.), FiberComposites (division of Ahlstrom Corp.), Hollingsworth & Vose, Kimberly-Clark Corp., MeadWestvaco Corp., and Neu Kaliss Spezialpapier GmbH. In some of the Company's niche markets, it competes with various large, integrated commodity paper manufacturers who may make less expensive substitute materials. In the graphic arts market, the Company's primary competitors are producers of films or 100% synthetic materials.

(c)      Manufacturing

The Company's German operations consist of three sites: Lahnstein, Germany (FiberMark Lahnstein); Feldkirchen/Westerham ("Weidach"); and Bruckmühl, Germany (FiberMark Gessner facilities). The Company manufactures base materials, including paper, often combining wood pulp sources and non-wood sources such as synthetic fibers and synthetic fiber-based materials, and combinations of paper and nonwoven materials. In addition, the Company's German facilities have various finishing capabilities, including saturating, coating, bonding, and other finishing capabilities. The Company's filter media business is primarily produced in its Weidach site. The Bruckmühl site primarily produces specialty tape substrates, which may be raw, saturated, and/or coated, as well as latex-treated abrasive base materials used for sandpaper. The Company's New Jersey operations supply its German operations with a portion of their vacuum bag filter media and tape base needs. The Company also purchases a small percentage of the base materials marketed by its German operations from outside sources. FiberMark Lahnstein produces and markets its largest single product line, wallcovering base, as well as printing and coating base materials. The Company sold its disposable tablecloth business, formerly produced by FiberMark Lahnstein, to Ahlstrom Corp. in December 2002.

## F.      Operational Matters

### 1.   Sales, Marketing and Distribution

The Company's customers are primarily converters or manufacturers who rely on its base materials for making their finished or semi-finished products. The Company's engineered materials are sold in roll or sheet form. Most of the Company's business is sold directly to customers primarily through its internal sales force, supplemented by agents or distributors, particularly for specialized markets or certain geographic markets outside of the United States. In some markets, such as publishing and packaging and graphic design markets, the Company's products are sold through distributors or paper merchants. In addition, the Company uses merchants or stocking distributors to sell materials used for certain broad channels such as printers, packaging converters, and select specialty book publishers. Worldwide direct sales to end users or converters represented approximately 84% of the Company's net sales in 2004. The remaining sales were made through distributors.

Most of the Company's products are widely known in its primary markets, with strong brand awareness for many of the Company's branded products. The Company holds a number of patents, trademarks, and licenses. While intellectual property rights are material to the Company's business, the loss of any one of these rights would not be expected to have a material adverse effect on the Company's business, with the exception of FiberMark®.

Many of the Company's customers are well known in their markets, and no single customer represented more than 5% of its net sales for the year ended December 31, 2004.

### 2.   Raw Materials

The Company uses a wide array of raw materials to formulate its products, including virgin hardwood and softwood pulp, secondary wood fiber from pre-and post-consumer waste, secondary cotton fiber from the apparel industry, synthetic fibers, such as nylon, polyester, and fiberglass, synthetic latex, chemicals, pigments, and dyes. These materials are purchased from numerous suppliers worldwide.

Wood pulp is the Company's single most significant raw material. The Company does not produce pulp. Pulp and secondary fiber prices are subject to substantial cyclical price fluctuations. Approximately 7% of the Company's revenues are based on contractual pricing that is indexed to commodity pulp. These customer contracts provide the Company with some insulation from raw material cost variability. A smaller portion of our revenues are tied to agreements with customers to set prices on an annual basis, which may permit pricing changes only in cases of extreme raw material volatility.

Latex represents the Company's second most significant raw material cost. The Company purchases this material from a number of sources worldwide. The price is generally less volatile than that of pulp.

The Company has a long-standing relationship with DuPont, its supplier of Tyvek®, and has never experienced a disruption in supply. Although the Company is an approved DuPont converter and believes that it has a good relationship with DuPont, there can be no assurance that the Company will be able to continually purchase adequate supplies of Tyvek®. The Company also purchases a significant quantity of polyester, the majority of which is Dacron®, purchased from DuPont SA. Any material interruption in the Company's supply of Tyvek® or Dacron® could have a material adverse effect on the results of operations and the Company's financial condition.

3. Energy

The Company's operations, particularly its paper mills, consume a significant amount of energy. The Company's natural gas and electricity requirements are supplied by public utilities and/or qualified suppliers. The Company employs third-party supply contracts to manage and reduce the commodity and transportation costs associated with natural gas and electric power. While natural gas accounts for the majority of the Company's fuel needs, the Company also uses fuel oil in some of its operations. The Company typically purchases fuel oil on the spot market as needed. In order to address energy issues and opportunities, the Company has retained the services of an energy management company. The Company also regularly evaluates alternative energy and co-generation options.

4. Environmental Regulation and Compliance

The Company and its predecessors have invested substantially in pollution control facilities to comply with environmental laws and regulations. The Company spent $7 million in 2004, $6.8 million in 2003, and $5.6 million in 2002 for environmental purposes. While the Company believes its capital expenditures will be sufficient to maintain substantial compliance with existing environmental laws, any failure to comply with present or future environmental laws could subject the Company to liability or require it to suspend or reduce operations. In the future, the duty to comply with environmental laws could restrict the Company's ability to expand its facilities, obligate the Company to acquire and operate costly equipment, or otherwise force the Company to incur significant expenses.

The Company understands that the United States Environmental Protection Agency ("EPA") has named the previous owners of CPG Investors, Inc. ("CPG") as potentially responsible parties ("PRPs") for costs to investigate and clean up various third-party sites. The Company acquired CPG by merger in 1996. The Company has no information suggesting that the EPA or any other agency or party plans to assert that it is a PRP. No Proof of Claim asserting PRP liability has been filed by the EPA or any other agency or party in the Chapter 11 Case.

CPG's liabilities at those sites arose under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended ("CERCLA"), which imposes liability on broad categories of parties. Courts have interpreted CERCLA to impose retroactive, strict, and, under certain circumstances, joint and several liability on parties for costs associated with investigating and cleaning up facilities. Typically, current owners and operators of a facility, those who owned or operated a facility when hazardous substances were disposed of there, as well as those that generated or transported the hazardous substances, may be liable under CERCLA as PRPs. In addition, CERCLA imposes liability for the costs of evaluating and addressing damage to natural resources.

The State of New Jersey required extensive environmental investigation regarding the release of hazardous substances, materials, and/or wastes at two sites the Company acquired in 1996 through the CPG merger. Based on the results of those investigations, remediation may be necessary to address that contamination.

In December 2002, a subsidiary of the Company and predecessor to FNA, then known as FiberMark DSI, Inc. ("DSI"), voluntarily disclosed to the EPA that DSI might have violated certain federal air pollution control laws. DSI disclosed the possible violations after performing a voluntary audit of its compliance with those legal requirements at the DSI facilities in Lowville, New York and Johnston, Rhode Island. The EPA has not informed the Company as to whether it plans to seek penalties for the possible violations and the EPA filed no Proof of Claim in the Chapter 11 Case with respect to any such penalties.

In December 2002, DSI also voluntarily disclosed to the New York State Department of Environmental Conservation ("NYSDEC") possible violations of state air pollution control law based on what it found during the voluntary

audit conducted at the Lowville facility. Based on the facts disclosed, the NYSDEC issued a notice of violation ("NOV") to DSI on December 18, 2002. The Company understands that the NYSDEC does not intend to seek a penalty for the possible violations and in fact the NYSDEC filed no Proof of Claim in the Chapter 11 Case with respect to such penalties.

The Company has demanded that the former owner of the Lowville and Johnston facilities indemnify it under the terms of the purchase agreement for the losses the Company has incurred and may incur as a result of the disclosures to the EPA and the NYSDEC. The former owner has rejected the Company's claim, and the Company cannot predict whether its indemnification demand will succeed.

In December 2003, the City of Fitchburg ("Fitchburg City") commenced an action against the Company and one of its subsidiaries in Massachusetts Superior Court. The complaint seeks monetary damages and injunctive relief under a 1973 agreement between Fitchburg City and a predecessor of the Company relating primarily to costs associated with a portion of Fitchburg City's wastewater treatment system. In January 2004, the Company and its subsidiary responded to the complaint. Fitchburg City filed a Proof of Claim in the Chapter 11 Case, to which the Debtors objected. In July 2005, the Company and Fitchburg City entered into a stipulation resolving Fitchburg City's claim, which stipulation was approved by the Bankruptcy Court by order entered August 24, 2005. Pursuant to the stipulation, Fitchburg City will have an allowed general unsecured claim in the amount of $225,000 and an allowed secured claim in the amount of $2,273.64, the latter being based upon allegedly unpaid real estate taxes and water and sewer charges.

In April 2001, the Company acquired paper mill and converting facilities in Johnston, Rhode Island; West Springfield, Massachusetts; and Brownville, New York. The former owner of the paper mill and converting facilities maintained responsibility for addressing known environmental conditions, and as long as the Company provided notice within a certain time period, the former owner agreed to indemnify the Company for environmental investigation and remediation obligations for previously unidentified contamination that existed prior to closing. The Company has advanced several demands, and the former owner has met its indemnity obligations to date. Under relevant state and federal environmental laws, the Company may be a PRP and consequently could be required to perform remedial actions to address contamination if the former owner defaults on its obligations. The Company believes that the potential for such default is remote. No Proofs of Claim were filed in the Chapter 11 Case asserting any PRP liability.

The NYSDEC has listed a portion of the Company's Lowville facility on its Hazardous Substance Waste Disposal Site Inventory. The listing is based on an assessment by the NYSDEC of potential impacts associated with activities that occurred before the Company acquired the facility. In 1997, testing on the listed portion revealed concentrations below applicable cleanup objectives but also revealed the presence of contamination elsewhere at the facility above applicable cleanup objectives. In 1998, cleanup activities at the facility were completed to remediate likely sources of that contamination. The NYSDEC was informed that chemicals were present in groundwater in excess of applicable cleanup objectives and that the source of the contamination may originate from a source offsite, at a location other than the facility. The NYSDEC has not asked the Company to perform additional cleanup activities. The Company cannot predict whether the NYSDEC will require it to take additional steps in the future, but the Company does not believe the costs of performing any such activities would have a material adverse effect on its financial position or results of operations.

In April 2003, Georgia-Pacific Corporation ("Georgia-Pacific") commenced an action in the United States District Court for the District of New Jersey against the Company in connection with the Warren Glen and Hughesville mills (the "Georgia-Pacific Action"). The complaint sought declaratory relief, unspecified monetary damages, and requested an order of specific performance, all in connection with alleged rights and obligations arising under a 1991 Asset Purchase Agreement (the "1991 Agreement"). The Company responded to the complaint in May 2003. In October 2003, Georgia-Pacific amended its complaint to include claims for similar relief allegedly arising from four additional agreements (the "1993 Agreements"). In December 2003, the Company filed an amended answer with counterclaims against Georgia-Pacific, based on the agreements at issue. The case relates to environmental assessment and remediation work required of Georgia-Pacific at two mill properties pursuant to state law, and potential payments owed to the Company under those various agreements. The litigation was stayed upon the chapter 11 filing. Georgia-Pacific filed a motion for relief from the automatic stay with the Bankruptcy Court in September 2004. After negotiations, the Debtors agreed to a settlement with Georgia-Pacific, which the Bankruptcy Court approved pursuant to an order entered in January 2005. The settlement provides for, among other things, (a) the withdrawal of Georgia-Pacific's motion to lift the automatic stay, (b) Georgia-Pacific's waiver of any claims relating to the Warren Glen and Hughesville Mill properties, the 1991 Agreement or the 1993 Agreements for purposes of voting on and recovering distributions under the Plan, and (c) subject to the occurrence of the Effective Date of the Plan, the Debtors' assumption of the 1991 Agreement and the 1993 Agreements, without the need to pay any cure costs associated therewith. Pursuant to the settlement, Georgia-Pacific will retain its right, to the extent that any

such right exists, to assert any claim relating to the Warren Glen and Hughesville Mill properties, the 1991 Agreement, and/or the 1993 Agreements defensively pursuant to the doctrines of setoff or recoupment against and to the extent of any claims the Debtors may assert against Georgia-Pacific arising from the imposition or recording of deed restrictions on the Warren Glen and Hughesville Mill properties in accordance with and to the extent provided for in the 1991 Agreement and/or the 1993 Agreements.  The Debtors retain any and all rights, claims, counterclaims, offsets, and defenses with respect to the action with Georgia-Pacific.

In May 2005, the New Jersey Department of Environmental Protection (the "NJDEP") issued the Company a NOV alleging that its Warren Glen facility had an unpermitted discharge from a sanitary septic system to the Musconetcong River.  The Company voluntarily notified the NJDEP about the configuration of the sanitary septic system after learning of it and plugged the pipe through which the alleged discharge occurred.

Over the last several years, certain of the Debtors or their predecessors have been named as a defendant in a large number of asbestos lawsuits, including several class action lawsuits.  It is the Debtors' position that they were named in error, and the vast majority of such lawsuits have been dismissed on that basis.  The Debtors have never been found liable on any asbestos-related claim.  Eleven Proofs of Claim were filed in the Chapter 11 Case with respect to such lawsuits.  All of such Proofs of Claim have since been disallowed by orders of the Bankruptcy Court.

Based upon the Company's experience, the Company expects that the future cost of complying with existing environmental laws, and the Company's liability for known environmental claims under those laws, will not have a material adverse effect on the Company's financial condition or results of operation.  However, new information, changes in environmental laws or how they are interpreted, or more vigorous enforcement by regulatory authorities may give rise to additional expenditures or liabilities that could be material to the Company's financial condition and results of operations.

## G.      Management and Employees

### 1.      Board of Directors

FiberMark's Board of Directors (the "Board" or the "Board of Directors") oversees the Company's management, reviews its long-term strategic plans, and exercises direct decision-making authority in key areas.

#### (a)      Members of Board

Set forth below is information with respect to the members of FiberMark's Board serving during the pendency of the Chapter 11 Case:

- *Alex Kwader* has been chairman of the Board of FiberMark since February 2002, in addition to serving as chief executive officer and a director of FiberMark since 1991.  He also served as president until January 2002.  He has been employed by the Company and its predecessor, Boise Cascade Corp. ("BCC"), since 1970.  He served as senior vice president of the Company from March 1990 to August 1991 and as vice president from the Company's inception in June 1989 until March 1990.  From 1970 until June 1989, Mr. Kwader was employed by BCC in various managerial positions.  He was general manager of the Pressboard Products Division from 1986 until June 1989.  From 1980 to 1985, he served as general manager of the Latex Fiber Products Division of BCC.  Mr. Kwader holds a bachelor's degree in mechanical engineering from the University of Massachusetts and a master's degree from Carnegie Mellon University, and attended the Harvard Business School Executive Program.

- *A. Duncan Middleton* joined FiberMark and assumed his role as president in January 2002, and was elected as a director of FiberMark in February 2002.  Prior to this, he was senior vice president for Ahlstrom FiberComposites in Windsor Locks, Connecticut.  He previously served as president and senior vice president in the nonwoven materials business of its predecessor, the Dexter Corporation, gaining significant international experience in the U.S., Belgium, Scotland, and Scandinavia.  Earlier with Dexter, he held the positions of director–business development, director–operations planning, and financial director–Europe.  Mr. Middleton holds a higher national diploma in business studies from Scottish College of Commerce, and is qualified as a Cost and Management Accountant (CIMA).  Mr.

Middleton's employment terminated on September 9, 2005, and he resigned his board position thereafter.

- *Brian C. Kerester* has been a director of FiberMark since May 1996. Mr. Kerester has been an independent consultant since August 2001. He currently serves on the Board's audit committee. From March 2000 to June 2001, he was chief financial officer for Collabria, Inc., a supply chain software company for the printing industry. From 1996 through 1999, Mr. Kerester held various positions at Distribution Dynamics, Inc., including chief financial officer and executive vice president of development. From 1988 to 1996, Mr. Kerester held a variety of positions, including operating affiliate and partner at McCown De Leeuw & Co., a private equity firm. Mr. Kerester previously worked with The First Boston Corporation in the Venture Capital Group from 1984 through 1986 and Bankers Trust Company in the World Corporate Department from 1981 to 1984. He holds a bachelor's degree in economics from the Wharton School, University of Pennsylvania and a master's degree in business administration from Columbia Business School.

- *Glenn S. McKenzie* has been a director of FiberMark since May 1999, and previously served as a director of FiberMark from January 1994 to May 1998. He currently serves on the Board's audit and compensation committees. Since October 1991, Mr. McKenzie has been president of Alpha Investments, Inc., a management consulting firm. Mr. McKenzie holds a bachelor's degree in economics and a master's degree in business administration from the University of North Carolina.

- *Elmar B. Schulte* has been a director of FiberMark since May 1998. He currently serves on the Board's audit and compensation committees. Dr. Schulte founded and has been a managing general partner of Dr. Schulte Vermoegensverwaltungs-KG since 1981 and is a private investor. He served as senior vice president of Deutsche Leasing AG, Frankfurt from 1976 to 1980. From 1971 to 1976, he was employed by Clark Equipment Corporation in various management positions, including corporate division controller and business manager for Clark International Marketing SA, Brussels. He currently serves as director of KAIROS Real Estate Inc., a land developer based in Montreal, Quebec. Dr. Schulte received his diploma in business and doctorate in economics from the University of Muenster, Germany and a master's degree in business administration from the European Institute of Business Administration (INSEAD), Fontainebleau, France.

- *Edward P. Swain, Jr.* has been a director of FiberMark since February 1998. He currently serves on the Board's governance committee. Mr. Swain served as president of P T Holdings Corporation from January 1992 to February 2002, having been president and chief executive officer ("CEO") of Port Townsend Paper Corporation from January 1992 until December of 1997 and acting president and CEO starting in August 1991. Previously, Mr. Swain was a partner in a major Seattle law firm, assistant general counsel of BCC, and president of a venture capital firm. He currently serves as treasurer, chairman of the finance committee and a member of the executive committee of the board of trustees of the Museum of Flight in Seattle, Washington. He is also a director of eAcceleration, Inc., a software company located in Poulsbo, Washington. Previous directorships include Orbanco Financial Services Corporation, Northwest Acceptance Corporation, and The Oregon Bank. Mr. Swain received his bachelor's degree from Williams College and a bachelor of law degree from Harvard Law School.

The Plan provides for the appointment of a new Board of Directors, to be comprised of seven (7) members. All of the initial members of the new Board will be designated by Silver Point. As of the date of this Disclosure Statement, Silver Point has indicated that it will designate the individuals identified in Section VII.L.4 hereto to serve as initial directors on the New Board. Such designations are subject to confirmation on a final basis by Silver Point in a filing with the Bankruptcy Court no later than three (3) days prior to the Confirmation Hearing. The initial directors will serve until the first annual meeting of stockholders following the first anniversary of the Effective Date or until earlier removed or replaced in accordance with the New FiberMark Charter or the New FiberMark By-laws.

(b)     Compensation of Board Members

Under the Company's director compensation policy, applicable to non-employee directors, the Company pays quarterly fees of $4,000 per director, with committee chairs receiving an added $625 per quarter. Additionally, each director receives $1,500 per regular board meeting attended or $500 for board meetings attended telephonically. Directors

receive $750 per committee meeting attended, whether attended in-person or telephonically. All fees are paid on a quarterly basis. All of the non-employee directors are reimbursed for their travel expenses associated with their attendance at each Board and committee meeting. The Debtors anticipate that the new Board of Directors will adopt similar payment and reimbursement policies, with any changes to be consistent with market practices for similar companies.

Prior to the Petition Date, the Company had in effect a Non-Employee Directors Stock Option Plan, under which shares of FiberMark's common stock were reserved for issuance and options with respect thereto were granted to non-employee directors. As a result of the Plan in the Chapter 11 Case, however, all stock and options held by non-employee directors will be cancelled. The Plan provides for the implementation of a New Equity Incentive Plan providing for participation in the New Common Stock by members of the new Board of Directors.

2. Executive Officers

Set forth below is information with respect to the executive officers of the Company serving as of the date hereof:

- *Alex Kwader* has been chairman of the Board of FiberMark since February 2002, in addition to serving as chief executive officer and a director of FiberMark since 1991. He also served as president until January 2002. He has been employed by the Company and its predecessor, BCC since 1970. He served as senior vice president of the Company from March 1990 to August 1991 and as vice president from the Company's inception in June 1989 until March 1990. From 1970 until June 1989, Mr. Kwader was employed by BCC in various managerial positions. He was general manager of the Pressboard Products Division from 1986 until June 1989. From 1980 to 1985, he served as general manager of the Latex Fiber Products Division of BCC. Mr. Kwader holds a bachelor's degree in mechanical engineering from the University of Massachusetts and a master's degree from Carnegie Mellon University, and attended the Harvard Business School Executive Program.

- *A. Duncan Middleton* joined FiberMark and assumed his role as president in January 2002, and was elected as a director in February 2002. Prior to this, he was senior vice president for Ahlstrom FiberComposites in Windsor Locks, Connecticut. He previously served as president and senior vice president in the nonwoven materials business of its predecessor, the Dexter Corporation, gaining significant international experience in the U.S., Belgium, Scotland, and Scandinavia. Earlier with Dexter, he held the positions of director—business development, director—operations planning, and financial director—Europe. Mr. Middleton holds a higher national diploma in business studies from Scottish College of Commerce, and is qualified as a Cost and Management Accountant (CIMA). Mr. Middleton's employment terminated on September 9, 2005.

- *Dr. Walter M. Haegler* has served as senior vice president and managing director for German operations since January 2003, and continues to manage FiberMark Gessner as he has since the January 1998 acquisition of Steinbeis Gessner GmbH. Since May 1999, he also assumed responsibility for filter media worldwide, and in September 1999, for FiberMark Lahnstein. With Gessner since 1987, he served as managing director of Steinbeis Gessner from 1990 until 1997, and as plant manager of the Feldkirchen site from 1987 until 1990. Before joining Gessner, Dr. Haegler was research and development and application technology manager for VP Schickedanz from 1981 to 1987. Dr. Haegler holds a master's degree and a doctorate from the University of Erlangen in inorganic and analytical chemistry.

- *John E. Hanley* has been vice president and chief financial officer of the Company since December 2003. He previously served as vice president and corporate controller, joining the Company in July 2003. Prior to joining FiberMark, he was vice president of finance and chief financial officer of Amerbelle Corporation, a privately held textile dye and finishing business. Earlier, he was vice president finance and chief financial officer, treasurer, and secretary for Axsys Technologies, Inc., a publicly held manufacturer of engineered systems for a wide range of industries, including aerospace and electronics capital equipment. Before that, he spent 20 years with Lydall, Inc., a publicly held specialty paper and fiber-based materials manufacturer, serving thermal, acoustical, and filtration markets. He was Lydall's vice president of finance, treasurer, and chief financial officer from 1992 to

2000.  Mr. Hanley holds bachelor's and master's degrees in business administration from the University of Connecticut and is a certified public accountant.

- *Robert O. Stein* has served as senior vice president of operations, North American operations, since August 2002. Most recently, he was vice president and general manager for FiberMark DSI (April 2001-August 2002). He served in the same capacity for the Company's North America filter media business (July 1999-August 2002). He joined the Company in November 1997 as vice president of business development. Prior to FiberMark, he was with Tiara Motorcoach Corp., most recently as its president and chief operating officer, from 1993 to 1997. Previously, he was manager, corporate strategy, and acquisitions for Polaroid Corp. Earlier experience includes consulting with Monitor Company and engineering and program management for General Electric. He holds a bachelor's degree in electrical engineering from Tufts University and a master's degree in business administration from the Harvard Business School.

- *David R. Kruft* is serving as senior vice president until his retirement in mid-2005, managing special projects, particularly in the Company's office products and tape base businesses, and assisting his successor, the senior vice president of sales and marketing, during a transition period.  Mr. Kruft served as senior vice president of sales and marketing, North American operations between August 2002 and August 2004.  He previously served as vice president and general manager, Durable Specialties Division, since joining FiberMark in 1996 at the time of the Arcon acquisition. He held the position of president of Arcon since 1993, having joined Arcon in 1990.  Employed for over 20 years by Esselte Pendaflex Corporation, his most recent role at Esselte was senior vice president and division head for the Boorum and Pease office products line.  Mr. Kruft holds a bachelor's degree in mechanical engineering from Hofstra University.

  In support of Mr. Kruft's retirement transition, *James P. Carolan* joined FiberMark as a consultant in August 2004, and now serves as senior vice president of sales and marketing, North American operations.  Previously with Lydall, Inc., of Manchester, Connecticut, he served as president of four different operating divisions from 1980 until 2003.  He also held senior sales and marketing roles, including vice president of e-commerce for Lydall, vice president of marketing for Lydall's technical papers division, and a variety of marketing roles while at Union Carbide prior to joining Lydall in 1980.  He holds a bachelor's degree in accounting from Fordham University.

The Plan provides that the existing executive officers of FiberMark will serve initially in the same capacities after the Effective Date for Reorganized FiberMark until replaced or removed by the new Board of Directors in accordance with the New FiberMark Charter and New FiberMark By-laws.

### 3.  Executive Compensation

Historical information regarding compensation of individuals serving in the Company's senior executive positions is provided in the Company's Form 10-K for the fiscal year ended December 31, 2004, which was filed with the Securities and Exchange Commission (the "SEC") and which may be accessed on the SEC's Web site, www.sec.gov, or on FiberMark's Web site, www.fibermark.com.  Salary levels that were in effect as of December 31, 2004, remain unchanged.  Except with respect to court-approved payments made pursuant to the Debtors' Key Employee Retention Plan, the Debtors did not pay any bonuses in 2004.  Moreover, the Debtors have not made and do not intend to make long-term compensation or stock option awards in 2005.  All other compensation for 2005 is expected to be similar to 2004 levels for similar positions.  However, following the Effective Date, compensation will be determined by the New Board and, although the Debtors anticipate that the New Board will adopt similar compensation levels (with any changes to be consistent with market practices for similar companies), there is no guarantee that such compensation levels will be adopted.

### 4.  Employees

As of June 30, 2005, the Company employed a total of 1,725 employees, of whom 545 were salaried and 1,180 were hourly.  Of the total number of employees, 933 were employed by the Debtors within the United States.

In the United States, approximately 72% of the Company's hourly employees are members of the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial, and Service Workers Union, known as USW, or

the International Brotherhood of Electrical Workers. Workers at the Company's Warren Glen and Hughesville sites are subject to two separate collective bargaining agreements. The Company believes that these collective bargaining agreements contain customary and standard terms. However, the Company's hourly employees at the Company's facilities in Quakertown, Pennsylvania and Brownville, New York are not affiliated with any union.

In Germany, the Company's employees are represented by the Mining, Chemicals and Energy Trade Union, Industriegewerkschaft Bergbau, Chemie and Energie (IG BCE). Approximately 70% of salaried employees and all of the hourly employees are union eligible but are not necessarily members, as membership is voluntary and not disclosed. Employees are represented by a local works council. In the United Kingdom, hourly employees are members of the Transport General Workers Union.

In general, the Company believes that it has good relations with its employees and their unions.

5.    Compensation and Benefits

The Company has historically provided a competitive compensation and benefit package to its executive officers, senior management, and other employees. The package for union employees is governed by the terms of the applicable collective bargaining agreement. For non-union employees, the package includes (a) wages, salaries, holiday and vacation pay, sick leave pay, and other accrued compensation; (b) severance in the event of termination; (c) various insured and self-insured health and welfare and related types of benefits (including, without limitation, medical, dental, vision, flexible spending accounts, prescription drugs, life insurance, dependent life and accidental death insurance, disability insurance, health and safety incentive programs, and business travel accident insurance); (d) retirement, savings, pension, other deferred compensation, and related types of benefits; and (e) reimbursement of business, travel, educational, and other reimbursable expenses.

(a)    Retirement Benefits

The Company offers retirement benefits to certain employees through a series of retirement plans, including the following:

- A defined contribution plan, which is a 401(k) ERISA and IRS-qualified plan, covering salaried and non-union hourly employees in the United States. The plan permits employee salary deferrals up to 16% of salary, with the Company matching 50% of the first 6%. Certain foreign subsidiary employees are eligible to participate in similar plans in those countries.

- A defined benefit plan for certain hourly employees in the United States, which is an ERISA and IRS-qualified plan. Plan assets are invested principally in equity securities, government and corporate debt securities, and other fixed income obligations. The Company annually contributes at least the minimum amount as required by ERISA. The defined benefit plans covering all hourly employees in Germany were established by the Company to provide a monthly pension upon retirement. There is no legal or governmental obligation to fund these plans.

- A multi-employer defined benefit plan for hourly employees at the Lowville, New York facility, which was part of the 2001 Rexam DSI acquisition.

- A supplemental executive retirement plan (the "SERP") and a deferred compensation plan (the "DCP"), which are non-qualified plans. The SERP and the DCP are governed by a trust agreement and are for the benefit of a select group of management, highly compensated employees, and/or directors who contribute materially to the continued growth, development, and business success of the Company. Pension benefits are based upon final average compensation and years of service. Benefits earned are subject to cliff vesting after fifteen (15) years or more of service. Claims under the SERP are in the approximate amount of $5,520,555 and are included among General Unsecured Claims. The DCP permits eligible participants to defer a specified portion of their compensation. The deferred compensation, together with certain company contributions, earns a guaranteed rate of return. Obligations under the DCP are in the approximate amount of $761,533 and are also included among General Unsecured Claims. To assist in the funding of the SERP and the DCP, the Company purchased corporate-owned life insurance contracts. Proceeds from the insurance policies are payable

to the Company upon the death of the participant. The value associated with the insurance policies was approximately $3,192,953 as of July 31, 2005, although that value is subject to claims of creditors. Trust assets also include a small balance of Cash to assist in the funding of the SERP and DCP. As of July 31, 2005, this Cash balance consisted of approximately $74,910 in the trust account, although that amount is subject to claims of creditors. The Plan provides that the SERP, DCP, and related trust agreements will terminate as of the Effective Date.

- The Company provides certain health care and life insurance benefits upon retirement to a specific group of employees who formerly worked for CPG, which was acquired by the Company in 1996. The Company also provides certain health care and life insurance benefits upon retirement to a specific group of employees who formerly worked for Rexam DSI, which was acquired by the Company in 2001.

### (b)  Stock Option Plans

Prior to the Petition Date, the Company had in place certain stock option plans, under which options to acquire FiberMark's common stock were granted to selected officers and employees. As a result of the Plan in the Chapter 11 Case, however, all stock and options held by officers and employees will be cancelled. The Plan provides for the implementation of a New Equity Incentive Plan providing for participation in the New Common Stock by certain members of management and key employees who serve after the Effective Date.

### (c)  Management Incentive Plan

Prior to the Petition Date, the Company offered a Management Incentive Plan providing for incentive payments to executives and key employees equal to a percentage of base salary based upon the Company's achievement of certain levels of earnings per share. The Management Incentive Plan utilized a sliding scale so that the percentage of base salary paid as incentive compensation increased as the Company's earnings per share increased. The Management Incentive Plan was designed to directly align the interests of the executive officers and the stockholders. No incentives were earned under the Management Incentive Plan in 2004, 2003, or 2002 and none are expected to be earned for 2005. The Management Incentive Plan is subject to annual review by the Compensation Committee of the Board of Directors. On December 17, 2003, the Company contracted with Stern Stewart & Co., an outside employee benefit consulting firm, to develop an EVA® financial management practices and incentive plan to replace the Management Incentive Plan. As of the date hereof, the replacement plan continues to be in development.

### (d)  Sales Incentive Plan

Prior to the Petition Date, the Company offered a Sales Incentive Plan providing for incentive payments to sales employees with direct sales responsibilities equal to a percentage of base salary based upon their achievement of specific sales objectives. The Sales Incentive Plan is intended to recognize performance in achieving and surpassing sales volume targets, earnings before interest and taxes (EBIT) targets, and up to three strategic sales initiatives directly assigned to a specific sales employee. Incentives were earned under the Sales Incentive Plan in 2004, 2003, and 2002 and incentives are expected to be earned for 2005. The Sales Incentive Plan is subject to annual review by senior management team of the Company. On December 17, 2003, the Company contracted with Stern Stewart & Co., an outside employee benefit consulting firm, to develop an EVA® financial management practices and incentive plan to replace the Sales Incentive Plan. As of the date hereof, the replacement plan continues to be in development.

### (e)  Severance Practices

Although there is no single company-wide severance policy, the Company has in the past maintained a practice of paying severance to terminated eligible salaried employees. This practice generally provides for salary continuance, based on the eligible employee's years of service, allotting one week of severance per year of service (without the imposition of any maximum). In certain cases, a terminated employee is required to execute a separate agreement and release in order to receive a severance payment. Special severance programs are instituted, in certain cases, in exchange for non-compete agreements. Compensation and benefits, including severance benefits if provided, are governed by the applicable collective bargaining agreement for hourly employees represented by a union.

Under the Company's severance plan for certain named executive officers, eligible employees are entitled to a continuation of their base salary for twelve (12) months, with the exception of Alex Kwader who is entitled to continuation of his base salary for 24 months. The severance benefits provided under the post-petition severance plan, described below, are in lieu of the benefits under this severance plan.

        (f)        Post-petition Employee Programs

By the Key Employee Protection Order, entered on August 6, 2004, the Bankruptcy Court approved the Debtors' Key Employee Retention Plan, Key Employee Severance Plan, and Discretionary Recognition Plan to incentivize employees to remain with the Debtors through the chapter 11 process and ameliorate the effects of the chapter 11 filing on employee morale. The following is a brief summary of the key elements of the programs, which is qualified by the terms of the actual program documents.

- Under the key employee retention program, approximately 49 of the Debtors' key employees, if eligible under the terms of the program, will receive aggregate non-discretionary retention incentive payments ranging from 20% to 125% of their respective annual salaries in consideration for continuing to remain in the Debtors' employ during the pendency of the Chapter 11 Case and during the 120 days following the Effective Date. For all but the top six eligible participants in the retention program, the program provides for the retention incentive payments to be made in three parts, each equal to one-third of the aggregate, with the first being due as soon as practical after the date of approval by the Bankruptcy Court, the second on the Effective Date of the Plan, and the third 120 days after the Effective Date of the Plan. For the top six eligible participants in the Retention Program, the aggregate amount is payable as follows: one-fourth on the first payment date, one-fourth on the second payment date, and the final one-half on the third payment date. Total retention incentive payments to be made under the Retention Program will not exceed $3,279,700.

- Under the key employee severance program, approximately 27 of the Debtors' eligible key employees are entitled to receive enhanced severance benefits during the Chapter 11 Case, with continuing provision for a period of two years after the Effective Date, in lieu of any other severance obligations the Debtors might otherwise owe to such key employees. The severance program provides that an eligible participant who terminates his or her employment for "good reason" (as defined in the severance program) or who is terminated by the Debtors for any reason other than for "cause" (as defined in the severance program) is entitled to receive severance benefits in an aggregate amount ranging from 50% to 200% of the participant's annual salary, payable on a pro rata monthly basis. In the event that a participant in the severance program obtains new employment while receiving severance payments, the monthly amount of the remaining severance payments will be reduced by the amount of the participant's monthly compensation from such new employment. If, however, such new employment is with a competitor of the Debtors, the participant will lose any right to severance and be required to repay severance payments received. Participants in the severance program who terminate their employment with the Debtors for other than good reason or whose employment is terminated by the Debtors for cause will not be entitled to receive any of the severance benefits. Eligibility is further conditioned upon a participant's execution of a non-solicitation, non-compete, non-disclosure, and non-disparagement agreement with the Debtors and their affiliates and an additional agreement whereby such participant releases any claims against the Debtors, their successors, assigns, affiliates, representatives, agents, officers, directors, stockholders, and/or employees relating to or arising out of such participant's termination of employment with the Debtors, including any claim to any severance payment under any other plan or agreement with the Debtors. The Debtors estimate that the approximate theoretical maximum cost of the severance program is approximately $4,099,866. However, the Debtors expect that the actual cost of the severance program will be far less than the theoretical maximum amount, depending on the number of qualifying terminations that occur while the severance program is in effect.

- The discretionary recognition program applies to salaried and hourly employees who are not participants in the key employee retention program and who are determined in the sole discretion of the Debtors' senior management to have made a significant contribution to the Debtors' successful reorganization. The individual amounts and the timing of payments to be made under the discretionary

recognition program will be determined by the Debtors' senior management. The payments in the aggregate cannot exceed $300,000.

(g)        Post-confirmation Compensation and Benefits

After the Effective Date, the Debtors intend to continue to provide compensation and benefits consistent with those historically offered. Under the Plan, except to the extent (i) otherwise provided for in the Plan, (ii) previously assumed or rejected by an order of the Bankruptcy Court on or before the Confirmation Date, (iii) the subject of a pending motion to reject filed by a Debtor on or before the Confirmation Date, or (iv) previously terminated, all employee compensation and benefit programs of the Debtors as set forth on Exhibit C to the Plan, including all health and welfare plans, pension plans within the meaning of Title IV of the Employee Retirement Income Security Act of 1974, as amended), and all programs subject to Sections 1114 and 1129(a)(13) of the Bankruptcy Code, entered into before or after the Petition Date and not since terminated, will be deemed to be, and will be treated as though they are, executory contracts that are assumed under the Plan. However, the Plan does not modify the existing terms of such employee compensation and benefit programs, including, without limitation, the Debtors' and the Reorganized Debtors' rights of termination and amendment thereunder.

The Plan provides that any employee compensation or benefit program that is not listed on Exhibit C of the Plan will be deemed to be, and will be treated as though it is, an executory contract that is rejected under the Plan, unless such employee compensation or benefit program is (i) otherwise provided for in the Plan, (ii) previously assumed or rejected by an order of the Bankruptcy Court entered on or before the Confirmation Date, (iii) the subject of a pending motion to assume filed by a Debtor on or before the Confirmation Date, or (iv) previously terminated.

Furthermore, under the Plan, subject to the rights of the Debtors and the Reorganized Debtors to terminate or amend as provided for in Section 7.5(a) of the Plan, the Reorganized Debtors will continue after the Effective Date all of their defined benefit pension plans covered by Title IV of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. §§ 1301-1461. The Plan further provides that, as part of the continuation of the defined benefit pension plans, subject to any such termination or amendment, the Reorganized Debtors will meet the minimum funding standards under ERISA and the Internal Revenue Code, pay all insurance premiums owed to the Pension Benefit Guaranty Corporation (the "PBGC"), and administer and operate the defined benefit pension plans in accordance with their terms and ERISA. The Plan also provides that nothing in the Plan is intended to release or discharge any statutory liability or obligation of the Debtors or the Reorganized Debtors with respect to the PBGC or the defined benefit pension plans and that neither the PBGC nor any of the defined benefit pension plans will be enjoined or precluded from enforcing such liability as a result of the Plan.

Moreover, the Plan provides that the Debtors' supplemental executive retirement plans, deferred compensation plans, and related trust and individual agreements will be deemed to have terminated as of the Petition Date, subject to any vesting (but not accruals) that may have occurred between the Petition Date and the Effective Date. To the extent such plans and agreements (and any separate agreements that may incorporate such plans and agreements) are considered to be executory contracts, such plans and agreements (and any separate agreements that may incorporate such plans and agreements) will be deemed to be rejected pursuant to Section 365 of the Bankruptcy Code under the Plan pursuant to the Confirmation Order; and the Claims of all vested participants in such plans will be calculated as of the Petition Date without post-petition interest or other accruals and treated as General Unsecured Claims under the Plan.

## H.      Debtors' Capital Structure

### 1.    Post-petition Superpriority Secured Obligations

As part of the restructuring process under chapter 11, the Debtors obtained a $30 million debtor-in-possession secured, superpriority revolving credit facility (the "DIP Facility") from GECC, which was approved by orders of the Bankruptcy Court dated April 1, 2004 and April 27, 2004. The DIP Facility is based on availability from North American assets, including receivables, inventory, and fixed assets, which are calculated on the same basis as the pre-petition facility. Funding for the German operations was provided under a separate $40 million credit agreement that excluded the North American borrowing base (the "German Facility"). The Debtors were required to guarantee the obligations under the German Facility. The guarantee was approved as part of the orders of the Bankruptcy Court approving the DIP Facility.

2.  Material Pre-petition Secured Obligations

      (a)        GECC Credit Facility

The Debtors' liabilities include secured obligations in respect of that certain $85 million credit agreement dated November 12, 2003, among, inter alia, the Debtors, their German affiliates, General Electric Capital Corporation, and certain lenders thereunder (as amended, the "GECC Credit Facility"). The Debtors' obligations under the GECC Credit Facility consist of, among other things, obligations in respect of revolving loans, letters of credit, and certain guarantees of borrowings by the German affiliates thereunder. Although there were no direct borrowings owed by the Debtors under the GECC Credit Facility as of the Petition Date, the Debtors were liable for amounts owing in respect of interest, fees, indemnification, or other charges and costs owing under such facility. Additionally, the Debtors were contingently liable (a) for approximately $8.3 million in outstanding letters of credit issued under the GECC Credit Facility for their benefit and (b) as guarantors for approximately $23.4 million in borrowings by, and outstanding letters of credit issued for, their German affiliates under the GECC Credit Facility. The Debtors do not expect to be required to pay on their guarantee obligations under the GECC Credit Facility, as the German affiliates currently have the financial ability to satisfy their own debt obligations.

      (b)        Other Secured Obligations

Other material secured obligations include, without limitation, a loan of approximately $8,900,000 secured by certain machinery at the Debtors' facility in Warren Glen, New Jersey, which is referred to in the Plan as the Banc One Equipment Financing Claim, and which is estimated to be in the remaining amount of $4,077,000 as of December 31, 2005 (after giving effect to the payment due by January 1, 2006); a loan of approximately $1,600,000 secured by certain machinery at the Debtors' facility in Quakertown, Pennsylvania, which is referred to in the Plan as the GECC Equipment Financing Claim, and which is estimated to be in the remaining amount of $903,495 as of December 31, 2005; and a sale/leaseback liability of approximately $3,300,000 secured by a building expansion at the Debtors' facility in Lowville, New York, which is referred to in the Plan as the Coated Paper Sale/Leaseback Claim, and which is estimated to be in the remaining amount of $740,000 as of December 31, 2005. A $380,000 secured claim existing as of Petition Date with respect to an insurance premium financing arrangement has been satisfied through post-petition payments. The County of Lewis, New York holds a contingent secured claim in the original amount of $750,000, secured by a printer at the facility in Lowville, New York, which is included among the Lowville Grant Claims provided for in the Plan. The claim is contingent on the maintenance of employment levels at the Lowville facility.

3.  Material Pre-petition Unsecured Obligations

      (a)        Senior Notes

The Debtors' unsecured obligations include two series of publicly-traded senior unsecured notes, one with a remaining principal amount of approximately $100 million, due October 15, 2006, and the other with a remaining principal amount of approximately $230 million, due April 15, 2011. Both series of notes were issued by FiberMark and are guaranteed by FNA and FIH. The obligations with respect to such notes are referred to in the Plan as the Noteholder Claims.

      (b)        Other Unsecured Obligations

Other unsecured obligations owed by the Debtors include, without limitation, trade debt, pre-petition liabilities under rejected contracts and leases, rejection damage claims, certain indemnification claims, certain employee claims, certain environmental claims, and litigation claims.

4.  Pre-petition Equity

FiberMark's authorized capital stock consists of 20 million shares of Common Stock, par value $.001 per share, 7,066 shares of Series A Junior Participatory Preferred Stock, par value $.001 per share, and 2 million shares of Preferred Stock, par value $.001 per share. FiberMark had 7,066,226 shares of Common Stock outstanding as of June 30, 2005. Moreover, the Debtors believe that there are, as of October 24, 2005, approximately 1,082 record holders and, as of March 11, 2005, approximately 1,402 beneficial holders of FiberMark Common Stock. No shares of either the Series A Junior Participatory Preferred Stock or the Preferred Stock had been issued.

Beginning on August 8, 2003, FiberMark's Common Stock traded on the American Stock Exchange under the ticker symbol "FMK," having previously traded on the New York Stock Exchange and the NASDAQ National Market System. On April 13, 2004, after voluntarily delisting from the American Stock Exchange, FiberMark's Common Stock began trading on the OTC Bulletin Board under the ticker symbol "FMKIQ." FiberMark has never paid any cash dividends on its Common Stock.

## I.     Summary of Assets

The Debtors have filed Schedules with the Bankruptcy Court that detail the assets owned by each of the Debtors. Such assets include real property, cash on hand, bank accounts and investments, security deposits, insurance policies, stock interests, accounts receivable, intellectual property, vehicles, office equipment, furnishings and supplies, machinery, fixtures, equipment and supplies used in business, inventory, and other items of personal property. The Schedules provide asset values on a net book basis, which are not reflective of actual values. The Schedules may be reviewed during business hours in the offices of the Clerk of the Bankruptcy Court or the Debtors' counsel. Information as to the Debtors' assets is also available in the balance sheets included in the Form 10-Q of FiberMark filed with the SEC for the period ending June 30, 2005, the Form 10-K and Form 10-K/A of FiberMark filed with the SEC for the fiscal year ended December 31, 2004, and in the liquidation analysis attached hereto as Appendix D. The aforementioned Form 10-Q, Form 10-K, and Form 10-K/A, along with any subsequent filings, may be accessed on the SEC's Web site, www.sec.gov, or on FiberMark's Web site, www.fibermark.com.

## J.     Historical Financial Information

Financial information regarding the Debtors (a) for the three month period ending June 30, 2005 is available in the Form 10-Q of FiberMark filed with the SEC for such period and (b) for the fiscal year ended December 31, 2004, is available in the Form 10-K and Form 10-K/A of FiberMark filed with the SEC for such period. The financial information contained in the 10-Q for the three month period ended June 30, 2005 has been reviewed by the Company's outside accountants but has not been audited. The financial information contained in the 10-K for the fiscal year ended December 31, 2004 has been audited. The aforementioned Form 10-Q, Form 10-K, and Form 10-K/A may be accessed on the SEC's Web site, www.sec.gov, or on FiberMark's Web site, www.fibermark.com. In preparing their financial statements, the Company has followed the accounting directives as set forth in the American Institute of Certified Public Accountants' Statement of Position 90-7, "Financial Reporting by Entities in Reorganization Under the Bankruptcy Code."

## K.     Events Leading to Commencement of the Chapter 11 Case

After its formation in 1989, the Company engaged in a comprehensive plan to optimize its strategic, operational, and financial position, becoming through the process a leading independent value-added producer of specialty fiber-based materials. Within the United States, the Debtors successfully expanded their capabilities through four acquisitions over a ten-year period, subsequently consolidated their manufacturing sites to achieve an optimal mix of operations, improved their organizational efficiency, developed and brought on line state-of-the-art equipment, implemented aggressive cost reductions, and strengthened their management team.

Since 2001, however, the Debtors' operations have suffered the effects of a weak economy and a prolonged recession in most of their key markets. These difficulties were exacerbated over the two years preceding the chapter 11 filing by the burden of acquisition-related debt and a number of operational issues, including production inefficiencies related to the consolidation of manufacturing facilities, structural sales declines due to business divestitures, instances of product obsolescence, and downgrading by customers to lower-valued materials.

Although the Debtors had nearly completed their facility consolidations and had made substantive productivity improvements, continuing adverse economic, industry, and other company-specific factors undermined the Debtors' profitability and ability to meet their debt obligations. Therefore, after carefully considering a variety of alternatives, the Debtors concluded that a chapter 11 filing was the best way to ensure their ability to continue operations for the benefit of customers, vendors, and employees and to preserve the value of their Estates for the benefit of stakeholders.

## L.     Business Plan

The Debtors' Business Plan contemplates that, upon the Debtors' emergence from chapter 11, the business will continue operating two segments, North American operations and German operations, with the objective of being a

leading supplier of specialty fiber-based materials in its three product families: Publishing and Packaging, Technical Specialties and Office Products.

Accordingly, the Debtors' management team has adopted the following strategies in pursuit of these objectives: (a) gain market leadership by excelling at serving existing and new markets with high value-added products, (b) optimize operations to gain competitive advantage in the markets we serve, and (c) broaden our technical capabilities and ability to use a wide range of raw materials. Included in Appendix B hereto is a forecast for the Reorganized Debtors for fiscal years ending December 31, 2005 through December 31, 2009, along with the assumptions upon which the forecast is based.

The forecast assumes the implementation of the strategic initiatives that were authorized by the Order Under 11 U.S.C. §§ 105(a) and 363(b) Authorizing (i) Implementation of Strategic Cost Reduction Program and (ii) Related Relief dated July 20, 2005. The proposed strategic cost reduction program involves, among other things, in the Debtors' discretion, the downsizing of the Debtors' New Jersey papermaking operations. More specifically, the strategic cost reduction program contemplates, in the discretion of and on the timetable determined by the Debtors, the closure of the Debtors' papermaking facility located in Hughesville, New Jersey, and the elimination of one of the Debtors' papermaking machines located in Warren Glen, New Jersey. Additionally, the program involves the transfer of certain product lines from the New Jersey plants to other of the Debtors' papermaking facilities and/or paper machines. Finally, the program involves the initiation of cost-cutting measures, including certain reductions in selling, general & administrative costs, designed to maximize efficiencies realized from the aforementioned downsizing and transfers. The Debtors' current intention, subject to business developments, is to effectuate this restructuring of operations by the end of the fourth quarter of 2005.

## VI.     CHAPTER 11 CASE

### A.     Continuation of Business; Stay of Litigation

As described above, on March 30, 2004, the Debtors filed petitions for relief under chapter 11 of the Bankruptcy Code. Since the Petition Date, the Debtors have continued to operate as debtors-in-possession subject to the supervision of the Bankruptcy Court and in accordance with the Bankruptcy Code. The Debtors are authorized to operate their businesses and manage their properties in the ordinary course, with transactions outside of the ordinary course of business requiring Bankruptcy Court approval.

An immediate effect of the filing of the Debtors' bankruptcy petitions was the imposition of the automatic stay under the Bankruptcy Code which, with limited exceptions, enjoins the commencement or continuation of all collection efforts by Creditors, the enforcement of Liens against property of the Debtors, and the continuation of litigation against the Debtors. The relief provides the Debtors with the "breathing room" necessary to assess and reorganize their businesses and prevents Creditors from obtaining an unfair recovery advantage while the reorganization is ongoing.

### B.     First Day Orders

On the first day of the Chapter 11 Case, the Debtors filed several applications and motions seeking certain relief by virtue of so-called "first day orders." First day orders are intended to facilitate the transition between a debtor's pre-petition and post-petition business operations by approving certain regular business practices that may not be specifically authorized under the Bankruptcy Code or as to which the Bankruptcy Code requires prior approval by the Bankruptcy Court. The first day orders obtained in the Chapter 11 Case are typical of orders entered in business reorganization cases across the country. With certain exceptions, the Bankruptcy Court granted the relief sought by the Debtors, first on an interim basis with orders entered on April 1, 2004, and then, following notice and hearing, on a final basis with orders entered on April 15, 2004 or April 27, 2004. The "first day orders" authorized, among other things:

- joint administration of the Debtors' bankruptcy cases;

- specific notice and case management procedures;

- extension of the deadline for filing schedules and statements;

- appointment of Logan as claims, noticing, and balloting agent;

- obtaining secured, superpriority post-petition financing and use of cash collateral;

- continued use of the existing cash management system and bank accounts, waiver of investment and deposit requirements, continuation of intercompany transactions, and grant of superpriority status to post-petition intercompany claims;

- payment of pre-petition employee compensation, benefits, expense reimbursements, and related obligations and continuation of employee programs on a post-petition basis;

- payment of pre-petition claims of critical vendors;

- payment of certain pre-petition shipping and warehousing charges and import and export obligations;

- payment of certain pre-petition obligations to foreign vendors;

- payment of certain pre-petition taxes and fees;

- payment of certain pre-petition claims of mechanics and materialmen;

- honoring of certain pre-petition customer obligations and continuation of customer programs and practices;

- continued performance and honoring of obligations under consignment arrangements;

- grant of administrative expense status and payment of obligations arising from post-petition delivery of goods, return of goods, and treatment of valid reclamation claims; and

- extension of the deadline for providing adequate assurance to utilities and establishment of procedures for determining requests of utilities for adequate assurance.

## C.      Retention of Professionals

The Debtors are represented in the Chapter 11 Case by Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden Arps") and Obuchowski & Emens-Butler as co-bankruptcy counsel, and Wilmer Cutler Pickering Hale and Dorr LLP (formerly, Hale and Dorr LLP) as special corporate counsel.  The Debtors obtained the financial advisory and investment banking services of Berenson & Company, LLC ("Berenson"), the restructuring, accounting, and bankruptcy reorganization services of Weiser, LLP ("Weiser"), and the auditing, tax, and employee benefit services of KPMG LLP ("KPMG").   The Debtors have also retained a number of other professional firms to assist them in the ordinary course of their businesses.

## D.      Official Committees

### 1.   Appointment of Official Committee of Unsecured Creditors

On April 7, 2004, the United States Trustee for the District of Vermont (the "U.S. Trustee") appointed, pursuant to the Section 1102(a) of the Bankruptcy Code, certain entities holding general unsecured claims to the Creditors Committee, which committee was subsequently disbanded by the U.S. Trustee on July 13, 2005.  Prior to its disbanding, the members of the Creditors Committee were: AIGGIC, Wilmington Trust Company ("Wilmington"), Solution Dispersions, Inc., Post, and Silver Point.  The Creditors Committee was represented by the law firms of Akin and Ryan Smith & Carbine, Ltd.  The Creditors Committee retained the financial advisory services of Chanin Capital Partners LLC ("Chanin").  The expenses of members of the Creditors Committee, and the fees and expenses of the Professionals serving on behalf of the Creditors Committee, are entitled to be paid by the Debtors, subject to approval by the Bankruptcy Court.  Currently before the Bankruptcy Court are objections by the U.S. Trustee and Silver Point to the most recent interim application of Akin and objections by the U.S. Trustee to the most recent interim application of Chanin.

On October 19, 2004, the Bankruptcy Court entered the Order Approving Specified Information Blocking Procedures and Permitting Trading in Securities of the Debtors Upon Establishment of a Screening Wall (the "Trading Order"). The Trading Order provided that members of the Creditors Committee who engage in the trading of securities as a regular part of their business are permitted to trade in the Debtors' securities provided that such Creditors Committee members adhere to the information blocking procedures and other requirements specified in the Trading Order. Allegations by certain members of the Creditors Committee against other members of the Creditors Committee with respect to compliance with the Trading Order were responsible in part for the appointment of the Examiner. See Section VI.H hereto.

### 2. Request to Appoint Official Committee of Equity Security Holders

Under the Bankruptcy Code, the U.S. Trustee may appoint additional committees as it deems appropriate. On June 23, 2004, a group of stockholders requested that the U.S. Trustee appoint an official committee of equity security holders. After carefully considering the request, the U.S. Trustee declined to appoint such a committee. In response, the stockholders, on August 9, 2004, filed a motion with the Bankruptcy Court requesting an order directing the appointment of an equity security holders committee. By order dated September 17, 2004, the Bankruptcy Court declined to grant the motion, having found that the stockholders failed to satisfy their burden of proving that an official committee of equity security holders was necessary. On June 29, 2005, by letter to the U.S. Trustee, the stockholders renewed their request for the appointment of an equity security holders committee. The Debtors opposed the request on the grounds that there is no potential for unsecured creditors to be paid in full and thus no ability to deliver any value to equity security holders under a plan of reorganization. On July 20, 2005, the U.S. Trustee rejected the shareholders' renewed request and declined to appoint an official committee of equity security holders.

## E. Post-Petition and Post-Confirmation Funding

### 1. DIP Facility

As part of the restructuring process under chapter 11, the $85 million GECC Credit Facility that was put in place on November 12, 2003, was amended to effectively split the agreement into two parts. The North American portion was converted to a $30 million secured, superpriority, debtor-in-possession revolving credit facility (the "DIP Facility") offered by GECC, which was approved by orders of the Bankruptcy Court dated April 1, 2004 and April 27, 2004. The DIP Facility is based on availability from North American assets, including receivables, inventory, fixed assets, and real property, which are calculated on a similar basis as the pre-petition facility. Funding for the German operations was provided under a separate $40 million secured credit agreement (the "German Facility") that excluded the North American borrowing base. Under the two credit agreements, the Company's pro-forma borrowing base is substantially the same as the borrowing base under the GECC Credit Facility. Various covenants and restrictions on the Company's operations under the GECC Credit Facility continue to apply under the DIP Facility without material modification, together with an additional restriction on the amount of funds that can be transferred from Germany to support North American operations. The obligations of the DIP Facility are secured by a security interest on substantially all of the assets of the Debtors. To replicate the GECC Credit Facility, the Debtors were required to guarantee the obligations under the German Facility. The guarantee was approved as part of the orders of the Bankruptcy Court approving the DIP Facility. The Debtors' guarantee of the obligations under the German Facility must be satisfied in full as part of the Plan, which will require the renegotiation of the credit facility in conjunction with the Exit Facility. The obligations under the guarantee are also secured by a security interest on substantially all of the assets of the Debtors.

Both the DIP Facility and the German Facility were scheduled to mature on June 30, 2005, subject to extension at the request of the borrower(s) thereto. Prior to the maturity date, the Debtors entered into an amendment of the GECC Credit Facility providing for (a) extension of the maturity date from June 30, 2005 to December 31, 2005, (b) payment of an extension fee of $75,000, (c) provision of weekly cash budgets through December 31, 2005, (c) requirement for minimum borrowing availability of $5 million during the thirteen week period commencing on July 1, 2005 and for borrowing availability of not less than $5 million on July 1, 2005, and (d) expansion of financial covenants to cover through December 31, 2005 and modifications to be less restrictive. The borrowers under the German Facility contemporaneously entered into a similar amendment of the German Facility.

### 2. Plan Financing

The Plan contemplates that the Reorganized Debtors will obtain an Exit Facility, in the form of revolving credit, term credit and/or letters of credit as determined necessary, in order to obtain the funds necessary to repay the DIP

Facility Claim and German Guaranty Claim, make other required payments under the Plan, and conduct their post-reorganization operations. The Exit Facility is expected to be secured by substantially all the assets of the Reorganized Debtors, subject to customary limitations, including limitations on the pledge of stock of foreign subsidiaries and substantially consistent with the pre-petition security package.

Following the withdrawal of the Previous Plan, the Debtors and Berenson contacted eight (8) prospective lenders (including each institution that submitted a proposal to provide exit financing under the Previous Plan) to solicit proposals regarding a potential Exit Facility and to conduct negotiations with respect to the terms of such proposals. As a result of the Debtors and Berenson's efforts, three (3) institutions (the "Prospective Lenders") – including GECC and Silver Point Finance, LLC ("Silver Point Finance"), an affiliate of Silver Point Capital, L.P. – submitted proposals for an Exit Facility (together with the "SP/GECC Proposal" defined below, the "Exit Facility Proposals"). Thereafter, Silver Point Finance and GECC reached an understanding regarding a joint proposal for an Exit Facility (the "SP/GECC Proposal") which contemplated Silver Point Finance providing a term loan and GECC providing a revolving credit facility.

As is customary for exit financings, the Exit Facility Proposals are conditioned upon: (a) the performance of further due diligence by the prospective lender(s) and the Debtors' agreement to reimburse the prospective lender(s) (in the form of a good faith, up-front deposit and then reimbursements, as incurred, thereafter) for certain amounts expended in connection with such due diligence (the "Diligence Fees and Expenses"); (b) the Debtors' agreement to indemnify the prospective lender(s) and its/their affiliates, as well as their respective directors, officers, employees against all claims, expenses, damages, and liabilities which may be incurred by, or asserted against, the indemnified parties in connection with the applicable Exit Facility Proposal and the Exit Facility (the "Indemnifications"); and (c) payment by the Debtors of a commitment fee (the "Commitment Fee") in the event that the prospective lender(s) issues/issue to the Debtors a commitment letter to pursue the Exit Facility that is accepted by the Debtors. To ensure the Debtors' ability to obtain a cost-effective Exit Facility as expeditiously as possible, on July 1, 2005, the Debtors filed a motion (the "Exit Facility Fee Motion") with the Bankruptcy Court seeking authority to (a) make aggregate payments of up to $300,000 to reimburse Diligence Fees and Expenses that the Debtors determine to be reasonable and necessary; (b) provide Indemnifications; and (c) pay a commitment fee of up to $1,500,000. The Exit Facility Fee Motion was approved by order of the Bankruptcy Court entered on July 20, 2005.

The Debtors and Berenson continued to negotiate with the Prospective Lenders following receipt of the Exit Facility Proposals to obtain improvements to the proposed terms outlined in each proposal. Each of the Exit Facility Proposals proposed comparable economic terms for an Exit Facility. However, the only Exit Facility Proposal that proposed a fully underwritten Exit Facility without (a) conditioning fees, price, and structure upon the achievement of syndication requirements and/or (b) a lengthy due diligence period was the SP/GECC Proposal. Accordingly, after considering the terms of each Exit Facility Proposal as revised through negotiation and consulting with their professionals, the Debtors determined that the SP/GECC Proposal provided the best opportunity to obtain competitive exit financing on a timetable that would allow the Debtors to expeditiously emerge from chapter 11. Accordingly, based upon the advice of their professionals, the Debtors are currently pursuing an Exit Facility with Silver Point Finance and GECC as the lenders and have obtained a Commitment Letter, a copy of which is attached as Appendix E hereto. There is no guarantee that such an Exit Facility will be consummated. The Debtors reserve all rights with respect to the final terms of the Exit Facility, including the selection of an exit lender, in the event that unanticipated circumstances require a change in course from that envisioned by the Commitment Letter.

## F.    Other Material Matters Addressed During the Chapter 11 Case

In addition to the first day relief sought in the Chapter 11 Case, the Debtors have sought authority with re-spect to a multitude of matters designed to assist in the administration of the Chapter 11 Case, to maximize the value of the Debtors' Estates, and to provide the foundation for the Debtors' emergence from chapter 11. Set forth below is a brief summary of certain of the principal motions the Debtors have filed during the pendency of the Chapter 11 Case.

### 1.    Post-petition Retention and Severance Plans

By motion dated May 21, 2004, the Debtors sought authorization from the Bankruptcy Court to implement what they believed to be standard post-petition retention and severance plans for their key employees, for the purpose of incentivizing continued employment and combating the negative employee morale and turnover problems that typically result from the uncertainties and increased burdens of an employer's debtor-in-possession status. The motion was opposed by the Creditors Committee. The hearing on the motion consumed almost three days of court time, as both the Debtors and the

Creditors Committee presented witnesses, exhibits, and arguments of counsel in favor of their respective positions. Prior to the announcement of a decision, the Bankruptcy Court invited the parties to make a final attempt to resolve their differences. As a result, a settlement in principle was reached on July 14, 2004 and was ultimately finalized by a stipulation dated August 4, 2004. On August 6, 2004, the stipulation was approved by the Bankruptcy Court pursuant to the Key Employee Protection Order. As a result, the Debtors were authorized to implement retention and severance plans for their key employees. See Section V.G.5.f hereto for a description of these plans. Thereafter, on January 25, 2005, the Debtors filed a motion to amend the key employee severance plan to ensure that the benefits sought to be afforded under the plan were not diminished by recently adopted provisions of the Internal Revenue Code that introduced restrictions on the timing and distribution of severance pay. The motion to amend was approved by order of the Bankruptcy Court dated February 15, 2005, and the Debtors amended the key employee severance plan to address the adopted provisions of the Internal Revenue Code.

2. Sale of Idle Facilities

As of the Petition Date, the Debtors were engaged in efforts to sell three idle properties, including (a) an idle hydroelectric power facility and related real and personal property located in West Springfield, Massachusetts, (b) an idle paper facility and related real and personal property located in Rochester, Michigan, and (c) an idle paper facility and related real and personal property located in Johnston, Rhode Island. Such sales constituted sales outside the ordinary course of business, necessitating prior approval by the Bankruptcy Court pursuant to Section 363 of the Bankruptcy Code. Upon the Debtors' motion dated May 21, 2004, the Bankruptcy Court approved the proposed sales transactions by order entered on June 15, 2004. The sale of the facility in West Springfield, Massachusetts, was consummated at a sale price of approximately $650,000, the sale of the facility in Johnston, Rhode Island, was consummated at a sale price of approximately $1,350,000, and the sale of the facility at Rochester, Michigan, was closed at a sale price of approximately $2,200,000.

As part of their motion to sell the three idle properties, the Debtors sought to assume an agreement with Bruce P. Moore for services in connection with the sale of the facilities. As a result of negotiations intended to resolve the objections and reservations of the U.S. Trustee and the Creditors Committee with respect to the commission payments provided for under the agreement, the Debtors on August 17, 2004 filed an amended motion and application to retain Mr. Moore as a professional, with provision for the holdback of commission payments pending the resolution of certain preferential transfer allegations with respect to a pre-petition payment received by Mr. Moore. An order granting the amended motion and application was entered by the Bankruptcy Court on September 13, 2004.

3. Adequate Protection for Secured Creditors

Under Section 361 of the Bankruptcy Code, a secured creditor may obtain post-petition payments as necessary to adequately protect its collateral from a diminution in value resulting from the automatic stay or a debtor's continued used of the collateral. By stipulations entered into with General Electric Capital Corporation, AFCO Credit Corporation, Banc One Corporation, and Coated Paper, LLC and approved by the Bankruptcy Court on May 28, 2004, June 10, 2004, July 1, 2004, and July 1, 2004, respectively, the Debtors agreed to provide adequate protection payments, in the approximate amount of regular monthly debt service payments, to each of the secured creditors. Supplemental stipulations were entered into with Coated Paper, LLC and approved by the Bankruptcy Court pursuant to orders entered on February 4, 2005 and April 25, 2005. Under the approved stipulations, the payments are interim in nature and without prejudice to recoupment in the event of a determination that any of the secured creditors are not entitled to adequate protection. The payments were subsequently made final as to AFCO Credit Corporation by order dated September 10, 2004, upon a motion by the Debtors to confirm the entitlement of AFCO Credit Corporation to adequate protection.

4. Extension of Time to Assume or Reject Unexpired Real Property Leases

Section 365(d)(4) of the Bankruptcy Code allows a debtor an initial 60-day period for determining whether to assume or reject nonresidential real property leases, which period may be extended by order of the bankruptcy court. A failure to assume or reject during the period or to obtain an extension of the period results in a deemed rejection of nonresidential real property leases. Given the size and complexity of the Chapter 11 Case, and the need to delay decisions as to leased premises until the structure of their reorganization was determined, by motion dated April 26, 2004 and subsequent motions dated August 23, 2004 and November 16, 2004, respectively, the Debtors sought to extend the assumption or rejection period first to September 30, 2004, then to December 31, 2004, and finally through the Confirmation Date. The motions were granted by orders of the Bankruptcy Court dated May 12, 2004, September 10, 2004, and December 12, 2004, respectively.

5.    Disposition of Executory Contracts and Unexpired Leases

Pursuant to Section 365 of the Bankruptcy Code, the Debtors may choose to assume, assume and assign, or reject executory contracts and unexpired leases of real and personal property, subject to approval of the Bankruptcy Court. As a condition to assumption, or assumption and assignment, unless otherwise agreed by the non-Debtor party, the Debtors must cure all existing defaults under the contract or lease, and must provide adequate assurance of future performance of the contract or lease.  If the contract or lease is rejected, any resulting rejection damages are treated as pre-petition unsecured claims.  Generally, and with certain exceptions, post-petition obligations arising under a contract or lease must be paid in full in the ordinary course of business.  Prior to the confirmation hearing scheduled on the Previous Plan, the Debtors had either rejected or assumed all executory contracts and unexpired leases identified by them.  The assumptions were made conditional on the confirmation and effectiveness of a plan or reorganization.  An additional contract was subsequently identified for rejection, and a motion to reject was filed on June 3, 2005, with a requested deadline for filing any rejection damages claim of July 3, 2005.

6.    Pending Litigation and Automatic Stay

The nature of the Debtors' businesses is such that they are from time to time named as defendants in litigation.  As a result of the commencement of the Chapter 11 Case, pursuant to Section 362 of the Bankruptcy Code, all litigation pending against the Debtors was automatically stayed.  As of the date hereof, only one request – by Georgia-Pacific Corporation –  has been made for relief from the automatic stay.  That motion, which was opposed by the Debtors, sought to lift the automatic stay to permit the litigation described at Section V.F.4 hereto.  Following a hearing held on October 19, 2004, the Bankruptcy Court denied Georgia-Pacific's motion subject to further consideration of the motion at a hearing to be held on December 14, 2004.  The Debtors and Georgia-Pacific subsequently agreed to the terms of a settlement, which among other things, provided for the withdrawal of Georgia-Pacific's motion for relief from the automatic stay.  A description of the terms of the settlement can be found at Section V.F.4 hereto.

7.    Claims Process

In chapter 11, claims against a debtor are established either as a result of being listed in the debtor's schedules of liabilities or through assertion by the creditor in a timely filed proof of claim form.  Once established, the claims are either allowed or disallowed.  If allowed, the claim will be recognized and treated pursuant to the plan of reorganization. If disallowed, the creditor will have no right to obtain any recovery on, or to otherwise enforce, the claim against the debtor.

(a)        Schedules and Statements

On May 14, 2004, the Debtors filed their schedules of assets and liabilities, schedules of executory contracts and unexpired leases, and statements of financial affairs (collectively, the "Schedules").  The Schedules set forth, among other information, the Claims of known Creditors against each of the Debtors as of the Petition Date, based upon the Debtors' books and records.  On June 25, 2004 and September 17, 2004, the Debtors filed certain amendments to the Schedules.  The Debtors reserve the right to further amend their Schedules during the remaining pendency of the Chapter 11 Case.

(b)        Claims Bar Date

By order dated May 20, 2004, the Bankruptcy Court established July 29, 2004 at 5:00 p.m. Eastern Time as the Bar Date for filing Proofs of Claim against the Debtors by those Creditors required to do so.  In compliance with procedures approved by the Bankruptcy Court, the Debtors, through Logan, acting as claims agent, provided timely notice of the Bar Date by mail.  In addition, the Debtors published notice of the Bar Date in The New York Times (National Edition), the Brattleboro Reformer (covering Brattleboro, Vermont), the Watertown Daily Times (covering Brownville, New York; Lowville, New York; and Beaver Falls, New York), the Express Times (covering Hughesville, New Jersey and Warren Glen, New Jersey), the Morning Call (covering Quakertown, Pennsylvania), the Reading Eagle (covering Reading, Pennsylvania), the Springfield Union News (covering South Hadley, Massachusetts and West Springfield, Massachusetts), the Sentinel & Enterprise (covering Fitchburg, Massachusetts), The Providence Journal (covering Johnston, Rhode Island), the Rochester Clarion (covering Rochester, Michigan), the Owensboro Messenger-Inquirer (covering Owensboro, Kentucky), the Richmond Times-Dispatch (covering Richmond, Virginia), and Pulp & Paper (an industry trade publication).

The Bankruptcy Court's May 20, 2004 order also allows the Debtors to establish, under certain circumstances, special bar dates with respect to certain Creditors. Consistent with the terms of, and in compliance with the procedures outlined in, the order, the Debtors have established special bar dates with respect to certain Creditors and have, through Logan, acting as claims agent, provided timely notice of the applicable special bar date to such Creditors. Recently, the Debtors issued an additional special bar date notice directed to certain litigation parties to ensure that any claims that may be asserted against the Debtors in connection with such litigation, which the Debtors believe would be without merit in any event, are discharged through the chapter 11 process. The special bar date was July 18, 2005.

(c)      Claims Objection Process

Approximately 729 Proofs of Claim have been filed against the Debtors aggregating approximately $1,296,570,189 (this is a consolidated figure that includes claims asserted against more than one of the Debtors for the same liability but does not include claims asserted in unliquidated amounts). The Debtors engaged over several months in the process of evaluating the Proofs of Claim to determine whether objections seeking the disallowance of certain asserted Claims should be filed. As a result, numerous objections to Proofs of Claim were filed. If the Debtors do not object to a Proof of Claim by the deadline established in the Plan, the Claim asserted therein will be deemed Allowed and will be treated pursuant to the Plan. As appropriate, the Debtors may seek to negotiate and settle disputes as to Proofs of Claim as an alternative to filing objections to the Proofs of Claim.

The ultimate Allowed amount of Noteholder Claims and General Unsecured Claims will determine the percentage recovery of holders of Allowed Claims in Classes 9 and 10, both of which share on a Pro Rata basis in the distribution of New Common Stock and Distribution Cash. In the absence of objections to any individual Noteholder Claims in Class 9, the aggregate Allowed amount of Noteholder Claims would be $345,629,166.67. Based upon the review of Claims and the allowance or disallowance of Proofs of Claim to date, the Debtors believe that General Unsecured Claims in Class 10 are likely to become Allowed Claims in the approximate aggregate amount of $12,381,123.97. Nevertheless, it is possible that the amount of Allowed General Unsecured Claims could exceed $12,381,123.97. If so, the estimated percentage recoveries for holders of Allowed Noteholder Claims in Class 9 and Allowed General Unsecured Claims in Class 10 could be materially less than as estimated in this Disclosure Statement.

## G.      Plan Process

1.    Extension of Exclusive Periods

Section 1121(b) of the Bankruptcy Code provides for an initial period of 120 days after the commencement of a chapter 11 case during which a debtor has the exclusive right to propose a plan of reorganization (the "Exclusive Proposal Period"). In addition, Section 1121(c)(3) of the Bankruptcy Code provides that if a debtor proposes a plan within the Exclusive Proposal Period, it has the remaining balance of 180 days after the commencement of the chapter 11 case to solicit acceptances of such plan (the "Exclusive Solicitation Period"). During the Exclusive Proposal Period and the Exclusive Solicitation Period, plans may not be proposed by any party in interest other than the debtor. Under Section 1121(d) of the Bankruptcy Code, the Exclusive Proposal Period and the Exclusive Solicitation Period may be extended for cause.

By motion dated July 7, 2004, the Debtors sought to extend their initial Exclusive Proposal Period from July 28, 2004 to November 26, 2004, and their corresponding initial Exclusive Solicitation Period from September 27, 2004 to January 26, 2005. Following the filing of the motion, the Debtors and the Creditors Committee entered into a stipulation providing for an extension of the Exclusive Proposal Period and Exclusive Solicitation Period to November 15, 2004 and January 15, 2005, respectively, but (a) permitting the Creditors Committee and other parties in interest to move to reduce the extended periods, with the Debtors having the burden in that event of proving that the periods should not be reduced, and (b) permitting the Debtors to seek further extensions of the extended periods only (i) with the consent of the Creditors Committee or (ii) without the consent of the Creditors Committee if the Creditors Committee has by its actions or inactions caused delay in or otherwise frustrated the ability of the Debtors to propose a viable plan within the extended periods. The stipulation was approved by order of the Bankruptcy Court entered August 6, 2004.

The Debtors initially filed the Previous Plan on November 12, 2004, before the expiration of the Exclusive Proposal Period. When it became clear that the intercreditor dispute could delay a consensual confirmation, the Debtors, with the consent of the Creditors Committee, filed a motion on January 13, 2005, seeking a further extension of the Exclusive

Solicitation Period. An extension was granted by order of the Bankruptcy Court on January 26, 2005, through February 15, 2005.

In conjunction with withdrawing the Previous Plan, the Debtors filed a motion on March 21, 2005, requesting either that the Bankruptcy Court reinstate their exclusive rights or impose case management rules that would preserve estate resources by controlling the proliferation of competing plans of reorganization. In response to that motion, the Bankruptcy Court entered an order on April 19, 2005, prohibiting the filing of any plans of reorganization by any parties through the Examiner's investigation period, except for a consensual plan filed by the Debtors with the unanimous support of the Creditors Committee, and permitting the filing of all plans of reorganization whether or not consensual after the end of the Examiner's investigation period and through a final deadline of August 8, 2005. Although the Bankruptcy Court extended the Examiner's investigation period from June 8, 2005 to July 6, 2005, the Bankruptcy Court by order dated June 2, 2005, lifted the moratorium on filing nonconsensual plans of reorganization as of June 15, 2005. No competing plans have been filed as of the date hereof, and none are anticipated.

2. Pursuit of Strategic Alternatives

Before the Debtors decided to pursue the standalone restructuring contemplated by the Previous Plan, the Debtors explored other plan alternatives for the purpose of gaining certainty that the plan structure ultimately pursued would maximize value for the benefit of all parties in interest. Specifically, with approval from their Board of Directors, the Debtors, with the assistance of Berenson, engaged in a process of exploring the possibility of a sale of all or part of their assets, including their German operations. The Debtors believed that exploring a sale process might result in a transaction that would be favorable to creditors and other parties in interest. Moreover, the process would assist the Debtors in determining the value of the Estates for purposes of validating plan distributions and determining the rights of creditors and stockholders under the absolute priority rule. Although the Debtors and Berenson conducted a thorough sale process and attracted a number of expressions of interest, it was not possible for an alternative transaction to be agreed upon by the Creditors Committee before the expiration of the Exclusive Proposal Period, necessitating the proposal of a standalone restructuring pursuant to the Previous Plan. In fact, the Creditors Committee was never enthusiastic about the possibility of a sale and from the beginning of the case strongly advocated a standalone plan based primarily on new equity securities.

After the withdrawal of the Previous Plan, certain members of the Creditors Committee, and primarily AIGGIC as chairman, began advocating a new sale process. The Debtors, believing that an expeditious emergence from chapter 11 was essential to the preservation of their business, declined to commence a new sale process and urged the Creditors Committee to engage in negotiations with respect to a new standalone plan. On June 15, 2005, AIGGIC filed a motion asking the Bankruptcy Court to order the Debtors to provide due diligence materials to prospective purchasers. The Debtors opposed the motion, and it was denied by the Bankruptcy Court at a hearing held on June 24, 2005.

3. Derailment of Previous Plan by Intercreditor Dispute

The Debtors formally commenced the plan process on November 12, 2004, by filing with the Bankruptcy Court a first proposed joint plan of reorganization and accompanying disclosure statement, containing terms that were heavily negotiated with and approved by the Creditors Committee. On that same date, the Debtors provided notice to all parties in interest of the disclosure statement hearing scheduled for December 14, 2004. The Debtors continued to work with the Creditors Committee in preparation for the disclosure statement hearing. In response to informal and formal objections to the disclosure statement received from certain parties in interest and further comments from the Creditors Committee, the Debtors filed a second and third proposed joint plan of reorganization and accompanying disclosure statement on December 10, 2004 and December 14, 2004, respectively, each time with the support of the Creditors Committee. Following the hearing on the disclosure statement, the Debtors filed a fourth proposed plan of reorganization and disclosure statement on December 16, 2004, again with the support of the Creditors Committee, further addressing certain objections raised at the hearing and concerns expressed by the Bankruptcy Court. Thereafter, by orders dated December 16, 2004, the Bankruptcy Court approved the disclosure statement and authorized the Debtors to commence the process of soliciting votes on the plan of reorganization based on the approved disclosure statement. The Bankruptcy Court also approved the supporting solicitation letters of the Debtors and the Creditors Committee, to be included with the disclosure statement. The final plan of reorganization was titled the Joint Plan of Reorganization Under Chapter 11, Title 11, United States Code of FiberMark, Inc., et al., Debtors, dated December 17, 2004, and is referred to herein as the Previous Plan.

The Debtors commenced the solicitation process on December 24, 2004, and moved towards confirmation of the Previous Plan with a voting and objection deadline of January 20, 2005 and a confirmation hearing date of January 27,

2005. In the meantime, the Debtors began to prepare the various plan implementing documents that were due to be filed in advance of the confirmation hearing, working closely in that regard with the Creditors Committee. In fact, the Creditors Committee insisted that its counsel take responsibility for the drafting of certain of the documents, including in particular the certificate of incorporation and the by-laws for Reorganized FiberMark. In mid-January 2005, the Debtors were formally notified that there was no consensus among the members of the Creditors Committee as to the corporate governance provisions to be included in those implementing documents and that the Creditors Committee had voted to approve extraordinary provisions desired by AIGGIC and Post, the second and third largest noteholders, and opposed by Silver Point, the largest noteholder. All three of the noteholders voted against the Previous Plan, with the result that Class 9 containing Noteholder Claims rejected the Previous Plan, requiring resort to the cramdown provisions of the Bankruptcy Code. Due to the extraordinary nature of the corporate governance provisions approved by the Creditors Committee, the Debtors determined that the Previous Plan could not be confirmed even in a cram down over the objection of Silver Point. Moreover, because the Previous Plan, being a consensual plan with the Creditors Committee, contained provisions requiring the consent of the Creditors Committee to any modification of the Plan and approval of all implementing documents as a condition to effectuating the Plan, the Creditors Committee was able to block the Debtors' emergence from chapter 11.

The Debtors and their advisors worked extensively to attempt to save the Previous Plan, meeting and conferring by telephone with the noteholders in an effort to mediate and resolve the intercreditor dispute. They sought and received from the Bankruptcy Court several extensions of the confirmation hearing date and associated deadlines, as they worked to keep the Previous Plan on track. On more than one occasion, the noteholders announced that they had reached an agreement, only to have that agreement subsequently fall apart. Over time, the acrimony and allegations of wrongdoing among the noteholders increased to the point that the Debtors were forced to conclude that the Previous Plan could never be confirmed and it would be necessary to file a new plan to emerge from chapter 11. Therefore, on March 21, 2005, the Debtors filed a notice of withdrawal of the Previous Plan.

## H.      Appointment and Report of Examiner

### 1.      Appointment of Examiner

In response to the intercreditor dispute and the escalation in allegations of wrongdoing among the parties, on April 19, 2005, the Bankruptcy Court ordered the appointment of an examiner under Section 1104(c) of the Bankruptcy Court and directed the U.S. Trustee to appoint an examiner, to be charged with investigating certain claims trading activity engaged in by Silver Point, including its purchase of several claims held by certain of the Debtors' current and former employees and members of management, including Alex Kwader, the Debtors' chief executive officer, the intercreditor dispute, and breaches of fiduciary duty by members of the Creditors Committee. After obtaining nominations from parties in interest and interviewing the potential candidates, the U.S. Trustee selected Harvey R. Miller (the "Examiner"), a nationally renowned bankruptcy lawyer and financial advisor. By order dated April 22, 2005, the Bankruptcy Court approved the appointment.

### 2.      Filing of Examiner's Report Under Seal and Subsequent Unsealing of Report

By order dated May 13, 2005, upon motion of Akin, the Bankruptcy Court directed that the Examiner's Report be confidential and filed under seal until further order of the Bankruptcy Court, but authorized the Examiner to provide copies to the U.S. Trustee, the Debtors, GECC, the Creditors Committee, Silver Point, AIGGIC, Post, Wilmington, and their respective attorneys. The Examiner conducted his investigation and, consistent with the orders of the Bankruptcy Court, filed the Examiner's Report under seal on July 8, 2005 (a corrected version of the Examiner's Report was filed under seal on July 29, 2005). Thereafter, the Debtors, the U.S. Trustee, Silver Point, Alex Kwader, and one of the Debtors' shareholders each filed pleadings with the Bankruptcy Court requesting that the Examiner's Report be unsealed (the "Requests to Unseal"). The Requests to Unseal were opposed by AIGGIC, Post, and Akin in pleadings filed with the Bankruptcy Court. On August 16, 2005, the Bankruptcy Court entered an order and a memorandum of decision (collectively, the "Unsealing Decision") providing for the unsealing of a version of the Examiner's Report (the "Public Examiner's Report") that, among other things, (i) was redacted to remove passages deemed protected by the attorney-client privilege and work product doctrine and (ii) included a cautionary legend on each page to make clear that the statements and conclusions in the report had not been adopted or accepted by the Bankruptcy Court and constituted only the opinions of the Examiner, that no portion of the report had been admitted into evidence, that several parties disputed the accuracy of the report, and that the publication of the report was without prejudice to the rights of any party to challenge the statements contained in the report. After providing a brief opportunity for AIGGIC, Post, and Akin to seek a stay of the Unsealing Decision, which they elected not to do, the Bankruptcy Court unsealed the Public Examiner's Report on August 19, 2005.

3. Examiner's Conclusions and Recommendations

The Public Examiner's Report is over 320 pages in length, with nearly 1,200 footnotes, and outlines the Examiner's findings, conclusions, and recommendations. A complete copy of the Public Examiner's Report may be obtained on the Debtors' Web site at www.fibermark.com. *The statements, conclusions, and recommendations in the Examiner's Report have not been adopted or accepted by the Bankruptcy Court or any other court, and constitute only the opinions of the Examiner. No portion of the Examiner's Report has been admitted into evidence. Moreover, several parties, including AIGGIC, Post, and Akin, dispute the accuracy of the contents of the Examiner's Report and the publication of the Public Examiner's Report is without prejudice to the right of any party to challenge the statements contained in the Examiner's Report.*

The following is a verbatim excerpt of the summary of conclusions contained in the Public Examiner's Report, excluding footnotes:

A.     "the transfer of the Debtors' executives' claims, including but not limited to, the claims of Alex Kwader, and other persons who were employees of the Debtors at the time of the transfer of their claim(s) to Silver Point, L.P., the nature and extent of the disclosure of those transfers and whether breach(es) of fiduciary duties to the estate resulted."

The purchase by Silver Point of the claims of Mr. Kwader and other employees of FiberMark was not a violation of the Trading Order because such claims are not Securities as such term is defined in Section 2(a)(1) of the Securities Act of 1933. Silver Point delay in disclosing the purchase of the SERP claims was unintentional and caused no harm (and any other deficient disclosure was caused by other parties). Silver Point did not violate any fiduciary duties in connection with its purchase of the SERP claims. There is no evidence that in purchasing the SERP claims, Silver Point possessed or used non-public confidential information or that Silver Point bought the SERP claims with the intent of purchasing the support of Mr. Kwader or FiberMark. Importantly, pursuant to the assignment of claim executed by Mr. Kwader and the other SERP claimants, Silver Point as the transferee of the claims received no economic benefit from the settlement of the SERP claims, as it agreed to pay a fixed percentage for such claims as finally allowed.

B.     "the transfer of the claim of former committee member Solutions Dispersions, Inc. to Silver Point."

The purchase of the SDI claim by Silver Point was not a violation of the Trading Order because trade claims are not Securities as that term is defined in Section 2(a)(1) of the Securities Act of 1933. The purchase of the SDI claim by Silver Point was not a breach of fiduciary duties on the part of Silver Point. Silver Point Committee personnel were not parties to and did not participate in the purchase of the SDI claim by Silver Point public side trader. The insertion of Paragraph 5.(a) in the assignment of claim agreement, while improper, was included by the Silver Point trader, without consultation with or advice from any other person, for the purpose of accommodating SDI's representative on the Committee. There is no evidence that anyone else at Silver Point understood or was aware of that the Silver Point trader had drafted and added language to a standard form of assignment agreement that would allow SDI to serve on the Committee as an agent of Silver Point. While Paragraph 5.(a) is startling, any professional experienced in bankruptcy or reorganization law and practice would immediately conclude that it was an unenforceable and voidable provision. The only harm caused by the transfer of the SDI claim and Paragraph 5.(a) was to stimulate the already highly charged distrust of Silver Point by AIG and Post.

C.     "the quality of the "screening wall" Silver Point, and the other members of the Creditors' Committee, established in accordance with this Court's Order Approving Specified Information Blocking Procedures and Permitting Trading in Securities of the Debtors Upon Establishment of a Screening Wall (doc. # 684) (the "Trading Order"), whether it was breached, and whether the Trading Order was violated."

47

1.       *Silver Point*

Silver Point complied with the Trading Order in all material aspects and maintained a previously established Screening Wall in accordance with the Trading Order. There is no evidence that the Silver Point Screening Wall was breached. Nevertheless, the circumstances surrounding its trading activities, particularly those involving the SDI claim and SERP related claims, did raise questions that needed to be propounded and answered. Accordingly, Silver Point should bear a portion of the responsibility for the costs and expenses of the investigation.

2.       *Post*

Post did not maintain a screening wall and did not file with the Court a declaration or affidavit in accordance with the Trading Order. Although Post did not consummate any trades of FiberMark "Securities" subsequent to the Commencement Date, there is evidence that Post wished to trade in FiberMark Securities and offered to sell all of its FiberMark Securities to Silver Point in December 2004 at a premium over the then market and in January 2005 at a discount to the then market. Moreover, Post Committee personnel engaged in conduct in furtherance of Post's trading activities. Under the circumstances, and especially because Post Committee personnel had non-public confidential information, Post's conduct may be considered a breach of the Trading Order.

3.       *AIG*

AIG did not engage in trading activities subsequent to the Commencement Date. Accordingly, AIG did not violate the Trading Order.

D.      <u>"the dispute among Committee members regarding corporate governance issues and whether any Committee member breached its fiduciary duty to act in the best interest of all creditors."</u>

1.       *AIG Breached Its Fiduciary Duties*

AIG breached its fiduciary duties by using the Committee as a tool to accomplish its own agenda and seek benefits for itself, particularly in connection with the corporate governance issues and the pursuit of trading allegations against Silver Point. There is no evidence that Mr. Musante ever considered the interests of creditors other than AIG and often commanded the Committee to act in ways contrary to the interests of such creditors or with reckless disregard to the consequences of such actions to such creditors.

2.       *Post Breached Its Fiduciary Duties*

Post, in a similar fashion to AIG, acted in its own self interest in pursuing the imposition of corporate governance provisions on Silver Point and trading allegations against Silver Point, without consideration of the interests of all general unsecured creditors. Post was preoccupied with assuring its ability to exit its FiberMark position without being hindered in any way by Silver Point. Post advocated the interests of other FiberMark general unsecured creditors only when those interests were completely aligned with Post, but often acted contrary to the interests of such creditors or with reckless disregard of the consequences of its actions on the interests of such creditors when its interests were not aligned with them. Post, therefore, violated its fiduciary duties to all creditors.

3.       *Silver Point Did Not Breach Its Fiduciary Duties*

Silver Point conducted good faith negotiations in connection with the corporate governance issues. Silver Point offered to provide minority shareholder protections beyond that provided by Delaware general corporate law and repeatedly made concessions in pursuit of a consensus. Although the introduction of Mr. Fortgang as the lead negotiator of the corporate governance provisions did have the effect of exacerbating an already existing tempest among the Big 3, the Examiner concludes that Silver Point consistently acted in accordance with its fiduciary duties.

E.    "any other matter the Examiner deems necessary and relevant to the complete and full investigation of the four enumerated areas included herein."

        1.    *The Role of Akin*

                Akin failed to discharge its obligations and perform its services in an independent, objective and disinterested manner as attorneys for the Committee by aligning itself with AIG and Post, particularly in respect of the corporate governance controversy and the assertion of Trading Order violations and breaches of fiduciary duties by Silver Point.

Public Examiner's Report, at 20-24.    Pages 284 through 321 of the Public Examiner's Report, which provide a more thorough discussion of the Examiner's conclusions, are attached as Appendix F hereto.    As previously indicated, ***the conclusions contained in the Examiner's Report, including those listed above, are those of the Examiner based upon his investigation, have not been adopted by the Bankruptcy Court or any other court, and are disputed by several parties, including AIGGIC, Post, and Akin.***

                The following is a verbatim excerpt of the recommendations contained in the Public Examiner's Report, excluding footnotes:

        A.    As a consequence of the breach of fiduciary duties by AIG and Post and the resultant loss of value to the FiberMark estate and creditors, the Examiner recommends the following:

                •    that AIG's and Post's claims be disallowed for voting purposes as to any plan of reorganization proposed in these chapter 11 cases including the Amended Joint Plan of Reorganization under Chapter 11, filed by FiberMark, dated June 23, 2005;

                •    that the Committee be disbanded as dysfunctional and unable to discharge its statutory duties to general unsecured creditors of FiberMark;

                •    that Wilmington be appointed as the general unsecured creditor representative for the remaining administration of these chapter 11 cases, with its expenses, including the fees and expenses of Covington, to be paid by FiberMark, in accordance with the applicable orders and rules regarding allowances of compensation and reimbursement of expenses;

                •    that any cash distributions to be made to AIG and Post pursuant to a confirmed plan of reorganization be reduced in the aggregate sum of $8,378,000, allocated 2/3 to AIG and 1/3 to Post, representing the loss in value to the other Noteholders and general unsecured creditors (other than Silver Point), because of the delay and extension of the chapter 11 cases caused by the conduct of AIG and Post and that such amount be reallocated and distributed to the other Noteholders and the general unsecured creditors (other than Silver Point) pro rata based upon the allowed amounts of their claims.    In absence of any cash distributions as aforesaid then as directed by further order of the Court; and

                •    that any plan of reorganization confirmed in these chapter 11 cases not provide for releases and exculpation for AIG, Post or Silver Point from any party other than FiberMark.

        B.    As a consequence of the facts surrounding the purchases by Silver Point of the claim of Mr. Kwader and other SERP claims and the SDI claim that precipitated an investigation and ultimately, the appointment of the Examiner, and the breaches of fiduciary duties by AIG and Post, the Examiner recommends that the costs of the Examiner's investigation, including his attorneys fees and expenses be paid by AIG, Post and Silver Point and allocated 1/3 each.    The payments by each will be deducted from any cash distributions to them pursuant to a confirmed chapter 11 plan for FiberMark or else paid by each pursuant to further order of the Court.

        C.    As a consequence of  (i) the actions of Akin in aligning itself with AIG and Post and failing to represent all of the members of the Committee and the other general unsecured creditors, (ii) the actions of

Akin in connection with its investigation of Silver Point, and (iii) the failure of Akin to discharge its responsibilities under the Trading Order which contributed to the disarray and dysfunctionality of the Committee and the postponement of FiberMark's emergence from chapter 11, some significant portion of the compensation requested by Akin for the period after December 1, 2004 should be disallowed.

D.      The Examiner recommends that (i) AIG, Post, Silver Point, Akin, Chanin, Berenson and Skadden bear their own costs in connection with Examiner's investigation and (ii) AIG, Post, Silver Point, Akin, Chanin and Berenson bear their own costs in connection with the corporate governance dispute, and none of such parties be reimbursed by FiberMark for any costs or fees relating thereto.

Public Examiner's Report, at 25-26.  As previously indicated, ***the recommendations contained in the Examiner's Report, including those listed above, are those of the Examiner, have not been adopted by the Bankruptcy Court or any other court, and are disputed by several parties, including AIGGIC, Post, and Akin.***

4.      Statement of AIGGIC and Post with Respect to Examiner's Report

AIGGIC and Post believe that the Examiner's Report contains numerous errors and internal inconsistencies, that the Examiner overlooked substantial evidence, and that his investigative methods were deficient, all of which render his findings, conclusions and recommendations suspect and untenable, according to AIGGIC and Post. Contrary to the Examiner's Report, AIGGIC and Post believe that the evidence demonstrates that they were at all times acting consistent with their fiduciary duties, and no creditor was harmed as the result of any actions or alleged omissions of AIGGIC and Post.  The positions of AIGGIC and Post are further set forth in various pleadings filed by each of them in the Bankruptcy Court, including the following, which are accessible on the Bankruptcy Court's docket:

- Response of AIGGIC Global Investment Corp. to Motions to Unseal the Examiner's Report (Docket No. 1737);

- Reply of AIGGIC Global Investment to Debtor's Motion to Unseal Examiner's Report and Supporting Memorandum of Law (Docket No. 1752);

- AIGGIC's Motion for Reconsideration or, in the Alternative, for Clarification Regarding Order Unsealing the Examiner's Report (Docket No. 1828);

- Objection of AIGGIC Global Investment Corp. to Debtors' Amended Disclosure Statement Dated August 25, 2005 (Docket No. 1853)

- Opposition of Post Advisory Group LLC to Unsealing of Examiner Report (Docket No.1736);

- Omnibus Reply of Post Advisory Group, LLC to (1) Debtors' Motion to Unseal Examiner's Report, (2) Statement and Memorandum of Law of the United States Trustee in Support of Order Unsealing Report of Examiner, (3) Response of AIGGIC Global Investment Corp. to Motions to Unseal Examiner's Report, and (4) Response of Akin Gump Strauss Hauer & Feld LLP to Motions to Unseal Examiner's Report  (Docket No.1749);

- Amended Opposition of Post Advisory Group, LLC to Unsealing of Examiner's Report (Docket No. 1782); and

- Response of Post Advisory Group, LLC to [Second Proposed] Disclosure Statement with Respect to Amended Joint Plan of Reorganization Under Chapter 11, Title 11, United States Code of FiberMark, Inc., et al., Debtors (Docket No. 1855).

5.      Implementation of Examiner's Report

The Examiner's Report is not self-executing.  The statements, conclusions, and recommendations in the Examiner's Report have not been adopted or accepted by the Bankruptcy Court or any other court, and constitute only the opinions of the Examiner and no portion of the Examiner's Report has been admitted into evidence.  Moreover, several

parties, including AIGGIC, Post, and Akin, dispute the accuracy of the contents of the Examiner's Report and intend to challenge the statements contained in the Examiner's Report. Accordingly, any attempt to implement the findings, conclusions, and recommendations of the Examiner's Report would likely involve litigation that is highly contested, time-consuming, and costly.

### 6. Constituency Settlement

As previously indicated, and as described in more detail in Section VII.C. below, a settlement has been reached among AIGGIC, Post, Silver Point, and the Debtors that resolves the allegations made in the Examiner's Report against AIGGIC and Post. The settlement is incorporated into the Plan as the Constituency Settlement.

## VII.    SUMMARY OF THE PLAN OF REORGANIZATION

THIS SECTION PROVIDES A SUMMARY OF THE STRUCTURE AND IMPLEMENTATION OF THE PLAN AND THE CLASSIFICATION AND TREATMENT OF CLAIMS UNDER THE PLAN AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN, WHICH ACCOMPANIES THIS DISCLOSURE STATEMENT, AND TO THE EXHIBITS ATTACHED THERETO.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT INCLUDE SUMMARIES OF THE PROVISIONS CONTAINED IN THE PLAN AND IN DOCUMENTS REFERRED TO THEREIN. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE PRECISE OR COMPLETE STATEMENTS OF ALL THE TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO THEREIN, AND REFERENCE IS MADE TO THE PLAN AND TO SUCH DOCUMENTS FOR THE FULL AND COMPLETE STATEMENTS OF SUCH TERMS AND PROVISIONS.

THE PLAN ITSELF AND THE DOCUMENTS REFERRED TO THEREIN WILL CONTROL THE TREATMENT OF CLAIMS AGAINST, AND INTERESTS IN, THE DEBTORS UNDER THE PLAN AND WILL, UPON THE EFFECTIVE DATE, BE BINDING UPON HOLDERS OF CLAIMS AGAINST, OR INTERESTS IN, THE DEBTORS, THE REORGANIZED DEBTORS, AND OTHER PARTIES IN INTEREST. IN THE EVENT OF ANY CONFLICT BETWEEN THIS DISCLOSURE STATEMENT AND THE PLAN OR ANY OTHER OPERATIVE DOCUMENT, THE TERMS OF THE PLAN AND/OR SUCH OTHER OPERATIVE DOCUMENT WILL CONTROL.

### A.    Overall Structure of the Plan

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under chapter 11, a debtor is authorized to reorganize its business for the benefit of its creditors and shareholders. Upon the filing of a petition for relief under chapter 11, Section 362 of the Bankruptcy Code provides for an automatic stay of substantially all acts and proceedings against the debtor and its property, including all attempts to collect claims or enforce liens that arose prior to the commencement of the chapter 11 case.

The consummation of a plan of reorganization is the principal objective of a chapter 11 case. A plan of reorganization sets forth the means for satisfying claims against and interests in a debtor. Confirmation of a plan of reorganization by the Bankruptcy Court makes the plan binding upon the debtor, any issuer of securities under the plan, any person acquiring property under the plan, and any creditor or equity security holder in the debtor, whether or not such creditor or equity security holder (a) is impaired under or has accepted the plan or (b) receives or retains any property under the plan. Subject to certain limited exceptions, and other than as provided in the plan itself or the confirmation order, the confirmation order discharges the debtor from any debt that arose prior to the date of confirmation of the plan and substitutes for such debt the obligations specified under the confirmed plan, and terminates all rights and interests of equity security holders.

The terms of the Debtors' Plan are based upon, among other things, the Debtors' assessment of their ability to achieve the goals of their business plan, make the distributions contemplated under the Plan, and pay their continuing obligations in the ordinary course of their businesses. Under the Plan, Claims against and Interests in the Debtors are divided into Classes according to their relative seniority and other criteria.

If the Plan is confirmed by the Bankruptcy Court and consummated, (a) the Claims in certain Classes will be reinstated or modified and receive distributions equal to the full amount of such Claims, (b) the Claims of certain other

Classes will be modified and receive distributions constituting a partial recovery on such Claims, and (c) the Claims and Interests in certain other Classes will receive no recovery on such Claims or Interests. On the Effective Date and at certain times thereafter, the Reorganized Debtors will distribute Cash, securities and other property in respect of certain Classes of Claims as provided in the Plan. The Classes of Claims against and Interests in the Debtors created under the Plan, the treatment of those Classes under the Plan, and the securities and other property to be distributed under the Plan are described below.

## B.      Substantive Consolidation

The Plan provides for the substantive consolidation of the Debtors' assets and liabilities. Substantive consolidation is an equitable remedy that must be approved by the Bankruptcy Court. The Plan constitutes a motion for substantive consolidation of the liabilities and properties of all the Debtors. The confirmation of the Plan will constitute approval of the motion by the Bankruptcy Court and the Confirmation Order will contain findings supporting and conclusions providing for substantive consolidation on the terms set forth in Section 2.2 of the Plan.

Substantive consolidation of the Debtors is necessary to ensure a fair recovery to individual creditors of each Debtor. If the Debtors' Estates were not substantively consolidated, it would be necessary to have three separate plans of reorganization, with each creditor receiving a distribution from the Debtor with which the particular creditor did business. Any benefit of requiring the Debtors to separate assets and liabilities by individual Debtor in order to formulate three individual plans of reorganization would be outweighed by the costs of doing so. Moreover, requiring the Debtors to separate their assets and liabilities in such a manner would fail to properly reflect the manner in which the Debtors conduct their businesses.

In the Debtors' view, the following facts clearly warrant substantive consolidation:

- ***Subsidiary Debtors are directly owned by the lead Debtor.*** FiberMark owns 100% of the stock of FNA and FIH.

- ***Officers and directors of the Subsidiary Debtors are substantially the same.*** The directors and officers of the Subsidiary Debtors are substantially the same individuals. Certain of such directors and officers also hold positions with FiberMark.

- ***Articulated decisions of the Board of Directors.*** The Board of Directors of FiberMark oversees the Debtors' management, reviews their long-term strategic plans, and exercises decision-making authority in key areas, including appointment of independent auditors, review of the adequacy of the internal accounting and control procedures of FiberMark and the Subsidiary Debtors, as well as the review and approval of compensation arrangements for officers and senior-level employees of FiberMark and the Subsidiary Debtors.

- ***Consolidated corporate policy.*** Corporate policy is created and executed for all the Debtors at the direction of FiberMark's management.

- ***Centralized cash management system.*** The Debtors utilize a fully-integrated, centralized cash management system that permits them to fund their ongoing operations in the most streamlined and cost-efficient manner possible.

- ***Debt guaranteed by Subsidiary Debtors.*** FiberMark and the Subsidiary Debtors are obligors or guarantors under a pre-petition senior secured credit facility. FiberMark is also the obligor under the FiberMark Notes, which are guaranteed by the Subsidiary Debtors.

- ***Loan documents controlled by consolidated numbers.*** Financial covenants contained in loan documents are based on the consolidated financials of FiberMark and its subsidiaries.

- ***Consolidated information.*** Consolidated books and records are maintained by FiberMark and its subsidiaries. FiberMark files consolidated reports with the SEC, prepares consolidated U.S. federal income tax returns, and provides information on a consolidated basis to third parties for the purpose of determining the Company's creditworthiness.

- *No entity differentiation.* The Debtors do business under the name "FiberMark" and historically have often failed to use legal entity names in their dealings with customers and vendors. Often legal documents appear in the name of the parent company even though they relate to operations and assets at the subsidiary level.

- *Transfer of German stock interest.* FIH was created within the year preceding the Petition Date. The only unsecured Claims against FIH are the Noteholder Claims, which are also unsecured Claims against FiberMark and FNA. The primary asset of FIH is the stock of the German subsidiaries. In the absence of the creation of FIH, the holders of General Unsecured Claims against FiberMark would have had an equal claim with the holders of Noteholder Claims to the value of the German subsidiaries. Substantive consolidation addresses the disparity in creditor rights that resulted from the creation of FIH.

As a result of the substantive consolidation of the liabilities and properties of all the Debtors, except as otherwise provided in the Plan, (i) the separate chapter 11 cases of the Debtors will be consolidated into the case of FiberMark as a single consolidated case; (ii) all property of the Estate of each Debtor will be deemed to be property of the consolidated Estates; (iii) all Claims against each Estate will be deemed to be Claims against the consolidated Estates, any Proof of Claim filed against one or more of the Debtors will be deemed to be a single Claim filed against the consolidated Estates, and all duplicate Proofs of Claim for the same Claim filed against more than one Debtor will be deemed expunged; (iv) no distributions under the Plan will be made on account of Claims based upon intercompany obligations by and against the Debtors; (v) all Claims based upon pre-petition unsecured guarantees by one Debtor in favor of any other of the Debtors (other than guarantees existing under any assumed executory contracts or unexpired leases) will be eliminated, and no distributions under this Plan will be made on account of Claims based upon such guarantees; (vi) for purposes of determining the availability of the right of setoff under Section 553 of the Bankruptcy Code, the Debtors will be treated as one consolidated entity so that, subject to the other provisions of Section 553, pre-petition debts due to any of the Debtors may be set off against the pre-petition debts of any other of the Debtors; and (vii) no distributions under this Plan will be made on account of any Subsidiary Interests.

Substantive consolidation will not merge or otherwise affect the separate legal existence of each Debtor other than with respect to distribution rights under this Plan; substantive consolidation will have no effect on valid, enforceable and unavoidable liens, except for liens that secure a Claim that is eliminated by virtue of substantive consolidation and liens against collateral that are extinguished by virtue of substantive consolidation; and substantive consolidation will not have the effect of creating a Claim in a class different from the class in which a Claim would have been placed in the absence of substantive consolidation.

## C. Constituency Settlement

As previously discussed, the Examiner concluded that AIGGIC and Post, as members of the Creditors Committee, breached their fiduciary duties to the unsecured creditors represented by the Creditors Committee, consisting of the holders of Noteholder Claims and General Unsecured Claims; and recommended as the penalty for such breach that AIGGIC and Post be required to compensate the unsecured creditors for the loss in the estimated value of their expected recoveries under the Previous Plan, which the Debtors had been estimated to have a value of 70% of the amount of their Allowed Claims.

The Examiner's recommendations, which are disputed by AIGGIC and Post and have not been ratified by the Bankruptcy Court, are not self-executing and can be implemented only as a result of successful litigation against AIGGIC and Post. Because AIGGIC and Post strenuously deny any wrongdoing and have indicated that they will spare no expense in defending against any litigation based upon the Examiner's conclusions, it is by no means certain that a litigation strategy will produce a favorable result for unsecured creditors. The difficulty in pursuing a cause of action based on breach of fiduciary duty in this context is that the cause of action belongs to no individual unsecured creditor but rather belongs to all constituents of the Creditors Committee as a group. Thus, it is unlikely that any individual unsecured creditor will step forward to take responsibility for the litigation, including funding the costs of litigation. The Debtors have been willing to take on the responsibility as a volunteer for the benefit of their unsecured creditors, but doing so is not without risk to the Debtors, as it will burden the Debtors' management and impose significant costs on the reorganized company that may ultimately impair the value of the recovery otherwise to be received by the creditors.

Against this backdrop, without any admission of liability by AIGGIC and Post but in the interest of putting the damaging and, in their view, unwarranted allegations behind them, a settlement was reached among AIGGIC, Post, Silver

Point, and the Debtors, for the benefit of the holders of Noteholder Claims and General Unsecured Claims, which resolves the breach of fiduciary duty issues and other constituency issues raised by the Examiner, including related causes of action asserted by Silver Point against AIGGIC and Post, in a manner that reflects the spirit of the Examiner's recommendations – that holders of Noteholders Claims and General Unsecured Claims have the opportunity to realize a 70% recovery on their Allowed Claims. Included at Appendix G are letters from AIGGIC, Post, and Silver Point that evidence their consent to and willingness to be bound by the settlement terms, as well as their agreement to vote in favor of the Plan and to support the Debtors' effort to confirm the Plan.

The settlement is referred to in the Plan as the Constituency Settlement. The Plan, and specifically the treatment of Noteholder Claims and General Unsecured Claims under the Plan, is premised upon the implementation of the Constituency Settlement. The Plan itself constitutes a motion for approval of the Constituency Settlement, including pursuant to Rule 9019 of the Bankruptcy Rules and otherwise. If the Plan is confirmed, the Confirmation Order will constitute an order of the Bankruptcy Court approving the Constituency Settlement as fair and equitable and within the bounds of reasonableness. **As a result, upon the Effective Date of the Plan, all holders of Noteholder Claims and General Unsecured Claims will be bound by the Constituency Settlement and all other provisions of the Plan, whether or not they decline to vote on the Plan, vote against the Plan, or object to the Plan.**

As described in the Plan, the Constituency Settlement includes the compromise and settlement of (a) all Constituency Causes of Action against AIGGIC and Post – which are claims, rights, causes of action, suits or proceedings, whether at law or in equity, against AIGGIC or Post (including without limitation those that were or could have been described or identified in the Examiner's Report or otherwise), arising from or related to actions or alleged omissions by AIGGIC or Post, in their respective capacities as members of the Creditors Committee, in or in connection with the Chapter 11 Case, belonging to all direct or indirect holders of Noteholder Claims and General Unsecured Claims at any time during the Chapter 11 Case, as constituents of the Creditors Committee; (b) all Litigation Rights against AIGGIC, Post, and Silver Point – which are claims, rights of action, suits, or proceedings, whether in law or in equity, whether known or unknown, that the Debtors or their Estates may hold; and (c) the Individual Causes of Action of Silver Point, AIGGIC, and Post against each other – which are claims, rights of action, suits, or proceedings, whether in law or in equity, including rights of contribution or indemnity, that belong to Silver Point, AIGGIC, or Post in their respective individual capacities.

The Constituency Settlement has a number of components, including the following, which are more particularly described in Section 6.16 of the Plan:

- *Settlement Cash.* AIGGIC and Post will fund the Settlement Cash, which is an amount equal to the lesser of (i) $0.08 times the aggregate amount of all Allowed Noteholder Claims and Allowed General Unsecured Claims or (ii) $4,200,000. AIGGIC is responsible for 75% of the amount up to a maximum of $3,150,000, and Post is responsible for 25% of the amount up to a maximum of $1,050,000. Holders of Allowed Noteholder Claims and Allowed General Unsecured Claims (other than AIGGIC, Post, and Silver Point) will share in the Settlement Cash as a part of their distribution under the Plan.

- *Stock Purchase Payment.* Silver Point will fund the Stock Purchase Payment, which is an amount that, together with Distribution Cash and Settlement Cash, will result in aggregate all-Cash payments to holders of Allowed Noteholder Claims and Allowed General Unsecured Claims that are expected to equal 70% of their Allowed Claims. (The amount may be less than 70% if Allowed Claim amounts exceed the Debtors' current estimates.) In consideration of the Stock Purchase Payment, Silver Point will receive the New Common Stock of all holders of Allowed Noteholder Claims and Allowed General Unsecured Claims (other than AIGGIC, Post, and Silver Point) who receive the all-Cash treatment provided for in the Plan.

  The maximum aggregate amount of the Stock Purchase Payment to be made by Silver Point is limited to $21,600,000. This amount was derived from (i) the assumption that the aggregate amount of Noteholder Claims and General Unsecured Claims (other than those held by AIGGIC, Post, and Silver Point) will be less than or equal to $52,505,084 and (ii) the assumption that none of the holders of such Claims will elect to receive a combination of New Common Stock and Cash and that by default all of such holders will receive the all-Cash distribution. Thus, to the extent that any of such holders make the election, the maximum aggregate amount paid by Silver Point will be less than $21,600,000. Until the deadlines for making the election pass, it is impossible to determine the aggregate amount ultimately payable by Silver Point.

- **Purchase of AIGGIC and Post Claims.**  Silver Point will purchase the Allowed Noteholder Claims held by AIGGIC, estimated to be in the amount of $68,421,745, for a purchase price of $41,334,000 and the Allowed Noteholder Claims held by Post, estimated to be in the amount of $53,676,017, for a purchase price of $32,271,450.  As a result of such purchases, Silver Point will be entitled to receive the distributions of New Common Stock and Distribution Cash that would have been made under the Plan on account of the Allowed Claims of AIGGIC and Post.  The end result is that AIGGIC and Post will have no interest in the reorganized company, mooting the corporate governance disputes that caused the derailment of the Previous Plan.

- **Treatment of Silver Point Claims.**  Silver Point will receive the same Pro Rata distribution of New Common Stock and Distribution Cash on account of its Noteholder Claims, estimated to be in the amount of $178,108,193 (approximately 52% of all Noteholder Claims), and its General Unsecured Claims, estimated to be in the amount of $6,809,328 (approximately 55% of all General Unsecured Claims), as other holders of Noteholder Claims and General Unsecured Claims.  Consistent with the Examiner's recommendations, Silver Point will not share in the Settlement Cash.  Silver Point will use its share of the Distribution Cash to fund the Stock Purchase Payment and to defray a portion of the purchase price of the Noteholder Claims of AIGGIC and Post.

- **Payment of Examiner Costs.**  Each of AIGGIC, Post, and Silver Point will pay one-third (1/3) of the aggregate amount of the Allowed fees and expenses of the Examiner and the Examiner's professionals, up to a maximum amount of $1,750,000.  In the absence of this agreement, the Debtors would be required to pay such fees and expenses.

- **Release.  As a result of the Constituency Settlement, all holders of Noteholder Claims and General Unsecured Claims will be deemed to have released all claims, rights, and causes of action against AIGGIC, Post, and Silver Point, other than Individual Causes of Action.**

- **No Admission of Wrongdoing.**  The parties to the Constituency Settlement expressly acknowledge that the Constituency Settlement represents a settlement of disputed rights and claims, and that by entering into the Constituency Settlement, no Person admits or acknowledges the existence of any liabilities or wrongdoing, all such liabilities and wrongdoing being expressly denied in all respects. Further, acceptance of the Plan and payment of the Settlement Cash will not constitute an acknowledgement or admission by AIGGIC or Post that any actions or omissions by either of them gave rise to any valid claims or caused any loss to any Person.

- **Retention of Defenses.**  Except as otherwise provided in the Plan, including the releases contained in Section 6.16 of the Plan, the releases contained in Section 12.9 of the Plan, the exculpations contained in Section 12.12 of the Plan, and the discharge contained in Section 12.10 of the Plan, Silver Point, AIGGIC, and Post will each retain all claims, counterclaims, crossclaims and rights against any Person.  No determination in or in connection with the Plan or in any prior proceeding in the Chapter 11 Case will be prejudicial to, or preclusive in respect of, any rights or defenses of any kind held by Silver Point, AIGGIC, or Post and which may be raised in or in connection with any claims brought against Silver Point, AIGGIC, or Post by any Person, or any claims brought by Silver Point, AIGGIC, or Post against any Person.

The Debtors believe that the Constituency Settlement is fair and reasonable and within the bounds of reasonableness. Moreover, the Constituency Settlement serves the interests of the holders of Noteholder Claims and General Unsecured Claims as the intended beneficiaries of the Constituency Causes of Action in a manner that is consistent with the spirit of the Examiner's recommendation.  Accordingly, approval of the Constituency Settlement as part of the Plan is appropriate upon a consideration of the factors applicable to settlements under Rule 9019 of the Bankruptcy Rules, including (a) the probability of success in the litigation; (b) the difficulties associated with collection; (c) the complexity of the litigation and the attendant expense, inconvenience and delay; and (d) the paramount interests of the creditors.  In support thereof, the Debtors submit the following:

- **No Guarantee of Success.**  It is difficult to assess the probability of success in any litigation against AIGGIC and Post.  On the one hand, the Debtors agree with the findings and conclusions of the Examiner, which are consistent with their view of events that occurred during the Chapter 11 Case.

On the other hand, AIGGIC and Post believe that the Examiner's Report contains numerous errors and internal inconsistencies, that the Examiner overlooked substantial evidence, and that his investigative methods were deficient, all of which render his findings, conclusions and recommendations suspect and untenable, according to AIGGIC and Post. Contrary to the Examiner's Report, AIGGIC and Post believe that the evidence demonstrates that they were at all times acting consistent with their fiduciary duties, and no creditor was harmed as the result of any actions or alleged omissions of AIGGIC and Post.

- *Limited Access to Privileged Materials.* In his investigation, the Examiner had access to many documents that are arguably subject to an attorney-client or work product privilege in favor of AIGGIC and Post. Those same documents may not be available in any litigation brought against AIGGIC and Post, with the result that a trier of fact may not reach the same conclusions as the Examiner. AIGGIC continues to fight the release of certain portions of the Public Examiner's Report and has filed an appeal of the Bankruptcy Court's orders providing for the release of the Public Examiner's Report. Thus, there remains the potential that portions of even the Public Examiner's Report may not be used in litigation against AIGGIC and Post.

- *Defendants' Resources.* AIGGIC and Post are multi-billion dollar institutions with the financial ability to mount a massive defense against the litigation. The plaintiffs in any such litigation are not in the same financial situation, whether they be individual holders of Noteholder Claims and General Unsecured Claims acting on behalf of all such holders – and none to date has come forward to indicate any desire to do so – or the Debtors volunteering to serve as the representative of all such holders.

- *Management Distraction.* Any litigation, whether brought by individual holders or by the Debtors will be a distraction to the Debtors' management that will prevent the necessary focus on the operations of the reorganized company. For example, AIGGIC has already served a comprehensive discovery request that seeks all documents relating to the Chapter 11 Case, from before the commencement of the Chapter 11 Case to the current time.

- *Risk to Value of Reorganized Company.* The Debtors' participation in the litigation will be expensive and could potentially impair the value of the New Common Stock, which would be the primary source of recovery to holders of Noteholder Claims and General Unsecured Claims under a plan of reorganization that proposed to litigate against AIGGIC and Post. There is no certainty that the expense will be offset by any recovery realized through litigation.

- *Confirmation Delay.* AIGGIC and Post can be expected to oppose the confirmation of any plan of reorganization proposed by the Debtors. Although the Debtors believe they can confirm a plan over such opposition, it will greatly add to the expense of the process and further the delay that has already damaged the Debtors.

- *Favorable Settlement.* The settlement provides the opportunity for holders of Noteholder Claims and General Unsecured Claims to recoup the loss that the Examiner determined, and which AIGGIC and Post dispute, resulted from the alleged breach of fiduciary duty, which was a diminution in the value of the recovery under the Previous Plan. With the all-Cash distribution made possible by the settlement, a 70% recovery like that forecasted under the Previous Plan is available under the current Plan.

## D. Certain Objections to Constituency Settlement

### 1. Minority Noteholders

Certain minority holders of Noteholder Claims, including River Run Management, Third Point, Inc., Catalyst Investment Management, and CP Management, LLC (the "Minority Noteholders"), have objected to the Plan as premised on the Constituency Settlement and have requested the opportunity to include their positions in the Disclosure Statement. The Debtors are willing to accommodate the request. Set forth below are the positions of the Minority Noteholders, along with the Debtors' response to each such position.

***The Minority Noteholders state:*** "Four holders of Class 9 Noteholder Claims, River Run Management, Third Point, Inc., Catalyst Investment Management and CP Management, LLC (the "Minority Noteholders"), aggregating approximately $38,700,000 in principal amount oppose the Plan and recommend that the holders of Class 9 and 10 Claims vote to reject it."

***The Debtors respond:*** The Minority Noteholders are relative newcomers to the Chapter 11 Case. They all acquired their positions after the Petition Date. Apparently unhappy with the recoveries offered under the Plan, the Minority Noteholders ask other creditors to vote down the Plan without offering any viable alternative for the Debtors' emergence from Chapter 11. The Debtors believe that the Plan offers the best opportunity for a successful reorganization and return to profitability. The only alternative is a plan that will result in massive litigation both before and after confirmation, with huge legal fees and costs eroding equity value and potentially jeopardizing business operations. Moreover, such litigation may ultimately prove to be unsuccessful or may otherwise not lead to recoveries sufficient to overcome the fees and costs incurred. Furthermore, if the Plan is not confirmed and the Debtors' emergence is further delayed, customer, vendor and employee loyalties will suffer serious harm, with corresponding deterioration in the business and in creditor recoveries. While the Minority Noteholders are new to the game, the Debtors believe that other creditors understand that an expeditious end to the Chapter 11 Case is absolutely critical to preserving the value of the Estates for all creditors.

***Further, the Minority Noteholders state:*** "First, the Minority Noteholders believe that the Plan amounts to a takeover of the Reorganized Debtors by Silver Point, which is not providing fair value to its fellow creditors who hold Class 9 and 10 Claims."

***The Debtors respond:*** Silver Point has been for some time the largest holder of Noteholder Claims and General Unsecured Claims. It acquired its position by legitimately buying up FiberMark Notes and Claims after the Petition Date. Nevertheless, the Plan provides Silver Point with no better treatment than is afforded to all other holders of Noteholder Claims and General Unsecured Claims. Silver Point shares Pro Rata in the New Common Stock and Distribution Cash like all other holders, but unlike all other holders it has agreed to accept the Examiner's recommendation that it not receive any of the Settlement Cash, and unlike other holders it has agreed to fund the cash necessary to satisfy the cash election for those creditors that do not wish to take equity as part of their distribution. There is nothing in the Plan that operates to enhance the position that Silver Point legitimately acquired. Moreover, there is nothing in the law that obligates Silver Point to provide greater value to fellow creditors than the Plan itself fairly provides to all.

***Further, the Minority Noteholders state:*** "In particular, the Plan improperly pressures unsecured creditors to accept the all-cash option because Silver Point will be taking the Reorganized Debtors "private" so there will not be a liquid market for new common stock being issued under the Plan."

***The Debtors respond:*** The proposal that Reorganized FiberMark emerge as a private company rather than a public company originated with the Creditors Committee prior to the filing of the Previous Plan. As an accommodation to the Creditors Committee, the Debtors agreed to the private company concept and included it in the Previous Plan, which was known to the Minority Noteholders before they acquired their interests in the Debtors. The Debtors understand that the Creditors Committee desired a private company primarily due to the costs associated with public company status, including SEC filings, particularly in view of the small number of equity holders in FiberMark upon its emergence. The Plan carries forward that original design. The illiquid nature of the New Common Stock was a concern to the Debtors under the Previous Plan where the cash option was deeply discounted at the insistence of the Creditors Committee. But the concern was for trade creditors and small investors rather than for sophisticated financial institutions like the Minority Noteholders who are well versed in the private equity markets. Unlike the Previous Plan, the Plan now on the table offers a cash option for creditors who are concerned about the illiquid nature of the New Common Stock. In addition, the Plan provides for corporate governance rights in excess of Delaware law that give minority holders certain additional protections and information rights.

***Further, the Minority Noteholders state:*** "Second, the Minority Noteholders believe that the valuation of the post-reorganization equity which is being offered to Class 9 and 10 claims under the plan which is valued at $118 million in the Debtors projections' contained in Appendix B of the Disclosure Statement may be substantially undervalued."

***The Debtors respond:*** The valuations contained in the Disclosure Statement represent the best efforts of the Debtors and their financial advisor to predict the future but, as the Debtors have stated in the Disclosure Statement, the value of any operating business is subject to uncertainties and contingencies that are difficult to predict, and will fluctuate with changes in factors affecting the financial condition and prospects of the business. The Minority Noteholders are sophisticated financial institutions that routinely assess the value of their investment targets, as they certainly did in determining to buy FiberMark Notes. If the Minority Noteholders believe that the post-reorganization equity has a higher value than projected by the Debtors, the Minority Noteholders should not hesitate to elect to receive a combination of New Common Stock and Cash. If there is any undervaluation, the election offers the Minority Noteholders an opportunity to take full advantage of it.

***Finally, the Minority Noteholders state:*** "Third, the Minority Noteholders believe that by having acted in a self-interested fashion while a member of the Creditors Committee, Silver Point has breached its fiduciary duty to its fellow creditors."

***The Debtors respond:*** The Examiner fully examined the actions of Silver Point while a member of the Creditors Committee and found no breach of fiduciary duty by Silver Point. Moreover, in the Debtors' view, Silver Point has always acted in good faith in the Chapter 11 Case. The Minority Noteholders have no basis for alleging otherwise. They all acquired their Noteholder Claims after the Petition Date and none have been active participants in the Chapter 11 Case. At this point, their unfounded allegations against Silver Point appear to be motivated by something other than the best interests of the Estates and other creditors.

The Minority Noteholders disagree with the Debtors' responses set forth above.

2.    Certain Stockholders

Certain stockholders have filed an informal request that the Court provide some payment to holders of Interests. Unfortunately, the FiberMark Interests have been out of the money for the entire duration of the Chapter 11 Case. The issues that gave rise to the Examiner's Report did not change that fact. In fact, in the view of the Examiner, those issues resulted in a further diminution of value. Therefore, under the absolute priority rule, no distribution is available for holders of FiberMark Interests.

**E.    Reorganized Capital Structure Created by Plan**

The Plan sets forth the capital structure for the Reorganized Debtors upon their emergence from chapter 11, which is summarized as follows:

- ***Exit Facility.*** On the Effective Date, the Reorganized Debtors will obtain new financing, including revolving credit, term credit and/or letters of credit as determined necessary. A new facility (the "New German Facility") will also be put in place to replace the existing German Facility. Funds from the Exit Facility will be used to refinance the DIP Facility and any obligations of the Debtors under their guarantee of the German Facility, support other payments required to be made under the Plan, pay transaction costs, and fund working capital and general corporate purposes of the Reorganized Debtors following the Effective Date. The Exit Facility is expected to be secured by substantially all the assets of the Reorganized Debtors, subject to customary limitations, including limitations on the pledge of stock of foreign subsidiaries and substantially consistent with the pre-petition security package. The Debtors may be required to guarantee the New German Facility, consistent with the current guarantee of the German Facility.

- ***Continuing Obligations.*** The obligations underlying the GECC Equipment Financing Claim, the Banc One Equipment Financing Claim, and the Coated Paper Sale/Leaseback Claim will be continued in accordance with their original terms or on restructured terms, resulting in secured indebtedness in the aggregate amount of approximately $6,862,495 (collateral for GECC Equipment Financing Claim includes $1 million in an undrawn letter of credit that has been included in the Debtors' estimate concerning the DIP Facility Claim in respect of letters of credit). In addition, the contingent obligations underlying the Lowville Grant Claims will continue.

- ***FiberMark Equity Ownership.*** Reorganized FiberMark will (i) authorize on the Effective Date 20 million shares of New Common Stock; (ii) issue on the Distribution Dates up to an aggregate of 10 million shares of New Common Stock for distribution to holders of Allowed Noteholder Claims and Allowed General Unsecured Claims, including amounts necessary to establish the Common Stock Reserve for Disputed General Unsecured Claims; (iii) reserve for issuance the number of shares of New Common Stock necessary to provide required distributions to holders of subsequently Allowed Noteholder Claims and subsequently Allowed General Unsecured Claims in the event the Common Stock Reserve is insufficient to satisfy such distributions; and (iv) reserve for issuance the number of shares of New Common Stock necessary (excluding shares that may be issuable as a result of the antidilution provisions thereof) to satisfy the required distributions of options granted under the New Equity Incentive Plan (excluding shares that may be issuable as a result of the antidilution provisions of thereof).

## F.  Classification and Treatment of Claims and Interests

Section 1122 of the Bankruptcy Code provides that a plan of reorganization must classify the claims and interests of a debtor's creditors and equity interest holders.  In accordance with Section 1122 of the Bankruptcy Code, the Plan divides Claims and Interests into Classes and sets forth the treatment for each Class (other than Administrative Claims and Priority Tax Claims, which, pursuant to Section 1123(a)(1), do not need to be classified).  The Debtors also are required, under Section 1122 of the Bankruptcy Code, to classify Claims against and Interests in the Debtors into Classes that contain Claims and Interests that are substantially similar to the other Claims and Interests in such Class.

The Debtors believe that the Plan has classified all Claims and Interests in compliance with the provisions of Section 1122 of the Bankruptcy Code and applicable case law, but it is possible that a holder of a Claim or Interest may challenge the Debtors' classification of Claims and Interests and that the Bankruptcy Court may find that a different classification is required for the Plan to be confirmed.  In that event, the Debtors intend, to the extent permitted by the Bankruptcy Code, the Plan, and the Bankruptcy Court, to make such reasonable modifications of the classifications under the Plan to permit confirmation and to use the Plan acceptances received for purposes of obtaining the approval of the reconstituted Class or Classes of which each accepting holder ultimately is deemed to be a member.  Any such reclassification could adversely affect the Class in which such holder initially was a member, or any other Class under the Plan, by changing the composition of such Class and the vote required of that Class for approval of the Plan.

The amount of any Impaired Claim that ultimately is allowed by the Bankruptcy Court may vary from any estimated allowed amount of such Claim and, accordingly, the total Claims ultimately allowed by the Bankruptcy Court with respect to each Impaired Class of Claims may also vary from any estimates contained herein with respect to the aggregate Claims in any Impaired Class.  Thus, the value of the property that ultimately will be received by a particular holder of an Allowed Claim under the Plan may be adversely or favorably affected by the aggregate amount of Claims ultimately allowed in the applicable Class.

The classification of Claims and Interests and the nature of distributions to members of each Class are summarized below.  The Debtors believe that the consideration, if any, provided under the Plan to holders of Claims and Interests reflects an appropriate resolution of their Claims and Interests, taking into account the differing nature and priority (including applicable contractual and statutory subordination) of such Claims and Interests and the fair value of the Debtors' assets.  In view of the deemed rejection by Classes 11, 12, 13, and 15, however, as set forth below, the Debtors will seek confirmation of the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code.  Specifically, Section 1129(b) of the Bankruptcy Code permits confirmation of a chapter 11 plan in certain circumstances even if the plan has not been accepted by all impaired classes of claims and interests.  See Section XI.G hereto.  Although the Debtors believe that the Plan can be confirmed under Section 1129(b), there can be no assurance that the Bankruptcy Court will find that the requirements to do so have been satisfied.

1.  Treatment of Unclassified Claims under the Plan

(a)  Administrative Claims

An Administrative Claim is defined in the Plan as a Claim for payment of an administrative expense of a kind specified in Section 503(b) or 1114(e)(2) of the Bankruptcy Code and entitled to priority pursuant to Section 507(a)(1) of the Bankruptcy Code, including, but not limited to, (a) the actual, necessary costs and expenses incurred after the Petition

Date of preserving the Estates and operating the businesses of the Debtors, including, without limitation, wages, salaries, or commissions for services rendered after the commencement of the Chapter 11 Case, (b) obligations under the Key Employee Protection Order, (c) Professional Fee Claims, (d) Substantial Contribution Claims, (e) all fees and charges assessed against the Estates under Section 1930 of Title 28 of the United States Code, (f) all Allowed Claims for reclamation under Section 546(c)(2)(A) of the Bankruptcy Code, (g) Cure payments for executory contracts and unexpired leases that are assumed under Section 365 of the Bankruptcy Code, (h) the Claim of Empire State Development Corporation pursuant to the Order Under 11 U.S.C. § 365(a) Authorizing Assumption of Grant Disbursement Agreement with Empire State Development Corporation on Negotiated Terms entered on August 24, 2004, (i) the DIP Facility Claim, and (j) the German Guaranty Claim.

Under the Plan, except as otherwise provided for therein, and subject to the requirements of Sections 12.1 through 12.3 of the Plan, on, or as soon as reasonably practicable after, the latest of (i) the Effective Date, (ii) the date such Administrative Claim becomes an Allowed Administrative Claim, or (iii) the date such Administrative Claim becomes payable pursuant to any agreement between a Debtor and the holder of such Administrative Claim, the holder of each such Allowed Administrative Claim will receive in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Administrative Claim, (A) Cash equal to the unpaid portion of such Allowed Administrative Claim or (B) such different treatment as to which the applicable Debtor and such holder agree upon in writing; *provided*, *however*, that Allowed Administrative Claims with respect to liabilities incurred by a Debtor in the ordinary course of business during the Chapter 11 Case will be paid in the ordinary course of business in accordance with the terms and conditions of any agreements relating thereto. All fees payable pursuant to Section 1930 of Title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, will be paid on or before the Effective Date. All such fees that arise after the Effective Date but before the closing of the Chapter 11 Case will be paid by the Reorganized Debtors.

Pursuant to the Plan, a DIP Facility Claim is a Claim arising under the Senior Secured, Superpriority Debtor-in-Possession Credit Agreement dated as of April 1, 2004 (as amended, supplemented, or otherwise modified from time to time) by and among FNA as borrower, FiberMark and FIH as guarantors, and GECC as agent for itself and the lenders party thereto, and related loan and security documents. The DIP Facility Claim will be deemed Allowed. The holders of the Allowed DIP Facility Claim will receive, on the later of the Effective Date or the date on which such DIP Facility Claim becomes payable pursuant to any agreement between the Debtors and the holders of such DIP Facility Claim, in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed DIP Facility Claim, (i) Cash equal to the full amount of such Allowed DIP Facility Claim or (ii) such different treatment as the Debtors and such holders agree upon in writing; *provided*, *however*, that in respect of any letters of credit issued and undrawn under the DIP Facility, unless GECC or an applicable affiliate is a lender under the Exit Facility and permits such letters of credit to be rolled over and treated as letters of credit under the Exit Facility, the Debtors will be required to either, with the consent of GECC: (A) cash collateralize such letters of credit in an amount equal to 103% of the undrawn amount of any such letters of credit, (B) return any such letters of credit to the applicable fronting bank undrawn and marked "cancelled," or (C) provide a "back-to-back" letter of credit to the issuing bank in a form and issued by an institution reasonably satisfactory to such issuing bank, in an amount equal to 103% of the then undrawn amount of such letters of credit.

The German Guaranty Claim is the Claim existing under the Amended and Restated Guaranty dated as of April 1, 2004 (as amended, supplemented, or otherwise modified from time to time), among FiberMark, FNA and FIH as guarantors, and GECC individually and as administrative agent for itself and other lenders, guaranteeing the obligations under the Amended and Restated Credit Agreement dated as of April 1, 2004 (as amended, supplemented or otherwise modified from time to time), among FiberMark Lahnstein GmbH & Co. OHG, FiberMark Gessner GmbH & Co. OHG as borrowers, the other credit parties thereto, GECC as administrative agent and European loan agent, Bayerische Hypo- und Vereinsbank AG as fronting lender, and the other lenders thereto. The German Guaranty Claim will be deemed Allowed. The holders of the Allowed German Guaranty Claim will receive, on the later of the Effective Date or the date on which such German Guaranty Claim becomes payable pursuant to any agreement between the Debtors and the holders of such German Guaranty Claim, in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed German Guaranty Claim, (i) Cash equal to the full amount of such Allowed German Guaranty Claim or (ii) such different treatment as the Debtors and such holders agree upon in writing.

The Debtors have estimated that the amount of Allowed Administrative Claims, exclusive of ordinary course operational expenses and the DIP Facility Claim and the German Guarantee Claim, payable as of and after the Effective Date, will be approximately $9,209,000, including Professional Fee Claims, fees payable under 28 U.S.C. § 1930, reclamation Claims, and Cure costs. The Debtors have estimated that the DIP Facility Claim will, as of December 31, 2005, consist of approximately $3,753,000 in respect of revolving loans and approximately $10,493,000 in letters of credit. The

Debtors have further estimate that the contingent German Guaranty Claim will, as of December 31, 2005, be approximately $12,068,000.

In the prior Disclosure Statement related to the Previous Plan, the Debtors had estimated that the amount of Allowed Administrative Claims, exclusive of ordinary course operational expenses, the DIP Facility Claim and the German Guarantee Claim, payable as of and after the then anticipated Effective Date, would be approximately $10,958,000, including Professional Fee Claims, fees payable under 28 U.S.C. § 1930, reclamation Claims, and Cure costs. The reduction from the estimated amount provided in the paragraph above is primarily due to lower Professional Fee Claims resulting from the disbanding of the Creditors Committee, although such estimate includes an additional amount attributable to post-petition insurance premium financing obligations. The Debtors had estimated that the DIP Facility Claim would, as of December 31, 2004, consist of approximately $7,445,000 in respect of revolving loans and approximately $8,800,000 in letters of credit. As compared to the estimated amounts in the paragraph above, the reduction in revolving loans is attributable to $2,000,000 in lower borrowings due to increased dividend receipts from the Debtors' German affiliates and the increase in letters of credit is attributable to an additional letter of credit obtained to support medical self-insurance deductibles. The Debtors further estimated that the contingent German Guaranty Claim would, as of December 31, 2004, be approximately $1,900,000. The increase over the estimated amount provided in the paragraph above is attributable to increased borrowing by the German affiliates and anticipated year-end expenditures.

All requests for payment of an Administrative Claim (other than as set forth in Sections 4.1(a), 12.1, and 12.2 of the Plan) must be filed with the Bankruptcy Court and served on counsel for the Reorganized Debtors no later than forty-five (45) days after the Effective Date. Unless the Reorganized Debtors object to an Administrative Claim within sixty (60) days after receipt, such Administrative Claim will be deemed Allowed in the amount requested. In the event that the Reorganized Debtors object to an Administrative Claim, the Bankruptcy Court will determine the Allowed amount of such Administrative Claim. Notwithstanding the foregoing, no request for payment of an Administrative Claim need be filed with respect to an Administrative Claim which was paid or payable by a Debtor in the ordinary course of business.

All final requests for payment of Professional Fee Claims pursuant to Sections 327, 328, 330, 331, 503(b) or 1103 of the Bankruptcy Code and Substantial Contribution Claims under Section 503(b)(3), (4), or (5) of the Bankruptcy Code must be filed and served on the Reorganized Debtors, their counsel, and other necessary parties in interest no later than sixty (60) days after the Effective Date, unless otherwise ordered by the Bankruptcy Court. Objections to such requests for payment must be filed and served on the Reorganized Debtors, their counsel, and the requesting Professional or other entity no later than twenty (20) days (or such longer period as may be allowed by order of the Bankruptcy Court) after the date on which the applicable request for payment was served. Each Reorganized Debtor may, without application to or approval by the Bankruptcy Court, pay reasonable professional fees and expenses in connection with services rendered to it after the Effective Date.

(b)     Priority Tax Claims

The Plan defines Priority Tax Claims as Claims of governmental units for taxes that are entitled to priority pursuant to Section 507(a)(8) of the Bankruptcy Code. Such Claims include Claims of governmental units for taxes owed by the Debtors that are entitled to a certain priority in payment pursuant to Section 507(a)(8) of the Bankruptcy Code. The taxes entitled to priority are (i) taxes on income or gross receipts that meet the requirements set forth in Section 507(a)(8)(A) of the Bankruptcy Code, (ii) property taxes meeting the requirements of Section 507(a)(8)(B) of the Bankruptcy Code, (iii) taxes that were required to be collected or withheld by the Debtors and for which the Debtors are liable in any capacity as described in Section 507(a)(8)(C) of the Bankruptcy Code, (iv) employment taxes on wages, salaries, or commissions that are entitled to priority pursuant to Section 507(a)(3) of the Bankruptcy Code, to the extent that such taxes also meet the requirements of Section 507(a)(8)(D), (v) excise taxes of the kind specified in Section 507(a)(8)(E) of the Bankruptcy Code, (vi) customs duties arising out of the importation of merchandise that meet the requirements of Section 507(a)(8)(F) of the Bankruptcy Code, and (vii) pre-petition penalties relating to any of the foregoing taxes to the extent such penalties are in compensation for actual pecuniary loss as provided in Section 507(a)(8)(G) of the Bankruptcy Code.

Under the Plan, each holder of an Allowed Priority Tax Claim will receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Priority Tax Claim, as will have been determined by the Debtors in their sole discretion, either (i) on, or as soon as reasonably practicable after, the later of the Effective Date or the date on which such Claim becomes an Allowed Claim, Cash equal to the unpaid portion of such Allowed Priority Tax Claim, (ii) such different treatment as the applicable Debtor and such holder agree upon in writing, or (iii) deferred Cash payments

having a value, as of the Effective Date, equal to such Allowed Priority Tax Claim, over a period not exceeding six (6) years after the date of assessment of such Allowed Priority Tax Claim.

The Debtors have estimated that the aggregate amount of Priority Tax Claims payable under the Plan will be approximately $624,000.

2. Treatment of Classified Claims and Interests under the Plan

(a)    Class 1, Other Priority Claims

Under the Plan, an Other Priority Claim is defined as a Claim against the Debtors entitled to priority pursuant to Section 507(a) of the Bankruptcy Code, other than a Priority Tax Claim or an Administrative Claim.

The Plan provides that, on, or as soon as reasonably practicable after, the latest of (i) the Effective Date, (ii) the date on which such Other Priority Claim becomes an Allowed Other Priority Claim, or (iii) the date on which such Other Priority Claim becomes payable pursuant to any agreement between a Debtor and the holder of such Other Priority Claim, each holder of an Allowed Other Priority Claim will receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Other Priority Claim, either (A) Cash equal to the unpaid portion of such Allowed Other Priority Claim or (B) such other different treatment as the applicable Debtor and such holder will have agreed upon in writing.

The Debtors believe that all Other Priority Claims have been previously paid pursuant to order of the Bankruptcy Court. A number of Proofs of Claim were filed by parties alleging priority status for Claims that have not been paid. The Claims of such parties are classified in Class 1, although as of the date hereof the Debtors believe that all such Proofs of Claim have been disallowed or reclassified.

(b)    Class 2, GECC Credit Facility Claim

The GECC Credit Facility Claim is the Claim existing under the Credit Agreement dated as of November 12, 2003 (as amended from time to time) among FNA, FiberMark Lahnstein GMBH & Co. OHG, and FiberMark Gessner GMBH & Co. OHG as borrowers, certain other credit parties signatory thereto, General Electric Capital Corporation as administrative agent, certain lenders signatory thereto, Bayerische Hypo- und Vereinsbank AG as fronting lender, and certain other parties signatory thereto; and related documents, agreements, and instruments.

The Plan provides that the holders of the Allowed GECC Credit Facility Claim will receive, on the later of the Effective Date or the date on which such GECC Credit Facility Claim becomes payable pursuant to any agreement between the Debtors and the holders of such GECC Credit Facility Claim, in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed GECC Credit Facility Claim, (i) Cash equal to the full amount of such Allowed GECC Credit Facility Claim or (ii) such different treatment as the Debtors and such holders agree upon in writing; *provided*, *however*, that in respect of any letters of credit issued and undrawn under the Credit Agreement giving rise to the GECC Credit Facility Claim, unless GECC or an applicable affiliate is a lender under the Exit Facility and permits such letters of credit to be rolled over and treated as letters of credit under the Exit Facility, the Debtors will be required to either, with the consent of GECC: (A) cash collateralize such letters of credit in an amount equal to 103% of the undrawn amount of any such letters of credit, (B) return any such letters of credit to the applicable fronting bank undrawn and marked "cancelled," or (C) provide a "back-to-back" letter of credit to the issuing bank in a form and issued by an institution reasonably satisfactory to such issuing bank, in an amount equal to 103% of the then undrawn amount of such letters of credit.

As of the Petition Date, the GECC Credit Facility Claim consisted of (a) $0 in respect of revolving loans, (b) at least $8,021,385 in letters of credit, plus (c) amounts owing in respect of other financial accommodations to or for the benefit of FNA. The letters of credit were rolled over into the DIP Facility.

(c)    Class 3, Convenience Claims

The Plan defines a Convenience Claim as a Claim in an amount equal to or less than $5,000, including any Claim in an amount greater than $5,000 that is reduced to $5,000 by an amended Proof of Claim filed on or before the Distribution Record Date, which Claim is not an Administrative Claim, a Priority Tax Claim, an Other Priority Claim, a GECC Credit Facility Claim, a GECC Equipment Financing Claim, a Banc One Equipment Financing Claim, a Coated Paper

Sale/Leaseback Claim, a Lowville Grant Claim, an Other Secured Claim, a Noteholder Claim, a General Unsecured Claim, an Intercompany Claim, a Subordinated Claim, or a Non-Compensatory Damages Claim.

Section 1122(b) of the Bankruptcy Code allows a plan of reorganization to designate, for administrative convenience, a separate class of claims consisting of unsecured claims that are less than a specified amount, as approved by the court as reasonable and necessary. Class 3 of the Plan, containing Convenience Claims, is intended to serve this purpose. It will allow the Debtors to achieve administrative efficiencies and will obviate the need for costly solicitation of small Claim holders and later costly distribution of stock interests to small Claim holders. The Debtors selected $5,000 as the amount most likely to achieve the intended efficiencies and cost savings. The selected amount is intended to ensure that Reorganized FiberMark is a private company, which will enable its to save on the reporting and other costs of complying with the laws and regulations governing public companies.

The Plan provides that, on, or as soon as reasonably practicable after, the later of the Effective Date or the date on which such Claim becomes an Allowed Claim, each holder of an Allowed Convenience Claim, will receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Convenience Claim, Cash in an amount equal to the lesser of (i) the Allowed amount of such Claim or (ii) $5,000.

The Debtors estimate that Allowed Convenience Claims will be in the approximate aggregate amount of $836,000.

(d)    Class 4, GECC Equipment Financing Claim

Under the Plan, the GECC Equipment Financing Claim is the Claim existing under the Master Security Agreement dated as of September 19, 2000 (as amended from time to time) between FiberMark and CIT Group/Equipment Financing, Inc.; the Schedule of Indebtedness and Collateral No. 1 dated as of October 25, 2000; and related documents, agreements, and instruments; all as assigned by CIT Group/Equipment Financing, Inc. to General Electric Capital Corporation; after application of adequate protection payments made under the Stipulation Providing Adequate Protection for Secured Manufacturing Equipment Loan of General Electric Capital Corporation filed on May 21, 2004, as approved by order of the Bankruptcy Court entered on May 28, 2004.

The GECC Equipment Financing Claim is Impaired. The Plan provides that the legal, equitable, and contractual rights of the holder of the GECC Equipment Financing Claim will be Reinstated in accordance with the provisions of Section 1124(2) of the Bankruptcy Code; *provided*, *however*, that any contractual right that does not pertain to the payment when due of principal and interest on the obligation on which such Claim is based, including, but not limited to, financial covenant ratios, negative pledge covenants, covenants or restrictions on merger or consolidation, covenants regarding corporate existence, or covenants prohibiting certain transactions or actions contemplated by the Plan or conditioning such transactions or actions on certain factors, will not be enforceable as to any breach that occurred on or prior to the Effective Date or any breach determined by reference back to a date preceding the Effective Date.

As used in the Plan, Reinstated means (a) leaving unaltered the legal, equitable, and contractual rights to which the holder of a Claim is entitled so as to leave such Claim unimpaired in accordance with Section 1124 of the Bankruptcy Code, or (b) notwithstanding any contractual provision or applicable law that entitles the holder of such Claim to demand or receive accelerated payment of such Claim after the occurrence of a default, (i) curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in Section 365(b)(2) of the Bankruptcy Code, (ii) reinstating the maturity of such Claim as such maturity existed before such default, (iii) compensating the holder of such Claim for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law, and (iv) not otherwise altering the legal, equitable, or contractual rights to which the holder of such Claim is entitled.

Each holder of a Claim in Class 4 that affirmatively votes in favor of the Plan will be deemed to forever release, waive, and discharge all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, and liabilities whatsoever (other than for fraud, breach of fiduciary duty, willful misconduct, or gross negligence) against the directors, officers, or employees of any of the Debtors serving during the pendency of the Chapter 11 Case, in connection with or related to the Debtors, the Chapter 11 Case, or the Plan (other than the rights under the Plan and the contracts, instruments, releases, indentures, other agreements, or documents delivered thereunder), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereunder arising, in law, equity, or otherwise, that are based in whole or part on any act, omission, transaction, event, or other occurrence taking

place on or prior to the Effective Date in any way relating to the Debtors or the Reorganized Debtors, the Chapter 11 Case, or the Plan.

As of the Petition Date, the GECC Equipment Financing Claim was in the amount of $1,574,429. That amount will be reduced to approximately $903,495 (collateral includes $1 million in an undrawn letter of credit that has been included in the Debtors' estimate concerning the DIP Facility Claim in respect of letters of credit) as of December 31, 2005 through payments made under the above-mentioned Stipulation Providing Adequate Protection for Secured Manufacturing Equipment Loan of General Electric Capital Corporation.

(e) Class 5, Banc One Equipment Financing Claim

Under the Plan, the Banc One Equipment Financing Claim is defined as the Claim of Banc One Leasing Corporation, now known as Chase Equipment Leasing Inc., or any affiliate thereof, existing under the Equipment Financing Agreement between FiberMark and Jules and Associates, Inc., dated as of December 13, 1999; Schedule 1 thereto dated as of July 5, 2000, Schedule 2 thereto dated as of September 13, 2000, and Schedule 3 thereto dated as of December 21, 2000; and related documents, agreements, and instruments; all as assigned by Jules and Associates, Inc. to Banc One Leasing Corporation or any affiliate thereof; after application of adequate protection payments made under the Stipulation Providing Adequate Protection for Secured Manufacturing Equipment Loan of Banc One Leasing Corporation filed on June 25, 2004, as approved by order of the Bankruptcy Court entered on July 1, 2004.

The Banc One Equipment Financing Claim is Impaired. The Plan provides that the legal, equitable, and contractual rights of the holder of the Banc One Equipment Financing Claim, including those relating to the payment when due of principal and interest on the obligation on which such Claim is based and the protection, maintenance, location, or insurance of or on the collateral securing such Claim, will be Reinstated in accordance with the provisions of Section 1124(2) of the Bankruptcy Code; provided, however, that any contractual right that does not pertain to the payment when due of principal and interest or said preservation of the collateral, including, but not limited to, contractual rights pertaining to financial covenant ratios, negative pledge covenants, covenants or restrictions on merger or consolidation, covenants regarding corporate existence, or covenants prohibiting certain transactions or actions contemplated by the Plan or conditioning such transactions or actions on certain factors, will not be enforceable as to any breach that occurred on or prior to the Effective Date or any breach determined by reference back to a date preceding the Effective Date.

As used in the Plan, Reinstated means (a) leaving unaltered the legal, equitable, and contractual rights to which the holder of a Claim is entitled so as to leave such Claim unimpaired in accordance with Section 1124 of the Bankruptcy Code, or (b) notwithstanding any contractual provision or applicable law that entitles the holder of such Claim to demand or receive accelerated payment of such Claim after the occurrence of a default, (i) curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in Section 365(b)(2) of the Bankruptcy Code, (ii) reinstating the maturity of such Claim as such maturity existed before such default, (iii) compensating the holder of such Claim for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law, and (iv) not otherwise altering the legal, equitable, or contractual rights to which the holder of such Claim is entitled.

Each holder of a Claim in Class 5 that affirmatively votes in favor of the Plan will be deemed to forever release, waive, and discharge all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, and liabilities whatsoever (other than for fraud, breach of fiduciary duty, willful misconduct, or gross negligence) against the directors, officers, or employees of any of the Debtors serving during the pendency of the Chapter 11 Case, in connection with or related to the Debtors, the Chapter 11 Case, or the Plan (other than the rights under the Plan and the contracts, instruments, releases, indentures, other agreements, or documents delivered thereunder), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereunder arising, in law, equity, or otherwise, that are based in whole or part on any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors or the Reorganized Debtors, the Chapter 11 Case, or the Plan.

As of the Petition Date, the Banc One Equipment Financing Claim was in the amount of $8,609,375. That amount will be reduced to approximately $4,077,000 as of December 31, 2005 (after giving effect to the payment due by January 1, 2006), through payments made under the above-mentioned Stipulation Providing Adequate Protection for Secured Manufacturing Equipment Loan of Banc One Leasing Corporation.

(f)     Class 6, Coated Paper Sale/Leaseback Claim

The Coated Paper Sale/Leaseback Claim is the Claim existing under the Project Agreement among FiberMark DSI, Inc. (a predecessor in interest to FNA), FiberMark, and Coated Paper, LLC dated as of October 3, 2002; the Supplemental Agreement between such parties dated as of January 29, 2003; and various related documents, agreements, and instruments; after application of adequate protection payments made under the Stipulation Providing for Post-Petition Adequate Protection or Real Property Lease Payments to Coated Paper, LLC filed on June 25, 2004, as approved by order of the Bankruptcy Court entered on July 1, 2004, the Stipulation Providing for Additional Adequate Protection Payments to Coated Paper, LLC Pending Effective Date of Plan filed on February 3, 2005, as approved by order of the Bankruptcy Court entered on February 4, 2005, and the Stipulation Providing for Post-Petition Adequate Protection or Payment in Lieu of Tax to County of Lewis Industrial Development Agency filed on April 19, 2005, as approved by order of the Bankruptcy Court entered on April 25, 2005.

The Coated Paper Sale/Leaseback Claim is Impaired. The Plan provides that the holder of the Allowed Coated Paper Sale/Leaseback Claim will (i) retain the Liens securing such Allowed Claim and (ii) receive the remaining amount of such Allowed Claim, with interest at the non-default contract rate, in monthly Cash payments of the same amount as historically paid by the Debtors under the documents governing such Allowed Claim, in lieu of the final balloon payment otherwise required by such documents.

Each holder of a Claim in Class 6 that affirmatively votes in favor of the Plan will be deemed to forever release, waive, and discharge all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, and liabilities whatsoever (other than for fraud, breach of fiduciary duty, willful misconduct, or gross negligence) against the directors, officers, or employees of any of the Debtors serving during the pendency of the Chapter 11 Case, in connection with or related to the Debtors, the Chapter 11 Case, or the Plan (other than the rights under the Plan and the contracts, instruments, releases, indentures, other agreements, or documents delivered thereunder), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereunder arising, in law, equity, or otherwise, that are based in whole or part on any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors or the Reorganized Debtors, the Chapter 11 Case, or the Plan.

As of the Petition Date, the Coated Paper Sale/Leaseback Claim was in the amount of $3,040,000. That amount will be reduced to approximately $740,000 as of December 31, 2005, through payments made under the above-mentioned Stipulations.

(g)     Class 7, Lowville Grant Claims

The Plan defines the Lowville Grant Claims as the Claims existing under the Grant Agreement for CDBG Funds dated as of March 11, 2003 among FNA as grantee, FiberMark as guarantor, and County of Lewis Industrial Development Agency as funding agency, providing grant funds of $100,000; the Grant Agreement dated as of March 11, 2003 between FNA as grantee and County of Lewis Industrial Development Agency as funding agency, providing grant funds of $250,000; the Grant Agreement for Small Cities CDBG Funds dated as of March 11, 2003 among FNA as grantee, FiberMark as guarantor, and County of Lewis as funding agency, and the associated Security Agreement dated as of March 11, 2003 between FNA as debtor and County of Lewis as secured party, providing grant funds of $750,000; the Grant Agreement for Empire State Development Funds dated as of October 27, 2003, between FNA as grantee and County of Lewis Industrial Development Agency as funding agency, providing grant funds of $150,000; and the Grant Agreement for Empire State Development Funds dated as of October 27, 2003, between FNA as grantee and County of Lewis Industrial Development Agency as funding agency, providing grant funds of $250,000.

The Claims are contingent, arising only in the event that the Debtors fail to fulfill their obligations under the grant agreements. Such obligations generally consist of maintaining operations at the Debtors' Lowville, New York, facility at a level that will insure the employment of a specific number of employees on specific measuring dates. The Debtors believe that they will fulfill their obligations under the grant agreements, with the result that the Lowville Grant Claims will not become payable.

The Lowville Grant Claims are Impaired. The Plan provides that a vote in favor of the Plan by the holder of a Lowville Grant Claim will constitute (i) the agreement by such holder that the Reorganized Debtors will be obligated to pay such holder's Claim only if they fail to maintain requisite levels of employment at their facility in Lowville, New York,

and (ii) the express waiver by such holder of any other breach, event of default or other act or omission giving rise to an obligation to pay the Claim. Subject to and as modified by such agreement and waiver, the legal, equitable, and contractual rights of the holder of a Lowville Grant Claim voting in favor of the Plan will be Reinstated in accordance with the provisions of Section 1124(2) of the Bankruptcy Code; *provided, however,* that any contractual right that does not pertain to the payment when due of principal and interest on the obligation on which any such Claim is based, including, but not limited to, financial covenant ratios, negative pledge covenants, covenants or restrictions on merger or consolidation, covenants regarding corporate existence, or covenants prohibiting certain transactions or actions contemplated by the Plan or conditioning such transactions or actions on certain factors, will not be enforceable as to any breach that occurred on or prior to the Effective Date or any breach determined by reference back to a date preceding the Effective Date.

As used in the Plan, Reinstated means (a) leaving unaltered the legal, equitable, and contractual rights to which the holder of a Claim is entitled so as to leave such Claim unimpaired in accordance with Section 1124 of the Bankruptcy Code, or (b) notwithstanding any contractual provision or applicable law that entitles the holder of such Claim to demand or receive accelerated payment of such Claim after the occurrence of a default, (i) curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in Section 365(b)(2) of the Bankruptcy Code, (ii) reinstating the maturity of such Claim as such maturity existed before such default, (iii) compensating the holder of such Claim for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law, and (iv) not otherwise altering the legal, equitable, or contractual rights to which the holder of such Claim is entitled.

A vote against the Plan by the holder of a Lowville Grant Claim will result in the treatment of such holder's Claim as an Other Secured Claim in Class 8 if and to the extent such Claim is a Secured Claim or as a General Unsecured Claim in Class 10 if and to the extent such Claim is not a Secured Claim.

Each holder of a Claim in Class 7 that affirmatively votes in favor of the Plan will be deemed to forever release, waive, and discharge all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, and liabilities whatsoever (other than for fraud, breach of fiduciary duty, willful misconduct, or gross negligence) against the directors, officers, or employees of any of the Debtors serving during the pendency of the Chapter 11 Case, in connection with or related to the Debtors, the Chapter 11 Case, or the Plan (other than the rights under the Plan and the contracts, instruments, releases, indentures, other agreements, or documents delivered thereunder), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereunder arising, in law, equity, or otherwise, that are based in whole or part on any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors or the Reorganized Debtors, the Chapter 11 Case, or the Plan.

The Debtors estimate that the Lowville Grant Claims are in the current amount of $810,000, including unsecured Claims of $510,000 and a Secured Claim of $300,000. They are contingent Claims and are not expected to become due.

(h)      Class 8, Other Secured Claims

An Other Secured Claim is a Secured Claim arising prior to the Petition Date against any of the Debtors, other than a GECC Credit Facility Claim, a GECC Equipment Financing Claim, a Banc One Equipment Financing Claim, or a Coated Paper Sale/Leaseback Claim. Any Lowville Grant Claim that is a Secured Claim will be treated as an Other Secured Claim if the holder of such Claim voted against the Plan. Each Other Secured Claim is deemed to be a separate sub-class in Class 8 and has all of the rights associated with separate class treatment.

The Plan provides for alternative treatments of each Other Secured Claim, as will have been determined by the Debtors in their sole discretion, depending upon the nature and amount of the Other Secured Claim, as follows:

- First, the Debtors may elect, in their sole discretion, that the legal, equitable, and contractual rights of any holder of an Allowed Other Secured Claim be Reinstated. Reinstated means (a) leaving unaltered the legal, equitable and contractual rights to which the holder of a Claim is entitled so as to leave such Claim unimpaired in accordance with Section 1124 of the Bankruptcy Code, or (b) notwithstanding any contractual provision or applicable law that entitles the holder of such Claim to demand or receive accelerated payment of such Claim after the occurrence of a default, (i) curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in Section 365(b)(2)

of the Bankruptcy Code, (ii) reinstating the maturity of such Claim as such maturity existed before such default, (iii) compensating the holder of such Claim for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law, and (iv) not otherwise altering the legal, equitable or contractual rights to which the holder of such Claim is entitled; *provided, however*, that any contractual right that does not pertain to the payment when due of principal and interest on the obligation on which such Claim is based, including, but not limited to, financial covenant ratios, negative pledge covenants, covenants or restrictions on merger or consolidation, covenants regarding corporate existence, or covenants prohibiting certain transactions or actions contemplated by the Plan or conditioning such transactions or actions on certain factors, will not be enforceable as to any breach that occurred on or prior to the Effective Date or any breach determined by reference back to a date preceding the Effective Date

- Second, the Debtors may elect, in their sole discretion, that any holder of an Allowed Other Secured Claim retain the Liens securing such Allowed Other Secured Claim and receive deferred Cash payments totaling at least the amount of such Allowed Other Secured Claim, of a value, as of the Effective Date, of at least the value of such holder's interest in the Estate's interest in such property.

- Third, the Debtors may elect, in their sole discretion, that the collateral securing any Allowed Other Secured Claim be surrendered to the holder of such Allowed Other Secured Claim.

- Fourth, the Debtors may elect, in their sole discretion, that any holder of an Allowed Other Secured Claim be paid in full on the Effective Date.

The failure to object to any Other Secured Claim in the Chapter 11 Case will be without prejudice to the Debtors' or the Reorganized Debtors' right to contest or otherwise defend against such Claim in the appropriate forum when and if such Claim is sought to be enforced by the holder of such Other Secured Claim. Notwithstanding Section 1141(c) or any other provision of the Bankruptcy Code, all pre-petition Liens on property of any Debtor held with respect to an Other Secured Claim will survive the Effective Date and continue in accordance with the contractual terms of the underlying agreements governing such Claim until such Allowed Claim is paid in full. Nothing in the Plan will preclude the Debtors or the Reorganized Debtors from challenging the validity of any alleged Lien on any asset of a Debtor or the value of the property that secures any alleged Lien.

Each holder of a Claim in Class 8 that affirmatively votes in favor of the Plan will be deemed to forever release, waive, and discharge all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, and liabilities whatsoever (other than for fraud, breach of fiduciary duty, willful misconduct, or gross negligence) against the directors, officers, or employees of any of the Debtors serving during the pendency of the Chapter 11 Case, in connection with or related to the Debtors, the Chapter 11 Case, or the Plan (other than the rights under the Plan and the contracts, instruments, releases, indentures, other agreements, or documents delivered thereunder), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereunder arising, in law, equity, or otherwise, that are based in whole or part on any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors or the Reorganized Debtors, the Chapter 11 Case, or the Plan.

The Debtors estimate that they have Other Secured Claims in an aggregate amount of $127,000.

(i)     Class 9, Noteholder Claims

A Noteholder Claim is any Claim arising from or relating to the FiberMark Notes, other than any Indenture Trustee Expenses. The FiberMark Notes consist of the 9-3/8% Senior Notes due 2006 in the aggregate principal amount of $100 million and the 10-3/4% Senior Notes due 2011 in the aggregate principal amount of $230 million, each issued by FiberMark and guaranteed by FNA and FIH.

Pursuant to the Constituency Settlement contained in the Plan, in full satisfaction, settlement, release, discharge of, in exchange for, and on account of each Allowed Noteholder Claim, the holder of such Allowed Claim as of the applicable Distribution Record Date (other than AIGGIC, Post, and Silver Point) will receive on the Distribution Date <u>either</u>:

- A Cash payment in an amount equal to the sum of (1) such holder's Pro Rata share of the Distribution Cash; (2) an additional amount from the Settlement Cash equal to the lesser of (x) eight percent (8%) of such holder's Allowed Claim or (y) such holder's Pro Rata share (together with all other holders of Allowed Noteholder Claims and all holders of Allowed General Unsecured Claims other than AIGGIC, Post, and Silver Point) of $4,200,000, and (3) a final amount from the Stock Purchase Payment equal to the lesser of (x) the amount that, when added to (1) and (2) above, results in an aggregate Cash payment of seventy percent (70%) of such holder's Allowed Claim or (y) such holder's Pro Rata share (together with all other holders of Allowed Noteholder Claims and all holders of Allowed General Unsecured Claims other than AIGGIC, Post, and Silver Point) of $21,600,000.

  Based upon the current estimated amount of Allowed Noteholder Claims and Allowed General Unsecured Claims, the sum of these three Cash components is expected to result in a distribution equal to 70% of each holder's Allowed Claim. If the amount of the Allowed Noteholder Claims and Allowed General Unsecured Claims exceeds the current estimate, then the distribution may be less than the estimated 70%.

  The Cash payment will be made by the Debtors to the Indenture Trustee, who will deliver the same to the DTC for allocation to the accounts of the DTC Participants entitled thereto, on behalf of the holders of Noteholder Claims represented by each of the DTC Participants.

  The applicable Distribution Record Date for the foregoing treatment is the date and time immediately prior to the initial Distribution Date.

- <u>Alternatively</u>, if affirmatively elected on such holder's behalf by such holder's DTC Participant, (1) such holder's Pro Rata share of the New Common Stock; (2) such holder's Pro Rata share of the Distribution Cash; and (3) an additional amount from the Settlement Cash equal to the lesser of (x) eight percent (8%) of such holder's Allowed Claim or (y) such holder's Pro Rata share (together with all other holders of Allowed Noteholder Claims and all holders of Allowed General Unsecured Claims other than AIGGIC, Post, and Silver Point) of $4,200,000 (the "Alternate Distribution").

  Based upon the current estimated amount of Allowed Noteholder Claims and Allowed General Unsecured Claims, the Alternate Distribution is expected to result in a distribution with an aggregate value estimated at 62% of each holder's Allowed Claim, with the New Common Stock being responsible for 33% of such aggregate value and the Cash components being responsible for 29% of such aggregate value. If the amount of the Allowed Noteholder Claims and Allowed General Unsecured Claims exceeds the current estimate, then the distribution value may be less than the estimated 62%.

  The deadline for electing the Alternate Distribution is December 2, 2005, the date of commencement of the Confirmation Hearing. All of the FiberMark Notes are held in book-entry form and are represented by one or more global certificates held by DTC. Accordingly, all elections to receive the Alternate Distribution must be made on behalf of the beneficial owners of the FiberMark Notes by the DTC Participant through which the FiberMark Notes of such beneficial owners are held. Only elections made by DTC Participants through the DTC's PTOP procedures will be accepted. Any beneficial owner of FiberMark Notes who desires to elect to receive the Alternate Distribution with respect to Noteholder Claims represented by its FiberMark Notes must contact the DTC Participant through which such beneficial owner holds its interest in the FiberMark Notes and request that such DTC Participant make the election on such beneficial owner's behalf through the DTC's PTOP procedures. The burden is on the beneficial owner to contact its DTC Participant and to ensure that such DTC Participant timely and properly acts on its behalf. The Debtors have no obligations in that regard and no liability for any party's failure to timely and properly make the election. At the time of the election, the position of the beneficial owner will be frozen, the beneficial owner's FiberMark Notes will be deemed to have been tendered and surrendered in exchange for the right to receive the Alternate Distribution, and no subsequent trading of the beneficial owner's interest in the FiberMark Notes will be recognized. If an election to receive the Alternate Distribution is not made for a beneficial owner by December 2, 2005, the beneficial owner will receive the all-Cash distribution. The Debtors reserve the right, in their sole and absolute discretion, to determine the timeliness and

adequacy of all elections to receive the Alternate Distribution, and the Debtors' judgment on such matters will be final and conclusive on all parties.

Under this alternative, the New Common Stock will be issued by the Debtors, through the Disbursing Agent, in the name of the DTC Participant who represents each electing holder of Noteholder Claims, to maintain for the account of each such electing holder, unless and until the DTC Participant provides written notice to the Debtors of the name and address of, and other necessary information concerning, such holder. The Cash payment will be made by the Debtors to the Indenture Trustee, who will deliver the same to the DTC for allocation to the accounts of the DTC Participants entitled thereto, on behalf of the holders of Noteholder Claims represented by each of the DTC Participants.

The applicable Distribution Record Date for this alternative is the date and time of the applicable DTC Participant's election via the PTOP procedures.

All such distributions will be subject to the Indenture Trustee Charging Lien to the extent of any Indenture Trustee Expenses that are not paid pursuant to Section 12.1(c) of the Plan. The Indenture Trustee Expenses are expected to be between $675,000 and $700,000.

Pursuant to the Constituency Settlement, in full satisfaction, settlement, release, discharge of, in exchange for, and on account of the Allowed Noteholder Claims held by AIGGIC and Post, (A) on or before the Distribution Date AIGGIC and Post will sell their Noteholder Claims to Silver Point as provided in Section 6.16(d) of the Plan and (B) the Pro Rata share of the New Common Stock and Distribution Cash otherwise allocable to AIGGIC and Post pursuant to the Plan will be distributed to Silver Point. AIGGIC and Post will receive the payments from Silver Point provided under Section 6.16(d) of the Plan, net of deductions in accordance with the provisions of Sections 6.16(b), 6.l6(d) and 6.16(e) of the Plan.

Pursuant to the Constituency Settlement, in full satisfaction, settlement, release, discharge of, in exchange for, and on account of the Allowed Noteholder Claims held by Silver Point, on the Distribution Date, the Pro Rata share of the New Common Stock and Distribution Cash allocated to Silver Point pursuant to the Plan will be distributed to Silver Point, except that the Debtors will withhold from such Distribution Cash the amount of the Stock Purchase Payment.

Distributions to holders of Noteholder Claims are conditioned on (a) the holding of the Claim as of the applicable Distribution Record Date for holders of Noteholder Claims, pursuant to Section 8.7 of the Plan and (b) the making of appropriate withholding tax and reporting arrangements as provided in Section 8.8 of the Plan.

Each holder of a Claim in Class 9 that affirmatively votes in favor of the Plan will be deemed to forever release, waive, and discharge all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, and liabilities whatsoever (other than for fraud, breach of fiduciary duty, willful misconduct, or gross negligence) against the directors, officers, or employees of any of the Debtors serving during the pendency of the Chapter 11 Case, in connection with or related to the Debtors, the Chapter 11 Case, or the Plan (other than the rights under the Plan and the contracts, instruments, releases, indentures, other agreements, or documents delivered thereunder), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereunder arising, in law, equity, or otherwise, that are based in whole or part on any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors or the Reorganized Debtors, the Chapter 11 Case, or the Plan.

**In addition, as a result of the Constituency Settlement, all holders of Noteholder Claims will be deemed to have released all claims, rights and causes of action against AIGGIC, Post, and Silver Point, other than Individual Causes of Action.**

Pursuant to the Constituency Settlement, all Noteholder Claims will be deemed Allowed in an aggregate amount not to exceed $345,629,166.67 for all purposes of the Plan and the Chapter 11 Case.

(j)    Class 10, General Unsecured Claims

A General Unsecured Claim is any Claim in an amount greater than $5,000 that is not an Administrative Claim, a Priority Tax Claim, an Other Priority Claim, a GECC Credit Facility Claim, a GECC Equipment Financing Claim, a Banc One Equipment Financing Claim, a Coated Paper Sale/Leaseback Claim, a Convenience Claim, an Other Secured

Claim, a Noteholder Claim, an Intercompany Claim, a Subordinated Claim, or a Non-Compensatory Damages Claim. This definition specifically includes, without limitation, rejection damages Claims, non-priority employee Claims, non-priority tax Claims, environmental Claims, indemnification Claims, trade vendor Claims, customer Claims, escheat Claims, and litigation Claims. A Lowville Grant Claim that is not a Secured Claim will be treated as a General Unsecured Claim if the holder of such Claim votes against the Plan.

Pursuant to the Constituency Settlement contained in the Plan, in full satisfaction, settlement, release, discharge of, in exchange for, and on account of each Allowed General Unsecured Claim, the holder of such Allowed Claim as of the Distribution Record Date (other than Silver Point) will receive on the Distribution Date either:

- A Cash payment in an amount equal to the sum of (1) such holder's Pro Rata share of the Distribution Cash; (2) an additional amount from the Settlement Cash equal to the lesser of (x) eight percent (8%) of such holder's Allowed Claim or (y) such holder's Pro Rata share (together with all other holders of Allowed General Unsecured Claims and all holders of Allowed Noteholder Claims other than Silver Point) of $4,200,000, and (3) a final amount from the Stock Purchase Payment equal to the lesser of (x) the amount that, when added to (1) and (2) above, results in an aggregate Cash payment of seventy percent (70%) of such holder's Allowed Claim or (y) such holder's Pro Rata share (together with all other holders of Allowed General Unsecured Claims and all holders of Allowed Noteholder Claims other than Silver Point) of $21,600,000.

  Based upon the current estimated amount of Allowed General Unsecured Claims and Allowed Noteholder Claims, the sum of these three Cash components is expected to result in a distribution equal to 70% of each holder's Allowed Claim. If the amount of the Allowed General Unsecured Claims and Allowed Noteholder Claims exceeds the current estimate, then the distribution may be less than the estimated 70%.

  The applicable Distribution Record Date for the foregoing treatment is the third (3rd) Business Day after the Confirmation Date at 5:00 p.m. prevailing Eastern Time.

- Alternatively, if affirmatively elected on the Ballot for Class 10, (1) such holder's Pro Rata share of the New Common Stock; (2) such holder's Pro Rata share of the Distribution Cash; and (3) an additional amount from the Settlement Cash equal to the lesser of (x) eight percent (8%) of such holder's Allowed Claim or (y) such holder's Pro Rata share (together with all other holders of Allowed General Unsecured Claims and all holders of Allowed Noteholder Claims other than Silver Point) of $4,200,000.

  Based upon the current estimated amount of Allowed General Unsecured Claims and Allowed Noteholder Claims, this election is expected to result in a distribution with an aggregate value estimated at 62% of each holder's Allowed Claim, with the New Common Stock being responsible for 33% of such aggregate value and the Cash components being responsible for 29% of such aggregate value. If the amount of the Allowed General Unsecured Claims and Allowed Noteholder Claims exceeds the current estimate, then the distribution value may be less than the estimated 62%.

  Only holders of record as of October 24, 2005, the applicable Distribution Record Date, will be entitled to make the election. To be recognized, the election must be clearly marked on the Ballot and the Ballot must have been returned by no later than November 22, 2005, the Voting Deadline, in accordance with the instructions contained on the Ballot. The election will be irrevocable and will be binding on the holder as identified on the Ballot. All resulting distributions of New Common Stock, Distribution Cash, and Settlement Cash will be made in the name of the holder identified on the Ballot and will be delivered to the address contained on the Ballot. For purposes of the election, no transfer of Claim made after October 24, 2005, will be recognized. Any holder that fails to return a Ballot by the Voting Deadline or that timely returns a Ballot without marking the election will receive the all-Cash treatment described above.

  The Distribution Record Date applicable to this alternative treatment is October 24, 2005, the Voting Record Date.

Pursuant to the Constituency Settlement, in full satisfaction, settlement, release, discharge of, in exchange for, and on account of the Allowed General Unsecured Claims held by Silver Point, on the Distribution Date, the Pro Rata share of the New Common Stock and Distribution Cash allocated to Silver Point pursuant to the Plan will be distributed to Silver Point, except that the Debtors will withhold from such Distribution Cash the amount of the Stock Purchase Payment.

Distributions to holders of Allowed General Unsecured Claims are conditioned on (a) the holding of the Claim as the applicable Distribution Record Date for holders of General Unsecured Claims, to the extent required by Section 8.7 of the Plan and (b) the making of appropriate withholding tax and reporting arrangements as provided in Section 8.8 of the Plan.

Each holder of a Claim in Class 10 that affirmatively votes in favor of the Plan will be deemed to forever release, waive, and discharge all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, and liabilities whatsoever (other than for fraud, breach of fiduciary duty, willful misconduct, or gross negligence) against the directors, officers, or employees of any of the Debtors serving during the pendency of the Chapter 11 Case, in connection with or related to the Debtors, the Chapter 11 Case, or the Plan (other than the rights under the Plan and the contracts, instruments, releases, indentures, other agreements, or documents delivered thereunder), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereunder arising, in law, equity, or otherwise, that are based in whole or part on any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors or the Reorganized Debtors, the Chapter 11 Case, or the Plan.

**In addition, as a result of the Constituency Settlement, all holders of General Unsecured Claims will be deemed to have released all claims, rights and causes of action against AIGGIC, Post, and Silver Point, other than Individual Causes of Action.**

The Debtors estimate that the General Unsecured Claims are in the amount of $12,381,123.97. However, the actual amounts of Allowed General Unsecured Claims could materially exceed or could be materially less than the estimated amounts shown herein.

(k)     Class 11, Intercompany Claims

Under the Plan, an Intercompany Claim is any Claim arising prior to the Petition Date against any of the Debtors by another Debtor. The term "Intercompany Claim" does not include Claims against any of the Debtors by a non-Debtor subsidiary or affiliate of a Debtor, which Claims will be treated as General Unsecured Claims.

The Plan provides that no holder of an Intercompany Claim will receive or retain any property under the Plan on account of such Claim; *provided, however,* that, if necessary for tax planning purposes, Intercompany Claims may be capitalized, satisfied, or preserved either directly or indirectly or in whole or part. Any Intercompany Claim, or portion thereof, that is not so capitalized, satisfied, or preserved will be discharged as of the Effective Date.

The Debtors estimate that Intercompany Claims are in the amount of $158,176,029.97.

(l)     Class 12, Subordinated Claims

A Subordinated Claim is a Claim against any of the Debtors that is subordinated pursuant to Section 510(b) or 510(c) of the Bankruptcy Code, which will include any Claim arising from the rescission of a purchase or sale of any Old Security, any Claim for damages arising from the purchase or sale of an Old Security, or any Claim for reimbursement, contribution, or indemnification on account of any such Claim.

Under the Plan, the holders of Subordinated Claims will not receive or retain any property of the Debtors under the Plan on account of such Claims. All Subordinated Claims will be discharged as of the Effective Date.

The Debtors believe that there are no Subordinated Claims.

(m)     Class 13, Non-Compensatory Damages Claims

Under the Plan, a Non-Compensatory Damages Claim is any Claim against any of the Debtors for any fine, penalty, or forfeiture, or multiple, exemplary, or punitive damages, to the extent that such fine, penalty, forfeiture, or damage is not compensation for actual pecuniary loss suffered by the holder of such Claim, including any such claim based upon, arising from, or relating to any cause of action whatsoever (including, without limitation, violation of law, personal injury, or wrongful death, whether secured or unsecured, liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising in law, equity or otherwise); *provided, however,* that such term will not include any Claim that might otherwise constitute a Non-Compensatory Damages Claim but for a Final Order allowing such Claim to be an Administrative Claim, Priority Tax Claim, Other Priority Claim, Convenience Claim, Other Secured Claim, General Unsecured Claim, or Subordinated Claim.

According to the Plan, the holders of Non-Compensatory Damages Claims will not receive or retain any property under the Plan on account of such Claims.  All Non-Compensatory Damages Claims will be discharged as of the Effective Date.

The Debtors believe that there are no Non-Compensatory Damages Claims.

(n)     Class 14, Subsidiary Interests

Under the Plan, Subsidiary Interests consist of all of the issued and outstanding shares of stock or membership interests of the Subsidiary Debtors, FNA and FIH, as of the Petition Date, which stock and interests are owned by FiberMark.

For the deemed benefit of the holders of the New Common Stock, FiberMark (as reorganized) will retain its equity interests in FNA and FIH, subject to any applicable restrictions arising under the Exit Facility.

(o)     Class 15, FiberMark Interests

FiberMark Interests consist of all equity interests in FiberMark, including, without limitation, any preferred stock, the Old FiberMark Common Stock, the Old FiberMark Stock Options, together with any warrants, conversion rights, rights of first refusal, or other rights, contractual or otherwise, to acquire or receive any stock or other equity ownership interests in FiberMark, and any contracts, subscriptions, commitments, or agreements pursuant to which a party was or could have been entitled to receive shares, securities, or other ownership interests in FiberMark prior to the Effective Date.

Under the Plan, all FiberMark Interests of any kind, including, without limitation, the Old FiberMark Common Stock, the Old FiberMark Stock Options, or any warrants or other agreements to acquire the same (whether or not arising under or in connection with any employment agreement), will be cancelled as of the Effective Date and the holders thereof will not receive or retain any property under the Plan on account of such Interests.

## G.     Reservation of Rights Regarding Claims

Except as otherwise explicitly provided in the Plan, nothing will affect the Debtors' or the Reorganized Debtors' rights and defenses, both legal and equitable, with respect to any Claims, including, but not limited to, all rights with respect to legal and equitable defenses to alleged rights of setoff or recoupment.

## H.     Allowed Claims, Distribution Rights and Objections to Claims

1.     Allowance Requirement

Only holders of Allowed Claims are entitled to receive distributions under the Plan.  An Allowed Administrative Claim is all or any portion of an Administrative Claim that has been allowed, or adjudicated in favor of the holder by estimation or liquidation, by a Final Order, that was incurred by the Debtors in the ordinary course of business during the Chapter 11 Case and as to which there is no dispute as to the Debtors' liability, or that has become allowed by failure to object pursuant to Section 9.1 of the Plan.  An Allowed Claim (other than an Administrative Claim) is such Claim or any portion thereof (a) that has been allowed, or adjudicated in favor of the holder by estimation or liquidation, by a Final Order, or (b) as to which (i) no Proof of Claim has been filed with the Bankruptcy Court and (ii) the liquidated and

noncontingent amount of which is included in the Schedules (any Claim identified in the Schedules as contingent for administrative purposes only, which is not otherwise contingent in nature, will not be considered contingent), other than a Claim that is included in the Schedules at zero, in an unknown amount, or as Disputed, or (c) for which a Proof of Claim in a liquidated amount has been timely filed with the Bankruptcy Court pursuant to the Bankruptcy Code, any Final Order of the Bankruptcy Court, or other applicable bankruptcy law, and as to which either (i) no objection to its allowance has been filed within the periods of limitation fixed by the Plan, the Bankruptcy Code, or any order of the Bankruptcy Court, or (ii) any objection to its allowance has been settled, withdrawn, or denied by a Final Order, or (d) that is expressly allowed in a liquidated amount in the Plan.

### 2. Distribution Record Date Requirements

In making distributions under the Plan, the Debtors will recognize only holders as of the applicable Distribution Record Date. As defined in the Plan, the Distribution Record Date is the date for determining entitlement to receive distributions under the Plan on account of Allowed Claims.

- For all holders of Claims other than holders of Noteholder Claims and General Unsecured Claims, the Distribution Record Date is the third (3rd) Business Day after the Confirmation Date at 5:00 p.m. prevailing Eastern Time.

- For all holders of Noteholder Claims receiving the all-Cash distribution described in Section 4.3(f)(iii)(A) of the Plan, the Distribution Record Date is the date and time immediately prior to the initial Distribution Date; or alternatively, for all holders of Noteholder Claims electing through their DTC Participants to receive the distribution of New Common Stock and Cash described in Section 4.3(f)(iii)(B) of the Plan, the Distribution Record Date is the date and time of the applicable election via the PTOP procedures; except as otherwise provided in Section 8.7 of the Plan.

- For all holders of General Unsecured Claims receiving the all-Cash distribution described in Section 4.3(g)(ii)(A) of the Plan, the Distribution Record Date is the third (3rd) Business Day after the Confirmation Date at 5:00 p.m. prevailing Eastern Time; or alternatively, for all holders of General Unsecured Claims electing on their Ballot to receive the distribution of New Common Stock and Cash described in Section 4.3(g)(ii)(B) of the Plan, the Distribution Record Date is October 24, 2005, the Voting Record Date; except as otherwise provided in Section 8.7 of the Plan.

### 3. Date of Distribution

All Distributions to holders of Allowed Claims as of the applicable Distribution Date will be made on or as soon as practicable after the applicable Distribution Date.

For any Claim that is an Allowed Claim on the Effective Date, the Distribution Date is the Effective Date or as soon as practicable after the Effective Date but not later than the first (1st) Business Day that is twenty (20) days after the Effective Date. For any Claim that is not an Allowed Claim on the Effective Date, the Distribution Date is fifteen (15) days after the last day of the month during which the Claim becomes an Allowed Claim; *provided, however,* a later date may be established by order of the Bankruptcy Court upon motion of the Debtors, the Reorganized Debtors or any other party. As to a Noteholder Claim or a General Unsecured Claim that is entitled to subsequent distributions from the Common Stock Reserve or the Cash Reserve under Section 9.3 of the Plan, the Distribution Date is also the additional date or dates provided in Section 9.3 of the Plan.

### 4. Making of Distributions

The Debtors will, in their sole discretion, on or before the Effective Date, designate the Person to serve as the Disbursing Agent under the Plan on mutually agreeable terms and conditions. Distributions to holders of Allowed Claims will be made by the Disbursing Agent (a) at the addresses set forth on the Proofs of Claim filed by such holders (or at the last known addresses of such holders if no Proof of Claim is filed or if the Debtors or the Reorganized Debtors have been notified of a change of address), (b) at the addresses set forth in any written notices of address changes delivered to the Debtors, the Reorganized Debtors, or the Disbursing Agent after the date of any related Proof of Claim, (c) at the addresses reflected in the Schedules if no Proof of Claim has been filed and the Debtors, the Reorganized Debtors, or the Disbursing Agent have not received a written notice of a change of address, (d) in the case of a GECC Credit Agreement Claim, to GECC, or (e) in

the case of the holder of an Allowed Noteholder Claim, to the Indenture Trustee or as directed by the Indenture Trustee. The Indenture Trustee will make distributions on account of the Allowed Noteholder Claims in accordance with the terms of the Indenture, subject to the terms of the Plan.

If any holder's distribution is returned as undeliverable, no further distributions to such holder will be made unless and until the Disbursing Agent is notified of such holder's then current address, at which time all missed distributions will be made to such holder without interest. Unless otherwise agreed by the Reorganized Debtors and the Disbursing Agent, amounts in respect of undeliverable distributions made by the Disbursing Agent will be returned to the Reorganized Debtors until such distributions are claimed.

All claims for undeliverable distributions must be made on or before the second (2nd) anniversary of the Distribution Date, after which date all unclaimed property will revert to the Reorganized Debtors free of any restrictions thereon and the claims of any holder or successor to such holder with respect to such property will be discharged and forever barred, notwithstanding any federal or state escheat laws to the contrary. In the event of a timely claim for an unclaimed distribution, the Reorganized Debtors will deliver the applicable unclaimed property to the Disbursing Agent for distribution pursuant to the Plan. Nothing contained in the Plan will require any Debtor, any Reorganized Debtor, any Disbursing Agent, or any Indenture Trustee to attempt to locate any holder of an Allowed Claim.

5.    Reserves for Disputed Claims; Distributions on Account Thereof

No payments or distributions will be made on account of a Disputed Claim or, if less than the entire Claim is a Disputed Claim, the portion of a Claim that is Disputed, until such Claim becomes an Allowed Claim. A Disputed Claim is any Claim, other than a Claim that has been Allowed pursuant to the Plan or a Final Order of the Bankruptcy Court: (a) if no Proof of Claim has been filed or deemed to have been filed by the applicable Bar Date, that has been or hereafter is listed on the Schedules as unliquidated, contingent, or disputed; (b) if a Proof of Claim has been filed or deemed to have been filed by the applicable Bar Date, as to which a Debtor has timely filed an objection or request for estimation in accordance with the Plan, the Bankruptcy Code, the Bankruptcy Rules, and any orders of the Bankruptcy Court, or which is otherwise disputed by a Debtor in accordance with applicable law, which objection, request for estimation, or dispute has not been withdrawn or determined by a Final Order; (c) for which a Proof of Claim was required to be filed by the Bankruptcy Code, the Bankruptcy Rules, or an order of the Bankruptcy Court, but as to which a Proof of Claim was not timely or properly filed; (d) for damages based upon the rejection by a Debtor of an executory contract or unexpired lease under Section 365 of the Bankruptcy Code and as to which the applicable Bar Date has not passed; (e) that is disputed in accordance with the provisions of the Plan; or (f) if not otherwise Allowed, as to which the applicable Claims Objection Deadline has not expired.

The Disbursing Agent will, on the applicable Distribution Dates, make distributions on account of any Disputed Claim that has become an Allowed Claim. Such distributions will be made pursuant to the provisions of the Plan governing the applicable Class. Such distributions will be based upon the cumulative distributions that would have been made to the holder of such Claim under the Plan if the Disputed Claim had been an Allowed Claim on the Effective Date in the amount ultimately Allowed.

On the Effective Date, the Debtors will (a) determine the amount of New Common Stock reasonably calculated to be sufficient to provide distributions to Disputed General Unsecured Claims that are expected to become Allowed Claims and (b) direct the Disbursing Agent to establish the Common Stock Reserve with the requisite amount of New Common Stock. In the event that the amount of New Common Stock in the Common Stock Reserve proves to be insufficient to satisfy the rights to New Common Stock of all Disputed General Unsecured Claims that subsequently become Allowed Claims, the Reorganized Debtors will issue additional shares of New Common Stock as necessary to ensure that all holders of Allowed Noteholder Claims and Allowed General Unsecured Claims ultimately receive the same Pro Rata distribution of New Common Stock.

On the Effective Date, the Debtors will (a) determine the amount of Distribution Cash reasonably calculated to be sufficient to provide Cash payments to Disputed General Unsecured Claims that are expected to become Allowed Claims and (ii) direct the Disbursing Agent to establish the Cash Reserve with the requisite amount of Cash to cover distributions. In the event that the amount of Distribution Cash in the Cash Reserve proves to be insufficient to satisfy the rights to Distribution Cash of all Disputed General Unsecured Claims that subsequently become Allowed Claims, the Reorganized Debtors will transfer additional funds to the Disbursing Agent as necessary to ensure that all holders of Allowed Noteholder Claims and Allowed General Unsecured Claims ultimately receive the same Pro Rata distribution of Distribution

Cash.  The Reorganized Debtors will also maintain in the Cash Reserve a portion of the Settlement Cash from AIGGIC or Post as provided for in Section 6.16(b).

Except with respect to the Cash Reserve for Disputed General Unsecured Claims, no reserve will be required with respect to Cash payments that may be required to be made by the Debtors.  The Debtors will transfer funds to the Disbursing Agent from time to time as necessary to satisfy any such Cash payments.

With respect to the shares of New Common Stock held in the Common Stock Reserve on account of Disputed General Unsecured Claims electing to receive same, not later than the one hundred twentieth (120th) day following the applicable Distribution Date and not less frequently than every one hundred twentieth (120th) day thereafter, the Disbursing Agent, as directed by the Reorganized Debtors, will calculate the amount, if any, by which the number of such shares exceeds the number that would be allocable to any of the remaining Disputed Claims that are expected to become Allowed Claims.  Except with respect to the final distribution, in the event the Disbursing Agent determines, as directed by the Reorganized Debtors, that an excess exists that would result in distributions in the aggregate of at least 10,000 shares of New Common Stock, such excess will be promptly distributed or allocated on a Pro Rata basis in accordance with Sections 4.3(f) and 4.3(g) of the Plan to holders of Allowed Noteholder Claims and Allowed General Unsecured Claims.  With respect to the final distribution, all remaining shares in the Common Stock Reserve will be promptly distributed or allocated on a Pro Rata basis in accordance with Sections 4.3(f) and 4.3(g) of the Plan to holders of Allowed Noteholder Claims and Allowed General Unsecured Claims unless the number of shares is de minimis and the cost of the distribution, as determined by the Reorganized Debtors, would exceed the value of the remaining shares.  Any shares of New Common Stock that are not distributed will be cancelled.

With respect to Distribution Cash held in the Cash Reserve on account of Disputed General Unsecured Claims, not later than the one hundred twentieth (120th) day following the Distribution Date and not less frequently than every one hundred twentieth (120th) day thereafter, the Disbursing Agent, as directed by the Reorganized Debtors, will calculate the amount, if any, by which such Cash exceeds the amount that would be allocable to any of the remaining Disputed Claims that are expected to become Allowed Claims.  Except with respect to the final distribution, in the event the Disbursing Agent determines that an excess exists that would result in distributions in the aggregate of at least $100,000, such excess will be promptly distributed or allocated on a Pro Rata basis in accordance with Section 4.3(g) to holders of Allowed General Unsecured Claims.  With respect to the final distribution, the remaining amount of Cash in the Cash Reserve will be promptly distributed or allocated on a Pro Rata basis in accordance with Section 4.3(g) to the holders of Allowed General Unsecured Claims unless such remaining amount is de minimis and the cost of the distribution would exceed such remaining amount.  Any of the Cash that is not distributed will be returned to the Reorganized Debtors.  Any of AIGGIC's Settlement Cash or Post's Settlement Cash that is no longer required to be maintained for Disputed General Unsecured Claims will be returned to AIGGIC or Post.

After the Effective Date, if Reorganized FiberMark consummates an Organic Change, then the successor or acquiring entity will assume Reorganized FiberMark's obligations regarding payment of Disputed Claims and will adjust the reserves and payouts for potential payment of Disputed Claims such that the reserves and payouts consist of the consideration, if any, that would have been paid with respect to the remaining New Common Stock and Distribution Cash reserved for Disputed Claims had such New Common Stock and Distribution Cash been outstanding immediately prior to the consummation of the Organic Change.  The Plan defines Organic Change as any transaction or series of transactions pursuant to which Reorganized FiberMark reorganizes its capital, consolidates or merges with or into another Person or enters into a business combination with another Person (in the case of a consolidation, merger or business combination, where Reorganized FiberMark is not the surviving Person), or sells, transfers or otherwise disposes of all or substantially all of its property, assets, or business to another Person.

No reserve will be required with respect to payments or other distributions to be made under the Plan to any Claim that is not a Noteholder Claim or a General Unsecured Claim.

6.    Objection Procedures

All objections to Claims must be filed and served on the holders of such Claims by the Claims Objection Deadline.  Under the Plan, the Claims Objection Deadline is defined as the last day for filing objections to Claims, which day will be the latest of (a) sixty (60) days after the Effective Date, (b) thirty (30) days after the applicable Proof of Claim or request for payment of an Administrative Claim is filed, (c) thirty (30) days after entry of a Final Order reinstating any Claim previously disallowed under Section 502(j) of the Bankruptcy Code, or (d) such other later date as is established by order of

the Bankruptcy Court upon motion of the Reorganized Debtors or any other party. If an objection has not been filed to a Proof of Claim or a scheduled Claim by the Claims Objection Deadline, the Claim to which the Proof of Claim or scheduled Claim relates will be treated as an Allowed Claim if such Claim has not been allowed earlier.

### 7. Estimation of Contingent or Unliquidated Claims

The Debtors may, at any time, request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to Section 502(c) of the Bankruptcy Code, regardless of whether such Debtor has previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to such Claim, including during the pendency of any appeal relating to any such objection. In the event the Bankruptcy Court so estimates any contingent or unliquidated Claim, that estimated amount will constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court, as applicable. If the estimated amount constitutes a maximum limitation on such Claim, the Debtors may elect to pursue any supplemental proceedings to object to any ultimate payment on such Claim. All of the aforementioned Claims objection, estimation, and resolution procedures are cumulative and are not necessarily exclusive of one another. Claims may be estimated and thereafter resolved by any permitted mechanisms.

## I. Disposition of Executory Contracts and Unexpired Leases

### 1. Executory Contracts and Unexpired Leases Deemed Assumed

The Plan provides for the deemed assumption of all executory contracts or unexpired leases that have not been otherwise disposed of. Specifically, each Debtor will be deemed to have assumed, as of the Effective Date, each executory contract and unexpired lease to which it is a party unless such contract or lease (a) was previously assumed or rejected upon motion by a Final Order, (b) previously expired or terminated pursuant to its own terms, or (c) is the subject of any pending motion, including to assume, to assume on modified terms, to reject, or to make any other disposition filed by a Debtor on or before the Confirmation Date. The Confirmation Order will constitute an order of the Bankruptcy Court under Section 365(a) of the Bankruptcy Code approving the executory contract and unexpired lease assumptions described above, as of the Effective Date.

Under the Plan, each executory contract and unexpired lease that is assumed and relates to the use, ability to acquire, or occupancy of real property will include (i) all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affects such executory contract or unexpired lease and (ii) all executory contracts or unexpired leases appurtenant to the premises, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, powers, uses, reciprocal easement agreements, vaults, tunnel or bridge agreements or franchises, and any other interests in real estate or rights in rem related to such premises, unless any of the foregoing agreements has been rejected pursuant to an order of the Bankruptcy Court.

### 2. Cure with Respect to Assumed Executory Contracts and Unexpired Leases

Any monetary amounts by which each executory contract and unexpired lease to be assumed pursuant to the Plan is in default will be satisfied, under Section 365(b)(1) of the Bankruptcy Code, at the option of the Debtor party to each such contract or lease or the assignee of such Debtor party assuming such contract or lease, by Cure. If there is a dispute regarding (a) the nature or amount of any Cure, (b) the ability of any Reorganized Debtor or any assignee to provide "adequate assurance of future performance" (within the meaning of Section 365 of the Bankruptcy Code) under the contract or lease to be assumed, or (c) any other matter pertaining to assumption, Cure will occur following the entry of a Final Order resolving the dispute and approving the assumption or assumption and assignment, as the case may be; *provided however*, that the Reorganized Debtors will be authorized to reject any executory contract or unexpired lease to the extent the Reorganized Debtors, in the exercise of their sound business judgment, conclude that the amount of the Cure obligation, as determined by such Final Order, renders assumption of such executory contract or unexpired lease unfavorable to the Reorganized Debtors.

### 3. Rejected Executory Contracts and Unexpired Leases

The Debtors reserve the right, at any time prior to the Effective Date, except as otherwise specifically provided in the Plan, to seek to reject any executory contract or unexpired lease to which any Debtor is a party and to file a

motion requesting authorization for the rejection of any such executory contract or unexpired lease. Any executory contracts or unexpired leases that expire by their terms prior to the Effective Date are deemed to be rejected, unless previously assumed or otherwise disposed of by the Debtors.

4. Rejection Damages Bar Date

If the rejection by a Debtor, pursuant to the Plan or otherwise, of an executory contract or unexpired lease results in a Claim, then such Claim will be forever barred and will not be enforceable against any Debtor or Reorganized Debtor or the properties of any of them unless a Proof of Claim is filed with the clerk of the Bankruptcy Court and served upon counsel to the Reorganized Debtors within thirty (30) days after entry of the order authorizing the rejection of such executory contract or unexpired lease.

5. Compensation and Benefit Programs

The Plan specifically provides for the rejection of any and all stock based incentive plans and stock ownership plans of the Debtors entered into before the Petition Date.

The Plan further provides that except to the extent (a) otherwise provided for in the Plan, (b) previously assumed or rejected by an order of the Bankruptcy Court entered on or before the Confirmation Date, (c) the subject of a pending motion to reject filed by a Debtor on or before the Confirmation Date, or (d) previously terminated, all employee compensation and benefit programs of the Debtors as set forth on Exhibit C of the Plan, including all health and welfare plans, pension plans within the meaning of Title IV of the Employee Retirement Income Security Act of 1974, as amended), and all programs subject to Sections 1114 and 1129(a)(13) of the Bankruptcy Code, entered into before or after the Petition Date and not since terminated, will be deemed to be, and will be treated as though they are, executory contracts that are assumed under the Plan. However, the Plan does not modify the existing terms of such employee compensation and benefit programs, including, without limitation, the Debtors' and the Reorganized Debtors' rights of termination and amendment thereunder. With a new Board of Directors, the Reorganized Debtors may elect to exercise such rights of termination and amendment.

Furthermore, the Key Employee Protection Order is incorporated into the Plan by reference. All rights, claims, interests, entitlements, and obligations of the Debtors under the Key Employee Protection Order and under the Key Employee Retention Plan, the Key Employee Severance Plan, and the Discretionary Recognition Plan authorized thereby will continue in full force and effect after the Effective Date as rights, claims, interests, entitlements, and obligations of the Reorganized Debtors.

Moreover, the Plan provides that the Debtors' supplemental executive retirement plans, deferred compensation plans, and related trust and individual agreements will be deemed to have terminated as of the Petition Date, subject to any vesting (but not accruals) that may have occurred between the Petition Date and the Effective Date. To the extent such plans and agreements (and any separate agreements that may incorporate such plans and agreements) are considered to be executory contracts, such plans and agreements (and any separate agreements that may incorporate such plans and agreements) will be deemed to be rejected pursuant to Section 365 of the Bankruptcy Code under the Plan pursuant to the Confirmation Order; and the Claims of all vested participants in such plans will be calculated as of the Petition Date without post-petition interest or other accruals and treated as General Unsecured Claims under the Plan.

The Plan provides that any employee compensation or benefit program that is not listed on Exhibit C of the Plan will be deemed to be, and will be treated as though it is, an executory contract that is rejected under the Plan, unless such employee compensation or benefit program is (i) otherwise provided for in the Plan, (ii) previously assumed or rejected by an order of the Bankruptcy Court entered on or before the Confirmation Date, (iii) the subject of a pending motion to assume filed by a Debtor on or before the Confirmation Date, or (iv) previously terminated.

6. Indemnification Obligations

The Plan provides that Indemnification Obligations owed to those of the Debtors' directors, officers, and employees serving on and after the Petition Date will be deemed to be, and will be treated as though they are executory contracts that are assumed pursuant to Section 365 of the Bankruptcy Code under the Plan, and such Indemnification Obligations (subject to any defenses thereto) will survive the Effective Date of the Plan and remain unaffected thereby, irrespective of whether indemnification is owed in connection with a pre-Petition Date or post-Petition Date occurrence. All

other Indemnification Obligations owed to any person who was a director, officer, or employee of the Debtor prior to the Petition Date will be deemed to be, and will be treated as though they are, executory contracts that are rejected pursuant to Section 365 of the Bankruptcy Code under the Plan pursuant to the Confirmation Order (unless earlier rejected by Final Order).

Indemnification Obligations owed to any Professionals retained by the Debtors pursuant to Sections 327 or 328 of the Bankruptcy Code and order of the Bankruptcy Court, whether such Indemnification Obligations relate to the period before or after the Petition Date, will be deemed to be, and will be treated as though they are, executory contracts that are assumed pursuant to Section 365 of the Bankruptcy Code under the Plan.

7. Extension of Time to Assume or Reject

To protect the Debtors from an inadvertent deemed assumption of a contract or lease that the Debtors do not consider to be executory or unexpired, the Plan provides that, notwithstanding anything set forth in Article VII of the Plan, in the event of a dispute as to whether a contract is executory or a lease is unexpired, the right of the Reorganized Debtors to move to assume or reject such contract or lease will be extended until the date that is thirty (30) days after entry of a Final Order by the Bankruptcy Court determining that the contract is executory or the lease is unexpired. The deemed assumption provided for in Section 7.1(a) of the Plan will not apply to any such contract or lease, and any such contract or lease will be assumed or rejected only upon motion of the Reorganized Debtors following the Bankruptcy Court's determination that the contract is executory or the lease is unexpired.

**J.      Revesting of Assets; Release of Liens**

Except as otherwise provided in the Plan, the property of each Debtor's Estate, together with any property of each Debtor that is not property of its Estate and that is not specifically disposed of or abandoned pursuant to the Plan, will revest in the applicable Debtor on the Effective Date. Thereafter, each Reorganized Debtor may operate its business and may use, acquire, and dispose of such property free of any restrictions of the Bankruptcy Code, the Bankruptcy Rules, and the Bankruptcy Court. As of the Effective Date, all such property of each Reorganized Debtor will be free and clear of all Claims and Interests, except as specifically provided in the Plan or the Confirmation Order.

**K.      Post-Effective Date Restructuring Transactions**

Under the Plan, on, as of, or after the Effective Date, with the consent of the New Board or the Board of Directors of the Subsidiary Debtors, as applicable, each of the Reorganized Debtors may enter into such transactions and may take such actions as may be necessary or appropriate, in accordance with any applicable state law, to effect a corporate or operational restructuring of their respective businesses, to otherwise simplify the overall corporate or operational structure of the Reorganized Debtors, to achieve corporate or operational efficiencies, or to otherwise improve financial results; provided, however, that such transactions or actions are not otherwise inconsistent with the Plan, the distributions to be made under the Plan, the New FiberMark Charter, the New FiberMark By-laws, or the Exit Facility. Such transactions or actions may include such mergers, consolidations, restructurings, dispositions, liquidations, closures, or dissolutions, as may be determined by the Reorganized Debtors to be necessary or appropriate. Without limiting the generality of the foregoing, FiberMark is specifically authorized to make a capital contribution of its ownership interests in Specialty Paperboard (Hong Kong) Ltd. and FiberMark SARL to FIH.

**L.      Post-Consummation Corporate Structure, Management and Operation**

1. Continued Corporate Existence

The Plan provides that the Reorganized Debtors will continue to exist after the Effective Date as separate corporate entities, in accordance with the applicable laws in the respective jurisdictions in which they are incorporated and pursuant to their respective certificates or articles of incorporation, memorandum of association, articles of association, and by-laws, as applicable, in effect prior to the Effective Date, except to the extent such certificates or articles of incorporation, memorandum of association, articles of association, and by-laws are amended pursuant to the Plan.

2.  Post-Consummation Governance Documents

The certificate or articles of incorporation, memorandum of association, articles of association, and by-laws of each Debtor, as applicable, will be amended as necessary to satisfy the provisions of the Plan and the Bankruptcy Code and will include, among other things, pursuant to Section 1123(a)(6) of the Bankruptcy Code, a provision prohibiting the issuance of non-voting equity securities, but only to the extent required by Section 1123(a)(6) of the Bankruptcy Code.  The New FiberMark Charter and the New FiberMark By-laws will be substantially in the forms attached to the Plan as Exhibit A and Exhibit B, respectively.  The rights of the holders of the New Common Stock will be governed by the New FiberMark Charter and the New FiberMark By-laws, the general terms of which are summarized below (defined terms in this section not otherwise defined in the Plan or in this Disclosure Statement have the meanings ascribed to them in the New FiberMark Charter or the New FiberMark By-laws, as appropriate):

(a)  New FiberMark Charter

The general terms of the New FiberMark Charter will include the following:

- Generally standard provisions under Delaware law – i.e.: no cumulative voting, no staggered board, no tag-along or drag-along rights, no right of participation in financings or other transactions for minority shareholders or others, amendments to charter generally permitted by vote of a majority of shares;

- No restrictions on transfer except for those designed to keep number of stockholders below level requiring registration under '34 Act;

- Special provisions relating to transactions with affiliates:

    -- the Company shall not, and shall not permit any Subsidiary to, (a) merge with or into or consolidate with any Affiliate, (b) sell, assign, transfer or otherwise dispose of all or substantially all of its assets to any Affiliate, (c) sell, assign, transfer or otherwise dispose of, to an Affiliate, assets having a fair market value in excess of $25 million, or (d) sell, assign, transfer or otherwise dispose of, to an Affiliate, any property, plant or equipment used principally in the Company's United States-based operations and having a fair market value in excess of $5 million, without, in any such case, first obtaining the approval of the holders of a majority of Disinterested Shares, provided, however, that, no such approval shall be required for transactions between the Corporation and any of its wholly owned subsidiaries or among wholly owned subsidiaries of the Corporation;

    -- the Company shall not, and shall not permit any Subsidiary to, enter into any transaction with or for the benefit of any Affiliate which transaction has a value, determined in good faith by the Board, in excess of $5 million, unless the material terms and conditions of such transaction (a) have been fully disclosed to the Board and (b) have been approved by a majority of the Disinterested Directors. For the avoidance of doubt, any transaction with or for the benefit of any Affiliate having a value, determined as set forth in the immediately preceding sentence, of $5 million or less, shall not be subject to the approval procedures set forth in the immediately preceding sentence and shall require only such approvals as shall normally be required under the Corporation's ordinary course procedures applicable to a transaction of that value;

    -- Special provisions relating to transactions with affiliates would require supermajority vote to amend (66-2/3% of outstanding shares) and (ii) information reporting would require supermajority vote to amend (66-2/3% of outstanding shares); and

- Reorganized FiberMark will provide to stockholders (i) annual audited financial statements within 90 days of the end of the fiscal year, and (ii) unaudited quarterly financial statements within 45 days of the end of each of the first three fiscal quarters of the year, such reports to be generally compliant with SEC requirements, including a narrative discussion as would otherwise be required in SEC reports, but shall not be required to include (a) provisions specifically added to public company reporting requirements by the Sarbanes-Oxley Act and rules and regulations promulgated by the SEC thereunder, or (b) any other provisions normally applicable only to publicly reporting issuers under Regulation S-K.

(b) New FiberMark By-laws

The New FiberMark By-laws will contain standard provisions under Delaware law. They will not include special notice or special voting requirements or provisions relating to advance notice to get agenda items considered at the annual meeting.

3. Cancellation of Old Securities and Agreements

On the Effective Date, except as otherwise provided for in the Plan, (a) the Old Securities, including, without limitation, the FiberMark Notes, the FiberMark Interests, and any other note, bond, or indenture evidencing or creating any indebtedness or obligation of any Debtor will be deemed extinguished, cancelled, and of no further force or effect, and (b) the obligations of the Debtors (and Reorganized Debtors) under any agreements, indentures, or certificates of designations governing the Old Securities and any other note, bond, or indenture evidencing or creating any indebtedness or obligation of any Debtor with respect to the Old Securities will be discharged in each case without further act or action under any applicable agreement, law, regulation, order, or rule and without any action on the part of the Bankruptcy Court or any Person; *provided, however,* that the FiberMark Notes and the Indentures will continue in effect solely for the purposes of (i) allowing Silver Point to receive the New Common Stock provided for under Section 4.3(f)(iii)(A) of the Plan, (ii) effectuating the purchase by Silver Point on or before the Distribution Date of the Noteholder Claims held by AIGGIC and Post as provided for in Section 6.16(d) of the Plan, (iii) allowing the holders of the FiberMark Notes to receive the distributions provided for Noteholder Claims hereunder, (iv) allowing the Disbursing Agent or the Indenture Trustee, as the case may be, to make distributions on account of the Noteholder Claims, and (v) preserving the rights of the Indenture Trustee with respect to the Indenture Trustee Expenses, including, without limitation, the Indenture Trustee Charging Lien and any indemnification rights provided by the Indentures.

Subsequent to the performance by the Indenture Trustee or its agents of any duties that are required under this Plan, the Confirmation Order and/or under the terms of the Indentures, the Indenture Trustee and its agents will be relieved of, and released from, all obligations associated with the FiberMark Notes arising under the Indentures or under other applicable agreements or law and the Indentures will be deemed to be discharged.

4. Officers and Directors of Reorganized Debtors

The Plan provides that the existing senior officers of FiberMark will serve initially in the same capacities after the Effective Date for Reorganized FiberMark until replaced or removed in accordance with the New FiberMark Charter and New FiberMark By-laws.

Under the Plan, the initial New Board will be comprised of seven (7) directors. All of the directors taking office on the Effective Date will be designated by Silver Point. Silver Point is the single largest holder of Noteholder Claims and General Unsecured Claims and thus, pursuant to its Pro Rata distribution entitlements under the Plan, will be the majority holder of New Common Stock upon the Effective Date. As such, under Delaware corporate law, Silver Point will have the right to cast the majority of votes, and thus the deciding votes, for the directors of Reorganized FiberMark. The Plan recognizes the legal position of Silver Point in allowing it to designate the New Board. As of the date of this Disclosure Statement, Silver Point has indicated that it will designate the following individuals to serve as directors on the New Board:

- *David L. Sawyer*: Mr. Sawyer joined Silverpoint Capital in August 2004 from Credit Suisse First Boston, where he worked as a workout and restructuring banker. Prior to his final role at Credit Suisse First Boston, Mr. Sawyer specialized in providing senior secured capital to media and telecommunications companies. During the period from 1996 to 2000, Mr. Sawyer was a vice president in the Media and Telecommunications Group at Société Générale. Prior to 1996, Mr. Sawyer was an associate director in corporate finance at the HSBC Group. Mr. Sawyer graduated from Georgetown University in 1991 with a B.S. in Finance.

- *Harry Wilson*: Mr. Wilson is a senior investment analyst at Silver Point Capital, LP. He joined Silverpoint Capital in May 2003 from The Blackstone Group, where he worked as a principal in the Private Equity group. While at Blackstone, Mr. Wilson made a number of private equity investments, worked on a portfolio company restructuring and also helped initiate and lead a significant investment in distressed securities. From 1995 to 1997, Mr. Wilson was an associate at Clayton, Dubilier & Rice, and, prior to that, he worked in the Investment Banking Division of Goldman, Sachs & Co. Mr. Wilson

graduated with honors from Harvard College, where he earned an A.B. in Government and was elected a class marshal, and earned an MBA from the Harvard Business School.

- *Elmar B. Schulte*: Dr. Schulte has been a director of FiberMark since May 1998. He currently serves on the Board's audit and compensation committees. Dr. Schulte founded and has been a managing general partner of Dr. Schulte Vermoegensverwaltungs-KG since 1981 and is a private investor. He served as senior vice president of Deutsche Leasing AG, Frankfurt from 1976 to 1980. From 1971 to 1976, he was employed by Clark Equipment Corporation in various management positions, including corporate division controller and business manager for Clark International Marketing SA, Brussels. He currently serves as director of KAIROS Real Estate Inc., a land developer based in Montreal, Quebec. Dr. Schulte received his diploma in business and doctorate in economics from the University of Muenster, Germany and a master's degree in business administration from the European Institute of Business Administration (INSEAD), Fontainebleau, France.

- *Ian W. Millar*: Mr. Millar retired from MeadWestvaco in 2003 as executive vice president after spending 14 years at MeadWestvaco and its predecessor Mead Corporation. Prior to joining Mead Corporation, Mr. Millar was a management consultant at McKinsey and Company.

- *Robert A. Moran*: Dr. Moran has over thirty years of service and ten years of education aligned with the forest products industry with key assignments in pulp, paper and converting operations and corporate senior management. Dr. Moran currently provides consulting to Thermion Systems International (2003-2005) regarding the utilization of carbon fiber non-wovens in the aerospace, materials joining and industrial heating markets. Dr. Moran's senior management assignments at Bowater Incorporated (1988-2002) and Champion International (1972-1988) include: Bowater corporate officer; vice president - manufacturing services; vice president - capital planning; director-business planning and development; mill operations and production management; director product quality and customer service and various other assignments in major acquisitions and capital projects, engineering, technical service and environment affairs at both mill and corporate locations. Dr. Moran was educated at the University of Massachusetts (B.S. in Engineering) and at Lawrence University (M.S. and PhD), with executive courses at Princeton and Columbia Universities in Financial Planning and Accounting. Dr. Moran's Industry Advisory Board and Foundation service includes various committee, executive and chair assignments at the U.S. Forest Products Laboratory; Georgia Tech (The Institute of Paper Science and Technology); the University of Maine; the University of South Carolina; Syracuse University and the Chief Technology Officer Committee of the American Forest and Paper Industry Association. Dr. Moran has also been involved in SC Literacy Programs; Board of Trustees for Carolina Day School; United Way; TAPPI Research Management Committee; Center for Paper Industry and Business Studies and President of various Homeowner Associations.

- *Frederick Fogel*: Mr. Fogel joined Silver Point Capital in February 2005. Prior to joining the firm, Mr. Fogel was a managing director and general counsel of Ziff Brothers Investments, a private family investment firm with several billion dollars under management. Mr. Fogel worked at Ziff Brothers from November 2002 through December 2004. From June 1999 through September 2002, Mr. Fogel worked at Tanning Technology Corporation, a NASDAQ-listed information technology company, most recently as executive vice president, business affairs and general counsel. Prior to that, Mr. Fogel spent 13 years at Fried, Frank, Harris, Shriver & Jacobson (as an associate from 1986, and a partner from 1992) focusing on M&A, private equity, securities transactions, and corporate counseling. Mr. Fogel graduated magna cum laude from Harvard College in 1982, and earned his J.D., cum laude, from Harvard Law School in 1985.

- *Thomas G. Weld*: Mr. Weld is an independent consultant. From 1993 to 2004 Mr. Weld was a managing director at Three Cities Research, Inc., a special situations middle market buyout fund. From 1988 to 1993 Mr. Weld was employed by Mckinsey and Company, Inc. Mr. Weld received a B.S. in Chemical Engineering from Tufts University in 1984 and a M.S. in Management from M.I.T. in 1988.

These designations are subject to confirmation on a final basis by Silver Point in a filing with the Bankruptcy Court no later than three (3) days prior to the Confirmation Hearing. The initial directors will serve until the first

annual meeting of stockholders following the first anniversary of the Effective Date or until earlier removed or replaced in accordance with the New FiberMark Charter or the New FiberMark By-laws.

The existing directors and senior officers of the Subsidiary Debtors will continue to serve in their same respective capacities after the Effective Date for the Reorganized Subsidiary Debtors, until replaced or removed in accordance with the certificate or articles of incorporation, memorandum of association, articles of association, and by-laws of such entities.

5.    Equity Incentive Plan; Further Participation in Incentive Plans

On the Effective Date, Reorganized FiberMark will be authorized and directed, subject to all requisite shareholder approvals, to establish and implement the New Equity Incentive Plan on or before the 6-month anniversary of the Effective Date for up to 10% of the total amount of New Common Stock issued on the Effective Date. Awards granted thereunder may be in the form of options, stock, restricted stock, and other forms of equity grants. The New Equity Incentive Plan will be promulgated by the New Board for the benefit of such members of management, employees, and directors of Reorganized FiberMark and any of its subsidiaries as are designated by the New Board, in its sole and absolute discretion, on such terms as to timing of issuance, manner and timing of vesting, duration, individual entitlement and all other terms, as such terms are determined by the New Board in its sole and absolute discretion. The New Equity Incentive Plan may be amended or modified from time to time by the New Board. No members of management, employees, and directors of Reorganized FiberMark and its subsidiaries who are entitled to receive awards pursuant to the New Equity Incentive Plan will be obligated to participate in such plan.

Except as provided in Section 7.5(c) of the Plan, any pre-existing understandings, either oral or written, between the Debtors and any member of management or any employee as to entitlement to participate in any pre-existing equity or other incentive plan of any kind will be null and void as of the Effective Date and will not be binding on Reorganized FiberMark with respect to the New Equity Incentive Plan or any other incentive plan implemented after the Effective Date. All decisions as to entitlement to participate after the Effective Date in any incentive plan will be within the sole and absolute discretion of the New Board.

6.    Funding of Reorganized Debtors

Under the Plan, the Reorganized Debtors will obtain an Exit Facility, in the form of revolving credit, term credit and/or letters of credit as determined necessary, in order to obtain the funds necessary to repay the DIP Facility Claim and German Guaranty Claim, make other required payments under the Plan, and conduct their post-reorganization operations. The Exit Facility is expected to be secured by substantially all the assets of the Reorganized Debtors, subject to customary limitations on the pledge of stock of foreign subsidiaries and substantially consistent with the pre-petition security package, and to have the terms described in the Commitment Letter attached hereto as Appendix E, subject to final negotiations. The Debtors reserve the right to file a modified or replacement Commitment Letter, if necessary, three days before the Confirmation Hearing.

The Confirmation Order will (i) approve the Exit Facility substantially in accordance with the Commitment Letter and (ii) authorize the Debtors to execute such other documents as the Exit Facility lenders or participants may reasonably require.

On the Effective Date, the Exit Facility, together with new promissory notes and guarantees evidencing obligations of the Reorganized Debtors thereunder, and all other documents, instruments, mortgages, and agreements to be entered into, delivered, or confirmed thereunder on the Effective Date, will become effective. All obligations under the Exit Facility and related documents will be repaid as set forth in the Exit Facility and related documents.

In connection with obtaining the Exit Facility, the Plan provides that the Debtors will be permitted to participate as a guarantor and pledgor in any contemporaneous financing obtained by the Debtors' foreign subsidiaries. In addition, the Debtors will be permitted to continue to obtain funding from their foreign subsidiaries, in the form of intercompany loans, dividends, repatriation, or other form of transfer, to the extent available and permitted under applicable law.

7.    Exemption from Certain Transfer Taxes

Pursuant to Section 1146(c) of the Bankruptcy Code, any transfers from a Debtor to a Reorganized Debtor or any other Person pursuant to the Plan in the United States, including any Liens granted by a Debtor or a Reorganized Debtor to secure the Exit Facility, will not be taxed under any law imposing a stamp tax, real estate transfer tax, sales or use tax, or other similar tax.  Such exemption specifically applies, without limitation, to all documents necessary to evidence and implement the provisions of and the distributions to be made under the Plan, including the New FiberMark Charter, the New FiberMark By-laws, and the documents reflecting the Exit Facility.

8.    Exemption from Registration

FiberMark files annual, quarterly and current reports, proxy statements and other information with the SEC, which documents are available for inspection and copying at the public reference room of the SEC and are also available from the SEC's Web site at www.sec.gov.  The Plan contemplates that from and after the Effective Date, or as soon thereafter as Reorganized FiberMark practically is able to make the appropriate filings with the SEC, Reorganized FiberMark will cease filing such public reports.  In addition, from and after the Effective Date, the New Common Stock will no longer be quoted for trading on any national interdealer quotation system or listed for trading on any national securities exchange, and as a consequence holders of the New Common Stock may find it difficult to effect trades in the New Common Stock, price quotes for the New Common Stock may be hard to obtain, and the liquidity of the New Common Stock may be severely adversely effected.  In addition, the provisions of the New FiberMark Charter will restrict the right of holders of the New Common Stock to sell, assign, transfer or otherwise dispose of shares of New Common Stock if as a result of the sale, assignment, transfer or other disposition the record number of holders of the New Common Stock (as determined in accordance with Rule 12g5-1 under the Securities Exchange Act of 1934, as amended or any successor rule or interpretation) would exceed 275 before January 1, 2006 and 450 thereafter.  These restrictions are being imposed so that Reorganized FiberMark would not have such number of stockholders as would require the New Common Stock to be registered under the Securities Exchange Act of 1934, as amended.  The restrictions will be of no further force and effect from and after such time as the New Common Stock becomes registered under the Securities Exchange Act of 1934, as amended.  Other than as so restricted, the New Common Stock may be resold without registration under the Securities Act or other federal securities laws pursuant to an exemption provided by Section 4(1) of the Securities Act, unless the holder is an "underwriter" (see discussion below) with respect to such securities, as that term is defined under the Bankruptcy Code.  In addition, such securities generally may be resold without registration under state securities or "blue sky" laws pursuant to various exemptions provided by the respective laws of the several states.  However, recipients of securities issued under the Plan are advised to consult with their own legal advisors as to the availability of any such exemption from registration under state law in any given instance and as to any applicable requirements or conditions to such availability.

9.    Corporate Action

On the Effective Date, the adoption and filing of the New FiberMark Charter and New FiberMark By-laws, the appointment of directors and officers of Reorganized FiberMark, and all actions contemplated by the Plan will be authorized and approved in all respects pursuant to the Plan.  All matters provided for in the Plan involving the corporate structure of the Debtors or Reorganized Debtors and any corporate action required by the Debtors or Reorganized Debtors in connection with the Plan will be deemed to have occurred and will be in effect, without any requirement of further action by the stockholders or directors of the Debtors or Reorganized Debtors.  On the Effective Date, the appropriate officers or directors of the Reorganized Debtors will be authorized and directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan in the name of and on behalf of the Reorganized Debtors without the need for any required approvals, authorizations, or consents, except for express consents required under this Plan.

M.    Releases, Discharge, Injunctions, Exculpation and Indemnification

1.    Releases by Debtors in Favor of Third Parties

The Plan provides for certain releases to be granted by the Debtors in favor of any of the other Debtors and any of the Debtors' non-Debtor subsidiaries; the directors, officers, and employees of any of the Debtors or any of the Debtors' non-Debtor subsidiaries serving during the pendency of the Chapter 11 Case; any Professionals of the Debtors; GECC and its advisors; Silver Point and its advisors; Solution Dispersions, Inc. and its advisors; and  the Indenture Trustee and its advisors.

Specifically, as of the Effective Date, the Debtors, the Reorganized Debtors, and any person seeking to exercise the rights of the Debtors' estate, including, without limitation, any successor to the Debtors and any estate representative appointed or selected pursuant to Section 1123(b)(3) of the Bankruptcy Code, will be deemed to forever release, waive, and discharge all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action (including claims or causes of action arising under Chapter 5 of the Bankruptcy Code), and liabilities whatsoever (other than for fraud, breach of fiduciary duty, malpractice, willful misconduct, or gross negligence) in connection with or related to the Debtors, the Chapter 11 Case, or the Plan (other than the rights of the Debtors and the Reorganized Debtors to enforce the Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered thereunder), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity, or otherwise, that are based in whole or part on any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, the Reorganized Debtors, the Chapter 11 Case, or the Plan, and that may be asserted by or on behalf of the Debtors, the Estates, or the Reorganized Debtors against (a) any of the other Debtors and any of the Debtors' non-Debtor subsidiaries, (b) any of the directors, officers, or employees of any of the Debtors or any of the Debtors' non-Debtor subsidiaries serving during the pendency of the Chapter 11 Case, (c) any Professionals of the Debtors, (d) GECC and its advisors, (e) Silver Point and its advisors, (f) Solution Dispersions, Inc. and its advisors, (g) the Indenture Trustee and its advisors, (h) AIGGIC and its advisors, and (i) Post and its advisors; *provided, however,* that nothing in Section 12.9(a) of the Plan will be deemed to prohibit the Debtors or the Reorganized Debtors from asserting and enforcing any claims, obligations, suits, judgments, demands, debts, rights, causes of action or liabilities they may have against any employee (other than any director or officer) that is based upon an alleged breach of a confidentiality, noncompete or any other contractual or fiduciary obligation owed to the Debtors or the Reorganized Debtors.

The Debtors do not believe that there are any valid claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, and liabilities that they hold against any of their directors, officers, and employees, against any of their subsidiaries, any of their Professionals, or against GECC, Silver Point, Solution Dispersions, Inc., or the Indenture Trustee. To the extent that any claims exist against AIGGIC and Post, such claims have been compromised and settled for fair consideration as part of the Constituency Settlement included in the Plan.

As to the Debtors' directors, officers, employees, and Professionals, the consideration for such release is the service rendered by such individuals during the pendency of the Chapter 11 Case and the need for their continued dedication after the Effective Date to fully consummate a successful reorganization. The Reorganized Debtors will be hampered in their consummation efforts if their directors, officers, employees, and Professionals are subject to claims and potential litigation that will distract their attention from operational and other business matters. None of such individuals are currently the target of any actual claim or litigation, and the Debtors are not aware of any credible theory on which they might pursue claims and litigation against such individuals.

As to GECC, Silver Point, Solutions Dispersions, Inc., and the Indenture Trustee, the Debtors believe that such parties have been constructive participants in the Debtors' cases and will be important participants in the future affairs of the Reorganized Debtors – whether as the agent under the DIP Facility and a proposed lender under the Exit Facility in the case of GECC; as a member of the Creditors Committee that the Examiner recommended exonerating, a proposed lender under the Exit Facility, and the largest prospective holder of the New Common Stock in the case of Silver Point; as a member of the Creditors Committee that the Examiner recommended exonerating and a continuing trade supplier in the case of Solutions Dispersions, Inc.; and as a member of the Creditors Committee as to which no allegations of wrongdoing were levied, the indenture trustee with respect to the Old Notes, and the potential stock transfer agent with respect to the New Common Stock in the case of the Indenture Trustee. The Debtors believe that the compromises reached with AIGGIC and Post as part of the Constituency Settlement, which should pave the way for an uncontested Confirmation Hearing, provide fair consideration for the releases provided to them.

Nevertheless, as to all of the released parties, except as otherwise provided with respect to AIGGIC, Post, and Silver Point pursuant to the settlement releases provided in the Constituency Settlement, it is important to note that the release does not cover fraud, breach of fiduciary duty, malpractice, willful misconduct, or gross negligence. Although the Debtors know of no basis for any claim of fraud, breach of fiduciary duty, malpractice, willful misconduct, or gross negligence against the released parties, the exclusions provide valuable protections to the Reorganized Debtors.

Under applicable law, the Debtors will have the burden at the Confirmation Hearing of justifying the releases proposed to be given by the Debtors. The Bankruptcy Court will determine whether the Debtors have met their burden or not, and any party desiring to do so may object to some or all of the releases proposed to be granted.

2. Releases by Creditors of Claims Against Third Parties

In furtherance of the release provisions of the Plan, as of the Effective Date, each holder of a Claim that affirmatively votes in favor of the Plan will be deemed to forever release, waive, and discharge all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, and liabilities whatsoever (other than for fraud, breach of fiduciary duty, willful misconduct, or gross negligence) against the directors, officers, or employees of any of the Debtors serving during the pendency of the Chapter 11 Case (collectively, the "Claimholder Releasees"), in connection with or related to the Debtors, the Chapter 11 Case, or the Plan (other than the rights under the Plan and the contracts, instruments, releases, indentures and other agreements or documents delivered thereunder), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereunder arising, in law, equity, or otherwise, that are based in whole or part on any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors or the Reorganized Debtors, the Chapter 11 Case, or the Plan.

The Plan provides that each of the Claimholder Releasees will be deemed to forever release, waive, and discharge any claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, and liabilities whatsoever (other than for fraud, breach of fiduciary duty, willful misconduct, or gross negligence) arising on or prior to the Effective Date in any way relating to the Debtors or the Reorganized Debtors, the Chapter 11 Case, or the Plan, that such Claimholder Releasees may hold in their individual capacities against each holder of a Claim that affirmatively votes in favor of the Plan. This provision of the Plan will not constitute, and will not be deemed to effect, a release by the Debtors or the Reorganized Debtors of any claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, and liabilities held by the Debtors or the Reorganized Debtors.

Creditors may have independent claims against one or more of the Claimholder Releasees. The Debtors have no actual knowledge of any such claims, but cannot warrant to creditors that they do not exist. Since a vote in favor of the Plan will release whatever creditor claims do exist, if any, against Claimholder Releasees, creditors should consult their own counsel for information and advice as to whether any such claims exist and the value or merit of any such claims. If a creditor does not wish to give the releases contemplated under the Plan, then the creditor should vote to reject the Plan.

Except with respect to Claimholder Releasees, all holders of Claims will retain their respective Individual Causes of Action, and no such Individual Cause of Action will be impaired by the Plan or by a vote in favor of the Plan or the receipt of any distributions under the Plan.

3. Discharge and Discharge Injunction

Confirmation of the Plan effects a discharge of all Claims against the Debtors. As set forth in the Plan, except as otherwise provided therein or in the Confirmation Order, all consideration distributed under the Plan will be in exchange for, and in complete satisfaction, settlement, discharge, and release of, all Claims of any nature whatsoever against the Debtors or any of their assets or properties and, regardless of whether any property is abandoned by order of the Bankruptcy Court, retained, or distributed pursuant to the Plan on account of such Claims, upon the Effective Date, the Debtors, and each of them, will (a) be deemed discharged and released under Section 1141(d)(1)(A) of the Bankruptcy Code from any and all Claims, including, but not limited to, demands and liabilities that arose before the Effective Date, and all debts of the kind specified in Section 502 of the Bankruptcy Code, whether or not (i) a Proof of Claim based upon such debt is filed or deemed filed under Section 501 of the Bankruptcy Code, (ii) a Claim based upon such debt is Allowed under Section 502 of the Bankruptcy Code, (iii) a Claim based upon such Debt is or has been disallowed by order of the Bankruptcy Court, or (iv) the holder of a Claim based upon such debt accepted the Plan, and (b) terminate all FiberMark Interests.

Under the Plan, as of the Effective Date, except as provided in the Plan or the Confirmation Order, all Persons will be precluded from asserting against the Debtors or the Reorganized Debtors, any other or further claims, debts, rights, causes of action, claims for relief, liabilities, or equity interests relating to the Debtors based upon any act, omission, transaction, occurrence, or other activity of any nature that occurred prior to the Effective Date. In accordance with the foregoing, except as provided in the Plan or the Confirmation Order, the Confirmation Order will be a judicial determination of discharge of all such Claims and other debts and liabilities against the Debtors and termination of all FiberMark Interests, pursuant to Sections 524 and 1141 of the Bankruptcy Code, and such discharge will void any judgment obtained against the Debtors at any time, to the extent that such judgment relates to a discharged Claim or terminated Interest.

In furtherance of the discharge of Claims and the termination of Interests, the Plan provides that, except as provided in the Plan or the Confirmation Order, as of the Effective Date, all Persons that have held, currently hold, may hold, or allege that they hold, a Claim or other debt or liability that is discharged or an Interest or other right of an equity security holder that is terminated pursuant to the terms of the Plan are permanently enjoined from taking any of the following actions against the Debtors, the Reorganized Debtors, and their respective subsidiaries or their property on account of any such discharged Claims, debts, or liabilities or terminated Interests or rights:  (a) commencing or continuing, in any manner or in any place, any action or other proceeding; (b) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order; (c) creating, perfecting, or enforcing any Lien or encumbrance; (d) asserting a setoff, right of subrogation, or recoupment of any kind against any debt, liability, or obligation due to the Debtors or the Reorganized Debtors; or (e) commencing or continuing any action, in each such case in any manner, in any place, or against any Person that does not comply with or is inconsistent with the provisions of the Plan.

The Plan further provides that as of the Effective Date, all Persons that have held, currently hold, or may hold, a Claim, obligation, suit, judgment, damage, demand, debt, right, cause of action, or liability that is released pursuant to Section 12.8, 12.9, or 12.12 of the Plan are permanently enjoined from taking any of the following actions on account of such released Claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, or liabilities or terminated Interests or rights: (a) commencing or continuing, in any manner or in any place, any action or other proceeding; (b) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order; (c) creating, perfecting, or enforcing any Lien or encumbrance; (d) asserting a setoff against any debt, liability, or obligation due to any released Person; or (e) commencing or continuing any action, in any manner, in any place, or against any Person that does not comply with or is inconsistent with the provisions of the Plan.

Moreover, the Plan provides that without limiting the effect of the provisions of Section 12.11 of the Plan upon any Person, by accepting distributions pursuant to the Plan, each holder of an Allowed Claim receiving distributions pursuant to the Plan will be deemed to have specifically consented to the injunctions set forth in Section 12.11 of the Plan.

The Plan also provides that without limiting the generality of the provisions of Sections 12.10 and 12.11 of the Plan, if any Person has held, currently holds, may hold, or alleges that s/he/it holds a Claim, and such Person  either did not timely file a Proof of Claim with respect such Claim or filed a Proof of Claim that is or was disallowed by order of the Bankruptcy Court, then such Person is permanently enjoined from taking any of the following actions on account of such Claim or on account of any acts, omissions, transactions, occurrences, or other activities upon which such Claim is or may be based: (a) commencing or continuing, in any manner or in any place, any action or other proceeding; (b) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order; (c) creating, perfecting, or enforcing any Lien or encumbrance; (d) asserting a setoff, right of subrogation, or recoupment of any kind against any debt, liability, or obligation due to the Debtors or the Reorganized Debtors; or (e) commencing or continuing any action, in each such case in any manner, in any place, or against any Person that does not comply with or is inconsistent with the provisions of the Plan.

As part of the Constituency Settlement, the Plan requires that the Confirmation Order provide that all Persons who have held, currently hold, may hold, or allege that they hold, directly or indirectly, Constituency Causes of Action or Litigation Rights against Silver Point, AIGGIC, or Post are permanently enjoined from commencing or continuing, in any manner or in any place, any action or other proceeding against Silver Point, AIGGIC, or Post that asserts Constituency Causes of Action or Litigation Rights.

In addition, the Plan requires that the Confirmation Order provide that in the event the Debtors or Reorganized Debtors sue any Person, and in connection with such suit such Person asserts a claim for contribution, indemnification, recovery of loss or potential loss, or otherwise, however denominated, arising under federal, state, or foreign law, including claims based upon tort or contract, as direct claims, crossclaims, counterclaims, or third party claims in any court, arbitration, administrative agency or forum, or in any other manner (each a "Contribution Claim" and collectively "Contribution Claims") against Silver Point, AIGGIC, or Post, then the Debtors or Reorganized Debtors will automatically, and without any further act on the part of any Person, credit against or reduce the amount of any judgment any of them may obtain against such Person by an amount equal to the amount as is determined by trial or otherwise in a Final Order to be the amount due to such Person from Silver Point, AIGGIC, or Post, on account of such Contribution Claim.  For purposes of this subsection, the terms "sue" and "suit" do not include objections by the Debtors or Reorganized Debtors to any applications or other requests for payment of Professional Fee Claims, and "judgment" does not include a Final Order of the Bankruptcy Court disallowing the fees and expenses of any Professional, whether previously paid or requested to be paid.  Accordingly, Silver Point, AIGGIC, and Post will have no rights against the Debtors or the Reorganized Debtors for the amounts of any disallowed fees and expenses that any Professional may seek to recover from Silver Point, AIGGIC, or Post.

4. Exculpation Relating to Chapter 11 Case

The Plan contains standard exculpation provisions applicable to the key parties in interest with respect to their conduct in the Chapter 11 Case. Specifically, the Plan provides that none of the Debtors, the Reorganized Debtors or their respective subsidiaries, GECC, Silver Point, Solution Dispersions, Inc., the Indenture Trustee, AIGGIC, or Post, or any of their respective present or former members, officers, directors, employees, advisors, Professionals, and agents, will have or incur any liability to any holder of a Claim or an Interest, or any other party in interest, or any of their respective agents, employees, representatives, advisors, attorneys, or affiliates, or any of their successors or assigns, for any act or omission in connection with, relating to, or arising out of, the Chapter 11 Case, the formulation, negotiation, or implementation of the Plan, the solicitation of acceptances of the Plan, the pursuit of Confirmation of the Plan, the Confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for acts or omissions (i) which are the result of fraud, breach of fiduciary duty, malpractice, willful misconduct, gross negligence, (ii) which constitute violations of the Internal Revenue Code or any state, city, or municipal tax code, the securities laws of the United States or any state, the environmental laws of the United States or any state, city, or municipality, or the criminal laws of the United States or any state, city, or municipality, or (iii) which give rise to or are the basis for Individual Causes of Action. The exculpated parties will be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.

Moreover, the Plan provides that no holder of a Claim or an Interest, no other party in interest, none of their respective agents, employees, representatives, advisors, attorneys, or affiliates, and none of their respective successors or assigns will have any right of action against any Debtor, any Reorganized Debtor, any of its subsidiaries, GECC, Silver Point, Solution Dispersions, Inc., the Indenture Trustee, AIGGIC, or Post, or any of their respective present or former members, officers, directors, employees, advisors, Professionals, and agents, for any act or omission in connection with, relating to, or arising out of, the Chapter 11 Case, the formulation, negotiation, or implementation of the Plan, solicitation of acceptances of the Plan, the pursuit of Confirmation of the Plan, the Confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for acts or omissions (i) which are the result of fraud, breach of fiduciary duty, malpractice, willful misconduct, gross negligence, (ii) which constitute violations of the Internal Revenue Code or any state, city, or municipal tax code, the securities laws of the United States or any state, the environmental laws of the United States or any state, city, or municipality, or the criminal laws of the United States or any state, city, or municipality, or (iii) which give rise to or are the basis for Individual Causes of Action.

The Plan's exculpation provisions do not reduce or limit the scope of the releases provided as part of the Constituency Settlement in Section 6.16 of the Plan.

5. Post-Effective Date Indemnifications

The Plan requires that the charter, certificate of incorporation, memorandum of association, articles of association, and by-laws, as applicable, of Reorganized FiberMark and each Reorganized Subsidiary Debtor contain provisions which (a) eliminate, to the maximum extent permitted under Delaware law, the personal liability of the Debtors' directors and officers, officers, and key employees (as identified for purposes of the Key Employee Protection Order, along with James P. Carolan) serving on and after the Effective Date and the Reorganized Debtors' directors, officers, and key employees (as identified by the Chief Executive Officer of the Reorganized Debtors in conjunction with the New Board) serving on and after the Effective Date for monetary damages resulting from breaches of their fiduciary duties and (b) require such Reorganized Debtor, subject to appropriate procedures and to the maximum extent permitted under Delaware law, to indemnify those of the Debtors' directors, officers, and other key employees (as identified by the Chief Executive Officer of the Reorganized Debtors in conjunction with the New Board) serving immediately prior to, on, or after the Effective Date for all claims and actions, including, without limitation, for pre-Effective Date acts and occurrences.

In addition, the Plan requires that on or as of the Effective Date, the Reorganized Debtors enter into separate written agreements providing for the indemnification of each Person who is a director, officer, or key employee (as identified by the Chief Executive Officer of the Reorganized Debtors in conjunction with the New Board) of such Reorganized Debtor as of the Effective Date.

N. **Preservation of Rights of Action; Resulting Claim Treatment**

Litigation Rights consist of claims, rights of action, suits, or proceedings, whether in law or in equity, whether known or unknown, that the Debtors or their Estates may hold against any Person. The Plan provides that except as

otherwise provided in the Plan or the Confirmation Order, or in any contract, instrument, release, indenture, or other agreement entered into in connection with the Plan, in accordance with Section 1123(b) of the Bankruptcy Code, on the Effective Date, each Debtor or Reorganized Debtor will retain all of the respective Litigation Rights that such Debtor or Reorganized Debtor may hold against any Person. Each Debtor or Reorganized Debtor will retain and may enforce, sue on, settle, or compromise (or decline to do any of the foregoing) all such Litigation Rights. Each Debtor or Reorganized Debtor or their respective successor(s) may pursue such retained Litigation Rights, as appropriate, in accordance with the best interests of the Reorganized Debtors or their successor(s) who hold such rights in accordance with applicable law and consistent with the terms of the Plan.

If, as a result of the pursuit of any Litigation Rights, a Claim would arise from a recovery pursuant to Section 550 of the Bankruptcy Code after distributions under the Plan have commenced, making it impracticable to treat the Claim in accordance with the applicable provisions of Article IV of the Plan, the Reorganized Debtors will be permitted to reduce the recovery by an amount that reflects the value of the treatment that would have been accorded to the Claim, thereby effectively treating the Claim through the reduction.

Litigation Rights include potential preferential transfer avoidance or other bankruptcy causes of action. For example, a number of creditors received payments within the 90 day or one-year periods prior to the Petition Date that may be considered to be preferential payments under Section 547 of the Bankruptcy Code. As an example, a former member of the Debtors' management team, Bruce Moore, retired prior to the Petition Date and received a lump sum distribution from the Debtors' supplemental executive retirement plan. Certain parties have alleged that such distribution constitutes a preferential transfer. In consideration of this outstanding issue, by order entered on September 13, 2004, the Bankruptcy Court approved an agreement by Mr. Moore to escrow certain post-petition commission amounts earned under a consulting agreement, in order to satisfy any preferential transfer judgment that may be obtained against him. The Debtors understand that Mr. Moore disputes, in its entirety, the characterization of the distribution as a preferential transfer, that Mr. Moore asserts that the payments were made in the ordinary course of business, and that he intends to defend vigorously any avoidance action that may be brought against him. The Reorganized Debtors will determine whether or not to pursue any or all preference payments, including the lump sum payment received by Mr. Moore, based upon the best interests of the reorganized Estates. All creditors and other parties who received potentially preferential payments are advised that such payments are subject to possible avoidance in proceedings to be commenced by the Reorganized Debtors.

In addition, Litigation Rights include non-bankruptcy claims, rights of action, suits, or proceedings that arise in the ordinary course of the Debtors' businesses. The Debtors currently hold certain claims or rights of action against a number of parties. For example, currently pending are trademark infringement lawsuits against Brownville Specialty and Merrimac Paper Co., which the Debtors or Reorganized Debtors intend to continue to prosecute, unless settled on terms acceptable to them. The Debtors also have claims against certain parties that may ripen into litigation. A number of parties are past due in their payment obligations to the Debtors. Certain of the past due amounts relate to pending setoffs or executory contract and unexpired lease disposition issues, which may be resolved prior to the Effective Date.

Relating to the Examiner's Report, Litigation Rights also include any objections to the fees and expenses of Akin and Chanin and any claims or causes of action for disallowance or disgorgement of any such fees and expenses to the extent paid or payable by the Debtors or their Estates.

Litigation Rights do not include any Constituency Causes of Action or Individual Causes of Action. Constituency Causes of Action consist of all claims, rights, causes of action, suits or proceedings, whether at law or in equity, against AIGGIC or Post (including without limitation those that were or could have been described or identified in the Examiner's Report or otherwise), arising from or related to actions or alleged omissions by AIGGIC or Post, in their respective capacities as members of the Creditors Committee, in or in connection with the Chapter 11 Case, belonging to all direct or indirect holders of Noteholder Claims and General Unsecured Claims at any time during the Chapter 11 Case, as constituents of the Creditors Committee. Individual Causes of Action consist of all claims, rights of action, suits, or proceedings, whether in law or in equity, including rights of contribution or indemnity, that belong to any holder of a Noteholder Claim or a General Unsecured Claim in such holder's individual capacity (rather than claims, rights of action, suits, or proceedings, whether in law or in equity, including rights of contribution or indemnity, that belong to all holders of Noteholder Claims and General Unsecured Claims as constituents of the Creditors Committee).

The Debtors and the Reorganized Debtors reserve the right to pursue, settle, or otherwise not pursue any pending or potential claims, rights of action, suits, or proceedings against any of the parties described herein. Neither the listing nor the failure to list any party herein will prejudice the Debtors' or Reorganized Debtors' rights to pursue any claims,

rights of action, suits, or proceedings that have arisen or may arise in the future in the ordinary course of the Debtors' or Reorganized Debtors' businesses.

**O.      Retention of Jurisdiction**

Under Sections 105(a) and 1142 of the Bankruptcy Code, and notwithstanding entry of the Confirmation Order and occurrence of the Effective Date, and except as otherwise ordered by the Bankruptcy Court, the Plan provides that the Bankruptcy Court will retain exclusive jurisdiction over all matters arising out of, and related to, the Chapter 11 Case and the Plan to the fullest extent permitted by law, including, among other things, jurisdiction to:

- allow, disallow, determine, liquidate, classify, estimate, or establish the priority or secured or unsecured status of any Claim or Interest not otherwise Allowed under the Plan (other than personal injury or wrongful death Claims, unless agreed by the holder), including the resolution of any request for payment of any Administrative Claim and the resolution of any objections to the allowance or priority of Claims or Interests;

- hear and determine all applications for compensation and reimbursement of expenses of Professionals under the Plan or under Sections 327, 328, 330, 331, 503(b), 1103, or 1129(a)(4) of the Bankruptcy Code; *provided, however,* that from and after the Effective Date, the payment of the fees and expenses of the retained Professionals of the Reorganized Debtors will be made in the ordinary course of business and will not be subject to the approval of the Bankruptcy Court;

- hear and determine all matters with respect to the assumption or rejection of any executory contract or unexpired lease to which a Debtor is a party or with respect to which a Debtor may be liable, including, if necessary, the nature or amount of any required Cure or the liquidation or allowance of any Claims arising therefrom;

- effectuate performance of and payments under the provisions of the Plan;

- hear and determine any and all adversary proceedings, motions, applications, and contested or litigated matters arising out of, under, or related to the Chapter 11 Case or the Litigation Rights;

- enter such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, and other agreements or documents created in connection with the Plan, this Disclosure Statement, or the Confirmation Order;

- hear and determine disputes arising in connection with the interpretation, implementation, consummation, or enforcement of the Plan, including disputes arising under agreements, documents, or instruments executed in connection with the Plan; *provided*, *however*, that any dispute arising under or in connection with the New FiberMark Charter, the New FiberMark By-laws, and the Exit Facility will be dealt with in accordance with the provisions of the applicable document;

- consider any modifications of the Plan, cure any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

- issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any entity with the implementation, consummation, or enforcement of the Plan or the Confirmation Order;

- enter and implement such orders as may be necessary or appropriate if the Confirmation Order is for any reason reversed, stayed, revoked, modified, or vacated;

- hear and determine any matters arising in connection with or relating to the Plan, this Disclosure Statement, the Confirmation Order, or any contract, instrument, release, or other agreement or document created in connection with the Plan, this Disclosure Statement, or the Confirmation Order;

- enforce all orders, judgments, injunctions, releases, exculpations, indemnifications, and rulings entered in connection with the Chapter 11 Case;

- except as otherwise limited, recover all assets of the Debtors and property of the Estates, wherever located;

- hear and determine matters concerning state, local, and federal taxes in accordance with Sections 346, 505, and 1146 of the Bankruptcy Code;

- hear and determine all disputes involving the existence, nature, or scope of the Debtors' discharge;

- hear and determine such other matters as may be provided in the Confirmation Order or as may be authorized under, or not inconsistent with, provisions of the Bankruptcy Code;

- hear and determine any matters arising under the Key Employee Protection Order, the Key Employee Retention Plan, the Key Employee Severance Plan, and the Discretionary Recognition Plan, including, without limitation, any dispute relating to the existence of "Good Reason" under such plans; and

- enter a final decree closing the Chapter 11 Case.

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising in, arising under, or related to the Chapter 11 Case, including the matters set forth in Section 11.1 of the Plan, the provisions of Article XI of the Plan will have no effect upon and will not control, prohibit, or limit the exercise of jurisdiction by any other court having jurisdiction with respect to such matter.

## P.    Amendment, Alteration and Revocation of Plan

The Debtors may alter, amend, or modify the Plan under Section 1127(a) of the Bankruptcy Code at any time prior to the Confirmation Date, except that any alteration, amendment, or modification of a provision of the Plan that refers to, specifically applies to or has any material impact upon GECC's treatment under the Plan will not be effective without the consent of GECC, and except that any alteration, amendment, or modification of the terms of the Constituency Settlement will not be effective without the consent of AIGGIC, Post, and Silver Point. After the Confirmation Date and prior to substantial consummation of the Plan, as defined in Section 1101(2) of the Bankruptcy Code, the Debtors may, under Section 1127(b) of the Bankruptcy Code, with the prior consent of GECC as to any remedy affecting a provision of the Plan that refers to, specifically applies to or has any material impact upon GECC's treatment under the Plan, institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Plan or the Confirmation Order, subject to any prior notice of such proceedings that may be required by the Bankruptcy Rules or order of the Bankruptcy Court.

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of any Debtor, with the consent of GECC as to any such term or provision that refers to, specifically applies to or has any material impact upon GECC's treatment under the Plan, or with the consent of AIGGIC, Post, and Silver Point as to any term or provision that affects the Constituency Settlement, will have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision will then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order will constitute a judicial determination and will provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

The Debtors reserve the right to revoke or withdraw the Plan at any time prior to the Confirmation Date and to file subsequent plans of reorganization. If the Debtors revoke or withdraw the Plan, or if Confirmation or the Effective Date does not occur, then (a) the Plan will be null and void in all respects, (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain for any Claim or Class of Claims), assumption or rejection of executory contracts or leases effected by the Plan, and any document or agreement executed pursuant to the Plan will be deemed null and void, and (c) nothing contained in the Plan, and no acts taken in preparation for consummation of the Plan,

will (i) constitute or be deemed to constitute a waiver or release of any Claims by or against, or any Interests in, any Debtor or any other Person, (ii) prejudice in any manner the rights of any Debtor or any Person in any further proceedings involving a Debtor, or (iii) constitute an admission of any sort by any Debtor or any other Person.

**Q.   Plan Implementing Documents**

The documents necessary to implement the Plan include the following:

- the New FiberMark Charter;

- the New FiberMark By-laws; and

- the documents evidencing the Exit Facility to be obtained by the Reorganized Debtors.

The proposed forms for the New FiberMark Charter and the New FiberMark By-laws are attached as exhibits to the Plan.  A copy of the Commitment Letter with respect to the Exit Facility is attached as Appendix E hereto. The Debtors reserve the right to file a modified or replacement Commitment Letter, if necessary, three days before the Confirmation Hearing.

**R.   Confirmation and/or Consummation**

Described below are certain important considerations under the Bankruptcy Code in connection with confirmation of the Plan.

1.   Requirements for Confirmation of the Plan

Before the Plan can be confirmed, the Bankruptcy Court must determine at the hearing on confirmation of the Plan (the "Confirmation Hearing") that the following requirements for confirmation, set forth in Section 1129 of the Bankruptcy Code, have been satisfied:

- The Plan complies with the applicable provisions of the Bankruptcy Code.

- The Debtors have complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or promised by the Debtors or by a Person issuing securities or acquiring property under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Case, or in connection with the Plan and incident to the Chapter 11 Case, has been disclosed to the Bankruptcy Court, and any such payment made before confirmation of the Plan is reasonable, or if such payment is to be fixed after confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable.

- The Debtors have disclosed (i) the identity and affiliations of (x) any individual proposed to serve, after confirmation of the Plan, as a director, officer, or voting trustee of the Reorganized Debtors, (y) any affiliate of the Debtors participating in a joint plan with the Debtors, or (z) any successor to the Debtors under the Plan (and the appointment to, or continuance in, such office of such individual(s) is consistent with the interests of Claim and Interest holders and with public policy), and (ii) the identity of any insider that will be employed or retained by the Debtors and the nature of any compensation for such insider.

- With respect to each Class of Claims or Interests, each Impaired Claim and Impaired Interest holder either has accepted the Plan or will receive or retain under the Plan, on account of the Claims or Interests held by such holder, property of a value, as of the Effective Date, that is not less than the amount that such holder would receive or retain if the Debtors were liquidated on such date under Chapter 7 of the Bankruptcy Code.  See Section XI.D hereto.

- The Plan provides that Administrative Claims and Priority Claims other than Priority Tax Claims will be paid in full on the Effective Date and that Priority Tax Claims will receive on account of such Claims deferred cash payments, over a period not exceeding six (6) years after the date of assessment of such Claims, of a value, as of the Effective Date, equal to the Allowed Amount of such Claims, except to the extent that the holder of any such Claim has agreed to a different treatment.  <u>See</u> Section VII.F.1 hereto.

- If a Class of Claims is Impaired under the Plan, at least one Class of Impaired Claims has accepted the Plan, determined without including any acceptance of the Plan by insiders holding Claims in such Class.

- Confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors under the Plan, unless such liquidation or reorganization is proposed in the Plan.  <u>See</u> Section XI.A hereto.

- The Plan provides for the continuation after the Effective Date of all retiree benefits, if any, at the level established pursuant to Section 1114(e)(1)(B) or 1114(g) of the Bankruptcy Code at any time prior to confirmation of the Plan, for the duration of the period the Debtors have obligated themselves to provide such benefits.

The Debtors believe that, upon receipt of the votes required to confirm the Plan, the Plan will satisfy all the statutory requirements of chapter 11 of the Bankruptcy Code, that the Debtors have complied or will have complied with all of the requirements of chapter 11, and that the Plan has been proposed and submitted to the Bankruptcy Court in good faith.

2.     Conditions to Confirmation Date and Effective Date

The Plan specifies conditions precedent to the Confirmation Date and the Effective Date.  Each of the specified conditions must be satisfied or waived in whole or in part by the Debtors without any notice to parties-in-interest or the Bankruptcy Court and without a hearing; *provided, however* that such waiver will not be effective with respect to certain conditions without the consent of GECC and/or the lender or the agent for the lenders under the Exit Facility, as the case may be.

The conditions precedent to the occurrence of the Confirmation Date, which is the date of entry by the clerk of the Bankruptcy Court of the Confirmation Order, are that:  (a) an order finding that the Disclosure Statement contains adequate information pursuant to Section 1125 of the Bankruptcy Code will have been entered; and (b) the proposed Confirmation Order will be in form and substance reasonably satisfactory to the Debtors, GECC as the lender under the DIP Facility, and the lender or the agent for the lenders under the Exit Facility.

The conditions that must be satisfied on or prior to the Effective Date, which is the Business Day upon which all conditions to the consummation of the Plan have been satisfied or waived, and is the date on which the Plan becomes effective, are that:  (a) the Confirmation Order will have been entered in form and substance reasonably satisfactory to the Debtors, GECC as the lender under the DIP Facility, and the lender or the agent for the lenders under the Exit Facility, and will, among other things: (i) provide that the Debtors and the Reorganized Debtors are authorized and directed to take all actions necessary or appropriate to enter into, implement, and consummate the contracts, instruments, releases, leases, indentures and other agreements or documents created in connection with the Plan; (ii) approve the Exit Facility; (iii) authorize the issuance of the New Common Stock; (iv) find that the compromises and settlements of the Constituency Causes of Action and Litigation Rights provided for in the Plan as part of the Constituency Settlement are fair and reasonable and within the bounds of reasonableness; find that the releases of the Constituency Causes of Action and Litigation Rights provided for in the Plan as part of the Constituency Settlement are valid and enforceable, find that the Constituency Settlement is binding on the owners of or the Persons with an interest in the Constituency Causes of Action, and approve the Constituency Settlement for all purposes, including Rule 9019 of the Bankruptcy Rules; and (v) provide that notwithstanding Bankruptcy Rule 3020(e), the Confirmation Order will be immediately effective, subject to the terms and conditions of the Plan; (b) the Confirmation Order will not then be stayed, vacated, or reversed; (c) the documents evidencing the Exit Facility will be in form and substance reasonably acceptable to the Debtors and the lender or the agent for the lenders under the Exit Facility, and, to the extent any of such documents contemplates execution by one or more persons, any such document will have been executed and delivered by the respective parties thereto, and all conditions precedent to the effectiveness of each such document will have been satisfied or waived; (d) the New FiberMark Charter and the New FiberMark By-laws will have

been executed and delivered by the respective parties thereto, and all conditions precedent to the effectiveness of each such document will have been satisfied or waived; (e) the Debtors will have determined that the number of record holders of New Common Stock as of the Effective Date will be less than 300; (f) all material authorizations, consents, and regulatory approvals required, if any, in connection with consummation of the Plan will have been obtained; (g) the Debtors will have received the funds necessary to implement the Plan as contemplated by the Plan; and (h) all material actions, documents, and agreements necessary to implement the Plan will have been effected or executed.

        3.    Anticipated Effective Date

The length of time between a confirmation date and an effective date varies from case to case and depends upon how long it takes to satisfy each of the conditions precedent to the occurrence of the effective date specified in the particular plan of reorganization. Under the Debtors' Plan, of the conditions precedent set forth above, the time necessary to satisfy the condition relating to the Exit Facility is most likely to dictate the Debtors' Effective Date. Although the Debtors will move as quickly as possible to put in place their Exit Facility and satisfy all of the other conditions precedent, it may take from two to six weeks or longer, particularly with the intervening holiday season, to close the transaction and trigger the Effective Date. Therefore, it is possible that, although the Debtors expect a Confirmation Date before the end of 2005, the Effective Date may not occur until the beginning of 2006.

## VIII.    CERTAIN RISK FACTORS TO BE CONSIDERED

The holders of Claims in Classes 4, 5, 6, 7, 8, 9, and 10 should read and carefully consider the following factors, as well as the other information set forth in this Disclosure Statement (and the documents delivered together herewith and/or incorporated by reference herein), before deciding whether to vote to accept or reject the Plan. These risk factors should not, however, be regarded as constituting the only risks associated with the Plan and its implementation.

### A.    General Considerations

The Plan sets forth the means for satisfying the Claims against each of the Debtors. Certain Claims and Interests receive no distributions pursuant to the Plan. Nevertheless, reorganization of the Debtors' businesses and operations under the proposed Plan avoids the potentially adverse impact of a liquidation on the Debtors' customers, suppliers, employees, communities, and other stakeholders.

### B.    Certain Bankruptcy Considerations

Even if all voting Impaired Classes vote in favor of the Plan, and if with respect to any Impaired Class deemed to have rejected the Plan the requirements for "cramdown" are met, the Bankruptcy Court, which, as a court of equity, may exercise substantial discretion, may choose not to confirm the Plan. Section 1129 of the Bankruptcy Code requires, among other things, a showing that confirmation of the Plan will not be followed by liquidation or the need for further financial reorganization of the Debtors, see Section XI.A hereto, and that the value of distributions to dissenting holders of Claims and Interests will not be less than the value such holders would receive if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code. See Section XI.D hereto. Although the Debtors believe that the Plan will meet such tests, there can be no assurance that the Bankruptcy Court will reach the same conclusion. See Appendix D hereto for a liquidation analysis of the Debtors.

If the Plan is not confirmed by the Court, it is unclear whether a restructuring of the Debtors could be implemented and what distributions holders of Claims or Interests ultimately would receive with respect to their Claims or Interests. If a liquidation or protracted reorganization were to occur, there is a significant risk that the value of the Debtors' enterprise would be substantially eroded to the detriment of all stakeholders.

The Debtors' future results are dependent upon the successful confirmation and implementation of a plan of reorganization. Failure to obtain this approval in a timely manner could adversely affect the Debtors' operating results, as the Debtors' ability to obtain financing to fund their operations and their relations with customers and suppliers may be harmed by protracted bankruptcy proceedings. Furthermore, the Debtors cannot predict the ultimate amount of all settlement terms for their liabilities that will be subject to a plan of reorganization. Once a plan of reorganization is approved and implemented, the Debtors' operating results may be adversely affected by the possible reluctance of prospective lenders, customers, and suppliers to do business with a company that recently emerged from bankruptcy proceedings.

## C. Claims Estimations

The Debtors reserve the right to object to the amount or classification of any Claim or Interest except any such Claim or Interest that is deemed Allowed under the Plan or except as otherwise provided in the Plan. There can be no assurance that any estimated Claim amounts set forth in this Disclosure Statement are correct. The actual Allowed amount of Claims likely will differ in some respect from the estimates. The estimated amounts are subject to certain risks, uncertainties, and assumptions. Should one or more of these risks or uncertainties materialize, or should the underlying assumptions prove incorrect, the actual Allowed amount of Claims may vary from those estimated herein.

## D. Conditions Precedent to Consummation; Timing

The Plan provides for certain conditions that must be satisfied (or waived) prior to the Confirmation Date and for certain other conditions that must be satisfied (or waived) prior to the Effective Date. As of the date of this Disclosure Statement, there can be no assurance that any or all of the conditions in the Plan will be satisfied (or waived). Accordingly, even if the Plan is confirmed by the Bankruptcy Court, there can be no assurance that the Plan will be consummated and the restructuring completed.

The Effective Date will occur after the Confirmation Date, when the conditions precedent to the occurrence of the Effective Date are satisfied. The Effective Date may not actually occur for two to six weeks or longer after the Confirmation Date, particularly with the intervening holiday season. Therefore, it is possible that, although the Debtors expect a Confirmation Date before the end of 2005, the Effective Date may not occur until the beginning of 2006.

## E. Inherent Uncertainty of Financial Projections

The Projections set forth in Appendix B hereto cover the operations of the Reorganized Debtors through fiscal year 2009. These Projections are based on numerous assumptions that are an integral part of the Projections, including confirmation and consummation of the Plan in accordance with its terms; realization of the operating strategy of the Reorganized Debtors; industry performance; no material adverse changes in applicable legislation or regulations, or the administration thereof, including environmental legislation or regulations, exchange rates, or generally accepted accounting principles; general business and economic conditions; competition; retention of key management and other key employees; expected investment returns on pension assets; adequate financing; absence of material contingent or unliquidated litigation, indemnity, or other claims; and other matters, many of which will be beyond the control of the Reorganized Debtors and some or all of which may not materialize.

To the extent that the assumptions inherent in the Projections are based upon future business decisions and objectives, they are subject to change. In addition, although they are presented with numerical specificity and are based on assumptions considered reasonable by the Debtors, the assumptions and estimates underlying the Projections are subject to significant business, economic, and competitive uncertainties and contingencies, many of which will be beyond the control of the Reorganized Debtors. Accordingly, the Projections are only estimates and are necessarily speculative in nature. It can be expected that some or all of the assumptions in the Projections will not be realized and that actual results will vary from the Projections, which variations may be material and are likely to increase over time. In light of the foregoing, readers are cautioned not to place undue reliance on the Projections. The projected financial information contained herein should not be regarded as a representation or warranty by the Debtors, the Debtors' advisors, or any other Person that the Projections can or will be achieved.

## F. Certain Risk Factors Relating to Securities to be Issued Under the Plan

### 1. *No Current Public Market for Securities; Certain Restrictions on Transfer*

The New Common Stock to be issued pursuant to the Plan are securities for which there is currently no trading market and no assurance can be given that such a trading market will develop following the Effective Date or, if the trading market for such securities develops, no assurance can be given as to the liquidity of such a trading market. If a market were to develop, the New Common Stock could trade at prices lower than the estimated value set forth in this Disclosure Statement. The trading prices of such securities will depend on many factors, including factors beyond Reorganized FiberMark's control. Furthermore, the liquidity of, and trading market for, the New Common Stock may be adversely affected by price declines and volatility in the markets for similar securities, as well as by changes in Reorganized FiberMark's financial condition or results of operations. In addition, the provisions of the New FiberMark Charter will

restrict the right of holders of the New Common Stock to sell, assign, transfer or otherwise dispose of shares of New Common Stock if as a result of the sale, assignment, transfer or other disposition the record number of holders of the New Common Stock (as determined in accordance with Rule 12g5-1 under the Securities Exchange Act of 1934, as amended or any successor rule or interpretation) would exceed 275 before January 1, 2006 and 450 thereafter. These restrictions are being imposed so that Reorganized FiberMark would not have such number of stockholders as would require the New Common Stock to be registered under the Securities Exchange Act of 1934, as amended. The restrictions will be of no further force and effect from and after such time as the New Common Stock becomes registered under the Securities Exchange Act of 1934, as amended. Such restrictions could have an adverse impact on prevailing trading prices for the New Common Stock or upon the liquidity of any trading market that develops for the New Common Stock.

In addition, while FiberMark currently files annual, quarterly and current reports, proxy statements, and other information with the SEC, the Plan contemplates that, from and after the Effective Date, or as soon thereafter as Reorganized FiberMark practically is able to make the appropriate filings with the SEC, Reorganized FiberMark will cease filing such public reports and the New Common Stock will not be quoted for trading on any national interdealer quotation system or listed for trading on any national securities exchange. Although Reorganized FiberMark will be obligated, under the terms of the New FiberMark Charter, to continue to provide certain financial and other information to stockholders, such information will not be as extensive as that required by companies that file public reports with the SEC. As a consequence, holders of the New Common Stock may find it difficult to effect trades in the New Common Stock, current information about Reorganized FiberMark and price quotes for the New Common Stock may be hard to obtain, and the liquidity of the New Common Stock may be severely adversely affected.

Holders of Claims who receive New Common Stock and who are deemed to be "underwriters" as defined in Section 1145(b) of the Bankruptcy Code, or who are otherwise deemed to be "affiliates" or "control persons" of Reorganized FiberMark within the meaning of the Securities Act, will be unable to transfer or sell shares of New Common Stock freely after the Effective Date, except pursuant to an available exemption from registration under the Securities Act and under equivalent state securities or "blue sky" laws or pursuant to an effective registration of such shares under the Securities Act. Reorganized FiberMark does not intend to file a registration statement covering the New Common Stock.

2. *Potential Dilution Caused by Options or Warrants*

If options or warrants to purchase the New Common Stock are exercised, or other equity interests are granted under the New Equity Incentive Plan, or the Board of Reorganized FiberMark issues equity securities in the future, including as the result of the need to issue additional shares due to a shortfall in the Common Stock Reserve, such equity interests will dilute the ownership percentage represented by the New Common Stock authorized for distribution under the Plan. If any of the options or warrants issued under the Plan are exercised, the resulting issuance of New Common Stock will dilute the ownership percentage represented by the New Common Stock distributed under the Plan.

In the future, additional equity financings or other share issuances by Reorganized FiberMark could adversely affect the market price of the New Common Stock. Sales by existing holders of a large number of shares of the New Common Stock in the public market, or the perception that additional sales could occur, could cause the market price of the New Common Stock to decline. If additional shares of New Common Stock are issued, as will be permitted by Reorganized FiberMark's charter, such equity interests will dilute the ownership percentage represented by the New Common Stock distributed under the Plan.

3. *Dividends*

Because all of the Debtors' cash flows will be used in the foreseeable future to either make payments under the Exit Facility, or for working capital purposes, the Debtors do not anticipate that cash dividends or other distributions will be paid with respect to the New Common Stock in the foreseeable future. In addition, restrictive covenants in certain debt instruments to which Reorganized FiberMark will be a party, including the Exit Facility, may limit the ability of Reorganized FiberMark to pay dividends.

4. *Change of Control*

The New FiberMark Charter and New FiberMark By-laws may contain, and the Delaware General Corporation Law contains, provisions that may have the effect of delaying, deterring, or preventing a change in control of Reorganized FiberMark.

5. *Significant Holder*

If the transactions contemplated by the Plan are consummated, the holders of the FiberMark Notes will receive all or substantially all of the New Common Stock. Based upon their understanding of current holdings of FiberMark Notes, the Debtors expect that Silver Point will be issued more than 50% of the New Common Stock to be distributed under the Plan and, accordingly, it will have the ability to elect a majority of the members of the New Board and may have the ability to control the outcome of matters presented to a vote of the holders of the New Common Stock.

6. *Section 16 Liability*

While Reorganized FiberMark intends to terminate its public reporting obligations under the federal securities laws as soon as practicable on or after the Effective Date, Reorganized FiberMark will nonetheless remain subject to the federal securities laws for a period of approximately ninety (90) days after such filing. As a result, during such ninety (90) day period Reorganized FiberMark will continue to be subject to Section 12(g) of the Securities Act and accordingly, the holders of the New Common Stock will continue to be subject to the reporting and short-swing profit recapture rules under Section 16 of the Securities Act until the public reporting obligations are effectively terminated.

7. *Restrictions on Transfer*

The New Common Stock will be distributed pursuant to the Plan without registration under the Securities Act and without qualification or registration under state securities laws, pursuant to exemptions from such registration and qualification contained in Section 1145 of the Bankruptcy Code. These Bankruptcy Code exemptions apply only to the distribution of such securities under the Plan and not to any subsequent sale, exchange, transfer or other disposition of such securities or any interest therein by Persons who constitute "underwriters" or "issuers", as such terms are defined pursuant to Section 1145 of the Bankruptcy Code, and each such subsequent sale, exchange, transfer or other disposition would require registration under the Securities Act or state securities laws unless another exemption from registration were available.

Holders of New Common Stock who are deemed to be "underwriters" as defined in Section 1145(b) of the Bankruptcy Code, including holders who are deemed to be "affiliates" or "control persons" within the meaning of the Securities Act, will be unable to transfer or to sell their securities freely except pursuant to (i) "ordinary trading transactions" by a holder that is not an "issuer" within the meaning of Section 1145(b), (ii) an effective registration of such securities under the Securities Act and under equivalent state securities or "blue sky" laws or (iii) pursuant to the provisions of Rule 144 under the Securities Act or another available exemption from registration requirements.

As stated above, the shares of New Common Stock will be subject to certain transfer restrictions set forth in the New FiberMark Charter. These provisions will restrict the right of holders of the New Common Stock to sell, assign, transfer or otherwise dispose of shares of New Common Stock if as a result of the sale, assignment, transfer or other disposition the record number of holders of the New Common Stock (as determined in accordance with Rule 12g5-1 under the Securities Exchange Act of 1934, as amended or any successor rule or interpretation) would exceed 275 before January 1, 2006 and 450 thereafter. These restrictions are being imposed so that Reorganized FiberMark would not have such number of stockholders as would require the New Common Stock to be registered under the Securities Exchange Act of 1934, as amended. The restrictions will be of no further force and effect from and after such time as the New Common Stock becomes registered under the Securities Exchange Act of 1934, as amended. Such restrictions could have an adverse impact on prevailing trading prices for the New Common Stock or upon the liquidity of any trading market that develops for the New Common Stock.

## G. Competition

Like the Debtors, the Reorganized Debtors will face intense competition, which could harm their financial condition and results of operations. Principal competitors include a small number of paper and specialty paper manufacturers. Additionally, the Reorganized Debtors will compete with producers of nonwoven materials, vinyl, plastic, and other substitute materials and technologies. Some of these competitive options may be lower priced, lower quality, or offer other advantages. Consequently, short-term or structural declines in sales may result. Some of these producers have substantially greater resources than will the Reorganized Debtors. Further concentration of competitors through mergers and acquisitions may increase their competitive advantage. In addition, some customers have the internal ability to process some or all of the materials they buy, and have in the past elected to do so. To the extent customers elect to do so in the future, the Reorganized Debtors' business could suffer. Industry and market-specific capacity levels can also affect competitive

behavior and adversely impact pricing levels. Increased concentration of buying power in certain large direct or indirect customers can have similar effects.

## H.  Raw Materials

The Debtors' principal raw materials, hardwood and softwood pulp and secondary fiber and latex, are cyclical in both price and supply. The cyclical nature of pulp pricing presents a potential risk to the Reorganized Debtors' gross profit margins because they may not be able to pass along price increases to customers. The Reorganized Debtors may also be unable to purchase pulp in sufficient quantities, or at acceptable prices, to meet their production requirements during times of tight supply.

In addition, DuPont is the sole source of Tyvek®, a critical component in the Debtors' binding tapes. A significant price increase or any material limitation or interruption in the Reorganized Debtors' supply of key raw materials, including pulp, Tyvek®, or latex, particularly if they are unable to pass those increases through to customers, could harm their financial condition, results of operations, and competitive position.

## I.  Market Conditions

The markets for the Debtors' products are variable and are influenced to a significant degree by the global economic activity and fluctuations in customer demand and inventory levels. Downturns in global economic conditions and decreased demand for specialty fiber-based materials could have a material adverse effect on the Reorganized Debtors' financial condition and results of operations. Efforts to find new high growth, high margin product lines to offset the effects of market shrinkage or slow growth in mature markets may not succeed. Achieving further market share gains in markets where the Debtors already have strong market positions may be difficult.

## J.  Seasonality

Historically, the Debtors' business has been mildly seasonal, with the second half of each year typically having a lower level of net sales and operating income. This seasonality has been the result of summer manufacturing shutdowns and the impact of year-end holidays.

## K.  Environmental and Other Regulations

The Debtors' operations and properties are subject to a wide variety of foreign, federal, state, and local laws and regulations, including those governing the use, storage, handling, generation, treatment, emission, release, discharge, and disposal of various materials, substances, and wastes, the remediation of contaminated soil and groundwater, and the health and safety of employees. Such regulations can restrict the Reorganized Debtors' operations, and expose them to claims and other liabilities with respect to environmental protection, remediation, and health and safety matters. The Reorganized Debtors could incur, and have historically incurred, material costs or other liabilities in connection with such regulations or claims. In addition, future events, such as new information, changes in environmental or health and safety laws or regulations or their interpretation, and more vigorous enforcement policies of regulatory agencies, may result in significant additional expenditures, liabilities, or restrictions that could harm the financial condition, results of operations, and competitive position of the Reorganized Debtors.

## L.  Reliance on Key Personnel

### 1.  *Reliance on Key Personnel*

The Debtors operate a business that is highly dependent on skilled employees. A loss of a significant number of key managers or skilled employees could have a material adverse effect on the Reorganized Debtors and may threaten their ability to survive as going concerns.

The Debtors' successful transition through the restructuring process is dependent in part on their ability to retain and motivate their key employees. There can be no assurance that the Debtors will be able to retain and employ qualified management and technical personnel. The Debtors obtained Bankruptcy Court authorization to implement new retention and severance plans designed to retain certain of their key employees. To date, the plans have had their intended

effect, but there is no guarantee that their effectiveness will continue or that the post-restructuring environment will not introduce new risks to employee retention. See Section VI.F.1 hereto.

Future compensation and benefits will be determined by the Debtors' new Board of Directors, which may elect to exercise any existing rights of termination and/or amendment under employee compensation or benefit plans. Any reduction in compensation or benefits and/or other action by the Debtors' new Board of Directors that has the effect of decreasing the competitiveness of compensation offered to employees may increase the possibility that employees, including the key employees, will seek other employment. Employee departures could have a significant negative impact upon the Debtors' business and, in turn, lead to a reduction in the value of the New Common Stock.

2. *Labor Unions*

A large proportion of the Debtors' workforce is represented by labor unions. In addition, the Debtors may from time to time experience union organizing activities in currently non-union facilities. Disputes with the current labor organizations or new union organizing activities may result in work slowdowns or stoppages or higher labor costs. A work slowdown or stoppage in any one of the Debtors' facilities could slow or halt production at that facility and at any other facility which depends on that facility for its material. As a result, meeting scheduled delivery times for customers could be difficult or impossible, which, in turn, could result in loss of business.

## M.    Risks Related to Foreign Operations

The Debtors' international business relationships and exports to foreign markets will make the Reorganized Debtors subject to a number of special risks such as: currency exchange rate fluctuations; foreign economic conditions; trade barriers; exchange controls; national and regional labor strikes; political risks and risks of increases in duties; taxes; governmental royalties; and changes in laws and policies governing operations of foreign-based companies. The occurrence of any one or a combination of these factors may increase the costs of the Reorganized Debtors or have other negative effects.

## N.    Leverage

The Debtors believe that they will emerge from chapter 11 with a reasonable level of debt that can be effectively serviced. However, they may find that they are over leveraged, which could have significant negative consequences, including:

- it may become more difficult for the Reorganized Debtors to satisfy their obligations with respect to all of their indebtedness;

- the Reorganized Debtors may be vulnerable to a downturn in the industries in which they operate or a downturn in the economy in general;

- the Reorganized Debtors may be required to dedicate a substantial portion of their cash flow from operations to fund working capital, capital expenditures, and other general corporate requirements;

- the Reorganized Debtors may be limited in their flexibility to plan for, or react to, changes in their businesses and the industry in which they operate;

- the Reorganized Debtors may be placed at a competitive disadvantage compared to their competitors that have less debt; and

- the ability of the Reorganized Debtors to borrow additional funds may be limited.

The covenants in the Exit Facility may also restrict the Reorganized Debtors' flexibility. Such covenants may place restrictions on the ability of the Reorganized Debtors to incur indebtedness; pay dividends and make other restricted payments or investments; sell assets; make capital expenditures; engage in certain mergers and acquisitions; and refinance existing indebtedness.

Additionally, there may be factors beyond the control of the Reorganized Debtors that could impact their ability to meet debt service requirements. The ability of the Reorganized Debtors to meet debt service requirements will depend on their future performance, which, in turn, will depend on conditions in the global markets for their products, the global economy generally, and other factors that are beyond their control. The Debtors can provide no assurance that the businesses of the Reorganized Debtors will generate sufficient cash flow from operations or that future borrowings will be available in amounts sufficient to enable the Reorganized Debtors to pay their indebtedness or to fund their other liquidity needs. Moreover, the Reorganized Debtors may need to refinance all or a portion of their indebtedness on or before maturity. The Debtors cannot make assurances that the Reorganized Debtors will be able to refinance any of their indebtedness on commercially reasonable terms or at all. If the Reorganized Debtors are unable to make scheduled debt payments or comply with the other provisions of their debt instruments, their various lenders will be permitted under certain circumstances to accelerate the maturity of the indebtedness owing to them and exercise other remedies provided for in those instruments and under applicable law.

**O.     Litigation**

The Reorganized Debtors will be subject to various claims and legal actions arising in the ordinary course of their businesses. The Debtors are not able to predict the nature and extent of any such claims and actions and cannot guarantee that the ultimate resolution of such claims and actions will not have a material adverse effect on the Reorganized Debtors.

**P.     Adverse Publicity**

Adverse publicity or news coverage relating to the Reorganized Debtors, in connection with the Chapter 11 Case, may negatively impact the Debtors' efforts to establish and promote name recognition and a positive image after the Effective Date.

**Q.     Certain Tax Considerations**

There are a number of income tax considerations, risks, and uncertainties associated with consummation of the Plan. Interested parties should read carefully the discussions set forth in Article X of this Disclosure Statement regarding certain U.S. federal income tax consequences of the transactions proposed by the Plan to the Debtors and the Reorganized Debtors and to holders of Claims who are entitled to vote to accept or reject the Plan.

## IX.     APPLICABILITY OF FEDERAL AND OTHER SECURITIES LAWS

The Debtors believe that, subject to certain exceptions described below, various provisions of the Securities Act, the Bankruptcy Code, and state securities laws exempt from federal and state securities registration requirements (a) the offer and the sale of such securities pursuant to the Plan and (b) subsequent transfers of such securities.

**A.     Offer and Sale of New Securities:  Bankruptcy Code Exemption**

Holders of Allowed Noteholder Claims and Allowed General Unsecured Claims will receive shares of New Common Stock pursuant to the Plan. Section 1145(a)(1) of the Bankruptcy Code exempts the offer or sale of securities under a plan of reorganization from registration under Section 5 of the Securities Act and state laws if three principal requirements are satisfied: (1) the securities must be issued "under a plan" of reorganization by the debtor or its successor under a plan or by an affiliate participating in a joint plan of reorganization with the debtor; (2) the recipients of the securities must hold a pre-petition or administrative expense claim against the debtor or an interest in the debtor; and (3) the securities must be issued entirely in exchange for the recipient's claim against or interest in the debtor, or "principally" in such exchange and "partly" for cash or property. In reliance upon this exemption, the Debtors believe that the offer and sale of the New Common Stock under the Plan will be exempt from registration under the Securities Act and state securities laws. In addition, the Debtors will seek to obtain, as part of the Confirmation Order, a provision confirming such exemption

FiberMark files annual, quarterly and current reports, proxy statements and other information with the SEC, which documents are available for inspection and copying at the public reference room of the SEC and are also available from the SEC's Web site at www.sec.gov. The Plan contemplates that from and after the Effective Date, or as soon as practicable thereafter, Reorganized FiberMark will cease filing such public reports. In addition, from and after the Effective Date, the New Common Stock will no longer be quoted for trading on any national interdealer quotation system or listed for

trading on any national securities exchange, and as a consequence holders of the New Common Stock may find it difficult to effect trades in the New Common Stock, price quotes for the New Common Stock may be hard to obtain, and the liquidity of the New Common Stock may be severely adversely effected. In addition, the provisions of the New FiberMark Charter will restrict the right of holders of the New Common Stock to sell, assign, transfer or otherwise dispose of shares of New Common Stock if as a result of the sale, assignment, transfer or other disposition the record number of holders of the New Common Stock (as determined in accordance with Rule 12g5-1 under the Securities Exchange Act of 1934, as amended or any successor rule or interpretation) would exceed 275 before January 1, 2006 and 450 thereafter. These restrictions are being imposed so that Reorganized FiberMark would not have such number of stockholders as would require the New Common Stock to be registered under the Securities Exchange Act of 1934, as amended. The restrictions will be of no further force and effect from and after such time as the New Common Stock becomes registered under the Securities Exchange Act of 1934, as amended. Other than as so restricted, the New Common Stock may be resold without registration under the Securities Act or other federal securities laws pursuant to an exemption provided by Section 4(1) of the Securities Act, unless the holder is an "underwriter" (see discussion below) with respect to such securities, as that term is defined under the Bankruptcy Code. In addition, such securities generally may be resold without registration under state securities or "blue sky" laws pursuant to various exemptions provided by the respective laws of the several states. However, recipients of securities issued under the Plan are advised to consult with their own legal advisors as to the availability of any such exemption from registration under state law in any given instance and as to any applicable requirements or conditions to such availability.

## B.    Subsequent Transfers of New Securities

Section 1145(b) of the Bankruptcy Code defines the term "underwriter" for purposes of the Securities Act as one who, except with respect to "ordinary trading transactions" of an entity that is not an "issuer," (1) purchases a claim against, interest in, or claim for an administrative expense in the case concerning, the debtor, if such purchase is with a view to distributing any security received in exchange for such a claim or interest; (2) offers to sell securities offered or sold under a plan for the holders of such securities; (3) offers to buy securities offered or sold under the plan from the holders of such securities, if the offer to buy is: (a) with a view to distribution of such securities and (b) under an agreement made in connection with the plan, with the consummation of the plan, or with the offer or sale of securities under the plan; or (4) is an "issuer" with respect to the securities, as the term "issuer" is defined in Section 2(11) of the Securities Act.

The term "issuer" is defined in Section 2(4) of the Securities Act. However, the reference contained in Section 1145(b)(1)(D) of the Bankruptcy Code to Section 2(11) of the Securities Act purports to include as statutory underwriters all persons who, directly or indirectly, through one or more intermediaries, control, are controlled by, or are under common control with, an issuer of securities. "Control" (as such term is defined in Rule 405 of Regulation C under the Securities Act) means the possession, direct or indirect, of the power to direct or cause the direction of the policies of a person, whether through the ownership of voting securities, by contract, or otherwise. Accordingly, an officer or director of a reorganized debtor (or its successor) under a plan of reorganization may be deemed to be a "control person," particularly if such management position is coupled with the ownership of a significant percentage of the debtor's (or successor's) voting securities. Moreover, the legislative history of Section 1145 of the Bankruptcy Code suggests that a creditor who owns at least 10% of the securities of a reorganized debtor may be presumed to be a "control person."

To the extent that persons deemed to be "underwriters" receive New Common Stock pursuant to the Plan, resales by such persons would not be exempted by Section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Such persons would not be permitted to resell such New Common Stock unless such securities were registered under the Securities Act or an exemption from such registration requirements were available. Entities deemed to be statutory underwriters for purposes of Section 1145 of the Bankruptcy Code may, however, be able, at a future time and under certain conditions, to sell securities without registration pursuant to the resale provisions of Rule 144 and Rule 144A under the Securities Act.

There can be no assurance that an active market for any of the securities to be distributed under the Plan will develop and no assurance can be given as to the prices at which they might be traded.

Pursuant to the Plan, certificates evidencing shares of New Common Stock received by a holder of 10% of the New Common Stock will bear a legend substantially in the form below:

THE SECURITIES EVIDENCED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER THE SECURITIES LAWS OF ANY STATE OR OTHER

JURISDICTION AND MAY NOT BE SOLD, OFFERED FOR SALE, OR OTHERWISE TRANSFERRED UNLESS REGISTERED OR QUALIFIED UNDER SAID ACT AND APPLICABLE STATE SECURITIES LAWS OR UNLESS THE COMPANY RECEIVES AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO IT THAT SUCH REGISTRATION OR QUALIFICATION IS NOT REQUIRED.

Whether or not any particular person would be deemed to be an "underwriter" with respect to the New Common Stock to be issued pursuant to the Plan, or an "affiliate" of Reorganized FiberMark, would depend upon various facts and circumstances applicable to that person. Accordingly, the Debtors express no view as to whether any such person would be such an "underwriter" or "affiliate." **Persons who receive New Common Stock under the Plan are urged to consult their own legal advisor with respect to the restrictions applicable under Rule 144 and the circumstances under which shares may be sold in reliance upon such Rule.**

THE FOREGOING SUMMARY DISCUSSION IS GENERAL IN NATURE AND HAS BEEN INCLUDED IN THIS DISCLOSURE STATEMENT SOLELY FOR INFORMATIONAL PURPOSES. THE DEBTORS MAKE NO REPRESENTATIONS CONCERNING, AND DO NOT HEREBY PROVIDE, ANY OPINIONS OR ADVICE WITH RESPECT TO THE NEW COMMON STOCK OR THE BANKRUPTCY MATTERS DESCRIBED HEREIN. IN LIGHT OF THE UNCERTAINTY CONCERNING THE AVAILABILITY OF EXEMPTIONS FROM THE RELEVANT PROVISIONS OF FEDERAL AND STATE SECURITIES LAWS, THE DEBTORS ENCOURAGE EACH CREDITOR AND PARTY-IN-INTEREST TO CONSIDER CAREFULLY AND CONSULT WITH ITS OWN LEGAL ADVISORS WITH RESPECT TO ALL SUCH MATTERS. BECAUSE OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A PARTICULAR HOLDER MAY BE AN UNDERWRITER, THE DEBTORS MAKE NO REPRESENTATION CONCERNING THE ABILITY OF A PERSON TO DISPOSE OF THE NEW COMMON STOCK.

## X. CERTAIN U.S. FEDERAL TAX CONSEQUENCES OF THE PLAN

### A. General

The following discussion summarizes certain anticipated U.S. federal income tax consequences of the Plan to the Debtors and certain holders of claims that are entitled to vote to accept or reject the Plan (other than AIGGIC, Post, and Silver Point). This summary is provided for information purposes only and is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), Treasury regulations promulgated thereunder, judicial authorities, and current administrative rulings and practice, all as in effect as of the date hereof and all of which are subject to change, possibly with retroactive effect, that could adversely affect the U.S. federal income tax consequences described below.

This summary does not address all aspects of U.S. federal income taxation that may be relevant to a particular holder of a Claim in light of its particular facts and circumstances or to certain types of holders of Claims subject to special treatment under the Tax Code (for example, non-U.S. taxpayers, financial institutions, broker-dealers, life insurance companies, tax-exempt organizations, persons holding a Claim as part of a hedging, integrated, constructive sale or straddle transaction and those holding claims through a partnership or other passthrough entity). In addition, this summary does not discuss any aspects of state, local, or non-U.S. taxation and does not address the U.S. federal income tax consequences to holders of Claims that are unimpaired under the Plan or holders of Claims that are not entitled to receive or retain any property under the Plan.

A substantial amount of time may elapse between the date of this Disclosure Statement and the receipt of a final distribution under the Plan. Events occurring after the date of this Disclosure Statement, such as additional tax legislation, court decisions, or administrative changes, could affect the U.S. federal income tax consequences of the Plan and the transactions contemplated thereunder. No ruling will be sought from the Internal Revenue Service (the "IRS") with respect to any of the tax aspects of the Plan, and no opinion of counsel has been or will be obtained by the debtors with respect thereto.

TO ENSURE COMPLIANCE WITH TREASURY DEPARTMENT CIRCULAR 230, EACH HOLDER IS HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF U.S. FEDERAL TAX ISSUES IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE RELIED UPON, AND CANNOT BE RELIED UPON, BY ANY HOLDER FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON A HOLDER UNDER THE TAX CODE; (B) SUCH DISCUSSION IS INCLUDED HEREBY BY THE DEBTORS IN CONNECTION WITH THE PROMOTION OR MARKETING (WITHIN THE MEANING OF CIRCULAR 230) BY THE DEBTORS OF THE

TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) EACH HOLDER SHOULD SEEK ADVICE BASED ON ITS PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

**B.     U.S. Federal Income Tax Consequences to the Debtors**

1.     Cancellation of Indebtedness Income

Under the Tax Code, a U.S. taxpayer generally must include in gross income the amount of any indebtedness that is cancelled during the taxable year ("COD").  COD income generally equals the difference between the principal amount of the indebtedness discharged and the sum of (i) the amount of cash and (ii) the fair market value of any other property transferred in satisfaction of such discharged indebtedness by the debtor.  COD income also includes any interest that has been previously accrued and deducted but remains unpaid at the time the indebtedness is discharged.  It is likely that the Debtors will realize a significant amount of COD income upon the satisfaction of the Impaired Claims pursuant to the Plan.

The Debtors will not be required to include such COD income in gross income, however, because the indebtedness will be discharged while the Debtors are under the jurisdiction of a court in a Title 11 case.  Instead, the Debtors will be required to reduce certain tax attributes (e.g., net operating losses ("NOLs"), capital loss carryovers, general business credit carryovers, foreign tax credit carryovers and tax basis in property (collectively, "Tax Attributes")) by the amount of the COD income realized.  To the extent that the amount of COD income realized by the Debtors exceeds the Tax Attributes available for reduction, the remaining COD income will have no effect for U.S. federal income tax purposes.  The Debtors are permitted to elect to reduce the basis of their depreciable property prior to any reduction of NOLs or other tax attributes; however, they have not yet determined whether to make such election.  The reduction in Tax Attributes will occur on the first day of the taxable year following the realization of such COD income.

2.     Utilization of NOLs and Net Unrealized Built-in Losses

The Debtors estimate that the consolidated group of which the Debtors are members for U. S. federal income tax purposes had consolidated NOL carryforwards of approximately $120 million as of the taxable year ending December 31, 2004, and anticipate having consolidated NOL carryforwards of approximately $135 million as of the end of the taxable year ending December 31, 2005.  It should be noted that these amounts are estimates.  The amount of NOLs available to the Debtors is based on factual and legal issues with respect to which there can be no certainty.  Moreover, a substantial portion of the Debtors' consolidated NOL carryovers will likely be eliminated as a result of the reduction of Tax Attributes described above in Section X.B.1.  Additionally, as described below, the Debtors' ability to utilize any NOL carryovers not so eliminated will likely be limited in the taxable years after the Effective Date.  The Debtors' ability to utilize certain other Tax Attributes, including foreign tax credit carryforwards, remaining after the Effective Date also will likely be limited.

In general, when a corporation (or an affiliated group) undergoes an "ownership change," which the Debtors will undergo as a result of the consummation of the Plan, Section 382 of the Tax Code ("Section 382") limits the corporation's ability to utilize its NOL carryovers.  Although corporations that undergo an ownership change in connection with a bankruptcy proceeding are not subject to Section 382 of the Tax Code under certain circumstances (the "Bankruptcy Exception"), the Debtors believe that they will not be eligible for, or even if eligible, will choose to elect out of, the Bankruptcy Exception.  Thus, to the extent that the Debtors have any NOL carryovers that are not eliminated as a result of the reduction of Tax Attributes described above in Section X.B.1, the Debtors' ability to utilize such NOLs will be limited under Section 382 following the Effective Date.  Section 382 generally places an annual limitation on a corporation's use of NOLs equal to the product of the value of the stock of the loss corporation, determined in the manner described below, and the applicable "long-term tax-exempt rate" (currently 4.24% for ownership changes occurring in October, 2005) (the "Annual Section 382 Limitation"), which limitation may be increased by the amount of certain "built-in gains" recognized during the five years following the ownership change.  Although not free from doubt, the Debtors expect to have a net unrealized built-in gain at the Effective Date, in which case the Annual Section 382 Limitation would be increased to the extent that any such built-in gains are recognized during such five year period.  The aggregate increase in the Annual Section 382 Limitation resulting from the recognition of such built-in gains generally is limited to the amount of the Debtors' net unrealized built-in gain on the Effective Date.  For purposes of determining the Debtors' Annual Section 382 Limitation, the value of the stock of FiberMark generally will be calculated by reference to the lesser of (i) the value of FiberMark's stock immediately after the Effective Date or (ii) the value of the Debtors' assets (determined without regard to liabilities) immediately before the

Effective Date. The Debtors' ability to utilize NOLs may be further limited under other Tax Code provisions such as the alternative minimum tax provisions.

**C.     U.S. Federal Income Tax Consequences to Claim Holders**

1.     Accrued But Unpaid Interest

FiberMark intends to take the position that no portion of the consideration distributed to holders of Claims is allocable to accrued but unpaid interest, and the remainder of this discussion assumes that this will be the case. However, the manner in which amounts paid in respect of Claims should be allocated as between interest and principal is unclear under present law, and it is possible that the IRS could take a different view. If an amount paid with respect to Claims is required to be allocated to accrued but unpaid interest, such portion would be taxable to the holder as interest income, except to the extent that the holder previously had included such interest in its gross income.

2.     Holders of GECC Equipment Financing Claim and Banc One Equipment Financing Claim (Classes 4 and 5)

The consummation of the Plan generally should not be a taxable event for a holder of a Class 4 or 5 Claim whose legal, equitable, and contractual rights are Reinstated pursuant to the Plan. This conclusion assumes that any particular Class 4 or 5 Claim covenant that is deemed unenforceable pursuant to the Plan would be considered a "customary accounting or financial covenant" for U.S. federal income tax purposes, which, although the matter is not free from doubt, the Debtors believe is likely.

3.     Coated Paper Sale/Leaseback Claim Holder (Class 6)

The U.S. federal income tax treatment of the holder of the Coated Paper Sale/Leaseback Claim upon receipt of the deferred Cash payment under the Plan will depend on a number of facts and circumstances including, but not limited to: (i) such holder's method of accounting; (ii) whether such holder is eligible to report any gain from such deferred Cash payments under the installment method; (iii) amounts previously included in income by such holder in respect of such Claim; and (iv) any bad debt deductions previously claimed by such holder with respect to the Coated Paper Sale/Leaseback Claim. The Coated Paper Sale/Leaseback Claim holder should consult its tax advisor regarding the specific U.S. federal income consequences to it as a result of its receipt of deferred Cash pursuant to the Plan.

4.     Holders of Lowville Grant Claims (Class 7)

The consummation of the Plan generally should not be a taxable event for a holder of a Lowville Grant Claim who votes in favor of the Plan and whose legal, equitable, and contractual rights are Reinstated pursuant to the Plan. This conclusion assumes that any particular Lowville Grant Claim covenant that is deemed unenforceable pursuant to the Plan would be considered a "customary accounting or financial covenant" for U.S. federal income tax purposes, which, although the matter is not free from doubt, the Debtors believe is likely. The consequences to any Lowville Grant Claim holder who votes against the Plan are described below in Section X.C.5, if secured, and in Section X.C.7, if unsecured.

5.     Holders of Other Secured Claims (Class 8)

A holder of an Other Secured Claim who receives the collateral securing such Claim or who receives Cash with respect to such Claim pursuant to the Plan generally will be required to recognize gain or loss for U.S. federal income tax purposes equal to the difference between the fair market value of the collateral or the amount of Cash, as the case may be, received in exchange therefor and such holder's adjusted tax basis in the Claim. A holder of an Other Secured Claim who receives deferred Cash payments and realizes gain thereon may be eligible to report gain from such Cash payments under the installment method, which generally will result in the recognition of gain as deferred Cash payments are received, unless such holder affirmatively elects out of the installment method. A portion of the Cash received will be characterized as interest income. Additionally, holders reporting under the installment method may be subject to an interest charge with respect to their deferred tax liability. A holder of an Other Secured Claim who receives deferred Cash payments and recognizes loss thereon likely should recognize loss on the Effective Date equal to the difference between such holder's adjusted tax basis in such Claim and the issue price (in the case of a cash basis taxpayer) or the principal amount (in the case of an accrual basis taxpayer) of the deferred Cash payments. Holders of Other Secured Claims who receive deferred Cash

payments should consult their tax advisors regarding the application of the installment method, the determination of the amount of gain or loss to be recognized, and the imputed interest rules.

The consummation of the Plan generally should not be a taxable event for a holder of an Other Secured Claim whose legal, equitable, and contractual rights are Reinstated pursuant to the Plan. This conclusion assumes that any particular Other Secured Claim covenant that is deemed unenforceable pursuant to the Plan would be considered a "customary accounting or financial covenant" for U.S. federal income tax purposes, which, although the matter is not free from doubt, the Debtors believe is likely.

6.  Holders of Noteholder Claims (Class 9)

*Holders Making a Class 9 Election.* The Debtors believe that the exchange of FiberMark Notes for New Common Stock, Distribution Cash, and Settlement Cash pursuant to Section 4.3(f)(iii)(B) of the Plan (the "Class 9 Election") should constitute a "recapitalization" for U.S. federal income tax purposes. Accordingly, a holder of Noteholder Claims who makes a Class 9 Election and surrenders its FiberMark Notes for New Common Stock, Distribution Cash, and Settlement Cash should recognize gain, but not loss, with respect to each Note surrendered in an amount equal to the lesser of (x) the amount of gain realized (*i.e.*, the excess of the fair market value on the Effective Date of the New Common Stock and the amount of Distribution Cash and Settlement Cash received by such holder in exchange for its FiberMark Notes, over the adjusted tax basis of such Notes) and (y) the amount of Distribution Cash and Settlement Cash received by such holder in the exchange.

Any gain recognized by a holder of a Noteholder Claim who makes a Class 9 Election and surrenders its FiberMark Notes pursuant to the Plan generally should be treated as capital gain, except as provided in the "Market Discount" section below. Such a holder's aggregate tax basis in the New Common Stock received should be the same as the tax basis of such holder's FiberMark Notes surrendered, decreased by the amount of Distribution Cash and Settlement Cash received and increased by any gain recognized. A holder's holding period in such New Common Stock should include such holder's holding period in the FiberMark Notes surrendered in exchange therefor.

The foregoing discussion assumes that the FiberMark Notes would be treated as "securities" for U.S. federal income tax purposes. The term "security" is not defined in the Tax Code or in the Treasury regulations issued thereunder and has not been clearly defined by judicial decisions. The determination of whether a particular debt instrument constitutes a "security" depends on an overall evaluation of the nature of the debt instrument. One of the most significant factors considered in determining whether a particular debt instrument is a security is its term. In general, debt instruments issued with a maturity at issuance of five years or less (e.g., trade debt and revolving credit obligations) do not constitute securities, whereas debt instruments with a maturity of ten years or more constitute securities. Among other things, the FiberMark Notes provide for a term of ten years, and FiberMark intends to take the position that the FiberMark Notes constitute "securities" for U.S. federal income tax purposes.

Notwithstanding the foregoing, if the FiberMark Notes do not constitute "securities" for U.S. federal income tax purposes, the exchange of FiberMark Notes for New Common Stock, Distribution Cash, and Settlement Cash would be treated as fully taxable to holders. In such an event, a holder of Noteholder Claims would generally recognize gain or loss in an amount equal to the difference between (i) the fair market value on the Effective Date of the New Common Stock and the amount of Distribution Cash and Settlement Cash received pursuant to the Plan and (ii) such holder's adjusted tax basis in its surrendered FiberMark Notes.

If the FiberMark Notes do not constitute "securities" for U.S. federal income tax purposes, any gain or loss recognized generally should be treated as capital gain or loss, except as provided in the "Market Discount" section below. The tax basis of an exchanging holder of a Noteholder Claim in the New Common Stock received pursuant to the Plan would equal the fair market value of the New Common Stock on the Effective Date. Any gain or loss recognized by such holder would be long-term gain or loss if the holder's holding period for its FiberMark Notes was more than one year on the Effective Date. The holding period for New Common Stock received pursuant to the Plan would begin on the day after the Effective Date.

*Holders Not Making a Class 9 Election.* The receipt of Distribution Cash, Settlement Cash, and a Stock Purchase Payment (collectively the "Cash Payments") in exchange for a Noteholder's FiberMark Notes pursuant to Section 4.3(f)(iii)(A) of the Plan should be treated as a taxable exchange for U.S. federal income tax purposes. Accordingly, a holder of a Noteholder Claim who does not make a Class 9 Election should recognize gain or loss for U.S. federal income tax

purposes in an amount equal to the difference, if any, between the Cash Payments received and such holder's adjusted tax basis in its FiberMark Notes. Except as provided in the "Market Discount" section below, any gain or loss recognized by such a holder should be treated as capital gain or loss and would be long-term gain or loss if the holder's holding period for its FiberMark Notes was more than one year on the Effective Date.

*Market Discount*. If a holder of a Noteholder Claim purchased a FiberMark Note at a price less than the FiberMark Note's principal amount, such difference would constitute "market discount" for U.S. federal income tax purposes, unless such difference were less than the statutory *de minimis* amount. Assuming that the FiberMark Notes qualify as "securities" for U.S. federal income tax purposes, gain recognized by a holder upon the exchange of such holder's Noteholder Claim for New Common Stock, Distribution Cash, and Settlement Cash pursuant to a Class 9 Election generally should be treated as ordinary income to such holder to the extent of any accrued market discount (unless such holder has elected to include market discount in income as it accrues). The amount of any remaining accrued market discount not recognized in the exchange should carry over to such holder's New Common Stock. Any gain recognized by such holder on a subsequent taxable disposition of the New Common Stock would be treated as ordinary income to the extent of any such remaining accrued but unrecognized market discount.

If a holder of a Noteholder Claim (i) makes a Class 9 Election and the FiberMark Notes do not qualify as "securities" for U.S. federal income tax purposes or (ii) does not make a Class 9 Election and receives Cash Payments pursuant to the Plan, gain recognized by such a holder on the exchange of its FiberMark Notes pursuant to the Plan generally would be treated as ordinary income to the extent of any market discount that accrued between the date of purchase of the FiberMark Notes by such holder and the Effective Date (unless the holder has elected to include market discount in income as it accrues).

### 7. General Unsecured Claims (Class 10)

In general, the receipt of either (i) New Common Stock, Distribution Cash, and Settlement Cash pursuant to Section 4.3(g)(ii)(B) of the Plan (the "Class 10 Election") or (ii) Cash Payments pursuant to Section 4.3(g)(ii)(A) of the Plan in respect of General Unsecured Claims should be treated as a taxable exchange for U.S. federal income tax purposes. Accordingly, a holder of General Unsecured Claims who makes a Class 10 Election should recognize gain or loss for U.S. federal income tax purposes in an amount equal to the difference, if any, between (i) the fair market value on the Effective Date of the New Common Stock and the amount of Distribution Cash and Settlement Cash received, and (ii) the holder's adjusted tax basis in its General Unsecured Claims. A holder of a General Unsecured Claim who does not make a Class 10 Election should recognize gain or loss for U.S. federal income tax purposes in an amount equal to the difference, if any, between the Cash Payments received and such holder's adjusted tax basis in its General Unsecured Claim. Any such recognized gain or loss generally will be ordinary if the holder is a trade creditor and capital gain or loss if the holder holds such Claim as a capital asset for U.S. federal income tax purposes and will be long-term capital gain or loss if the holder's holding period for such claim exceeds one year as of the Effective Date.

A holder's tax basis in the New Common Stock received in respect of its General Unsecured Claims pursuant to a Class 10 Election generally should equal the fair market value of such New Common Stock on the Effective Date. The holding period for such New Common Stock should begin on the day after the Effective Date.

Any gain recognized by a holder upon a subsequent taxable disposition of New Common Stock received pursuant to a Class 10 Election should be treated as ordinary income to the extent of any bad debt deductions claimed with respect to such General Unsecured Claims and any ordinary loss incurred upon the receipt of such New Common Stock, Distribution Cash, and Settlement Cash in satisfaction of such Claim, less any income (other than interest income) recognized by the holder upon satisfaction of such Claim.

## D. Information Reporting and Backup Withholding

Certain payments, including certain payments of Claims pursuant to the Plan, payments of interest on the FiberMark Notes, payments of dividends, if any, on the New Common Stock and the proceeds from the sale or other taxable disposition of the New Common Stock, may be subject to information reporting to the IRS. Moreover, such reportable payments may be subject to backup withholding unless the taxpayer: (i) comes within certain exempt categories (which generally include corporations) or (ii) provides a correct taxpayer identification number and otherwise complies with applicable backup withholding provisions. In addition, Treasury regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other

types of transactions, the following: (i) certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds; and (ii) certain transactions in which the taxpayer's book-tax differences exceed a specified threshold in any tax year. Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the holders' tax returns.

E.     **Importance of Obtaining Professional Tax Assistance**

THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE ABOVE DISCUSSION IS FOR INFORMATION PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S INDIVIDUAL CIRCUMSTANCES. ACCORDINGLY, HOLDERS ARE URGED TO CONSULT THEIR TAX ADVISORS ABOUT THE U.S. FEDERAL, STATE, LOCAL AND NON-U.S. INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.

# XI.     FEASIBILITY OF THE PLAN AND BEST INTERESTS OF CREDITORS

A.     **Feasibility of the Plan**

In connection with confirmation of the Plan, the Bankruptcy Court will be required to determine that the Plan is feasible pursuant to Section 1129(a)(11) of the Bankruptcy Code, which means that the confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors.

To support their belief in the feasibility of the Plan, the Debtors have relied upon the Projections, which are annexed to this Disclosure Statement as Appendix B.

The Projections indicate that the Reorganized Debtors should have sufficient cash flow to pay and service their debt obligations and to fund their operations. Accordingly, the Debtors believe that the Plan complies with the financial feasibility standard of Section 1129(a)(11) of the Bankruptcy Code.

The Projections are based upon numerous assumptions that are an integral part of the Projections, including, without limitation, confirmation and consummation of the Plan in accordance with its terms; realization of the Debtors' operating strategy for the Reorganized Debtors; industry performance; no material adverse changes in applicable legislation or regulations, or the administration thereof, including environmental legislation or regulations, exchange rates, or generally accepted accounting principles; general business and economic conditions; competition; adequate financing; absence of material contingent or unliquidated litigation, indemnity or other claims; and other matters, many of which will be beyond the control of the Reorganized Debtors and some or all of which may not materialize. To the extent that the assumptions inherent in the Projections are based upon future business decisions and objectives, they are subject to change. The Projections were not prepared in accordance with standards for projections promulgated by the American Institute of Certified Public Accountants or with a view to compliance with published guidelines of the SEC regarding projections or forecasts. The Projections have not been audited, reviewed, or compiled by the Debtors' independent public accountants. In addition, although they are presented with numerical specificity and the assumptions on which they are based are considered reasonable by the Debtors, the assumptions and estimates underlying the Projections are subject to significant business, economic, and competitive uncertainties and contingencies, many of which will be beyond the control of the Reorganized Debtors. Accordingly, the Projections are only an estimate that are necessarily speculative in nature. It can be expected that some or all of the assumptions in the Projections will not be realized and that actual results will vary from the Projections, which variations may be material and are likely to increase over time. The Projections should therefore not be regarded as a representation by the Debtors or any other Person that the results set forth in the Projections will be achieved. Neither the Debtors' independent public accountants, nor any other independent accountants or financial advisors, have compiled, examined, or performed any procedures with respect to the projected consolidated financial information contained herein, nor have they expressed any opinion or any other form of assurance on such information or its achievability, and assume no responsibility for, and disclaim any association with, the projected financial information. In light of the foregoing, readers are cautioned not to place undue reliance on the Projections. The projected financial information contained herein should not be regarded as a representation or warranty by the Debtors, the Debtors' advisors, or any other Person that the Projections can or will be achieved. The Projections should be read together with the information in Article VIII of this Disclosure Statement entitled "Certain Risk Factors to be Considered," which sets forth important factors that could cause actual results to differ from those in the Projections.

FiberMark is subject to the informational requirements of the Exchange Act, and in accordance therewith files periodic reports and other information with the SEC relating to its businesses, financial statements, and other matters. Such filings do not and will not include projected financial information. The Debtors do not intend to update or otherwise revise the Projections, including any revisions to reflect events or circumstances existing or arising after the date of this Disclosure Statement or to reflect the occurrence of unanticipated events, even if any or all of the underlying assumptions do not come to fruition. Furthermore, the Debtors do not intend to update or revise the Projections to reflect changes in general economic or industry conditions.

SAFE HARBOR STATEMENT UNDER THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995: This Disclosure Statement and the Projections contained herein include "forward-looking statements" within the meaning of Section 27A of the Securities Act and Section 21E of the Exchange Act. All statements other than statements of historical fact included in this Disclosure Statement are forward-looking statements, including, without limitation, financial projections, the statements, and the underlying assumptions, regarding the timing of, completion of, and scope of the current restructuring, the Plan, bank financing, debt and equity market conditions, the cyclicality of the Debtors' industry, current and future industry conditions, the potential effects of such matters on the Debtors' business strategy, results of operations or financial position, the adequacy of the Debtors' liquidity, and the market sensitivity of the Debtors' financial instruments. The forward-looking statements are based upon current information and expectations. Estimates, forecasts, and other statements contained in or implied by the forward-looking statements speak only as of the date on which they are made, are not guarantees of future performance, and involve certain risks, uncertainties, and assumptions that are difficult to evaluate and predict. Although the Debtors believe that the expectations reflected in the forward-looking statements are reasonable, parties are cautioned that any such forward-looking statements are not guarantees of future performance, and involve risks and uncertainties, and that actual results may differ materially from those contemplated by such forward-looking statements. Certain important factors that could cause actual results to differ materially from the Debtors' expectations or what is expressed, implied, or forecasted by or in the forward-looking statements include developments in the Chapter 11 Case, adverse developments in the timing or results of the Debtors' business plan (including the time line to emerge from chapter 11), the timing and extent of changes in commodity prices and global economic conditions, industry production capacity and operating rates, the supply-demand balance for the Debtors' products, competitive products and pricing pressures, the Debtors' ability to obtain raw materials at acceptable prices, in a timely manner and on acceptable terms, federal and state regulatory developments, the Debtors' financial leverage, motions filed or actions taken in connection with the bankruptcy proceedings, the availability of skilled personnel, the Debtors' ability to attract or retain high quality employees, and operating hazards attendant to the industry. Additional factors that could cause actual results to differ materially from the Projections or what is expressed, implied, or forecasted by or in the forward-looking statements are stated herein in cautionary statements made in conjunction with the forward-looking statements or are included elsewhere in this Disclosure Statement.

## B.      Acceptance of the Plan

As a condition to Confirmation, the Bankruptcy Code requires that each Class of Impaired Claims vote to accept the Plan, except under certain circumstances.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds (⅔) in dollar amount and more than one-half (½) in number of claims in that class, but for that purpose counts only those who actually vote to accept or to reject the Plan. Thus, holders of Claims in each of Classes 4, 5, 6, 7, 8, 9, and 10 will have voted to accept the Plan only if two-thirds (⅔) in amount and a majority in number of the Claims actually voting in each Class cast their ballots in favor of acceptance. Holders of Claims who fail to vote are not counted as either accepting or rejecting a plan.

## C.      Best Interests Test

As noted above, even if a plan is accepted by each class of claims and interests, the Bankruptcy Code requires a bankruptcy court to determine that the plan is in the best interests of all holders of claims or interests that are impaired by the plan and that have not accepted the plan. The "best interests" test, as set forth in Section 1129(a)(7) of the Bankruptcy Code, requires a bankruptcy court to find either that all members of an impaired class of claims or interests have accepted the plan or that the plan will provide a member who has not accepted the plan with a recovery of property of a value, as of the effective date of the plan, that is not less than the amount that such holder would recover if the debtor were liquidated under Chapter 7 of the Bankruptcy Code.

To calculate the probable distribution to holders of each impaired class of claims and interests if the debtor were liquidated under Chapter 7, a bankruptcy court must first determine the aggregate dollar amount that would be generated from the debtor's assets if its chapter 11 case were converted to a Chapter 7 case under the Bankruptcy Code. This "liquidation value" would consist primarily of the proceeds from a forced sale of the debtor's assets by a Chapter 7 trustee.

The amount of liquidation value available to unsecured creditors would be reduced by, first, the claims of secured creditors to the extent of the value of their collateral and, second, by the costs and expenses of liquidation, as well as by other administrative expenses and costs of both the Chapter 7 case and the chapter 11 case. Costs of liquidation under Chapter 7 of the Bankruptcy Code would include the compensation of a trustee, as well as of counsel and other professionals retained by the trustee, asset disposition expenses, all unpaid expenses incurred by the debtors in its chapter 11 case (such as compensation of attorneys, financial advisors, and accountants) that are allowed in the Chapter 7 cases, litigation costs, and claims arising from the operations of the debtor during the pendency of the chapter 11 case. The liquidation itself would trigger certain priority payments that otherwise would be due in the ordinary course of business. Those priority claims would be paid in full from the liquidation proceeds before the balance would be made available to pay general unsecured claims or to make any distribution in respect of equity security interests. The liquidation would also prompt the rejection of a large number of executory contracts and unexpired leases and thereby significantly enlarge the total pool of unsecured claims by reason of resulting rejection damages claims.

Once the bankruptcy court ascertains the recoveries in liquidation of secured creditors and priority claimants, it must determine the probable distribution to general unsecured creditors and equity security holders from the remaining available proceeds in liquidation. If such probable distribution has a value greater than the distributions to be received by such creditors and equity security holders under the plan, then the plan is not in the best interests of creditors and equity security holders.

**D.      Liquidation Analysis**

For purposes of the Best Interest Test, in order to determine the amount of liquidation value available to Creditors, the Debtors, with the assistance of their restructuring accountants, Weiser, prepared a liquidation analysis, annexed hereto as Appendix D (the "Liquidation Analysis"), which concludes that in a Chapter 7 liquidation, holders of pre-petition unsecured Claims would receive less of a recovery than the recovery they would receive under the Plan. This conclusion is premised upon the assumptions set forth in Appendix D, which the Debtors and Weiser believe are reasonable.

Notwithstanding the foregoing, the Debtors believe that any liquidation analysis with respect to the Debtors is inherently speculative. The liquidation analysis for the Debtors necessarily contains estimates of the net proceeds that would be received from a forced sale of assets and/or business units, as well as the amount of Claims that would ultimately become Allowed Claims. Claims estimates are based solely upon the Debtors' review of the Claims filed and the Debtors' books and records. No order or finding has been entered by the Bankruptcy Court estimating or otherwise fixing the amount of Claims at the projected amounts of Allowed Claims set forth in the liquidation analysis. In preparing the liquidation analysis, the Debtors have projected an amount of Allowed Claims that represents their best estimate of the Chapter 7 liquidation dividend to holders of Allowed Claims. The estimate of the amount of Allowed Claims set forth in the liquidation analysis should not be relied on for any other purpose, including, without limitation, any determination of the value of any distribution to be made on account of Allowed Claims under the Plan.

**E.      Valuation of the Reorganized Debtors**

The reorganization value of the Reorganized Debtors is assumed for the purposes of the Plan to be between approximately $210 million and $240 million, with a midpoint value of $225 million. Based upon the reorganization value of the Debtors' businesses and total net debt of approximately $107.2 million, the assumed range of equity values for the Reorganized Debtors approximates $102.8 million to $132.8 million, with a midpoint value of $117.8 million. Assuming a distribution of 10 million shares upon consummation of the Plan, the imputed estimate of the range of equity value on a per share basis is $10.28 to $13.28, with a midpoint value of $11.78. It has been alleged that the equity value of the Reorganized Debtors would be higher if the Plan provided for the reorganized company to emerge as a public company rather than a private company. The Debtors do not agree that any premium should be assigned to the value of the Reorganized Debtors if they were a public company upon emergence. In addition, the Debtors would note that the higher costs of maintaining a public company versus a private company would negatively affect the equity value.

The foregoing valuations are based on a number of measured assumptions, including a successful reorganization of the Debtors' business and finances in a timely manner, the achievement of the forecasts reflected in the Projections, the availability of certain tax attributes, the outcome of certain expectations regarding market conditions, and the Plan becoming effective in accordance with its terms. The estimates of value represent hypothetical reorganization values of the Reorganized Debtors as the continuing operator of their businesses and assets and do not purport to reflect or constitute appraisals, liquidation values, or estimates of the actual market value that may be realized through the sale of any assets or securities to be issued pursuant to the Plan, which may be significantly different than the amounts set forth herein. The value of operating businesses such as the Debtors' businesses is subject to uncertainties and contingencies that are difficult to predict, and will fluctuate with changes in factors affecting the financial condition and prospects of such businesses.

## F. Application of the "Best Interests" of Creditors Test to the Liquidation Analysis and the Valuation

It is impossible to determine with any specificity the value each holder of a Noteholder Claim or General Unsecured Claim will receive as a percentage of its Allowed Claim. The difficulty in estimating the value of recoveries for such holders is due to, among other things, the lack of any public market for the New Common Stock.

Notwithstanding the difficulty in quantifying recoveries with precision, the Debtors believe that the financial disclosures and projections contained herein imply a greater or equal recovery to holders of Claims in Impaired Classes than the recovery available in a Chapter 7 liquidation. Accordingly, the Debtors believe that the "best interests" test of Section 1129 of the Bankruptcy Code is satisfied.

## G. Confirmation Without Acceptance of All Impaired Classes: The "Cramdown" Alternative

In view of the deemed rejection by holders of Classes 11, 12, 13, and 15, the Debtors will seek confirmation of the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code. The Debtors further reserve the right to seek confirmation of the Plan with respect to the Claims in Classes 4, 5, 6, 7, 8, 9, and 10 in the event the holders of such Claims vote to reject the Plan. Specifically, Section 1129(b) of the Bankruptcy Code provides that a plan can be confirmed even if the plan is not accepted by all impaired classes, as long as at least one impaired class of claims has accepted it. The Bankruptcy Court may confirm a plan at the request of the debtors if the plan "does not discriminate unfairly" and is "fair and equitable" as to each impaired class that has not accepted the plan. A plan does not discriminate unfairly within the meaning of the Bankruptcy Code if a dissenting class is treated equally with respect to other classes of equal rank.

The Debtors believe the Plan does not discriminate unfairly with respect to the Claims and Interests in Classes 11, 12, 13, and 15. Such Classes include Claims or Interests that are subordinated to other Claims under Section 510(b) or (c) of the Bankruptcy Code or Section 726(a)(2)(C), (a)(3), (a)(4), or (a)(5) of the Bankruptcy Code as incorporated into Section 1129(a)(7) of the Bankruptcy Code, or are otherwise not entitled to payment under the absolute priority rule until all other Creditors have been paid in full. Thus, because all holders of Claims and Interests in Classes 11, 12, 13, and 15 are similarly treated, there is no unfair discrimination with respect to such holders or Claims and Interests.

A plan is fair and equitable as to a class of unsecured claims that rejects a plan if the plan provides (a) for each holder of a claim included in the rejecting class to receive or retain on account of that claim property that has a value, as of the effective date of the plan, equal to the allowed amount of such claim or (b) that the holder of any claim or interest that is junior to the claims of such class will not receive or retain on account of such junior claim or interest any property at all.

A plan is fair and equitable as to a class of equity interests that rejects a plan if the plan provides (a) that each holder of an interest included in the rejecting class receive or retain on account of that interest property that has a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled or the value of such interest or (b) that the holder of any interest that is junior to the interests of such class will not receive or retain under the plan on account of such junior interest any property at all.

The Debtors believe that they will meet the "fair and equitable" requirements of Section 1129(b) of the Bankruptcy Code with respect to holders of Claims in Classes 11, 12, and 13 and holders of Interests in Class 15 in that no holders of junior claims or interests will receive distributions under the Plan.

As to Classes 4, 5, 6, 7, 8, 9, and 10 in the event it becomes necessary to "cramdown" the Plan over the rejection of any such Classes, the Debtors will demonstrate at the Confirmation Hearing that the Plan does not discriminate unfairly and is fair and equitable with respect to such Classes. The fair and equitable test set forth above for unsecured claims applies to Classes 9 and 10. The fair and equitable test for secured claims, which is applicable to Classes 4, 5, 6, and 8, is that the plan provides (a) that the holders of secured claims retain the liens in the property securing such claims to the extent of the allowed amount of such claims, and that the holders of such claims receive on account of such claims deferred cash payments totaling at least the allowed amount of such claims, of a value, as of the effective date of the plan, of at least the value of such holders' interest in the estate's interest in such property; (b) for the sale of any property subject to the liens securing such claims, free and clear of such liens, with the liens attaching the proceeds of such sale, and such liened proceeds being treated either pursuant to (a) or (c); or (c) for the realization by such holders of the indubitable equivalent of such claims. The treatment proposed for Classes 4, 5, 6, and 8 satisfies the fair and equitable test and can be crammed down, if necessary.

## XII.      ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

The Debtors believe that the Plan affords holders of Claims in Classes 4, 5, 6, 7, 8, 9, and 10 the potential for the greatest realization on the Debtors' assets and, therefore, is in the best interests of such holders. If, however, the requisite acceptances are not received or the Plan is not confirmed and consummated, the theoretical alternatives include (a) formulation of an alternative plan or plans of reorganization or (b) liquidation of the Debtors under Chapter 7 or chapter 11 of the Bankruptcy Code.

### A.      Alternative Plan(s) of Reorganization

If the requisite acceptances are not received or if the Plan is not confirmed, the Debtors or any other party in interest could attempt to formulate and propose a different plan or plans of reorganization. Such a plan or plans might involve either a reorganization and continuation of the Debtors' businesses or an orderly liquidation of assets.

The Debtors believe that the Plan enables Creditors to realize the greatest possible value under the circumstances and has the greatest chance to be confirmed and consummated. Moreover, the Debtors strongly believe that any further delay in their emergence from chapter 11 will be prejudicial to their businesses and the potential recoveries of creditors.

### B.      Liquidation under Chapter 7 or Chapter 11

If no plan is confirmed, the Debtors' cases may be converted to cases under Chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected or appointed to liquidate the Debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code. It is impossible to predict precisely how the proceeds of the liquidation would be distributed to the respective holders of Claims against or Interests in the Debtors.

The Debtors believe that in a liquidation under Chapter 7, additional administrative expenses involved in the appointment of a trustee or trustees and attorneys, accountants, and other professionals to assist such trustees would cause a substantial diminution in the value of the Debtors' Estates. The assets available for distribution to Creditors would be reduced by such additional expenses and by Claims, some of which would be entitled to priority, arising by reason of the liquidation and from the rejection of leases and other executory contracts in connection with the cessation of operations and the failure to realize the greater going concern value of the Debtors' assets. More importantly, as set forth in Appendix D, conversion to a Chapter 7 liquidation would likely result in the immediate cessation of the Debtors' businesses, as most Chapter 7 trustees are disinclined to continue operations.

The Debtors could also be liquidated pursuant to the provisions of a chapter 11 plan of reorganization. In a liquidation under chapter 11, the Debtors' assets could theoretically be sold in an orderly fashion over a more extended period of time than in a liquidation under Chapter 7, thus resulting in a potentially greater recovery. Conversely, to the extent the Debtors' businesses incur operating losses, the Debtors efforts to liquidate their assets over a longer period of time could theoretically result in a lower net distribution to Creditors than they would receive through a Chapter 7 liquidation. Nevertheless, because there would be no need to appoint a Chapter 7 trustee and to hire new professionals, a chapter 11 liquidation might be less costly than a Chapter 7 liquidation and thus provide larger net distributions to Creditors than in a Chapter 7 liquidation. Any recovery in a chapter 11 liquidation, while potentially greater than in a Chapter 7 liquidation, would also be highly uncertain.

Although preferable to a Chapter 7 liquidation, the Debtors believe that any alternative liquidation under chapter 11 is a much less attractive alternative to Creditors than the Plan because of the greater return anticipated by the Plan.

## XIII.   THE SOLICITATION; VOTING PROCEDURES

### A.        Parties in Interest Entitled to Vote

In general, a holder of a claim or interest may vote to accept or to reject a plan if (a) the claim or interest is "allowed," which means generally that no party in interest has objected to such claim or interest and (b) the claim or interest is "impaired" by the plan.

Under Section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "impaired" under a plan unless (a) the plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder thereof or (b) notwithstanding any legal right to an accelerated payment of such claim or interest, the plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

If, however, the holder of an impaired claim or interest will not receive or retain any distribution under the plan on account of such claim or interest, the Bankruptcy Code deems such holder to have rejected the plan and, accordingly, holders of such claims and interests do not actually vote on the plan.  If a claim or interest is not impaired by the plan, the Bankruptcy Code deems the holder of such claim or interest to have accepted the plan and, accordingly, holders of such claims and interests are not entitled to vote on the plan.

### B.        Classes Entitled to Vote to Accept or Reject the Plan

Holders of Claims in Classes 4, 5, 6, 7, 8, 9, and 10 are entitled to vote to accept or reject the Plan.  By operation of law, each unimpaired Class of Claims is deemed to have accepted the Plan and each impaired Class of Claims or Interests that will receive nothing under the Plan is deemed to have rejected the Plan and, therefore, the holders of Claims or Interests in such Classes are not entitled to vote to accept or reject the Plan.  Consequently, Classes 1, 2, 3, and 14 are deemed to have accepted the Plan and Classes 11, 12, 13, and 15 are deemed to have rejected the Plan; and, therefore, none of the holders of Claims or Interests in such Classes are entitled to vote to accept or reject the Plan.

### C.        Solicitation Order

On October 27, 2005, the Bankruptcy Court entered an order that, among other things, determines the dates, procedures, and forms applicable to the process of soliciting votes on the Plan and establishes certain procedures with respect to the tabulation of such votes (the "Solicitation Order").  Parties in interest may obtain a copy of the Solicitation Order by making written request to the Debtors' counsel or may access a copy on the Debtors' Web site at www.fibermark.com.

### D.        Waivers of Defects, Irregularities, Etc.

Unless otherwise directed by the Bankruptcy Court, all questions as to the validity, form, eligibility (including time of receipt), acceptance, and revocation or withdrawal of ballots will be determined by the Voting Agent and the Debtors in their sole discretion, which determination will be final and binding.  As indicated below under "Withdrawal of Ballots; Revocation," effective withdrawals of ballots must be delivered to the Voting Agent prior to the Voting Deadline. The Debtors reserve the absolute right to contest the validity of any such withdrawal.  The Debtors also reserve the right to reject any and all ballots not in proper form, the acceptance of which would, in the opinion of the Debtors or their counsel, be unlawful.  The Debtors further reserve the right to waive any defects or irregularities or conditions of delivery as to any particular ballot.  The interpretation (including the ballot and the respective instructions thereto) by the Debtors, unless otherwise directed by the Bankruptcy Court, will be final and binding on all parties.  Unless waived, any defects or irregularities in connection with deliveries of ballots must be cured within such time as the Debtors (or the Bankruptcy Court) determine.  Neither the Debtors nor any other Person will be under any duty to provide notification of defects or irregularities with respect to deliveries of ballots nor will any of them incur any liabilities for failure to provide such notification.  Unless otherwise directed by the Bankruptcy Court, delivery of such ballots will not be deemed to have been made until such irregularities have been cured or waived.  Ballots previously furnished (and as to which any irregularities have not theretofore been cured or waived) will be invalidated.

## E. Withdrawal of Ballots; Revocation

Any party who has delivered a valid ballot for the acceptance or rejection of the Plan may withdraw such acceptance or rejection by delivering a written notice of withdrawal to the Voting Agent at any time prior to the Voting Deadline. To be valid, a notice of withdrawal must (a) contain the description of the Claim(s) to which it relates and the aggregate principal amount represented by such Claim(s), (b) be signed by the withdrawing party in the same manner as the ballot being withdrawn, (c) contain a certification that the withdrawing party owns the Claim(s) and possesses the right to withdraw the vote sought to be withdrawn, and (d) be received by the Voting Agent in a timely manner at Logan & Company, Inc., Attention: FiberMark, Inc., et al., 546 Valley Road, Upper Montclair, New Jersey 07043. The Debtors intend to consult with the Voting Agent to determine whether any withdrawals of ballots were received and whether the requisite acceptances of the Plan have been received. As stated above, the Debtors expressly reserve the absolute right to contest the validity of any such withdrawals of ballots.

Unless otherwise directed by the Bankruptcy Court, a purported notice of withdrawal of ballots which is not received in a timely manner by the Voting Agent will not be effective to withdraw a previously cast ballot.

Any party who has previously submitted to the Voting Agent prior to the Voting Deadline a properly completed ballot may revoke such ballot and change his or its vote by submitting to the Voting Agent prior to the Voting Deadline a subsequent properly completed ballot for acceptance or rejection of the Plan. In the case where more than one timely, properly, completed ballot is received, only the ballot which bears the latest date will be counted for purposes of determining whether the requisite acceptances have been received.

## F. Special Instructions for Holders of Noteholder Claims

If you are the holder of any Noteholder Claim, or if you are acting on behalf of the holder of any of such Claims, please carefully review the special instructions that accompany your ballot. The special instructions may not be consistent with the general instructions contained herein. In the event of an inconsistency, the special instructions that accompany your ballot should be followed.

## G. Voting Rights of Disputed Claimants

Holders of Disputed Claims in Classes 4, 5, 6, 7, 8, 9, and 10 whose Claims are (a) asserted as wholly unliquidated or wholly contingent in Proofs of Claim filed prior to the Voting Record Date or are based upon a pending lawsuit as to which no judgment has been issued or (b) whose Claims are asserted in Proofs of Claim as to which an objection to the entirety of the Claim is pending as of the Voting Record Date (collectively, the "Disputed Claimants") are not permitted to vote on the Plan except as provided in the Solicitation Order. Pursuant to the procedures outlined in the Solicitation Order, Disputed Claimants may obtain a ballot for voting on the Plan only by filing a motion under Bankruptcy Rule 3018(a) seeking to have their Claims temporarily allowed for voting purposes (a "Rule 3018 Motion"). Any such Rule 3018 Motion must be filed with the Bankruptcy Court and served upon the Debtors' counsel and the Voting Agent by no later than November 15, 2005, at 4:00 p.m. Eastern Time (the "Rule 3018 Motion Deadline"). Any party timely filing and serving a Rule 3018 Motion will be provided a ballot and be permitted to cast a provisional vote to accept or reject the Plan. If and to the extent that the Debtors and such party are unable to resolve the issues raised by the Rule 3018 Motion prior to the November 22, 2005, Voting Deadline established by the Bankruptcy Court, then at the Confirmation Hearing the Bankruptcy Court will determine whether the provisional ballot should be counted as a vote on the Plan. Nothing herein affects the Debtors' right to object to any Proof of Claim after the Voting Record Date. With respect to any such objection, the Debtors may request that any vote cast by the holder of the Claim subject to the objection be disallowed and not counted in determining whether the requirements of Section 1126(c) of the Bankruptcy Code have been met.

## H. Further Information; Additional Copies

If you have any questions or require further information about the voting procedures for voting your Claim or about the packet of material you received, or if you wish to obtain an additional copy of the Plan, this Disclosure Statement, or any exhibits or appendices to such documents (at your own expense, unless otherwise specifically required by Bankruptcy Rule 3017(d) or the Solicitation Order), please contact the Voting Agent at:

LOGAN & COMPANY, INC.
546 VALLEY ROAD
UPPER MONTCLAIR, NEW JERSEY 07043
ATTENTION: MARITZA MARTINEZ
TELEPHONE: (973) 509-3190
EMAIL: mmartinez@loganandco.com

## RECOMMENDATION AND CONCLUSION

For all of the reasons set forth in this Disclosure Statement, the Debtors believe that confirmation and consummation of the Plan is preferable to all other alternatives. Consequently, the Debtors urge all holders of Claims in Classes 4, 5, 6, 7, 8, 9, and 10 to vote to ACCEPT the Plan, and to complete and return their ballots so that they will be RECEIVED on or before 4:00 p.m. Eastern Time on the Voting Deadline.

Dated: November 1, 2005

FIBERMARK, INC.
FIBERMARK NORTH AMERICA, INC.
FIBERMARK INTERNATIONAL HOLDINGS LLC


By: _____

Name:   Alex Kwader
Title:     Chairman of the Board and Chief Executive Officer


D. J. Baker
Rosalie Walker Gray
Jane M. Leamy
Adam S. Ravin
David M. Turetsky
SKADDEN, ARPS, SLATE, MEAGHER
& FLOM LLP
Four Times Square
New York, New York 10036-6522
Telephone: (212) 735-3000
Facsimile: (212) 735-2000

Raymond J. Obuchowski (Bar ID 000502389)
Jennifer Emens-Butler (Bar ID 000845663)
OBUCHOWSKI & EMENS-BUTLER
P.O. Box 60, 1542 Vt. Rt. 107
Bethel, Vermont 05032
Telephone: (802) 234-6244
Facsimile: (802) 234-6245

Co-Counsel for Debtors

**APPENDIX A**

**AMENDED JOINT PLAN OF REORGANIZATION UNDER**
**CHAPTER 11, TITLE 11, UNITED STATES CODE OF FIBERMARK, INC., ET AL., DEBTORS**

In re:                                  )
                                        )
FiberMark, Inc.,                        ) Case No. 04-10463-cab
FiberMark North America, Inc., and      ) *Chapter 11*
FiberMark International Holdings LLC,    ) Jointly Administered
                                        )
                    Debtors.            )

---

**AMENDED JOINT PLAN OF REORGANIZATION
UNDER CHAPTER 11, TITLE 11, UNITED STATES CODE
OF FIBERMARK, INC., ET AL., DEBTORS**

---

SKADDEN, ARPS, SLATE, MEAGHER &
    FLOM LLP
Four Times Square
New York, New York 10036-6522
Telephone:  (212) 735-3000
Fax:  (212) 735-2000

- and -

OBUCHOWSKI & EMENS-BUTLER
P.O. Box 60, 1542 Vt. Rt. 107
Bethel, Vermont 05032
Telephone: (802) 234-6244
Facsimile: (802) 234-6245

Dated: November 1, 2005                 Co-Counsel for Debtors

**TABLE OF CONTENTS**

ARTICLE I DEFINITIONS ................................................................................................................ 1
1.1        "Administrative Claim" ................................................................................................. 1
1.2        "AIGGIC" ....................................................................................................................... 1
1.3        "Allowed" ....................................................................................................................... 1
1.4        "Ballot" ........................................................................................................................... 2
1.5        "Banc One Equipment Financing Claim" ..................................................................... 2
1.6        "Bankruptcy Code" ........................................................................................................ 2
1.7        "Bankruptcy Court" ....................................................................................................... 2
1.8        "Bankruptcy Rules" ....................................................................................................... 2
1.9        "Bar Date(s)" .................................................................................................................. 2
1.10      "Business Day" ............................................................................................................... 2
1.11      "Cash" ............................................................................................................................. 2
1.12      "Cash Reserve" ............................................................................................................... 2
1.13      "Chapter 11 Case" .......................................................................................................... 2
1.14      "Claim" ........................................................................................................................... 2
1.15      "Claims Objection Deadline" ......................................................................................... 2
1.16      "Class" ............................................................................................................................ 3
1.17      "Coated Paper Sale/Leaseback Claim" .......................................................................... 3
1.18      "Common Stock Reserve" .............................................................................................. 3
1.19      "Confirmation" ............................................................................................................... 3
1.20      "Confirmation Date" ...................................................................................................... 3
1.21      "Confirmation Hearing" ................................................................................................. 3
1.22      "Confirmation Order" ..................................................................................................... 3
1.23      "Constituency Causes of Action" .................................................................................. 3
1.24      "Constituency Settlement" ............................................................................................. 3
1.25      "Convenience Claim" ..................................................................................................... 3
1.26      "Creditor" ....................................................................................................................... 3
1.27      "Creditors Committee" ................................................................................................... 3
1.28      "Cure" ............................................................................................................................. 3
1.29      "Debtor(s)" ..................................................................................................................... 4
1.30      "DIP Facility" ................................................................................................................. 4
1.31      "DIP Facility Claim" ...................................................................................................... 4
1.32      "Disbursing Agent" ........................................................................................................ 4
1.33      "Disclosure Statement" .................................................................................................. 4
1.34      "Disputed" ...................................................................................................................... 4
1.35      "Distribution Cash" ........................................................................................................ 4
1.36      "Distribution Date" ........................................................................................................ 4
1.37      "Distribution Record Date" ............................................................................................ 4
1.38      "DTC" ............................................................................................................................. 5
1.39      "DTC Participant" ........................................................................................................... 5
1.40      "Effective Date" ............................................................................................................. 5
1.41      "Estate(s)" ...................................................................................................................... 5
1.42      "Examiner" ..................................................................................................................... 5
1.43      "Examiner's Report" ....................................................................................................... 5
1.44      "Exit Facility" ................................................................................................................ 5
1.45      "FiberMark" .................................................................................................................... 5
1.46      "FiberMark Notes" ......................................................................................................... 5
1.47      "FiberMark Interests" ..................................................................................................... 5
1.48      "FIH" .............................................................................................................................. 5
1.49      "Final Order" .................................................................................................................. 5
1.50      "FNA" ............................................................................................................................. 6
1.51      "GECC" ........................................................................................................................... 6
1.52      "GECC Credit Facility Claim" ....................................................................................... 6
1.53      "GECC Equipment Financing Claim" ............................................................................ 6
1.54      "General Unsecured Claims" .......................................................................................... 6
1.55      "German Guaranty Claim" ............................................................................................. 6
1.56      "Impaired" ...................................................................................................................... 6

| | | |
|---|---|---|
| 1.57 | "Indemnification Obligation" | 6 |
| 1.58 | "Indentures" | 6 |
| 1.59 | "Indenture Trustee" | 6 |
| 1.60 | "Indenture Trustee Charging Lien" | 6 |
| 1.61 | "Indenture Trustee Expenses" | 7 |
| 1.62 | "Individual Causes of Action" | 7 |
| 1.63 | "Intercompany Claim" | 7 |
| 1.64 | "Interests" | 7 |
| 1.65 | "Key Employee Protection Order" | 7 |
| 1.66 | "Lien" | 7 |
| 1.67 | "Litigation Rights" | 7 |
| 1.68 | "Lowville Grant Claims" | 7 |
| 1.69 | "New Board" | 7 |
| 1.70 | "New Common Stock" | 7 |
| 1.71 | "New Equity Incentive Plan" | 7 |
| 1.72 | "New FiberMark Charter" | 7 |
| 1.73 | "New FiberMark By-laws" | 8 |
| 1.74 | "Non-Compensatory Damages Claim" | 8 |
| 1.75 | "Noteholder Claims" | 8 |
| 1.76 | "Old FiberMark Common Stock" | 8 |
| 1.77 | "Old FiberMark Stock Options" | 8 |
| 1.78 | "Old Securities" | 8 |
| 1.79 | "Organic Change" | 8 |
| 1.80 | "Other Priority Claim" | 8 |
| 1.81 | "Other Secured Claim" | 8 |
| 1.82 | "Person" | 8 |
| 1.83 | "Petition Date" | 8 |
| 1.84 | "Plan" | 8 |
| 1.85 | "Post" | 8 |
| 1.86 | "Priority Tax Claim" | 8 |
| 1.87 | "Professional" | 8 |
| 1.88 | "Professional Fee Claim" | 9 |
| 1.89 | "Proof of Claim" | 9 |
| 1.90 | "Pro Rata" | 9 |
| 1.91 | "PTOP" | 9 |
| 1.92 | "Reinstated" | 9 |
| 1.93 | "Reorganized Debtor(s)" | 9 |
| 1.94 | "Reorganized FiberMark" | 9 |
| 1.95 | "Reorganized Subsidiary Debtor(s)" | 9 |
| 1.96 | "Schedules" | 9 |
| 1.97 | "Secured Claim" | 9 |
| 1.98 | "Settlement Cash" | 9 |
| 1.99 | "Silver Point" | 9 |
| 1.100 | "Stock Purchase Payment" | 9 |
| 1.101 | "Subordinated Claim" | 10 |
| 1.102 | "Subsidiary Debtors" | 10 |
| 1.103 | "Subsidiary Interests" | 10 |
| 1.104 | "Substantial Contribution Claim" | 10 |
| 1.105 | "Unimpaired" | 10 |
| 1.106 | "Voting Deadline" | 10 |
| 1.107 | "Voting Record Date" | 10 |
| | | |
| ARTICLE II SUBSTANTIVE CONSOLIDATION | | 10 |
| 2.1 | Request for Substantive Consolidation | 10 |
| 2.2 | Effect of Substantive Consolidation | 10 |
| | | |
| ARTICLE III CLASSIFICATION OF CLAIMS AND INTERESTS | | 11 |
| 3.1 | Introduction | 11 |
| 3.2 | Unimpaired Claims | 11 |

| | | |
|---|---|---|
| 3.3 | Impaired Claims | 11 |
| 3.4 | Unimpaired Interests | 12 |
| 3.5 | Impaired Interests | 12 |

ARTICLE IV TREATMENT OF CLAIMS AND INTERESTS ............................................................ 12
| | | |
|---|---|---|
| 4.1 | Unclassified Claims | 12 |
| 4.2 | Unimpaired Classes of Claims | 13 |
| 4.3 | Impaired Classes of Claims | 13 |
| 4.4 | Classes of Interests | 18 |
| 4.5 | Reservation of Rights Regarding Claims | 18 |

ARTICLE V ACCEPTANCE OR REJECTION OF THE PLAN ........................................................ 18
| | | |
|---|---|---|
| 5.1 | Impaired Classes of Claims and Interests Entitled to Vote | 18 |
| 5.2 | Acceptance by an Impaired Class | 18 |
| 5.3 | Presumed Acceptances by Unimpaired Classes | 18 |
| 5.4 | Classes Deemed to Reject Plan | 18 |
| 5.5 | Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code | 18 |

ARTICLE VI MEANS FOR IMPLEMENTATION OF THE PLAN ................................................... 19
| | | |
|---|---|---|
| 6.1 | Continued Corporate Existence | 19 |
| 6.2 | Certificates of Incorporation and By-laws | 19 |
| 6.3 | New Financing | 19 |
| 6.4 | Cancellation of Old Securities and Agreements | 19 |
| 6.5 | Authorization and Issuance of New Common Stock | 20 |
| 6.6 | New Equity Incentive Plan; Further Participation in Incentive Plans | 20 |
| 6.7 | Directors of Reorganized Debtors | 20 |
| 6.8 | Officers of Reorganized Debtors | 21 |
| 6.9 | Revesting of Assets; Releases of Liens | 21 |
| 6.10 | Post-Effective Date Restructuring Transactions | 21 |
| 6.11 | Indemnification of Debtors' Directors, Officers, and Employees | 21 |
| 6.12 | Preservation of Rights of Action; Resulting Claim Treatment | 22 |
| 6.13 | Effectuating Documents; Further Transactions | 22 |
| 6.14 | Exemption From Certain Transfer Taxes | 22 |
| 6.15 | Corporate Action | 22 |
| 6.16 | Constituency Settlement | 22 |

ARTICLE VII TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ............ 25
| | | |
|---|---|---|
| 7.1 | Assumed Executory Contracts and Unexpired Leases | 25 |
| 7.2 | Payments Related to Assumption of Executory Contracts and Unexpired Leases | 25 |
| 7.3 | Rejected Executory Contracts and Unexpired Leases | 25 |
| 7.4 | Rejection Damages Bar Date | 25 |
| 7.5 | Compensation and Benefit Programs | 25 |
| 7.6 | Certain Indemnification Obligations | 26 |
| 7.7 | Extension of Time to Assume or Reject | 27 |
| 7.8 | Claims Arising From Assumption or Rejection | 27 |

ARTICLE VIII PROVISIONS GOVERNING DISTRIBUTIONS ..................................................... 27
| | | |
|---|---|---|
| 8.1 | Distributions for Claims Allowed as of Effective Date | 27 |
| 8.2 | Interest on Claims | 27 |
| 8.3 | Designation; Distributions by Disbursing Agent | 27 |
| 8.4 | Means of Cash Payment | 28 |
| 8.5 | Calculation of Distribution Amounts of New Common Stock | 28 |
| 8.6 | Delivery of Distributions | 28 |
| 8.7 | Application of Distribution Record Date | 28 |
| 8.8 | Withholding and Reporting Requirements | 29 |
| 8.9 | Setoffs | 29 |
| 8.10 | Prepayment | 29 |
| 8.11 | No Distribution in Excess of Allowed Amount of Claim | 29 |

8.12        Allocation of Distributions ..................................................................... 29

ARTICLE IX PROCEDURES FOR RESOLVING DISPUTED, CONTINGENT, AND UNLIQUIDATED CLAIMS AND DISTRIBUTIONS WITH RESPECT THERETO ....................................... 29

9.1         Prosecution of Objections to Claims ....................................................... 29
9.2         Treatment of Disputed Claims.................................................................. 30
9.3         Provisions for Disputed General Unsecured Claims ................................ 30

ARTICLE X CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE PLAN ..................................................................................................... 31

10.1       Conditions to Confirmation..................................................................... 31
10.2       Conditions to Effective Date .................................................................. 32
10.3       Waiver of Conditions .............................................................................. 32

ARTICLE XI RETENTION OF JURISDICTION ............................................................ 33

11.1       Scope of Retention of Jurisdiction ......................................................... 33
11.2       Failure of the Bankruptcy Court to Exercise Jurisdiction...................... 34

ARTICLE XII MISCELLANEOUS PROVISIONS ......................................................... 34

12.1       Professional Fee Claims; Indenture Trustee Expenses .......................... 34
12.2       Administrative Claims............................................................................. 35
12.3       Payment of Statutory Fees....................................................................... 35
12.4       Modifications and Amendments.............................................................. 35
12.5       Severability of Plan Provisions .............................................................. 35
12.6       Successors and Assigns and Binding Effect............................................ 35
12.7       Compromises and Settlements ................................................................ 36
12.8       Releases and Satisfaction of Subordination Rights ................................ 36
12.9       Releases and Related Matters.................................................................. 36
12.10     Discharge of the Debtors ........................................................................ 37
12.11     Injunction ............................................................................................... 37
12.12     Exculpation and Limitation of Liability ................................................ 38
12.13     Term of Injunctions or Stays ................................................................. 39
12.14     Revocation, Withdrawal, or Non-Consummation ................................. 39
12.15     Notices.................................................................................................... 39
12.16     Dissolution of Creditors Committee ...................................................... 40
12.17     Computation of Time ............................................................................. 40
12.18     Governing Law....................................................................................... 40

EXHIBITS
A         New FiberMark Charter
B         New FiberMark By-laws
C         Section 7.5(a) Benefits

## AMENDED JOINT PLAN OF REORGANIZATION
## UNDER CHAPTER 11, TITLE 11, UNITED STATES CODE
## OF FIBERMARK, INC., ET AL., DEBTORS

## INTRODUCTION

FiberMark, Inc., FiberMark North America, Inc., and FiberMark International Holdings LLC (the "Debtors") hereby propose this joint plan of reorganization (the "Plan") for the resolution of their outstanding Claims (as defined herein) and Interests (as defined herein). Reference is made to the Disclosure Statement (as defined herein) distributed contemporaneously herewith for a discussion of the Debtors' history, businesses, properties, results of operations, projections for future operations and risk factors, and a summary and analysis of the Plan and certain related matters, including distributions to be made under the Plan. The Debtors are the proponents of the Plan within the meaning of Section 1129 of the Bankruptcy Code (as defined herein).

All holders of Claims who are entitled to vote on the Plan are encouraged to read the Plan and the Disclosure Statement in their entirety before voting to accept or reject the Plan. Subject to certain restrictions and requirements set forth in Section 1127 of the Bankruptcy Code, Rule 3019 of the Bankruptcy Rules (as defined herein), and Article XII of the Plan, the Debtors reserve the right to alter, amend, modify, revoke, or withdraw the Plan prior to its substantial consummation.

For purposes of the Plan, except as expressly provided or unless the context otherwise requires, all capitalized terms used in the Plan and not otherwise defined in the Plan shall have the meanings ascribed to them in Article I of the Plan. Any capitalized term used in the Plan that is not defined herein, but is defined in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning ascribed to that term in the Bankruptcy Code or the Bankruptcy Rules. Whenever the context requires, such terms shall include the plural as well as the singular number, the masculine gender shall include the feminine, and the feminine gender shall include the masculine.

## ARTICLE I

## DEFINITIONS

For purposes of the Plan, (a) any reference in the Plan to a contract, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions, (b) any reference in the Plan to an existing document or exhibit means such document or exhibit as it may be amended, modified, or supplemented from time to time, (c) unless otherwise specified, all references in the Plan to sections, articles, schedules, and exhibits are references to sections, articles, schedules, and exhibits of or to the Plan, (d) the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan, (e) captions and headings to articles and sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan, and (f) the rules of construction set forth in Section 102 of the Bankruptcy Code and in the Bankruptcy Rules shall apply.

**1.1** **"Administrative Claim"** means a Claim for payment of an administrative expense of a kind specified in Section 503(b) or 1114(e)(2) of the Bankruptcy Code and entitled to priority pursuant to Section 507(a)(1) of the Bankruptcy Code, including, but not limited to, (a) the actual, necessary costs and expenses incurred after the Petition Date of preserving the Estates and operating the businesses of the Debtors, including, without limitation, wages, salaries, or commissions for services rendered after the commencement of the Chapter 11 Case, (b) obligations under the Key Employee Protection Order, (c) Professional Fee Claims, (d) Substantial Contribution Claims, (e) all fees and charges assessed against the Estates under Section 1930 of Title 28 of the United States Code, (f) all Allowed Claims for reclamation under Section 546(c)(2)(A) of the Bankruptcy Code, (g) Cure payments for executory contracts and unexpired leases that are assumed under Section 365 of the Bankruptcy Code, (h) the Claim of Empire State Development Corporation pursuant to the Order Under 11 U.S.C. § 365(a) Authorizing Assumption of Grant Disbursement Agreement with Empire State Development Corporation on Negotiated Terms entered on August 24, 2004, (i) the DIP Facility Claim, and (j) the German Guaranty Claim.

**1.2** **"AIGGIC"** means AIG Global Investment Corp., and its affiliates, agents, officers, directors, employees, and representatives, together with all accounts and funds managed or controlled thereby.

**1.3** **"Allowed"** means, (a) when used with respect to an Administrative Claim, all or any portion of an Administrative Claim that has been allowed, or adjudicated in favor of the holder by estimation or liquidation, by a Final Order, that was incurred by the Debtors in the ordinary course of business during the Chapter 11 Case and as to which there is no dispute as

to the Debtors' liability, or that has become allowed by failure to object pursuant to Section 9.1 of the Plan; (b) when used with respect to a Claim other than an Administrative Claim, such Claim or any portion thereof (i) that has been allowed, or adjudicated in favor of the holder by estimation or liquidation, by a Final Order, or (ii) as to which (x) no Proof of Claim has been filed with the Bankruptcy Court and (y) the liquidated and noncontingent amount of which is included in the Schedules (any Claim identified in the Schedules as contingent for administrative purposes only, which is not otherwise contingent in nature, shall not be considered contingent), other than a Claim that is included in the Schedules at zero, in an unknown amount, or as Disputed, or (iii) for which a Proof of Claim in a liquidated amount has been timely filed with the Bankruptcy Court pursuant to the Bankruptcy Code, any Final Order of the Bankruptcy Court, or other applicable bankruptcy law, and as to which either (x) no objection to its allowance has been filed within the periods of limitation fixed by the Plan, the Bankruptcy Code, or any order of the Bankruptcy Court, or (y) any objection to its allowance has been settled or withdrawn, or has been denied by a Final Order, or (iv) that is expressly allowed in a liquidated amount in the Plan.

**1.4**     **"Ballot"** means the form to be used by (a) holders of Claims in Classes that are entitled to vote on the Plan to indicate their votes to accept or reject the Plan and (b) holders of General Unsecured Claims in Class 10 also to elect the treatment described in Section 4.3(g)(ii)(B) of the Plan.

**1.5**     **"Banc One Equipment Financing Claim"** means the Claim of Banc One Leasing Corporation, now known as Chase Equipment Leasing Inc., or any affiliate thereof, existing under the Equipment Financing Agreement between FiberMark and Jules and Associates, Inc., dated as of December 13, 1999; Schedule 1 thereto dated as of July 5, 2000, Schedule 2 thereto dated as of September 13, 2000, and Schedule 3 thereto dated as of December 21, 2000; and related documents, agreements, and instruments; all as assigned by Jules and Associates, Inc. to Banc One Leasing Corporation or any affiliate thereof; after application of adequate protection payments made under the Stipulation Providing Adequate Protection for Secured Manufacturing Equipment Loan of Banc One Leasing Corporation filed on June 25, 2004, as approved by order of the Bankruptcy Court entered on July 1, 2004.

**1.6**     **"Bankruptcy Code"** means the Bankruptcy Reform Act of 1978, as codified in title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as now in effect on the Petition Date or thereafter amended to the extent the amendment is applicable to the Chapter 11 Case.

**1.7**     **"Bankruptcy Court"** means the United States Bankruptcy Court for the District of Vermont or such other court as may have jurisdiction over the Chapter 11 Case or any aspect thereof.

**1.8**     **"Bankruptcy Rules"** means the Federal Rules of Bankruptcy Procedure.

**1.9**     **"Bar Date(s)"** means the date(s) designated by the Bankruptcy Court as the last date(s) for filing Proofs of Claim against the Debtors.

**1.10**     **"Business Day"** means any day, excluding Saturdays, Sundays, or "legal holidays" (as defined in Rule 9006(a) of the Bankruptcy Rules), on which commercial banks are open for business in New York, New York.

**1.11**     **"Cash"** means legal tender of the United States or equivalents thereof.

**1.12**     **"Cash Reserve"** means the reserve of Distribution Cash established and maintained by the Disbursing Agent on account of Disputed General Unsecured Claims, which shall also include a portion of the Settlement Cash as provided for in Section 6.16(b) of the Plan.

**1.13**     **"Chapter 11 Case"** means the jointly administered Chapter 11 cases of the Debtors.

**1.14**     **"Claim"** means (a) the right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured, or (b) the right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

**1.15**     **"Claims Objection Deadline"** means the last day for filing objections to Claims, which day shall be the latest of (a) sixty (60) days after the Effective Date, (b) thirty (30) days after the applicable Proof of Claim or request for payment of an Administrative Claim is filed, (c) thirty (30) days after entry of a Final Order reinstating any Claim previously disallowed under Section 502(j) of the Bankruptcy Code, or (d) such other later date as is established by order of the Bankruptcy Court upon motion of the Reorganized Debtors or any other party.

**1.16** **"Class"** means a category of holders of Claims or Interests, as described in Article III of the Plan.

**1.17** **"Coated Paper Sale/Leaseback Claim"** means the Claim existing under the Project Agreement among FiberMark DSI, Inc. (a predecessor in interest to FNA), FiberMark and Coated Paper, LLC dated as of October 3, 2002; the Supplemental Agreement between such parties dated as of January 29, 2003; and various related documents, agreements, and instruments; after application of adequate protection payments made under the Stipulation Providing for Post-Petition Adequate Protection or Real Property Lease Payments to Coated Paper, LLC filed on June 25, 2004, as approved by order of the Bankruptcy Court entered on July 1, 2004, the Stipulation Providing for Additional Adequate Protection Payments to Coated Paper, LLC Pending Effective Date of Plan filed on February 3, 2005, as approved by order of the Bankruptcy Court entered on February 4, 2005, and the Stipulation Providing for Post-Petition Adequate Protection or Payment in Lieu of Tax to County of Lewis Industrial Development Agency filed on April 19, 2005, as approved by order of the Bankruptcy Court entered on April 25, 2005.

**1.18** **"Common Stock Reserve"** means the reserve of New Common Stock established and maintained by the Disbursing Agent on account of Disputed General Unsecured Claims.

**1.19** **"Confirmation"** means approval of the Plan by the Bankruptcy Court pursuant to Section 1129 of the Bankruptcy Code.

**1.20** **"Confirmation Date"** means the date of entry by the clerk of the Bankruptcy Court of the Confirmation Order.

**1.21** **"Confirmation Hearing"** means the hearing to consider Confirmation of the Plan under Section 1128 of the Bankruptcy Code.

**1.22** **"Confirmation Order"** means the order entered by the Bankruptcy Court confirming the Plan.

**1.23** **"Constituency Causes of Action"** means all claims, rights, causes of action, suits or proceedings, whether at law or in equity, against AIGGIC or Post (including without limitation those that were or could have been described or identified in the Examiner's Report or otherwise), arising from or related to actions or alleged omissions by AIGGIC or Post, in their respective capacities as members of the Creditors Committee, in or in connection with the Chapter 11 Case, belonging to all direct or indirect holders of Noteholder Claims and General Unsecured Claims at any time during the Chapter 11 Case, as constituents of the Creditors Committee. The term specifically excludes (a) all Litigation Rights and (b) all Individual Causes of Action.

**1.24** **"Constituency Settlement"** means the compromise and settlement of (a) all Constituency Causes of Action against AIGGIC and Post, (b) all Litigation Rights against AIGGIC, Post, and Silver Point, and (c) the Individual Causes of Action of Silver Point, AIGGIC, and Post against each other, to be effectuated pursuant to the Plan, as more particularly described in Section 6.16 of the Plan.

**1.25** **"Convenience Claim"** means a Claim in an amount equal to or less than $5,000, including any Claim in an amount greater than $5,000 that is reduced to $5,000 by an amended Proof of Claim filed on or before the Distribution Record Date, which Claim is not an Administrative Claim, a Priority Tax Claim, an Other Priority Claim, a GECC Credit Facility Claim, a GECC Equipment Financing Claim, a Banc One Equipment Financing Claim, a Coated Paper Sale/Leaseback Claim, a Lowville Grant Claim, an Other Secured Claim, a Noteholder Claim, a General Unsecured Claim, an Intercompany Claim, a Subordinated Claim, or a Non-Compensatory Damages Claim.

**1.26** **"Creditor"** means any Person who holds a Claim against any of the Debtors.

**1.27** **"Creditors Committee"** means any Official Committee of Unsecured Creditors appointed pursuant to Section 1102(a) of the Bankruptcy Code; and depending on the context, means either the initial committee that was appointed by the U.S. Trustee on April 7, 2004 and disbanded by the U.S. Trustee on July 13, 2005, or any subsequent committee that may be appointed by the U.S. Trustee.

**1.28** **"Cure"** means with respect to the assumption of an executory contract or unexpired lease pursuant to Section 365(b) of the Bankruptcy Code, (a) the distribution of Cash, or the distribution of such other property as may be agreed upon by the parties or ordered by the Bankruptcy Court, in an amount equal to all unpaid monetary obligations, without interest, or such other amount as may be agreed upon by the parties under an executory contract or unexpired lease, to the extent such

obligations are enforceable under the Bankruptcy Code and applicable bankruptcy law or (b) the taking of such other actions as may be agreed upon by the parties or ordered by the Bankruptcy Court.

**1.29** **"Debtor(s)"** means, individually, FiberMark, FNA, or FIH, and collectively, FiberMark, FNA, and FIH, including in their capacity as debtors-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

**1.30** **"DIP Facility"** means the Senior Secured, Superpriority Debtor-in-Possession Credit Agreement dated as of April 1, 2004 (as amended, supplemented or otherwise modified from time to time) by and among FNA as borrower, FiberMark and FIH as guarantors, and GECC as agent for itself and the lenders party thereto; and related loan and security documents.

**1.31** **"DIP Facility Claim"** means the Claim existing under the DIP Facility.

**1.32** **"Disbursing Agent"** means Reorganized FiberMark or any Person designated by the Debtors in their discretion on or before the Effective Date to serve as disbursing agent under the Plan. Such term may include, without limitation, a stock transfer agent for the New Common Stock if elected by Reorganized FiberMark.

**1.33** **"Disclosure Statement"** means the Disclosure Statement with Respect to Amended Joint Plan of Reorganization Under Chapter 11, Title 11, United States Code of FiberMark, Inc., et al., Debtors, as amended, supplemented, or modified from time to time, and that is prepared, approved and distributed in accordance with Section 1125 of the Bankruptcy Code and Rule 3018 of the Bankruptcy Rules.

**1.34** **"Disputed"** means, with respect to any Claim, other than a Claim that has been Allowed pursuant to the Plan or a Final Order of the Bankruptcy Court, a Claim:

(a) if no Proof of Claim has been filed or deemed to have been filed by the applicable Bar Date, that has been or hereafter is listed on the Schedules as unliquidated, contingent (unless identified in the Schedules as contingent for administrative purposes only and not otherwise contingent in nature), or disputed;

(b) if a Proof of Claim has been filed or deemed to have been filed by the applicable Bar Date, as to which a Debtor has timely filed an objection or request for estimation in accordance with the Plan, the Bankruptcy Code, the Bankruptcy Rules, and any orders of the Bankruptcy Court, or which is otherwise disputed by a Debtor in accordance with applicable law, which objection, request for estimation, or dispute has not been withdrawn or determined by a Final Order;

(c) for which a Proof of Claim was required to be filed by the Bankruptcy Code, the Bankruptcy Rules, or an order of the Bankruptcy Court, but as to which a Proof of Claim was not timely or properly filed;

(d) for damages based upon the rejection by a Debtor of an executory contract or unexpired lease under Section 365 of the Bankruptcy Code and as to which the applicable Bar Date has not passed;

(e) that is disputed in accordance with the provisions of the Plan; or

(f) if not otherwise Allowed, as to which the applicable Claims Objection Deadline has not expired.

**1.35** **"Distribution Cash"** means Cash in the amount of $75 million, to be distributed on a Pro Rata basis to holders of Allowed Noteholder Claims and Allowed General Unsecured Claims pursuant to Sections 4.3(f) and 4.3(g) of the Plan.

**1.36** **"Distribution Date"** means (a) for any Claim that is an Allowed Claim on the Effective Date, the Effective Date or as soon as practicable after the Effective Date but not later than the first (1st) Business Day that is twenty (20) days after the Effective Date or (b) for any Claim that is not an Allowed Claim on the Effective Date, fifteen (15) days after the last day of the month during which the Claim becomes an Allowed Claim; *provided, however*, a later date may be established by order of the Bankruptcy Court upon motion of the Debtors, the Reorganized Debtors or any other party. As to a Noteholder Claim or a General Unsecured Claim that is entitled to subsequent distributions from the Common Stock Reserve or the Cash Reserve under Section 9.3(a) and 9.3(b) of the Plan, such term also means the additional date or dates provided in Section 9.3(c) of the Plan.

**1.37** **"Distribution Record Date"** means the record date for determining entitlement to receive distributions under the Plan on account of Allowed Claims, which date shall be (a) for all holders of Claims other than holders of Noteholder Claims and General Unsecured Claims, the third (3rd) Business Day after the Confirmation Date at 5:00 p.m. prevailing Eastern time; (b) except as otherwise provided in Section 8.7 of the Plan, for all holders of Noteholder Claims (i) receiving the distribution

described in Section 4.3(f)(iii)(A) of the Plan, the date and time immediately prior to the initial Distribution Date or (ii) electing to receive the distribution described in Section 4.3(f)(iii)(B) of the Plan, the date and time of the applicable election via the PTOP procedures; and (c) except as otherwise provided in Section 8.7 of the Plan, for all holders of General Unsecured Claims (i) receiving the distribution described in Section 4.3(g)(ii)(A) of the Plan, the third (3rd) Business Day after the Confirmation Date at 5:00 p.m. prevailing Eastern time or (ii) electing on their Ballot to receive the distribution described in Section 4.3(g)(ii)(B) of the Plan, the Voting Record Date.

**1.38** **"DTC"** means the Depository Trust Company (and, as the context may require, shall also include its nominee Cede & Co.), which holds, in the form of one or more global notes, all of the outstanding FiberMark Notes on behalf of beneficial owners.

**1.39** **"DTC Participant"** means a broker, dealer, or other institution that holds securities (including the FiberMark Notes) on behalf of clients or customers who are the beneficial owners thereof and that participates in the centralized deposit and clearance services provided by DTC.

**1.40** **"Effective Date"** means the Business Day upon which all conditions to the consummation of the Plan as set forth in Section 10.2 of the Plan have been satisfied or waived as provided in Section 10.3 of the Plan, and is the date on which the Plan becomes effective.

**1.41** **"Estate(s)"** means, individually, the estate of each Debtor in the Chapter 11 Case and, collectively, the estates of all Debtors in the Chapter 11 Case, created pursuant to Section 541 of the Bankruptcy Code.

**1.42** **"Examiner"** means Harvey R. Miller, the examiner appointed by the Bankruptcy Court pursuant to Section 1104(c) of the Bankruptcy Code by orders entered on April 19, 2005 and April 22, 2005.

**1.43** **"Examiner's Report"** means the Report of Harvey R. Miller, as Examiner, dated July 8, 2005, as amended and superseded on July 29, 2005, and as filed of record in redacted form on August 19, 2005.

**1.44** **"Exit Facility"** means the agreements and related documents and instruments evidencing the new financing to be obtained by the Reorganized Debtors as of the Effective Date, including revolving credit, term credit and/or letters of credit as determined necessary, to satisfy the DIP Facility Claim and the German Guaranty Claim, support other payments required to be made under the Plan, pay transaction costs, and fund working capital and general corporate purposes of the Reorganized Debtors following the Effective Date.

**1.45** **"FiberMark"** means FiberMark, Inc., a Delaware corporation, which is the parent company of FNA and FIH and which, along with FNA and FIH, is a Debtor herein.

**1.46** **"FiberMark Notes"** means the 9-3/8% Senior Notes due 2006 in the aggregate principal amount of $100,000,000 and the 10-3/4% Senior Notes due 2011 in the aggregate principal amount of $230,000,000, each issued by FiberMark and guaranteed by FNA and FIH.

**1.47** **"FiberMark Interests"** means, collectively, all equity interests in FiberMark, including, without limitation, any preferred stock, the Old FiberMark Common Stock, the Old FiberMark Stock Options, together with any warrants, conversion rights, rights of first refusal, or other rights, contractual or otherwise, to acquire or receive any stock or other equity ownership interests in FiberMark, and any contracts, subscriptions, commitments, or agreements pursuant to which a party was or could have been entitled to receive shares, securities, or other ownership interests in FiberMark prior to the Effective Date.

**1.48** **"FIH"** means FiberMark International Holdings LLC, a Delaware limited liability company, which is a subsidiary of FiberMark and which, along with FiberMark and FNA, is a Debtor in the Chapter 11 Case.

**1.49** **"Final Order"** means an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction, as entered on the docket in the Chapter 11 Case, or the docket of any such other court, the operation or effect of which has not been stayed, reversed, or amended, and as to which order or judgment (or any revision, modification, or amendment thereof) the time to appeal or seek review or rehearing or leave to appeal has expired and as to which no appeal or petition for review or rehearing was filed or, if filed, remains pending.

**1.50** **"FNA"** means FiberMark North America, Inc., a Delaware corporation, which is a subsidiary of FiberMark and which, along with FiberMark and FIH, is a Debtor in the Chapter 11 Case.

**1.51** **"GECC"** means General Electric Capital Corporation as the administrative agent and a lender with respect to the GECC Credit Facility Claim and as agent and a lender with respect to the DIP Facility Claim.

**1.52** **"GECC Credit Facility Claim"** means the Claim existing under the Credit Agreement dated as of November 12, 2003 (as amended from time to time) among FNA, FiberMark Lahnstein GMBH & Co. OHG and FiberMark Gessner GMBH & Co. OHG as borrowers, certain other credit parties signatory thereto, General Electric Capital Corporation as administrative agent, certain lenders signatory thereto, Bayerische Hypo- und Vereinsbank AG as fronting lender and certain other parties signatory thereto; and related documents, agreements, and instruments.

**1.53** **"GECC Equipment Financing Claim"** means the Claim existing under the Master Security Agreement dated as of September 19, 2000 (as amended from time to time) between FiberMark and CIT Group/Equipment Financing, Inc.; the Schedule of Indebtedness and Collateral No. 1 dated as of October 25, 2000; and related documents, agreements, and instruments; all as assigned by CIT Group/Equipment Financing, Inc. to General Electric Capital Corporation; after application of adequate protection payments made under the Stipulation Providing Adequate Protection for Secured Manufacturing Equipment Loan of General Electric Capital Corporation filed on May 21, 2004, as approved by order of the Bankruptcy Court entered on May 28, 2004.

**1.54** **"General Unsecured Claims"** means a Claim in an amount greater than $5,000 that is not an Administrative Claim, a Priority Tax Claim, an Other Priority Claim, a GECC Credit Facility Claim, a GECC Equipment Financing Claim, a Banc One Equipment Financing Claim, a Coated Paper Sale/Leaseback Claim, a Convenience Claim, an Other Secured Claim, a Noteholder Claim, an Intercompany Claim, a Subordinated Claim, or a Non-Compensatory Damages Claim. Any Lowville Grant Claim that is not a Secured Claim shall be treated as a General Unsecured Claim only if the holder of such Claim votes against the Plan. This definition specifically includes, without limitation, rejection damages Claims, non-priority employee Claims, non-priority tax Claims, environmental Claims, indemnification Claims, trade vendor Claims, customer Claims, escheat Claims, and litigation Claims.

**1.55** **"German Guaranty Claim"** means the Claim existing under the Amended and Restated Guaranty dated as of April 1, 2004 (as amended, supplemented, or otherwise modified from time to time), among FiberMark, FNA and FIH as guarantors and GECC individually and as administrative agent for itself and other lenders, guaranteeing the obligations under the Amended and Restated Credit Agreement dated as of April 1, 2004 (as amended, supplemented, or otherwise modified from time to time), among FiberMark Lahnstein GmbH & Co. OHG, FiberMark Gessner GmbH & Co. OHG as borrowers, the other credit parties thereto, GECC as administrative agent and European loan agent, Bayerische Hypo- und Vereinsbank AG as front lender, and the other lenders thereto.

**1.56** **"Impaired"** means, with respect to any Claim or Interest, that such Claim or Interest is impaired within the meaning of Section 1124 of the Bankruptcy Code.

**1.57** **"Indemnification Obligation"** means any obligation of any of the Debtors to indemnify, reimburse, or provide contribution pursuant to by-laws, articles or certificate of incorporation, contract, or otherwise.

**1.58** **"Indentures"** means that certain Indenture dated as of October 15, 1996 (as amended, supplemented, or otherwise modified) between FiberMark, as issuer, and the Subsidiary Debtors, as guarantors, and the Indenture Trustee, which Indenture governs all obligations arising under or in connection with the 9-3/8% Senior Notes due 2006, and that certain Indenture dated as of April 18, 2001 (as amended, supplemented, or otherwise modified) between FiberMark, as issuer, and the Subsidiary Debtors, as guarantors, and the Indenture Trustee, which Indenture governs all obligations arising under or in connection with the 10-3/4% Senior Notes due 2011.

**1.59** **"Indenture Trustee"** means Wilmington Trust Company, as Trustee, or its successor, in either case in its capacity as indenture trustee for the FiberMark Notes.

**1.60** **"Indenture Trustee Charging Lien"** means any Lien or other priority in payment or right available to the Indenture Trustee pursuant to the Indentures or under any other applicable law for the payment of the Indenture Trustee Expenses.

**1.61** **"Indenture Trustee Expenses"** means any reasonable, unpaid fees of the Indenture Trustee, and reasonable, unpaid out-of-pocket costs and expenses, including reasonable fees and expenses of counsel, incurred by the Indenture Trustee through the Effective Date, except any such costs and expenses as may be attributable to the Indenture Trustee's negligence or willful misconduct.

**1.62** **"Individual Causes of Action"** means all claims, rights of action, suits, or proceedings, whether in law or in equity, including rights of contribution or indemnity, that belong to any holder of a Noteholder Claim or a General Unsecured Claim in such holder's individual capacity (rather than claims, rights of action, suits, or proceedings, whether in law or in equity, including rights of contribution or indemnity, that belong to all holders of Noteholder Claims and General Unsecured Claims as constituents of the Creditors Committee). The term specifically excludes (a) all Litigation Rights and (b) all Constituency Causes of Action.

**1.63** **"Intercompany Claim"** means any Claim arising prior to the Petition Date against any of the Debtors by another Debtor. The term does not include Claims against any of the Debtors by a non-Debtor subsidiary or affiliate of a Debtor, which Claims shall be treated as General Unsecured Claims.

**1.64** **"Interests"** means the legal, equitable, contractual, or other rights of any Person (a) with respect to FiberMark Interests, (b) with respect to Subsidiary Interests, or (c) to acquire or receive either of the foregoing.

**1.65** **"Key Employee Protection Order"** means the Order Under 11 U.S.C. §§ 105(a) and 363(b)(1) Authorizing Implementation of Key Employee Retention and Severance Plans entered on August 6, 2004, which approved the Debtors' Key Employee Retention Plan, Key Employee Severance Plan, and Discretionary Recognition Plan.

**1.66** **"Lien"** means a charge against or interest in property to secure payment of a debt or performance of an obligation.

**1.67** **"Litigation Rights"** means the claims, rights of action, suits, or proceedings, whether in law or in equity, whether known or unknown, that the Debtors or their Estates may hold against any Person (except to the extent such claims are expressly released under the Plan), which are to be retained by the Reorganized Debtors pursuant to Section 6.12 of the Plan, including, without limitation, (a) claims or causes of action arising under or pursuant to Chapter 5 of the Bankruptcy Code, and (b) objections to the fees and expenses of Akin Gump Strauss Hauer & Feld LLP and Chanin Capital Partners LLC and any claims or causes of action for disallowance or disgorgement of any such fees and expenses to the extent paid or payable by the Debtors or their Estates. The term does not include any (a) Constituency Causes of Action or (b) Individual Causes of Action.

**1.68** **"Lowville Grant Claims"** means the Claims existing under the Grant Agreement for CDBG Funds dated as of March 11, 2003 among FNA as grantee, FiberMark as guarantor, and County of Lewis Industrial Development Agency as funding agency, providing grant funds of $100,000; the Grant Agreement dated as of March 11, 2003 between FNA as grantee and County of Lewis Industrial Development Agency as funding agency, providing grant funds of $250,000; the Grant Agreement for Small Cities CDBG Funds dated as of March 11, 2003 among FNA as grantee, FiberMark as guarantor, and County of Lewis as funding agency, and the associated Security Agreement dated as of March 11, 2003 between FNA as debtor and County of Lewis as secured party, providing grant funds of $750,000; the Grant Agreement for Empire State Development Funds dated as of October 27, 2003, between FNA as grantee and County of Lewis Industrial Development Agency as funding agency, providing grant funds of $150,000; and the Grant Agreement for Empire State Development Funds dated as of October 27, 2003, between FNA as grantee and County of Lewis Industrial Development Agency as funding agency, providing grant funds of $250,000.

**1.69** **"New Board"** means the Board of Directors of Reorganized FiberMark, to be constituted as of the Effective Date pursuant to Section 6.7(a) of the Plan.

**1.70** **"New Common Stock"** means the new common shares, par value $0.001 per share, of Reorganized FiberMark to be authorized and/or issued under Section 6.5 of the Plan as of the Effective Date, with terms substantially as set forth in the New FiberMark Charter and the New FiberMark By-laws.

**1.71** **"New Equity Incentive Plan"** means the new management and directors equity incentive plan to be adopted by the New Board pursuant to Section 6.6 of the Plan.

**1.72** **"New FiberMark Charter"** means the certificate of incorporation of Reorganized FiberMark, which shall be substantially in the form attached hereto as Exhibit A.

**1.73** **"New FiberMark By-laws"** means the by-laws of Reorganized FiberMark, which shall be substantially in the form attached hereto as Exhibit B.

**1.74** **"Non-Compensatory Damages Claim"** means any Claim against any of the Debtors for any fine, penalty, or forfeiture, or multiple, exemplary, or punitive damages, to the extent that such fine, penalty, forfeiture, or damage is not compensation for actual pecuniary loss suffered by the holder of such Claim, including any such claim based upon, arising from, or relating to any cause of action whatsoever (including, without limitation, violation of law, personal injury, or wrongful death, whether secured or unsecured, liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising in law, equity or otherwise); *provided*, *however*, that such term shall not include any Claim that might otherwise constitute a Non-Compensatory Damages Claim but for a Final Order allowing such Claim to be an Administrative Claim, Priority Tax Claim, Other Priority Claim, Convenience Claim, Other Secured Claim, General Unsecured Claim, or Subordinated Claim.

**1.75** **"Noteholder Claims"** means any Claim arising from or relating to the FiberMark Notes, other than any Indenture Trustee Expenses.

**1.76** **"Old FiberMark Common Stock"** means, the shares of the common stock, par value $0.001 per share, of FiberMark issued and outstanding as of the Petition Date.

**1.77** **"Old FiberMark Stock Options"** means the stock options issued by FiberMark and outstanding as of the Petition Date that give the holders of such options the right to purchase Old FiberMark Common Stock.

**1.78** **"Old Securities"** means, collectively, the FiberMark Interests, specifically including the Old FiberMark Common Stock and the Old FiberMark Stock Options, and the FiberMark Notes.

**1.79** **"Organic Change"** means any transaction or series of transactions pursuant to which Reorganized FiberMark reorganizes its capital, consolidates or merges with or into another Person or enters into a business combination with another Person (in the case of a consolidation, merger or business combination, where Reorganized FiberMark is not the surviving Person), or sells, transfers, or otherwise disposes of all or substantially all of its property, assets, or business to another Person.

**1.80** **"Other Priority Claim"** means a Claim against the Debtors entitled to priority pursuant to Section 507(a) of the Bankruptcy Code, other than a Priority Tax Claim or an Administrative Claim.

**1.81** **"Other Secured Claim"** means a Secured Claim arising prior to the Petition Date against any of the Debtors, other than a GECC Credit Facility Claim, a GECC Equipment Financing Claim, a Banc One Equipment Financing Claim, or a Coated Paper Sale/Leaseback Claim. Any Lowville Grant Claim that is a Secured Claim shall be treated as an Other Secured Claim only if the holder of such Claim votes against the Plan.

**1.82** **"Person"** means any individual, firm, partnership, corporation, trust, association, company, limited liability company, joint stock company, joint venture, governmental unit, or other entity or enterprise.

**1.83** **"Petition Date"** means March 30, 2004, the date on which the Debtors filed their petitions for relief commencing the cases that are being administered as the Chapter 11 Case.

**1.84** **"Plan"** means this Amended Joint Plan of Reorganization Under Chapter 11, Title 11, United States Code of FiberMark, Inc., et al., Debtors, all exhibits annexed hereto or referenced herein, as the same may be amended, modified, or supplemented from time to time.

**1.85** **"Post"** means Post Advisory Group, LLC, and its affiliates, agents, officers, directors, employees, and representatives, together with all accounts and funds managed or controlled thereby.

**1.86** **"Priority Tax Claim"** means a Claim that is entitled to priority pursuant to Section 507(a)(8) of the Bankruptcy Code.

**1.87** **"Professional"** means any professional employed in the Chapter 11 Case pursuant to Section 327 or 1103 of the Bankruptcy Code, and any professional seeking compensation or reimbursement of expenses in connection with the Chapter 11 Case pursuant to Section 503(b) of the Bankruptcy Code.

**1.88** **"Professional Fee Claim"** means a Claim of (a) a Professional for compensation or reimbursement of costs and expenses relating to services rendered after the Petition Date and prior to and including the Effective Date and (b) the Examiner and any professionals employed by the Examiner.

**1.89** **"Proof of Claim"** means a Proof of Claim filed with the Bankruptcy Court in connection with the Chapter 11 Case.

**1.90** **"Pro Rata"** means, at any time, the proportion that the amount of a Claim in a particular Class or Classes (or portions thereof, as applicable) bears to the aggregate amount of all Claims (including Disputed Claims) in such Class or Classes, unless the Plan provides otherwise.

**1.91** **"PTOP"** means the Participant Tender over Participant Terminal System of the DTC, through which elections to receive the treatment described in Section 4.3(f)(iii)(B) of the Plan must have been made.

**1.92** **"Reinstated"** means (a) leaving unaltered the legal, equitable, and contractual rights to which the holder of a Claim is entitled so as to leave such Claim unimpaired in accordance with Section 1124 of the Bankruptcy Code, or (b) notwithstanding any contractual provision or applicable law that entitles the holder of such Claim to demand or receive accelerated payment of such Claim after the occurrence of a default, (i) curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in Section 365(b)(2) of the Bankruptcy Code, (ii) reinstating the maturity of such Claim as such maturity existed before such default, (iii) compensating the holder of such Claim for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law, and (iv) not otherwise altering the legal, equitable, or contractual rights to which the holder of such Claim is entitled.

**1.93** **"Reorganized Debtor(s)"** means, individually, any reorganized Debtor or its successor and, collectively, all reorganized Debtors or their successors, on or after the Effective Date.

**1.94** **"Reorganized FiberMark"** means reorganized FiberMark or its successor, on and after the Effective Date.

**1.95** **"Reorganized Subsidiary Debtor(s)"** means, individually, a reorganized Subsidiary Debtor or its successor and, collectively, both reorganized Subsidiary Debtors or their successors, on or after the Effective Date.

**1.96** **"Schedules"** means the schedules of assets and liabilities, schedules of executory contracts and unexpired leases, and the statements of financial affairs filed in the Bankruptcy Court by the Debtors, as amended or supplemented from time to time in accordance with Rule 1009 of the Bankruptcy Rules or orders of the Bankruptcy Court.

**1.97** **"Secured Claim"** means a Claim that is secured by a Lien which is not subject to avoidance under the Bankruptcy Code or otherwise invalid under the Bankruptcy Code or applicable state law, on property in which an Estate has an interest, or a Claim that is subject to setoff under Section 553 of the Bankruptcy Code; to the extent of the value of the holder's interest in the Estate's interest in such property or to the extent of the amount subject to setoff, as applicable; as determined by a Final Order pursuant to Section 506(a) of the Bankruptcy Code, or in the case of setoff, pursuant to Section 553 of the Bankruptcy Code, or in either case as otherwise agreed upon in writing by the Debtors or the Reorganized Debtors and the holder of such Claim.

**1.98** **"Settlement Cash"** means Cash in an aggregate amount equal to the lesser of (a) eight percent (8%) of the aggregate amount of all Allowed Noteholder Claims and Allowed General Unsecured Claims other than any such Claims held by Silver Point, AIGGIC, and Post and (b) $4,200,000, to be derived from payments made by or directed to be made by AIGGIC and Post to the Reorganized Debtors in full satisfaction, discharge, and release of the Constituency Causes of Action and the Litigation Rights against AIGGIC and Post, pursuant to the Constituency Settlement provided for in Section 6.16 of the Plan.

**1.99** **"Silver Point"** means Silver Point Capital, L.P., and its affiliates, agents, officers, directors, employees and representatives, together with all accounts and funds managed thereby.

**1.100** **"Stock Purchase Payment"** means the payment to be made by Silver Point, by reduction of the Distribution Cash payable to Silver Point, to acquire the New Common Stock allocated to holders of Allowed Noteholder Claims and Allowed General Claims who do not properly and timely elect the alternative treatment provided in Sections 4.3(f)(iii)(B) and 4.3(g)(ii)(B) of the Plan and, thus, are to be treated pursuant to Sections 4.3(f)(iii)(A) and 4.3(g)(ii)(A) of the Plan, in an amount that will provide an aggregate Cash payment to such holders equal to the lesser of (a) the amount that, when added to

each such holder's share of the Distribution Cash and Settlement Cash, results in a total payment of seventy percent (70%) of each such holder's Allowed Claim or (b) $21,600,000.

**1.101** **"Subordinated Claim"** means any Claim against any of the Debtors that is subordinated pursuant to Section 510(b) or 510(c) of the Bankruptcy Code, which shall include any Claim arising from the rescission of a purchase or sale of any Old Security, any Claim for damages arising from the purchase or sale of an Old Security, or any Claim for reimbursement, contribution, or indemnification on account of any such Claim.

**1.102** **"Subsidiary Debtors"** means, collectively, FNA and FIH, each of which is a Debtor in the Chapter 11 Case.

**1.103** **"Subsidiary Interests"** means, collectively, all of the issued and outstanding shares of stock or membership interests of the Subsidiary Debtors, as of the Petition Date, which stock and interests are owned by FiberMark.

**1.104** **"Substantial Contribution Claim"** means a claim for compensation or reimbursement of costs and expenses relating to services rendered in making a substantial contribution in the Chapter 11 Case pursuant to Section 503(b)(3), (4), or (5) of the Bankruptcy Code.

**1.105** **"Unimpaired"** means, with respect to any Claim, that such Claim is not impaired within the meaning of Section 1124 of the Bankruptcy Code.

**1.106** **"Voting Deadline"** means the deadline established by the Bankruptcy Court by which the holders of Claims in Classes that are entitled to vote on the Plan must submit the Ballot indicating each such holder's vote on the Plan.

**1.107** **"Voting Record Date"** means the record date for determining the holders of Claims entitled to vote on the Plan, as established by the Bankruptcy Court.

## ARTICLE II

## SUBSTANTIVE CONSOLIDATION

### 2.1    Request for Substantive Consolidation

This Plan constitutes a motion for substantive consolidation of the liabilities and properties of the Debtors, the confirmation of the Plan shall constitute approval of the motion by the Bankruptcy Court, and the Confirmation Order shall contain findings supporting and conclusions providing for substantive consolidation on the terms set forth in Section 2.2 of this Plan.

### 2.2    Effect of Substantive Consolidation

(a)    As a result of the substantive consolidation of the liabilities and properties of the Debtors, except as otherwise provided in the Plan, (i) the separate Chapter 11 cases of the Debtors shall be consolidated into the case of FiberMark as a single consolidated case; (ii) all property of the Estate of each Debtor shall be deemed to be property of the consolidated Estates; (iii) all Claims against each Estate shall be deemed to be Claims against the consolidated Estates, any Proof of Claim filed against one or more of the Debtors shall be deemed to be a single claim filed against the consolidated Estates, and all duplicate Proofs of Claim for the same claim filed against more than one Debtor shall be deemed expunged; (iv) no distributions under this Plan shall be made on account of Intercompany Claims; (v) all Claims based upon pre-petition unsecured guarantees by one Debtor in favor of any other of the Debtors (other than guarantees existing under any assumed executory contracts or unexpired leases) shall be eliminated, and no distributions under this Plan shall be made on account of Claims based upon such guarantees; (vi) for purposes of determining the availability of the right of setoff under Section 553 of the Bankruptcy Code, the Debtors shall be treated as one consolidated entity so that, subject to the other provisions of Section 553, pre-petition debts due to any of the Debtors may be set off against the pre-petition debts of any other of the Debtors; and (vii) no distributions under this Plan shall be made on account of any Subsidiary Interests.

(b)    Substantive consolidation shall not merge or otherwise affect the separate legal existence of each Debtor, other than with respect to distribution rights under this Plan; substantive consolidation shall have no effect on valid, enforceable and unavoidable liens, except for liens that secure a Claim that is eliminated by virtue of substantive consolidation and liens against collateral that are extinguished by virtue of substantive consolidation; and substantive consolidation shall not have the effect of creating a Claim in a class different from the class in which a Claim would have been placed in the absence of substantive consolidation.  Substantive consolidation shall not affect the obligation of each of

the Debtors or the Reorganized Debtors, pursuant to Section 1930 of Title 28 of the United States Code, to pay quarterly fees to the Office of the United States Trustee until such time as a particular Chapter 11 case is closed, dismissed or converted.

## ARTICLE III

## CLASSIFICATION OF CLAIMS AND INTERESTS

**3.1**      **Introduction**

(a)      In accordance with Section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified, and the respective treatment of such unclassified claims is set forth in Section 4.1 of the Plan.

(b)      A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class and such Claim or Interest has not been paid, released, or otherwise settled prior to the Effective Date. A Claim or Interest may be and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes.

**3.2**      **Unimpaired Claims**

*Class 1:   Other Priority Claims*

Class 1 consists of all Other Priority Claims.

*Class 2:  GECC Credit Facility Claim*

Class 2 consists of the GECC Credit Facility Claim.

*Class 3:  Convenience Claims*

Class 3 consists of all Convenience Claims.

**3.3**      **Impaired Claims**

*Class 4:  GECC Equipment Financing Claim*

Class 4 consists of the GECC Equipment Financing Claim.

*Class 5:  Banc One Equipment Financing Claim*

Class 5 consists of the Banc One Equipment Financing Claim.

*Class 6: Coated Paper Sale/Leaseback Claim*

Class 6 consists of the Coated Paper Sale/Leaseback Claim.

*Class 7:   Lowville Grant Claims*

Class 7 consists of the Lowville Grant Claims.

*Class 8:   Other Secured Claims*

Class 8 consists of separate sub-Classes for each Other Secured Claim against any of the Debtors. Each sub-Class is deemed to be a separate Class for all purposes under the Bankruptcy Code, including for voting purposes.

*Class 9:  Noteholder Claims*

Class 9 consists of all Noteholder Claims.

*Class 10:  General Unsecured Claims*

Class 10 consists of all General Unsecured Claims.

*Class 11: Intercompany Claims*

Class 11 consists of all Intercompany Claims.

*Class 12:  Subordinated Claims*

Class 12 consists of all Subordinated Claims.

*Class 13:  Non-Compensatory Damages Claims*

Class 13 consists of all Non-Compensatory Damages Claims.

**3.4    Unimpaired Interests**

*Class 14:  Subsidiary Interests*

Class 14 consists of all Subsidiary Interests.

**3.5    Impaired Interests**

*Class 15:  FiberMark Interests*

Class 15 consists of all FiberMark Interests.

**ARTICLE IV**

**TREATMENT OF CLAIMS AND INTERESTS**

**4.1    Unclassified Claims**

(a)    **Administrative Claims**

With respect to each Allowed Administrative Claim, except as otherwise provided for herein, and subject to the requirements of Sections 12.1 through 12.3 of the Plan, on, or as soon as reasonably practicable after, the latest of (i) the Effective Date, (ii) the date such Administrative Claim becomes an Allowed Administrative Claim, or (iii) the date such Administrative Claim becomes payable pursuant to any agreement between a Debtor and the holder of such Administrative Claim, the holder of each such Allowed Administrative Claim shall receive in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Administrative Claim, (A) Cash equal to the unpaid portion of such Allowed Administrative Claim or (B) such different treatment as to which the applicable Debtor and such holder shall have agreed upon in writing; *provided*, *however*, that Allowed Administrative Claims with respect to liabilities incurred by a Debtor in the ordinary course of business during the Chapter 11 Case shall be paid in the ordinary course of business in accordance with the terms and conditions of any agreements relating thereto.

The DIP Facility Claim shall be deemed Allowed in its entirety for all purposes of the Plan and the Chapter 11 Case.  The holders of the Allowed DIP Facility Claim shall receive, on the later of the Effective Date or the date on which such DIP Facility Claim becomes payable pursuant to any agreement between the Debtors and the holders of such DIP Facility Claim, in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed DIP Facility Claim, (i) Cash equal to the full amount of such Allowed DIP Facility Claim, or (ii) such different treatment as to which the Debtors and such holders shall have agreed upon in writing; *provided*, *however*, that in respect of any letters of credit issued and undrawn under the DIP Facility, unless GECC or an applicable affiliate is a lender under the Exit Facility and permits such letters of credit to be rolled over and treated as letters of credit issued under the Exit Facility, the Debtors shall be required to either, with the consent of GECC: (A) cash collateralize such letters of credit in an amount equal to 103% of the undrawn amount of any such letters of credit, (B) return any such letters of credit to the applicable fronting bank undrawn and marked "cancelled," or (C) provide a "back-to-back" letter of credit to the issuing bank in a form and issued by an

institution reasonably satisfactory to such issuing bank, in an amount equal to 103% of the then undrawn amount of such letters of credit.

The German Guaranty Claim shall be deemed Allowed in its entirety for all purposes of the Plan and the Chapter 11 Case. The holders of the Allowed German Guaranty Claim shall receive, on the later of the Effective Date or the date on which such German Guaranty Claim becomes payable pursuant to any agreement between the Debtors and the holders of such German Guaranty Claim, in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed German Guaranty Claim, (i) Cash equal to the full amount of such Allowed German Guaranty Claim, or (ii) such different treatment as to which the Debtors and such holders shall have agreed upon in writing.

(b)     **Priority Tax Claims**

Each holder of an Allowed Priority Tax Claim shall receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Priority Tax Claim, as shall have been determined by the Debtors in their sole discretion, either (i) on, or as soon as reasonably practicable after, the later of the Effective Date or the date on which such Claim becomes an Allowed Claim, Cash equal to the unpaid portion of such Allowed Priority Tax Claim, (ii) such different treatment as to which the applicable Debtor and such holder shall have agreed upon in writing, or (iii) deferred Cash payments having a value, as of the Effective Date, equal to such Allowed Priority Tax Claim, over a period not exceeding six (6) years after the date of assessment of such Allowed Priority Tax Claim.

**4.2     Unimpaired Classes of Claims**

(a)     **Class 1:  Other Priority Claims**

On, or as soon as reasonably practicable after, the latest of (i) the Effective Date, (ii) the date on which such Other Priority Claim becomes an Allowed Other Priority Claim, or (iii) the date on which such Allowed Other Priority Claim becomes payable pursuant to any agreement between a Debtor and the holder of such Other Priority Claim, each holder of an Allowed Other Priority Claim shall receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Other Priority Claim, either (A) Cash equal to the unpaid portion of such Allowed Other Priority Claim or (B) such different treatment as to which the applicable Debtor and such holder shall have agreed upon in writing.

(b)     **Class 2:  GECC Credit Facility Claim**

The holders of the Allowed GECC Credit Facility Claim shall receive, on the later of the Effective Date or the date on which such GECC Credit Facility Claim becomes payable pursuant to any agreement between the Debtors and the holders of such GECC Credit Facility Claim, in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed GECC Credit Facility Claim, (i) Cash equal to the full amount of such Allowed GECC Credit Facility Claim, or (ii) such different treatment as to which the Debtors and such holders shall have agreed upon in writing; *provided, however*, that in respect of any letters of credit issued and undrawn under the Credit Agreement giving rise to the GECC Credit Facility Claim, unless GECC or an applicable affiliate is a lender under the Exit Facility and permits such letters of credit to be rolled over and treated as letters of credit issued under the Exit Facility, the Debtors shall be required to either, with the consent of GECC: (A) cash collateralize such letters of credit in an amount equal to 103% of the undrawn amount of any such letters of credit, (B) return any such letters of credit to the applicable fronting bank undrawn and marked "cancelled," or (C) provide a "back-to-back" letter of credit to the issuing bank in a form and issued by an institution reasonably satisfactory to such issuing bank, in an amount equal to 103% of the then undrawn amount of such letters of credit.

(c)     **Class 3:  Convenience Claims**

On, or as soon as reasonably practicable after, the later of the Effective Date or the date on which such Claim becomes an Allowed Claim, each holder of an Allowed Convenience Claim, shall receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Convenience Claim, Cash in an amount equal to the lesser of (i) the Allowed amount of such Claim or (ii) $5,000.

**4.3     Impaired Classes of Claims**

(a)     **Class 4: GECC Equipment Financing Claim**

The legal, equitable, and contractual rights of the holder of the GECC Equipment Financing Claim shall be Reinstated in accordance with the provisions of Section 1124(2) of the Bankruptcy Code, *provided, however,* that any

contractual right that does not pertain to the payment when due of principal and interest on the obligation on which such Claim is based, including, but not limited to, financial covenant ratios, negative pledge covenants, covenants or restrictions on merger or consolidation, covenants regarding corporate existence, or covenants prohibiting certain transactions or actions contemplated by the Plan or conditioning such transactions or actions on certain factors, shall not be enforceable as to any breach that occurred on or prior to the Effective Date or any breach determined by reference back to a date preceding the Effective Date.

(b)      **Class 5:  Banc One Equipment Financing Claim**

The legal, equitable, and contractual rights of the holder of the Banc One Equipment Financing Claim, including those relating to the payment when due of principal and interest on the obligation on which such Claim is based and the protection, maintenance, location, or insurance of or on the collateral securing such Claim, shall be Reinstated in accordance with the provisions of Section 1124(2) of the Bankruptcy Code; provided, however, that any contractual right that does not pertain to the payment when due of principal and interest or said preservation of the collateral, including, but not limited to, contractual rights pertaining to financial covenant ratios, negative pledge covenants, covenants or restrictions on merger or consolidation, covenants regarding corporate existence, or covenants prohibiting certain transactions or actions contemplated by the Plan or conditioning such transactions or actions on certain factors, shall not be enforceable as to any breach that occurred on or prior to the Effective Date or any breach determined by reference back to a date preceding the Effective Date.

(c)      **Class 6:  Coated Paper Sale/Leaseback Claim**

The holder of the Allowed Coated Paper Sale/Leaseback Claim shall (i) retain the Liens securing such Allowed Claim and (ii) receive the remaining amount of such Allowed Claim, with interest at the non-default contract rate, in monthly Cash payments of the same amount as historically paid by the Debtors under the documents governing such Allowed Claim, in lieu of the final balloon payment otherwise required by such documents.

(d)      **Class 7:  Lowville Grant Claims**

A vote in favor of the Plan by the holder of a Lowville Grant Claim shall constitute (i) the agreement by such holder that the Reorganized Debtors shall be obligated to pay such holder's Claim only if they fail to maintain requisite levels of employment at their facility in Lowville, New York and (ii) the express waiver by such holder of any other breach, event of default or other act or omission giving rise to an obligation to pay the Claim.  Subject to and as modified by such agreement and waiver, the legal, equitable, and contractual rights of the holder of a Lowville Grant Claim voting in favor of the Plan shall be Reinstated in accordance with the provisions of Section 1124(2) of the Bankruptcy Code, *provided*, *however*, that any contractual right that does not pertain to the payment when due of principal and interest on the obligation on which any such Claim is based, including, but not limited to, financial covenant ratios, negative pledge covenants, covenants or restrictions on merger or consolidation, covenants regarding corporate existence, or covenants prohibiting certain transactions or actions contemplated by the Plan or conditioning such transactions or actions on certain factors, shall not be enforceable as to any breach that occurred on or prior to the Effective Date or any breach determined by reference back to a date preceding the Effective Date.

A vote against the Plan by the holder of a Lowville Grant Claim shall result in the treatment of such holder's Claim as an Other Secured Claim in Class 8 if and to the extent such Claim is a Secured Claim or as a General Unsecured Claim in Class 10 if and to the extent such Claim is not a Secured Claim.

(e)      **Class 8:  Other Secured Claims**

On the Effective Date, as shall have been determined by the Debtors in their sole discretion, either (i) the legal, equitable, and contractual rights of each holder of an Allowed Other Secured Claim shall be Reinstated in accordance with the provisions of Section 1124(2) of the Bankruptcy Code, *provided*, *however*, that any contractual right that does not pertain to the payment when due of principal and interest on the obligation on which such Claim is based, including, but not limited to, financial covenant ratios, negative pledge covenants, covenants or restrictions on merger or consolidation, covenants regarding corporate existence, or covenants prohibiting certain transactions or actions contemplated by the Plan or conditioning such transactions or actions on certain factors, shall not be enforceable as to any breach that occurred on or prior to the Effective Date or any breach determined by reference back to a date preceding the Effective Date; (ii) each holder of an Allowed Other Secured Claim shall (A) retain the Liens securing such Allowed Other Secured Claim and (B) receive deferred Cash payments totaling at least the amount of such Allowed Other Secured Claim, of a value, as of the Effective Date, of at least the value of such holder's interest in the Estate's interest in such property; (iii) the collateral securing such

Allowed Other Secured Claim shall be surrendered to the holder of such Allowed Other Secured Claim; or (iv) each holder of an Allowed Other Secured Claim shall be paid in full on the Effective Date. The failure to object to any Other Secured Claim in the Chapter 11 Case shall be without prejudice to the Debtors' or the Reorganized Debtors' right to contest or otherwise defend against such Claim in the appropriate forum when and if such Claim is sought to be enforced by the holder of such Other Secured Claim.

Notwithstanding Section 1141(c) or any other provision of the Bankruptcy Code, all pre-petition Liens on property of any Debtor held with respect to an Other Secured Claim shall survive the Effective Date and continue in accordance with the contractual terms of the underlying agreements governing such Claim until such Allowed Claim is paid in full. Nothing in this Section 4.3(e) or elsewhere in the Plan shall preclude the Debtors or the Reorganized Debtors from challenging the validity of any alleged Lien on any asset of a Debtor or the value of the property that secures any alleged Lien.

(f) **Class 9: Noteholder Claims**

(i) *Deemed Allowance of Noteholder Claims*: Pursuant to the Constituency Settlement, all Noteholder Claims shall be deemed Allowed in an aggregate amount not to exceed $345,629,166.67 for all purposes of the Plan and the Chapter 11 Case.

(ii) *Allocation to All Holders of Allowed Noteholder Claims:* Each holder of an Allowed Noteholder Claim shall be allocated as of the Distribution Date its Pro Rata share (together with all other holders of Allowed Noteholder Claims and all holders of Allowed General Unsecured Claims, with reserves for Disputed General Unsecured Claims to the extent required by Section 9.3 of the Plan) of (A) 10,000,000 shares of the New Common Stock to be authorized and issued by Reorganized FiberMark as of the Effective Date pursuant to the Plan, subject to dilution as set forth in Sections 6.5(b) and 9.3(a) of the Plan, and (B) the Distribution Cash; *provided, however*, that all distributions to holders of Allowed Noteholder Claims shall be subject to, and the allocations made herein shall be reduced on a Pro Rata basis by, the Indenture Trustee Charging Lien to the extent of any Indenture Trustee Expenses that are not paid pursuant to Section 12.1(c) of the Plan.

(iii) *Distribution to Holders of Allowed Noteholder Claims Other than AIGGIC, Post, and Silver Point*: Pursuant to the Constituency Settlement, in full satisfaction, settlement, release, discharge of, in exchange for, and on account of each Allowed Noteholder Claim, the holder of such Allowed Claim other than AIGGIC, Post, and Silver Point shall receive on the Distribution Date either:

(A) A Cash payment in an amount equal to the sum of the following:

(1) such holder's Pro Rata share of the Distribution Cash as allocated pursuant to subsection (f)(ii) above,

(2) an additional amount from the Settlement Cash equal to the lesser of (x) eight percent (8%) of such holder's Allowed Claim or (y) such holder's Pro Rata share (together with all other holders of Allowed Noteholder Claims and all holders of Allowed General Unsecured Claims other than AIGGIC, Post, and Silver Point) of $4,200,000, and

(3) a final amount from the Stock Purchase Payment equal to the lesser of (x) the amount that, when added to (1) and (2) above, results in an aggregate Cash payment of seventy percent (70%) of such holder's Allowed Claim or (y) such holder's Pro Rata share (together with all other holders of Allowed Noteholder Claims and all holders of Allowed General Unsecured Claims other than AIGGIC, Post, and Silver Point) of $21,600,000; in consideration of which, pursuant to Section 6.16(c) of the Plan, Silver Point shall receive the New Common Stock allocated to such holder under subsection (f)(ii) above; or

(B) If affirmatively elected on such holder's behalf by such holder's DTC Participant:

(1) such holder's Pro Rata share of the New Common Stock as allocated pursuant to subsection (f)(ii) above;

(2) such holder's Pro Rata share of the Distribution Cash as allocated pursuant to subsection (f)(ii) above; and

(3) an additional amount from the Settlement Cash equal to the lesser of (x) eight percent (8%) of such holder's Allowed Claim or (y) such holder's Pro Rata share (together with all other holders of Allowed Noteholder Claims and all holders of Allowed General Unsecured Claims other than AIGGIC, Post, and Silver Point) of $4,200,000.

To be recognized, the election must have been made no later than the date of commencement of the Confirmation Hearing, by the DTC Participant representing the electing holder, through the DTC's PTOP procedure. The electing holder shall be responsible for instructing its DTC Participant to make the election on its behalf. Once made, the election shall be irrevocable and shall be binding on the DTC Participant and on such electing holder. The election shall operate to freeze the position in the FiberMark Notes to which the election applies and shall constitute a tender and surrender of such FiberMark Notes; and no subsequent transfers of such FiberMark Notes shall be recognized for any purpose. All resulting distributions of New Common Stock, Distribution Cash, and Settlement Cash shall be made in the name of the DTC Participant, who shall be responsible for holding the same for the electing holder, unless and until the DTC Participant provides written notice to the Debtors of the name and address of, and other necessary information concerning, such holder. Any holder of Noteholder Claims whose position in the FiberMark Notes is not subject to a timely PTOP election made by its DTC Participant shall receive the treatment provided for in subsection (f)(iii)(A) above. The Debtors shall have the right, in their sole and absolute discretion, to determine the timeliness and adequacy of all elections hereunder, and the Debtors' judgment on such matters shall be final and conclusive on all parties.

(iv) *Distribution to AIGGIC and Post*: Pursuant to the Constituency Settlement, in full satisfaction, settlement, release, discharge of, in exchange for, and on account of the Allowed Noteholder Claims held by AIGGIC and Post, (A) on or before the Distribution Date AIGGIC and Post shall sell their Noteholder Claims to Silver Point as provided in Section 6.16(d) of the Plan and (B) the Pro Rata share of the New Common Stock and Distribution Cash otherwise allocable to AIGGIC and Post pursuant to subsection (f)(ii) above shall be distributed to Silver Point. AIGGIC and Post shall receive the payments from Silver Point provided under Section 6.16(d) of the Plan, net of deductions in accordance with the provisions of Sections 6.16(b), 6.16(d) and 6.16(e) of the Plan.

(v) *Distribution to Silver Point*: Pursuant to the Constituency Settlement, in full satisfaction, settlement, release, discharge of, in exchange for, and on account of the Allowed Noteholder Claims held by Silver Point, on the Distribution Date, the Pro Rata share of the New Common Stock and Distribution Cash allocated to Silver Point pursuant to subsection (f)(ii) above shall be distributed to Silver Point; *provided, however*, that the Debtors shall withhold from such Distribution Cash the amount of the Stock Purchase Payment.

(g) **Class 10: General Unsecured Claims**

(i) *Allocation to All Holders of Allowed General Unsecured Claims:* Each holder of an Allowed General Unsecured Claim shall be allocated as of the Distribution Date its Pro Rata share (together with all other holders of Allowed General Unsecured Claims and all holders of Allowed Noteholder Claims, with reserves for Disputed General Unsecured Claims to the extent required by Section 9.3 of the Plan) of (A) 10,000,000 shares of the New Common Stock to be authorized and issued by Reorganized FiberMark as of the Effective Date pursuant to the Plan, subject to dilution as set forth in Sections 6.5(b) and 9.3(a) of the Plan, and (B) the Distribution Cash.

(ii) *Distribution to Holders of Allowed General Unsecured Claims Other than Silver Point*: Pursuant to the Constituency Settlement, in full satisfaction, settlement, release, discharge of, in exchange for, and on account of each Allowed General Unsecured Claim, the holder of such Allowed Claim other than Silver Point shall receive on the Distribution Date either:

(A) A Cash payment in an amount equal to the sum of the following:

(1) such holder's Pro Rata share of the Distribution Cash as allocated pursuant to subsection (g)(i) above,

(2) an additional amount from the Settlement Cash equal to the lesser of (x) eight percent (8%) of such holder's Allowed Claim or (y) such holder's Pro Rata share (together with all other holders

of Allowed General Unsecured Claims and all holders of Noteholder Claims other than AIGGIC, Post, and Silver Point) of $4,200,000, and

(3)   a final amount from the Stock Purchase Payment equal to the lesser of (x) the amount that, when added to (1) and (2) above, results in an aggregate Cash payment of seventy percent (70%) of such holder's Allowed Claim or (y) such holder's Pro Rata share (together with all other holders of Allowed General Unsecured Claims and all holders of Allowed Noteholder Claims other than AIGGIC, Post, and Silver Point) of $21,600,000; in consideration of which, pursuant to Section 6.16(c) of the Plan, Silver Point shall receive the New Common Stock allocated to such holder under subsection (g)(i) above; or

(B)      If affirmatively elected on the Ballot for Class 10:

(1)   such holder's Pro Rata share of the New Common Stock as allocated pursuant to subsection (g)(i) above;

(2)   such holder's Pro Rata share of the Distribution Cash as allocated pursuant to subsection (g)(i) above; and

(3)   an additional amount from the Settlement Cash equal to the lesser of (x) eight percent (8%) of such holder's Allowed Claim or (y) such holder's Pro Rata share (together with all other holders of Allowed General Unsecured Claims and all holders of Allowed Noteholder Claims other than AIGGIC, Post, and Silver Point) of $4,200,000.

Only holders of record as of the Distribution Record Date shall have been entitled to make the election.  To be recognized, the election must have been clearly marked on the Ballot and the Ballot must have been returned by no later than the Voting Deadline in accordance with the instructions contained on the Ballot.  The election shall be irrevocable and shall be binding on the holder as identified on the Ballot.  All resulting distributions of New Common Stock, Distribution Cash, and Settlement Cash shall be made in the name of the holder identified on the Ballot and shall be delivered to the address contained on the Ballot.  For purposes of the election, no transfer of Claim made after the Distribution Record Date shall be recognized.  Any holder that fails to return a Ballot by the Voting Deadline or that timely returns a Ballot without marking the election shall receive the treatment provided for in subsection (g)(ii)(A) above.

(iii)      *Distribution to Silver Point*:  Pursuant to the Constituency Settlement, in full satisfaction, settlement, release, discharge of, in exchange for, and on account of the Allowed General Unsecured Claims held by Silver Point, on the Distribution Date, the Pro Rata share of the New Common Stock and Distribution Cash allocated to Silver Point pursuant to subsection (g)(i) above shall be distributed to Silver Point; *provided, however*, that the Debtors shall withhold from such Distribution Cash the amount of the Stock Purchase Payment.

(h)      **Class 11:  Intercompany Claims**

No holder of an Intercompany Claim shall receive or retain any property under the Plan on account of such Claim; *provided, however*, if necessary for tax planning purposes, Intercompany Claims may be capitalized, satisfied, or preserved either directly or indirectly or in whole or part.  Any Intercompany Claim, or portion thereof, that is not so capitalized, satisfied or preserved shall be discharged as of the Effective Date.

(i)      **Class 12:  Subordinated Claims**

The holders of Subordinated Claims shall not receive or retain any property under the Plan on account of such Claims.  All Subordinated Claims shall be discharged as of the Effective Date.

(j)      **Class 13:  Non-Compensatory Damages Claims**

The holders of Non-Compensatory Damages Claims shall not receive or retain any property under the Plan on account of such Claims.  All Non-Compensatory Damages Claims shall be discharged as of the Effective Date.

**4.4     Classes of Interests**

(a)     **Class 14:  Subsidiary Interests**

For the deemed benefit of the holders of the New Common Stock, FiberMark shall retain its equity interests in FNA and FIH, subject to any applicable restrictions arising under the Exit Facility.

(b)     **Class 15:  FiberMark Interests**

All FiberMark Interests of any kind, including, without limitation, the Old FiberMark Common Stock, the Old FiberMark Stock Options or any warrants or other agreements to acquire the same (whether or not arising under or in connection with any employment agreement), shall be cancelled as of the Effective Date and the holders thereof shall not receive or retain any property under the Plan on account of such Interests.

**4.5     Reservation of Rights Regarding Claims**

Except as otherwise explicitly provided in the Plan, nothing shall affect the Debtors' or the Reorganized Debtors' rights and defenses, both legal and equitable, with respect to any Claims, including, but not limited to, all rights with respect to legal and equitable defenses to alleged rights of setoff or recoupment.

## ARTICLE V

## ACCEPTANCE OR REJECTION OF THE PLAN

**5.1     Impaired Classes of Claims and Interests Entitled to Vote**

Holders of Claims and Interests in each Impaired Class of Claims or Interests are entitled to vote as a Class to accept or reject the Plan, other than Classes that are deemed to reject the Plan as provided in Section 5.4 of the Plan.  Accordingly, the votes of holders of Claims in Classes  4, 5, 6, 7, 8, 9, and 10 shall be solicited with respect to the Plan.

**5.2     Acceptance by an Impaired Class**

In accordance with Section 1126(c) of the Bankruptcy Code, and except as provided in Section 1126(e) of the Bankruptcy Code, an Impaired Class of Claims shall have accepted the Plan if the Plan is accepted by the holders of at least two-thirds (2/3) in dollar amount and more than one-half (½) in number of the Allowed Claims of such Class that have timely and properly voted to accept or reject the Plan.

**5.3     Presumed Acceptances by Unimpaired Classes**

Classes 1, 2, 3, and 14 are Unimpaired under the Plan.  Under Section 1126(f) of the Bankruptcy Code, holders of such Unimpaired Claims are conclusively presumed to have accepted the Plan, and the votes of such Unimpaired Claim holders shall not be solicited.

**5.4     Classes Deemed to Reject Plan**

Holders of Claims and Interests in Classes 11, 12, 13, and 15 are not entitled to receive or retain any property under the Plan.  Under Section 1126(g) of the Bankruptcy Code, such holders are deemed to have rejected the Plan, and the votes of such holders shall not be solicited.

**5.5     Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code**

To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Debtors shall request Confirmation of the Plan, as it may be modified from time to time, under Section 1129(b) of the Bankruptcy Code. The Debtors reserve the right to alter, amend, modify, revoke, or withdraw the Plan or any exhibit, including to amend or modify it to satisfy the requirements of Section 1129(b) of the Bankruptcy Code, if necessary.

# ARTICLE VI

## MEANS FOR IMPLEMENTATION OF THE PLAN

### 6.1 Continued Corporate Existence

The Reorganized Debtors shall continue to exist after the Effective Date as separate legal entities, in accordance with the applicable laws in the respective jurisdictions in which they are incorporated and pursuant to the New FiberMark Charter and New FiberMark By-laws in the case of Reorganized FiberMark, and pursuant to the respective certificates or articles of incorporation, memorandum of association, articles of association, and by-laws, as applicable, of the Subsidiary Debtors in effect prior to the Effective Date, except to the extent such certificates or articles of incorporation, memorandum of association, articles of association, and by-laws, as applicable, are amended pursuant to the Plan.

### 6.2 Certificates of Incorporation and By-laws

The New FiberMark Charter and the New FiberMark By-laws shall be substantially in the forms attached hereto as Exhibit A and Exhibit B, respectively. The certificate of incorporation, memorandum of association, articles of association and by-laws, as applicable, of each Reorganized Subsidiary Debtor, shall be amended as necessary to satisfy the provisions of the Plan and the Bankruptcy Code and shall include, among other things, pursuant to Section 1123(a)(6) of the Bankruptcy Code, a provision prohibiting the issuance of non-voting equity securities, but only to the extent required by Section 1123(a)(6) of the Bankruptcy Code.

### 6.3 New Financing

On the Effective Date, the Exit Facility, together with new promissory notes and guarantees evidencing obligations of the Reorganized Debtors thereunder, and all other documents, instruments, mortgages, and agreements to be entered into, delivered, or confirmed thereunder on the Effective Date, shall become effective. The obligations incurred by the Reorganized Debtors pursuant to the Exit Facility and related documents shall be paid as set forth in the Exit Facility and related documents. The Debtors shall file with the Bankruptcy Court a commitment letter with respect to the Exit Facility as soon as obtained, but not later than three (3) days prior to the Confirmation Hearing.

In connection with obtaining the Exit Facility, the Debtors shall be permitted to participate as a guarantor and pledgor in any contemporaneous financing obtained by the Debtors' foreign subsidiaries. In addition, the Debtors shall be permitted to continue to obtain funding from their foreign subsidiaries, in the form of intercompany loans, dividends, repatriation, or other form of transfer, to the extent available and permitted under applicable law.

### 6.4 Cancellation of Old Securities and Agreements

(a)  On the Effective Date, except as otherwise provided for herein, (a) the Old Securities, including, without limitation, the FiberMark Notes, the FiberMark Interests, and any other note, bond, or indenture evidencing or creating any public indebtedness or obligation of any Debtor shall be deemed extinguished, cancelled and of no further force or effect, and (b) the obligations of the Debtors (and Reorganized Debtors) under any agreements, indentures, or certificates of designations governing the Old Securities and any other note, bond, or indenture evidencing or creating any indebtedness or obligation of any Debtor with respect to the Old Securities shall be discharged in each case without further act or action under any applicable agreement, law, regulation, order, or rule and without any action on the part of the Bankruptcy Court or any Person; *provided*, *however*, that the FiberMark Notes and the Indentures shall continue in effect solely for the purposes of (i) allowing Silver Point to receive the New Common Stock provided for under Section 4.3(f)(iii)(A) of the Plan, (ii) effectuating the purchase by Silver Point on or before the Distribution Date of the Noteholder Claims held by AIGGIC and Post as provided for in Section 6.16(d) of the Plan, (iii) allowing the holders of the FiberMark Notes to receive the distributions provided for Noteholder Claims hereunder, (iv) allowing the Disbursing Agent or the Indenture Trustee, as the case may be, to make distributions on account of the Noteholder Claims, and (v) preserving the rights of the Indenture Trustee with respect to the Indenture Trustee Expenses, including, without limitation, the Indenture Trustee Charging Lien and any indemnification rights provided by the Indentures.

(b)  Subsequent to the performance by the Indenture Trustee or its agents of any duties that are required under this Plan, the Confirmation Order and/or under the terms of the Indentures, the Indenture Trustee and its agents shall be relieved of, and released from, all obligations associated with the FiberMark Notes arising under the Indentures or under other applicable agreements or law and the Indentures shall be deemed to be discharged.

**6.5    Authorization and Issuance of New Common Stock**

(a)    Reorganized FiberMark shall (i) authorize on the Effective Date 20,000,000 shares of New Common Stock; (ii) issue on the Distribution Dates up to an aggregate of 10,000,000 shares of New Common Stock for distribution to holders of Allowed Noteholder Claims and Allowed General Unsecured Claims, including amounts necessary to establish the Common Stock Reserve for Disputed General Unsecured Claims; (iii) reserve for issuance the number of shares of New Common Stock necessary to provide required distributions to holders of subsequently Allowed General Unsecured Claims in the event the Common Stock Reserve is insufficient to satisfy such distributions; and (iv) reserve for issuance the number of shares of New Common Stock necessary (excluding shares that may be issuable as a result of the antidilution provisions thereof) to satisfy the required distributions of options granted under the New Equity Incentive Plan (excluding shares that may be issuable as a result of the antidilution provisions).

(b)    The New Common Stock issued under the Plan shall be subject to dilution based upon (i) the issuance of New Common Stock pursuant to the New Equity Incentive Plan as set forth in Section 6.6 of the Plan, (ii) the issuance of New Common Stock to provide required distributions to holders of subsequently Allowed General Unsecured Claims in the event the Common Stock Reserve is insufficient to satisfy such distributions, and (iii) any other shares of New Common Stock issued post-emergence.

(c)    The issuance and distribution of the New Common Stock pursuant to distributions under the Plan to holders of Allowed Noteholder Claims and Allowed General Unsecured Claims shall be authorized under Section 1145 of the Bankruptcy Code as of the Effective Date without further act or action by any Person, except as may be required by the New FiberMark Charter, the New FiberMark By-laws, or applicable law, regulation, order or rule; and all documents evidencing same shall be executed and delivered as provided for in the Plan.

(d)    From and after the Effective Date, or as soon as practicable thereafter, upon the filing of the necessary certifications with the Securities and Exchange Commission, it is intended that Reorganized FiberMark shall no longer be a "public" company and shall no longer be subject to periodic filing requirements pursuant to the Securities Exchange Act of 1934.  The rights of the holders of New Common Stock shall be as provided for in the New FiberMark Charter and the New FiberMark By-laws, which shall include restrictions on transfer of the New Common Stock intended to ensure that the New Common Stock does not become held by such number of persons as would require Reorganized FiberMark to continue or resume filing periodic reports pursuant to the Securities Exchange Act of 1934.

**6.6    New Equity Incentive Plan; Further Participation in Incentive Plans**

(a)    On the Effective Date, Reorganized FiberMark shall be authorized and directed, subject to all requisite shareholder approvals, to establish and implement the New Equity Incentive Plan on or before the 6-month anniversary of the Effective Date for up to 10% of the total amount of New Common Stock issued on the Effective Date.  Awards granted thereunder may be in the form of options, stock, restricted stock, and other forms of equity grants.  The New Equity Incentive Plan shall be promulgated by the New Board for the benefit of such members of management, employees, and directors of Reorganized FiberMark and any of its subsidiaries as are designated by the New Board, in its sole and absolute discretion, on such terms as to timing of issuance, manner and timing of vesting, duration, individual entitlement and all other terms, as such terms are determined by the New Board in its sole and absolute discretion.    The New Equity Incentive Plan may be amended or modified from time to time by the New Board.  No members of management, employees, and directors of Reorganized FiberMark and its subsidiaries who are entitled to receive awards pursuant to the New Equity Incentive Plan shall be obligated to participate in such plan.

(b)    Except as provided in Section 7.5(c) of the Plan, any pre-existing understandings, either oral or written, between the Debtors and any member of management or any employee as to entitlement to participate in any pre-existing equity or other  incentive plan of any kind shall be null and void as of the Effective Date and shall not be binding on Reorganized FiberMark with respect to the New Equity Incentive Plan or any other incentive plan implemented after the Effective Date.  All decisions as to entitlement to participate after the Effective Date in any new incentive plan shall be within the sole and absolute discretion of the New Board.

**6.7    Directors of Reorganized Debtors**

(a)    The initial New Board shall be comprised of seven (7) directors.  All of the directors taking office on the Effective Date shall be designated by Silver Point.  The designations shall be disclosed on a preliminary basis in the Disclosure Statement and confirmed on a final basis in a filing with the Bankruptcy Court no later than three (3) days prior to the Confirmation Hearing.  The initial directors shall serve until the first annual meeting of stockholders following the first

anniversary of the Effective Date or until earlier removed or replaced in accordance with the New FiberMark Charter or the New FiberMark By-laws.

(b)     The existing directors of the Subsidiary Debtors shall continue to serve in their same respective capacities after the Effective Date for the Reorganized Subsidiary Debtors, until replaced or removed in accordance with the certificate of incorporation, memorandum of association, articles of association and by-laws, as applicable, of such entities.

**6.8     Officers of Reorganized Debtors**

(a)     The existing senior officers of FiberMark shall serve initially in the same capacities after the Effective Date for Reorganized FiberMark until replaced or removed in accordance with the New FiberMark Charter and New FiberMark By-laws.

(b)     The existing senior officers of the Subsidiary Debtors shall continue to serve in their same respective capacities after the Effective Date for the Reorganized Subsidiary Debtors, until replaced or removed in accordance with the certificate of incorporation, memorandum of association, articles of association and by-laws, as applicable, of such entities.

**6.9     Revesting of Assets; Releases of Liens**

Except as otherwise provided herein, the property of each Debtor's Estate, together with any property of each Debtor that is not property of its Estate and that is not specifically disposed of pursuant to the Plan, shall revest in the applicable Debtor on the Effective Date. Thereafter, each Reorganized Debtor may operate its business and may use, acquire, and dispose of such property free of any restrictions of the Bankruptcy Code, the Bankruptcy Rules, and the Bankruptcy Court. As of the Effective Date, all such property of each Reorganized Debtor shall be free and clear of all Claims and Interests, except as specifically provided in the Plan or the Confirmation Order.

**6.10     Post-Effective Date Restructuring Transactions**

(a)     On, as of, or after the Effective Date, with the consent of the New Board or the board of directors of the Subsidiary Debtors, as applicable, each of the Reorganized Debtors may enter into such transactions and may take such actions as may be necessary or appropriate, in accordance with any applicable state law, to effect a corporate or operational restructuring of their respective businesses, to otherwise simplify the overall corporate or operational structure of the Reorganized Debtors, to achieve corporate or operational efficiencies, or to otherwise improve financial results; *provided*, *however*, that such transactions or actions are not otherwise inconsistent with the Plan, the distributions to be made under the Plan, the New FiberMark Charter, the New FiberMark By-laws, or the Exit Facility. Such transactions or actions may include such mergers, consolidations, restructurings, dispositions, liquidations, closures, or dissolutions, as may be determined by the Reorganized Debtors to be necessary or appropriate.

(b)     Without limiting the generality of subsection (a) above, FiberMark is specifically authorized to make a capital contribution of its ownership interests in Specialty Paperboard (Hong Kong) Ltd. and FiberMark SARL to FIH.

**6.11     Indemnification of Debtors' Directors, Officers, and Employees**

(a)     Upon the Effective Date, the New FiberMark Charter, the New FiberMark By-laws, and the certificate of incorporation, memorandum of association, articles of association and by-laws, as applicable, of each Reorganized Subsidiary Debtor shall contain provisions which (i) eliminate, to the maximum extent permitted under Delaware law, the personal liability of the Debtors' directors, officers, and key employees  (as identified for purposes of the Key Employee Protection Order, along with James P. Carolan) serving on and after the Petition Date and the Reorganized Debtors' directors, officers, and key employees (as identified by the Chief Executive Officer of the Reorganized Debtors in conjunction with the New Board) serving on and after the Effective Date for monetary damages resulting from breaches of their fiduciary duties and (ii) require such Reorganized Debtor, subject to appropriate procedures and to the maximum extent permitted under Delaware law, to indemnify those of the Debtors' directors, officers, and key employees (as identified by the Chief Executive Officer of the Reorganized Debtors in conjunction with the New Board) serving immediately prior to, on, or after the Effective Date for all claims and actions, including, without limitation, for pre-Effective Date acts and occurrences.

(b)     On or as of the Effective Date, the Reorganized Debtors shall enter into separate written agreements providing for the indemnification of each Person who is a director, officer, or key employee (as identified by the Chief Executive Officer of the Reorganized Debtors in conjunction with the New Board) of such Reorganized Debtor as of the Effective Date.

**6.12    Preservation of Rights of Action; Resulting Claim Treatment**

(a)    Except as otherwise provided in the Plan or the Confirmation Order, or in any contract, instrument, release, indenture, or other agreement entered into in connection with the Plan, in accordance with Section 1123(b) of the Bankruptcy Code, on the Effective Date, each Debtor or Reorganized Debtor shall retain all of their respective Litigation Rights that such Debtor or Reorganized Debtor may hold against any Person.  Each Debtor or Reorganized Debtor shall retain and may enforce, sue on, settle, or compromise (or decline to do any of the foregoing) all such Litigation Rights.  Each Debtor or Reorganized Debtor or their respective successor(s) may pursue such retained Litigation Rights as appropriate, in accordance with the best interests of the Reorganized Debtors or their successor(s) who hold such rights in accordance with applicable law and consistent with the terms of the Plan.

(b)    If, as a result of the pursuit of any Litigation Rights, a Claim would arise from a recovery pursuant to Section 550 of the Bankruptcy Code after distributions under the Plan have commenced, making it impracticable to treat the Claim in accordance with the applicable provisions of Article IV of the Plan, the Reorganized Debtors shall be permitted to reduce the recovery by an amount that reflects the value of the treatment that would have been accorded to the Claim under the Plan, thereby effectively treating the Claim through the reduction.

**6.13    Effectuating Documents; Further Transactions**

The chief executive officer, the president, the chief financial officer, the general counsel or any other appropriate officer of Reorganized FiberMark, or any applicable Reorganized Subsidiary Debtor, as the case may be, shall be authorized to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents, and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The secretary or assistant secretary of Reorganized FiberMark, or any applicable Reorganized Subsidiary Debtor, as the case may be, shall be authorized to certify or attest to any of the foregoing actions.

**6.14    Exemption From Certain Transfer Taxes**

Pursuant to Section 1146(c) of the Bankruptcy Code, any transfers from a Debtor to a Reorganized Debtor or any other Person pursuant to the Plan in the United States, including any Liens granted by a Debtor or a Reorganized Debtor to secure the Exit Facility, shall not be taxed under any law imposing a stamp tax, real estate transfer tax, sales or use tax, or other similar tax.  Such exemption specifically applies, without limitation, to all documents necessary to evidence and implement the provisions of and the distributions to be made under the Plan, including the New FiberMark Charter, the New FiberMark By-laws, and the documents reflecting the Exit Facility.

**6.15    Corporate Action**

On the Effective Date, the adoption and filing of the New FiberMark Charter and the New FiberMark By-laws, the appointment of directors and officers of Reorganized FiberMark, and all actions contemplated hereby shall be authorized and approved in all respects pursuant to this Plan.  All matters provided for herein involving the corporate structure of the Debtors or Reorganized Debtors, and any corporate action required by the Debtors or Reorganized Debtors in connection with the Plan, shall be deemed to have occurred and shall be in effect, without any requirement of further action by the stockholders or directors of the Debtors or Reorganized Debtors.  On the Effective Date, the appropriate officers or directors of the Reorganized Debtors are authorized and directed to issue, execute and deliver the agreements, documents, securities, and instruments contemplated by the Plan in the name of and on behalf of the Reorganized Debtors without the need for any required approvals, authorizations, or consents except for express consents required under this Plan.

**6.16    Constituency Settlement**

(a)    The Plan is predicated upon the Constituency Settlement, which is intended to compromise and settle all issues arising from the Examiner's Report, including (i) the Constituency Causes of Action against AIGGIC and Post, (ii) the Litigation Rights against AIGGIC, Post, and Silver Point, and (iii) the Individual Causes of Action of Silver Point, AIGGIC, and Post against each other.  The terms and conditions of the Constituency Settlement are set forth in subsections (b) through (m) below.  The Plan constitutes, to the extent necessary, a motion for approval of the Constituency Settlement, including pursuant to Rule 9019 of the Bankruptcy Rules and otherwise.  The Confirmation Order shall constitute an order of the Bankruptcy Court approving the Constituency Settlement as fair and equitable and within the bounds of reasonableness.

(b)    On the Effective Date and thereafter as requested by the Reorganized Debtors, AIGGIC and Post shall fund the Settlement Cash either, as elected by each of them on or before the Effective Date, by direct payment to the Reorganized Debtors or by setoff against amounts due to either of them under Sections 4.3(f) and 6.16(d) of the Plan.  The amount to be funded on the Effective Date shall equal the lesser of (i) $0.08 times the aggregate amount of all Allowed Noteholder Claims

and Allowed General Unsecured Claims as then determined or (ii) $4,200,000, with AIGGIC being responsible for seventy-five percent (75%) of such aggregate amount up to a maximum of $3,150,000, and Post being responsible for twenty-five percent (25%) of such aggregate amount up to a maximum of $1,050,000. With respect to any Noteholder Claims or General Unsecured Claims that are not Allowed Claims as of the Effective Date but become Allowed Claims thereafter, AIGGIC may elect on or before the Effective Date to insure that the Settlement Cash is fully funded as to each of such subsequently Allowed Claims, but in no event more than its aggregate amount of $3,150,000, by either of the following means: (x) within five (5) business days following a written request from the Reorganized Debtors, AIGGIC shall provide additional funding in the form of a direct payment to the Reorganized Debtors or (y) the full amount of $3,150,000 shall be directly deducted from the payments otherwise due to AIGGIC from Silver Point under Section 6.16(d), and to the extent that AIGGIC's share of the Settlement Cash would otherwise be less than $3,150,000 as a result of the actual amount of Allowed Noteholder Claims and Allowed General Unsecured Claims, the balance shall be held in the Cash Reserve and promptly remitted to AIGGIC as Claims are resolved. In the case of Post, to insure that the Settlement Cash is fully funded as to each of such subsequently Allowed Claims, but in no event more than its aggregate amount of $1,050,000, the full amount of $1,050,000 shall be directly deducted from the payments otherwise due to Post from Silver Point under Section 6.16(d), and to the extent that Post's share of the Settlement Cash would otherwise be less than $1,050,000 as a result of the actual amount of Allowed Noteholder Claims and Allowed General Unsecured Claims, the balance shall be held in the Cash Reserve and promptly remitted to Post as Claims are resolved.

(c) On the Effective Date and thereafter as requested by the Reorganized Debtors, Silver Point shall fund the Stock Purchase Payment by setoff against amounts due to Silver Point under Sections 4.3(f) and 4.3(g) of the Plan. The amount to be funded by Silver Point on the Effective Date shall provide, together with Distribution Cash and Settlement Cash, an aggregate Cash payment under Sections 4.3(f)(iii)(A) and 4.3(g)(ii)(A) of the Plan equal to lesser of (i) seventy percent (70%) of all Allowed Noteholder Claims and all Allowed General Unsecured Claims as then determined to be treated thereunder or (ii) $21,600,000. With respect to any General Unsecured Claims that are not Allowed Claims as of the Effective Date but become Allowed Claims thereafter, within five (5) business days following a written request from the Reorganized Debtors, Silver Point shall fund an additional amount that provides the same aggregate Cash payment amount for subsequently Allowed Claims as received by holders of Allowed Claims as of the Effective Date, but in no event shall Silver Point be required to pay more than the aggregate amount of $21,600,000. In consideration of the Stock Purchase Payment, Silver Point shall receive the New Common Stock of all holders of Allowed Noteholder Claims who receive the treatment provided for in Section 4.3(f)(iii)(A) of the Plan and all holders of Allowed General Unsecured Claims who receive the treatment provided for in Section 4.3(g)(ii)(A).

(d) On the Effective Date, subject to customary documentation, Silver Point shall purchase the Allowed Noteholder Claims held by AIGGIC for a purchase price of $41,334,000 and the Allowed Noteholder Claims held by Post for a purchase price of $32,271,450. The purchase price shall be remitted to AIGGIC and Post respectively on or before the Distribution Date, less (if elected) the Settlement Cash as provided for in subsection (b) above and less their shares of the fees and expenses of the Examiner and his professionals as provided for in subsection (e) below. As a result of such purchases, Silver Point shall be entitled to receive the distributions to be made under the Plan on account of those Allowed Claims, as provided for in Section 4.3(f)(iv) of the Plan.

(e) Each of AIGGIC, Post, and Silver Point shall pay to the Examiner and any professionals retained by the Examiner, or if paid prior to the Effective Date by the Debtors shall reimburse the Reorganized Debtors for, one-third (1/3) of the aggregate amount of fees and expenses of the Examiner and such professionals as may be Allowed by Final Order of the Bankruptcy Court upon application of the Examiner and such professionals, up to a maximum amount of $1,750,000. To the extent that such fees and expenses have not been determined by the Effective Date, then pending such determination, the maximum amount allocable to Post and, if elected, to AIGGIC shall be withheld from the distributions owed to Post and, if elected, AIGGIC under subsection (d) above. To the extent that the fees and expenses of the Examiner and any professionals retained by the Examiner are Allowed in an amount less than $1,750,000, the Reorganized Debtors shall promptly remit the excess to Post and, if elected, to AIGGIC respectively, on a pro rata basis. If AIGGIC does not elect a withholding from distributions owed to it, AIGGIC shall make its share of the required payment to the Examiner and his professionals, or the reimbursement to the Reorganized Debtors, within twenty (20) days after the later of the date of entry of the Final Order allowing such fees and expenses or the Distribution Date.

(f) Each of AIGGIC, Post, and Silver Point shall bear their own fees and costs of the Chapter 11 Case, but no other fees and cost of the Chapter 11 Cases shall be assessed against or payable by AIGGIC, Post, and Silver Point, whether incurred by the Debtors or any other Person.

(g) **Silver Point in its individual capacity and on behalf of all accounts and funds managed or controlled thereby, the Debtors, Reorganized Debtors, and the Estates as holders and owners of the Litigation Rights, and the**

**holders of or Persons with an interest in the Constituency Causes of Action** (i) shall each provide, or be deemed to have provided, general and complete releases of all claims, rights and causes of action of any kind held by any of them in a direct or representative capacity against AIGGIC and Post, and (ii) shall covenant, or be deemed to have covenanted, not to sue AIGGIC and Post based upon any act or omission of AIGGIC or Post arising from or related to the Chapter 11 Case, and not to cooperate with holders of Individual Causes of Action in the prosecution of such claims against AIGGIC or Post, if any; *provided, however*, that as to holders of or Persons with an interest in the Constituency Causes of Action, other than Silver Point, AIGGIC, and Post, nothing herein shall constitute a release of or otherwise prejudice any of their Individual Causes of Action.

(h)     **AIGGIC in its individual capacity and on behalf of all accounts and funds managed or controlled thereby, Post in its individual capacity and on behalf of all accounts and funds managed or controlled thereby, the Debtors, the Reorganized Debtors, and the Estates as holders and owners of the Litigation Rights, and the holders of or Persons with an interest in the Constituency Causes of Action** (i) shall each provide, or be deemed to have provided, general and complete releases of all claims, rights and causes of action of any kind held by any of them in a direct or representative capacity against Silver Point, and (ii) shall covenant, or be deemed to have covenanted, not to sue Silver Point based upon any act or omission of Silver Point arising from or related to the Chapter 11 Case, and not to cooperate with holders of Individual Causes of Action in the prosecution of such claims against Silver Point, if any; *provided, however*, that as to holders of or Persons with an interest in the Constituency Causes of Action, nothing herein shall constitute a release of or otherwise prejudice any of their Individual Causes of Action.

(i)     Silver Point, AIGGIC, and Post shall each be deemed on the Effective Date to have concurrently released, and covenanted not to sue or to cooperate with any other Person in the prosecution of, any Individual Causes of Action against each other, except for their rights under the Plan.

(j)     Silver Point, AIGGIC, and Post (i) shall each provide, or shall each be deemed to have provided, general and complete releases of all claims, rights, and causes of action of any kind held by any of them in a direct or representative capacity against any of the Debtors, the Debtors' non-Debtor subsidiaries and any of the directors, officers, or employees of any of the Debtors or any of the Debtors' non-Debtor subsidiaries serving during the pendency of the Chapter 11 Case (the "Debtor Parties") and (ii) shall each covenant, or be deemed to have covenanted, not to sue any of the Debtor Parties based upon any act or omission of any of the Debtor Parties arising from or related to the Chapter 11 Case, and not to cooperate with holders of Individual Causes of Action in the prosecution of such claims against any of the Debtor Parties.

(k)     Except as otherwise provided in the Plan, including the releases contained in this Section 6.16 of the Plan, the releases contained in Section 12.9 of the Plan, the exculpations contained in Section 12.12 of the Plan, and the discharge contained in Section 12.10 of the Plan, Silver Point, AIGGIC, and Post shall each retain all claims, counterclaims, crossclaims and rights against any Person.  No determination in or in connection with the Plan or in any prior proceeding in the Chapter 11 Case shall be prejudicial to, or preclusive in respect of, any rights or defenses of any kind held by Silver Point, AIGGIC, or Post and which may be raised in or in connection with any claims brought against Silver Point, AIGGIC, or Post by any Person, or any claims brought by Silver Point, AIGGIC, or Post against any Person.

(l)     AIGGIC's appeal of certain orders of the Bankruptcy Court evidenced in the Notice of Appeal dated September 19, 2005, shall be deemed dismissed with prejudice as the Effective Date, and AIGGIC and all parties with an interest in such appeal shall immediately take all necessary actions in the Bankruptcy Court and the federal district court to evidence the dismissal.

(m)     The parties to the Constituency Settlement expressly acknowledge that the Constituency Settlement represents a settlement of disputed rights and claims, and that by entering into the Constituency Settlement, no Person admits or acknowledges the existence of any liabilities or wrongdoing, all such liabilities and wrongdoing being expressly denied in all respects. Further, acceptance of the Plan and payment of the Settlement Cash shall not constitute an acknowledgement or admission by AIGGIC or Post that any actions or omissions by either of them gave rise to any valid claims or caused any loss to any Person.

## ARTICLE VII

## TREATMENT OF EXECUTORY CONTRACTS
## AND UNEXPIRED LEASES

**7.1      Assumed Executory Contracts and Unexpired Leases**

(a)      Except as otherwise provided in the Plan, or in any contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan, as of the Effective Date, each Debtor shall be deemed to have assumed each executory contract and unexpired lease to which it is a party unless such executory contract or unexpired lease (i) was previously assumed or rejected upon motion by a Final Order, (ii) previously expired or terminated pursuant to its own terms, or (iii) is the subject of any pending motion, including to assume, to assume on modified terms, to reject or to make any other disposition filed by a Debtor on or before the Confirmation Date.  The Confirmation Order shall constitute an order of the Bankruptcy Court under Section 365(a) of the Bankruptcy Code approving the executory contract and unexpired lease assumptions described above, as of the Effective Date.

(b)      Each executory contract and unexpired lease that is assumed and relates to the use, ability to acquire, or occupancy of real property shall include (i) all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affects such executory contract or unexpired lease and (ii) all executory contracts or unexpired leases appurtenant to the premises, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, powers, uses, reciprocal easement agreements, vaults, tunnel or bridge agreements or franchises, and any other interests in real estate or rights *in rem* related to such premises, unless any of the foregoing agreements has been rejected pursuant to an order of the Bankruptcy Court.

**7.2      Payments Related to Assumption of Executory Contracts and Unexpired Leases**

Any monetary amounts by which each executory contract and unexpired lease to be assumed pursuant to the Plan is in default shall be satisfied, under Section 365(b)(1) of the Bankruptcy Code, at the option of the Debtor party to each such contract or lease or the assignee of such Debtor party assuming such contract or lease, by Cure.  If there is a dispute regarding (a) the nature or amount of any Cure, (b) the ability of any Reorganized Debtor or any assignee to provide "adequate assurance of future performance" (within the meaning of Section 365 of the Bankruptcy Code) under the contract or lease to be assumed, or (c) any other matter pertaining to assumption, Cure shall occur following the entry of a Final Order resolving the dispute and approving the assumption or assumption and assignment, as the case may be; *provided, however,* that the Reorganized Debtors shall be authorized to reject any executory contract or unexpired lease to the extent the Reorganized Debtors, in the exercise of their sound business judgment, conclude that the amount of the Cure obligation as determined by such Final Order, renders assumption of such executory contract or unexpired lease unfavorable to the Reorganized Debtors.

**7.3      Rejected Executory Contracts and Unexpired Leases**

The Debtors reserve the right, at any time prior to the Effective Date, except as otherwise specifically provided herein, to seek to reject any executory contract or unexpired lease to which any Debtor is a party and to file a motion requesting authorization for the rejection of any such executory contract or unexpired lease.  Any executory contracts or unexpired leases that expire by their terms prior to the Effective Date are deemed to be rejected, unless previously assumed or otherwise disposed of by the Debtors.

**7.4      Rejection Damages Bar Date**

If the rejection by a Debtor, pursuant to the Plan or otherwise, of an executory contract or unexpired lease results in a Claim, then such Claim shall be forever barred and shall not be enforceable against any Debtor or Reorganized Debtor or the properties of any of them unless a Proof of Claim is filed with the clerk of the Bankruptcy Court and served upon counsel to the Reorganized Debtors within thirty (30) days after entry of the order authorizing the rejection of such executory contract or unexpired lease.  The foregoing applies only to Claims arising from the rejection of an executory contract or unexpired lease; any other Claims held by a party to a rejected contract or lease shall have been evidenced by a Proof of Claim filed by earlier applicable bar dates or shall be barred and unenforceable.

**7.5      Compensation and Benefit Programs**

(a)      Except to the extent (i) otherwise provided for in the Plan, (ii) previously assumed or rejected by an order of the Bankruptcy Court entered on or before the Confirmation Date, (iii) the subject of a pending motion to reject filed by a Debtor on or before the Confirmation Date, or (iv) previously terminated, all employee compensation and benefit programs of the Debtors as set forth on Exhibit C hereto, including all health and welfare plans, pension plans within the meaning of

Title IV of the Employee Retirement Income Security Act of 1974, as amended, and all programs subject to Sections 1114 and 1129(a)(13) of the Bankruptcy Code, entered into before or after the Petition Date, shall be deemed to be, and shall be treated as though they are, executory contracts that are assumed under the Plan. Nothing contained herein shall be deemed to modify the existing terms of such employee compensation and benefit programs, including, without limitation, the Debtors' and the Reorganized Debtors' rights of termination and amendment thereunder.

(b)    Subject to the rights of the Debtors and the Reorganized Debtors to terminate or amend as provided for in Section 7.5(a) of the Plan, the Reorganized Debtors shall continue after the Effective Date all of their defined benefit pension plans covered by Title IV of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. §§ 1301-1461. As part of the continuation of the defined benefit pension plans, subject to any such termination or amendment, the Reorganized Debtors shall meet the minimum funding standards under ERISA and the Internal Revenue Code, pay all insurance premiums owed to the Pension Benefit Guaranty Corporation (the "PBGC"), and administer and operate the defined benefit pension plans in accordance with their terms and ERISA. Nothing in this Plan is intended to release or discharge any statutory liability or obligation of the Debtors or the Reorganized Debtors with respect to the PBGC or the defined benefit pension plans. Neither the PBGC nor any of the defined benefit pension plans shall be enjoined or precluded from enforcing such liability as a result of the Plan.

(c)    The Key Employee Protection Order is incorporated herein by reference. All rights, claims, interests, entitlements, and obligations of the Debtors under the Key Employee Protection Order and under the Key Employee Retention Plan, the Key Employee Severance Plan, and the Discretionary Recognition Plan approved by such order shall continue in full force and effect after the Effective Date as rights, claims, interests, entitlements, and obligations of the Reorganized Debtors.

(d)    The Debtors' supplemental executive retirement plans, deferred compensation plans, and related trust and individual agreements shall be deemed to have terminated as of the Petition Date, subject to any vesting (but not accruals) that may have occurred between the Petition Date and the Effective Date. To the extent such plans and agreements (and any separate agreements that may incorporate such plans and agreements) are considered to be executory contracts, such plans and agreements (and any separate agreements that may incorporate such plans and agreements) shall be deemed to be rejected pursuant to Section 365 of the Bankruptcy Code under the Plan pursuant to the Confirmation Order; and the Claims of all vested participants in such plans shall be calculated as of the Petition Date without post-petition interest or other accruals and treated as General Unsecured Claims under the Plan.

(e)    As of the Effective Date, any and all stock based incentive plans and stock ownership plans of the Debtors entered into before the Effective Date shall be deemed to be, and shall be treated as though they are, executory contracts that are rejected pursuant to Section 365 of the Bankruptcy Code under the Plan pursuant to the Confirmation Order.

(f)    Any employee compensation or benefit program that is not listed on Exhibit C hereto shall be deemed to be, and shall be treated as though it is, an executory contract that is rejected under the Plan, unless such employee compensation or benefit program is (i) otherwise provided for in the Plan, (ii) previously assumed or rejected by an order of the Bankruptcy Court entered on or before the Confirmation Date, (iii) the subject of a pending motion to assume filed by a Debtor on or before the Confirmation Date, or (iv) previously terminated.

## 7.6    Certain Indemnification Obligations

(a)    Indemnification Obligations owed to those of the Debtors' directors, officers, and employees serving on and after the Petition Date shall be deemed to be, and shall be treated as though they are, executory contracts that are assumed pursuant to Section 365 of the Bankruptcy Code under the Plan, and such Indemnification Obligations (subject to any defenses thereto) shall survive the Effective Date of the Plan and remain unaffected by the Plan, irrespective of whether obligations are owed in connection with a pre-Petition Date or post-Petition Date occurrence. All other Indemnification Obligations owed to any person who was a director, officer, or employee of the Debtor prior to the Petition Date shall be deemed to be, and shall be treated as though they are, executory contracts that are rejected pursuant to Section 365 of the Bankruptcy Code under the Plan pursuant to the Confirmation Order (unless assumed or rejected upon motion by a Final Order).

(b)    Indemnification Obligations owed to any Professionals retained by the Debtors pursuant to Sections 327 or 328 of the Bankruptcy Code and order of the Bankruptcy Court, whether such Indemnification Obligations relate to the period before or after the Petition Date, shall be deemed to be, and shall be treated as though they are, executory contracts that are assumed pursuant to Section 365 of the Bankruptcy Code under the Plan.

**7.7 Extension of Time to Assume or Reject**

Notwithstanding anything set forth in Article VII of the Plan, in the event of a dispute as to whether a contract is executory or a lease is unexpired, the right of the Reorganized Debtors to move to assume or reject such contract or lease shall be extended until the date that is thirty (30) days after entry of a Final Order by the Bankruptcy Court determining that the contract is executory or the lease is unexpired. The deemed assumption provided for in Section 7.1(a) of the Plan shall not apply to any such contract or lease, and any such contract or lease shall be assumed or rejected only upon motion of the Reorganized Debtors following the Bankruptcy Court's determination that the contract is executory or the lease is unexpired.

**7.8 Claims Arising From Assumption or Rejection**

All Allowed Claims arising from the assumption of any executory contract or unexpired lease shall be treated as Administrative Claims pursuant to Section 4.1(a) of this Plan; all Allowed Claims arising from the rejection of an executory contract or unexpired lease shall be treated as General Unsecured Claims pursuant to Section 4.3(g) of this Plan unless otherwise ordered by Final Order of the Bankruptcy Court; and all other Allowed Claims relating to an executory contract or unexpired lease shall have such status as they may be entitled to under the Bankruptcy Code as determined by Final Order of the Bankruptcy Court.

## ARTICLE VIII

## PROVISIONS GOVERNING DISTRIBUTIONS

**8.1 Distributions for Claims Allowed as of Effective Date**

Except as otherwise provided herein or as ordered by the Bankruptcy Court, all distributions to holders of Allowed Claims as of the applicable Distribution Date shall be made on or as soon as practicable after the applicable Distribution Date. Distributions on account of Claims that first become Allowed Claims after the applicable Distribution Date shall be made pursuant to Section 9.2 of the Plan. The Reorganized Debtors shall have the right, in their discretion, to accelerate any Distribution Date occurring after the Effective Date if the facts and circumstances so warrant.

**8.2 Interest on Claims**

Unless otherwise specifically provided for in the Plan or the Confirmation Order, or required by applicable bankruptcy law, post-petition interest shall not accrue or be paid on Claims, and no holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim. Interest shall not accrue or be paid upon any Disputed Claim in respect of the period from the Petition Date to the date a final distribution is made thereon if and after such Disputed Claim becomes an Allowed Claim.

**8.3 Designation; Distributions by Disbursing Agent**

(a) The Debtors shall, in their sole discretion, on or before the Effective Date, designate the Person to serve as the Disbursing Agent under the Plan on mutually agreeable terms and conditions.

(b) Unless otherwise provided herein, the Disbursing Agent shall make all distributions of New Common Stock and Cash required to be made to holders of General Unsecured Claims on the respective Distribution Dates under the Plan and such other distributions as are delegated to the Disbursing Agent by Reorganized FiberMark.

(c) The Indenture Trustee shall make all distributions of New Common Stock and Cash required to be made to holders of Allowed Noteholder Claims in accordance with the terms of the Indenture, subject to the terms of the Plan, or shall have the right to delegate such distributions to the Disbursing Agent.

(d) If the Disbursing Agent is an independent third party designated to serve in such capacity, such Disbursing Agent shall receive, without further Bankruptcy Court approval, reasonable compensation for distribution services rendered pursuant to the Plan and reimbursement of reasonable out of pocket expenses incurred in connection with such services from Reorganized FiberMark. No Disbursing Agent shall be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.

**8.4    Means of Cash Payment**

(a)    Cash payments made pursuant to the Plan shall be in U.S. funds, by the means agreed to by the payor and the payee, including by check or wire transfer or, in the absence of an agreement, such commercially reasonable manner as the payor shall determine in its sole discretion.

(b)    For purposes of effectuating distributions under the Plan, any Claim denominated in foreign currency shall be converted to U.S. Dollars pursuant to the applicable published exchange rate in effect on the Petition Date.

**8.5    Calculation of Distribution Amounts of New Common Stock**

No fractional shares of New Common Stock shall be issued or distributed under the Plan.  Each Person entitled to receive New Common Stock shall receive the total number of whole shares of New Common Stock to which such Person is entitled.  Whenever any distribution to a particular Person would otherwise call for distribution of a fraction of shares of New Common Stock, the actual distribution of shares of such stock shall be rounded to the next higher or lower whole number as follows:  (a) fractions one-half (½) or greater shall be rounded to the next higher whole number and (b) fractions of less than one-half (½) shall be rounded to the next lower whole number.  Notwithstanding the foregoing, whenever rounding to the next lower whole number would result in such Person receiving zero shares of New Common Stock, such Person shall receive one (1) share of New Common Stock.  If two or more Persons are entitled to equal fractional entitlements and the aggregate amount of New Common Stock that would otherwise be issued to such Persons with respect to such fractional entitlements as a result of such rounding exceeds the number of whole shares which remain to be allocated, the Disbursing Agent shall allocate the remaining whole shares to such holders by random lot or such other impartial method as the Disbursing Agent deems fair.  Upon the allocation of all of the whole shares authorized under the Plan, all remaining fractional portions of the entitlements shall be cancelled and shall be of no further force and effect.  The Disbursing Agent shall have the right to carry forward to subsequent distributions any applicable credits or debits arising from the rounding described in this paragraph.

**8.6    Delivery of Distributions**

Distributions to holders of Allowed Claims shall be made by the Disbursing Agent (a) at the addresses set forth on the Proofs of Claim filed by such holders (or at the last known addresses of such holders if no Proof of Claim is filed or if the Debtors or the Reorganized Debtors have been notified of a change of address), (b) at the addresses set forth in any written notices of address changes delivered to the Debtors, the Reorganized Debtors, or the Disbursing Agent after the date of any related Proof of Claim, (c) at the addresses reflected in the Schedules if no Proof of Claim has been filed and the Debtors, the Reorganized Debtors, or the Disbursing Agent have not received a written notice of a change of address, (d) in the case of a GECC Credit Agreement Claim, to GECC, or (e) in the case of the holder of an Allowed Noteholder Claim, distributions shall be sent to the Indenture Trustee or as directed by the Indenture Trustee.  If any holder's distribution is returned as undeliverable, no further distributions to such holder shall be made unless and until the Disbursing Agent is notified of such holder's then current address, at which time all missed distributions shall be made to such holder without interest.  Unless otherwise agreed between the Reorganized Debtors and the Disbursing Agent, amounts in respect of undeliverable distributions made by the Disbursing Agent shall be returned to the Reorganized Debtors until such distributions are claimed.  All claims for undeliverable distributions must be made on or before the second (2nd) anniversary of the Distribution Date, after which date all unclaimed property shall revert to the Reorganized Debtors free of any restrictions thereon and the claims of any holder or successor to such holder with respect to such property shall be discharged and forever barred, notwithstanding any federal or state escheat laws to the contrary.  In the event of a timely claim for an unclaimed distribution, the Reorganized Debtors shall deliver the applicable unclaimed property to the Disbursing Agent for distribution pursuant to the Plan.  Nothing contained in the Plan shall require any Debtor, any Reorganized Debtor, any Disbursing Agent, or any Indenture Trustee to attempt to locate any holder of an Allowed Claim.

**8.7    Application of Distribution Record Date**

At the close of business on the Distribution Record Date, the claims registers for all Claims and the transfer ledgers for the FiberMark Notes shall be closed, and there shall be no further changes in the record holders of such Claims or FiberMark Notes; provided, however, that the claims register and transfer ledgers may be thereafter adjusted to reflect (a) the implementation of Sections 4.3(f)(iii)(A)(3), 4.3(g)(ii)(A)(3), and Section 6.16(c) of the Plan as between Silver Point and certain holders of Noteholder Claims and (b) the implementation of Sections 4.3(f)(iv) and 6.16(d) as between Silver Point and each of AIGGIC and Post.  Except as provided herein, the Reorganized Debtors, the Disbursing Agent, the Indenture Trustee, and each of their respective agents, successors, and assigns shall have no obligation to recognize any transfer of Claims or FiberMark Notes occurring after the Distribution Record Date and shall be entitled instead to recognize and deal for all purposes hereunder with only those record holders stated on the claims registers or transfer ledgers as of the close of

business on the Distribution Record Date irrespective of the number of distributions to be made under the Plan to such Persons or the date of such distributions.

**8.8    Withholding and Reporting Requirements**

In connection with the Plan and all distributions hereunder, the Disbursing Agent shall, to the extent applicable, comply with all tax withholding and reporting requirements imposed by any federal, state, provincial, local, or foreign taxing authority, and all distributions hereunder shall be subject to any such withholding and reporting requirements.  The Disbursing Agent shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding and reporting requirements.  Notwithstanding any other provision of the Plan, (a) each holder of an Allowed Claim that is to receive a distribution pursuant to the Plan shall have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding, and other tax obligations, on account of such distribution, and (b) no distribution shall be made to or on behalf of such holder pursuant to the Plan unless and until such holder has made arrangements satisfactory to the Disbursing Agent for the payment and satisfaction of such withholding tax obligations.  Any property to be distributed pursuant to the Plan shall, pending the implementation of such arrangements, be treated as an undeliverable distribution pursuant to Section 8.6 of the Plan.

**8.9    Setoffs**

The Reorganized Debtors may, but shall not be required to, set off against any Claim, and the payments or other distributions to be made pursuant to the Plan in respect of such Claim, claims of any nature whatsoever that the Debtors or the Reorganized Debtors may have against the holder of such Claim; *provided, however,* that neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Reorganized Debtors of any such claim that the Debtors or the Reorganized Debtors may have against such holder.

**8.10    Prepayment**

Except as otherwise provided in the Plan, any ancillary documents entered into in connection herewith, or the Confirmation Order, the Reorganized Debtors shall have the right to prepay, without penalty, all or any portion of an Allowed Claim at any time; *provided, however,* that any such prepayment shall not be violative of, or otherwise prejudice, the relative priorities and parities among the Classes of Claims.

**8.11    No Distribution in Excess of Allowed Amount of Claim**

Notwithstanding anything to the contrary herein, no holder of an Allowed Claim shall receive in respect of such Claim any distribution of a value as of the Effective Date in excess of the Allowed amount of such Claim (excluding payments on account of interest due and payable from and after the Effective Date pursuant to the Plan).

**8.12    Allocation of Distributions**

All distributions received under the Plan by holders of Claims shall be deemed to be allocated first to the principal amount of such Claim as determined for United States federal income tax purposes and then to accrued interest, if any, with respect to such Claim.

**ARTICLE IX**

**PROCEDURES FOR RESOLVING DISPUTED, CONTINGENT, AND UNLIQUIDATED CLAIMS AND DISTRIBUTIONS WITH RESPECT THERETO**

**9.1    Prosecution of Objections to Claims**

(a)    **Objections to Claims**

All objections to Claims must be filed and served on the holders of such Claims by the Claims Objection Deadline.  If an objection has not been filed to a Proof of Claim by the Claims Objection Deadline, the Claim to which the Proof of Claim or scheduled Claim relates shall be treated as an Allowed Claim if such Claim has not been allowed earlier. The Reorganized Debtors may, at any time, request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to Section 502(c) of the Bankruptcy Code, regardless of whether the Debtors or the Reorganized Debtors have previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim,

including during the pendency of any appeal relating to any such objection. In the event the Bankruptcy Court so estimates any contingent or unliquidated Claim, that estimated amount shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court, as applicable. If the estimated amount constitutes a maximum limitation on such Claim, the Reorganized Debtors may elect to pursue any supplemental proceedings to object to any ultimate payment on such Claim. All of the aforementioned Claims objection, estimation, and resolution procedures are cumulative and are not necessarily exclusive of one another. Claims may be estimated and thereafter resolved by any permitted mechanisms.

      (b)      **Authority to Prosecute Objections**

After the Effective Date, only the Reorganized Debtors shall have the authority to file objections to Claims and to settle, compromise, withdraw, or litigate to judgment objections to Claims, including Claims for reclamation under Section 546(c) of the Bankruptcy Code. The Reorganized Debtors may settle or compromise any Disputed Claim without approval of the Bankruptcy Court.

**9.2**      **Treatment of Disputed Claims**

      (a)      **No Distributions Pending Allowance**

Notwithstanding any other provisions of the Plan, no payments or distributions shall be made on account of a Disputed Claim or, if less than the entire Claim is a Disputed Claim, the portion of a Claim that is Disputed, until such Claim becomes an Allowed Claim.

      (b)      **Distributions on Account of Disputed Claims Once They Are Allowed**

The Disbursing Agent shall, on the applicable Distribution Dates, make distributions on account of any Disputed Claim that has become an Allowed Claim. Such distributions shall be made pursuant to the provisions of the Plan governing the applicable Class. Such distributions shall be based upon the cumulative distributions that would have been made to the holder of such Claim under the Plan if the Disputed Claim had been an Allowed Claim on the Effective Date in the amount ultimately Allowed.

**9.3**      **Provisions for Disputed General Unsecured Claims**

      (a)      **Common Stock Reserve; Additional Issuances**

On the Effective Date, the Debtors shall (i) determine the amount of the New Common Stock reasonably calculated to be sufficient to provide distributions to Disputed General Unsecured Claims that are expected to become Allowed Claims and (ii) direct the Disbursing Agent to establish the Common Stock Reserve with the requisite amount of New Common Stock. In the event that the amount of New Common Stock in the Common Stock Reserve proves to be insufficient to satisfy the rights to New Common Stock of all Disputed General Unsecured Claims that subsequently become Allowed Claims, the Reorganized Debtors shall issue additional shares of New Common Stock as necessary to ensure that all holders of Allowed Noteholder Claims and Allowed General Unsecured Claims ultimately receive the same Pro Rata distribution of New Common Stock.

      (b)      **Cash Reserve**

On the Effective Date, the Debtors shall (i) determine the amount of the Distribution Cash reasonably calculated to be sufficient to provide distributions to Disputed General Unsecured Claims that are expected to become Allowed Claims and (ii) direct the Disbursing Agent to establish the Cash Reserve with the requisite amount of Distribution Cash. In the event that the amount of Distribution Cash in the Cash Reserve proves to be insufficient to satisfy the rights to Distribution Cash of all Disputed General Unsecured Claims that subsequently become Allowed Claims, the Reorganized Debtors shall transfer additional funds to the Disbursing Agent as necessary to ensure that all holders of Allowed Noteholder Claims and Allowed General Unsecured Claims ultimately receive the same Pro Rata distribution of Distribution Cash. The Reorganized Debtors shall also maintain in the Cash Reserve a portion of the Settlement Cash from AIGGIC or Post as provided for in Section 6.16(b).

      (c)      **Redistribution of Reserved Amounts**

With respect to the shares of New Common Stock held in the Common Stock Reserve on account of Disputed General Unsecured Claims electing to receive same, not later than the one hundred twentieth (120th) day following

the Distribution Date and not less frequently than every one hundred twentieth (120th) day thereafter, the Disbursing Agent, as directed by the Reorganized Debtors, shall calculate the amount, if any, by which the number of such shares exceeds the number that would be allocable to any of the remaining Disputed Claims that are expected to become Allowed Claims. Except with respect to the final distribution, in the event the Disbursing Agent determines, as directed by the Reorganized Debtors, that an excess exists that would result in distributions in the aggregate of at least 10,000 shares of New Common Stock, such excess shall be promptly distributed or allocated on a Pro Rata basis in accordance with Sections 4.3(f) and 4.3(g) to holders of Allowed Noteholder Claims and Allowed General Unsecured Claims. With respect to the final distribution, all remaining shares in the Common Stock Reserve shall be promptly distributed or allocated on a Pro Rata basis in accordance with Sections 4.3(f) and 4.3(g) to holders of Allowed Noteholder Claims and Allowed General Unsecured Claims unless the number of shares is de minimis and the cost of the distribution, as determined by the Reorganized Debtors, would exceed the value of the remaining shares. Any shares of New Common Stock not distributed shall be cancelled.

With respect to Distribution Cash held in the Cash Reserve on account of Disputed General Unsecured Claims, not later than the one hundred twentieth (120th) day following the Distribution Date and not less frequently than every one hundred twentieth (120th) day thereafter, the Disbursing Agent, as directed by the Reorganized Debtors, shall calculate the amount, if any, by which such Distribution Cash exceeds the amount that would be allocable to any of the remaining Disputed Claims that are expected to become Allowed Claims. Except with respect to the final distribution, in the event the Disbursing Agent determines that an excess exists that would result in distributions in the aggregate of at least $100,000, such excess shall be promptly distributed or allocated on a Pro Rata basis in accordance with Sections 4.3(f) and 4.3(g) to holders of Allowed Noteholder Claims and Allowed General Unsecured Claims. With respect to the final distribution, the remaining amount of Distribution Cash in the Cash Reserve shall be promptly distributed or allocated on a Pro Rata basis in accordance with Sections 4.3(f) and 4.3(g) to the holders of Allowed Noteholder Claims and Allowed General Unsecured Claims unless such remaining amount is de minimis and the cost of the distribution would exceed such remaining amount. Any of the Cash that is not distributed shall be returned to the Reorganized Debtors. Any of AIGGIC's Settlement Cash or Post's Settlement Cash that is no longer required to be maintained for Disputed General Unsecured Claims shall be returned to AIGGIC or Post.

(d)     **Organic Change**

After the Effective Date, if Reorganized FiberMark consummates an Organic Change, then the successor or acquiring entity shall assume Reorganized FiberMark's obligations regarding payment of Disputed Claims and shall adjust the reserves and payouts for potential payment of Disputed Claims such that the reserves and payouts consist of the consideration, if any, that would have been paid with respect to the remaining New Common Stock and Distribution Cash reserved for Disputed Claims had such New Common Stock and Distribution Cash been outstanding immediately prior to the consummation of the Organic Change.

(e)     **No Reserve for Other Claims**

No reserve shall be required with respect to payments or other distributions to be made under the Plan to any Claim that is not a Noteholder Claim or a General Unsecured Claim.

## ARTICLE X

## CONDITIONS PRECEDENT TO CONFIRMATION
## AND CONSUMMATION OF THE PLAN

**10.1     Conditions to Confirmation**

The following are conditions precedent to the occurrence of the Confirmation Date, each of which must be satisfied or waived in accordance with Section 10.3 of the Plan:

(a)     an order finding that the Disclosure Statement contains adequate information pursuant to Section 1125 of the Bankruptcy Code shall have been entered; and

(b)     the proposed Confirmation Order shall be in form and substance reasonably satisfactory to the Debtors, GECC as the lender under the DIP Facility, and the lender or the agent for the lenders under the Exit Facility.

**10.2 Conditions to Effective Date**

The following conditions precedent must be satisfied or waived on or prior to the Effective Date in accordance with Section 10.3 of the Plan:

(a)     the Confirmation Order shall have been entered in form and substance reasonably satisfactory to the Debtors, GECC as the lender under the DIP Facility, and the lender or the agent for the lenders under the Exit Facility, and shall, among other things:

(i)     provide that the Debtors and the Reorganized Debtors are authorized and directed to take all actions necessary or appropriate to enter into, implement, and consummate the contracts, instruments, releases, leases, indentures, and other agreements or documents created in connection with the Plan;

(ii)     approve the Exit Facility;

(iii)     authorize the issuance of the New Common Stock;

(iv)     find that the compromises and settlements of the Constituency Causes of Action and Litigation Rights provided for in the Plan as part of the Constituency Settlement are fair and reasonable and within the bounds of reasonableness; find that the releases of the Constituency Causes of Action and Litigation Rights provided for in the Plan as part of the Constituency Settlement are valid and enforceable, find that the Constituency Settlement is binding on the owners of or the Persons with an interest in the Constituency Causes of Action, and approve the Constituency Settlement for all purposes, including Rule 9019 of the Bankruptcy Rules; and

(v)     provide that notwithstanding Rule 3020(e) of the Bankruptcy Rules, the Confirmation Order shall be immediately effective, subject to the terms and conditions of the Plan;

(b)     the Confirmation Order shall not then be stayed, vacated, or reversed;

(c)     the documents evidencing the Exit Facility shall be in form and substance reasonably acceptable to the Debtors and the lender or the agent for the lenders under the Exit Facility, and, to the extent any of such documents contemplates execution by one or more persons, any such document shall have been executed and delivered by the respective parties thereto, and all conditions precedent to the effectiveness of each such document shall have been satisfied or waived;

(d)     the New FiberMark Charter and the New FiberMark By-laws shall have been executed and delivered by the respective parties thereto, and all conditions precedent to the effectiveness of each such document shall have been satisfied or waived;

(e)     the Debtors shall have determined that the number of record holders of New Common Stock as of the Effective Date shall be less than 300;

(f)     all material authorizations, consents, and regulatory approvals required, if any, in connection with consummation of the Plan shall have been obtained;

(g)     the Debtors shall have received the funds necessary to implement the Plan as contemplated by the Plan; and

(h)     all material actions, documents, and agreements necessary to implement the Plan shall have been effected or executed.

**10.3 Waiver of Conditions**

Each of the conditions set forth in Sections 10.1 and 10.2, with the express exception of the conditions contained in Section 10.1(a) and Section 10.2(a) and (b), may be waived in whole or in part by the Debtors without any notice to parties in interest or the Bankruptcy Court and without a hearing, *provided*, *however*, that such waiver shall not be effective without the consent of GECC and the lender or the agent for the lenders under the Exit Facility, as the case may be.

# ARTICLE XI

# RETENTION OF JURISDICTION

## 11.1    Scope of Retention of Jurisdiction

Under Sections 105(a) and 1142 of the Bankruptcy Code, and notwithstanding entry of the Confirmation Order and occurrence of the Effective Date, and except as otherwise ordered by the Bankruptcy Court, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, and related to, the Chapter 11 Case and the Plan to the fullest extent permitted by law, including, among other things, jurisdiction to:

(a)    allow, disallow, determine, liquidate, classify, estimate, or establish the priority or secured or unsecured status of any Claim or Interest not otherwise Allowed under the Plan (other than personal injury or wrongful death Claims, unless agreed by the holder), including the resolution of any request for payment of any Administrative Claim and the resolution of any objections to the allowance or priority of Claims or Interests;

(b)    hear and determine all applications for compensation and reimbursement of expenses of Professionals under the Plan or under Sections 327, 328, 330, 331, 503(b), 1103, and 1129(a)(4) of the Bankruptcy Code; *provided*, *however,* that from and after the Effective Date, the payment of the fees and expenses of the retained Professionals of the Reorganized Debtors shall be made in the ordinary course of business and shall not be subject to the approval of the Bankruptcy Court;

(c)    hear and determine all matters with respect to the assumption or rejection of any executory contract or unexpired lease to which a Debtor is a party or with respect to which a Debtor may be liable, including, if necessary, the nature or amount of any required Cure or the liquidation or allowance of any Claims arising therefrom;

(d)    effectuate performance of and payments under the provisions of the Plan;

(e)    hear and determine any and all adversary proceedings, motions, applications, and contested or litigated matters arising out of, under, or related to, the Chapter 11 Case or the Litigation Rights;

(f)    enter such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, and other agreements or documents created in connection with the Plan, the Disclosure Statement, or the Confirmation Order;

(g)    hear and determine disputes arising in connection with the interpretation, implementation, consummation, or enforcement of the Plan, including disputes arising under agreements, documents, or instruments executed in connection with the Plan, *provided*, *however*, that any dispute arising under or in connection with the New FiberMark Charter, the New FiberMark By-laws, and the Exit Facility shall be dealt with in accordance with the provisions of the applicable document;

(h)    consider any modifications of the Plan, cure any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

(i)    issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any entity with the implementation, consummation, or enforcement of the Plan or the Confirmation Order;

(j)    enter and implement such orders as may be necessary or appropriate if the Confirmation Order is for any reason reversed, stayed, revoked, modified, or vacated;

(k)    hear and determine any matters arising in connection with or relating to the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, or other agreement or document created in connection with the Plan, the Disclosure Statement, or the Confirmation Order;

(l)    enforce all orders, judgments, injunctions, releases, exculpations, indemnifications, and rulings entered in connection with the Chapter 11 Case;

(m)    except as otherwise limited herein, recover all assets of the Debtors and property of the Estates, wherever located;

(n)     hear and determine matters concerning state, local, and federal taxes in accordance with Sections 346, 505, and 1146 of the Bankruptcy Code;

(o)     hear and determine all disputes involving the existence, nature, or scope of the Debtors' discharge;

(p)     hear and determine such other matters as may be provided in the Confirmation Order or as may be authorized under, or not inconsistent with, provisions of the Bankruptcy Code;

(q)     hear and determine any matters arising under the Key Employee Protection Order, the Key Employee Retention Plan, the Key Employee Severance Plan, and the Discretionary Recognition Plan, including, without limitation, any dispute relating to the existence of "Good Reason" under such plans; and

(r)     enter a final decree closing the Chapter 11 Case.

## 11.2    Failure of the Bankruptcy Court to Exercise Jurisdiction

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising in, arising under, or related to the Chapter 11 Case, including the matters set forth in Section 11.1 of the Plan, the provisions of this Article XI shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having jurisdiction with respect to such matter.

## ARTICLE XII

## MISCELLANEOUS PROVISIONS

## 12.1    Professional Fee Claims; Indenture Trustee Expenses

(a)     All final requests for payment of Professional Fee Claims pursuant to Sections 327, 328, 330, 331, 503(b), or 1103 of the Bankruptcy Code and Substantial Contribution Claims under Section 503(b)(3), (4), or (5) of the Bankruptcy Code must be filed and served on the Reorganized Debtors, their counsel, and other necessary parties in interest no later than sixty (60) days after the Effective Date, unless otherwise ordered by the Bankruptcy Court.  Objections to such requests for payment must be filed and served on the Reorganized Debtors, their counsel, and the requesting Professional or other entity no later than twenty (20) days (or such longer period as may be allowed by order of the Bankruptcy Court) after the date on which the applicable request for payment was served.

(b)     Each Reorganized Debtor may, without application to or approval by the Bankruptcy Court, pay reasonable professional fees and expenses in connection with services rendered to it after the Effective Date.

(c)     The Indenture Trustee Expenses shall be paid solely in accordance with the procedures established in this Section 12.1(c).  To the extent the Indenture Trustee Expenses are paid in Cash in full by the Debtors or the Reorganized Debtors, distributions received by holders of Noteholder Claims pursuant to the Plan shall not be reduced on account of the fees and expenses of the Indenture Trustee.  On or before the Confirmation Date, the Indenture Trustee shall serve on the Debtors reasonably substantiating documents in support of the Indenture Trustee Expenses incurred to date by the Indenture Trustee, whether incurred prior or subsequent to the Petition Date, together with a detailed, reasonable estimate of any fees and expenses to be incurred through the Effective Date.  Such estimate may include, without limitation, projected fees and expenses relating to surrender and cancellation of the FiberMark Notes, distribution of the New Common Stock and the Distribution Cash, and in respect of any challenge to the claims asserted by the Indenture Trustee, whether based on the FiberMark Notes or the claimed amount of the Indenture Trustee Expenses.  On or as soon as reasonably practicable after the Effective Date, the Reorganized Debtors shall pay in Cash the undisputed amount of the Indenture Trustee Expenses without the need for the Indenture Trustee to file an application for the allowance thereof with the Bankruptcy Court.  If, prior to the Effective Date, the Debtors objected in writing to all or a portion of the Indenture Trustee Expenses, (i) the Reorganized Debtors shall pay the undisputed portion of the Indenture Trustee Expenses as provided above and (ii) such Indenture Trustee may, in its sole discretion, either (a) submit the disputed portion of the Indenture Trustee Expense to the Bankruptcy Court for resolution or (b) exercise its rights under the Indentures to ensure full payment of the Indenture Trustee Expenses.  The allowance of the disputed portion of the Indenture Trustee Expenses shall be determined under a "reasonableness" standard.  In connection with such allowance, the Indenture Trustee shall not be required to file fee applications or comply with guidelines and rules applicable to fee applications, and shall not be subject to Sections 330 or 503(b) of the Bankruptcy Code.  To the extent that the Reorganized Debtors fail to pay any portion of the Indenture Trustee Expenses, whether as a result of the Bankruptcy Court's determination or the Indenture Trustee's determination not to seek payment therefor, the Indenture Trustee shall have the right to assert the Indenture Trustee Charging Lien for the Payment of any such unpaid amount.

Nothing in the Plan or Confirmation Order shall be deemed to impair, waive, or discharge the Indenture Trustee Charging Lien, or any other rights of the Indenture Trustee (including, without limitation, the right of the Indenture Trustee to contest the jurisdiction of the Bankruptcy Court with respect to such matters) with respect to the payment of any portion of the Indenture Trustee Expenses not paid by the Reorganized Debtors. The Reorganized Debtors shall pay in the ordinary course of the Reorganized Debtors' business the reasonable direct out-of-pocket costs and expenses, including the reasonable attorney's fees and expenses, incurred by the Indenture Trustee after the Effective Date in connection with making distributions pursuant to the Plan.

## 12.2    Administrative Claims

All requests for payment of an Administrative Claim (other than as set forth in Sections 4.1(a) and 12.1 and this Section 12.2 of the Plan) must be filed with the Bankruptcy Court and served on counsel for the Reorganized Debtors no later than forty-five (45) days after the Effective Date. Unless the Reorganized Debtors object to an Administrative Claim within sixty (60) days after receipt, such Administrative Claim shall be deemed Allowed in the amount requested. In the event that the Reorganized Debtors object to an Administrative Claim, the Bankruptcy Court shall determine the Allowed amount of such Administrative Claim. Notwithstanding the foregoing, no request for payment of an Administrative Claim need be filed with respect to an Administrative Claim which was paid or payable by a Debtor in the ordinary course of business.

## 12.3    Payment of Statutory Fees

All fees payable pursuant to Section 1930 of Title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid on or before the Effective Date. All such fees that arise after the Effective Date shall be paid by the Reorganized Debtors. The obligation of each of the Reorganized Debtors to pay quarterly fees to the Office of the United States Trustee pursuant to Section 1930 of Title 28 of the United States Code shall continue until such time as a particular Chapter 11 case is closed, dismissed or converted.

## 12.4    Modifications and Amendments

The Debtors may alter, amend, or modify the Plan under Section 1127(a) of the Bankruptcy Code at any time prior to the Confirmation Date; *provided, however,* that any alteration, amendment, or modification of a provision of the Plan that refers to, specifically applies to or has any material impact upon GECC's treatment under the Plan shall not be effective without the consent of GECC; *provided further, however,* that any alteration, amendment, or modification of the terms of the Constituency Settlement shall not be effective without the consent of AIGGIC, Post, and Silver Point. After the Confirmation Date and prior to substantial consummation of the Plan, as defined in Section 1101(2) of the Bankruptcy Code, the Debtors may, under Section 1127(b) of the Bankruptcy Code, with the prior consent of GECC as to any remedy affecting a provision of the Plan that refers to, specifically applies to or has any material impact upon GECC's treatment under the Plan, or with the prior consent of AIGGIC, Post, and Silver Point as to any term of the Constituency Settlement, institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Plan or the Confirmation Order, *provided, however,* that prior notice of such proceedings shall be served in accordance with the Bankruptcy Rules or order of the Bankruptcy Court.

## 12.5    Severability of Plan Provisions

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of any Debtor, with the consent of GECC as to any such term or provision that refers to, specifically applies to or has any material impact upon GECC's treatment under the Plan, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

## 12.6    Successors and Assigns and Binding Effect

The rights, benefits, and obligations of any Person named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, personal representative, successor, or assign of such entity, including, but not limited to, the Reorganized Debtors and all other parties in interest in the Chapter 11 Case.

**12.7 Compromises and Settlements**

From and after the Effective Date, the Reorganized Debtors may compromise and settle various Claims against them and/or Litigation Rights and other claims that they may have against other Persons without any further approval by the Bankruptcy Court. Until the Effective Date, the Debtors expressly reserve the right to compromise and settle (subject to the approval of the Bankruptcy Court) Claims against them and Litigation Rights or other claims that they may have against other Persons.

**12.8 Releases and Satisfaction of Subordination Rights**

All Claims against the Debtors and all rights and claims between or among the holders of Claims relating in any manner whatsoever to any claimed subordination rights shall be deemed satisfied by the distributions under, described in, contemplated by, and/or implemented in Sections 4.1, 4.2, and 4.3 of the Plan. Distributions under, described in, contemplated by, and/or implemented by the Plan to the various Classes of Claims hereunder shall not be subject to levy, garnishment, attachment, or like legal process by any holder of a Claim by reason of any claimed subordination rights or otherwise, so that each holder of a Claim shall have and receive the benefit of the distributions in the manner set forth in the Plan.

**12.9 Releases and Related Matters**

    (a)    **Releases by Debtors**

**As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, the Debtors, the Reorganized Debtors and any Person seeking to exercise the rights of the Debtors' estate, including, without limitation, any successor to the Debtors or any estate representative appointed or selected pursuant to Section 1123(b)(3) of the Bankruptcy Code, shall be deemed to forever release, waive, and discharge all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action (including claims or causes of action arising under Chapter 5 of the Bankruptcy Code), and liabilities whatsoever (other than for fraud, breach of fiduciary duty, malpractice, willful misconduct, or gross negligence) in connection with or related to the Debtors, the Chapter 11 Case, or the Plan (other than the rights of the Debtors and the Reorganized Debtors to enforce the Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered thereunder), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity, or otherwise, that are based in whole or part on any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, the Reorganized Debtors, the Chapter 11 Case, or the Plan, and that may be asserted by or on behalf of the Debtors, the Estates, or the Reorganized Debtors against (i) any of the other Debtors and any of the Debtors' non-Debtor subsidiaries, (ii) any of the directors, officers, or employees of any of the Debtors or any of the Debtors' non-Debtor subsidiaries serving during the pendency of the Chapter 11 Case, (iii) any Professionals of the Debtors, (iv) GECC and its advisors, (v) Silver Point and its advisors, (vi) Solutions Dispersions, Inc. and its advisors, (vii) the Indenture Trustee and its advisors, (viii) AIGGIC and its advisors, and (ix) Post and its advisors; *provided, however,* that nothing in this Section 12.9(a) shall be deemed to prohibit the Debtors or the Reorganized Debtors from asserting and enforcing any claims, obligations, suits, judgments, demands, debts, rights, causes of action or liabilities they may have against any employee (other than any director or officer) that is based upon an alleged breach of a confidentiality, noncompete or any other contractual or fiduciary obligation owed to the Debtors or the Reorganized Debtors.**

**Nothing in this Section 12.9(a) shall reduce or limit the scope of the releases provided as part of the Constituency Settlement in Section 6.16 of the Plan.**

    (b)    **Releases by Holders of Claims and Interests**

**As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, each holder of a Claim that affirmatively votes in favor of the Plan shall be deemed to forever release, waive, and discharge all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, and liabilities whatsoever (other than for fraud, breach of fiduciary duty, willful misconduct, or gross negligence) against the directors, officers, or employees of any of the Debtors serving during the pendency of the Chapter 11 Case (collectively, the "Claimholder Releasees"), in connection with or related to the Debtors, the Chapter 11 Case, or the Plan (other than the rights under the Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered thereunder), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereunder arising, in law, equity, or otherwise, that are**

based in whole or part on any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors or the Reorganized Debtors, the Chapter 11 Case, or the Plan.

Each of the Claimholder Releasees shall be deemed to forever release, waive, and discharge any claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, and liabilities whatsoever (other than for fraud, breach of fiduciary duty, willful misconduct, or gross negligence) arising on or prior to the Effective Date in any way relating to the Debtors or the Reorganized Debtors, the Chapter 11 Case, or the Plan, that such Claimholder Releasees may hold in their individual capacities against each holder of a Claim that affirmatively votes in favor of the Plan. This provision does not constitute, and shall not be deemed to effect, a release by the Debtors or the Reorganized Debtors of any claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, and liabilities held by the Debtors or the Reorganized Debtors.

Except as specifically provided herein with respect to Claimholder Releases, all holders of Claims shall retain their respective Individual Causes of Action, and no such Individual Cause of Action shall be impaired by the Plan or by a vote in favor of the Plan or the receipt of any distributions under the Plan.

Nothing in this Section 12.9(b) shall reduce or limit the scope of the releases provided as part of the Constituency Settlement in Section 6.16 of the Plan.

## 12.10    Discharge of the Debtors

(a)      Except as otherwise provided herein or in the Confirmation Order, all consideration distributed under the Plan shall be in exchange for, and in complete satisfaction, settlement, discharge, and release of, all Claims of any nature whatsoever against the Debtors or any of their assets or properties and, regardless of whether any property shall have been abandoned by order of the Bankruptcy Court, retained, or distributed pursuant to the Plan on account of such Claims, upon the Effective Date, the Debtors, and each of them, shall (i) be deemed discharged and released under Section 1141(d)(1)(A) of the Bankruptcy Code from any and all Claims, including, but not limited to, demands and liabilities that arose before the Effective Date, and all debts of the kind specified in Section 502 of the Bankruptcy Code, whether or not (A) a Proof of Claim based upon such debt is filed or deemed filed under Section 501 of the Bankruptcy Code, (B) a Claim based upon such debt is Allowed under Section 502 of the Bankruptcy Code, (C) a Claim based upon such debt is or has been disallowed by order of the Bankruptcy Court, or (D) the holder of a Claim based upon such debt accepted the Plan, and (ii) terminate all FiberMark Interests.

(b)      As of the Effective Date, except as provided in the Plan or the Confirmation Order or under the terms of the documents evidencing and orders approving the DIP Facility and/or the Exit Facility, all Persons shall be precluded from asserting against the Debtors or the Reorganized Debtors, any other or further claims, debts, rights, causes of action, claims for relief, liabilities, or equity interests relating to the Debtors based upon any act, omission, transaction, occurrence, or other activity of any nature that occurred prior to the Effective Date. In accordance with the foregoing, except as provided in the Plan or the Confirmation Order, the Confirmation Order shall be a judicial determination of discharge of all such Claims and other debts and liabilities against the Debtors and termination of all FiberMark Interests, pursuant to Sections 524 and 1141 of the Bankruptcy Code, and such discharge shall void any judgment obtained against the Debtors at any time, to the extent that such judgment relates to a discharged Claim or terminated Interest.

## 12.11    Injunction

(a)      **Except as provided in the Plan or the Confirmation Order, as of the Effective Date, all Persons that have held, currently hold, may hold, or allege that they hold, a Claim or other debt or liability that is discharged or an Interest or other right of an equity security holder that is terminated pursuant to the terms of the Plan are permanently enjoined from taking any of the following actions against the Debtors, the Reorganized Debtors, and their respective subsidiaries or their property on account of such discharged Claims, debts, or liabilities or terminated Interests or rights:  (i) commencing or continuing, in any manner or in any place, any action or other proceeding; (ii) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order; (iii) creating, perfecting, or enforcing any Lien or encumbrance; (iv) asserting a setoff, right of subrogation, or recoupment of any kind against any debt, liability, or obligation due to the Debtors or the Reorganized Debtors; or (v) commencing or continuing any action, in each such case in any manner, in any place, or against any Person that does not comply with or is inconsistent with the provisions of the Plan.**

(b)      **As of the Effective Date, all Persons that have held, currently hold, or may hold, a Claim, obligation, suit, judgment, damage, demand, debt, right, cause of action, or liability that is released pursuant to Section 12.8,**

12.9, or 12.12 of the Plan are permanently enjoined from taking any of the following actions on account of such released Claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, or liabilities or terminated Interests or rights: (i) commencing or continuing, in any manner or in any place, any action or other proceeding; (ii) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order; (iii) creating, perfecting, or enforcing any Lien or encumbrance; (iv) asserting a setoff against any debt, liability, or obligation due to any released Person; or (v) commencing or continuing any action, in any manner, in any place, or against any Person that does not comply with or is inconsistent with the provisions of the Plan.

(c) Without limiting the effect of the foregoing provisions of this Section 12.11 upon any Person, by accepting distributions pursuant to the Plan, each holder of an Allowed Claim receiving distributions pursuant to the Plan shall be deemed to have specifically consented to the injunctions set forth in this Section 12.11.

(d) Without limiting the generality of the foregoing provisions of this Section 12.11 and the foregoing Section 12.10, if any Person has held, currently holds, may hold, or alleges that s/he/it holds a Claim, and such Person either did not timely file a Proof of Claim with respect such Claim or filed a Proof of Claim that is or was disallowed by order of the Bankruptcy Court, then such Person is permanently enjoined from taking any of the following actions on account of such Claim or on account of any acts, omissions, transactions, occurrences, or other activities upon which such Claim is or may be based: (i) commencing or continuing, in any manner or in any place, any action or other proceeding; (ii) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order; (iii) creating, perfecting, or enforcing any Lien or encumbrance; (iv) asserting a setoff, right of subrogation, or recoupment of any kind against any debt, liability, or obligation due to the Debtors or the Reorganized Debtors; or (v) commencing or continuing any action, in each such case in any manner, in any place, or against any Person that does not comply with or is inconsistent with the provisions of the Plan.

(e) The Confirmation Order shall provide that all Persons who have held, currently hold, may hold, or allege that they hold, directly or indirectly, Constituency Causes of Action or Litigation Rights against Silver Point, AIGGIC, or Post are permanently enjoined from commencing or continuing, in any manner or in any place, any action or other proceeding against Silver Point, AIGGIC, or Post that asserts Constituency Causes of Action or Litigation Rights.

(f) The Confirmation Order shall provide that in the event the Debtors or Reorganized Debtors sue any Person, and in connection with such suit such Person asserts a claim for contribution, indemnification, recovery of loss or potential loss, or otherwise, however denominated, arising under federal, state, or foreign law, including claims based upon tort or contract, as direct claims, crossclaims, counterclaims, or third party claims in any court, arbitration, administrative agency or forum, or in any other manner (each a "Contribution Claim" and collectively "Contribution Claims") against Silver Point, AIGGIC, or Post, then the Debtors or Reorganized Debtors shall automatically, and without any further act on the part of any Person, credit against or reduce the amount of any judgment any of them may obtain against such Person by an amount equal to the amount as is determined by trial or otherwise in a Final Order to be the amount due to such Person from Silver Point, AIGGIC, or Post, on account of such Contribution Claim. For purposes of this subsection, the terms "sue" and "suit" do not include objections by the Debtors or Reorganized Debtors to any applications or other requests for payment of Professional Fee Claims, and "judgment" does not include a Final Order of the Bankruptcy Court disallowing the fees and expenses of any Professional, whether previously paid or requested to be paid. Accordingly, Silver Point, AIGGIC, and Post shall have no rights against the Debtors or the Reorganized Debtors for the amounts of any disallowed fees and expenses that any Professional may seek to recover from Silver Point, AIGGIC, or Post.

**12.12 Exculpation and Limitation of Liability**

(a) None of the Debtors, the Reorganized Debtors, their respective subsidiaries, GECC, Silver Point, Solutions Dispersions, Inc., the Indenture Trustee, AIGGIC, or Post, or any of their respective present or former members, officers, directors, employees, advisors, Professionals, or agents, shall have or incur any liability to any holder of a Claim or an Interest, or any other party in interest, or any of their respective agents, employees, representatives, advisors, attorneys, or affiliates, or any of their successors or assigns, for any act or omission in connection with, relating to, or arising out of, the Chapter 11 Case, the formulation, negotiation, or implementation of the Plan, the solicitation of acceptances of the Plan, the pursuit of Confirmation of the Plan, the Confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for acts or omissions (i) which are the result of fraud, breach of fiduciary duty, malpractice, willful misconduct, or gross negligence, (ii) which constitute violations of the Internal Revenue Code or any state, city, or municipal tax code, the securities laws of the United States or any state, the environmental laws of the United States or any state, city, or municipality, or the criminal laws of the United States or any state, city, or municipality, or (iii)

which give rise to or are the basis for Individual Causes of Action; and in all respects shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.

(b)     Notwithstanding any other provision of the Plan, no holder of a Claim or an Interest, no other party in interest, none of their respective agents, employees, representatives, advisors, attorneys, or affiliates, and none of their respective successors or assigns shall have any right of action against any of the Debtors, any of the Reorganized Debtors, any of the Debtors' or Reorganized Debtors' subsidiaries, GECC, Silver Point, Solutions Dispersions, Inc., the Indenture Trustee, AIGGIC, or Post, or of their respective present or former members, officers, directors, employees, advisors, Professionals, or agents, for any act or omission in connection with, relating to, or arising out of, the Chapter 11 Case, the formulation, negotiation, or implementation of the Plan, solicitation of acceptances of the Plan, the pursuit of Confirmation of the Plan, the Confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for acts or omissions (i) which are the result of fraud, breach of fiduciary duty, malpractice, willful misconduct, or gross negligence, (ii) which constitute violations of the Internal Revenue Code or any state, city, or municipal tax code, the securities laws of the United States or any state, the environmental laws of the United States or any state, city, or municipality, or the criminal laws of the United States or any state, city, or municipality, or (iii)  which give rise to or are the basis for Individual Causes of Action.

(c)     Nothing in this Section 12.12 shall reduce or limit the scope of the releases provided as part of the Constituency Settlement in Section 6.16 of the Plan.

## 12.13    Term of Injunctions or Stays

Unless otherwise provided herein or in the Confirmation Order, all injunctions or stays provided for in the Chapter 11 Case under Sections 105 or 362 of the Bankruptcy Code or otherwise, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order), shall remain in full force and effect until the Effective Date.

## 12.14    Revocation, Withdrawal, or Non-Consummation

The Debtors reserve the right to revoke or withdraw the Plan at any time prior to the Confirmation Date and to file subsequent plans of reorganization.  If the Debtors revoke or withdraw the Plan, or if Confirmation or the Effective Date does not occur, then (a) the Plan shall be null and void in all respects, (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain any Claim or Class of Claims), assumption or rejection of executory contracts or leases effected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void, and (c) nothing contained in the Plan, and no acts taken in preparation for consummation of the Plan, shall (i) constitute or be deemed to constitute a waiver or release of any Claims by or against, or any Interests in, any Debtor or any other Person, (ii) prejudice in any manner the rights of any Debtor or any Person in any further proceedings involving a Debtor, or (iii) constitute an admission of any sort by any Debtor or any other Person.

## 12.15    Notices

Any notice, request, or demand required or permitted to be made or provided to or upon a Debtor or a Reorganized Debtor under the Plan shall be (a) in writing, (b) served by (i) certified mail, return receipt requested, (ii) hand delivery, (iii) overnight delivery service, (iv) first class mail, or (v) facsimile transmission, and (c) deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

FIBERMARK, INC.
161 Wellington Road
P.O. Box 498
Brattleboro, Vermont 05302
Attn:     Alex Kwader
Telephone:  (802) 257-0365
Fax:   (802) 258-2720

with a copy to:

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036-6522
Attn:    D. J. Baker, Esq.
Telephone: (212) 735-3000
Fax:   (212) 735-2000

## 12.16    Dissolution of Creditors Committee

On the Effective Date, any Creditors Committee then in existence shall dissolve and its members shall be released and discharged from all duties and obligations arising from or related to the Chapter 11 Case.  The Professionals retained by any such then existing Creditors Committee and the members thereof shall not be entitled to compensation or reimbursement of expenses for any services rendered after the Effective Date, except as may be necessary to file final requests for payment pursuant to Section 12.1(a) of the Plan.

## 12.17    Computation of Time

In computing any period of time prescribed or allowed by the Plan, the provisions of Rule 9006(a) of the Bankruptcy Rules shall apply.

## 12.18    Governing Law

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules), the laws of (a) the State of Vermont shall govern the construction and implementation of the Plan and (except as may be provided otherwise in any such agreements, documents, or instruments) any agreements, documents, and instruments executed in connection with the Plan and (b) the laws of the state of incorporation of each Debtor shall govern corporate governance matters with respect to such Debtor; in each case without giving effect to the principles of conflicts of law thereof.

Dated: November 1, 2005

FIBERMARK, INC.
FIBERMARK NORTH AMERICA, INC.
FIBERMARK INTERNATIONAL HOLDINGS LLC


By:    _Alex Kwader_

Name:    Alex Kwader
Title:    Chairman and Chief Executive Officer

D. J. Baker
Rosalie Walker Gray
Jane M. Leamy
Adam S. Ravin
David M. Turetsky
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036-6522
Telephone: (212) 735-3000
Facsimile: (212) 735-2000

Raymond J. Obuchowski (Bar ID 00502389)
Jennifer Emens-Butler (Bar ID 000845663)
OBUCHOWSKI & EMENS-BUTLER
P.O. Box 60, 1542 Vt. Rt. 107
Bethel, Vermont 05032
Telephone: (802) 234-6244
Facsimile: (802) 234-6245

Co-Counsel for Debtors

**EXHIBIT A**

<u>**NEW FIBERMARK CHARTER**</u>

**AMENDED AND RESTATED**

**CERTIFICATE OF INCORPORATION**

**OF**

**FIBERMARK, INC.**


ARTICLE  I

The name of the corporation is FiberMark, Inc. (the "***Corporation***").  The Corporation filed its original certificate of incorporation in Delaware under the name "Specialty Paperboard, Inc." on June 15, 1989, and subsequently filed a Certificate of Ownership and Merger, pursuant to which, among other things, Specialty Paperboard, Inc. changed its name to "FiberMark, Inc.," on March 26, 1997.

This Amended and Restated Certificate of Incorporation (the "***Certificate***") of the Corporation is made and filed pursuant to an order of the United States Bankruptcy Court, for the District of Vermont, dated _____, 2005 in In re: FiberMark, Inc., Case No.: Case No. 04-10463 cab, under Chapter 11, title 11 of the United States Code.

ARTICLE  II

The address of the Corporation's registered office in the State of Delaware is Corporation Service Company, 2711 Centerville Road, Suite 400, County of New Castle, Wilmington, Delaware.  The name of the Corporation's registered agent at such address is Corporation Service Company.

ARTICLE  III

The nature of the business or purpose to be conducted or promoted is to be engaged in any lawful act or activity for which corporations may be organized under the General Corporation Law of the State of Delaware (the "***DGCL***").

ARTICLE  IV

Section 1.     Authorized Capital Stock.   The Corporation is authorized to issue one class of shares designated "***Common Stock***."   The total number of shares of Common Stock which the Corporation has authority to issue is 20,000,000, each having a par value of $.001.

Section 2.     Limitation on Nonvoting Stock.   Notwithstanding anything herein to the contrary, the Corporation shall not issue nonvoting capital stock to the extent prohibited by Section 1123 of Title 11 of the United States Code (the "***Bankruptcy Code***"); provided, however, that this Section IV.2:  (a) will have no further force and effect beyond that required under Section 1123 of the Bankruptcy Code, (b) will have such force and effect only for so long as

Section 1123 of the Bankruptcy Code is in effect and applicable to the Corporation and (c) in all events may be amended or eliminated in accordance with applicable law as from time to time in effect.

Section 3.    Common Stock.

(a)    The holders of shares of Common Stock shall be entitled to one (1) vote for each such share on each matter properly submitted to the stockholders on which the holders of shares of Common Stock are entitled to vote.  Except as otherwise required by applicable law or this Certificate, at any annual or special meeting of the stockholders the holders of Common Stock shall have the exclusive right to vote for the election of directors and on all other matters properly submitted to a vote of the stockholders.

(b)    The holders of shares of Common Stock shall be entitled to receive such dividends and other distributions (payable in cash, property or capital stock of the Corporation) when, as and if declared thereon by the Board of Directors of the Corporation (the "***Board***") from time to time out of any assets or funds of the Corporation legally available therefor and shall share equally on a per share basis in such dividends and distributions.

(c)    In the event of any voluntary or involuntary liquidation, dissolution or winding up of the Corporation, after payment or provision for payment of the debts and other liabilities of the Corporation, the holders of shares of Common Stock shall be entitled to receive all the remaining assets of the Corporation available for distribution to its stockholders, ratably in proportion to the number of shares of Common Stock held by them.

ARTICLE  V

Section 1.    Limitation on Number of Shareholders.

(a)    Notwithstanding anything set forth in this Certificate of Incorporation, or the compliance with any of the terms hereof, no Transfer of shares of Common Stock shall be effective, and any such Transfer of shares of Common Stock shall be deemed null and void, if, as a result of any such Transfer, the record number of shareholders of the Corporation (as determined in accordance with Rule 12g5-1 under the Securities Exchange Act of 1934, as amended or any successor rule or interpretation) would exceed 275 before January 1, 2006 and 450 thereafter; provided, however, that this Section V.1 shall be of no further force and effect from and after such time as the Common Stock of the Corporation shall become registered under the Securities Exchange Act of 1934, as amended.

(b)    As used in this Article V, the term "***Transfer***" shall mean any voluntary or involuntary attempt, directly or indirectly through the transfer of interests in controlled Affiliates or otherwise, to offer, sell, assign, transfer, grant a participation in, pledge or otherwise dispose of any shares of Common Stock, or the consummation of any such transaction, or the soliciting of any offers to purchase or otherwise acquire, or taking a pledge of, any of the shares of Common Stock; provided, however, that the transfer of an interest in any holder of Common

Stock shall not be deemed to be a Transfer.  The term "***Transferred***" shall have a correlative meaning.

Section 2.  <u>Transfers Not In Compliance</u>.  In the event of any purported or attempted Transfer of shares of Common Stock by a stockholder that does not comply with the provisions of this Article V, such purported or attempted Transfer shall be void <u>ab</u> <u>initio</u>, and the purported transferee or successor by operation of law shall not be deemed to be a stockholder of the Corporation for any purpose and shall not be entitled to any of the rights of a stockholder, including, without limitation, the right to vote the shares of Common Stock or to receive a certificate for the shares of Common Stock or any dividends or other distributions on or with respect to the shares of Common Stock.

## ARTICLE  VI

The Corporation is to have perpetual existence.

## ARTICLE  VII

Whenever a compromise or arrangement is proposed between the Corporation and its creditors or any class of them, and/or between the Corporation and its stockholders or any class of them, any court of equitable jurisdiction within the State of Delaware may, on the application in a summary way of the Corporation or of any creditor or stockholder thereof or on the application of any receiver or receivers appointed for the Corporation under the provisions of Section 291 of Title 8 of the DGCL or on the application of trustees in dissolution or of any receiver or receivers appointed for the Corporation under the provisions of Section 279 of Title 8 of the DGCL, order a meeting of the creditors or class of creditors, and/or of the stockholders or class of stockholders of the Corporation, as the case may be, to be summoned in such manner as the said court directs.  If a majority in number representing three-fourths in value of the creditors or class of creditors, and/or of the stockholders or class of stockholders of the Corporation, as the case may be, agree to any compromise or arrangement and to any reorganization of the Corporation as a consequence of such compromise or arrangement, the said compromise or arrangement and the said reorganization shall, if sanctioned by the court to which the said application has been made, be binding on all the creditors or class of creditors, and/or on all the stockholders or class of stockholders, of the Corporation, as the case may be, and also on the Corporation.

## ARTICLE  VIII

For the management of the business and for the conduct of the affairs of the Corporation, and in further definition, limitation and regulation of the powers of the Corporation, of its directors and of its stockholders or any class thereof, as the case may be, it is further provided that:

Section 1.  <u>Board of Directors Generally</u>.  The management of the business and the conduct of the affairs of the Corporation shall be vested in its Board.  The number of directors which shall constitute the whole Board shall be as set forth in the Bylaws.

Section 2.    Power of Board to Change By-Laws. Except as otherwise provided in the Bylaws, the Board is expressly authorized to adopt, amend, supplement or repeal the Bylaws.

Section 3.    Written Ballot Not Required.  The directors of the Corporation need not be elected by written ballot unless the Bylaws so provide.

ARTICLE  IX

Section 1.    Limitation on Certain Mergers and Sales of Assets.  The Corporation shall not, and shall not permit any Subsidiary to, (a) merge with or into or consolidate with any Affiliate, (b) sell, assign, transfer or otherwise dispose of all or substantially all of its assets to any Affiliate, (c) sell, assign, transfer or otherwise dispose of, to an Affiliate, assets having a fair market value in excess of $25,000,000, or (d) sell, assign, transfer or otherwise dispose of, to an Affiliate, any property, plant or equipment used principally in the Company's United States-based operations and having a fair market value in excess of $5,000,000, without, in any such case, first obtaining the approval of the holders of a majority of Disinterested Shares, provided, however, that, no such approval shall be required for transactions between the Corporation and any of its wholly owned subsidiaries or among wholly owned subsidiaries of the Corporation.

Section 2.    Limitation on Certain Other Transactions with Affiliates.  The Corporation shall not, and shall not permit any Subsidiary to, enter into any transaction with or for the benefit of any Affiliate which transaction has a value, determined in good faith by the Board, in excess of $5,000,000, unless the material terms and conditions of such transaction (a) have been fully disclosed to the Board and (b) have been approved by a majority of the Disinterested Directors. For the avoidance of doubt, any transaction with or for the benefit of any Affiliate having a value, determined as set forth in the immediately preceding sentence, of $5,000,000 or less, shall not be subject to the approval procedures set forth in the immediately preceding sentence and shall require only such approvals as shall normally be required under the Corporation's ordinary course procedures applicable to a transaction of that value.

Section 3.    Definitions.  For the purposes of this Article IX:

(a)    An "*Affiliate*" of, or a Person "*Affiliated*" with, a specified Person is a Person who directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, the Person specified, where "control" means the possession, directly or indirectly, of the power to direct or influence, or to cause the direction of or influence of, the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.

(b)    The term "*Capital Stock*" shall mean, with respect to any Person, any and all shares, interests, participations, rights in, or other equivalents (however designated and whether voting and/or non-voting) of, such Person's capital stock, and any and all rights (other than any evidence of indebtedness), warrants or options exchangeable for or convertible into such capital stock.

4

(c)     The term "***Disinterested Director***" shall mean, with respect to the consideration by the Board of any transaction, a director of the Corporation who does not have, nor will acquire by reason of the consummation of such transaction, any direct or indirect financial interest in the transaction under consideration and who will not, directly or indirectly, obtain any personal benefit from such transaction; <u>provided</u>, <u>however</u>, that (a) a director's general interest in a Person that is a party to, or that will directly or indirectly benefit from, the transaction in question resulting from such director's ownership, management or control of fewer that five percent (5%) of the outstanding shares of Capital Stock of such Person, shall not in and of itself result in such Director not being a Disinterested Director, (b) a Director shall be not be precluded from being a Disinterested Director solely by virtue of the fact that such Person was designated as a Director by a Person who is not a holder of Disinterested Shares and (c) except to the extent expressly set forth in this definition, nothing in this definition is intended to limit the scope, interpretation of application of the DGCL insofar as it bears on the interpretation of whether or under what circumstances a director is considered disinterested.

(d)     The term "***Disinterested Shares***" shall mean, with respect to the consideration by the holders of Common Stock of any transaction, all shares of Common Stock outstanding, but excluding shares of Common Stock beneficially owned, or otherwise managed or controlled, by a Person (or its Affiliates) having an interest in the transaction under consideration (other than the general interest in the Corporation resulting from such Person's ownership, management or control of shares of Common Stock).

(e)     The term "***Person***" shall mean any individual, firm, corporation, partnership, limited liability company, trust or other entity, and shall include any successor (by merger or otherwise) of such entity.

(f)     The term "***Subsidiary***" shall mean, with respect to any Person, (i) any corporation of which the outstanding Capital Stock having at least a majority of the votes entitled to be cast in the election of directors shall at the time be owned, directly or indirectly, by such Person, or (ii) any other Person of which at least a majority of the voting interest is at the time, directly or indirectly, owned by such Person.

ARTICLE X

Section 1.     Limitation of Personal Liability.  No person who is or was a director of the Corporation shall be personally liable to the Corporation or any of its stockholders for monetary damages for breach of fiduciary duty as a director, except to the extent such exemption from liability or limitation thereof is not permitted by the DGCL as the same exists or hereafter may be amended.  If the DGCL is hereafter amended to authorize corporate action further limiting or eliminating the liability of directors, then the liability of a director to the Corporation or its stockholders shall be limited or eliminated to the fullest extent permitted by the DGCL, as so amended.  Any repeal or amendment of this Section X.1 by the stockholders of the Corporation or by changes in applicable law, or the adoption of any other provision of this Certificate inconsistent with this Section X.1 will, unless otherwise required by law, be prospective only (except to the extent such amendment or change in law permits the Corporation to further limit

or eliminate the liability of directors) and shall not adversely affect any right or protection of a director of the Corporation existing at the time of such repeal or amendment or adoption of such inconsistent provision with respect to acts or omissions occurring prior to such repeal or amendment or adoption of such inconsistent provision.

Section 2.    Indemnification.

(a)    With respect to each person who is or was made a party or is threatened to be made a party to or is otherwise involved in any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative (hereinafter a "*Proceeding*") by reason of the fact that he or she is or was a director, officer, employee or agent of the Corporation or, while a director, officer, employee or agent of the Corporation, is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation or of a partnership, joint venture, trust or other enterprise, including service with respect to an employee benefit plan (hereinafter a "*Covered Person*"), whether the basis of such Proceeding is alleged action in an official capacity as a director, officer, employee or agent, or in any other capacity while serving as a director, officer, employee or agent, the Corporation (A) shall, with respect to any such directors and officers, and (B) may, upon approval by a majority vote of the Board, with respect to any employees (other than officers) or agents of the Corporation, be indemnified and held harmless by the Corporation to the fullest extent authorized or permitted by applicable law, as the same exists or may hereafter be amended, against all expense, liability and loss (including, without limitation, (i) reasonable attorneys' fees, (ii) judgments, (iii) fines, (iv) ERISA excise taxes and penalties and (v) amounts paid in settlement; provided, that such Covered Person shall only be indemnified for such amounts paid if the terms of any such settlement are approved in writing by a disinterested executive officer of the Corporation on behalf of the Corporation, which approval shall not be unreasonably withheld) incurred or suffered by such Covered Person in connection with such Proceeding, and such right to indemnification shall continue as to a person who has ceased to be a director, officer, employee or agent and shall inure to the benefit of his or her heirs, executors and administrators; provided, however, that, except for Proceedings to enforce rights to indemnification, the Corporation shall, or may, as applicable, indemnify a Covered Person in connection with a Proceeding (or part thereof) initiated by such Covered Person only if such Proceeding (or part thereof) was authorized by the Board.  The right to indemnification conferred (in the case of employees (other than officers) and agents such right shall be conferred only upon approval by a majority vote of the Board) by this Section X.2 shall be a contract right and shall include the right to be paid by the Corporation the reasonable expenses incurred in defending or otherwise participating in any such Proceeding in advance of its final disposition subject to the Bylaws.

(b)    The rights conferred on any Covered Person by this Section X.2 shall not be exclusive of any other rights which any Covered Person may have or hereafter acquire under applicable law, this Certificate, the Bylaws, any agreement, vote of stockholders or disinterested directors, or otherwise.

(c)    Any repeal or amendment of this Section X.2 by the stockholders of the Corporation or by changes in applicable law, or the adoption of any other provision of this

Certificate inconsistent with this <u>Section X.2</u>, will, unless otherwise required by applicable law, be prospective only (except to the extent such amendment or change in applicable law permits the Corporation to provide broader indemnification rights on a retroactive basis than permitted prior thereto), and will not in any way diminish or adversely affect any right or protection existing at the time of such repeal or amendment or adoption of such inconsistent provision in respect of any act or omission occurring prior to such repeal or amendment or adoption of such inconsistent provision.

(d)     This <u>Section X.2</u> shall not limit the right of the Corporation, to the extent and in the manner authorized or permitted by applicable law, to indemnify and to advance expenses to persons other than Covered Persons.

ARTICLE XI

Section 1.    <u>Provision of Certain Financial Information to Stockholders.</u>    The Corporation shall provide to all holders of its Common Stock unaudited quarterly consolidated financial statements within 45 days after the end of each fiscal quarter and audited annual consolidated financial statements within 90 days after the end of each fiscal year. Such financial statements shall be prepared in accordance with United States generally accepted accounting principles and shall include (x) such financial information (including, without limitation, such information required under Regulation S-X and Items 302 and 304 of Regulation S-K promulgated under the Exchange Act) as the Company would be required to disclose in reports filed with the Commission if it were subject to the Exchange Act and (y) such other information required under Items 401, 402, 403 and 404 of Regulation S-K promulgated under the Exchange Act as the Company would be required to disclose in reports filed with the Commission if it were subject to the Exchange Act.  Such financial statements shall  include a narrative discussion substantially as would be required under Item 303 of Regulation S-K promulgated under the Exchange Act, but need not include any disclosure of such other information or such certifications required under the Sarbanes-Oxley Act as the Company would be required to disclose in reports filed with the Commission if it were subject to the Exchange Act.

Section 2.    <u>Amendments</u>.    The Corporation reserves the right at any time and from time to time to amend, alter, change or repeal any provision contained in this Certificate, and any other provisions authorized by the laws of the State of Delaware at the time in force may be added or inserted, in the manner now or hereafter prescribed by this Certificate, the Bylaws or the DGCL; <u>provided</u>, that except as expressly set forth in this Certificate, all rights, preferences and privileges herein conferred upon stockholders, directors or any other persons by and pursuant to this Certificate in its present form or as hereafter amended are granted subject to the right reserved in this Article; <u>provided</u>, <u>further</u>, that  neither Article IX, nor any of the provisions of such Article, nor this Section XI.2, nor any of the provisions of this Section XI.2, shall be amended, altered, changed or repealed without first obtaining the approval of the holders of 66-2/3% of the outstanding shares of Common Stock entitled to vote thereon.

IN WITNESS WHEREOF, the undersigned has executed this Certificate as of this _____ day of _____, 2005.

**FIBERMARK, INC.**

By: _____
    Name:
    Title:

**EXHIBIT B**

**NEW FIBERMARK BY-LAWS**

**AMENDED AND RESTATED**

**BYLAWS**

**OF**

**FIBERMARK, INC.,**

**a Delaware Corporation**

**(the "*Corporation*")**

**(Adopted as of _____, 2005)**

# TABLE OF CONTENTS

Page

ARTICLE I Offices ................................................................................................................1

    Section 1.    Registered Office ................................................................................1

    Section 2.    Other Offices ......................................................................................1

ARTICLE II Corporate Seal ...............................................................................................1

    Section 3.    Corporate Seal ....................................................................................1

ARTICLE III Stockholders Meetings .................................................................................1

    Section 4.    Place of Meetings ...............................................................................1

    Section 5.    Annual Meeting ..................................................................................1

    Section 6.    Special Meetings ................................................................................2

    Section 7.    Notice of Meetings ............................................................................2

    Section 8.    Quorum ..............................................................................................3

    Section 9.    Adjournment and Notice of Adjourned Meetings ..............................3

    Section 10.    Beneficial Owners of Stock ..............................................................3

    Section 11.    Voting of Shares ................................................................................4

    Section 12.    Action Without Meeting ....................................................................6

    Section 13.    Organization ......................................................................................7

ARTICLE IV Directors .......................................................................................................7

    Section 14.    Number and Term of Office ...............................................................7

    Section 15.    Powers ...............................................................................................7

    Section 16.    Vacancies ...........................................................................................8

    Section 17.    Resignation and Removal of Directors .............................................8

    Section 18.    Meetings ............................................................................................8

    Section 19.    Quorum and Voting ...........................................................................9

    Section 20.    Action without Meeting .....................................................................9

    Section 21.    Fees and Compensation ...................................................................10

    Section 22.    Committees ......................................................................................10

    Section 23.    Organization ....................................................................................11

    Section 24.    Interested Directors .........................................................................11

ARTICLE V Officers .........................................................................................................11

    Section 25.    Officers Designated .........................................................................11

Section 26.      Tenure and Duties of Officers .................................................................12

Section 27.      Delegation of Authority ..........................................................................13

Section 28.      Resignations ............................................................................................13

Section 29.      Removal ...................................................................................................14

ARTICLE VI Execution of Corporate Instruments and Voting of Securities Owned by the Corporation ...........................................................................................................................14

Section 30.      Execution of Corporate Instruments .......................................................14

Section 31.      Voting of Securities Owned by the Corporation .....................................14

ARTICLE VII Shares of Stock ...................................................................................................15

Section 32.      Form and Execution of Certificates ........................................................15

Section 33.      Lost Certificates ......................................................................................15

Section 34.      Transfers..................................................................................................16

Section 35.      Consideration and Payment for Shares ...................................................16

Section 36.      Restrictions on Transfer .........................................................................17

Section 37.      Effect of the Corporation's Restriction on Transfer................................17

Section 38.      Regulations .............................................................................................18

Section 39.      Fixing Record Dates ...............................................................................18

Section 40.      Registered Stockholders.........................................................................19

ARTICLE VIII Other Securities of the Corporation...................................................................19

Section 41.      Execution of Other Securities .................................................................19

ARTICLE IX Dividends ..............................................................................................................20

Section 42.      Declaration of Dividends ........................................................................20

Section 43.      Dividend Reserve ....................................................................................20

ARTICLE X Fiscal Year .............................................................................................................20

Section 44.      Fiscal Year ..............................................................................................20

ARTICLE XI Indemnification .....................................................................................................20

Section 45.      Indemnification of Directors, Officers, Employees and Other Agents.................20

ARTICLE XII Notices .................................................................................................................24

Section 46.      Notices ....................................................................................................24

ARTICLE XIII Amendments; Special Voting Requirements ....................................................26

Section 47.      Amendments; Special Voting Requirements...........................................26

ARTICLE XIV Loans to Officers ...............................................................................................26

Section 48.      Loans to Officers.....................................................................................26

ARTICLE XV Miscellaneous ............................................................................................................27

    Section 49.    Meeting Attendance via Remote Communication Equipment...............................27

    Section 50.    Surety Bonds...........................................................................................................27

    Section 51.    Securities of Other Corporations ...........................................................................27

**AMENDED AND RESTATED BYLAWS**

**OF**

**FIBERMARK, INC.**

(a Delaware Corporation)

ARTICLE I

OFFICES

Section 1.    <u>Registered Office</u>.  The registered office of the Corporation shall be in the City of Wilmington, County of New Castle.

Section 2.    <u>Other Offices</u>.  The Corporation shall also have and maintain an office or principal place of business in Brattleboro, Vermont, or at such place as may be fixed by the Board of Directors, and may also have offices at such other places, both within and without the State of Delaware, as the Board of Directors may from time to time determine or the business of the Corporation may require.

ARTICLE II

CORPORATE SEAL

Section 3.    <u>Corporate Seal</u>.  The seal of the Corporation shall be in such form as shall from time to time be adopted by the Board of Directors.  Said seal may be used by causing it or a facsimile thereof to be impressed or affixed or in any other manner reproduced.

ARTICLE III

STOCKHOLDERS MEETINGS

Section 4.    <u>Place of Meetings</u>.  Meetings of the stockholders of the Corporation shall be held at such place, either within or without the State of Delaware, as may be designated from time to time by the Board of Directors, or, if not so designated, then at the office of the Corporation required to be maintained pursuant to Section 2 hereof; <u>provided</u>, that the Board of Directors may in its sole discretion determine that the meeting shall not be held at any place, but may instead be held solely by means of remote communication pursuant to Section 49.

Section 5.    <u>Annual Meeting</u>.  Unless an annual meeting is otherwise not required by applicable law, the annual meeting of the stockholders of the Corporation, for the purpose of election of Directors and for such other business as may lawfully come before it, shall be held on such date and at such time as may be designated from time to time by the Board of Directors.

Section 6.     <u>Special Meetings</u>.

(a)     Special meetings of the stockholders of the Corporation may be called, for any purpose or purposes, by (i) the Chairman of the Board of Directors, (ii) the President, (iii) or by the Secretary at the request in writing of stockholders holding shares representing a majority of the voting power of the outstanding shares entitled to vote on the matter for which such meeting is to be called, or (iv) the Board of Directors pursuant to a resolution adopted by a majority of the total number of authorized directors (whether or not there exists any vacancies in previously authorized directorships at the time any such resolution is presented to the Board of Directors for adoption), and shall be held at such place, on such date, and at such time as such person or the Board of Directors shall fix; provided, that the Board may in its sole discretion determine that the meeting shall not be held at any place, but may instead be held solely by means of remote communication pursuant to Section 49.

(b)     If a special meeting is called by any person or persons other than the Board of Directors, the request shall be in writing, specifying the time of such meeting and the general nature of the business proposed to be transacted, and shall be delivered personally or sent by registered mail or by telegraphic or other facsimile transmission to the Chairman of the Board, the President, any Vice President, or the Secretary of the Corporation.  No business may be transacted at such special meeting otherwise than specified in such notice.  The officer receiving the request shall cause notice to be promptly given to the stockholders entitled to vote, in accordance with the provisions of Section 7 of these Bylaws, that a meeting will be held not less than thirty five (35) nor more than sixty (60) days after the receipt of the request.  If the notice is not given within twenty (20) days after the receipt of the request, the person or persons requesting the meeting may give the notice.  Nothing contained in this paragraph (b) shall be construed as limiting, fixing, or affecting the time when a meeting of stockholders called by action of the Board of Directors may be held.

Section 7.     <u>Notice of Meetings</u>.  Except as otherwise provided by applicable law or the Amended and Restated Certificate of Incorporation (the "***Certificate of Incorporation***"), notice of each meeting of stockholders shall be given not less than ten (10) nor more than sixty (60) days before the date of the meeting to each stockholder entitled to vote at such meeting, such notice to specify the place, if any, date and hour, the means of remote communication, if any, by which stockholders and proxyholders may be deemed to be present in person and vote at such meeting, and, in the case of a special meeting, the purpose or purposes of the meeting.  Notice of the time, place and purpose of any meeting of stockholders may be waived in writing, signed by the person entitled to notice thereof, or a waiver by electronic transmission by the person entitled to notice, either before or after such meeting, and will be waived by any stockholder by his or her attendance thereat in person or by proxy, except when the stockholder attends a meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened.  All such waivers shall be kept with the books and records of the Corporation.  Any stockholder so waiving notice of such meeting shall be bound by the proceedings of any such meeting in all respects as if due notice thereof had been given.  Any notice given pursuant to these Bylaws shall be delivered in accordance with Section 46.

Section 8.    Quorum.  At all meetings of stockholders, except where otherwise provided by applicable law or by the Certificate of Incorporation, or by these Bylaws, the presence, in person or by proxy duly authorized, of the holders of a majority of the then outstanding shares of stock entitled to vote shall constitute a quorum for the transaction of business.  Any shares, the voting of which at said meeting has been enjoined, or which for any reason cannot be lawfully voted at such meeting, shall not be counted to determine a quorum at such meeting.  In the absence of a quorum any meeting of stockholders may be adjourned, from time to time either by the chairman of the meeting or by vote of the holders of a majority of the shares represented thereat, but no other business shall be transacted at such meeting.  The stockholders present at a duly called or convened meeting, at which a quorum is present, may continue to transact business until adjournment, notwithstanding the withdrawal of enough stockholders to leave less than a quorum.  Except as otherwise provided by law, the Certificate of Incorporation or these Bylaws, all action taken by the holders of a majority of the voting power represented at any meeting at which a quorum is present shall be valid and binding upon the Corporation.  Where a separate vote by a class or classes is required, a majority of the outstanding shares of such class or classes, present in person or represented by proxy, shall constitute a quorum entitled to take action with respect to that vote on that matter and the affirmative vote of the majority of shares of such class or classes present in person or represented by proxy at the meeting shall be the act of such class.

Section 9.    Adjournment and Notice of Adjourned Meetings.  Any meeting of stockholders, whether annual or special, may be adjourned from time to time either by the chairman of the meeting or by the vote of a majority of the shares represented thereat.  When a meeting is adjourned to another date, time or place, if any, notice need not be given of the adjourned meeting if the date, time and place, if any, thereof, and the means of remote communication, if any, by which stockholders and proxyholders may be deemed to be present in person and vote at such adjourned meeting are announced at the meeting at which the adjournment is taken.  At the adjourned meeting the Corporation may transact any business which might have been transacted at the original meeting.  If the adjournment is for more than thirty (30) days, or if after the adjournment a new record date is fixed for the adjourned meeting, a notice of the adjourned meeting shall be given to each stockholder of record entitled to vote at the meeting.

Section 10.    Beneficial Owners of Stock.

(a)    If shares or other securities having voting power stand of record in the names of two (2) or more persons, whether fiduciaries, members of a partnership, joint tenants, tenants in common, tenants by the entirety, or otherwise, or if two (2) or more persons have the same fiduciary relationship respecting the same shares, unless the Secretary is given written notice to the contrary and is furnished with a copy of the instrument or order appointing them or creating the relationship wherein it is so provided, their acts with respect to voting shall have the following effect: (i) if only one (1) votes, his or her act binds all; (ii) if more than one (1) votes, the act of the majority so voting binds all; and (iii) if more than one (1) votes, but the vote is evenly split on any particular matter, each faction may vote the securities in question proportionally, or may apply to the Delaware Court of Chancery for relief as provided in Section 217(b) of the Delaware General Corporation Law ("**DGCL**").  If the instrument filed with the

Secretary shows that any such tenancy is held in unequal interests, a majority or even split for the purpose of subsection (iii) hereof shall be a majority or even split in interest.

(b)     Persons holding stock in a fiduciary capacity shall be entitled to vote the shares so held.  Persons whose stock is pledged shall be entitled to vote, unless in the transfer by the pledgor on the books of the Corporation he has expressly empowered the pledgee to vote thereon, in which case only the pledgee, or his or her proxy, may represent such stock and vote thereon.

Section 11.     <u>Voting of Shares</u>.

(a)     The Secretary shall prepare, or shall cause the officer or agent who has charge of the stock ledger of the Corporation to prepare, at least 10 days before each meeting of stockholders, a complete list of the stockholders of record entitled to vote thereat arranged in alphabetical order and showing the address and the number of shares registered in the name of each stockholder.  Nothing contained in this Section 11(a) shall require the Corporation to include electronic mail addresses or other electronic contact information on such list.  Such list shall be open to the examination of any stockholder, for any purpose germane to the meeting, during ordinary business hours for a period of at least 10 days prior to the meeting:  (i) on a reasonably accessible electronic network, provided that the information required to gain access to such list is provided with the notice of the meeting, or (ii) during ordinary business hours, at the principal place of business of the Corporation.  In the event that the Corporation determines to make the list available on an electronic network, the Corporation may take reasonable steps to ensure that such information is available only to stockholders of the Corporation.  If the meeting is to be held at a place, then the list shall be produced and kept at the time and place of the meeting during the whole time thereof, and may be inspected by any stockholder who is present. If a meeting of stockholders is to be held solely by means of remote communication as permitted by Section 49, the list shall be open to the examination of any stockholder during the whole time of the meeting on a reasonably accessible electronic network, and the information required to access such list shall be provided with the notice of meeting.  The stock ledger shall be the only evidence as to who are the stockholders entitled to examine the list required by this Section 11(a) or to vote in person or by proxy at any meeting of stockholders.

(b)     <u>Manner of Voting</u>.  At any stockholders meeting, every stockholder entitled to vote may vote in person or by proxy.  If authorized by the Board, the voting by stockholders or proxyholders at any meeting conducted by remote communication may be effected by a ballot submitted by electronic transmission (as defined in Section 46), provided that any such electronic transmission must either set forth or be submitted with information from which the Corporation can determine that the electronic transmission was authorized by the stockholder or proxyholder.  The Board, in its discretion, or the chairman of the meeting of stockholders, in such person's discretion, may require that any votes cast at such meeting shall be cast by written ballot; <u>provided</u>, that the election of Directors of the Corporation need not be by written ballot.

(c)     <u>Proxies</u>.  Each stockholder entitled to vote at a meeting of stockholders or to express consent or dissent to corporate action in writing without a meeting may authorize another person or persons to act for such stockholder by proxy, but no such proxy shall be voted

or acted upon after three years from its date, unless the proxy provides for a longer period. Proxies need not be filed with the Secretary until the meeting is called to order, but shall be filed with the Secretary before being voted. Without limiting the manner in which a stockholder may authorize another person or persons to act for such stockholder as proxy, either of the following shall constitute a valid means by which a stockholder may grant such authority:

(i)     A stockholder may execute a writing authorizing another person or persons to act for such stockholder as proxy. Execution may be accomplished by the stockholder or such stockholder's authorized officer, director, employee or agent signing such writing or causing such person's signature to be affixed to such writing by any reasonable means, including, but not limited to, by facsimile signature.

(ii)     A stockholder may authorize another person or persons to act for such stockholder as proxy by transmitting or authorizing the transmission of an electronic transmission to the person who will be the holder of the proxy; provided, that any such electronic transmission must either set forth or be submitted with information from which it can be determined that the electronic transmission was authorized by the stockholder.

(iii)     Any copy, facsimile telecommunication or other reliable reproduction of the writing or transmission authorizing another person or persons to act as proxy for a stockholder may be substituted or used in lieu of the original writing or transmission for any and all purposes for which the original writing or transmission could be used; provided, that such copy, facsimile telecommunication or other reproduction shall be a complete reproduction of the entire original writing or transmission.

(d)     Required Vote. All matters to be submitted to a vote of the stockholders shall be determined by the vote of a majority of the votes cast by the stockholders present in person or represented by proxy at the meeting and entitled to vote thereon, unless the matter is one upon which, by applicable law, the Certificate of Incorporation or these Bylaws, a different vote is required, in which case such provision shall govern and control the decision of such matter.

(e)     Inspectors of Election. The Board of Directors may appoint one or more persons as inspectors of election, who may be employees of the Corporation or otherwise serve the Corporation in other capacities, to act at any meeting of stockholders or any adjournment thereof and to make a written report thereof. The Board of Directors may appoint one or more persons as alternate inspectors to replace any inspector who fails to act. If no inspectors of election or alternates are appointed by the Board of Directors, the chairman of the meeting shall appoint one or more inspectors to act at the meeting. Each inspector, before discharging his or her duties, shall take and sign an oath faithfully to execute the duties of inspector with strict impartiality and according to the best of his or her ability. The inspectors shall ascertain and report the number of outstanding shares and the voting power of each; determine the number of shares present in person or represented by proxy at the meeting and the validity of proxies and ballots; count all votes and ballots and report the results; determine and retain for a reasonable period a record of the disposition of any challenges made to any determination by the inspectors; and certify their determination of the number of shares represented at the meeting and their count of all votes and ballots. No person who is a candidate for an office at an election may serve as an

inspector at such election. Each report of an inspector shall be in writing and signed by the inspector or by a majority of them if there is more than one inspector acting at such meeting. If there is more than one inspector, the report of a majority shall be the report of the inspectors.

Section 12.    Action Without Meeting.

(a)    Any action required by statute to be taken at any annual or special meeting of the stockholders, or any action which may be taken at any annual or special meeting of the stockholders, may be taken without a meeting, without prior notice and without a vote, if a consent or consents in writing, setting forth the action so taken, are signed by the holders of outstanding stock having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted.

(b)    Every written consent shall bear the date of signature of each stockholder who signs the consent, and no written consent shall be effective to take the corporate action referred to therein unless, within sixty (60) days of the earliest dated consent delivered to the Corporation in the manner herein required, written consents signed by a sufficient number of stockholders to take action are delivered to the Corporation by delivery to its registered office in the State of Delaware, its principal place of business or an officer or agent of the Corporation having custody of the book in which proceedings of meetings of stockholders are recorded. Delivery made to the Corporation's registered office shall be by hand or by certified or registered mail, return receipt requested. An electronic transmission consenting to the action to be taken and transmitted by a stockholder, proxyholder or a person or persons authorized to act for a stockholder or proxyholder shall be deemed to be written, signed and dated for purposes hereof if such electronic transmission sets forth or is delivered with information from which the Corporation can determine that such transmission was transmitted by a stockholder or proxyholder (or by a person authorized to act for a stockholder or proxyholder) and the date on which such stockholder, proxyholder or authorized person transmitted such transmission. The date on which such electronic transmission is transmitted shall be deemed to be the date on which such consent was signed. No consent given by electronic transmission shall be deemed to have been delivered until such consent is reproduced in paper form and delivered to the Corporation by delivery either to the Corporation's registered office in the State of Delaware, the Corporation's principal place of business, or the Secretary. Delivery made to the Corporation's registered office shall be made by hand or by certified or registered mail, return receipt requested. Notwithstanding the limitations on delivery in the previous sentence, consents given by electronic transmission may be otherwise delivered to the Corporation's principal place of business or to the Secretary if, to the extent, and in the manner provided by resolution of the Board of Directors. Any copy, facsimile or other reliable reproduction of a consent in writing may be substituted or used in lieu of the original writing for any and all purposes for which the original writing could be used; provided, that such copy, facsimile or other reproduction shall be a complete reproduction of the entire original writing.

(c)    Prompt notice of the taking of the corporate action without a meeting by less than unanimous written consent shall be given to those stockholders who have not consented in writing. If the action which is consented to is such as would have required the filing of a certificate under any section of the DGCL if such action had been voted on by stockholders at a

6

meeting thereof, then the certificate filed under such section shall state, in lieu of any statement required by such section concerning any vote of stockholders, that written notice and written consent have been given as provided in Section 228 of the DGCL.

Section 13.    Organization.

(a)    At every meeting of stockholders, the Chairman of the Board of Directors, or, if a Chairman has not been appointed or is absent (or in the case of inability or refusal to act), the President, or, if the President is absent (or in the case of inability or refusal to act), the most senior Vice President present, or in the absence (or inability or refusal to act) of any such officer, a chairman of the meeting chosen by a majority in interest of the stockholders entitled to vote, present in person or by proxy, shall act as chairman.  The Secretary, or, in his or her absence (or inability or refusal to act), an Assistant Secretary directed to do so by the President, shall act as secretary of the meeting.

(b)    The Board of Directors of the Corporation shall be entitled to make such rules or regulations for the conduct of meetings of stockholders as it shall deem necessary, appropriate or convenient.  Subject to such rules and regulations of the Board of Directors, if any, the chairman of the meeting shall have the right and authority to prescribe such rules, regulations and procedures and to do all such acts as, in the judgment of such chairman, are necessary, appropriate or convenient for the proper conduct of the meeting, including, without limitation, establishing an agenda or order of business for the meeting, rules and procedures for maintaining order at the meeting and the safety of those present, limitations on participation in such meeting to stockholders of record of the Corporation and their duly authorized and constituted proxies, and such other persons as the chairman shall permit, restrictions on entry to the meeting after the time fixed for the commencement thereof, limitations on the time allotted to questions or comments by participants and regulation of the opening and closing of the polls for balloting on matters which are to be voted on by ballot.

ARTICLE IV

DIRECTORS

Section 14.    Number and Term of Office.  The authorized number of Directors which shall constitute the whole of the Board of Directors shall be seven (7).  Except as provided in Section 16, the Directors shall be elected by the stockholders at, or by remote communication at, their annual meeting in each year and shall hold office until the next annual meeting and until their successors shall be duly elected and qualified, subject to such director's earlier death, resignation, retirement, disqualification or removal.  Directors need not be stockholders unless so required by the Certificate of Incorporation.  If for any cause, the Directors shall not have been elected at an annual meeting, they may be elected as soon thereafter as convenient at a special meeting of the stockholders called for that purpose in the manner provided in these Bylaws.  No reduction of the authorized number of Directors shall have the effect of removing any Director before the Director's term of office expires.

Section 15.    Powers.  The business and affairs of the Corporation shall be managed by or under the direction of the Board of Directors, which may exercise all such powers of the

Corporation and do all such lawful acts and things as are not by statute or by the Certificate of Incorporation or by these Bylaws required to be exercised or done by the stockholders.

Section 16.     Vacancies.  Unless otherwise provided in the Certificate of Incorporation, vacancies and newly created directorships resulting from any increase in the authorized number of Directors may be filled by a majority of the Directors then in office, although less than a quorum, or by a sole remaining Director, and each Director so elected shall hold office for the unexpired portion of the term of the Director whose place shall be vacant and until his or her successor shall have been duly elected and qualified, subject to such director's earlier death, resignation, retirement, disqualification or removal, retirement or disqualification.  A vacancy in the Board of Directors shall be deemed to exist under this Section 16 in the case of the death, removal or resignation of any Director, or if the stockholders fail at any meeting of stockholders at which Directors are to be elected (including any meeting referred to in Section 18 below) to elect the number of Directors then constituting the whole Board of Directors.

Section 17.     Resignation and Removal of Directors.  Any Director may resign at any time by delivering his or her written resignation to the Secretary, such resignation to specify whether it will be effective at a particular time, upon receipt by the Secretary or at the pleasure of the Board of Directors.  If no such specification is made, it shall be deemed effective at the pleasure of the Board of Directors.  When one or more Directors shall resign from the Board of Directors, effective at a future date, a majority of the Directors then in office, including those who have so resigned, shall have power to fill such vacancy or vacancies, the vote thereon to take effect when such resignation or resignations shall become effective, and each Director so chosen shall hold office for the unexpired portion of the term of the Director whose place shall be vacated and until his or her successor shall have been duly elected and qualified, subject to such director's earlier death, resignation, retirement, disqualification or removal.  Except as otherwise required by applicable law and subject to the rights, if any, of the holders of shares of any preferred stock then outstanding, any director or the entire Board of Directors may be removed from office at any time, with or without cause, by the affirmative vote of the holders of at least a majority in voting power of the issued and outstanding capital stock of the Corporation entitled to vote in the election of directors.

Section 18.     Meetings.

(a)     Annual Meetings.  The annual meeting of the Board of Directors shall be held as promptly as practicable after the adjournment of each annual meeting of stockholders and at the place where such meeting is held unless the Board shall fix another time and place and give notice thereof in the manner required herein for special meetings of the Board.  No notice of an annual meeting of the Board of Directors shall be necessary and such meeting shall be held for the purpose of electing officers and transacting such other business as may lawfully come before it.

(b)     Regular Meetings. Except as hereinafter otherwise provided, regular meetings of the Board of Directors shall be held in the office of the Corporation required to be maintained pursuant to Section 2 hereof.  Unless otherwise restricted by the Certificate of Incorporation, regular meetings of the Board of Directors may also be held at any place within or without the State of Delaware which has been determined by the Board of Directors.

(c)     Special Meetings.  Unless otherwise restricted by the Certificate of Incorporation, special meetings of the Board of Directors may be held at any time and place within or without the State of Delaware whenever called by the President or a majority of the Directors.

(d)     Telephone Meetings.  Any member of the Board of Directors, or of any committee thereof, may participate in a meeting by means of conference telephone or similar communications equipment by means of which all persons participating in the meeting can hear each other, and participation in a meeting by such means shall constitute presence in person at such meeting.

(e)     Notice of Meetings.  Written notice of the time and place of all special meetings of the Board of Directors shall be given at least one (1) day before the date of the meeting in the manner provided by Section 46.  Notice of any meeting may be waived in writing at any time before or after the meeting and will be waived by any Director by attendance thereat, except when the Director attends the meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened.

(f)     Waiver of Notice.  The transaction of all business at any meeting of the Board of Directors, or any committee thereof, however called or noticed, or wherever held, shall be as valid as though had at a meeting duly held after regular call and notice, if a quorum be present and if, either before or after the meeting, each of the Directors not present shall sign a written waiver of notice, or a consent to holding such meeting, or an approval of the minutes thereof.  Neither the business to be transacted at, nor the purpose of, any regular or special meeting of the Board of Directors need be specified in any written waiver of notice or consent unless so required by the Certificate of Incorporation or these Bylaws.  All such waivers, consents or approvals shall be filed with the corporate records or, made a part of the minutes of the meeting.

Section 19.     Quorum and Voting.

(a)     Unless the Certificate of Incorporation requires a greater number, a quorum of the Board of Directors shall consist of a majority of the exact number of Directors fixed from time to time in accordance with Section 14 of these Bylaws; provided, however, at any meeting whether a quorum be present or otherwise, a majority of the Directors present may adjourn from time to time until the time fixed for the next regular meeting of the Board of Directors, without notice other than by announcement at the meeting.

(b)     At each meeting of the Board of Directors at which a quorum is present all questions and business shall be determined by a vote of a majority of the Directors present, unless a different vote be required by law, the Certificate of Incorporation or these Bylaws.

Section 20.     Action without Meeting.  Unless otherwise restricted by the Certificate of Incorporation or these Bylaws, any action required or permitted to be taken at any meeting of the Board of Directors or of any committee thereof may be taken without a meeting, if all members of the Board of Directors or committee, as the case may be, consent thereto in writing or by

electronic transmission, and such writing or writings (or paper reproductions thereof) are filed with the minutes of proceedings of the Board of Directors or committee.  Such filing shall be in paper form if the minutes are maintained in paper form and shall be in electronic form if the minutes are maintained in electronic form.

Section 21.    Fees and Compensation.  Directors shall be entitled to such compensation for their services as may be approved by the Board of Directors, including, if so approved by resolution of the Board of Directors, a fixed sum and expenses of attendance, if any, for attendance at each regular or special meeting of the Board of Directors and at any meeting of a committee of the Board of Directors.  Nothing herein contained shall be construed to preclude any Director from serving the Corporation in any other capacity as an officer, agent, employee, or otherwise and receiving compensation therefor.

Section 22.    Committees.

(a)    Committees.  The Board of Directors may designate one or more committees, each committee to consist of one or more of the directors of the Corporation.  The Board of Directors may designate one or more directors as alternate members of any committee, who may replace any absent or disqualified member at any meeting of any such committee.  In the absence or disqualification of a member of a committee, and in the absence of a designation by the Board of Directors of an alternate member to replace the absent or disqualified member, the member or members thereof present at any meeting and not disqualified from voting, whether or not such member or members constitute a quorum, may unanimously appoint another member of the Board of Directors to act at the meeting in the place of any absent or disqualified member.  Any committee, to the extent permitted by law and provided in the resolution establishing such committee, shall have and may exercise all the powers and authority of the Board of Directors in the management of the business and affairs of the Corporation, and may authorize the seal of the Corporation to be affixed to all papers which may require it.  Each committee shall keep regular minutes and report to the Board of Directors when required.

(b)    Term.  The members of all committees of the Board of Directors shall serve a term coexistent with that of the Board of Directors which shall have appointed such committee.  The Board of Directors, subject to the provisions of subsection (a) of this Section 22, may at any time increase or decrease the number of members of a committee or terminate the existence of a committee.  The membership of a committee member shall terminate on the date of his or her death or voluntary resignation from the committee or from the Board of Directors.  The Board of Directors may fill any committee vacancy created by death, resignation, removal or increase in the number of members of the committee.

(c)    Meetings.  Unless the Board of Directors shall otherwise provide, regular meetings of any committee appointed pursuant to this Section 22 shall be held at such times and places as are determined by the Board of Directors, or by any such committee, and when notice thereof has been given to each member of the Board of Directors, no further notice of such regular meetings need be given thereafter.  Special meetings of any such committee may be held at any place which has been determined from time to time by such committee, and may be called by any Director, upon written notice to each member of the Board of Directors of the time and place of such special meeting given in the manner provided for the giving of written notice to

members of the Board of Directors of the time and place of special meetings of the Board of Directors. Notice of any special meeting of any committee may be waived in writing at any time before or after the meeting and will be waived by any Director by attendance thereat, except when the Director attends such special meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened. A majority of the number of members electing to be a part of any such committee shall constitute a quorum for the transaction of business, and the act of a majority of those present at any meeting at which a quorum is present shall be the act of such committee.

Section 23. <u>Organization</u>. At every meeting of the Directors, the Chairman of the Board of Directors, or, if a Chairman has not been appointed or is absent (or in the case of inability or refusal to act), the President, or if the President is absent (or in the case of inability or refusal to act), the most senior Vice President, or, in the absence (or inability or refusal to act) of any such officer, a chairman of the meeting chosen by a majority of the Directors present, shall preside over the meeting. The Secretary, or in his or her absence (or inability or refusal to act), an Assistant Secretary directed to do so by the President, shall act as secretary of the meeting.

Section 24. <u>Interested Directors</u>. No contract or transaction between the Corporation and one or more of its directors or officers, or between the Corporation and any other corporation, partnership, association or other organization in which one or more of its directors or officers are directors or officers or have a financial interest, shall be void or voidable solely for this reason, or solely because the director or officer is present at or participates in the meeting of the Board of Directors or committee thereof which authorizes the contract or transaction, or solely because any such director's or officer's vote is counted for such purpose if: (i) the material facts as to the director's or officer's relationship or interest and as to the contract or transaction are disclosed or are known to the Board of Directors or the committee, and the Board of Directors or committee in good faith authorizes the contract or transaction by the affirmative votes of a majority of the disinterested directors, even though the disinterested directors be less than a quorum; or (ii) the material facts as to the director's or officer's relationship or interest and as to the contract or transaction are disclosed or are known to the stockholders entitled to vote thereon, and the contract or transaction is specifically approved in good faith by vote of the stockholders; or (iii) the contract or transaction is fair as to the Corporation as of the time it is authorized, approved or ratified by the Board of Directors, a committee thereof or the stockholders. Common or interested directors may be counted in determining the presence of a quorum at a meeting of the Board of Directors or of a committee which authorizes the contract or transaction.

ARTICLE V

OFFICERS

Section 25. <u>Officers Designated</u>. The officers of the Corporation shall be the President, one or more Vice Presidents, the Secretary and the Chief Financial Officer or Treasurer, and such other officers as the Board of Directors may from time to time determine, all of whom shall be elected at the annual organizational meeting of the Board of Directors. The Chairman of the Board of Directors shall be an officer if so specifically designated by resolution of the Board of Directors. The order of the seniority of the Vice Presidents shall be in the order

11

of their nomination, unless otherwise determined by the Board of Directors. The Board of Directors may also appoint one or more Assistant Secretaries, Assistant Treasurers, and such other officers and agents with such powers and duties as it shall deem necessary. The Board of Directors may assign such additional titles to one or more of the officers as it shall deem appropriate. Any one person may hold any number of offices of the Corporation at any one time unless specifically prohibited therefrom by law. The salaries and other compensation of the officers of the Corporation shall be fixed by or in the manner designated by the Board of Directors.

       Section 26.    <u>Tenure and Duties of Officers</u>.

       (a)    <u>General</u>. All officers shall hold office at the pleasure of the Board of Directors and until their successors shall have been duly elected and qualified or until their earlier death, resignation, retirement or disqualification, unless sooner removed. Any officer elected or appointed by the Board of Directors may be removed at any time by the Board of Directors. If the office of any officer becomes vacant for any reason, the vacancy may be filled by the Board of Directors.

       (b)    <u>Duties of Chairman of the Board of Directors</u>. The Chairman of the Board of Directors, when present, shall preside at all meetings of the stockholders and the Board of Directors. The Chairman of the Board of Directors shall perform other duties commonly incident to his or her office and shall also perform such other duties and have such other powers as the Board of Directors shall designate from time to time. If there is no President, then the Chairman of the Board of Directors shall also serve as the Chief Executive Officer of the Corporation and shall have the powers and duties prescribed in paragraph (c) of this Section 26. The Chairman of the Board of Directors must be a Director of the Corporation.

       (c)    <u>Duties of President</u>. The President shall preside at all meetings of the stockholders and at all meetings of the Board of Directors, unless the Chairman of the Board of Directors has been appointed and is present. The President shall be the Chief Executive Officer of the Corporation and shall, subject to the control of the Board of Directors, have general supervision, direction and control of the business and officers of the Corporation. The President shall perform other duties commonly incident to his or her office and shall also perform such other duties and have such other powers as the Board of Directors shall designate from time to time.

       (d)    <u>Duties of Vice Presidents</u>. The Vice Presidents, in the order of their seniority, may assume and perform the duties of the President in the absence (or inability or refusal to act) or disability of the President or whenever the office of President is vacant. The Vice Presidents shall perform other duties commonly incident to their office and shall also perform such other duties and have such other powers as the Board of Directors or the President shall designate from time to time.

       (e)    <u>Duties of Secretary</u>. The Secretary shall attend all meetings of the stockholders and of the Board of Directors, and shall record all acts and proceedings thereof in the minute book of the Corporation. The Secretary shall give notice in conformity with these Bylaws of all meetings of the stockholders, and of all meetings of the Board of Directors and any

committee thereof requiring notice. The Secretary shall perform all other duties given him in these Bylaws and other duties commonly incident to his or her office and shall also perform such other duties and have such other powers as the Board of Directors shall designate from time to time. The President may direct any Assistant Secretary to assume and perform the duties of the Secretary in the absence or disability of the Secretary, and each Assistant Secretary shall perform other duties commonly incident to such office and shall also perform such other duties and have such other powers as the Board of Directors or the President shall designate from time to time. The Secretary shall have custody of the corporate seal of the Corporation and the Secretary, or any Assistant Secretary, shall have authority to affix the same to any instrument requiring it, and when so affixed, it may be attested by his or her signature or by the signature of such Assistant Secretary. The Board may give general authority to any other officer to affix the seal of the Corporation and to attest the affixing thereof by his or her signature. The Secretary shall keep, or cause to be kept, at the principal executive office of the Corporation or at the office of the Corporation's transfer agent or registrar, if one has been appointed, a stock ledger, or duplicate stock ledger, showing the names of the stockholders and their addresses, the number and classes of shares held by each and, with respect to certificated shares, the number and date of certificates issued for the same and the number and date of certificates cancelled.

(f)     Duties of Chief Financial Officer or Treasurer. The Chief Financial Officer or Treasurer shall keep or cause to be kept the books of account of the Corporation in a thorough and proper manner, and shall render statements of the financial affairs of the Corporation in such form and as often as required by the Board of Directors or the President. The Chief Financial Officer or Treasurer, subject to the order of the Board of Directors, shall have the custody of all funds and securities of the Corporation. The Chief Financial Officer or Treasurer shall perform other duties commonly incident to his or her office and shall also perform such other duties and have such other powers as the Board of Directors or the President shall designate from time to time. The President may direct any Assistant Treasurer to assume and perform the duties of the Chief Financial Officer or Treasurer in the absence (or inability or refusal to act) or disability of the Chief Financial Officer or Treasurer, and each Assistant Treasurer shall perform other duties commonly incident to his or her office and shall also perform such other duties and have such other powers as the Board of Directors or the President shall designate from time to time.

(g)     Other Officers. The Board of Directors may delegate the power to appoint such other officers and agents, and may also remove such officers and agents or delegate the power to remove same, as it shall from time to time deem necessary or desirable.

Section 27.     Delegation of Authority. The Board of Directors may from time to time delegate the powers or duties of any officer to any other officer or agent, notwithstanding any provision hereof.

Section 28.     Resignations. Any officer may resign at any time by giving written notice to the Board of Directors or to the President or to the Secretary. Any such resignation shall be effective when received by the person or persons to whom such notice is given, unless a later time is specified therein, in which event the resignation shall become effective at such later time. Unless otherwise specified in such notice, the acceptance of any such resignation shall not be

necessary to make it effective. Any resignation shall be without prejudice to the rights, if any, of the Corporation under any contract with the resigning officer.

Section 29. <u>Removal</u>. Any officer may be removed from office at any time, either with or without cause, by the vote or written consent of a majority of the Directors in office at the time, or by any committee or superior officers upon whom such power of removal may have been conferred by the Board of Directors.

ARTICLE VI

EXECUTION OF CORPORATE INSTRUMENTS AND VOTING
OF SECURITIES OWNED BY THE CORPORATION

Section 30. <u>Execution of Corporate Instruments</u>.

(a) The Board of Directors may, in its discretion, determine the method and designate the signatory officer or officers, or other person or persons, to execute on behalf of the Corporation any corporate instrument or document, or to sign on behalf of the Corporation the corporate name without limitation, or to enter into contracts on behalf of the Corporation, except where otherwise provided by applicable law or these Bylaws, and such execution or signature shall be binding upon the Corporation.

(b) Unless otherwise specifically determined by the Board of Directors or otherwise required by applicable law, promissory notes, deeds of trust, mortgages and other evidences of indebtedness of the Corporation, and other corporate instruments or documents requiring the corporate seal, and certificates of shares of stock owned by the Corporation, shall be executed, signed or endorsed by (i) the Chairman of the Board of Directors, or the President or any Vice President, and (ii) the Secretary or Chief Financial Officer or Treasurer or any Assistant Secretary or Assistant Treasurer. All other instruments and documents requiring the corporate signature, but not requiring the corporate seal, may be executed as aforesaid or in such other manner as may be directed by the Board of Directors.

(c) All checks and drafts drawn on banks or other depositaries on funds to the credit of the Corporation or in special accounts of the Corporation shall be signed by such person or persons as the Board of Directors shall authorize so to do.

(d) Unless authorized or ratified by the Board of Directors or within the agency power of an officer, no officer, agent or employee shall have any power or authority to bind the Corporation by any contract or engagement or to pledge its credit or to render it liable for any purpose or for any amount.

Section 31. <u>Voting of Securities Owned by the Corporation</u>. All stock and other securities of other corporations owned or held by the Corporation for itself, or for other parties in any capacity, shall be voted, and all proxies with respect thereto shall be executed, by the person authorized so to do by resolution of the Board of Directors, or, in the absence of such authorization, by the Chairman of the Board of Directors, the President, or any Vice President.

# ARTICLE VII

## SHARES OF STOCK

Section 32.    <u>Form and Execution of Certificates</u>.  Certificates for the shares of stock of the Corporation shall be in such form as is consistent with the Certificate of Incorporation and applicable law; provided, that the Board of Directors may provide by resolution or resolutions that some or all of any or all classes or series of its stock shall be uncertificated shares.  Any such resolution shall not apply to shares represented by a certificate until such certificate is surrendered to the Corporation.  Notwithstanding the adoption of such a resolution by the Board of Directors, every holder of stock represented by certificates and upon request every holder of uncertificated shares shall be entitled to have a certificate signed in accordance with this Section 32 representing the number of shares registered in certificate form.  The Corporation shall not have power to issue a certificate representing shares in bearer form.  Every holder of stock in the Corporation shall be entitled to have a certificate signed by or in the name of the Corporation by (i) the Chairman of the Board of Directors, or the President or any Vice President and (ii) the Treasurer or Assistant Treasurer or the Secretary or Assistant Secretary, certifying the number of shares owned by such holder in the Corporation.  Where such certificate is countersigned by a transfer agent other than the Corporation or its employee, or by a registrar other than the Corporation or its employee, any other signature on the certificate may be a facsimile.  In case any officer, transfer agent, or registrar who has signed or whose facsimile signature has been placed upon a certificate shall have ceased to be such officer, transfer agent, or registrar before such certificate is issued, it may be issued with the same effect as if he were such officer, transfer agent, or registrar at the date of issue.  Each certificate shall state upon the face or back thereof, in full or in summary, all of the designations, preferences, limitations, restrictions on transfer and relative rights of the shares authorized to be issued.

Section 33.    <u>Lost Certificates</u>.  A new certificate or certificates shall be issued in place of any certificate or certificates theretofore issued by the Corporation alleged to have been lost, stolen, or destroyed, upon the making of an affidavit of that fact by the person claiming the certificate of stock to be lost, stolen, or destroyed.  The Corporation may require, as a condition precedent to the issuance of a new certificate or certificates, the owner of such lost, stolen, or destroyed certificate or certificates, or his or her legal representative, to advertise the same in such manner as it shall require or to give the Corporation a surety bond in such form and amount as it may direct as indemnity against any claim that may be made against the Corporation with respect to the certificate alleged to have been lost, stolen, or destroyed.  If a certificate representing shares has been lost, apparently destroyed or wrongfully taken, and the owner fails to notify the Corporation of that fact within a reasonable time after the owner has notice of such loss, apparent destruction or wrongful taking and the Corporation registers a transfer of such shares before receiving notification, the owner shall be precluded from asserting against the Corporation any claim for registering such transfer or a claim to a new certificate representing such shares or such shares in uncertificated form.

Section 34.    Transfers.

(a)    Transfers of record of shares of stock of the Corporation shall be made only upon its books by the holders thereof, in person or by attorney duly authorized, and upon the surrender of a properly endorsed certificate or certificates for a like number of shares.

(b)    The Corporation shall have power to enter into and perform any agreement with any number of stockholders of any one or more classes of stock of the Corporation to restrict the transfer of shares of stock of the Corporation of any one or more classes owned by such stockholders in any manner not prohibited by the DGCL.

(c)    If a certificate representing shares of the Corporation is presented to the Corporation with an indorsement requesting the registration of transfer of such shares or an instruction is presented to the Corporation requesting the registration of transfer of uncertificated shares, the Corporation shall register the transfer as requested if:

(i)    in the case of certificated shares, the certificate representing such shares has been surrendered;

(ii)    (A) with respect to certificated shares, the indorsement is made by the person specified by the certificate as entitled to such shares; (B) with respect to uncertificated shares, an instruction is made by the registered owner of such uncertificated shares; or (C) with respect to certificated shares or uncertificated shares, the indorsement or instruction is made by any other appropriate person or by an agent who has actual authority to act on behalf of the appropriate person;

(iii)    the Corporation has received a guarantee of signature of the person signing such indorsement or instruction or such other reasonable assurance that the indorsement or instruction is genuine and authorized as the Corporation may request;

(iv)    the transfer does not violate any restriction on transfer imposed by the Corporation that is enforceable in accordance with Section 36; and

(v)    such other conditions for such transfer as shall be provided for under applicable law have been satisfied.

(d)    Whenever any transfer of shares shall be made for collateral security and not absolutely, the Corporation shall so record such fact in the entry of transfer if, when the certificate for such shares is presented to the Corporation for transfer or, if such shares are uncertificated, when the instruction for registration of transfer thereof is presented to the Corporation, both the transferor and transferee request the Corporation to do so.

Section 35.    Consideration and Payment for Shares.

(a)    Subject to applicable law and the Certificate of Incorporation, shares of stock may be issued for such consideration, having in the case of shares with par value a value not less than the par value thereof, and to such persons, as determined from time to time by the Board of Directors.  The consideration may consist of any tangible or intangible property or

benefit to the Corporation including cash, promissory notes, services performed, contracts for services to be performed or other securities.

(b)     Subject to applicable law and the Certificate of Incorporation, shares may not be issued until the full amount of the consideration has been paid, unless upon the face or back of each certificate issued to represent any partly paid shares of capital stock or upon the books and records of the Corporation in the case of partly paid uncertificated shares, there shall have been set forth the total amount of the consideration to be paid therefor and the amount paid thereon up to and including the time said certificate representing certificated shares or said uncertificated shares are issued.

Section 36.     Restrictions on Transfer.

(a)     No Transfer (as such term is defined below) of shares of Common Stock shall be effective, and any such Transfer of shares of Common Stock shall be deemed null and void, if, as a result of any such Transfer, the record number of shareholders of the Corporation (as determined in accordance with Rule 12g5-1 under the Securities Exchange Act of 1934, as amended or any successor rule or interpretation) would exceed 275 before January 1, 2006 and 450 thereafter; provided, however, that this Section 36 shall be of no further force and effect from and after such time as the Common Stock of the Corporation shall become registered under the Securities Exchange Act of 1934, as amended.

(b)     As used in this Section 36, the term "*Transfer*" shall mean any voluntary or involuntary attempt, directly or indirectly through the transfer of interests in controlled Affiliates or otherwise, to offer, sell, assign, transfer, grant a participation in, pledge or otherwise dispose of any shares of Common Stock, or the consummation of any such transaction, or the soliciting of any offers to purchase or otherwise acquire, or taking a pledge of, any of the shares of Common Stock; provided, however, that the transfer of an interest in any holder of Common Stock shall not be deemed to be a Transfer.  The term "*Transferred*" shall have a correlative meaning.

(c)     In the event of any purported or attempted Transfer of shares of Common Stock by a stockholder that does not comply with the provisions of this Section 36, such purported or attempted Transfer shall be void *ab initio*, and the purported transferee or successor by operation of law shall not be deemed to be a stockholder of the Corporation for any purpose and shall not be entitled to any of the rights of a stockholder, including, without limitation, the right to vote the shares of Common Stock or to receive a certificate for the shares of Common Stock or any dividends or other distributions on or with respect to the shares of Common Stock.

Section 37.     Effect of the Corporation's Restriction on Transfer.

(a)     A written restriction on the transfer or registration of transfer of shares of the Corporation or on the amount of shares of the Corporation that may be owned by any person or group of persons, if permitted by the DGCL and noted conspicuously on the certificate representing such shares or, in the case of uncertificated shares, contained in a notice sent by the Corporation to the registered owner of such shares within a reasonable time after the issuance or transfer of such shares, may be enforced against the holder of such shares or any successor or

transferee of the holder including an executor, administrator, trustee, guardian or other fiduciary entrusted with like responsibility for the person or estate of the holder.

(b)     A restriction imposed by the Corporation on the transfer or the registration of shares of the Corporation or on the amount of shares of the Corporation that may be owned by any person or group of persons, even if otherwise lawful, is ineffective against a person without actual knowledge of such restriction unless: (i) the shares are certificated and such restriction is noted conspicuously on the certificate; or (ii) the shares are uncertificated and such restriction was contained in a notice sent by the Corporation to the registered owner of such shares within a reasonable time after the issuance or transfer of such shares.

Section 38.     Regulations.  The Board of Directors shall have power and authority to make such additional rules and regulations, subject to any applicable requirement of law, as the Board of Directors may deem necessary and appropriate with respect to the issue, transfer or registration of transfer of shares of stock or certificates representing shares.  The Board of Directors may appoint one or more transfer agents or registrars and may require for the validity thereof that certificates representing shares bear the signature of any transfer agent or registrar so appointed.

Section 39.     Fixing Record Dates.

(a)     In order that the Corporation may determine the stockholders entitled to notice of or to vote at any meeting of stockholders or any adjournment thereof, the Board of Directors may fix, in advance, a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the Board of Directors, and which record date shall not be more than sixty (60) nor less than ten (10) days before the date of such meeting.  If no record date is fixed by the Board of Directors, the record date for determining stockholders entitled to notice of or to vote at a meeting of stockholders shall be at the close of business on the day next preceding the day on which notice is given, or if notice is waived, at the close of business on the day next preceding the day on which the meeting is held.  A determination of stockholders of record entitled to notice of or to vote at a meeting of stockholders shall apply to any adjournment of the meeting; provided, however, that the Board of Directors may fix a new record date for the adjourned meeting.

(b)     In order that the Corporation may determine the stockholders entitled to consent to corporate action in writing without a meeting, the Board of Directors may fix, in advance, a record date, which record date shall not precede, the date upon which the resolution fixing the record date is adopted by the Board of Directors, and which date shall not be more than ten (10) days after the date upon which the resolution fixing the record date is adopted by the Board of Directors.  If no record date has been fixed by the Board of Directors, the record date for determining stockholders entitled to consent to corporate action in writing without a meeting, when no prior action by the Board of Directors is required by law, shall be the first date on which a signed written consent setting forth the action taken or proposed to be taken is delivered to the Corporation by delivery to its registered office in the State of Delaware, its principal place of business or an officer or agent of the Corporation having custody of the book in which proceedings of meetings of stockholders are recorded.  Delivery made to a Corporation's registered office shall be by hand or by certified or registered mail, return receipt

requested. If no record date has been fixed by the Board of Directors and prior action by the Board of Directors is required by law, the record date for determining stockholders entitled to consent to corporate action in writing without a meeting shall be at the close of business on the day on which the Board of Directors adopts the resolution taking such prior action.

(c)     In order that the Corporation may determine the stockholders entitled to receive payment of any dividend or other distribution or allotment of any rights or the stockholders entitled to exercise any rights in respect of any change, conversion or exchange of stock, or for the purpose of any other lawful action, the Board of Directors may fix, in advance, a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted, and which record date shall be not more than sixty (60) days prior to such action. If no record date is fixed, the record date for determining stockholders for any such purpose shall be at the close of business on the day on which the Board of Directors adopts the resolution relating thereto.

Section 40.     Registered Stockholders.  The Corporation shall be entitled to recognize the exclusive right of a person registered on its books as the owner of shares to receive dividends, and to vote as such owner, and shall not be bound to recognize any equitable or other claim to or interest in such share or shares on the part of any other person whether or not it shall have express or other notice thereof, except (a) as otherwise provided by the laws of Delaware and (b) that a person who is the beneficial owner of such shares (if held in a voting trust or by a nominee on behalf of such person) may, upon providing documentary evidence of beneficial ownership of such shares and satisfying such other conditions as are provided under applicable law, may also so inspect the books and records of the Corporation.

ARTICLE VIII

OTHER SECURITIES OF THE CORPORATION

Section 41.     Execution of Other Securities.  All bonds, debentures and other corporate securities of the Corporation, other than stock certificates (covered in Section 32), may be signed by the Chairman of the Board of Directors; the President or any Vice President, or such other person as may be authorized by the Board of Directors, and the corporate seal impressed thereon or a facsimile of such seal imprinted thereon and attested by the signature of the Secretary or an Assistant Secretary, or the Chief Financial Officer or Treasurer or an Assistant Treasurer; provided, however, that where any such bond, debenture or other corporate security shall be authenticated by the manual signature of a trustee under an indenture pursuant to which such bond, debenture or other corporate security shall be issued, the signatures of the persons signing and attesting the corporate seal on such bond, debenture or other corporate security may be the imprinted facsimile of the signatures of such persons.  Interest coupons appertaining to any such bond, debenture or other corporate security, authenticated by a trustee as aforesaid, shall be signed by the Treasurer or an Assistant Treasurer of the Corporation or such other person as may be authorized by the Board of Directors, or bear imprinted thereon the facsimile signature of such person.  In case any officer who shall have signed or attested any bond, debenture or other corporate security, or whose facsimile signature shall appear thereon or on any such interest coupon, shall have ceased to be such officer before the bond, debenture or other corporate security so signed or attested shall have been delivered, such bond, debenture or other corporate

security nevertheless may be adopted by the Corporation and issued and delivered as though the person who signed the same or whose facsimile signature shall have been used thereon had not ceased to be such officer of the Corporation.

ARTICLE IX

DIVIDENDS

Section 42.    <u>Declaration of Dividends</u>.  Dividends upon the capital stock of the Corporation, subject to the provisions of the Certificate of Incorporation and applicable law, if any, may be declared by the Board of Directors from time to time.  Dividends may be paid in cash, in property, or in shares of the capital stock, subject to the provisions of the Certificate of Incorporation.

Section 43.    <u>Dividend Reserve</u>.  Before payment of any dividend, there may be set aside out of any funds of the Corporation available for dividends such sum or sums as the Board of Directors may from time to time, in their absolute discretion, think proper as a reserve or reserves to meet contingencies, or for equalizing dividends, or for repairing or maintaining any property of the Corporation, or for such other purpose as the Board of Directors shall think conducive to the interests of the Corporation, and the Board of Directors may modify or abolish any such reserve in the manner in which it was created.

ARTICLE X

FISCAL YEAR

Section 44.    <u>Fiscal Year</u>.  The fiscal year of the Corporation shall end, unless otherwise fixed by a resolution of the Board of Directors, on the 31st day of December in each calendar year.

ARTICLE XI

INDEMNIFICATION

Section 45.    <u>Indemnification of Directors, Officers, Employees and Other Agents</u>.

.

(a)    <u>Directors and Executive Officers</u>. The Corporation shall indemnify its Directors and executive officers to the fullest extent not prohibited by the DGCL; <u>provided</u>, <u>however</u>, that the Corporation may limit the extent of such indemnification by individual contracts with its Directors and executive officers; <u>provided</u>, <u>further</u>, that the Corporation shall not be required to indemnify any Director or executive officer in connection with any proceeding (or part thereof) initiated by such person or any proceeding by such person against the Corporation or its Directors, officers, employees or other agents unless (i) such indemnification is expressly required to be made by applicable law, (ii) the proceeding was authorized by the Board of Directors of the Corporation or (iii) such indemnification is provided by the

Corporation, in its sole discretion, pursuant to the powers vested in the Corporation under the DGCL.

(b)     Other Officers, Employees and Other Agents.  The Corporation shall have power to indemnify its other officers, employees and other agents as set forth in the DGCL.

(c)     Good Faith.

(i)     For purposes of any determination under this Bylaw, a Director or executive officer shall be deemed to have acted in good faith and in a manner such Director or executive officer reasonably believed to be in or not opposed to the best interests of the Corporation, and, with respect to any criminal action or proceeding, to have had no reasonable cause to believe that his or her conduct was unlawful, if his or her action is based on information, opinions, reports and statements, including financial statements and other financial data, in each case prepared or presented by:

(1)     one or more officers or employees of the Corporation whom the Director or executive officer believed to be reliable and competent in the matters presented;

(2)     counsel, independent accountants or other persons as to matters which the Director or executive officer believed to be within such person's professional competence; and

(3)     with respect to a Director, a committee of the Board of Directors upon which such Director does not serve, as to matters within such Committee's designated authority, which committee the Director believes to merit confidence; so long as, in each case, the Director or executive officer acts without knowledge that would cause such reliance to be unwarranted.

(ii)     The termination of any proceeding by judgment, order, settlement, conviction or upon a plea of *nolo contendere* or its equivalent shall not, of itself, create a presumption that the person did not act in good faith and in a manner which he reasonably believed to be in or not opposed to the best interests of the Corporation, and, with respect to any criminal proceeding, that he had reasonable cause to believe that his or her conduct was unlawful.

(iii)     The provisions of this paragraph (c) shall not be deemed to be exclusive or to limit in any way the circumstances in which a person may be deemed to have met the applicable standard of conduct set forth by the DGCL.

(d)     Expenses.  The Corporation shall advance, prior to the final disposition of any proceeding, promptly following request therefor, all expenses incurred by any Director or executive officer in connection with such proceeding upon receipt of an undertaking by or on behalf of such person to repay said amounts if it should be determined ultimately that such person is not entitled to be indemnified under this Bylaw or otherwise.  Notwithstanding the foregoing, unless otherwise determined pursuant to paragraph (e) of this Bylaw, no advance shall be made by the Corporation if a determination is reasonably and promptly made (1) by the Board

of Directors by a majority vote of a quorum consisting of Directors who were not parties to the proceeding, or (2) if such quorum is not obtainable, or, even if obtainable, a quorum of disinterested Directors so directs, by independent legal counsel in a written opinion, that the facts known to the decision making party at the time such determination, is made demonstrate clearly and convincingly that such person acted in bad faith or in a manner that such person did not believe to be in or not opposed to the best interests of the Corporation.

(e)     Enforcement.  Without the necessity of entering into an express contract, all rights to indemnification and advances to Directors and executive officers under this Bylaw shall be deemed to be contractual rights and be effective to the same extent and as if provided for in a contract between the Corporation and the Director or executive officer.  Any right to indemnification or advances granted by this Bylaw to a Director, or executive officer shall be enforceable by or on behalf of the person holding such right in any court of competent jurisdiction if (i) the claim for indemnification or advances is denied, in whole or in part, or (ii) no disposition of such claim is made within ninety (90) days of request therefor.  The claimant in such enforcement action, if successful in whole or in part, shall be entitled to be paid also the expense of prosecuting his or her claim.  The Corporation shall be entitled to raise as a defense to any such action that the claimant has not met the standards of conduct that make it permissible under the DGCL for the Corporation to indemnify the claimant for the amount claimed.  Neither the failure of the Corporation (including its Board of Directors, independent legal counsel or its stockholders) to have made a determination prior to the commencement of such action that indemnification of the claimant is proper in the circumstances because he has met the applicable standard of conduct set forth in the DGCL, nor an actual determination by the Corporation (including its Board of Directors, independent legal counsel or its stockholders) that the claimant has not met such applicable standard of conduct, shall be a defense to the action or create a presumption that claimant has not met the applicable standard of conduct.

(f)     Non-Exclusivity of Rights.  The rights conferred on any person by this Bylaw shall not be exclusive of any other right which such person may have or hereafter acquire under any statute, provision of the Certificate of Incorporation, Bylaws, agreement, vote of stockholders or disinterested Directors or otherwise, both as to action in his or her official capacity and as to action in another capacity while holding office.  The Corporation is specifically authorized to enter into individual contracts with any or all of its Directors, officers, employees or agents respecting indemnification and advances, to the fullest extent not prohibited by the DGCL.

(g)     Survival of Rights.  The rights conferred on any person by this Bylaw shall continue as to a person who has ceased to be a Director, officer, employee or other agent and shall inure to the benefit of the heirs, executors and administrators of such a person.

(h)     Insurance.  To the fullest extent permitted by the DGCL, the Corporation, upon approval by the Board of Directors, may purchase insurance on behalf of any person required or permitted to be indemnified pursuant to this Bylaw.

(i)     Amendments.  Any repeal or modification of this Bylaw shall only be prospective and shall not affect the rights under this Bylaw in effect at the time of the occurrence

of any action or omission to act that is the cause of any proceeding against any agent of the Corporation.

(j)     <u>Saving Clause</u>.  If this Bylaw or any portion hereof shall be invalidated on any ground by any court of competent jurisdiction, then the Corporation shall nevertheless indemnify each Director and executive officer to the full extent not prohibited by any applicable portion of this Bylaw that shall not have been invalidated, or by any other applicable law.

(k)     <u>Certain Definitions</u>.  For the purposes of this Bylaw, the following definitions shall apply:

(i)     The term "***proceeding***" shall be broadly construed and shall include, without limitation, the investigation, preparation, prosecution, defense, settlement, arbitration and appeal of, and the giving of testimony in, any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative.

(ii)     The term "***expenses***" shall be broadly construed and shall include, without limitation, court costs, attorneys' fees, witness fees, fines, amounts paid in settlement or judgment and any other costs and expenses of any nature or kind incurred in connection with any proceeding.

(iii)     The term "***Corporation***" shall include, in addition to the resulting Corporation, any constituent Corporation (including any constituent of a constituent) absorbed in a consolidation or merger which, if its separate existence had continued, would have had power and authority to indemnify its directors, officers, and employees or agents, so that any person who is or was a director, officer, employee or agent of such constituent Corporation, or is or was serving at the request of such constituent Corporation as a director, officer, employee or agent of another Corporation, partnership, joint venture, trust or other enterprise, shall stand in the same position under the provisions of this Bylaw with respect to the resulting or surviving Corporation as he would have with respect to such constituent Corporation if its separate existence had continued.

(iv)     References to a "***director***," "***officer***," "***employee***," or "***agent***" of the Corporation shall include, without limitation, situations where such person is serving at the request of the Corporation as a director, officer, employee, trustee or agent of another Corporation, partnership, joint venture, trust or other enterprise.

(v)     References to "***other enterprises***" shall include employee benefit plans; references to "***fines***" shall include any excise taxes assessed on a person with respect to an employee benefit plan; and references to "***serving at the request of the Corporation***" shall include any service as a director, officer, employee or agent of the Corporation which imposes duties on, or involves services by, such director, officer, employee, or agent with respect to an employee benefit plan, its participants, or beneficiaries; and a person who acted in good faith and in a manner he reasonably believed to be in the interest of the participants and beneficiaries of an employee benefit plan shall be deemed

to have acted in a manner "not opposed to the best interests of the Corporation" as referred to in this Bylaw.

## ARTICLE XII

## NOTICES

Section 46.    <u>Notices</u>.

(a)    <u>Notice to Stockholders</u>.  Whenever under applicable law, the Certificate of Incorporation or these Bylaws notice is required to be given to any stockholder, such notice may be given (i) in writing and sent either by hand delivery, through the United States mail, or by a nationally recognized overnight delivery service for next day delivery, or (ii) by means of a form of electronic transmission consented to by the stockholder, to the extent permitted by, and subject to the conditions set forth in, Section 232 of the DGCL.  A notice to a stockholder shall be deemed given as follows:  (i) if given by hand delivery, when actually received by the stockholder, (ii) if sent through the United States mail, when deposited in the United States mail, with postage and fees thereon prepaid, addressed to the stockholder at the stockholder's address appearing on the stock ledger of the Corporation, (iii) if sent for next day delivery by a nationally recognized overnight delivery service, when deposited with such service, with fees thereon prepaid, addressed to the stockholder at the stockholder's address appearing on the stock ledger of the Corporation, and (iv) if given by a form of electronic transmission consented to by the stockholder to whom the notice is given and otherwise meeting the requirements set forth above, (A) if by facsimile transmission, when directed to a number at which the stockholder has consented to receive notice, (B) if by electronic mail, when directed to an electronic mail address at which the stockholder has consented to receive notice, (C) if by a posting on an electronic network together with separate notice to the stockholder of such specified posting, upon the later of (1) such posting and (2) the giving of such separate notice, and (D) if by any other form of electronic transmission, when directed to the stockholder.  A stockholder may revoke such stockholder's consent to receiving notice by means of electronic communication by giving written notice of such revocation to the Corporation.  Any such consent shall be deemed revoked if (1) the Corporation is unable to deliver by electronic transmission two consecutive notices given by the Corporation in accordance with such consent and (2) such inability becomes known to the Secretary or an Assistant Secretary or to the Corporation's transfer agent, or other person responsible for the giving of notice; <u>provided</u>, <u>however</u>, the inadvertent failure to treat such inability as a revocation shall not invalidate any meeting or other action.

(b)    <u>Notice to Directors</u>.  Whenever under applicable law, the Certificate of Incorporation or these Bylaws notice is required to be given to any director, such notice shall be given either (i) in writing and sent by hand delivery, through the United States mail, or by a nationally recognized overnight delivery service for next day delivery, (ii) by means of facsimile telecommunication or other form of electronic transmission, or (iii) by oral notice given personally or by telephone.  A notice to a director will be deemed given as follows: (A) if given by hand delivery, orally, or by telephone, when actually received by the director, (B) if sent through the United States mail, when deposited in the United States mail, with postage and fees thereon prepaid, addressed to the director at the director's address appearing on the records of the Corporation, (C) if sent for next day delivery by a nationally recognized overnight delivery

service, when deposited with such service, with fees thereon prepaid, addressed to the director at the director's address appearing on the records of the Corporation, (D) if sent by facsimile telecommunication, when sent to the facsimile transmission number for such director appearing on the records of the Corporation, (E) if sent by electronic mail, when sent to the electronic mail address for such director appearing on the records of the Corporation, or (F) if sent by any other form of electronic transmission, when sent to the address, location or number (as applicable) for such director appearing on the records of the Corporation.

(c)     Electronic Transmission.  "***Electronic transmission***" means any form of communication, not directly involving the physical transmission of paper, that creates a record that may be retained, retrieved and reviewed by a recipient thereof, and that may be directly reproduced in paper form by such a recipient through an automated process, including but not limited to transmission by telex, facsimile telecommunication, electronic mail, telegram and cablegram.

(d)     Address Unknown.  If no address of a stockholder or Director be known, notice may be sent to the office of the Corporation required to be maintained pursuant to Section 2 hereof.

(e)     Affidavit of Mailing.  An affidavit of mailing, executed by a duly authorized and competent employee of the Corporation, or its transfer agent appointed with respect to the class of stock affected, specifying the name and address or the names and addresses of the stockholder or stockholders, or Director or Directors, to whom any such notice or notices was or were given, and the time and method of giving the same, shall be conclusive evidence of the statements therein contained.

(f)     Methods of Notice.  It shall not be necessary that the same method of giving notice be employed in respect of all Directors, but one permissible method may be employed in respect of any one or more, and any other permissible method or methods may be employed in respect of any other or others.

(g)     Failure to Receive Notice.  The period or limitation of time within which any stockholder may exercise any option or right, or enjoy any privilege or benefit, or be required to act, or within which any Director may exercise any power or right, or enjoy any privilege, pursuant to any notice sent him in the manner above provided, shall not be affected or extended in any manner by the failure of such stockholder or such Director to receive such notice.

(h)     Notice to Person with Whom Communication is Unlawful.  Whenever notice is required to be given, under any provision of law or of the Certificate of Incorporation or Bylaws of the Corporation, to any person with whom communication is unlawful, the giving of such notice to such person shall not be required and there shall be no duty to apply to any governmental authority or agency for a license or permit to give such notice to such person.  Any action or meeting which shall be taken or held without notice to any such person with whom communication is unlawful shall have the same force and effect as if such notice had been duly given.  In the event that the action taken by the Corporation is such as to require the filing of a certificate under any provision of the DGCL, the certificate shall state, if such is the fact and if

notice is required, that notice was given to all persons entitled to receive notice except such persons with whom communication is unlawful.

(i)     Notice to Person with Undeliverable Address.  Whenever notice is required to be given, under any provision of law or the Certificate of Incorporation or Bylaws of the Corporation, to any stockholder to whom (i) notice of two consecutive annual meetings, and all notices of meetings or of the taking of action by written consent without a meeting to such person during the period between such two consecutive annual meetings, or (ii) all, and at least two, payments (if sent by first class mail) of dividends or interest on securities during a twelve month period, have been mailed addressed to such person at his or her address as shown on the records of the Corporation and have been returned undeliverable, the giving of such notice to such person shall not be required. Any action or meeting which shall be taken or held without notice to such person shall have the same force and effect as if such notice had been duly given. If any such person shall deliver to the Corporation a written notice setting forth his or her then current address, the requirement that notice be given to such person shall be reinstated.  In the event that the action taken by the Corporation is such as to require the filing of a certificate under any provision of the DGCL, the certificate need not state that notice was not given to persons to whom notice was not required to be given pursuant to this paragraph.

## ARTICLE XIII

## AMENDMENTS; SPECIAL VOTING REQUIREMENTS

Section 47.     Amendments; Special Voting Requirements.  Except as otherwise provided in this Section 47, these Bylaws may be amended or repealed and new Bylaws adopted only upon receiving the affirmative vote of at least 50% of each class of the then outstanding voting securities of the Corporation.  The Board of Directors shall also have the power, subject to any specific voting requirements set forth in this Section 47, to adopt, amend or repeal Bylaws.

## ARTICLE XIV

## LOANS TO OFFICERS

Section 48.     Loans to Officers.  The Corporation may lend money to, or guarantee any obligation of, or otherwise assist any officer or other employee of the Corporation or of its subsidiaries, except to the extent prohibited by law with respect to any (i) executive officer (as defined below) of the Corporation or any of its subsidiaries and (ii) Director of the Corporation or any of its subsidiaries, whenever, in the judgment of the Board of Directors, such loan, guarantee or assistance may reasonably be expected to benefit the Corporation.  The loan, guarantee or other assistance may be with or, without interest and may be unsecured, or secured in such manner as the Board of Directors shall approve, including, without limitation, a pledge of shares of stock of the Corporation.  Nothing in this Section 48 shall be deemed to deny, limit or restrict the powers of guaranty or warranty of the Corporation at common law or under any statute.  For purposes of this Section 48, "*executive officer*" shall have the meaning set forth in Rule 405 under the General Rules and Regulations under the Securities Act.

## ARTICLE XV

## MISCELLANEOUS

Section 49.    Meeting Attendance via Remote Communication Equipment.

(a)    Stockholder Meetings.  If authorized by the Board in its sole discretion, and subject to such guidelines and procedures as the Board may adopt, stockholders and proxyholders not physically present at a meeting of stockholders may, by means of remote communication:

(i)    participate in a meeting of stockholders; and

(ii)    be deemed present in person and vote at a meeting of stockholders, whether such meeting is to be held at a designated place or solely by means of remote communication, provided that (A) the Corporation shall implement reasonable measures to verify that each person deemed present and permitted to vote at the meeting by means of remote communication is a stockholder or proxyholder, (B) the Corporation shall implement reasonable measures to provide such stockholders and proxyholders a reasonable opportunity to participate in the meeting and to vote on matters submitted to the stockholders, including an opportunity to read or hear the proceedings of the meeting substantially concurrently with such proceedings, and (C) if any stockholder or proxyholder votes or takes other action at the meeting by means of remote communication, a record of such votes or other action shall be maintained by the Corporation.

(b)    Board Meetings.  Unless otherwise restricted by applicable law, the Certificate of Incorporation, or these Bylaws, members of the Board or any committee thereof may participate in a meeting of the Board or any committee thereof by means of conference telephone or other communications equipment by means of which all persons participating in the meeting can hear each other.  Such participation in a meeting shall constitute presence in person at the meeting, except where a person participates in the meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting was not lawfully called or convened.

Section 50.    Surety Bonds.  Such officers, employees and agents of the Corporation (if any) as the Chairman of the Board, the Chief Executive Officer, the President or the Board may direct, from time to time, shall be bonded for the faithful performance of their duties and for the restoration to the Corporation, in case of their death, resignation, retirement, disqualification or removal from office, of all books, papers, vouchers, money and other property of whatever kind in their possession or under their control belonging to the Corporation, in such amounts and by such surety companies as the Chairman of the Board, the Chief Executive Officer, the President or the Board may determine.  The premiums on such bonds shall be paid by the Corporation and the bonds so furnished shall be in the custody of the Secretary.

Section 51.    Securities of Other Corporations.  Powers of attorney, proxies, waivers of notice of meeting, consents in writing and other instruments relating to securities owned by the

Corporation may be executed in the name of and on behalf of the Corporation by the Chairman of the Board, the Chief Executive Officer, the President or any Vice President.  Any such officer may, in the name of and on behalf of the Corporation, take all such action as any such officer may deem advisable to vote in person or by proxy at any meeting of security holders of any corporation in which the Corporation may own securities, or to consent in writing, in the name of the Corporation as such holder, to any action by such corporation, and at any such meeting or with respect to any such consent shall possess and may exercise any and all rights and power incident to the ownership of such securities and which, as the owner thereof, the Corporation might have exercised and possessed.  The Board may from time to time confer like powers upon any other person or persons.

**EXHIBIT C**

**<u>SECTION 7.5(a) BENEFITS</u>**

## <u>SECTION 7.5(a) BENEFITS</u>

FiberMark Pension Plan for Hourly Employees
Paper Industry Union Management Pension Fund / Hourly Pension for Lowville Employees
401(k) / Defined Contribution Pension Plans
Management Incentive Plan
Sales Incentive Plan
Severance Program / Practice
Post-Retirement Benefits (Medical / Life Insurance)
Health Insurance (Medical, Dental, Vision, Rx, Stoploss, COBRA)
Short Term Disability Insurance
Long Term Disability Insurance
Accidental Death & Dismemberment Insurance
Life Insurances
Accident & Sickness Insurance
Worker's Compensation Programs
Flexible Spending Account Plan
Travel Insurance
Auto Allowance Program
Unused Vacation Policy
Outplacement Employment Services
Site-Based Incentive Programs (Safety / Productivity)
Non-Tobacco Use Certification Program
Sick Days
Relocation
Business Expense Reimbursement
Education Reimbursement / Limited Development
Holidays
Legally Required Leave
Funeral Leave
Employee Assistance Programs
Site-Based Employee Events
Service Awards
Work-Related Health Management Services
Training & Development Programs
Lunchroom Support (Coffee / Bottled Water / Vending Supply)
Safety Supplies
Uniform Rental Service
Security Services (Key Cards, Fire Systems, etc.)
State Unemployment Compensation/Disability  Insurance
Employer Social Security / Medicare Contribution

**APPENDIX B**

**<u>PRO FORMA FINANCIAL PROJECTIONS</u>**

# APPENDIX B

## PRO FORMA FINANCIAL PROJECTIONS

The Debtors believe that the Plan meets the Bankruptcy Code's feasibility requirement, and that confirmation of the Plan is not likely to be followed by liquidation, or the need for further financial reorganization, of the Debtors or any successor thereof under the Plan. In connection with the development of the Plan, and for the purposes of determining whether the Plan satisfies this feasibility standard, the Debtors analyzed their ability to satisfy their financial obligations while maintaining sufficient liquidity and capital resources. Management, with Berenson's assistance, developed and refined a business plan and prepared financial projections (the "Projections" or the "Financial Projections") for the calendar years ending December 31, 2005 through 2009 (the "Projection Period").

The Debtors do not, as a matter of course, publish their business plans and strategies or projections, anticipated financial position or results of operations. Accordingly, the Debtors do not anticipate that they will, and disclaim any obligation to, furnish updated business plans or projections to holders of Claims or New Common Stock, or to include such information in documents required to be filed with the SEC or otherwise make such information public.

In connection with the planning and development of the Plan, the Projections were prepared by the Debtors, with Berenson's assistance, to present the anticipated impact of the Plan. The Projections assume that the Plan will be implemented in accordance with its stated terms. The Projections are based on forecasts of key economic variables and may be significantly affected by changes in the competitive environment, future changes in technology, and a variety of other factors. Accordingly, the estimates and assumptions underlying the Projections are inherently uncertain and are subject to significant business, economic and competitive uncertainties. Therefore, such Projections, estimates and assumptions are not necessarily indicative of current values or future performance, which may be significantly less favorable or more favorable than as set forth herein. The Projections included herein were prepared in June 2005.

The projections should be read in conjunction with the significant assumptions, qualifications and notes set forth below.

ALTHOUGH EVERY REASONABLE EFFORT WAS MADE TO BE ACCURATE, THE PROJECTIONS ARE ONLY AN ESTIMATE, AND ACTUAL RESULTS MAY VARY CONSIDERABLY FROM THE PROJECTIONS. IN ADDITION, THE UNCERTAINTIES WHICH ARE INHERENT IN THE PROJECTIONS INCREASE FOR LATER YEARS IN THE PROJECTION PERIOD, DUE TO INCREASED DIFFICULTY ASSOCIATED WITH FORECASTING LEVELS OF ECONOMIC ACTIVITY AND PERFORMANCE AT MORE DISTANT POINTS IN THE FUTURE. CONSEQUENTLY, THE PROJECTED INFORMATION INCLUDED HEREIN SHOULD NOT BE REGARDED AS A REPRESENTATION BY THE DEBTORS, THE DEBTORS' ADVISORS, OR ANY OTHER PERSON THAT THE DEBTORS WILL ACHIEVE THE PROJECTED RESULTS. ALTHOUGH EVERY EFFORT WAS MADE TO PREPARE THE PROJECTIONS IN COMPLIANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES, THE PROJECTIONS HAVE NOT BEEN AUDITED OR REVIEWED BY THE DEBTORS' INDEPENDENT CERTIFIED ACCOUNTANTS. CREDITORS ARE CAUTIONED NOT TO PLACE UNDUE RELIANCE ON THE FOLLOWING PROJECTIONS IN DETERMINING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN.

The condensed combined projected financial statements of the Debtors are presented herein. These statements reflect the projected financial position, results of operations and cash flows of the Debtors on a combined basis, including certain amounts and transactions between Debtors and non-debtor subsidiaries of the Company.

|  | Forecast 12/31/05 | Reorganization Adjustments |  | Fresh Start Adjustments |  | Pro Forma 12/31/05 |
|---|---|---|---|---|---|---|
| Cash | ($3) | $-- |  | $-- |  | ($3) |
| Accounts Receivable, Net | 20 | -- |  | -- |  | 20 |
| Inventories | 41 | -- |  | -- |  | 41 |
| Prepaid Expenses | 4 | -- |  | -- |  | 4 |
| Total Current Assets | 62 | -- |  | -- |  | 62 |
|  |  |  |  |  |  |  |
| Property, Plant and Equipment, Net | 133 | -- |  | (111) | (H) | 21 |
| Intercompany Notes Receivable | 4 | -- |  | -- |  | 4 |
| Investment in Subsidiaries | 100 | -- |  | 65 | (H) | 165 |
| Other Intangible Assets, Net | -- | 4 | (A) | -- |  | 4 |
| Other Pension Assets | 3 | -- |  | -- |  | 3 |
| Total Assets | $302 | $4 |  | ($46) |  | $259 |
|  |  |  |  |  |  |  |
| Revolving Credit Line | $-- | $7 | (B) | $-- |  | $7 |
| Current Portion of Long-Term Debt | -- | 4 | (C) | -- |  | 4 |
| Accounts Payable | 7 | -- |  | -- |  | 7 |
| Accrued Liabilities | 15 | 6 | (D) | -- |  | 21 |
| Accrued Income Taxes Payable | 0 | -- |  | -- |  | 0 |
| Deferred Income Taxes | -- | -- |  | -- |  | -- |
| Total Current Liabilities | 22 | 17 |  | -- |  | 39 |
|  |  |  |  |  |  |  |
| Long-Term Debt, Less Current Portion | -- | 77 | (E) | -- |  | 77 |
| Deferred Income Taxes | 7 | -- |  | -- |  | 7 |
| Other Long-Term Liabilities | 18 | -- |  | -- |  | 18 |
| Total Long-Term Liabilities | 25 | 77 |  | -- |  | 102 |
|  |  |  |  |  |  |  |
| Liabilities Subject to Compromise | 366 | (366) | (F) | -- |  | -- |
| Total Liabilities | 413 | (272) |  | -- |  | 142 |
|  |  |  |  |  |  |  |
| Stockholders' Equity | (112) | 276 | (G) | (46) | (I) | 118 |
| Total Liabilities and Stockholders' Equity | $302 | $4 |  | ($46) |  | $259 |

# Notes to Pro Forma Projected Balance Sheet

The Pro Forma Balance Sheet adjustments contained herein account for (i) the reorganization and related transactions pursuant to the Plan and (ii) the implementation of "fresh start" accounting pursuant to Statement of Position 90-7 as issued by the American Institute of Certified Public Accountants. The fresh start adjustments are based on an enterprise value of $225 million, the midpoint of the assumed reorganization value range of $210 to $240 million. Although management has followed the principles of fresh start accounting, the actual adjustments will be determined after the Effective Date and may be materially different than those presented herein upon completion of the required asset appraisals following the Effective Date.

(A)     Approximately $4 million of fees related to the Plan Financing have been capitalized.

(B)     (i) Holders of Administrative Claims ($10.0 million), Priority Tax Claims ($624,000), and Other Priority Claims will be paid in full as required by the Bankruptcy Code, unless subject to Bankruptcy Court approval post-confirmation or otherwise agreed by the holders of such claims, (ii) payment in full for Other Secured Claims ($127,000), plus (iii) financing fees related to the Plan Financing. In addition, the GECC Credit Facility Claim will be paid in full through borrowings under the Exit Facility.

(C)     Reclassification of the current portion of the GECC Equipment Financing Claim and Banc One Equipment Financing Claim, each of which will be reinstated and paid pursuant to their preexisting terms. In addition, the Coated Paper Sale/Leaseback Claim will be paid in continuing monthly payments in lieu of the balloon payment required by the governing documents..

(D)     Accrued professional fees and other expenses to be paid post-confirmation.

(E)     Reclassification of the long-term portion of the GECC Equipment Financing Claim and Banc One Equipment Financing Claim, each of which will be reinstated and paid pursuant to their preexisting terms, plus the long-term portion of the Coated Paper Sale/Leaseback Claim which will be paid in continuing monthly payments in lieu of the balloon payment required by the governing documents plus $75.0 million of term loan borrowings under the Plan Financing to finance the Distribution Cash.

(F)     Elimination of Liabilities Subject to Compromise based on the treatment of each of the respective Claims.

(G)     Issuance of New Common Stock to the holders of Noteholder Claims and General Unsecured Claims plus cancellation of indebtedness income.

(H)     In the application of SOP 90-7 (which requires conformity with APB 16 and APB 17 which was superseded with SFAS 141 and SFAS 142), the Company, as a first step, adjusted the carrying value of their assets and liabilities to their estimated fair values at the date of emergence. As a final step, the new fair values were compared with the reorganization value, which resulted in a reduction in the carrying value of property plant and equipment.

(I)     Elimination of historical Stockholders' Equity and extraordinary gains.

**Debtors' Projected Statement of Operations**
Pro Forma Year Ended December 31, 2005 and
Projected Years Ended December 31, 2006 through 2009

(In millions)

Unaudited

| | Pro Forma 12 Months 12/31/05 | Projected Fiscal Years Ended December 31, | | | |
|---|---|---|---|---|---|
| | | 2006 | 2007 | 2008 | 2009 |
| Net Sales | $205 | $204 | $218 | $230 | $241 |
| Cost of Sales | (178) | (165) | (174) | (183) | (191) |
| Gross Profit | 27 | 40 | 44 | 47 | 50 |
| Selling, General and Administrative Expenses | (30) | (27) | (28) | (28) | (28) |
| Income (Loss) From Operations | (3) | 12 | 16 | 19 | 22 |
| Other Income (Expense), Net | (1) | (3) | (3) | (3) | (3) |
| Equity in Subsidiary Income | 21 | 21 | 20 | 23 | 26 |
| Interest Expense, Net | (8) | (10) | (10) | (10) | (10) |
| Reorganization / Other Non-Recurring Expense | (23) | -- | -- | -- | -- |
| Income (Loss) Before Income Taxes | (14) | 20 | 23 | 29 | 34 |
| Income Tax Expense | -- | -- | (1) | (2) | (3) |
| Net Income (Loss) | ($14) | $20 | $22 | $27 | $31 |

**Debtors' Projected Balance Sheets**
Pro Forma December 31, 2005 and
Projected Years Ended December 31, 2006 through 2009

(In millions)

Unaudited

| | Pro Forma 12 Months 12/31/05 | 2006 | 2007 | 2008 | 2009 |
|---|---|---|---|---|---|
| Cash | ($3) | $-- | $-- | $-- | $-- |
| Accounts Receivable, Net | 20 | 21 | 22 | 23 | 24 |
| Inventories | 41 | 36 | 38 | 40 | 42 |
| Prepaid Expenses | 4 | 3 | 3 | 4 | 4 |
| Total Current Assets | 62 | 60 | 64 | 67 | 70 |
| | | | | | |
| Property, Plant and Equipment, Net | 21 | 26 | 31 | 35 | 40 |
| Intercompany Notes Receivable | 4 | 4 | 4 | 4 | 4 |
| Investment in Subsidiaries | 165 | 178 | 194 | 210 | 233 |
| Other Intangible Assets, Net | 4 | 3 | 2 | 1 | 0 |
| Other Long-Term Assets | -- | -- | -- | -- | -- |
| Other Pension Assets | 3 | 3 | 3 | 3 | 3 |
| Total Assets | $259 | $274 | $298 | $321 | $351 |
| | | | | | |
| Revolving Credit Line | $7 | $10 | $13 | $7 | $5 |
| Current Portion of Long-Term Debt | 4 | 2 | 0 | -- | -- |
| Accounts Payable | 7 | 7 | 8 | 8 | 8 |
| Accrued Liabilities | 21 | 16 | 16 | 16 | 17 |
| Accrued Income Taxes Payable | 0 | -- | 1 | 2 | 2 |
| Deferred Income Taxes | -- | -- | -- | -- | -- |
| Total Current Liabilities | 39 | 35 | 37 | 33 | 33 |
| | | | | | |
| Long-Term Debt, Less Current Portion | 77 | 75 | 75 | 75 | 75 |
| Intercompany Notes Payable | -- | -- | -- | -- | -- |
| Deferred Income Taxes | 7 | | | | |
| Other Long-Term Liabilities | 18 | 25 | 25 | 25 | 25 |
| Total Long-Term Liabilities | 102 | 100 | 100 | 100 | 100 |
| | | | | | |
| Liabilities Subject to Compromise | 0 | 0 | 0 | 0 | 0 |
| Total Liabilities | 142 | 136 | 138 | 134 | 134 |
| | | | | | |
| Stockholders' Equity | 118 | 138 | 160 | 187 | 217 |
| Total Liabilities and Stockholders' Equity | $259 | $274 | $298 | $321 | $351 |

**Debtors' Projected Statement of Cash Flows**
Projected Years Ended December 31, 2006 through 2009

(In millions)

Unaudited

| | Projected Fiscal Years Ended December 31, | | | |
|---|---|---|---|---|
| | 2006 | 2007 | 2008 | 2009 |
| Net Income (Loss) | $20 | $22 | $27 | $31 |
| Depreciation and Amortization | 2 | 2 | 2 | 2 |
| Equity in Subsidiary Income | (21) | (20) | (23) | (26) |
| Reorganization Costs | -- | -- | -- | -- |
| Net Cash Used for Reorganization Items | (5) | -- | -- | -- |
| Change in Operating Assets and Liabilities | | | | |
|     Accounts Receivable | (1) | (1) | (1) | (1) |
|     Inventories | 5 | (2) | (2) | (2) |
|     Prepaid Expenses | 1 | (0) | (0) | (0) |
|     Accounts Payable | (0) | 0 | 0 | 0 |
|     Accrued Liabilities | -- | (1) | 1 | 1 |
|     Accrued Income Taxes Payable | (0) | 1 | 1 | 1 |
|     Net Cash Provided by (Used in) Operating Activities | 0 | 1 | 4 | 5 |
| Additions to Property, Plant and Equipment | (6) | (6) | (6) | (6) |
|     Cash Used in Investing Activities | (6) | (6) | (6) | (6) |
| Net Borrowings (Repayments) Under Revolving Credit Line | 3 | 3 | (6) | (2) |
| Repayment of Debt | (4) | (2) | (0) | -- |
| Dividend, Net | 9 | 4 | 7 | 2 |
|     Net Cash Provided by (Used in) Financing Activities | 8 | 5 | 2 | 0 |
| Net Increase (Decrease) in Cash | $3 | $-- | $-- | $-- |
| Cash (Overdraft) at Beginning of Period | (3) | -- | -- | -- |
|     Cash at End of Period | $-- | $-- | $-- | $-- |

**Assumptions to Financial Projections**

**Projections**

Management, with Berenson's assistance, prepared the Projections for the years ending December 31, 2005 through December 31, 2009. The Projections for the fiscal year ended December 31, 2005 include preliminary actual unaudited results through April 30, 2005.

The Projections are based on a number of assumptions made by management with respect to the future performance of the Company's various lines of business. The Projections should be reviewed in conjunction with a review of these assumptions, including the qualifications and footnotes, set forth herein.

While management has prepared the Projections in good faith and believes the assumptions to be reasonable, it is important to note that the Debtors can provide no assurance that such assumptions will be realized. As outlined in "Section VII—Certain Risk Factors to be Considered" of the Disclosure Statement, a variety of risk factors could effect the Company's financial results and must be considered.

The Projections are based upon a detailed build-up by strategic business unit and by facility. The following summarizes the underlying assumptions behind the Projections.

**Key Assumptions**

A.      General

1.      Methodology. The Projections were prepared using a "bottom-up" methodology. Management prepared sales forecasts by product for the three strategic business units (Publishing and Packaging, Technical Specialties, and Office Products). Production costs were calculated at a mill-by-mill basis by the respective plant controllers based on the projected product mix and certain assumptions for pulp prices, wages increases, energy costs and other costs as provided by management.

2.      Strategic Cost Reduction Program. The Projections assumes that the Company implements a strategic cost reduction program, which involves, among other things, the downsizing of the Debtors' New Jersey papermaking operations. Implementation of the Strategic Cost Reduction Program was approved by the Bankruptcy Court on July 20, 2005 and is assumed to be completed by December 31, 2005.

3.      Plan of Reorganization Consummation. The operating assumptions assume the Plan will be confirmed and consummated by December 31, 2005. The "fresh start" accounting adjustments incorporate an emergence as of December 31, 2005.

4.      Macroeconomic and Industry Environment. The Projections reflect a cyclical improvement in the overall economic environment over the projected period on a basis consistent with historical ranges in the specialty materials business cycles.

5.      Non-Debtor Subsidiaries. These Projections reflect the projected financial position, results of operations and cash flows of the Debtors on a combined basis, including certain amounts and transactions between Debtors and non-debtor subsidiaries of the Company. For presentation purposes, the results of the Company's non-debtor subsidiaries have been accounted for under the equity method.

B.    Projected Statements of Operations

    1.    Net Sales.  Net Sales are projected to increase from $205 million in 2005 to $241 million in 2009, a compound annual growth rate of approximately 4.2%.  Key drivers of Net Sales growth include (a) investment in product and market development activities, and (b) general economic growth.  The growth in Net Sales is offset by product line rationalization of certain low margin product lines.

    2.    Gross Profit.  Gross Profit is projected to improve from $27 million, or approximately 13% of Net Sales, in 2005 Pro Forma to $50 million, or approximately 21% of Net Sales, in 2009.  Gross Profit increase is driven by (a) $9.2 million annual projected benefits from the Strategic Cost Reduction Program, (b) increased operating leverage from higher Net Sales and (c) efficiency improvements throughout the Company.  Pro Forma 2005 and projected 2006-2009 Gross Profit reflects an approximately $11 million annual reduction in depreciation as a result of the write-down of Property, Plant and Equipment relative to historical reported results.  The increase in Gross Profit is offset somewhat by certain raw materials and energy costs that are not passed through to customers.  Commodity NBSK pulp has been assumed to be constant at $600/metric ton, which is approximately equal to the ten year historical average price.

    3.    Selling, General and Administrative ("SG&A") Expenses.  SG&A is projected to decrease from $30 million, or approximately 15% of Net Sales, in 2005 to $28 million, or 12% of Net Sales, in 2009.  SG&A decrease is driven by (a) $3.3 million annual projected benefits from the Strategic Cost Reduction Program, (b) elimination of certain public company reporting costs, and (c) focus on cost reduction opportunities to offset inflationary personnel costs.  This decrease in SG&A is offset somewhat by modest inflationary increases in non-personnel costs.

    4.    Equity in Subsidiary Income.  Equity in Subsidiary Income reflects the Debtors' 100% ownership of its foreign operations, primarily in Germany and the United Kingdom.  The Projections assume constant exchange rates based on long-term forecasts prepared by third-party sources as follows: (i) Dollar/Euro exchange rate of $1.32/€and (ii) Dollar/British Pound exchange rate of $1.85/£.

    5.    Interest Expense.  Interest expense reflects interest imputed on (a) the GECC Equipment Financing of Libor + 215 basis points; (b) the Banc One Equipment Financing of 8.47%; (c) the Coated Paper Sale/Leaseback of approximately 6.90%; (d) the Exit Facility at an assumed rate of Libor + 225 basis points; and (e) term loan borrowings under the Plan Financing of Libor + 650 basis points.

    6.    Reorganization Expense.  Reorganization Expense of approximately $23 million in 2005 consists primarily of legal and professional fees, employee retention costs, rejection of contractual obligations and certain one-time costs associated with cost savings initiatives.

    7.    Income Tax Expense.  Income tax expense assumes a 38% tax rate on Income Before Income Taxes excluding Equity in Subsidiary Income.

C.    Projected Balance Sheets

    1.    Cash.  Based on the Debtors' projected need to borrow under the Exit Facility, the Projections assume that the Debtors will maintain a zero cash balance.

    2.    Working Capital.  Accounts receivable are projected to remain constant at approximately 37 days of sales outstanding throughout the Projection Period.  Inventories and accounts payable are also projected to remain stable with inventory turns of 4.6x throughout the Projection Period.  Accounts payable are projected to remain constant at 16 days of cost of sales outstanding throughout the Projection Period.

D.      Projected Statement of Cash Flows

1.      Depreciation and Amortization.  Book depreciation and amortization are projected based on estimates of useful life of the Company's PP&E and intangibles.  Depreciation expense decreases from historical levels by approximately $11 million as a result of the write-down of Property, Plant and Equipment.

2.      Capital Expenditures.  Annual capital expenditures for the Reorganized Debtor are forecast to remain constant at approximately $5.5 million during the Projection Period.

3.      Dividends from Subsidiary.  The Projections assume that the Debtors' foreign subsidiaries will have the ability to distribute excess cash as needed to service the Debtors obligations and investment requirements based on the projected cash flow of their U.K. and German subsidiaries and the excess availability under the German Revolving Credit Facility.  The Projections assume constant exchange rates based on long-term forecasts prepared by third-party sources as follows: (i) Dollar/Euro exchange rate of $1.32/€ and (ii) Dollar/British Pound exchange rate of $1.85/£.

**APPENDIX C**

**<u>CORPORATE STRUCTURE CHART</u>**





**APPENDIX D**

**LIQUIDATION ANALYSIS**

**APPENDIX D**

**LIQUIDATION ANALYSIS**

Section 1129(a)(7) of the Bankruptcy Code (often called the "Best Interests Test"), requires that each holder of an impaired Claim or Equity Interest either (a) accept the Plan, or (b) receive or retain under the Plan property of a value, as of the Plan's Effective Date, that is not less than the value such non-accepting holder would receive or retain if the Debtors were to be liquidated under Chapter 7 of the Bankruptcy Code on the assumed date of conversion to Chapter 7 (the "Conversion Date"). In determining whether the Best Interests Test has been met, the first step is to determine the dollar amount that would be generated from a hypothetical liquidation of the Debtors' assets in Chapter 7. The gross amount of cash available would be the sum of the proceeds from the disposition of the Debtors' assets and the cash held by the Debtors at the commencement of its Chapter 7 case. Such amount is reduced by the amount of any Claims secured by such assets, the costs and expenses of the liquidation, and such additional administrative expenses and priority claims that may result from the use of Chapter 7 for purposes of liquidation. Any remaining net cash would be allocated to creditors and shareholders in strict priority in accordance with Section 726 of the Bankruptcy Code.

A general summary of the assumptions used in preparing the liquidation analysis follows.

THERE CAN BE NO ASSURANCE THAT THE VALUES REFLECTED IN THE LIQUIDATION ANALYSIS WOULD BE REALIZED IF THE DEBTORS WERE, IN FACT, TO UNDERGO SUCH A LIQUIDATION, AND ACTUAL RESULTS COULD VARY MATERIALLY FROM THOSE SHOWN HEREIN.

**Analysis Methodology**

Hypothetical recoveries to stakeholders of the Debtors in a liquidation were determined through multiple steps, as set forth below.

- Taking into account the mechanics of a Chapter 7 liquidation, the analysis estimated proceeds from the liquidation of each of the Debtors' assets. This included the stock that FiberMark International Holdings LLC holds in the Debtors' German operations and FiberMark Red Bridge International Ltd. (together, the "Foreign Subsidiaries").

- Proceeds from the sale of the Debtors' interests in their Foreign Subsidiaries were estimated. Such sales were assumed to occur on a going concern basis and produce proceeds within a range of values arrived at using what are considered to be appropriate multiples.

- Proceeds from the sale of the Debtors' North American operations were assumed to occur over a six month period, with a complete shutdown of operations occurring after the expiration of the federally mandated 60-day lay-off notice period for large employers (the "Warn Act").

- The analysis assumed that the Chapter 7 trustee would obtain an order of substantive consolidation with respect to the assets and liabilities of the Debtors, for the reasons set forth in Article VII. B. of the Disclosure Statement.

- Estimated recoveries were reduced by estimated liquidation costs. These included estimated operating costs during the liquidation process, as well as trustee fees and professional fees. Fees related to the sale of the Debtors' stock interests in the Foreign Subsidiaries were also deducted from gross proceeds. Additional deductions from gross proceeds included costs to finish work in process, the costs associated with the Court approved Key Employee Severance Plan and wind-down and Warn Act costs.

- The letters of credit outstanding under the DIP Facility (estimated at $10.5 million) were assumed to be drawn.

Estimate of Net Proceeds

Estimates were made of the cash proceeds that might be realized from the liquidation of the Debtors' assets. The Liquidation Analysis also assumes that the sale of the assets of the Debtors would occur under the direction of a Court-appointed Chapter 7 trustee. Liquidation values were assessed for general classes of assets by estimating the percentage

recoveries that a Chapter 7 trustee might achieve through their disposition. The proceeds of these sale transactions would be conveyed to the Debtors' creditors.

This Liquidation Analysis does not reflect any recoveries that might be realized by the Chapter 7 trustee's pursuit of any avoidance actions, as the Debtors believe that any such recoveries are highly speculative in light of, among other things, the various defenses that would likely be asserted. Accordingly, the Liquidation Analysis has valued any such recoveries at zero, including those attributable to the Chapter 7 trustee's pursuit of allegedly preferential payments. To the extent that any recoveries are obtained, the Debtors do not believe that such recoveries would materially alter the distributions to unsecured creditors.

Estimate of Costs

The Debtors' liquidation costs under Chapter 7 would include the fees payable to a Chapter 7 trustee, as well as those that might be payable to attorneys and other professionals that such a trustee may engage. In accordance with the priority of payments provided for in the Bankruptcy Code, once the costs of liquidation were satisfied, payments would include any obligations and unpaid expenses incurred by the Debtors during the Chapter 11 case and allowed in the Chapter 7 case, such as compensation for attorneys, financial advisers, appraisers, accountants and other professionals, and costs and expenses of members of any statutory committee of unsecured creditors appointed pursuant to section 1102 of the Bankruptcy Code and any other committee so appointed. Moreover, additional claims could arise by reason of the breach or rejection of obligations incurred and executory contracts or leases entered into by the Debtors both prior to and during the pendency of the Chapter 11 case.

Distribution of Net Proceeds under Absolute Priority

Under the absolute priority rule, no junior creditor would receive any distribution until all senior creditors are paid in full, and no equity holder would receive any distribution until all creditors are paid in full. Accordingly, the $6.8 million DIP Facility Claim, which enjoys super-priority status, was assumed to be paid in full. Additionally, various assumptions were made as to the value of the collateral underlying the Banc One Equipment Financing Claim, the Lowville Grant Claim, the Coated Paper Sale/Leaseback Claim, and Other Secured Claims, and the corresponding level of recovery that such claims would receive in a liquidation scenario on account of the secured portion of such claims. Thereafter, proceeds of assets were assumed to be applied to the payment of administrative chapter 11 creditors, including chapter 11 professionals and reclamation claimants.

After consideration of the effects that a Chapter 7 liquidation would have on the ultimate proceeds available for distribution to creditors in a Chapter 11 case, including (i) the increased costs and expenses of a liquidation under Chapter 7 arising from fees payable to a trustee in bankruptcy and professional advisors to such trustee, (ii) the erosion in value of assets in a Chapter 7 case in the context of the expeditious liquidation required under Chapter 7 and the "forced sale" atmosphere that would prevail, and (iii) substantial increases in claims which are likely to arise in a liquidation, the Debtors have determined, as summarized on the charts below, that confirmation of the Plan will provide each creditor and equity holder with a recovery that is not less than it would receive pursuant to a liquidation of the Debtors under Chapter 7 of the Bankruptcy Code.

The Liquidation Analysis is based on the Debtors' unaudited, projected balance sheets as of December 31, 2005. The Liquidation Analysis assumes that the unaudited, projected December 31, 2005 balance sheets, on which the analysis is based, are a proxy for the balance sheets that would exist upon the Conversion Date. Certain key assumptions underlying the Liquidation Analysis are listed in the footnotes immediately following each hypothetical liquidation analysis chart.

THE DEBTORS' LIQUIDATION ANALYSIS IS AN ESTIMATE OF THE PROCEEDS THAT MAY BE GENERATED AS A RESULT OF A HYPOTHETICAL CHAPTER 7 LIQUIDATION OF THE ASSETS OF THE DEBTORS.

Underlying the liquidation are a number of estimates and assumptions that are inherently subject to significant economic, competitive and operational uncertainties and contingencies beyond the control of the Debtors or a Chapter 7 trustee. Additionally, various liquidation decisions upon which certain assumptions are based are subject to change. Therefore, there can be no assurance that the assumptions and estimates employed in determining the liquidation values of the Debtors' assets will result in an accurate estimate of the proceeds that would be realized were the Debtors to undergo an actual liquidation. The actual amounts of claims against the Estates could vary significantly from the Debtors' estimates, depending on the claims asserted during the pendency of the Chapter 7 case. This Liquidation Analysis does not include

liabilities that may arise as a result of litigation, additional claims by environmental agencies, certain new tax assessments, or other potential claims. This analysis also does not include potential recoveries from avoidance actions. Therefore, the actual liquidation value of the Debtors could vary materially from the estimates provided herein.

*( $ in 000's )*

| | Notes: | Projected Net Book Value @ 12/31/05 * | Hypothetical Liquidation Value Range | | | |
|---|---|---|---|---|---|---|
| | | | Liquidation Recovery % | | Liquidation Amount | |
| | | | Low % | High % | Low $ | High $ |
| **Current Assets:** | | | | | | |
| Cash & Cash Equivalents | ( A ) | $0 | 100.0% | 100.0% | $0 | $0 |
| Net Accounts Receivable | ( B ) | 19,658 | 49.6% | 61.1% | 9,747 | 12,015 |
| Inventories | ( C ) | 40,937 | 10.9% | 33.7% | 4,446 | 13,804 |
| Prepaid Expenses | ( D ) | 3,877 | 0.0% | 0.0% | 0 | 0 |
| **Total Current Assets** | | 64,472 | | | 14,192 | 25,819 |
| **Net PP&E** | ( E ) | 132,831 | 6.1% | 8.8% | 8,148 | 11,623 |
| **Other Assets:** | | | | | | |
| Intercompany Note Receivable | ( F ) | 4,010 | 0.0% | 0.0% | 0 | 0 |
| Investment in Subsidiary | ( G ) | 99,763 | 159.4% | 193.4% | 159,031 | 192,912 |
| Goodwill | ( H ) | 0 | 0.0% | 0.0% | $0 | $0 |
| Other Intangible Assets, net | ( I ) | 3,914 | 0.0% | 0.0% | 0 | 0 |
| Other Pension Assets | ( J ) | 3,064 | 100.0% | 100.0% | 3,064 | 3,064 |
| **Total Other Assets** | | 110,751 | | | 162,095 | 195,976 |
| **Total Assets / Est. Proceeds From Wind-down Sales** | | $308,053 | | | $184,435 | $233,418 |
| **Wind-down Costs:** | | | | | | |
| Chapter 7 Trustee Fees | ( K ) | | 3.0% | 3.0% | 5,533 | 7,003 |
| Professional Fees | ( L ) | | 2.4% | 2.8% | 4,500 | 6,500 |
| Cost to Finish WIP | ( M ) | | | | 0 | 3,166 |
| "Warn Act" Costs | ( N ) | | | | 9,328 | 9,328 |
| Key Employee Severance Program Costs | ( O ) | | | | 4,100 | 4,100 |
| Corporate and Plant Personnel & Other Wind-down Costs | ( P ) | | | | 4,678 | 4,678 |
| | | | | | $28,139 | $34,774 |
| **NET ASSETS AVAILABLE FOR DISTRIBUTION TO SECURED, PRIORITY & UNSECURED CREDITORS** | | | | | $156,296 | $198,644 |

* Projected Net Book Values at 12/31/05 are from the Debtors' projected balance sheet.

| ($ in 000's) | | | Projected Net Book Value | Hypothetical Liquidation Value Range | | | |
|---|---|---|---|---|---|---|---|
| | | | | Liquidation Recovery % | | Liquidation Amount | |
| | | | @ 12/31/05 * | Low % | High % | Low $ | High $ |
| **NET ASSETS AVAILABLE FOR DISTRIBUTION TO SECURED, PRIORITY & UNSECURED CREDITORS** | | | | | | $156,296 | $198,644 |
| | **Notes:** | | | | | | |
| **Less:** | | | | | | | |
| **Liquidated Liabilities -- Super-priority Creditors:** | | ( Q ) | | | | | |
| DIP Facility Claim (Letters Of Credit) | Secured | | $10,493 | 100.0% | 100.0% | $10,493 | $10,493 |
| DIP Facility Claim | Secured | | 6,802 | 100.0% | 100.0% | 6,802 | 6,802 |
| **Total Super-priority Creditors** | | | 17,295 | | | 17,295 | 17,295 |
| **Liquidated Liabilities -- Secured Creditors:** | | ( R ) | | | | | |
| Banc One Equipment Financing Claim | Secured | | $4,077 | 50.0% | 50.0% | $2,038 | $2,038 |
| Coated Paper Sale/Leaseback Claim | Secured | | 740 | 75.0% | 75.0% | 555 | 555 |
| Lowville Grant Claim | Secured | | 300 | 20.0% | 20.0% | 60 | 60 |
| GECC Equipment Financing Claim | Secured | | 0 | 20.0% | 20.0% | 0 | 0 |
| RV Industries Inc., Mechanic's Lien | Secured | | 77 | 100.0% | 100.0% | 77 | 77 |
| AR Green & Son Inc., Mechanic's Lien | Secured | | 48 | 100.0% | 100.0% | 48 | 48 |
| City Of Fitchburg | Secured | | 2 | 100.0% | 100.0% | 2 | 2 |
| **Total Secured Creditors** | | | 5,244 | | | 2,780 | 2,780 |
| **Liquidated Liabilities -- Administrative Ch. 11 Creditors:** | | ( S ) | | | | | |
| Post-petition Trade | Administrative Ch. 11 | | $7,385 | 100.0% | 100.0% | $7,385 | $7,385 |
| Ch. 11 Professional Fee Accrual | Administrative Ch. 11 | | 2,500 | 100.0% | 100.0% | 2,500 | 2,500 |
| Post-petition Taxes | Administrative Ch. 11 | | 450 | 100.0% | 100.0% | 450 | 450 |
| Empire State Development Corporation | Administrative Ch. 11 | | 300 | 100.0% | 100.0% | 300 | 300 |
| AFCO Premium Credit LLC | Administrative Ch. 11 | | 303 | 100.0% | 100.0% | 303 | 303 |
| Bruce Moore Commission | Administrative Ch. 11 | | 224 | 100.0% | 100.0% | 224 | 224 |
| Reclamation Claims | Administrative Ch. 11 | | 166 | 100.0% | 100.0% | 166 | 166 |
| **Total Administrative Ch. 11 Creditors** | | | 11,328 | | | 11,328 | 11,328 |
| **Liquidated Liabilities -- Priority Ch. 11 Creditors:** | | ( T ) | | | | | |
| State of New Jersey Labor Dept | Priority Ch. 11 | | $624 | 100.0% | 100.0% | $624 | $624 |
| **Total Priority Ch. 11 Creditors** | | | 624 | | | 624 | 624 |
| **NET ASSETS AVAILABLE FOR DISTRIBUTION TO UNSECURED CREDITORS** | | | | | | $124,268 | $166,616 |
| **UNSECURED CREDITORS -- RECOVERIES ON PAR VALUE** | | ( U ) | | | | | |
| Noteholder Claims | | | | | | $345,629 | $345,629 |
| General Unsecured Claims | | | | | | 41,744 | 41,744 |
| **Total Unsecured Creditors** | | | | | | 387,374 | 387,374 |
| **UNSECURED CREDITOR RECOVERY %** | | | | | | **32.1%** | **43.0%** |

| NOTES |
|---|

**( A )  Cash & Cash Equivalents**
Cash consists of all cash in banks or operating accounts. Cash is assumed to be fully recoverable.

**( B )  Net Accounts Receivable**
Accounts receivable reflect a blended recovery rate which decreases with the amount of time that customer invoices are outstanding and uncollected. Utilizing the 3/31/05 aging percentages of accounts receivable as a proxy for the year end's projected accounts receivable aging, the anticipated recovery rates on accounts receivable decline gradually from 70% for new balances to zero for aging balances past their due by 60 days. These recovery percentages reflect anticipated customer disputes, settlements and collection agent fees.

**( C )  Inventories**
Estimated inventory recoveries vary by category and reflect the following recovery ranges: raw materials (25% to 35%); work in process (on the high side 35% assumes full conversion to finished goods at the Quakertown, Lowville, Brownville and Reading finishing mills; 0% on the low side without conversion to finished goods), finished goods (20% to 35%); and supplies (0%). The 3/31/05 composition percentages of the various inventory categories were utilized to project year end balances. The cost to convert work-in-process inventory to finished goods is included separately in this analysis under Wind-down Costs.

**( D )  Prepaid Expenses**
Recovery on prepaid expenses is estimated at zero. Prepaid expenses are largely comprised of prepaid insurance balances that the Debtor believes would be maintained in force by a Trustee during a liquidation. The remaining prepaid expenses are comprised of a small number of supplier deposits that the Debtor believes would be offset against amounts owed to the supplier.

**( E )  Net Property, Plant & Equipment**
Most of the Debtor's facilities and equipment are customized for specific uses and are not readily relocated. Accordingly, they are subject to very substantial discounting in a liquidation as evidenced by a Property, Plant and Equipment appraisal obtained by the Debtor in December 2003 on a "Net Orderly Liquidation" basis, which appraisal indicated a liquidation value of $3.2 million.
Property, Plant, and Equipment includes land, buildings, improvements, manufacturing equipment, office equipment and construction in progress shown at net book value. Recoveries of net property, plant, and equipment vary by category as follows: land and land improvements (10% to 20%, no appraisal available, contemplated environmental liabilities may erode recoveries); buildings and leasehold improvements (10% to 20%, no appraisal available); manufacturing equipment (5.7% to 7.1%, based on appraisal and management input); office equipment (1.4% to 2.8%, based on appraisal); construction in progress (1.4% to 2.8%, based on appraisal).

**( F )  Intercompany Note Receivable**
Intercompany notes receivable from RedBridge. The recovery is included in the recovery on investment in subsidiary (shown below).

**( G )  Investment in Subsidiary**
Represents the investments in Germany ($90.2 million) and RedBridge ($9.5 million).
Germany -- Asset sale values in a liquidation context are estimated at 4.75X (low) to 5.75X (high) 2005E EBITDA (approximately $33.2 million at a $1.1966/€exchange rate as of October 6, 2005). Assumes a stock sale of top tier German subsidiaries without a step-up in the tax basis of the German assets. Professional fees directly related to the sale of the German business are estimated at 1.25% of the Gross Purchase Price plus $0.4 million of direct legal, accounting and other expenses. Total net proceeds to the estate are estimated at $150 million (low) and $181 million (high).
RedBridge -- Asset sale values in a liquidation context are estimated at 4.0X (low) to 5.0X (high) 2005E EBITDA (approximately $2.4 million at a $1.762/£ exchange rate as of October 6, 2005). Assumes a stock sale of RedBridge with negligible income taxes. Professional fees directly related to the sale of RedBridge is estimated at 2.50% of the Gross Purchase Price plus $200,000 of direct legal, accounting and other expenses. Total net proceeds to the estate are estimated at $9 million (low) and $11 million (high).

**( H )  Goodwill**
Goodwill carrying values were reduced to zero in September 2003 based on an appraisal conducted by Deloitte and Touche in conjunction with the Debtor's annual impairment test pursuant to SFAS 142.

**( I )  Other Intangible Assets, net**
Represents vacuum bag related patents acquired as part of the Ahlstrom transaction December, 2002 and deferred financing costs related to the procurement and implementation of the Debtors' exit financing.

**( J )  Other Pension Assets**
Includes assets for two executive deferral plans for the benefit of a select group of management, highly compensated employees and directors. Supplemental Executive Retirement Plan (SERP) a defined benefit plan, unfunded for tax purposes and for purposes of Title I of ERISA. Pension benefits are based upon final average compensation and years of service. Benefits earned are subject to cliff vesting after fifteen (15) years or more of service. The other plan is a Deferred Compensation Plan that permits eligible participants to defer a specified portion of their compensation. The deferred compensation, together with certain company contributions, earns a guaranteed rate of return. The liquidation analysis assumes these assets are fully available to unsecured creditors without regard to vested or unvested claims.

**( K )  Chapter 7 Trustee Fees**

Chapter 7 trustee fees are estimated to be 3.0% of the estimated proceeds available for distribution.

**( L )  Professional Fees**

Professional fees are estimated at $4.5 million on the low end and $6.5 million on the high end.  All professional fees are contingent, subject to court approval, and accordingly, are subject to potential upward or downward adjustment, or disallowance in their entirety, by the Court.

**( M )  Cost to Finish WIP**

Reflects the payroll and related manufacturing costs to fully convert work in process inventory to finished goods at the Quakertown, Lowville, Brownville and Reading finishing mills.

**( N )  "Warn Act" Costs**

Reflects the payroll cost of employees for the federally mandated 60 day lay-off notice period for large employers ("Warn Act").   Includes all plant and corporate employees (including plant personnel associated with the Quakertown, Lowville, Brownville, Reading, Brattleboro, Warren Glen, Hughesville and South Hadley mills).

**( O )  Key Employee Severance Program (KESP) Costs**

Reflects severance payments pursuant to Court approved KESP.

**( P )  Corporate and Plant Personnel & Other Wind-down Costs**

Reflects the employment and overhead costs for corporate and plant personnel associated with the Quakertown, Lowville, Brownville, Reading, Brattleboro, Warren Glen, Hughesville and South Hadley mills after taking into account payroll costs incurred during the 60 day notice period under the "Warn Act" (2 to 3 months after the 60 day notice period).

**( Q )  Super-priority Creditors**

Approximately $18.1 million of secured claims including the General Electric Capital Corp - DIP Facility Claim of $7.7 million ( based on projected borrowings through 12/31/05) and $10.5 million in letters of credit.

**( R )  Secured Creditors**

Approximately $5.2 million of secured claims composed of various machinery and equipment loans.  In a hypothetical liquidation these claims are undersecured with the exception of the mechanic's liens.  The GECC Equipment Financing Claim is back stopped by a $1 million letter of credit against the DIP Facility which causes the projected 12/31/05 claim amount of $903,495 to be reduced to zero as shown.

**( S )  Administrative Chapter 11 Creditors**

Approximately $10.9 million of administrative Ch. 11 claims. These reflect the accrued value of post-petition Ch. 11 trade, professional fees, taxes, state grant claims, reclamation claims and commissions.  All professional fees are contingent, subject to court approval, and accordingly, are subject to potential upward or downward adjustment, or disallowance in their entirety, by the Court.  Reclamation claims are based on the debtor's best estimate prior to the claims reconciliation process and therefore may be subject to revision.  Administrative Ch. 11 claims are entitled to recover to the extent of any unencumbered proceeds before Ch. 11 priority claims.

The commission amount payable to Mr. Moore assumes the sale of all three facilities referenced in the Order Under 11 U.S.C. §§ 105(a), 363(a) and 363(f) (i) Approving Sales of Three Idle Facilities and (ii) Continuing Hearing with Respect  to Debtors' Motion Seeking Authorization to Assume, on Modified Terms, a Commission Agreement Related to Such Sales dated June 15, 2004.  The total amount payable to Mr. Moore is subject to certain potential reductions consistent with the Order Under 11 U.S.C. §§ 105(a), 327(a), and 365(a) and Fed. R. Bankr. P. 2014(a)  (i) Authorizing Assumption, on Modified Terms, of Commission Agreement Related to Sales of Three Idle Facilities and (ii) Authorizing Employment and Retention, as of the Petition Date, of Bruce P. Moore as Liquidator of Such Facilities dated September 13, 2004.

**( T )  Priority Chapter 11 Creditors**

Approximately $0.6 million of priority claims, reflects the adjusted value of pre-petition accrued taxes.  Priority claims are entitled to recover to the extent of any unencumbered proceeds before pre-petition, non-priority unsecured claims.

**( U )  Unsecured Creditors**

Approximately $387 million of unsecured claims -- representing $346 million of bond debt, $14 million of retiree medical claims, $7 million of Pension Benefit Guarantee Corporation (PBGC) claims, $5 million of contract rejection liabilities (the rejection damage claim estimate does not include rejection damage amounts attributable to certain contingent claims, such as claims for indemnification, arising under various contracts), $5 million of SERP & deferred compensation claims, $7 million of primarily trade debt and $3 million on the unsecured portion of secured claims. These are entitled to recover after all other claims have recovered in full. Unsecured claims must recover in full prior to any distributions to equity.

Substantive Consolidation Note:

This liquidation analysis assumes that the Chapter 7 trustee will obtain an order of substantive consolidation with respect to the assets and liabilities of the Debtors, for the reasons set forth in Article VII. B. of the Disclosure Statement.

**APPENDIX E**

**COMMITMENT LETTER**

SILVER POINT FINANCE, LLC
2 Greenwich Plaza
1st Floor
Greenwich, CT  06830


GENERAL ELECTRIC CAPITAL
CORPORATION
201 Merritt 7
Norwalk, Connecticut 06856-5201


August 22, 2005


FiberMark, Inc.
161 Wellington Road
P.O. Box 498
Brattleboro, Vermont 05032
Attention: John E. Hanley
            Vice President and
            Chief Financial Officer

FiberMark North America, Inc.
161 Wellington Road
P.O. Box 498
Brattleboro, Vermont 05032
Attention: John E. Hanley
            Vice President and
            Chief Financial Officer

FiberMark Lahnstein GmbH & Co. OHG
Auf Brühl 15-27
56112 Lahnstein
Germany
Attention: Alex Kwader

FiberMark Services GmbH & Co. KG
Otto-von-Steinbeisstrasse 14b
83052 Bruckmühl
Germany
Attention: Alex Kwader

FiberMark, Inc.
FiberMark North America, Inc.
FiberMark Lahnstein GmbH & Co. OHG
FiberMark Services GmbH & Co. KG
FiberMark Gessner GmbH & Co. OHG
August 22, 2005
Page 2

FiberMark Gessner GmbH & Co. OHG
Otto-von-Steinbeisstrasse 14 b
83052 Bruckmühl
Germany
Attention: Alex Kwader

Re:     Financing Commitment

Ladies and Gentlemen:

FiberMark, Inc. ("FiberMark"), FiberMark North America, Inc. ("FNA", and together with FiberMark, each a "U.S. Borrower" and collectively the "U.S. Borrowers"), FiberMark Lahnstein GmbH & Co. OHG ("FiberMark Lahnstein"), FiberMark Services GmbH & Co. KG ("FiberMark Services") and FiberMark Gessner GmbH & Co. OHG ("FiberMark Gessner", and together with FiberMark Lahnstein and FiberMark Services, each a "German Borrower" and collectively, the "German Borrowers" ) and certain of their respective subsidiaries (together with each of the U.S. Borrowers and German Borrowers, each a "Company", and collectively, the "Companies") have advised Silver Point Finance, LLC (together with or one or more of its affiliates, hereinafter referred to as "Silver Point") and General Electric Capital Corporation (together with or one or more of its affiliates, hereinafter referred to as "GE Capital"; and together with Silver Point, each a "Lender" and collectively, the "Lenders"),  that they would like to obtain financing to refinance the U.S. Borrowers' Debtor-in-Possession credit facilities and the German Borrowers' working capital facilities and provide for ongoing working capital needs, payments to the Companies' pre-petition creditors and general corporate purposes (collectively, the "Transaction").

Silver Point is pleased to offer its commitment to provide the Companies with a term credit facility of  $75,000,000 (the "Term Financing Facility") and GE Capital is pleased to offer its commitment to provide the Companies with (a) a United States revolving credit facility (the "U.S. Revolving Facility") of up to $30,000,000 and (b) a German revolving credit facility (the "German Facility") of up to €40,000,000 (collectively, the "Revolving Financing Facilities"; and together with the Term Financing Facility, the "Financing Facilities") substantially on the terms and conditions set forth in the Summary of Terms and Conditions of Senior Secured Credit Facilities attached hereto as Exhibit A (the "Term Sheet"; capitalized terms used in this letter without definition shall have the meanings ascribed thereto  in the Term Sheet).  The commitments of Silver Point and GE Capital under this commitment letter (the "Commitment Letter") are several and not joint. The obligations of the U.S. Borrowers and the U.S. Guarantors will be secured by a lien on, and security interest in (the "U.S. Collateral"), substantially all of the assets of the U.S. Borrowers and the U.S. Guarantors (as described in more detail in the Term Sheet and subject to certain exceptions as further described therein) and the obligations of the

FiberMark, Inc.
FiberMark North America, Inc.
FiberMark Lahnstein GmbH & Co. OHG
FiberMark Services GmbH & Co. KG
FiberMark Gessner GmbH & Co. OHG
August 22, 2005
Page 3

German Borrowers and the German Guarantors will be secured by a lien on, and security interest in, substantially all of the assets of the German Borrowers and the German Guarantors (as described in more detail in the Term Sheet and subject to certain exceptions as further described therein). The U.S. Collateral will also secure the German Facility on a subordinated basis to the U.S. Revolving Facility and the Term Financing Facility. The Lenders' commitments to provide the Financing Facilities are subject in all respects to satisfaction of the terms and conditions contained in this Commitment Letter and in the Term Sheet.

The parties hereby acknowledge that due to local German law restrictions, the documentation will provide that neither the U.S. Revolving Facility nor the Term Facility will be (i) guaranteed by any of the German Borrowers or German Guarantors (other than those German Guarantors that are also U.S. Guarantors) or (ii) secured by any collateral granted by the German Borrowers or German Guarantors (other than those German Guarantors that are also U.S. Guarantors).

Each U.S. Borrower and German Borrower (each a "Fibermark Borrower" and collectively, the "FiberMark Borrowers"), on behalf of itself and the other Companies, acknowledges that the Term Sheet is intended as an outline only and does not purport to summarize all the conditions, covenants, representations, warranties and other provisions which would be contained in definitive legal documentation for the Financing Facilities. The loan documentation for the Financing Facilities will include, in addition to the provisions that are summarized in this Commitment Letter and the Term Sheet, provisions that, in the reasonable opinion of the Lenders, are customary or typical for this type of financing transaction or the business of the Companies.

By its execution hereof and its acceptance of this Commitment Letter, each of the U.S. Borrowers jointly and severally among them (subject to the approval by an order of the United States Bankruptcy Court for the District of Vermont (the "Bankruptcy Court") presiding over In re: FiberMark, Inc., FiberMark North America, Inc. and FiberMark International Holdings LLC, as Debtors, Case No. 04-10463 cab, jointly administered (the "Bankruptcy Case") and, separately and not jointly with the U.S. Borrowers, the German Borrowers jointly and severally among them, agrees to (i) indemnify and hold harmless each Lender and each Lender's assignees and each of their affiliates, directors, officers, employees and agents (each an "Indemnified Party") from and against any and all losses (other than lost profits), claims, damages, liabilities or other reasonable and documented out-of-pocket expenses to which such Indemnified Party may become subject, insofar as such losses (other than lost profits), claims, damages, liabilities or other reasonable and documented expenses arise out of or relate to or result from, this Commitment Letter or the extension of the Financing Facilities contemplated by this Commitment Letter, or arise from any use or intended use of this Commitment Letter or the proceeds of the Financing Facilities contemplated by this Commitment Letter, and (ii) reimburse

FiberMark, Inc.
FiberMark North America, Inc.
FiberMark Lahnstein GmbH & Co. OHG
FiberMark Services GmbH & Co. KG
FiberMark Gessner GmbH & Co. OHG
August 22, 2005
Page 4

each Indemnified Party for any reasonable legal or other reasonable and documented out-of-pocket expenses incurred in connection with investigating, defending or participating in any such loss (other than lost profits), claim, damage or liability, but in each case excluding therefrom all expenses, losses, claims, damages and liabilities which are finally determined in a non-appealable decision of a court of competent jurisdiction to have resulted from the gross negligence or willful misconduct of such Indemnified Party. In the event of any litigation or dispute involving this Commitment Letter or the Financing Facilities, each FiberMark Borrower and each Lender agree that neither any Indemnified Party, on the one hand, nor any Company or its affiliates, directors, officers, employees or agents, on the other hand, shall be responsible or liable to the other, or any other person, for any special, indirect, consequential, incidental or punitive damages. In addition, each of the U.S. Borrowers jointly and severally among them (subject to the approval by an order of the Bankruptcy Court), and, separately and not jointly with the U.S. Borrowers, the German Borrowers jointly and severally among them, agrees to reimburse each Lender for all of such Lender's reasonable fees and reasonable and documented out-of-pocket expenses (the "Expenses") incurred by or on behalf of such Lender in connection with the negotiation, preparation, execution and delivery of this Commitment Letter, the Term Sheet and any and all definitive documentation relating hereto and thereto, including, but not limited to, the reasonable fees and reasonable and documented expenses of counsel to each Lender and the reasonable fees and reasonable and documented out-of-pocket expenses incurred by each Lender in connection with any due diligence, collateral reviews, valuations, field examinations and syndication expenses. The obligations of each U.S. Borrower as among the U.S. Borrowers shall be joint and several and the obligations of each German Borrower as among the German Borrowers shall be joint and several. The compensation, reimbursement, indemnification and confidentiality provisions contained herein and in the Fee Letters shall remain in full force and effect notwithstanding the termination of this Commitment Letter or each Lender's commitment hereunder, unless and until such provisions are superseded and replaced by corresponding provisions that are contained in definitive loan documentation governing the Financing Facilities that shall have been executed by the parties hereto.

The respective commitments of Silver Point and GE Capital hereunder are conditioned upon (i) the payment of certain fees in the amount and on the dates of those certain letters (the "Fee Letters") of even date herewith by and among the parties to this letter and (ii) receipt by Silver Point of an expense deposit of $125,000 (the "Expense Deposit") to fund Expenses incurred by Silver Point and GE Capital. The Expense Deposit will be applied to Expenses of Silver Point and GE Capital as and when they are incurred. If less than $125,000 of Expenses are incurred by or on behalf Silver Point and GE Capital, the unused portion of the Expense Deposit will be returned promptly to FiberMark. Each Lender may request an additional expense deposit if the amount of Expenses incurred or to be incurred by or on behalf of such Lender in connection with the Financing Facilities exceeds or is expected to exceed the amount of the Expense Deposit; provided, however, that compliance by the U.S. Borrowers with

FiberMark, Inc.
FiberMark North America, Inc.
FiberMark Lahnstein GmbH & Co. OHG
FiberMark Services GmbH & Co. KG
FiberMark Gessner GmbH & Co. OHG
August 22, 2005
Page 5

such Lender's request will be subject to prior approval by order of the Bankruptcy Court. The Expense Deposit will not be segregated and may be commingled with other funds and FiberMark will not be entitled to receive interest on the Expense Deposit.

Each Lender's commitment to provide the Financing Facilities is subject to (i) the negotiation, execution and delivery of definitive loan and intercreditor documentation in form and substance reasonably satisfactory to such Lender, the FiberMark Borrowers and their respective counsel, (ii) the satisfaction of such Lender that since the date hereof there has not occurred or become known to such Lender any material adverse change with respect to the condition, financial or otherwise, business, operations or assets of either the U.S. Borrowers and U.S. Guarantors, taken as a whole, or the German Borrowers and German Guarantors, taken as a whole (a "Material Adverse Change") (other than as disclosed in writing to both Silver Point and GE Capital prior to the date hereof by the FiberMark entities or any of their respective advisors), and (iii) such other customary conditions as are set forth in the Term Sheet. If at any time any Lender shall in its reasonable business judgment determine that any Material Adverse Change has occurred, such Lender may terminate this Commitment Letter (which shall then terminate with respect to all parties, including the other Lender) by giving written notice thereof to the FiberMark Borrowers and the other Lender (subject to the obligation of the FiberMark Borrowers to pay all reasonable fees, and reasonable and documented out-of-pocket costs and expenses and other payment obligations expressly assumed by the FiberMark Borrowers hereunder and in accordance with the terms hereof, which shall survive the termination of this Commitment Letter).

Each U.S. Borrower represents and warrants that (i) all written information and other relevant materials, other than the Projections (as defined below) concerning such U.S. Borrower and the other Companies (collectively, the "Information") which has been, or is hereafter, made available by, or on behalf of such U.S. Borrower or any other Company when furnished was, or when delivered will be, complete and correct in all material respects and does not, or will not when delivered, contain any untrue statement of material fact or, when taken as a whole, omit to state a material fact necessary in order to make the statements contained therein not materially misleading in light of the circumstances under which such statement has been made and (ii) all financial projections concerning the Companies prepared by the Companies and/or their respective advisors (the "Projections") that have been or are hereafter made available to any Lender were, or when delivered will be, prepared in good faith on the basis of (A) assumptions believed by the management of such U.S. Borrower and the other Companies to be reasonable at the time made and (B) information believed by the management of such U.S. Borrower and the other Companies to have been accurate in all material respects based upon the information available to the management of such U.S. Borrower and the other Companies at the time such Projections were furnished to such Lender. Each German Borrower represents and warrants that (i) all written information and other relevant materials, other than the Projections,

FiberMark, Inc.
FiberMark North America, Inc.
FiberMark Lahnstein GmbH & Co. OHG
FiberMark Services GmbH & Co. KG
FiberMark Gessner GmbH & Co. OHG
August 22, 2005
Page 6

concerning the German Borrowers which has been, or is hereafter, made available by, or on behalf of such German Borrowers when furnished was, or when delivered will be, complete and correct in all material respects and does not, or will not when delivered, contain any untrue statement of material fact or, when taken as a whole, omit to state a material fact necessary in order to make the statements contained therein not materially misleading in light of the circumstances under which such statement has been made and (ii) all Projections concerning the German Borrowers that have been or are hereafter made available to any Lender were, or when delivered will be, prepared in good faith on the basis of (A) assumptions believed by the management of such German Borrowers to be reasonable at the time made and (B) information believed by the management of such German Borrowers to have been accurate in all material respects based upon the information available to the management of such German Borrowers at the time such projections were furnished to such Lender. The Lenders recognize, understand and acknowledge that such Projections are subject to significant uncertainties and contingencies, many of which are beyond the Companies' control, and that no assurances can be given that the Projections will be realized.

This Commitment Letter is delivered to the FiberMark Borrowers upon the condition that, prior to the disclosure hereof in connection with the filing of the U.S. Borrowers Disclosure Statement with the Bankruptcy Court outlining its proposed plan of reorganization (which each Lender hereby consents to), neither the existence of this Commitment Letter or the Term Sheet, nor any of their contents, shall be disclosed by any FiberMark Borrower or any other Company, except (i) as required by law, regulation or legal process (including, without limitation, the Bankruptcy Court and any other court of competent jurisdiction that presides over the Bankruptcy Case), or (ii) on a confidential and "need to know" basis in connection with the transactions contemplated hereby to the directors, officers, employees, advisors and agents of the Companies. In addition, each FiberMark Borrower agrees that it will (i) consult with each Lender prior to the making of any filing in which reference is made to such Lender or the commitment of such Lender contained herein, and (ii) obtain the prior approval (not to be unreasonably withheld or delayed) of each Lender before releasing any public announcement in which reference is made to such Lender or to the commitment contained herein, except for such disclosures permitted pursuant to clauses (i) and (ii) of the immediately preceding sentence. Each FiberMark Borrower acknowledges that one or both of the Lenders and their affiliates may now or hereafter provide financing or obtain other interests in other companies in respect of which such FiberMark Borrower or its affiliates may be business competitors, and that neither of the Lenders nor any of their affiliates will have any obligation to provide to such FiberMark Borrower or any of its affiliates any confidential information obtained from such other companies. Neither Silver Point nor GE Capital will use "confidential information", as hereinafter defined (including without limitation, the Information and the Projections) obtained from the Companies or their respective representatives by virtue of the Transaction contemplated by this Commitment Letter and the Term Sheet in connection with the performance by Silver

FiberMark, Inc.
FiberMark North America, Inc.
FiberMark Lahnstein GmbH & Co. OHG
FiberMark Services GmbH & Co. KG
FiberMark Gessner GmbH & Co. OHG
August 22, 2005
Page 7

Point or GE Capital of services for other persons or entities, and neither Silver Point or GE Capital will furnish any such information to such other persons or entities; provided, however, each of Silver Point and GE Capital shall be permitted to so use and disclose such confidential information to the extent that the information is already available or known to the public or such confidential information is legally required to be disclosed by Silver Point or GE Capital, as applicable. All material, non-public documents, agreements, records, reports, data, forecasts, projections, business plans, interpretations, audit reports, and all material non-public other information, written, visual or oral regardless of how transmitted, shall constitute "confidential information" (a) if pertaining to the financial condition or performance of any FiberMark entity, the business operations of any FiberMark entity, or the valuation of any FiberMark entity and/or its assets, or (b) if designated by any FiberMark entity as "confidential" by a separate written notice to Silver Point and/or GE Capital, as applicable, at the time of their production that specifically identifies the documents or materials as "confidential," or by stamping the documents, materials or information with the legend "CONFIDENTIAL" prior to their production.

Although the commitment of the Lenders in this Commitment Letter is for the entire Financing Facilities, the Companies acknowledge that either Lender may syndicate its portion of the Financing Facilities to certain other lenders (in accordance with the Term Sheet) with a corresponding reduction of such Lender's share of the Financing Facility. Each Lender will manage all aspects of its syndication, including the timing of all offers to potential lenders and the acceptance of commitments, the amount offered, the structure of loans and the compensation provided, and each FiberMark Borrower agrees to cooperate, and to cause the other Companies to cooperate, with the syndication by the Lenders of the Financing Facilities. Each Lender will consult with FiberMark (and obtain the approval of the FiberMark Borrowers with respect to the assignment of any of its commitments hereunder to the extent required by the Term Sheet, such approval not to be unreasonably withheld), and keep FiberMark informed of the status of, its syndication of the Financing Facilities.

The offer made by the Lenders in this Commitment Letter shall expire, unless otherwise agreed by each Lender in writing, at the earlier of (i) 5:00 p.m. (New York City time) on August 25, 2005, unless prior thereto each Lender has received a copy of this Commitment Letter, signed by the FiberMark Borrowers accepting the terms and conditions of this Commitment Letter and the Term Sheet, and (ii) 2:00 p.m. (New York City time) on August 26, 2005, unless prior thereto each Lender has received the commitment fees payable to such Lender pursuant to the Fee Letters, in immediately available funds. The commitment by the Lenders to provide the Financing Facilities shall expire at 5:00 p.m. (New York City time) on November 30, 2005, unless prior thereto, (x) definitive loan documentation shall have been agreed to in writing by all parties and the conditions set forth therein shall have been satisfied or (y) each Lender in its sole discretion shall have extended such expiration date (it being understood that the

FiberMark, Inc.
FiberMark North America, Inc.
FiberMark Lahnstein GmbH & Co. OHG
FiberMark Services GmbH & Co. KG
FiberMark Gessner GmbH & Co. OHG
August 22, 2005
Page 8

FiberMark Borrowers' obligations to pay all amounts in respect of indemnification and Expenses shall survive termination of this Commitment Letter).

This Commitment Letter, including the attached Term Sheet (i) supersedes all prior discussions, agreements, commitments, arrangements, negotiations or understandings, whether oral or written, of the parties with respect thereto, (ii) shall be governed by the law of the State of New York, (iii) shall be binding upon the parties and their respective successors and assigns, (iv) may not be relied upon or enforced by any other person or entity, and (v) may be signed in multiple counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument. If this Commitment Letter becomes the subject of a dispute, each of the parties hereto hereby waives trial by jury. This Commitment Letter may be amended, modified or waived only in a writing signed by the parties hereto.

[Signature Page to Follow]

FiberMark, Inc.
FiberMark North America, Inc.
FiberMark Lahnstein GmbH & Co. OHG
FiberMark Services GmbH & Co. KG
FiberMark Gessner GmbH & Co. OHG
August 22, 2005
Page 9

Very truly yours,

SILVER POINT FINANCE, LLC

By: _____

Name:
Title:

Frederick H. Fogel
Authorized Signatory

GENERAL ELECTRIC CAPITAL
CORPORATION

By: _____

Name:
Title:

ACCEPTED AND AGREED TO
this ___ day of August, 2005

FIBERMARK, INC.

By:_____
Name:
Title:

FIBERMARK NORTH AMERICA, INC.

By:_____
Name:
Title:

Very truly yours,

SILVER POINT FINANCE, LLC

By:_____

Name:

Title:

GENERAL ELECTRIC CAPITAL
CORPORATION

By:_____

Name:

Title:    PHILIP F. CARFORA

        DULY AUTHORIZED SIGNATORY

FiberMark, Inc.
FiberMark North America, Inc.
FiberMark Lahnstein GmbH & Co. OHG
FiberMark Services GmbH & Co. KG
FiberMark Gessner GmbH & Co. OHG
August 22, 2005
Page 9

Very truly yours,

SILVER POINT FINANCE, LLC

By: _____
    Name:
    Title:

GENERAL ELECTRIC CAPITAL
CORPORATION

By: _____
    Name:
    Title:

ACCEPTED AND AGREED TO
this 22nd day of August, 2005

FIBERMARK, INC.

By: _____
Name: _John E. Hanley_
Title: _VP CFO_

FIBERMARK NORTH AMERICA, INC.

By: _____
Name: _John E. Hanley_
Title: _VP CFO_

FiberMark, Inc.
FiberMark North America, Inc.
FiberMark Lahnstein GmbH & Co. OHG
FiberMark Services GmbH & Co. KG
FiberMark Gessner GmbH & Co. OHG
August 22, 2005
Page 10


FIBERMARK LAHNSTEIN GMBH & CO. OHG

By: _____

Name:  Alex Kwader

Title:  In his position as managing director of
        FiberMark Beteiligungs GmbH, in turn
        the managing partner


FIBERMARK GESSNER GMBH & CO. OHG

By: _____

Name:  Alex Kwader

Title:  In his position as managing director of
        FiberMark Beteiligungs GmbH, in turn
        the general partner of FiberMark
        GmbH & Co. KG, in turn the
        managing partner


FIBERMARK SERVICES GMBH & CO. KG

By: _____

Name:  Alex Kwader

Title:  In his position as managing director of
        FiberMark Beteiligungs GmbH, in turn
        the general partner of FiberMark
        Services GmbH & Co. KG

**FiberMark, Inc.**
**FiberMark North America, Inc.**
**FiberMark Lahnstein GmbH & Co. OHG**
**FiberMark Gessner GmbH & Co. OHG**
**FiberMark Services GmbH & Co. KG**

## Summary of Terms and Conditions of Senior Secured Credit Facilities

This Summary of Terms and Conditions of Senior Secured Credit Facilities is part of the Commitment Letter, dated August 22, 2005 (the "Commitment Letter"), addressed to FiberMark, Inc., FiberMark North America, Inc., FiberMark Lahnstein GmbH & Co. OHG, FiberMark Gessner GmbH & Co. OHG, and FiberMark Services GmbH & Co. KG (collectively, the "FiberMark Borrowers") by Silver Point Finance, LLC and General Electric Capital Corporation and is subject to the terms and conditions of the Commitment Letter. Capitalized terms used herein shall have the meanings set forth in the Commitment Letter unless otherwise defined herein.

## U.S. BORROWER FACILITIES

| | |
|---|---|
| **U.S. Borrowers:** | FiberMark, Inc. ("FM") and FiberMark North America, Inc. ("FNA", and together with FM, the "U.S. Borrowers"). |
| **U.S. Guarantors:** | FM and FNA and any other domestic subsidiaries of FM, other than FiberMark International Holdings, LLC ("FIH") (collectively, the "U.S. Guarantors"). |
| **Administrative and Collateral Agents:** | Silver Point Finance, LLC will be the administrative agent with respect to the Term Loan (the "Term Loan Agent" or "Silver Point") and GE Capital will be the administrative agent with respect to the U.S. Revolver (the "U.S. Revolving Loan Agent" or "GE Capital"). |
| | Silver Point will be the Collateral Agent with respect to the Term Loan (hereinafter referred to as the "Term Loan Collateral Agent" and GE Capital will be the Collateral Agent with respect to the U.S. Revolver (the "U.S. Revolver Collateral Agent"). The Term Loan Agent, the U.S. Revolving Loan Agent, the Term Loan Collateral Agent and the U.S. Revolver Collateral Agent are sometimes referred to herein collectively as the U.S. Agents"). |
| **Term Loan Lenders:** | Silver Point and one or more of its affiliates or other lenders providing the Term Loan designated by Silver Point in |

consultation with the U.S. Borrowers.

| | |
|---|---|
| **U.S. Revolving Loan Lenders:** | GE Capital and one or more of its affiliates or other lenders providing the U.S. Revolver designated by GE Capital in consultation with the U.S. Borrowers. As used herein "U.S. Lenders" shall mean the U.S. Revolving Loan Lenders and the Term Loan Lenders. |
| **U.S. Facilities:** | On the closing date, the U.S. Revolving Loan Lenders will provide to U.S. Borrowers a $30 million revolving credit facility (the "U.S. Revolver") and (ii) Term Loan Lenders will provide to U.S. Borrowers a term loan of $75 million (the "Term Loan", together with the U.S. Revolver, the "U.S. Facility"). |
| **Letters of Credit:** | At the U.S. Borrowers' option, a portion of the U.S. Revolver not to exceed $15 million may be made available for the issuance of letters of credit ("Letters of Credit"). Letters of Credit would be issued either by a bank and/or by GE Capital and/or one of its affiliates on terms reasonably acceptable to the U.S. Borrowers and GE Capital. The face amount of all outstanding letters of credit under the U.S. Revolver would reduce availability under the U.S. Revolver. |
| **Use of Proceeds:** | Loans under the U.S. Facility made on the closing date will be used: (i) to fund the plan of reorganization in the Bankruptcy Case; (ii) for general corporate purposes; and (iii) to refinance certain of U.S. Borrowers' existing indebtedness. Advances made on the U.S. Revolver after the closing date will be used: (i) to fund the plan of reorganization in the Bankruptcy Case; (ii) for the U.S. Borrowers' working capital needs; (iii) to fund the U.S. Borrowers' capital expenditures; and (iv) other corporate purposes, to be determined in each case at the U.S. Borrowers' sole discretion, including, without limitation, the payment when due of interest on the U.S. Borrowers' indebtedness. |
| **Availability:** | Lesser of $30 million or the U.S. Borrowing Base (as defined below), calculated based on advance rates against eligible domestic accounts and eligible domestic inventory. The U.S. Borrowing Base will include the assets of the U.S. Borrowers. The U.S. Revolver Collateral Agent will retain the right from time to time to establish or modify advance rates, standards of eligibility and reserves against availability. |
| | The U.S. Borrowing Base will be computed consistent with the U.S. Borrowers pre-petition credit facility with GE Capital (the "Pre-Petition Facility"). |

- 2 -

The "U.S. Borrowing Base" shall be constitute the sum of (i) up to 85% on U.S. Borrowers' eligible accounts receivable, plus (ii) up to the lesser of (A) 60% of U.S. Borrowers' eligible inventory valued at the lower of cost (FIFO) or market and (B) 85% of the appraised net orderly liquidation value of U.S. Borrowers' eligible inventory, plus (iii) up to the lesser of (A) $2.8 million and (B) 85% of the appraised net orderly liquidation value of U.S. Borrowers' eligible machinery and equipment, in each case, less reserves. The face amount of all letters of credit outstanding under the Letter of Credit subfacility will reduce such availability.

**Maturity:**

Five (5) years from the closing date.

**U.S. Security:**

The obligations of the U.S. Borrowers and the U.S. Guarantors under and with respect to the U.S. Revolver will be secured by: (i) a first-priority security interest in substantially all of the assets of the U.S. Borrowers and the U.S. Guarantors; (ii) a pledge by FM of 100% of all of the issued and outstanding capital stock of FNA; (iii) a pledge by FNA of 100% of all of the issued and outstanding capital stock of its U.S. subsidiaries, if any; (iv) a pledge by FM of 65% of the stock of: (a) FIH, and (b) each "first tier" foreign subsidiary of FM; and (v) a pledge by FIH of 65% of each "first tier" foreign subsidiary of FIH (collectively, (i), (ii), (iii), (iv) and (v) the "U.S. Collateral"). The U.S. Collateral will be subject to certain customary limitations, exceptions and exclusions to be agreed upon by the U.S. Borrowers and the U.S. Agents.

The obligations of the U.S. Borrowers under the Term Loan will be secured by a second-priority security interest in the U.S. Collateral junior only to the liens securing the U.S. Revolver.

The liens securing the U.S. Revolver will be first in priority to the liens securing the Term Loan and any permitted refinancings thereof. The priority of the security interests and related creditor rights between the U.S. Revolver and the Term Loan will be set forth in an intercreditor agreement (the "Intercreditor Agreement") on terms and conditions reasonably satisfactory to the U.S. Agents and the U.S. Borrowers. A summary of certain material terms and conditions of such Intercreditor Agreement are set forth on Exhibit B attached to the Commitment Letter.

The obligations of the U.S. Borrowers will not be supported

- 3 -

by guarantees from or any property or assets of (i) FIH or (ii) any non-U.S. direct or indirect subsidiaries of either of the U.S. Borrowers.

Proceeds of the property or assets of U.S. Guarantors securing their guarantee of the obligations arising under the German Facility described below shall be applied first to the obligations arising under the U.S. Facility until paid in full (including cash collateralization of outstanding Letters of Credit) and then to such guarantee obligations.

Cash management systems reasonably acceptable to the Agents shall be in place for the U.S. Borrowers and each U.S. Guarantor.

**Interest Rates:**        At the option of any U.S. Borrower prior to default, the U.S. Revolver shall bear interest at a rate per annum equal to either (x) the LIBOR Rate (as defined below) plus 2.25% or (y) the Reference Rate (as defined below) plus 0.75%, and in each case, subject to a pricing grid.

At the option of any U.S. Borrower prior to default, amounts outstanding under the Term Loan would bear interest at either (x) the LIBOR Rate plus 6.50% per annum (the "LIBOR Margin") or (y) the Reference Rate plus 5.00% per annum (the "Reference Rate Margin").

All interest would be calculated based upon a year of 360 days for actual days elapsed. All interest would accrue from the closing date and would be payable monthly in arrears in cash.

As used herein (x) "LIBOR Rate" means the rate per annum, determined by the applicable Lender in accordance with its customary procedures, and utilizing such electronic or other quotation sources as it considers appropriate, on the basis of the rates at which dollar deposits are offered to major banks in the London interbank market, adjusted by the reserve percentage prescribed by governmental authorities as determined by the applicable Lender, provided that, at no time shall the LIBOR Rate be less than 3.00% and (y) "Reference Rate" means the greater of (1) the rate of interest publicly announced from time to time by a commercial bank selected by the applicable Agent as its reference rate, base rate or prime rate, and (2) the Federal Funds rate plus 0.50%, provided that, at no time shall the Reference Rate be less than 4.50%. If any Event of Default shall occur and be continuing, interest shall accrue at a rate per annum equal to 2.00% above

- 4 -

the rate previously applicable to such obligation, payable on demand.

Each U.S. Lender's obligation to provide LIBOR Rate loans shall be subject to (a) a maximum number of interest periods, interest periods of certain specified lengths, and a minimum amount and integral multiple levels of the LIBOR Rate loans, in each case as is customary for such loans and to be set forth in the definitive loan documentation, and (b) the U.S. Borrowers shall be responsible for any reasonable and customary breakage fees, yield maintenance, or other associated costs, as reasonably determined by the U.S. Lenders.

**Letter of Credit Fees:**  A fee equal to the product of (i) 2.25% per annum (calculated on the basis of a 360-day year and actual number of days elapsed), <u>multiplied by</u> (ii) the average daily maximum aggregate amount available to be drawn under all Letters of Credit, will be payable monthly in arrears to the U.S. Revolving Loan Lenders. In addition, a fronting fee, to be agreed upon between the issuer of each Letter of Credit and the U.S. Borrowers, will be payable to such issuer, as well as certain customary fees assessed thereby.

**Unused U.S. Revolver Fee:**  An unused line fee equal to the product of (i) 0.50% per annum (calculated on the basis of a 360 day year and actual number of days elapsed), multiplied by (ii) the daily average undrawn portion of the U.S. Revolver (reduced by the amount of Letters of Credit issued and outstanding) will accrue from the closing date and shall be payable monthly in arrears.

**Mandatory Prepayment:**  Excess cash flow sweeps in an amount to be determined. Subject to carve-outs to be agreed, 100% of asset sale proceeds, 75% of equity proceeds, 100% of insurance events. Definitive mandatory prepayment provisions shall be determined based upon final deal structure. Mandatory prepayment shall be applied first to the outstanding balance of the U.S. Revolver (and to cash collateralize outstanding Letters of Credit) with a corresponding reduction in the U.S. Revolver commitments to the extent the aggregate amount of all such prepayments from excess cash flow, asset sales, equity issuances and insurance events exceed an amount to be mutually agreed upon, and thereafter to the unpaid amounts under the Term Loan. The Term Loan Lenders (or any of them) at their option may waive the requirement that the U.S. Borrowers make any such mandatory prepayment owing to such Term Loan Lender.

In the event the sum of (i) the outstanding borrowings under the U.S. Revolver plus (ii) the aggregate amount of Letters of Credit issued under the U.S. Revolver exceeds the U.S. Borrowing Base, the U.S. Borrowers shall repay loans (and/or cash collateralize outstanding Letters of Credit) in an amount sufficient such that the total outstanding borrowings and Letters of Credit referred to above do not exceed the U.S. Borrowing Base.

**Optional Prepayments:**

Loans made under the U.S. Facility may be prepaid in whole or in part. The U.S. Borrowers will bear all reasonable and customary breakage costs related to the prepayment of a Loan prior to the last day of the interest period.

**Early Termination Fees:**
**Term Loans:**

The following fees shall be payable on any Term Loans repaid during the periods indicated:

| Year | Fee |
|------|-------|
| 1 | 3.50% |
| 2 | 2.50% |
| 3 | 1.00% |

**Early Termination Fee for U.S. Revolver:**

Payable in the event the commitment amount of the U.S. Revolver is reduced or terminated, as appropriate, multiplied by 0.50% in the first year.

**Representations and Warranties:**

Usual and customary representations and warranties for a facility of this type (with exceptions and materiality thresholds to be agreed), including, without limitation: (i) corporate existence and good standing; (ii) due authorization, execution, delivery and enforceability of the loan documentation; (iii) no governmental or regulatory approvals required (other than the Bankruptcy Court, as applicable); (iv) non-violation of other existing material agreements or laws as a result of execution, delivery and performance of the loan documentation; (v) accuracy of information and financial statements delivered by U.S. Borrowers; (vi) no litigation that could reasonably be expected to have a "Material Adverse Effect" (defined as a material adverse effect on the condition, financial or otherwise, business, operations or assets of either the U.S. Borrowers and U.S. Guarantors, taken as a whole, or the German Borrowers and German Guarantors, taken as a whole); (vii) material compliance with laws and regulations

- 6 -

(including, applicable environmental laws, ERISA and payment of taxes); (ix) maintenance of insurance; (x) ownership of real and personal property (including intellectual property and deposit and other accounts); (xi) absence of material matters related to labor; (xii) not an investment company or public utility holding company; (xiii) loan proceeds not used to acquire margin stock; (xiv) no broker used in obtaining financing; (xv) since the effective date of the plan of reorganization, the absence of "<u>Material Adverse Change</u>" (defined as a material adverse change on the condition, financial or otherwise, business, operations or assets of either the U.S. Borrowers and U.S. Guarantors, taken as a whole, or the German Borrowers and German Guarantors, taken as a whole); (xvi) absence of default or unmatured default under the U.S. Facility; and (xvii) solvency of U.S. Borrowers.

**Covenants:**    Usual and customary affirmative and negative covenants for a facility of this type (with exceptions and materiality thresholds to be agreed), including without limitation: (i) maintenance of existence and conduct of business; (ii) payment of taxes; (iii) provision of financial statements and borrowing base reports (see "<u>Financial Reporting</u>" section below); (iv) provision of notices regarding material litigation, events of default and unmatured defaults; (v) inspection of properties by the U.S. Agents or their representatives, (vi) maintenance of books and records; (vii) maintenance of insurance; (viii) limitations with respect to (A) liens and encumbrances, (B) payment of dividends and repurchases or retirement of capital stock, (C) guarantees, (D) sale and lease back transactions, (E) consolidations and mergers, (F) investments, (G) capital expenditures, (H) loans and advances, (I) indebtedness, (J) operating leases, (K) transactions with affiliates, and (L) repurchases or prepayment of other indebtedness; and (ix) material compliance with laws and regulations (including, applicable environmental laws, ERISA and payment of taxes).

Financial covenants based on a customary discount to the U.S. Borrowers' projections to include, minimum fixed charge ratio, maximum total debt to trailing twelve month EBITDA and maximum capital expenditures, in each case to be agreed upon by the U.S. Borrowers and the U.S. Agents.

Financial reporting to include: (i) annual, audited financial statements, (ii) quarterly, internally prepared, financial statements, (iii) monthly, internally prepared, financial statements, (iv) annual projections including monthly balance

- 7 -

sheet, profit and loss, cash flow figures, leverage levels and fixed charge coverage, (v) monthly, and in certain circumstances weekly borrowing base and related collateral reports, and (vi) other reporting as reasonably required by the U.S. Agents.

**Collateral Audits:**  The definitive documentation for the U.S. Revolver will also provide that the U.S. Revolver Collateral Agent shall be entitled to conduct periodic collateral audits; provided that, so long as no event of default has occurred and is continuing, the U.S. Borrowers shall not be responsible for the costs of the U.S. Revolver Collateral Agent associated with more than three such audits in any fiscal year.

**Events of Default:**  Usual and customary for a facility of this type (with customary and appropriate grace periods and materiality thresholds to be agreed), including, without limitation: (i) failure to make payments when due; (ii) cross-defaults (after the expiration of any applicable grace periods) in respect of certain other material indebtedness; (iii) violation of covenants, (iv) breaches of representations or warranties in any material respect; (v) judgments in excess of specified amounts (net of certain insurance); (vi) bankruptcy; and (vii) change of control.

**Governing Law:**  All documentation in connection with the U.S. Facility shall be governed by the laws of the State of New York.

**Assignments, Participations:**  The U.S. Revolving Loan Lenders may sell or assign all or a portion of their respective loans or commitments under the U.S. Facility without the consent of the U.S. Borrowers in a minimum commitment amount of $1 million (or the remainder of such U.S. Revolving Loan Lender's commitments, if less) to one or more other U.S. Revolving Loan Lenders, or to one or more financial institutions or other persons or entities that are eligible assignees (to be defined in a mutually agreed upon manner by the U.S. Borrowers and the U.S. Agents) with the consent of the U.S. Borrowers (unless an event of default or potential event of default has occurred and is continuing), such consent not to be unreasonably withheld; provided that assignments made to affiliates and other U.S. Revolving Loan Lenders shall not be subject to such minimum assignment requirements.

The Term Loan Lenders may sell or assign all or a portion of their respective loans or commitments under the U.S. Facility without the consent of the U.S. Borrowers in a minimum principal amount of $1 million (or the remainder of such Term

Loan Lender's loans, if less) to one or more other Term Loan Lenders, or to one or more financial institutions or other persons or entities that are eligible assignees (to be defined in a mutually agreed upon manner by the U.S. Borrowers and the U.S. Agents); provided that assignments made to affiliates and other Term Loan Lenders shall not be subject to such minimum assignment requirements.

The U.S. Revolving Loan Lenders and the Term Loan Lenders may also sell participations in their respective loans and commitments under the U.S. Facility without the consent of the U.S. Borrowers, subject to customary limitations on voting rights of such participants.

**Conditions Precedent to Closing:** Customary for U.S. Agents' loans of this type and those additional deemed appropriate by the U.S. Agents for this transaction, including the following, the results of which are satisfactory to the U.S. Agents, in their sole discretion:

(a) completion of U.S. Agent's legal, environmental, if any, and collateral due diligence, including but not limited to, a collateral valuation and review of U.S. Borrowers' books and records, review of the business plan, UCC and tax lien searches,

(b) customary individual background checks for management of the U.S. Borrowers that U.S. Agents deem necessary,

(c) no Material Adverse Change,

(d) minimum availability under the U.S. Revolver and German Revolver plus unrestricted cash and cash equivalents of U.S Borrowers at closing, after giving effect to the initial use of proceeds in an amount to be determined,

(e) funded debt to LTM adjusted EBITDA at closing shall not exceed an amount greater than 4.0 x EBITDA,

(f) satisfactory legal documentation, including the credit agreement, security agreements, control agreements, pledge agreements, bailee agreements, any related documentation and intercreditor arrangements among the Lenders

(g) appraisals collateral and field examination by appropriate third parties designated by U.S. Agents,

(h) A plan of reorganization (the "Plan") for the U.S. Borrowers reasonably satisfactory to the U.S. Agents shall have been confirmed pursuant to an order (the "Confirmation Order") in form and substance reasonably

- 9 -

satisfactory to the U.S. Agents, and the Confirmation Order shall have become final and not appealable (with no appeal pending and no stay in effect); provided, however, that the U.S. Agents shall have the ability to waive this condition in the absence of a stay of a pending appeal with respect to the Confirmation Order,

(i)  All conditions precedent to the effectiveness of the Plan (other than the closing of the Financing Facilities) shall have been satisfied, and

(j)  Closing of the German Facility.

**Closing Date:**

Closing Date to occur on the effective date of a plan of reorganization for the U.S. Borrowers.

**Expenses:**

Subject to approval by an order of the Bankruptcy Court, the U.S. Borrowers will agree to reimburse each of the U.S. Agents for all of such U.S. Agent's reasonable and documented out-of-pocket expenses relating to this financing transaction, including, but not limited to, search fees, filing and recording fees, reasonable attorneys' fees and reasonable and documented out-of-pocket expenses, and reasonable financial examination and collateral appraisal fees and reasonable and documented out-of-pocket expenses

- 10 -

# GERMAN BORROWER FACILITIES

**German Borrowers:** FiberMark Lahnstein GmbH & Co. OHG ("FM Lahnstein"), FiberMark Services GmbH & Co. KG ("FM Services") and FiberMark Gessner GmbH & Co. OHG ("FM Gessner", and together with FM Lahnstein and FM Services, the "German Borrowers").

**German Guarantors:** (i) The U.S. Guarantors, (ii) the U.S. Borrowers, (iii) FIH, (iv) FiberMark Beteiligungs GmbH, (v) FiberMark Red Bridge International Ltd. and (iv) each direct and indirect German subsidiary of FM and FIH, each consistent with the German Borrowers' existing credit facilities with GE Capital (collectively, (i), (ii), (iii) and (iv), the "German Guarantors"). The guarantee by the U.S. Guarantors and the U.S. Borrowers shall be subordinated to their obligations with respect to the U.S. Revolver and the Term Loan.

**Administrative and Collateral Agents:** GE Capital, or an affiliate of GE Capital, will be the administrative agent with respect to the German Revolver (the "German Revolving Loan Agent") and GE Capital will also be the Collateral Agent with respect to the German Revolver (the "German Revolver Collateral Agent"; and together with the German Revolving Loan Agent, the "German Agents").

**German Lenders:** GE Capital, one or more of its affiliates, or other lenders designated by GE Capital in consultation with the German Borrowers; provided, however, that under no circumstances shall choice of the initial German Lenders have material adverse tax implications on the German Borrowers as a consequence of such German Lender's or its affiliate's direct or indirect ownership, voting rights or other governing influence in and comparable relation to the German Borrowers. Without limiting the foregoing, at GE Capital's discretion, the German Revolver may be funded by one or more fronting banks reasonably acceptable to GE Capital and the German Borrowers; provided, however, that under no circumstances shall choice of any such fronting bank have material adverse tax implications on the German Borrowers as a consequence of such fronting bank's or its affiliate's direct or indirect ownership, voting rights or other governing influence in and comparable relation to the German Borrowers.

**German Facility:** On the closing date, the German Lenders will provide to the German Borrowers a €40 million revolving credit facility (the "German Revolver").

**Letters of Credit:** At the German Borrowers' option, a portion of the German

Revolver not to exceed €8 million may be made available for the issuance of letters of credit ("<u>German Letters of Credit</u>"). Letters of Credit would be issued either by a bank and/or by GE Capital and/or one of its affiliates on terms reasonably acceptable to the German Borrowers and GE Capital. The face amount of all outstanding letters of credit under the German Revolver would reduce availability under the German Revolver.

**<u>Use of Proceeds:</u>** Advances made on the German Revolver on the closing date will be used: (i) for general corporate purposes; and (ii) to refinance certain of the German Borrowers' existing indebtedness. Advances made on the German Revolver after the closing date will be used for: (i) working capital purposes of the German Borrowers and their subsidiaries; (ii) capital expenditures; and (iii) other general corporate purposes, including, subject to applicable covenants, dividends or other distributions and, subject to applicable upstream limitations, loans to the U.S Borrowers and U.S. Guarantors to be determined in each case at the German Borrowers' sole discretion, including, without limitation, the payment when due of interest on the German Borrowers' indebtedness.

**<u>Availability:</u>** Borrowing Availability will be limited to the lesser of (i) the product of the consolidated EBITDA of the German Borrowers and their subsidiaries for the immediately preceding 12-month period multiplied by 1.5x, less reserves (the "German Borrowing Base") and (ii) €40 million. The German Revolving Loan Agent will retain the right from time to time to establish customary reserves against availability.

**<u>Maturity:</u>** Five (5) years from the closing date.

**<u>German Security:</u>** The obligations of the German Borrowers and the German Guarantors under and with respect to the German Facility will be secured by: (i)(a) first-priority land charges on German real property, (b) pledges of the bank accounts of all German entities, (c) pledge by FM of 100% of shares in FiberMark Beteiligungs GmbH, (d) a pledge by FIH of 100% of its limited partnership interest in FiberMark Services GmbH & Co. KG and (e) pledge by all German Borrowers and German Guarantors (other than those which are also U.S. Guarantors) of 100% of their shares or participations in their respective German subsidiaries (excluding a pledge of shares and interests in FiberMark Gessner Unterstützungskasse GmbH and Leiss GmbH & Co. KG) (collectively (a) through (e), the "European Collateral") and (ii) a third-priority security interest in the U.S. Security. The German Security shall also include such additional property of the German Borrowers and German Guarantors to the extent the

- 12 -

granting of and maintenance of security interests and liens in such property is reasonably practicable in light of material interests of the German Lenders and the German Agents and the cost and effects on to the German Borrowers and German Guarantors to so grant and maintain such liens and security interests, provided, however, that no such security interest shall adversely affect the ordinary course of business of any German Borrower or any German Guarantor in any material manner.

Cash management systems reasonably acceptable to German Collateral Agent shall be in place for the German Borrowers and each German Guarantor.

The U.S. Collateral shall also secure the German Facility and the related obligations.

The German Security will be released upon repayment of all owed amounts due under the German Facility and termination of all commitments to lend thereunder.

|                |                |
|----------------|----------------|
| **Interest Rates:** | At the option of the German Borrowers, the German Revolver shall bear interest at a rate per annum equal to either (x) the 1, 2 or 3-month reserve-adjusted EURIBOR (or such other period as to be agreed to by the German Revolving Loan Agent) plus 2.25% or (y) the Reference Rate (as defined below) plus 0.75%, and in each case, subject to a pricing grid.

Interest on the German Revolver shall be paid at the expiration of each EURIBOR period and calculated on the basis of a 360-day year and actual days elapsed. EURIBOR mechanics and breakage fees to be contained in financing documentation to be consistent with the German Borrowers' existing credit facilities with GE Capital. |
| **Letter of Credit Fees:** | A fee equal to the product of (i) 2.25% per annum (calculated on the basis of a 360-day year and actual number of days elapsed) multiplied by (ii) the average daily maximum aggregate amount available to be drawn under all German Letters of Credit, will be payable monthly in arrears to the German Lenders. |
| **Unused German Revolver Fee:** | An unused line fee equal to the product of (i) 0.50% per annum, multiplied by (ii) the daily average undrawn portion of the German Revolver will accrue from the closing date and shall be payable monthly in arrears. |
| **Mandatory Prepayment:** | Excess cash flow sweeps in an amount to be determined. Subject to carve-outs to be agreed, 100% of asset sale proceeds, 75% of equity proceeds, 100% of insurance events, with a corresponding reduction in the German Revolver commitments to the extent the |

- 13 -

aggregate amount of all such prepayments from excess cash flow, asset sales, equity issuances and insurance events exceeds an amount to be mutually agreed upon. Definitive mandatory prepayment provisions (taking into account applicable restrictions under German law) shall be determined based upon final deal structure.

In the event the outstanding borrowings under the German Revolver exceeds the German Borrowing Base, the German Borrowers shall repay loans in an amount sufficient such that the total outstanding borrowings referred to above do not exceed the German Borrowing Base.

**Optional Prepayments:** Loans made under the German Facility may be prepaid in whole or in part. The German Borrowers will bear all reasonable and customary breakage costs related to the prepayment of a loan prior to the last day of the interest period.

**Early Termination Fee for German Revolver:** Payable in the event the commitment amount of the German Revolver is reduced or terminated, as appropriate, multiplied by 0.50% in the first year.

**Representations and Warranties:** Usual and customary representations and warranties for a facility of this type (with exceptions and materiality thresholds to be agreed) including, without limitation: (i) corporate existence and good standing; (ii) due authorization, execution, delivery and enforceability of the loan documentation; (iii) no governmental or regulatory approvals required; (iv) non-violation of other existing material agreements or laws as a result of execution, delivery and performance of the loan documentation; (v) accuracy of information and financial statements delivered by German Borrowers; (vi) no litigation that could reasonably be expected to have a "Material Adverse Effect" (defined as a material adverse effect on the condition, financial or otherwise, business, operations or assets of the German Borrowers and their respective subsidiaries, taken as a whole); (vii) material compliance with laws and regulations (including, applicable environmental laws, labor laws and payment of taxes); (ix) maintenance of insurance; (x) ownership of German Security; (xi) absence of material matters related to labor; (xii) not an investment company or public utility holding company; (xiii) loan proceeds not used to acquire margin stock; (xiv) no broker used in obtaining financing; (xv) since the effective date of the plan of reorganization, the absence of "Material Adverse Change" (defined as any material adverse change in the business, assets, results of operations or financial condition of the German Borrowers and their respective subsidiaries, taken as a whole) other than specific acts contemplated by and required

- 14 -

to implement such plan of reorganization; (xvi) absence of default or unmatured default under the German Facility; and (xvii) solvency of German Borrowers.

**Covenants:**

Usual and customary affirmative and negative covenants for a facility of this type (with exceptions and materiality thresholds to be agreed), including, without limitation: (i) maintenance of existence and conduct of business; (ii) payment of taxes; (iii) provision of financial statements and borrowing base reports (see "<u>Financial Reporting</u>" section below); (iv) provision of notices regarding material litigation, events of default and unmatured defaults; (v) maintenance of books and records; (vi) maintenance of insurance; (vii) limitations with respect to (A) liens and encumbrances, (B) payment of dividends and repurchases or retirement of capital stock (with exceptions to be agreed upon for the upstreaming of funds to the U.S. Borrowers and U.S. Guarantors), (C) guarantees, (D) sale and lease back transactions, (E) consolidations and mergers, (F) investments, (G) capital expenditures, (H) loans and advances, (I) indebtedness, (J) operating leases, (K) transactions with affiliates, and (L) repurchases or prepayment of other indebtedness; and (viii) material compliance with laws and regulations (including, applicable environmental laws, labor laws and payment of taxes).

**Financial Covenants:**

Financial covenants based on a customary discount to the German Borrowers' projections to include, minimum fixed charge ratio, maximum total debt to trailing twelve month EBITDA and maximum capital expenditures, in each case to be agreed upon by the German Borrowers and the German Agents.

Financial reporting to include: (i) annual, audited financial statements, (ii) quarterly, internally prepared, financial statements, (iii) monthly, internally prepared, financial statements, (iv) annual projections including monthly balance sheet, profit and loss, cash flow figures, leverage levels and fixed charge coverage, (v) monthly borrowing base reports, and (vi) other reporting as reasonably required by the German Agents.

The German Revolver will also provide that the German Collateral Agent shall be entitled to conduct periodic collateral audits; <u>provided</u> that, so long as no event of default has occurred and is continuing, the German Borrowers shall not be responsible for the costs of the German Collateral Agent associated with more than one such audit in any fiscal year.

**Events of Default:**

Usual and customary for a facility of this type (with customary

- 15 -

and appropriate grace periods and materiality thresholds to be agreed), including, without limitation: (i) failure to make payments when due; (ii) cross-defaults (after the expiration of any applicable grace periods) in respect of certain other material indebtedness; (iii) violation of covenants, (iv) breaches of representations or warranties in any material respect; (v) judgments in excess of specified amounts (net of certain insurance); (vi) bankruptcy; and (vii) change of control.

**Governing Law:** State of New York, or as applicable with regard to collateral security documents, Germany.

**Assignments, Participations:** The German Lenders may sell or assign all or a portion of their respective loans or commitments under the German Facility in a minimum commitment amount of €1 million (or the remainder of such German Lender's commitments, if less) to one or more other German Lenders, or to one or more financial institutions or other persons or entities that are eligible assignees (to be defined in a mutually agreed upon manner by the German Borrowers and the German Agents) with the consent of the German Borrowers (unless an event of default or a potential event of default has occurred and is continuing) and the German Agents, such consent not to be unreasonably withheld; provided that assignments made to affiliates and other German Lenders shall not be subject to such minimum assignment requirements. The German Lenders may also sell participations in their respective loans and commitments under the German Facility without the consent of the German Borrowers, subject to customary limitations on voting rights of such participants. Unless an event of default shall have occurred and be continuing, without the consent of the German Borrowers, no such assignment may be made and no such participation may be sold to any person or entity if such assignment or sale shall have material adverse tax implications on the German Borrowers as a consequence of such assignee or participant's direct or indirect ownership, voting rights or other governing influence in and comparable relation to the German Borrowers.

**Conditions Precedent to Closing:** Customary for the German Agents' loans of this type and those additional deemed appropriate by Agent for this transaction, including the following, the results of which are satisfactory to German Agents, in their sole discretion:

(a) completion of German Agent's legal, environmental, if any, and collateral due diligence, including but not limited to, a collateral valuation and review of German Borrowers' books and records, review of the business

- 16 -

plan, UCC and tax lien searches (or comparable searches under applicable German law),

(b) customary individual background checks for management of the German Borrowers that Agent deems necessary,

(c) no Material Adverse Change,

(d) minimum availability under the German Facility plus unrestricted cash and cash equivalents of the German Borrowers at closing, after giving effect to the initial use of proceeds in an amount to be determined,

(e) funded debt to LTM adjusted EBITDA at closing shall not exceed an amount greater than 4.0 x EBITDA,

(f) satisfactory legal documentation, including the credit agreement, security agreements, control agreements, pledge agreements, any related documentation and intercreditor arrangements among the Lenders,

(g) appraisals collateral and field examination by appropriate third parties designated by Agent,

(h) closing of the U.S. Facility,

(i) Satisfactory retention of services of a fronting lender for the German Facility which fronting lender (and any reasonable fees and expenses required to be paid by the German Borrowers to such fronting lender) shall be reasonably satisfactory to the German Agents and the German Borrowers.

**Closing Date:**      Closing Date to occur on the date of consummation of the U.S. Facility.

**Expenses:**      The German Borrowers will agree to reimburse German Agents for all of the German Agents' reasonable and documented out-of-pocket expenses relating to this financing transaction, including, but not limited to, search fees, filing and recording fees, reasonable attorneys' fees and reasonable and documented out-of-pocket expenses, and reasonable financial examination and collateral appraisal fees and reasonable and documented out-of-pocket expenses.

**German Tax**
**Restructuring:**      The parties hereto contemplate that the German Borrowers and German Guarantors will enter into a corporate reorganization after the closing date in order to optimize the German Borrowers' and German Guarantors' tax position in Germany. Unless such restructuring could reasonably be expected to (i) have a material adverse effect on the ability of the German Collateral Agent or the German Lenders to obtain and maintain valid and perfected security interest in, or realize upon, the

- 17 -

German Security, or (ii) impair the obligations of the German Borrowers or German Guarantors to the German Lenders or the rights and remedies of the German Lenders and/or the German Collateral Agent with respect to such obligations, the German Lenders and German Collateral Agent, without committing to do so, anticipate that the definitive credit documentation would contain such flexibility as may be needed to permit the consummation of such reorganization. In addition, in considering whether to permit such restructuring, the German Lenders and the German Collateral Agent may consider such other factors as it shall reasonably deem appropriate, including the impact on cross-collateralization and the impact on the German Borrowers' and German Guarantors' ability to declare or pay any dividends or other distributions to their respective equity holders.

**Evidence to Tax Authorities:**

The German Lenders shall provide reasonable cooperation with German Borrowers in their efforts to achieve tax deductibility with respect to interest payments in connection with the German Facility under German thin capitalization rules. The German Lenders' cooperation shall, upon request by the German Borrowers, include the issuance of a certificate addressing the factual requirements for what is considered back-to-back-financing by German thin cap rules, in particular the certificate shall provide detailed information about the German Security. The German Lenders are aware that such requirements may change from time to time and will take account of such changes of rules. If and to the extent that the German Lenders assign their loans or commitments to other lenders or make use of a fronting bank, such assignment or interposition of a fronting bank may only be made, if such new lender or the fronting bank also obliges itself to such obligation to cooperate as set forth herein. German Borrowers shall indemnify the German Lenders upon demand for any losses, damages, liabilities, costs and expenses (including legal fees) resulting from or in connection with the issuance of such certificate or any other assistance provided under this obligation to cooperate. In no event shall the provisions of this section impose any limitations on any German Lender's right to otherwise assign its commitment or loans in accordance with the other provisions of this Term Sheet.

## Exhibit B

## FiberMark, Inc.
## FiberMark North America, Inc.
## FiberMark Lahnstein GmbH & Co. OHG
## FiberMark Gessner GmbH & Co. OHG
## FiberMark Services GmbH & Co. KG

## Summary of Terms of Intercreditor Agreement

The U.S. Revolver Collateral Agent, the German Revolver Collateral Agent (collectively, the "Revolver Collateral Agents") and the Term Loan Collateral Agent will enter into a Lien Intercreditor Agreement containing, among other provisions, the following terms and conditions.

| | |
|---|---|
| **LIEN SUBORDINATION:** | The liens securing the U.S. Revolver Facility would have priority over the Liens securing the Term Loan to the extent that such Liens secure the Maximum U.S Revolver Debt as set forth below, notwithstanding, (i) the time of incurrence of any U.S. Revolver debt, (ii) the time, order or method of attachment of the Term Loan liens or the U.S. Revolver liens (iii) the time or order of filing or recording of financing statements or other documents filed or recorded to perfect any lien upon any collateral, (iv) the time of taking possession or control over any collateral, or (v) the rules for determining priority under the bankruptcy code or any other law governing relative priorities of secured creditors. Nothing in the intercreditor agreement shall constitute debt subordination. |
| **MAXIMUM REVOLVER DEBT:** | (i) With respect to the U.S. Revolver the lesser of (A) $30.0 million plus the Additional Amount (as hereinafter defined) and (B) 110% of borrowing base availability under the U.S Revolver loan agreement (the "Maximum U.S. Revolver Debt") and (ii) with respect to the German Revolver, the lesser of (A) €40 million plus the Additional Amount (as hereinafter defined) and (B) 110% of the borrowing base availability under the German Revolver, as reduced, in each case, from time to time by payments and prepayments actually received to repay the permanent reductions of the commitments thereunder.<br><br>"Additional Amount" shall mean an aggregate amount not to exceed the dollar equivalent of $8.5 million allocated between the U.S. Revolver and the German Revolver. |

- 19 -

The U.S Revolver would include currency and interest rate hedges and cash management costs, all subject to the maximum U.S Revolver debt limitation described above. Interest, fees, costs and expenses shall not be subject to the foregoing limitation. In addition, unintentional borrowing base overadvances shall not be subject to the limitation set forth in clauses (B) above.

**AGREEMENT NOT TO CONTEST LIENS:**

Each Collateral Agent (and the Lenders) will agree not to contest the validity, perfection, priority or enforceability of the Liens granted to any other Collateral Agent.

**APPLICATION OF PROCEEDS OF COLLATERAL AFTER EVENT OF DEFAULT:**

Subject to the section entitled "Lien Subordination" set forth above, after the occurrence and during the continuance of an event of default under the U.S Revolver of which the U.S. Revolver Collateral Agent has provided written notice to the Term Loan Collateral Agent, all proceeds of dispositions of collateral and insurance proceeds in connection with a casualty event with respect to collateral that are received by the U.S. Revolver Collateral Agent (or any U.S. Revolving Loan Lenders or their respective agents) or the Term Loan Collateral Agent (or any Term Loan Lender or their respective agents) shall be applied to the U.S Revolver and the Term Loan in accordance with the application of Mandatory Prepayment set forth in the Term Sheet (but with a permanent reduction in the revolver commitments to the extent set forth in the Term Sheet).

So long as such prepayments are applied to repay the U.S. Revolver (and cash collateralize outstanding letters of credit), with a corresponding permanent reduction in the revolver commitments to the extent set forth in the Term Sheet, prior to the payment in full of the U.S. Revolver there shall be no prepayments of principal on the Term Loan.

**PURCHASE OPTION:**

The U.S Revolver Collateral Agent (on behalf of the U.S. Revolving Loan Lenders) and the German Revolver Collateral Agent (on behalf of the German Lenders) would be required to give the Term Loan Lenders (or their agent) prior written notice (a "Trigger Notice") of its intent to (i) require the Term Loan Lenders to release their lien on the U.S. Collateral and/or (ii) accelerate the U.S. Revolver debt and/or the German Revolver debt. In the absence of Exigent Circumstances (defined below), the Term Loan Lenders would then have the option, exercised by delivery of notice to each of the Revolver Collateral Agents (or

- 20 -

another agent designated for the U.S. Revolving Loan Lenders or the German Lenders, as applicable) (the "Purchase Notice") within 10 business days (or in the case of an acceleration based upon a payment default, 5 business days) of receipt of such Trigger Notice, (the "Purchase Option Period) to purchase (or cause one or more of their designees to purchase) all (but not less than all) of the U.S Revolver debt and the German Revolver debt then outstanding from the U.S Revolving Loan Lenders and the German Lenders, as applicable. Absent Exigent Circumstances (as hereinafter defined), during the Purchase Option Period (i) the U.S. Revolver Collateral Agent (on behalf of the U.S. Revolving Loan Lenders) and the German Revolver Collateral Agent (on behalf of the German Lenders) will not accelerate the U.S. Revolver debt or German Revolver debt and (ii) the Term Loan Lenders would not be required to release their lien on the U.S. Collateral.

As used herein, "Exigent Circumstance" shall mean (i) an exercise by another lender of enforcement rights or remedies with respect to particular U.S. Collateral or German Security, or (ii) any other event or circumstance that materially and imminently threatens the ability of either Revolver Collateral Agent to realize upon all or a material part of the U.S. Collateral or German Security, as applicable, such as, without limitation, fraudulent removal, concealment, or abscondment thereof, or destruction (other than to the extent covered by insurance) or material waste thereof.

The purchase and sale would be required to be consummated within 5 business days of receipt by each of the Revolver Collateral Agents of the Purchase Notice. Upon the date of purchase and sale, the Term Loan Lenders would, subject to the limitations set forth below, (i) pay to the U.S Revolving Loan Lenders the full amount of all U.S Revolver debt then outstanding and pay the German Lenders the full amount of the German Revolver debt then outstanding (including any applicable Early Termination Fees, whether or not then due), (ii) furnish cash collateral in respect of (A) any issued and outstanding Letters of Credit in an aggregate amount of 105% of the aggregate undrawn face amount thereof and (B) currency and interest rate hedges in an amount equal to 100% of the Borrowers' obligations under such hedges, and (iii) agree to reimburse the U.S Revolving Loan Lenders for any losses related to any outstanding Letters

- 21 -

of Credit and any checks or other payments provisionally credited to the U.S Revolver debt and the German Revolver debt for which final payment has not yet been received.

To the extent that the U.S. Revolver debt or the German Revolver debt exceeds the maximum permitted amount of such debt as set forth above (the "Excess Amount") payment of such Excess Amount shall be made solely with proceeds of U.S. Collateral and German Security received after the repayment in full of the U.S. Revolver debt (including the cash collateralization of all outstanding Letters of Credit) and termination of all commitments with respect thereto and the repayment in full of the Term Loan debt.

**BANKRUPTCY:** The terms of the intercreditor agreement will survive in a bankruptcy proceeding of the U.S. Borrowers, the German Borrowers and their respective subsidiaries. The Term Loan Lenders will not object to debtor-in-possession financing or the use of cash collateral with the consent of the U.S Revolver Collateral Agent on the grounds of a failure to provide "adequate protection" if: (i) the interest rate, fees, advance rates, lending sublimits and limits and other terms are commercially reasonable under the circumstances, (ii) the Term Loan Collateral Agent retains a Lien on the U.S. Collateral (including proceeds thereof arising after the commencement of such proceeding) with the same priority as existed prior to the commencement of the bankruptcy case subject to any Lien granted in connection with the debtor in possession financing or use of cash collateral, (iii) the Term Loan Collateral Agent receives a replacement Lien on post-petition assets to the same extent granted to the U.S. Revolver Collateral Agent, with the same priority as existed prior to the commencement of the bankruptcy case subject to the Liens granted in connection with the debtor-in-possession financing or use of cash collateral, (iv) the aggregate principal amount of loans and letter of credit accommodations outstanding under such post-petition financing, together with the aggregate principal amount of the pre-petition U.S Revolver debt and German Revolver debt shall not exceed the Maximum Revolver Debt, and (v) such financing or use of cash collateral is subject to the terms of the intercreditor agreement. Except as set forth in the intercreditor provisions outlined above, no other restrictions shall apply to any Agent or Lender as a result

- 22 -

of the Intercreditor Agreement.

**DOCUMENTATION:**  The Financing Facilities will be documented under separate credit agreements and separate security agreements and other collateral documents applicable to the facilities covered thereby. It is contemplated that the U.S. Revolver and the Term Loan credit agreements would contain substantially identical conditions precedent, representations, warranties, covenants (including financial covenants) and events of default.

**VOTING:**  Subject to the intercreditor and standstill arrangements set forth below, the lenders under each of the Financing Facilities would have the right to make their own decisions, and exercise of remedies, with respect to the collateral.

**STANDSTILL**  Following the occurrence of an event of default under the Term Loan credit agreement and notice from the Term Loan Collateral Agent to each of the Revolver Collateral Agents of their intent to accelerate the Term Loan, the Term Loan Collateral Agent and the Term Loan Lenders will be subject to a 90 day standstill period. During such standstill period, absent Exigent Circumstances (of which the Revolver Collateral Agents have received notice from the Term Loan Collateral Agent), the Term Loan Collateral Agent and the Term Loan Lenders will not take any enforcement action prior to the earlier of (i) the end of such period and (ii) the commencement of an enforcement action by the Revolver Collateral Agents. So long as the Revolver Collateral Agents have commenced enforcement actions, the Term Loan Collateral Agent and the Term Loan Lenders will not take any enforcement action with respect to the collateral other than to join in the enforcement actions commenced by the Revolver Collateral Agents.

**APPENDIX F**

**CONCLUSIONS OF EXAMINER**

**(The following discussion of the Examiner's conclusions has been reproduced from the Public Examiner's Report and consists of pages 284 to 321 of the report.   A complete copy of the Public Examiner's Report may be obtained on the Debtors' Web site at www.fibermark.com.)**

**CONFIDENTIAL BY ORDER OF THE COURT – FILED UNDER SEAL**

*The statements and conclusions in this report have not been adopted or accepted by the Court, and constitute only the opinions of the Examiner. No portion of this report has been admitted into evidence. Several parties dispute the accuracy of the contents of this report. The publication of this report is without prejudice to the right of any party to challenge the statements contained in the report.*

UNITED STATES BANKRUPTCY COURT
DISTRICT OF VERMONT


------------------------------------------------------x
In re:                                    :
                                       :
                                       :
FiberMark, Inc.,                   :     Case No. 04-10463
FiberMark North America, Inc., and   :     *Chapter 11*
FiberMark International Holdings LLC   :     Jointly Administered
                                         :
------------------------------------------------------x


# REPORT OF HARVEY R. MILLER, AS EXAMINER

WEIL, GOTSHAL & MANGES LLP
Attorneys for the Examiner
767 Fifth Avenue
New York, New York 10153
Telephone (212) 310-8000
Facsimile (212) 310-8007

Dated: New York, New York
       August 16, 2005 Version

**CONFIDENTIAL BY ORDER OF THE COURT**
*The statements and conclusions in this Report have not been adopted or accepted by the Court, and constitute only the opinions of the Examiner. No portion of this report has been admitted into evidence. Several parties dispute the accuracy of the contents of this Report. The publication of this Report is without prejudice to the right of any party to challenge the statements contained in the Report.*

## VII.

## CONCLUSIONS OF EXAMINER

The Examiner reaches the following conclusions as a result of his investigation and analysis of applicable law:

E.        The Transfer of SERP Claims

The Examiner Order charged the Examiner with responsibility to investigate

*the transfer of the Debtors' executives' claims, including but not limited to, the claims of Alex Kwader, and other persons who were employees of the Debtors at the time of the transfer of their claim(s), to Silver Point Capital, L.P., the nature and extent of the disclosure of those transfers and whether breach(es) of fiduciary duties to the estate resulted.*

The indisputable facts lead to the conclusion that there were no improprieties in the transfer of Mr. Kwader's claim and the SERP claims to Silver Point.  As discussed, Silver Point did not stand to gain from the resolution of the SERP discount rate controversy because any increase or decrease in the value of the SERP claims transferred to Silver Point – including Mr. Kwader's claim – was passed on to the respective sellers.[1188]  Consequently, Silver Point had no motivation to hide or conceal the transfer of these claims.  Instead, the evidence demonstrates that the delay in filing of the notice of assignment of claim forms was the result of administrative delay (mostly by Logan).[1189]  There is no evidence that Silver Point acquired Mr. Kwader's claim in order to influence Mr. Kwader or FiberMark.  Both Silver Point and Mr. Kwader understood that Silver Point's designation of Mr. Kwader as a director was merely a placeholder.

Although Silver Point should have disclosed its acquisitions of the SERP claims and recused itself from any deliberations, the Committee would not have voted differently had

---

[1188] Kwader Tr. at 84-86; SP102-3.

[1189] Jarmain Tr. at 93-95.

**CONFIDENTIAL BY ORDER OF THE COURT**

*The statements and conclusions in this Report have not been adopted or accepted by the Court, and constitute only the opinions of the Examiner. No portion of this report has been admitted into evidence. Several parties dispute the accuracy of the contents of this Report. The publication of this Report is without prejudice to the right of any party to challenge the statements contained in the Report.*

Silver Point disclosed the transfers and recused itself from consideration of the settlement motion. Silver Point did not stand to benefit from the SERP settlement and Akin agreed that the SERP settlement was reasonable. Moreover, no Committee member objected to the SERP Settlement, and no Committee member questioned the propriety of the transfers to Silver Point until weeks after they were posted on the docket. These facts leads to the conclusion that objections related to these transfers were raised for the purpose of gaining leverage in the negotiations of the Plan Supplement, not because any entity had a justifiable and sincere suspicion of wrongdoing with respect to the transfers of the SERP claims. Accordingly, Silver Point did not commit a breach of fiduciary duty in connection with its purchase of the SERP claims.

As to any allegations that there was wrongdoing on the part of FiberMark or any of the SERP claimants in connection with the SERP settlement, the Examiner found no evidence or other information that Mr. Kwader or other persons who were FiberMark employees at the time of the transfer of their SERP claims to Silver Point breached their respective fiduciary duties to the FiberMark estates. Mr. Kwader was completely screened from discussion of the SERP claims settlement.

It is unclear why FiberMark and Skadden failed to disclose the transfer when this information was within the ambit of their knowledge.[1190] It would have been better practice to disclose the transfer. However, this lack of disclosure is of no material consequence, as no harm resulted therefrom. Silver Point did not have a stake in the resolution of the value of the claims, as under the assignment of claim, such value was passed on to the sellers.

---

[1190] FM450, AK14.

**CONFIDENTIAL BY ORDER OF THE COURT**

*The statements and conclusions in this Report have not been adopted or accepted by the Court, and constitute only the opinions of the Examiner. No portion of this report has been admitted into evidence. Several parties dispute the accuracy of the contents of this Report. The publication of this Report is without prejudice to the right of any party to challenge the statements contained in the Report.*

F.       The Transfer of the SDI Claim

The Examiner Order charged the Examiner with responsibility to investigate

***the transfer of the claim of former committee member Solution Dispersions, Inc. to Silver Point.***

Silver Point's acquisition of the SDI claim did not violate the Trading Order and was not a breach of Silver Point's fiduciary duties. As explained below, trade claims are not securities and are not, therefore, governed by the Trading Order. The Examiner's investigation revealed no evidence that Silver Point acquired the SDI claim in an attempt to manipulate the Committee.

Patently, the inclusion of Paragraph 5.(a) as a provision of the assignment of claim agreement was contrary to the basic premise that one must be a creditor to serve on a creditors' committee. No professional experienced in bankruptcy or reorganization law would ever attribute any enforceability or validity to Paragraph 5.(a). It is also manifest that Mr. Fortgang would not have countenanced or acquiesced to the inclusion of such a provision in an assignment of claim agreement. There is no evidence that Silver Point intended to keep Paragraph 5.(a) hidden or secret. Silver Point followed the process of filing a notice of transfer with the Court. It was not a covert operation but rather a gross error of judgment by the public side of Silver Point. The sourcer, Mr. Jarmain, was anxious to buy the SDI claim. He appears to have agreed to give Mr. McFarlen the right to attend the Committee meetings without consideration of the ramifications of such arrangements. Obviously, SDI was motivated by getting the best return on its claim and negotiations with Libertas and then Silver Point resulted in a cash payment to SDI equal to 65% of the allowed amount of its claim. Mr. McFarlen

**CONFIDENTIAL BY ORDER OF THE COURT**

*The statements and conclusions in this Report have not been adopted or accepted by the Court, and constitute only the opinions of the Examiner. No portion of this report has been admitted into evidence. Several parties dispute the accuracy of the contents of this Report. The publication of this Report is without prejudice to the right of any party to challenge the statements contained in the Report.*

promptly resigned from the Committee when he learned it was improper to remain as a Committee member after the sale of his claim.

No actual harm resulted from the inappropriate inclusion of Paragraph 5.(a) in the assignment of claim form to accommodate Mr. McFarlen or the transfer of the SDI claim to Silver Point. The voice-mail affirmative vote by Mr. McFarlen on behalf of SDI on or about February 28, 2005 in support of the FiberMark Plan was of no consequence because FiberMark, as noted, at that time did not intend to pursue a cramdown plan.

Moreover, there is no evidence that Silver Point acquired the SDI claim in an attempt to influence or compel a favorable vote by SDI in connection with the February 28, 2005 Confirmation Hearing.[1191] Silver Point Committee personnel were not parties to and did not participate in the purchase of the SDI claim by Silver Point's public side trader. The consequence of the transfer was to stimulate the already highly charged distrust of Silver Point by AIG and Post.

The assertion of a conspiratorial scheme on the part of Silver Point linking the purchases of Mr. Kwader and other SERP claims and the SDI claim, while at the same time increasing its position in FiberMark Notes, does not withstand scrutiny and the consideration of the relevant facts. As Mr. Hodara advised Ms. Johnston, he was extremely skeptical of attacking Silver Point's trading activities.[1192] His skepticism was more than warranted. Nonetheless he aligned himself with AIG, a position, that deeply disconcerted his Vermont co-counsel, Mr. Anderson.[1193]

---

[1191] McFarlen Tr. at 83-84.

[1192] CB5664.

[1193] COMM046042-44.

**CONFIDENTIAL BY ORDER OF THE COURT**

*The statements and conclusions in this Report have not been adopted or accepted by the Court, and constitute only the opinions of the Examiner. No portion of this report has been admitted into evidence. Several parties dispute the accuracy of the contents of this Report. The publication of this Report is without prejudice to the right of any party to challenge the statements contained in the Report.*

G.    The Quality of Committee Members' Screening Wall

      The Examiner Order charged the Examiner with responsibility to investigate

> **the quality of the "screening wall" Silver Point, and the other members of the Creditors' Committee, established in accordance with this Court's Order Approving Specific Information Blocking Procedures and Permitting Trading in Securities of the Debtors Upon Establishment of a Screen Wall (doc. # 684) (the "<u>Trading Order</u>"), whether it was breached, and whether the Trading Order was violated.**

      1.    *Silver Point*

      As an initial matter, the Examiner observes that the Trading Order applies only to securities and, accordingly, that the integrity of Silver Point's Screening Wall is only an issue with respect to Silver Point's trading in FiberMark bonds and not trade claims, including the SERP claims and SDI's claim.  The Examiner's investigation revealed no breaches of Silver Point's Screening Wall.  There is no evidence that Silver Point's Committee personnel informed Silver Point public side employees of any confidential information or that Silver Point's purchases were an attempt to gain additional leverage in the negotiation of corporate governance provisions in the FiberMark plan of reorganization.  That Silver Point Committee personnel knew of Silver Point's increasing FiberMark position is a result of the dissemination of daily reports listing all of Silver Point's holdings, information that Messrs. Sawyer and Fortgang were permitted to receive under the Trading Order.

      The essence of the charges of violation of the Trading Order is the *ipse dixit* of Mr. Hobart and Mr. Musante's conclusion that the timing of renewed purchasing of FiberMark

**CONFIDENTIAL BY ORDER OF THE COURT**
*The statements and conclusions in this Report have not been adopted or accepted by the Court, and
constitute only the opinions of the Examiner. No portion of this report has been admitted into evidence.
Several parties dispute the accuracy of the contents of this Report. The publication of this Report is without
prejudice to the right of any party to challenge the statements contained in the Report.*

Notes by Silver Point was a "tad convenient"[1194] or "strange"[1195] because of the continuing dispute over corporate governance and market price for FiberMark Notes. Other than their "convenient" conclusions neither Mr. Hobart nor Mr. Musante, or indeed Akin, has provided a scintilla of evidence that Silver Point traders had non-public information about FiberMark that had been furnished by either Mr. Sawyer or Mr. Fortgang and used for the economic benefit of Silver Point.

Silver Point was invited to become a member of the Committee because of the substantial position it had accumulated in FiberMark Notes. A condition for its joining the Committee was entry of the Trading Order. Silver Point intended to trade in FiberMark Notes as it determined to be in its economic best interests.

Silver Point, as a large hedge fund that manages approximately $3.8 billion, has in place a physical screening wall separating its trading activities (public side) from Silver Point's principal finance and related activities (private side). It has in effect Information Barrier Policies and Procedures that are updated periodically that are required reading for its employees. Silver Point also requires such employees to attend educational seminars to apprise them of their responsibilities under applicable laws and regulations. There is no evidence that the screening wall was breached in relation to FiberMark or that the public side traded in FiberMark Notes or claims while in the possession of non-public confidential information or that Silver Point Committee Personnel provided the public side with non-public confidential information about FiberMark and its affairs.

---

[1194] Musante Tr. at 244.

[1195] Musante Tr. at 409.

**CONFIDENTIAL BY ORDER OF THE COURT**

*The statements and conclusions in this Report have not been adopted or accepted by the Court, and constitute only the opinions of the Examiner. No portion of this report has been admitted into evidence. Several parties dispute the accuracy of the contents of this Report. The publication of this Report is without prejudice to the right of any party to challenge the statements contained in the Report.*

The Examiner found no evidence of any improper communication of inside information by Silver Point Committee Personnel to public side employees. Mr. Wilson's decisions to acquire FiberMark notes were not based on discussions with Mr. Sawyer or Mr. Fortgang. Rather, they were based on his belief that such Notes were undervalued. Silver Point was consistent in its efforts to acquire a larger interest in FiberMark throughout the chapter 11 cases – before and after it was a member of the Committee as an economically beneficial position for its investors.

The receipt by Messrs. Sawyer and Fortgang of regular daily reports showing Silver Point's position in all of its investments, including FiberMark, does not constitute a Trading Order violation.[1196] As set forth in the Declarations, "usual and customary internal reports showing Silver Point's purchases and sales on behalf of Silver Point or its clients and the amount and class of claims, interests or securities owned by Silver Point or its clients" were permissible "to the extent that such personnel would otherwise receive such reports in the ordinary course and such reports are not specifically prepared with respect to the Debtors."[1197] Thus, even assuming that Mr. Fortgang did, as alleged, announce the increasing position of Silver Point in FiberMark Notes and claims *after* the trades occurred, it was not be a violation of the Trading Order or his Declaration.

2.     *Post*

Post violated the Trading Order. Post, as a Committee member, did not maintain a screening wall. Post Committee Personnel did not file with the Court a declaration or affidavit under the Trading Order.

---

[1196] Fortgang Tr. at 37-38.

[1197] Ex. 2.

**CONFIDENTIAL BY ORDER OF THE COURT**
*The statements and conclusions in this Report have not been adopted or accepted by the Court, and constitute only the opinions of the Examiner. No portion of this report has been admitted into evidence. Several parties dispute the accuracy of the contents of this Report. The publication of this Report is without prejudice to the right of any party to challenge the statements contained in the Report.*

Although Post did not exercise any trades of FiberMark Notes subsequent to the Commencement Date, there is evidence that Post wished to trade in FiberMark Notes. Pursuant to paragraph 4 of the Trading Order, "Any Committee member that wishes to trade in the Debtors' securities shall, as a pre-condition to any such trading *** cause to be filed with the Bankruptcy Court a declaration or affidavit of each individual performing Committee-related activities *** stating that such individual shall comply with the terms and procedures set forth in the Screening Wall Declaration." Post offered to sell all of its FiberMark Securities to Silver Point in December 2004 and January 2005. Post Committee personnel did not file any declaration or affidavit consistent with paragraph 4 of the Trading Order. Post contends that inasmuch as Silver Point rejected the sale proposals, it had no obligation or duty to comply with the Trading Order. In the circumstances, and especially the possession of non-public confidential information held by Post Committee personnel, Post's conduct may be considered a violation of the Trading Order under the terms thereof. Nonetheless, no actual harm resulted as the actual sale was not consummated.

     3.    *AIG*

AIG did not execute any trades in FiberMark Securities subsequent to the Commencement Date and did not maintain a Screening Wall pursuant to the Trading Order. Because AIG did not engage in any trading activity or demonstrate any wish to trade, AIG did not violate the Trading Order.

H.    <u>The Dispute Among Committee Members Regarding Corporate Governance</u>

The Examiner Order charged the Examiner with responsibility to investigate

> ***the dispute among Committee members regarding corporate governance issues and whether any Committee member breached its fiduciary duty to act in the best interest of all creditors***

**CONFIDENTIAL BY ORDER OF THE COURT**

*The statements and conclusions in this Report have not been adopted or accepted by the Court, and constitute only the opinions of the Examiner. No portion of this report has been admitted into evidence. Several parties dispute the accuracy of the contents of this Report. The publication of this Report is without prejudice to the right of any party to challenge the statements contained in the Report.*

1.    *AIG Breached its Fiduciary Duties as a Committee Member*

a.    AIG's Fiduciary Duties

The members of the FiberMark Committee, including AIG, owe fiduciary duties to all FiberMark general unsecured creditors.  See In re Barneys, Inc., 197 B.R. 431 (Bankr. S.D.N.Y. 1996) ("[T]he committee and its members have a fiduciary duty to all creditors represented by the committee."); In re Drexel Burnham Lambert Group, Inc., 138 B.R. 717, 722 (Bankr. S.D.N.Y. 1992), aff'd 140 B.R. 347 (S.D.N.Y. 1992) ("The Committee and its members owed a fiduciary duty to the class it represented, but not to the individual creditors within the class or to the estate").  The members of the Committee owe the general unsecured creditors the fiduciary duties of care and loyalty.  In re Rickel & Assocs., Inc., 272 B.R. 74, 99 (Bankr. S.D.N.Y. 2002).

Recognizing the importance of a creditors' committee's fiduciary obligations to its constituents, the court in In re Johns-Manville Corp. stated:

> In the case of reorganization committees … *fiduciary duties are crucial because of the importance of committees.* Reorganization committees are the primary negotiating bodies for the plan of reorganization.  They represent those classes of creditors from which they are selected.  They also provide supervision of the debtor and execute an oversight function in protecting their constituent's interest.

**CONFIDENTIAL BY ORDER OF THE COURT**
*The statements and conclusions in this Report have not been adopted or accepted by the Court, and constitute only the opinions of the Examiner. No portion of this report has been admitted into evidence. Several parties dispute the accuracy of the contents of this Report. The publication of this Report is without prejudice to the right of any party to challenge the statements contained in the Report.*

26 B.R. 919, 924 (Bankr. S.D.N.Y. 1983) (internal citations omitted) (emphasis added). Further, the court noted that the "'whole body of law' imposes 'the most rigorous responsibilities for fair dealing' on fiduciaries who represent the rights of others." Id. at 925 (citing Young v. Higbee Co., 324 U.S. 204, 213 (1945)).

In discharging their duties to FiberMark's creditors, the law imposes on the members of the Committee "the most rigorous responsibilities for fair dealing." In re Johns-Manville Corp., 26 B.R. at 924. Committee members must be "honest, loyal, trustworthy and without conflicts of interest, and with undivided loyalty and allegiance to their constituents." Johns-Manville, 26 B.R. at 925. Moreover, the FiberMark Committee is required to "guide its actions so as to safeguard as much as possible the rights of minority as well as majority creditors." In re Bohack Corp., 607 F.2d 258, 262, n. 4 (2d Cir. 1979) (citing Woods v. City National Bank & Trust Co., 312 U.S. 262 (1941)).

While Committee members are free, within the parameters of their duties as members of the Committee to pursue their individual rights as creditors of FiberMark, Rickel, 272 B.R. at 100; they are not entitled to use their positions as Committee members to advance their own self-interests at the expense of FiberMark's other general unsecured creditors. Id. at 101. Further, Committee members are not permitted to *act through the Committee* in a way that would promote only that member's interests. In re Nat'l Equip. & Mold Corp., 33 B.R. 574 (N.D. Ohio 1983). Similarly, Committee members may not use the Committee to further the interests of only one category of creditors they represent, e.g., bondholders over trade creditors or large bondholders over small bondholders. In re Gen. Homes Corp., 81 B.R. 870 (Bankr. S.D. Tex. 1994).

*The statements and conclusions in this Report have not been adopted or accepted by the Court, and constitute only the opinions of the Examiner. No portion of this report has been admitted into evidence. Several parties dispute the accuracy of the contents of this Report. The publication of this Report is without prejudice to the right of any party to challenge the statements contained in the Report.*

Although some courts, in recognition of the need to induce creditors to serve on creditors' committees, have developed a qualified immunity for committee members to protect them from ordinary negligence claims, it is a very limited immunity. It does not apply if the Committee members engaged in willful misconduct, acted with reckless disregard for the probable consequences, or engaged in conduct without any authority (i.e., *ultra vires*). Pan Am Corp. v. Delta Air Lines, Inc., 175 B.R. 438, 514-15 (Bankr. S.D.N.Y. 1994). See also In re PWS Holding Corp., 228 F.3d 224, 246 (3d Cir. 2000). As noted by the court in In re Tucker Freight Lines, Inc.:

> At a minimum, [a committee's] fiduciary duty requires that the committee's determinations must be honestly arrived at, and, to the greatest degree possible, also accurate and correct. For a Creditors' Committee to urge rejection of a plan for reasons they knew, or would have known but for their recklessness, to be false would violate this duty and deprive them of any limited immunity they might otherwise hold under [section] 1103(c)(3) [of the Bankruptcy Code].

62 B.R. 213 (Bankr. W.D. Mich. 1986).

Based upon the facts, legal principles and the actions of its representative Mr. Musante, the Examiner has concluded that AIG as the Chairperson and a member of the Committee breached its fiduciary duties to the general unsecured creditors of FiberMark. AIG usurped the role of the Committee for its own purposes and engaged in self-interested and destructive conduct in the negotiation of corporate governance provisions for the reorganized FiberMark. The cumulative effect of the actions taken on behalf of AIG overwhelmingly establish a pattern of conduct rising to a willful disregard of the consequences to interests of the general creditor constituency as well as wrongful misconduct. As a direct result of AIG's actions to protect its own interests, the simple uncomplicated chapter 11 cases of FiberMark turned into

*The statements and conclusions in this Report have not been adopted or accepted by the Court, and constitute only the opinions of the Examiner. No portion of this report has been admitted into evidence. Several parties dispute the accuracy of the contents of this Report. The publication of this Report is without prejudice to the right of any party to challenge the statements contained in the Report.*

one of the worst examples of a chapter 11 reorganization gone awry to the prejudice of all parties and particularly, the entire general unsecured creditor constituency.  The early exit from chapter 11 that all parties had predicted for FiberMark did not occur.  In large measure it did not occur because of the actions pursued by AIG.  The result has been an erosion in the value of FiberMark, representing actual harm to the general unsecured creditors to whom AIG owed its fiduciary duties and responsibilities.

      b.      AIG Used Its Position on the Committee to Further Its Own Interests Without Regard to the Interests of Other Creditors

AIG viewed the Committee merely as a conduit for accomplishing its own agenda.  From the inception of these cases, AIG's representative, Mr. Musante, dominated and controlled the Committee.  Rather than recognizing that the function of a Committee is to achieve the best results for all creditors through a congress of equals charged with representing diverse creditor interests, Mr. Musante used the Committee as an estate-paid vehicle for imposing his will on FiberMark, feeding his need for control, and procuring benefits largely for AIG.

Mr. Musante pursued and took control of the Committee and its activities from the date of its formation.  He imposed his choice of professional advisors on the other Committee members.  Opposition to his choice of financial advisors resulted in the denigration of Wilmington.  It set the tone for Mr. Musante's domination of the non-Noteholder Committee members.

During the initial stages of the chapter 11 cases, Wilmington was the biggest obstacle to Mr. Musante's exercise of unfettered control and authority.  When Mr. Musante attempted to include highly unusual provisions in the bylaws that would serve to give him

**CONFIDENTIAL BY ORDER OF THE COURT**
*The statements and conclusions in this Report have not been adopted or accepted by the Court, and constitute only the opinions of the Examiner. No portion of this report has been admitted into evidence. Several parties dispute the accuracy of the contents of this Report. The publication of this Report is without prejudice to the right of any party to challenge the statements contained in the Report.*

substantial power to take action without a Committee vote, only Wilmington pushed back to prevent such dominance. As a result, Mr. Musante simply ignored the bylaws and acted by himself on behalf of the Committee, with the support and concurrence of Akin and sometimes Post. The insights and input of Wilmington and SDI, generally, were not requested and they were often excluded from the considerations that AIG presented, allegedly on behalf of the Committee. As the Chairperson of the Committee, Mr. Musante minimized Wilmington's involvement in the Committee process and used threats to undermine Wilmington. Mr. Musante attempted to deprive Wilmington as an Indenture Trustee of the service of its attorneys, Covington. More egregiously, it appears Mr. Musante even threatened to have Wilmington removed from the Committee if it continued to fail to follow the lead of AIG. (Ironically, this occurred when Wilmington complained about AIG and Post's actions to involve Silver Point on Committee calls before Silver Point was a member.) It appeared as if Mr. Musante did not like the attempt of Wilmington, the only truly neutral member of the Committee, to act in a manner consistent with its fiduciary duties. Mr. Musante's actions in connection with Wilmington were improper and demonstrative of AIG's failure to discharge its fiduciary obligations to all general unsecured creditors.

          c.      Mr. Musante's Aggressive Self-Possessed Conduct on Behalf of AIG Caused Harm to FiberMark's Creditors

Mr. Musante's "aggressive" conduct and passion for control of the Committee and the reorganization process were not in the interests of the general unsecured creditor constituency but were instead intended to achieve the AIG agenda without regard to their consequences, including the damage it would cause to other creditors. Mr. Musante's view of the chapter 11 process as a war game with winners and losers rather than a process for the

**CONFIDENTIAL BY ORDER OF THE COURT**

*The statements and conclusions in this Report have not been adopted or accepted by the Court, and constitute only the opinions of the Examiner. No portion of this report has been admitted into evidence. Several parties dispute the accuracy of the contents of this Report. The publication of this Report is without prejudice to the right of any party to challenge the statements contained in the Report.*

rehabilitation and restructuring of a distressed business entity for the benefit of all stakeholders as contemplated by chapter 11 resulted in actual harm to the constituency AIG was supposed to represent.

Mr. Musante was so infuriated that FiberMark had initiated chapter 11 cases despite the demands to desist, that he decided to punish those who crossed him, which included Berenson, Skadden, and FiberMark management, especially Mr. Kwader. Instead of using the chapter 11 process as a forum for rehabilitation and accommodation among parties, Mr. Musante treated the debtors and their professionals in the wake of his intense anger with disrespect. His first response to opposition from FiberMark and its professionals, after anger, was to demean them and threaten and pursue litigation. In substance, Mr. Musante's mantra is "my way or no way."

The April 29, 2004 meeting between FiberMark and the Committee provided the opportunity for the parties to get past the unfortunate disagreements as to the commencement of the chapter 11 cases and begin to work together productively to preserve the value of FiberMark's estate for the benefit of all creditors. Instead, Mr. Musante created a "hostile" and "adversarial" environment by acting completely "unprofessionally," and "disrespectful" and "rude" toward FiberMark and its advisors. Such conduct by AIG as the Committee Chairperson was motivated by Mr. Musante's own personal animus, and was adverse to the interests of other general unsecured creditors. It instilled a destructive counterproductive environment for the chapter 11 cases. Again, the victims were the other general unsecured creditors who would suffer the loss of value caused by AIG's representative.

A quick and efficient exit from chapter 11 was doomed. As part of this program of retribution against FiberMark's professionals, he caused the Committee to file an objection to

**CONFIDENTIAL BY ORDER OF THE COURT**
*The statements and conclusions in this Report have not been adopted or accepted by the Court, and constitute only the opinions of the Examiner. No portion of this report has been admitted into evidence. Several parties dispute the accuracy of the contents of this Report. The publication of this Report is without prejudice to the right of any party to challenge the statements contained in the Report.*

FiberMark's engagement of Berenson, notwithstanding Berenson's agreement to remove the request to retain Berenson under section 328(a) of the Bankruptcy Code (ensuring that any fees paid to Berenson would be subject to review and objection at the end of the cases). Mr. Musante also tried to keep Berenson "out of the loop."

The negative effects of Mr. Musante's conduct are illustrated by the costly battle over the KERP. From day one of the chapter 11 cases, "Tom the Bull" Musante explicitly expressed his opposition to any type of severance or retention package for FiberMark management, due in large part to his animosity toward management for its decision to file chapter 11 cases. As a result of Mr. Musante's views, FiberMark knew Mr. Musante and the Musante-dominated Committee would strongly oppose any KERP and, therefore, decided to initiate the KERP process by filing a motion to approve a KERP. It was Skadden's belief that the KERP terms would be negotiated during the period between the filing of the motion and the hearing date, or else decided by the Court.

As another unfortunate occurrence in these cases, the strategy backfired and FiberMark incurred well over $1.5 million in professional fees and expenses as a result of the KERP litigation. It appears that if Mr. Musante had not conducted himself in the hostile manner that he did, FiberMark and the Committee could have, and likely would have, negotiated a KERP very similar to the one the parties ultimately stipulated to, without the substantial costs incurred and the huge amount of time expended and distraction caused by the KERP litigation, that, in reality, concerned a battle for control of the chapter 11 process and disciplining of Mr. Kwader and Skadden.

Several parties admitted and contemporaneous documents demonstrate that the KERP fight was as much about "control" and sending a message to the Court and FiberMark as

**CONFIDENTIAL BY ORDER OF THE COURT**
*The statements and conclusions in this Report have not been adopted or accepted by the Court, and
constitute only the opinions of the Examiner. No portion of this report has been admitted into evidence.
Several parties dispute the accuracy of the contents of this Report. The publication of this Report is without
prejudice to the right of any party to challenge the statements contained in the Report.*

it was about the merits of providing a KERP to employees. The reduction of costs of the KERP were in large measure offset by the costs of the KERP litigation without quantifying the loss of time and distraction to the process. Even the three-day trial on the KERP resulted in a savings of only $375,000 from FiberMark's final proposal. The KERP battle was fought as a result of and in furtherance of the individual objections of Mr. Musante, and not in the pursuit of the best interests of FiberMark creditors as a whole.

       d.      Mr. Musante Usurped the Role of the Committee to Serve the Interests of AIG

Consistently throughout the administration of the chapter 11 cases, Mr. Musante, in pursuing the AIG agenda, excluded Wilmington and SDI from participation in the development of a plan, the determination of FiberMark's debt capacity and ability to service such debt, the development of the Cash Option, and the commitment fees payable to the Big 3 for backstopping the cash option and other matters usually determined by all the members of the Committee. As Wilmington representatives repeated and SDI agreed they were "outsiders."

From Mr. Musante's perspective, Wilmington was at the level of an officious intermeddler. According to Mr. Musante, Wilmington had no "skin in the game," and Ms. MacDonald lacked the experience to contribute anything to the process. It appears that SDI's involvement was not solicited. Mr. Musante viewed himself as the Committee. It was not until the breakdown of the corporate governance negotiations with Silver Point that he needed to cater to Wilmington and SDI. Even at that juncture he attempted to dominate the decision-making process. It was Mr. Musante who, effectively, made the decision to foreclose the sale process that had been initiated in June 2004 by establishing a floor price that he knew was unattainable in the circumstances. Prior thereto, he had allowed FiberMark and Berenson to expend time,

**CONFIDENTIAL BY ORDER OF THE COURT**
*The statements and conclusions in this Report have not been adopted or accepted by the Court, and constitute only the opinions of the Examiner. No portion of this report has been admitted into evidence. Several parties dispute the accuracy of the contents of this Report. The publication of this Report is without prejudice to the right of any party to challenge the statements contained in the Report.*

money and effort in seeking out a purchase price. Wilmington and SDI were not part of that process.

In similar fashion, Mr. Musante excluded Wilmington and SDI from the consideration of FiberMark's desire to include a Cash Option in the Plan for non-Noteholder claimants. Clearly, this was an issue for the entire Committee. Nevertheless, Mr. Musante decided that he and the other two Noteholders on the Committee would exclusively deal with FiberMark's request. The level of cash funding to be received by trade creditors in connection with the cash option should have been an issue for the entire Committee, especially given that it was an issue replete with conflict. Conflict existed between Noteholders and trade creditors, as well as between Noteholders such as the Big 3 who would receive a commitment fee and Noteholders who were denied a commitment fee even if they participated in the backstopping arrangements. Mr. Musante did not acknowledge the conflict or consider what decision was in the best interests of anyone other than AIG.

The Cash Option with the Noteholder funding mechanism and commitment fees for the Big 3 was a direct transfer of value from trade creditors to Noteholders. Mr. Sawyer's testimony corroborated the same. He testified that the Big 3 viewed the Cash Option as a way to pick up more claims at a greater discount (i.e., the lower the Cash Option payout, the greater the discount and the more value that is transferred from the trade creditors to the Noteholders who participate in the funding). Moreover the commitment fee was a transfer of value from all other creditors (other than those exercising the cash option) to the Big 3. Despite this patent conflict of interest, Mr. Musante persevered in furthering AIG's self interests. He did not follow the Committee bylaws in having the terms of the Cash Option approved by a majority vote of members, excluding those with conflicts (which would have included AIG).

**CONFIDENTIAL BY ORDER OF THE COURT**

*The statements and conclusions in this Report have not been adopted or accepted by the Court, and constitute only the opinions of the Examiner. No portion of this report has been admitted into evidence. Several parties dispute the accuracy of the contents of this Report. The publication of this Report is without prejudice to the right of any party to challenge the statements contained in the Report.*

The documentation required for the funding mechanism negotiated by Mr. Musante, including the documentation of the commitment letters, was extremely complicated and costly, yet it does not appear that Mr. Musante (or Post or Silver Point) ever considered the costs imposed on FiberMark. Instead, they only considered their own pecuniary benefits.

When FiberMark decided that the Cash Option was no longer significant because of the small number of creditors who elected the option, Mr. Musante rejected FiberMark's request to rescind the commitment fee inasmuch as it would not require any funds from AIG, Post or Silver Point. The response of the Big 3 that a commitment fee is a commitment fee, in the circumstances of being members of the Committee illustrates the placing of individual interests above the global interests of the Committee's constituency. The fact that the amount involved was small and that Mr. Hodara supported the rejection of FiberMark's request does not diminish patent self interest and disregard of the role of the Committee and all of its members.

As FiberMark required Committee consent for any plan modification, Mr. Musante threatened to withhold the Committee consent if FiberMark did not include language in any modification promising to pay the commitment fee. If the Committee was functioning according to its bylaws, the decision to approve the Plan modification proposed by FiberMark would have been put to a Committee vote with the conflicted members (AIG, Post, and Silver Point) recused as interested parties. Instead, those conflicted Committee members made the decision to compel payment of the commitment fee, regardless of the benefit that might result to other creditors from the Plan modification.

> e.  Mr. Musante as the AIG Representative Breached His Fiduciary Duties By Using the Committee as an Instrument to Serve AIG's Self-Interest to Pursue His Own Corporate Governance

**CONFIDENTIAL BY ORDER OF THE COURT**
*The statements and conclusions in this Report have not been adopted or accepted by the Court, and
constitute only the opinions of the Examiner. No portion of this report has been admitted into evidence.
Several parties dispute the accuracy of the contents of this Report. The publication of this Report is without
prejudice to the right of any party to challenge the statements contained in the Report.*

Mr. Musante's most egregious behavior occurred when a bigger threat to his control than Wilmington surfaced on the scene – Silver Point.  Until the emergence of Silver Point, AIG had been the largest creditor and would have been the largest shareholder of reorganized FiberMark.

The evidence supports the conclusion that AIG and Post's concerns about corporate governance had everything to do with protecting their own individual interests and nothing to do with the protection of other creditors interests.  Any benefits to other minority holders that might flow from their negotiations would have been incidental and subsidiary to their objectives.

Delaware general corporate law provides protections for minority shareholders that have been deemed effective for those purposes.  When AIG and Post believed they would be the controlling shareholders, they took the position that Delaware law provided sufficient protections for minority shareholders against a controlling shareholder.  Only when they realized that they would be minority shareholders did they take up the cudgels of demanding corporate governance provisions well beyond those provided by Delaware law.  Their sole objective was to benefit themselves and their ability to control the disposition of their shares and Notes of reorganized FiberMark without interference from Silver Point as a controlling shareholder.  In the pursuit of that objective they were prepared to hold up the confirmation of a FiberMark Plan.

Notwithstanding their recognition that corporate governance issues represented as intercreditor situation, AIG and Post used Committee (and therefore estate) resources, including the Committee's attorneys, to draft corporate governance documents that worked to their own benefit.  During October, AIG and Post continually provided comments on drafts of the shareholders agreement to Akin to ensure that the starting document they presented to Silver

**CONFIDENTIAL BY ORDER OF THE COURT**

*The statements and conclusions in this Report have not been adopted or accepted by the Court, and constitute only the opinions of the Examiner. No portion of this report has been admitted into evidence. Several parties dispute the accuracy of the contents of this Report. The publication of this Report is without prejudice to the right of any party to challenge the statements contained in the Report.*

Point would be as anti-Silver Point as possible. While using Committee resources, AIG and Post did not seek the input of Wilmington or SDI on the appropriate corporate governance regime to protect the interests of minority holders.

The draft term sheet AIG and Post first provided to Silver Point imposed severe constraints on Silver Point as a controlling shareholder. One example is that AIG and Post demanded that they each have a designated director as long as the relevant entity held only 10% of the stock, while Silver Point was limited to two designated directors regardless of whether it held 80% of the stock. AIG and Post did not advocate for any directors to be designated to represent the other shareholders (of which, at this point, there were 30%). In addition, the tag along and drag along rights were set at different thresholds, conveniently limiting Silver Point's liquidity while improving that of AIG and Post. Further, AIG and Post were given veto rights over any amendments if the relevant entity held as little as 10% of the shares. Providing one holder with the ability to extract hold up value before agreeing to something that 90% of shareholders believe is in the best interests of the company (including 100% of the other "minority holders" who AIG claims to be representing) is not in one's best interest other than the holder of that veto right. It is no surprise, then, that Silver Point rejected such one sided proposals and attempted to negotiate in good faith.

Although the introduction of Mr. Fortgang, another strong personality, into the negotiations contributed to the intensity, Mr. Fortgang's frustration as each Silver Point concession was met with new demands to enhance AIG's position, appears justified.

Mr. Musante took advantage of FiberMark's position that it did not want to proceed by cramdown (and therefore wanted unanimous approval of the Plan Supplement by at least the Big 3 Noteholders) to exercise greater leverage than AIG's 20% position would

---

**CONFIDENTIAL BY ORDER OF THE COURT**

*The statements and conclusions in this Report have not been adopted or accepted by the Court, and constitute only the opinions of the Examiner. No portion of this report has been admitted into evidence. Several parties dispute the accuracy of the contents of this Report. The publication of this Report is without prejudice to the right of any party to challenge the statements contained in the Report.*

otherwise have warranted.  FiberMark might have proposed a plan that provided for a simple Delaware law corporate governance regime.  Such a plan would have been confirmable and would have left AIG, Post, and, significantly, *all minority shareholders* with fewer protections than the concessions that Silver Point had offered.  Despite this knowledge, Mr. Musante continued to press for greater "minority protections," most of which would have inured disproportionately, if not exclusively, to the benefit of AIG (and Post).  He also took the risk that AIG's atypical demands would cause FiberMark to withdraw the Plan (which it did), and thereby extend FiberMark's chapter 11 stay as well as result erosion to the value of the FiberMark and the recovery to creditors (which it clearly did).

AIG was negotiating from a position of weakness as if it were in a position of strength, because it had counterparties willing to make concessions in the interests of obtaining a consensus regarding the Plan Supplement.  Mr. Musante was not in that mold.  His rigidity doomed the negotiations.  Any control benefits Silver Point would have had from its equity distribution under the Plan would have been, not a result of the Plan or the chapter 11, but a result of "the natural consequences of corporate law."  In re Piece Goods Shops Co., L.P., 188 B.R. 778 (Bankr. M.D.N.C. 1995).[1198]  Of course, shareholders may enter into an agreement with regard to corporate governance rights, but they are not required to do so.  Moreover, when they do, it is usually because the majority shareholder agrees to certain limits in exchange for some

---

[1198] In In re Piece Goods Shops Co., L.P., an unsecured creditor objected to confirmation of the plan on the grounds that, among other things, the plan did not provide equal treatment to all creditors in the same class due to certain corporate governance provisions.  188 B.R. at 789.  The majority holder had accommodated the committee and the debtor by giving up the right it had to elect all of the directors of the reorganized company in exchange for "drag-along" rights.  Id.  Such corporate governance provisions were held to "represent a give and take among Committee members and the Debtors…[and] were included in the Plan as part of the consensus reached on corporate governance."  Id.  The court found that special control benefits provided by corporate governance charters are not attributable to the disparate treatment of claims, "but rather [to] the natural consequences of corporate law."  Id. at 790 (citing Delaware General Corporate Law § 215(c)).  Accordingly, the court overruled the unsecured creditor's objections and confirmed the plan.  Id. at 799.

**CONFIDENTIAL BY ORDER OF THE COURT**
*The statements and conclusions in this Report have not been adopted or accepted by the Court, and
constitute only the opinions of the Examiner. No portion of this report has been admitted into evidence.
Several parties dispute the accuracy of the contents of this Report. The publication of this Report is without
prejudice to the right of any party to challenge the statements contained in the Report.*

benefits or concessions from other shareholders. AIG and Post were demanding a lot and offering little in return, and then blaming Silver Point for not coming to an agreement. Silver Point, for the sake of a consensus, offered AIG and Post enhanced rights that would have benefited only AIG and Post and other rights that would have benefited all minority shareholders. No person examined or interviewed, other than AIG and Post, could recall AIG and Post discussing the interests of "other" minority shareholders during the negotiation and as the Committee's Vermont attorney stated they only became the protectors of minority shareholders when they found that they would be minority shareholders. As Ms. MacDonald noted, even though the differences between AIG and Silver Point were not very substantive, for AIG, it was all about "control."

When Mr. Musante was unsuccessful in forcing Silver Point to comply with his demands, Mr. Musante changed the venue to the Committee, once again proving that Mr. Musante only used the Committee process when it served his needs. He generally had no need for the Committee, especially Wilmington and SDI, as he acted as the Committee, despite the Committee bylaws. Heading into the January 13 vote, and despite Mr. Hodara's efforts, to try to make sure that it did not appear as a "total set up for Tom", Mr. Musante knew he had the support of Post and the generally uninformed and naïve Mr. McFarlen. Therefore, he was ready to railroad Silver Point by imposing his Plan Supplement.

As an individual creditor, AIG did not owe fiduciary duties to other creditors, but through its pressing of its position on the Committee, use of Committee resources (Akin) to achieve its aims, and resort to the Committee process to achieve by a change of venue what it could not achieve by negotiation, AIG invoked its fiduciary obligations to act as a Committee member in furtherance of the best interests of all creditors and not just AIG or Post. This is also

305

**CONFIDENTIAL BY ORDER OF THE COURT**

*The statements and conclusions in this Report have not been adopted or accepted by the Court, and constitute only the opinions of the Examiner. No portion of this report has been admitted into evidence. Several parties dispute the accuracy of the contents of this Report. The publication of this Report is without prejudice to the right of any party to challenge the statements contained in the Report.*

what sets Silver Point apart from AIG.  From the beginning and consistently throughout the cases, Silver Point viewed the corporate governance issues as an intercreditor matter subject to resolution among the Big 3 or failing that, resort to Delaware law.  Unlike AIG, however, Silver Point did not use Committee resources or the Committee process to advance its position.  Despite Mr. Fortgang's sometimes bombastic conduct, Silver Point demonstrated flexibility and a willingness to compromise and concede minority shareholder's rights, even when it was under no obligation to do so.

Wilmington's abstention from the January 13 vote and, indeed, its contemporaneous recognition that AIG and Post were representing their own interests and were, therefore, conflicted in the discussion of corporate governance issues, strongly support the Examiner's conclusion that AIG and Post used the Committee to pursue their own agenda. Wilmington represented the interests of all Noteholders and consistently throughout the chapter 11 cases took its role as a Committee member and fiduciary to all creditors very seriously.  It had no reason to favor one side over another, and advocated the position that was best for *all creditors*.  In that context, it is extremely noteworthy that in late December, when Mr. Musante brought these issues to the Committee, Wilmington took the position that if the Big 3 could not reach a consensual shareholders agreement, Delaware law should govern.

The January 13 vote forced by Mr. Musante elevated an intercreditor controversy and the distress of FiberMark.  Mr. Musante compelled the vote even though it was recognized that the risk of delay caused by lack of unanimity could result in harm to parties if consensus was not accomplished.  Importantly, it is undisputed that Silver Point's Plan Supplement enhanced minority shareholder rights beyond those provided under Delaware law.

**CONFIDENTIAL BY ORDER OF THE COURT**

*The statements and conclusions in this Report have not been adopted or accepted by the Court, and constitute only the opinions of the Examiner. No portion of this report has been admitted into evidence. Several parties dispute the accuracy of the contents of this Report. The publication of this Report is without prejudice to the right of any party to challenge the statements contained in the Report.*

The unreasonableness, inflexibility, and negativity of Mr. Musante are illustrated by the events of January 24-25, 2005.  For one week only, Mr. Musante was not the primary representative of AIG in the negotiations.  And, during that Musante-less (or at least Musante-light) week, AIG and Silver Point were able to hammer out an agreement that all sides thought was fair and reasonable.  This was no coincidence.  Mr. Musante's personality and emphasis on power, control, and retribution had dominated the negotiations while he was involved.  In stark contrast, Ms. Levitt and Ms. Handley focused on *the issues*.  Unlike Mr. Musante, they engaged in constructive dialogue with Silver Point to determine which issues were most important to Silver Point.  They also outlined and considered which issues were most important to AIG versus which they could trade away in the negotiations.  Unlike Mr. Musante, they considered their leverage (or lack thereof) and the potential consequences of not reaching a consensus (Delaware law, delay, etc.).  They formed this opinion by engaging in dialogue with FiberMark about what corporate governance provisions it would propose (and likely confirm) if the parties could not ultimately reach a consensual resolution.  Unlike Mr. Musante, they saw the need for accommodation of each party to enable consensus and progress to an exit from chapter 11 by FiberMark an event that would serve the interests of all creditors.

Once Mr. Musante reentered the negotiations, the old environment of accusatory and belligerent e-mails and telephone calls became SOP and the agreement of January 25, 2005 fell apart.

Although issues inevitably arise while documenting an agreement in principle, generally, parties interested in consensus will extend themselves during the documentation process.  Instead, in this case, although Silver Point showed a willingness to compromise, AIG used the documentation process as an excuse to raise new issues, such as demanding ever

**CONFIDENTIAL BY ORDER OF THE COURT**

*The statements and conclusions in this Report have not been adopted or accepted by the Court, and constitute only the opinions of the Examiner. No portion of this report has been admitted into evidence. Several parties dispute the accuracy of the contents of this Report. The publication of this Report is without prejudice to the right of any party to challenge the statements contained in the Report.*

increasing thresholds to amend various governance provisions. On February 17, 2005 and in the Plan Supplement ultimately filed on February 18, 2005, FiberMark proposed what it believed to be a reasonable compromise on all open issues. Indisputably, the proposal enhanced minority shareholder rights beyond the provisions of Delaware law. Nevertheless, AIG voted against the Plan Supplement as a Committee member on February 27, 2005 (and filed an objection to the Plan as an individual creditor). As the Committee's Vermont counsel stated, Mr. Musante wanted to go "to the mattresses" and the devil with the rest of the creditors. His actions were wrongful as a Committee member and in blatant disregard of AIG's fiduciary duties to general creditors.

As March approached and FiberMark tried to broker a fair compromise in its March letters, AIG made this possibility impossible by making new and every increasing demands, essentially demanding the equivalent of veto rights over more events. In an extreme example, AIG demanded for the first time, that it have a complete veto right on any amendments to the shareholders agreement, then characterized as the Investors Rights Agreement ("IRA"). Under its new demand, if AIG owned only one share of FiberMark, and every other shareholder (holding 99.9%+ of the value of the company) thought it was in the best interests of reorganized FiberMark to make a certain amendment to the IRA, AIG would be able to veto that amendment as the holder of a single share of common stock. To hold up confirmation of a Plan and the emergence from chapter 11, with the knowledge that the Debtors' estates were losing value due to delay because of an insatiable desire for atypical governance provisions to protect its perceived self-interests and power, is willful misconduct made with reckless disregard of the consequences and a breach of the duties owed to all other creditors. AIG's highly intense and

**CONFIDENTIAL BY ORDER OF THE COURT**
*The statements and conclusions in this Report have not been adopted or accepted by the Court, and constitute only the opinions of the Examiner. No portion of this report has been admitted into evidence. Several parties dispute the accuracy of the contents of this Report. The publication of this Report is without prejudice to the right of any party to challenge the statements contained in the Report.*

elevated distrust and dislike for Silver Point is simply not enough to justify its counterproductive actions that inured to the prejudice and harm of the Committee's creditor consistency.

The circumstances surrounding the Silver Point purchase of employee claims and the SDI claim emboldened Mr. Musante to be more assertive in AIG's demands. AIG evidently believed that Silver Point's bargaining leverage had contracted as result of the threat of pursuing strategic litigation that would compel Silver Point to accede to AIG's demands. As Mr. Musante testified, in effect litigation often leads to compromise. AIG was, therefore, willing to forgive what it believed was conduct that destroyed the integrity of the chapter 11 process and specific order of the Court, if Silver Point gave it what it wanted. If AIG honestly believed that Silver Point engaged in trading violations or breached its fiduciary duties as a Committee member as asserted, no agreement could redeem those acts. Of course, Mr. Musante will say that the objective of the assertions was appropriate judicial sanctions against Silver Point that would remove it as an obstacle to his plans for FiberMark and its governance. However he may put it, AIG and Post with support of Akin were seeking to obtain bargaining leverage against Silver Point. With Akin's help they pounced on the Silver Point trading activities as a last resort to avoid the cramdown of a Silver Point supported plan. AIG breached its fiduciary duties by holding up confirmation to secure additional benefits to it while attempting to use the trading allegations as leverage.

AIG's use of the Committee to pursue its self-serving allegations against Silver Point is another example of AIG's improper use of the Committee and abuse of its position as a Committee member for its own benefit. Knowing that the impartial U.S. Trustee was pursuing an investigation against Silver Point (at the behest of AIG and Post), AIG somehow asserted that the Committee, at estate expense, should hire special counsel and pursue its own investigation

**CONFIDENTIAL BY ORDER OF THE COURT**
*The statements and conclusions in this Report have not been adopted or accepted by the Court, and constitute only the opinions of the Examiner. No portion of this report has been admitted into evidence. Several parties dispute the accuracy of the contents of this Report. The publication of this Report is without prejudice to the right of any party to challenge the statements contained in the Report.*

against Silver Point. This duplicative, wasteful, and vengeful decision by Mr. Musante, as a Committee member, constituted a breach of his fiduciary duties to all other creditors.

As discussed above, real harm was caused to the constituents to whom Mr. Musante owed fiduciary duties, and Mr. Musante was the primary cause of that harm. Accordingly, AIG should be accountable for the harm it has caused.

2. *Post Breached Its Fiduciary Duties*

As a member of the Committee, Post has the same fiduciary duties, described above. Although Post may not be as culpable as AIG for the counterproductive, hostile relationship between the Committee and FiberMark that caused harm to FiberMark's creditors and the intentional exclusion of Wilmington and SDI from the Committee process, Post breached its fiduciary duties as a Committee member by not acting in the interests of all general unsecured creditors (except when those creditors' interests just happened to be the same as Post's); rather, it pursued its individual self-interests. Post had one major objective in these chapter 11 cases and that was its own liquidity, i.e. to enhance its ability to exit its FiberMark position. In that respect, it wanted to restrict the rights of a majority shareholder, e.g., Silver Point, from taking any actions that might inhibit the liquidity of its position. Post also wanted to participate in the benefits that might occur if the majority shareholder sold its position or took certain other actions. Any argument that Post was acting to protect other creditors is dissipated by Post's conduct in offering to sell its FiberMark position to Silver Point (thereby, in Post's view, giving Silver Point more power to impose its will on the other holders) during the December 2004 and January 2005 period.

As stated above, Post was the first to suggest to Akin and AIG that they act to ensure corporate governance provisions to prevent Silver Point from getting "effective control"

**CONFIDENTIAL BY ORDER OF THE COURT**
*The statements and conclusions in this Report have not been adopted or accepted by the Court, and constitute only the opinions of the Examiner. No portion of this report has been admitted into evidence. Several parties dispute the accuracy of the contents of this Report. The publication of this Report is without prejudice to the right of any party to challenge the statements contained in the Report.*

of FiberMark. Thereafter, Post acted in concert with AIG to make the corporate governance controversy a "cause celebre" and thereby risking the delay, the potential loss of concessions made by Silver Point beyond the Delaware corporate law, and the erosion in value of FiberMark that finally ripened into fact.

In January and February, Post separated itself from AIG somewhat. Post was even less willing to negotiate during this period than AIG. Instead, Post made increasing demands and finally declared its intent not to sign the IRA. By refusing to sign the IRA and thereby taking a risk, to the detriment of all general unsecured creditors that Silver Point would back out of the concessions it had made to obtain a consensual deal, Post was seeking to obtain the advantages of the liquidity enhancing concessions offered by Silver Point in the charter (e.g., tag rights that primarily benefits large shareholders), while avoiding being bound by the agreed upon *quid pro quo* for such concessions, the right of first offer (or similar right).

It appears that Mr. Hobart asserted on or about February 3, 2005 that Silver Point was trading in FiberMark Notes while in possession of non-public confidential information. Yet, he did not pursue his assertion as long as it appeared that Silver Point might accede to Post's demands. It was only after it appeared that FiberMark had changed its position and would prosecute a cramdown plan, that Post actively supported pursuit of the alleged Trading Order violations. The clear implication is that Post, already distrustful of Silver Point, viewed the situation as giving it bargaining leverage to coerce Silver Point to accede to its demands. As more fully stated in the body of the Report, Post willfully ignored the interests of the Committee's constituency and acted in pursuit of its self interest. This attempt to extort veto rights and other concessions by threatening action for failure to accede to its demands, while ignoring the fact that all other creditors were suffering by the delay and risk that FiberMark

**CONFIDENTIAL BY ORDER OF THE COURT**
*The statements and conclusions in this Report have not been adopted or accepted by the Court, and constitute only the opinions of the Examiner. No portion of this report has been admitted into evidence. Several parties dispute the accuracy of the contents of this Report. The publication of this Report is without prejudice to the right of any party to challenge the statements contained in the Report.*

would withdraw the Plan, was undertaken solely in Post's self-interests. Post, as a result, breached its fiduciary duties as a Committee member with reckless disregard for the consequences for all other general unsecured creditors and as such its conduct was wrongful.

   3. *Silver Point Did Not Breach Its Fiduciary Duties*

    There is no credible proof that Silver Point breached its fiduciary duties as a member of the Committee. Silver Point was not compelled to enter into a shareholder agreement with AIG and Post. As suggested by Akin, Silver Point could have insisted during the negotiations with AIG and Post that the state of incorporation chosen by AIG and Post, i.e., Delaware, provides the correct corporate governance regime for reorganized FiberMark. It is not atypical for debtors to emerge from chapter 11 with shareholder rights governed solely by Delaware corporate law. <u>See</u>, <u>e.g.</u>, <u>IWO Holdings, Inc.</u>, case no. 05-10009 (PJW) (Bankr. D. Del. 2005) (a case in which AIG was the majority stockholder).

    However, in the interests of a consensual chapter 11 plan, throughout the chapter 11 cases, Silver Point notwithstanding the descriptions of Mr. Fortgang's negotiating style, offered numerous concessions beyond Delaware law to increase minority shareholders protections (most of which would have inured to the sole benefit of AIG and Post while others would have benefited all minority shareholders). Neutral Wilmington, as the Indenture Trustee for all Noteholders, recognized early on that Silver Point was being reasonable in its efforts to accommodate AIG and Post, as well as benefit all of FiberMark's general unsecured creditors that would become shareholders under the Plan.

    On numerous occasions Silver Point agreed to "one more concession," often at the request of Skadden, to placate AIG and Post and put an end to the loud and antagonistic negotiations. This conclusion is amply confirmed by the result of the January 24-25 meeting.

**CONFIDENTIAL BY ORDER OF THE COURT**
*The statements and conclusions in this Report have not been adopted or accepted by the Court, and constitute only the opinions of the Examiner. No portion of this report has been admitted into evidence. Several parties dispute the accuracy of the contents of this Report. The publication of this Report is without prejudice to the right of any party to challenge the statements contained in the Report.*

Generally, AIG and Post accepted the concession, but then made further or additional demands, including the demand for veto rights that may be described as unreasonable and that would have prevented Silver Point from taking certain actions even if it had the support of 100% of minority shareholders other than AIG and Post. By granting these veto rights to AIG and Post, Silver Point would have been acting contrary to the best interests of other minority holders.

There are numerous examples of this "give but no take" interaction throughout the chapter 11 cases. Examples from the one week in February following the filing of the Plan Supplement illustrate this well. Mr. Musante said that having a high threshold to amend the affiliate transactions provision in the charter was his one "bullet issue," and if Silver Point agreed to his demand, "we're done." Silver Point did agree to the bullet issue, but Mr. Musante was not done. In the same week, Silver Point relented by agreeing to delete the word "related" from the affiliate transactions provision, believing it would resolve all outstanding issues. It did not. Later, on the eve of the Confirmation Hearing, Silver Point conceded the two points Mr. Hodara claimed were the only remaining issues: whether to have an affiliate transaction provision in the indenture and whether the requirement to amend the indenture would be 66 2/3% versus a simple majority. Silver Point agreed to both these points, but to no avail. At this juncture, AIG and Post focused on Silver Point's trading activities. It appears that they concluded such activities might give them a weapon to offset the size and position of Silver Point or FiberMark's single largest creditor. Thus, even though Silver Point was willing to agree to each of the proposals made by FiberMark in March 2005 to bring the chapter 11 cases to a close, AIG and Post persisted in their quest for more concessions until even FiberMark could not tolerate them. AIG and Post continued to demand more.

**CONFIDENTIAL BY ORDER OF THE COURT**
*The statements and conclusions in this Report have not been adopted or accepted by the Court, and
constitute only the opinions of the Examiner. No portion of this report has been admitted into evidence.
Several parties dispute the accuracy of the contents of this Report. The publication of this Report is without
prejudice to the right of any party to challenge the statements contained in the Report.*

Silver Point did comply with the Trading Order. It maintains an effective

Screening Wall and separation of its public and private sides. As a hedge fund and investor and

financier it is sensitive to its statutory and other obligations under the securities and other

applicable laws as well as pursuant to the Trading Order. Similarly, Silver Point is sensitive to

the fiduciary duties it assumed when it became a member of the Committee.

There is no substance to the assertions that Silver Point's purchases of the SERP

claims or the SDI claims constituted a breach of its fiduciary duties. The purchases were made

by public side traders. There is no evidence that they possessed non-public confidential

information about FiberMark and its affairs at the time of the purchases or discussed such

purchases with Silver Point Committee personnel prior to the execution of the purchases. As

stated, the Examiner found no breach of the Silver Point Screening Wall. Mr. Musante's

foundation for the investigation, that the purchase of Notes was "a tad convenient" and the

purchase of the SERP claims and SDI claim were strange in the context of the chapter cases and

timing does not sustain a conclusion that a breach of fiduciary duties occurred.

However, the circumstances of the trading activities and SDI assignment

agreement did result, in some degree, to the Examiner's appointment and perhaps attendant delay

in FiberMark's emergence from chapter 11. To a significant degree, the erosion in the value of

FiberMark noted in the Report will be borne by Silver Point as the majority creditor. In addition,

the Examiner's Recommendations include a recommendation as to Silver Point.

I.    Other Matters Relevant and Necessary to the Examiner's Investigation

The Examiner Order charged the Examiner with responsibility to investigate

*any other matter the Examiner deems necessary and relevant to the complete
and full investigation of the four enumerated areas included herein.*

**CONFIDENTIAL BY ORDER OF THE COURT**
*The statements and conclusions in this Report have not been adopted or accepted by the Court, and constitute only the opinions of the Examiner. No portion of this report has been admitted into evidence. Several parties dispute the accuracy of the contents of this Report. The publication of this Report is without prejudice to the right of any party to challenge the statements contained in the Report.*

Based upon the entire investigation, and as set forth in this Report, the Examiner has concluded that throughout these chapter 11 cases, there were certain periods when Akin failed to objectively represent the interests of the entire Committee and its constituency of all general unsecured creditors of FiberMark. Akin did not discharge its duties to represent the Committee in an objective, independent and disinterested manner.

From the inception of the pre-chapter 11 period involving the Ad Hoc Committee, Akin took instructions from Mr. Musante. That chain of command continued after the Commencement Date and, particularly, as to the corporate governance battle described in this Report. To avoid "mischief," Akin recommended that the Committee not keep minutes of its meetings. Clearly, Akin did not want a record to be made of the Committee's deliberations and actions. Basically, it instructed the Committee to opt for non-transparency in a world in which more or complete transparency in business affairs is mandated.

Akin did not candidly provide legal and strategic advice to the full Committee as to the numerous controversial issues that arose and critically affected the administration of the chapter 11 cases. This was especially true when such advice would have been contrary to the position taken by Mr. Musante on behalf of AIG. Thus, when internal Akin e-mails suggested that AIG's positions were wrong or weak, Akin failed to appropriately inform the full Committee or confront Mr. Musante. Indeed, Mr. Hodara often expressed support of Mr. Musante, notwithstanding Akin's internal views. Akin catered to Mr. Musante and his agenda. As the chapter 11 case progressed, Akin became more and more an advocate for AIG and, at times, Post rather than as the independent, impartial attorneys for the full Committee.

Rather than promoting dialogue with FiberMark and its professionals in a manner to overcome the acrimonious onset of the chapter 11 cases and the vitriolic relationships that

**CONFIDENTIAL BY ORDER OF THE COURT**
*The statements and conclusions in this Report have not been adopted or accepted by the Court, and constitute only the opinions of the Examiner. No portion of this report has been admitted into evidence. Several parties dispute the accuracy of the contents of this Report. The publication of this Report is without prejudice to the right of any party to challenge the statements contained in the Report.*

resulted and to achieve the goal of an expeditious reorganization of FiberMark and its exit from chapter 11, Akin adopted Mr. Musante's belligerent and acerbic attitude towards FiberMark's management, Skadden and Berenson on all issues that arose. Despite its claim to be a consensus builder, as the chapter 11 administration went forward, Akin's actions did not encourage reconciliation and collaboration to achieve the objectives of chapter 11. In that context, for example, rather than pursuing compromise and avoidance of the substantial expenses of litigation, such as that which resulted from the KERP controversy, Akin encouraged pursuit of "strategic litigation." A course of action that proved costly in time, expense and distraction that, overall, may not have been in the best interests of all general unsecured creditors on a cost/benefit analysis. The pursuit of that adversarial proceeding for a primary purpose of providing a platform to allegedly enlighten the Court as to the views of the Committee on the misdeeds of FiberMark and its professionals was extremely costly and improvident.

Subsequent to the KERP litigation, again, Akin appeared to be the tool of AIG, and, to a more limited extent, Post, in preparing corporate governance provisions that were designed to serve the interests of AIG and Post *vis a vis* the newly emerging major creditor, Silver Point.

Notwithstanding Akin's recommendation to add Silver Point to the Committee, Akin aided the objectives of AIG and Post to prevent Silver Point from taking "effective control" of FiberMark. As the intercreditor battle erupted, Akin consciously made the decision to align itself with AIG and Post, without consideration of the interests of all general unsecured creditors represented by the Committee. Although Akin gave lip service to Wilmington's claims of exclusion from Committee affairs, essentially, it did nothing to cure the exclusionary actions of Mr. Musante, or indeed, to keep Wilmington fully informed, as expressed in the internal e-mails

**CONFIDENTIAL BY ORDER OF THE COURT**
*The statements and conclusions in this Report have not been adopted or accepted by the Court, and
constitute only the opinions of the Examiner. No portion of this report has been admitted into evidence.
Several parties dispute the accuracy of the contents of this Report. The publication of this Report is without
prejudice to the right of any party to challenge the statements contained in the Report.*

of the Wilmington team. Akin rarely consulted with Committee members other than AIG and, to a lesser extent, Post, even as to the important issues of the formulation of a Plan. When Akin did decide to include Wilmington and SDI, it was usually as a result of an afterthought, or to give the appearance of inclusion but without full participation by those Committee members.

Despite Wilmington's complaints as to the disfunctionality of the Committee, Akin did not risk incurring the wrath of Mr. Musante by taking the side of Wilmington. Resultantly, Wilmington, in particular, and SDI, continued to be treated as second class members of the Committee. It became so egregious that Wilmington considered complaining to the U.S. Trustee and putting Mr. Hodara "on the carpet." The lack of impartiality and objective representation of the full Committee by Akin is abundantly established by the record of this investigation.

Clearly, during the period October 2004 through January 2005, Akin represented the interests of AIG and Post in the formulation of the terms of a shareholder agreement and other corporate governance documents that would serve the objectives of AIG and Post *vis-à-vis* Silver Point. There is no indication during this period that Akin advised the full Committee in respect of the corporate governance issues or as to the overriding principle of protecting the rights of minority shareholders. As it became obvious that Silver Point had become the largest single creditor of FiberMark and would be a controlling shareholder, Akin modeled the proposed treatment of the shareholders agreement to meet the objectives of AIG and Post, e.g. Silver Point was not to have effective control of FiberMark. It intentionally pre-cleared the terms of the proposed shareholders agreement with AIG and Post to get their approval before sharing same with Silver Point, Wilmington and SDI, even after Silver Point became a member of the Committee. In a similar fashion and despite Akin's internal observations made during the initial

**CONFIDENTIAL BY ORDER OF THE COURT**

*The statements and conclusions in this Report have not been adopted or accepted by the Court, and constitute only the opinions of the Examiner. No portion of this report has been admitted into evidence. Several parties dispute the accuracy of the contents of this Report. The publication of this Report is without prejudice to the right of any party to challenge the statements contained in the Report.*

stages of the negotiations among the Big 3 that certain Silver Point positions were reasonable or correct and that Mr. Musante was being unreasonable, there is no indication that Akin ever informed Silver Point of its observations or informed the full Committee of same as the Plan Supplement controversy was moved to from an intercreditor issue to a Committee venue and decision, at Mr. Musante's direction.

The Akin position in support of Mr. Musante's position was so obvious at that point that, even Mr. Hodara became concerned. He recognized that observers would not be oblivious to the obvious. Accordingly, in anticipation of the telephonic meeting of the full Committee, in late December 2004, that Mr. Musante directed be held so that he could use the Committee process as the instrument to impose AIG-sponsored corporate governance provisions on Silver Point, Mr. Hodara instructed the Akin team to come up with other items to discuss during the telephonic meeting. Mr. Hodara did not want the meeting to appear to be a "total setup" for Mr. Musante. Akin's internal e-mails revealed serious apprehensions about the use of the Committee as proposed by Mr. Musante. The internal e-mails noted that the objectives of AIG and Post were to enhance the liquidity of their FiberMark positions. Akin decided not to raise the questions it perceived as to the propriety of the use of the Committee as the force for AIG and Post to overcome Silver Point. Akin recognized that AIG's use of the Committee as its instrument to further its own objectives and self-interests implicated the fiduciary duties owed by AIG as a Committee member.

Akin demonstrated its advocacy of the AIG proposals by characterizing them as "reasonable," and, thereafter, on or about January 4, 2005, distributing a memorandum to Wilmington and SDI comparing AIG's proposal to that provided by Delaware corporate law. However, Akin did not give the same consideration to Silver Point's proposed concessions as

**CONFIDENTIAL BY ORDER OF THE COURT**

*The statements and conclusions in this Report have not been adopted or accepted by the Court, and constitute only the opinions of the Examiner. No portion of this report has been admitted into evidence. Several parties dispute the accuracy of the contents of this Report. The publication of this Report is without prejudice to the right of any party to challenge the statements contained in the Report.*

compared to Delaware law or that Silver Point was prepared to agree to minority shareholder rights beyond those provided by Delaware corporate law. Curiously, Akin did not furnish Silver Point, a Committee member, with a copy of the above memorandum.

Throughout the corporate governance controversy and process, it does not appear that Akin advised and disclosed to the non-participant Committee members, Wilmington and SDI, the full implications of the dispute among the Big 3. No guidance was given to Wilmington and SDI as to the fiduciary duties of the Committee and its members to the constituency it represented, all of the general unsecured creditors.

The Akin bias in favor of AIG and against Silver Point became more evident as the chapter 11 cases moved into 2005, and, particularly, during the negotiations in February of that year. Interestingly, during that period, Mr. Hodara became concerned that the Akin partner assigned to work on the proposed new debt indenture might not have been aware that Akin, supposedly, was acting as attorneys for the Committee, and not as the attorneys for AIG and Post. Akin's contemporaneous e-mails also demonstrated its conclusions that AIG and Post would not win a cramdown fight if FiberMark prosecuted the confirmation of a Plan with Silver Point's support. Nonetheless, Mr. Hodara did not make any effort to persuade AIG to accommodate in any way Silver Point's needs or requests, so that needless and expensive confirmation litigation could be avoided with FiberMark's emergence from chapter 11 secured for the benefit of all general unsecured creditors. Akin never assumed a position of neutrality as to the corporate governance provisions but rather became a strong advocate of AIG and not the Committee's general unsecured creditor constituency.

Akin, in its role as an advocate of AIG and Post, seized upon the trading activities of Silver Point as a possible source of bargaining leverage for AIG and Post. Silver Point's

**CONFIDENTIAL BY ORDER OF THE COURT**
*The statements and conclusions in this Report have not been adopted or accepted by the Court, and constitute only the opinions of the Examiner. No portion of this report has been admitted into evidence. Several parties dispute the accuracy of the contents of this Report. The publication of this Report is without prejudice to the right of any party to challenge the statements contained in the Report.*

trading activity presented an opportunity for strategic litigation that might instill fear in Silver Point of sanctions, equitable subordination, disallowance of its claim, etc., all of which would compel Silver Point to make significant concessions and/or submit to the demands of AIG. Akin's conduct during the telephonic meeting of the Committee on March 21, 2005, and the events leading up to that meeting, vividly demonstrated that lack of objectivity on the part of Mr. Hodara. The events during that period of time speak for themselves. Mr. Hodara's every action, including the determinations as to which members of the Committee were subject to conflicts of interest that precluded their participation in the deliberations of the Committee, are difficult to comprehend. Silver Point was conflicted because it was the target of a potential investigation. Nevertheless, if the agenda item as to the conduct of AIG and Post and whether they breached their fiduciary duties was to be considered, according to Mr. Hodara, AIG and Post would not be conflicted and would be free to participate in the Committee's deliberations.

It appears that almost all parties involved, even Akin, as evidenced by its internal e-mails, recognized that the trading allegations and the desire for an investigation were a pretext for AIG and Post to obtain bargaining leverage against Silver Point. Nevertheless, Mr. Hodara did not advise the Committee of Akin's reservations. He did state to Ms. Johnston that he was "extremely skeptical" as to the soundness of an attack based on Silver Point's trading activities. However, it does not appear that he or Akin informed Mr. Musante or Post that the establishment of trading violations and breach of fiduciary duties by Silver Point were doubtful, unlikely or otherwise. In point of fact, it appears that at that time, Mr. Hodara did not even review the provisions of the Trading Order. Akin, as one of the entities charged with the enforcement of the Trading Order, did not deem it necessary to meet the notice and filing requirements of the Trading Order.

**CONFIDENTIAL BY ORDER OF THE COURT**

*The statements and conclusions in this Report have not been adopted or accepted by the Court, and constitute only the opinions of the Examiner. No portion of this report has been admitted into evidence. Several parties dispute the accuracy of the contents of this Report. The publication of this Report is without prejudice to the right of any party to challenge the statements contained in the Report.*

Mr. Hodara also ignored the sage advice and comments of James Anderson referred to in this Report, in his quest to serve the interests of AIG. Given the statements of Mr. Anderson as to the motives of AIG and Post and his descriptions of Mr. Musante's conduct, it is no wonder that after setting up Silver Point as a target, when Mr. Hodara suddenly announced that Akin had a conflict and could not pursue claims against Silver Point, he did not recommend Mr. Anderson, as the Committee's co-counsel, to pursue any investigation of the facts surrounding the trading issues — a choice that would have involved less time and expense to the administration of these cases.

Akin's performance of services on behalf of AIG and Post in furtherance of their self-interests and its lack of objectivity and disinterestedness in representing the Committee and the Committee members, exacerbated the tempest that raged in these chapter 11 cases. Such services were in disregard and not in the best interest of the Committee's constituency – all of the general unsecured creditors of FiberMark.

**APPENDIX G**

**AGGIC, POST, AND SILVER POINT SUPPORT LETTERS**

AIG Global Investment Corp.
70 Pine Street
New York, New York 10270


October 12, 2005



FiberMark, Inc.
161 Wellington Road
Brattleboro, Vermont 05302

Dear Sirs:

     This letter is being submitted by AIG Global Investment Corp., as investment adviser, investment sub-adviser, and collateral manager in connection with the Disclosure Statement With Respect to the Amended Joint Plan of Reorganization filed by the Debtors on September 23, 2005 (as may be amended with the consent of AIGGIC). Capitalized terms used herein shall have the meaning set forth in the Plan. AIGGIC has reviewed and considered the terms and provisions of the Plan, and the disclosures set forth in the Disclosure Statement. AIGGIC supports the confirmation of the Plan in its current form and, assuming that all other parties comply with the provisions and conditions in the Plan that are binding on them, and that all parties to the settlement among Silver Point, AIGGIC, and Post satisfy the obligations under that settlement, AIGGIC will cause the FiberMark Notes, for which it acts as investment adviser, investment sub-adviser, or collateral manager, to be voted to accept the Plan, will support confirmation of the Plan, and will comply with the terms of the settlement and the Plan.


                Very truly yours,

                AIG GLOBAL INVESTMENT CORP.,
                as investment adviser, investment sub-
                adviser, and collateral manager


                By: _Greg Braun_
                Name: Greg Braun
                Title:  Managing Director



October 12, 2005

FiberMark, Inc.
162 Wellington Road
Brattleboro, VT 05302

To Whom It May Concern:

This letter relates to the *Amended Joint Plan of Reorganization Under Chapter 11, Title 11, United States Code of FiberMark, et al., Debtors*, filed in United States Bankruptcy Court, District of Vermont, on September 23, 2005 (as may be amended with the consent of Post, the "Plan"). Capitalized terms used herein and not otherwise defined shall have the meaning ascribed to such terms in the Plan. Subject to and conditioned upon (i) compliance by the Debtors, Silver Point and AIGGIC with the terms of the settlement between and among them and Post (the "Settlement") and (ii) there having been no modification to those provisions of the Plan which reflect, incorporate or are based in whole or in part on the terms of the Settlement, Post agrees to (x) cause its FiberMark Notes to be voted in favor of the Plan, (y) not to object to confirmation of the Plan and (z) to sell its $51,165,000 face amount of FiberMark Notes to Silver Point for the price agreed on in and pursuant to the terms of the Settlement.

Sincerely,

Michael Migro
President

Silver Point Capital, LLC
Two Greenwich Plaza
Greenwich, Connecticut 06830

October 12, 2005

FiberMark, Inc.
161 Wellington Road
Brattleboro, Vermont 05302

Dear Sirs:

This letter is being submitted by Silver Point Capital, LLC, in connection with the Disclosure Statement With Respect to the Amended Joint Plan of Reorganization filed by the Debtors on September 23, 2005 (as may be amended with the consent of Silver Point). Capitalized terms used herein shall have the meaning set forth in the Plan. Silver Point has reviewed and considered the terms and provisions of the Plan, and the disclosures set forth in the Disclosure Statement. Silver Point supports the confirmation of the Plan in its current form and, assuming that all other parties comply with the provisions and conditions in the Plan that are binding on them, and that all parties to the settlement among Silver Point, AIGGIC, and Post satisfy the obligations under that settlement, Silver Point will cause its FiberMark Notes to be voted to accept the Plan, will support confirmation of the Plan, and will comply with the terms of the settlement and the Plan.

Very truly yours,

Silver Point Capital, LLC

By: