UNITED STATES BANKRUPTCY COURT
DISTRICT OF VERMONT

_____

In re:
**FIBERMARK, INC.,**
**FIBERMARK NORTH AMERICA, INC., and**            Chapter 11 Case
**FIBERMARK INTERNATIONAL HOLDINGS, INC.,**       # 04-10463
                     Debtors.         Jointly Administered

_____

Filed & Entered
On Docket
03/10/06

## MEMORANDUM OF DECISON
### DENYING IN PART, AND GRANTING IN PART, THE MOTION OF THE REORGANIZED DEBTORS TO ADMIT THE EXAMINER'S REPORT INTO EVIDENCE, AS AN EXPERT OPINION

The Reorganized Debtors have filed a request for a ruling on the admissibility of the Examiner's Report in this case. They wish to rely upon it in connection with their objection to the fee application of Chanin Capital Partners, LLC ("Chanin") (doc. # 2137) (the "Motion"). The Reorganized Debtors (the "Debtors") argue that the entire Report may be admitted into evidence, as an expert opinion, on the basis that it is relevant to the Debtors' assertion that Chanin failed the test of disinterestedness and acted with an interest adverse to that of the bankruptcy estate. See Motion at pp 1-2. Chanin does not oppose admission of those portions of the Examiner's Report that constitute the Examiner's recommendations and conclusions, but characterizes the remainder of the report as "rank hearsay." See Chanin Opposition, doc. # 2150, p. 3, pars. 7 and 1, respectively.

For the reasons set forth below, the Court rules that those portions of the Examiner's Report (doc. # 1805) that constitute the Examiner's recommendations and conclusions (to wit, pp 25-26 and 284-322), are admissible as an expert opinion. However, the Court denies admission of the balance of the Examiner's Report as inadmissible hearsay.

## PROCEDURAL BACKGROUND

When the Debtors filed the instant chapter 11 cases on March 31, 2004, it appeared to all parties and the Court as if the Debtors were poised to emerge from chapter 11 by the end of 2004. The Debtors, the U.S. Trustee, the Committee and the primary secured creditor were proceeding in a remarkably collaborative fashion and projected that a Joint Plan of Reorganization would be filed in the fall and confirmed by the end of 2004. All proceeded according to that schedule through the filing of a Joint Disclosure Statement and Plan in November, 2004. However, in January, 2005 the issue of corporate governance of the post-confirmation entity caused the collaboration to begin to disintegrate. A stalemate occurred which ultimately derailed the reorganization process and led the Debtors to withdraw their plan

on March 21, 2005 (doc. # 1332). Based upon a number of allegations by several parties against several other parties (including principals of the Debtor and the members of the Committee), coupled with the Debtors' inability to proceed with their case under the cloud of these many allegations and the stalemate over post-confirmation governance, the Court issued an Order to Show Cause (doc. # 1354) directing parties to present arguments as to why an examiner should not be appointed to investigate all of the allegations, and make recommendations, on both the alleged breaches of fiduciary duty and the revitalization of the Debtors' reorganization. The Debtors, the U.S. Trustee, the Committee, Wilmington Trust Company ("Wilmington Trust"), Silver Point Capital LP ("Silver Point"), AIG Global Investment Corp. ("AIG"), Post Advisory Group LLC ("Post"), and Alex Kwader ("Kwader," the CEO of FiberMark) (collectively, the "interested parties") all filed papers supporting (to varying extents) the appointment of an examiner. See docs # 1393, 1392, 1396, 1342 [fn 3], 1377, 1395, and 1399, respectively. After consulting with the interested parties, the U.S. Trustee recommended and the Court appointed Mr. Harvey R. Miller to serve as examiner. (Mr. Miller is hereafter referred to as "the Examiner"). Prior to making this recommendation, the U.S. Trustee had consulted with all key players and conducted its own independent inquiry into the Examiner's competence and disinterestedness, as set forth in the statement filed with the Court on April 18, 2005 (doc. # 1409). No party objected to the Examiner's selection or questioned his expertise to serve in this capacity. All interested parties participated in a hearing defining the scope of the Examiner's duties on April 19, 2005, and agreed to the scope of the Examiner's duties. An Order (doc. # 1422) was subsequently entered that, in pertinent part, provided:

1. The United States Trustee's Office is directed to appoint an independent examiner to conduct an investigation into the following matters:

   a. the transfer of the Debtors' executives' claims, including but not limited to, the claims of Alex Kwader, and other persons who were employees of the Debtors at the time of the transfer of their claim(s), to Silver Point Capital, L.P. ("Silver Point"), the nature and extent of the disclosure of those transfers and whether breach(es) of fiduciary duties to the estate resulted;

   b. the transfer of the claim of former committee member Solutions Dispersions, Inc. to Silver Point;

   c. the quality of the "screening wall" Silver Point, and the other members of the Creditors' Committee, established in accordance with this Court's Order Approving Specified Information Blocking Procedures and Permitting Trading in Securities of the Debtors Upon Establishment of a Screening Wall (doc. # 684) (the "Trading Order"), whether it was breached, and whether the Trading Order was violated;

2

    d.    the dispute among Committee members regarding corporate governance issues and whether any Committee member breached its fiduciary duty to act in the best interest of all creditors; and

    e.    any other matter the Examiner deems necessary and relevant to the complete and full investigation of the four enumerated areas included herein.

2.    In order to meet his or her responsibilities, the Examiner has the authority to retain counsel, to issue subpoenas, and to require document production and conduct examinations under FED. R. BANKR. P. 2004, provided the Examiner exercises this authority in a manner which is consistent with the Examiner's obligation to complete the investigation in a prompt and cost-effective fashion.

3.    The Official Committee of Unsecured Creditors and its members, Alex Kwader and other individuals who were employed by the Debtors when his or her individual claims were transferred to Silver Point, representatives of Solutions Dispersions, Inc. and all other parties in interest who have information that the Examiner deems relevant to this investigation shall cooperate fully with the Examiner.

4.    The Examiner shall commence his or her investigation immediately upon the Court's approval of the United States Trustee's appointment of the Examiner.

. . .

7.    In the event that the Examiner finds that a Committee member or any other party has violated the Trading Order, has breached fiduciary duties, or has acted to intentionally thwart the plan confirmation process in these cases, the Examiner shall include in the report recommendations regarding

    (a)    how the culpable conduct should affect the allocation of the cost of the Examiner;

    (b)    whether such conduct warrants the imposition of sanctions against any such party, including without limitation, the avoidance of claims transfers or subordination of claims; and

    (c)    any such other recommendations the Examiner has based upon the totality of his or her findings.

See doc. # 1422.

The Examiner spent eleven weeks conducting his investigation, and filed a 298 page report (the "Report") that included 1244 footnotes and cost the estate $1,750,000. The Report was initially filed under seal, but the Court later entered an Order unsealing the report, subject to the caveat that the following cautionary ledger be printed on each page:

> The statements and conclusions in this report have not been adopted or accepted by the Court, and constitute only the opinions of the Examiner. No portion of this report has been admitted into evidence. Several parties dispute the accuracy of the contents of this report. The publication of this report is without prejudice to the right of any party to challenge the statements contained in the report.

See doc # 1798. The Court determines today the extent to which the Report is admissible.

## DISCUSSION

The Bankruptcy Code provides bankruptcy courts with the power to appoint an independent examiner for the purpose of investigating matters related to the debtor's estate, "including an investigation of any allegations of fraud, dishonesty, or gross mismanagement …" 11 U.S.C. § 1104(c). An examiner's investigation is conducted under Fed.R.Bankr.P. 2004 and is broader than the scope of civil discovery. "The investigation of an examiner in bankruptcy, unlike civil discovery under Rule 26(c), is supposed to be a 'fishing expedition,' as exploratory and groping as appears proper to the Examiner." Air Line Pilots Assoc. Int'l v. American National Bank and Trust Co. of Chicago (In re Ionosphere, Inc.), 156 B.R. 414, 432 (S.D.N.Y. 1993). Unfortunately, the Bankruptcy Code is silent on the question of how an examiner's report may be used, and neither the parties nor the Court has been able to find a case which squarely addresses the circumstances under which an examiner's report may be admitted into evidence, over the objection of an interested party, or how an examiner's report fits into the rubric created by the Federal Rules of Evidence. Therefore, the Court considers the instant dispute to present a case of first impression.

As the Debtors have argued, if bankruptcy courts were unable to consider the findings and recommendations of an examiner's report, the process of appointing an examiner would be an exercise in futility. However, it is not necessary to determine that the report is admissible – or to admit it into evidence – in order for the examiner's investigation and report to be of benefit to the estate. The benefits of an examiner's investigative efforts flow directly to the debtor and its creditors and shareholders. In re Apex Oil Co., 101 B.R. 92, 99 (Bankr. E.D.Mo. 1989; In the Matter of Baldwin United Corp., 46 B.R. 314, 316 (Bankr. S.D. Ohio 1985). While the examiner answers solely to the court and is required to file a report of his or her investigation with the court, an examiner's findings have no binding affect on the court. See 11 U.S.C. § 1106; Ionosphere, 156 B.R. at 432, citing Baldwin, 46 B.R. at 316. The record compiled by the examiner is meant to be a source of information that assists parties in identifying assets of the estate, evaluating a plan of reorganization, or describing likely and legitimate areas for recovery. Ionosphere, 156 B.R. at 432. Thus, while courts are aided by the conclusions of examiners and often rely on their reports in contested matters, the decision not to admit the examiner's written explanation of how he or she reached his conclusions does not diminish the value of the examiner's conclusions.

The benefit of appointing an independent examiner is that he or she will act as an objective nonadversarial party who will review the pertinent transactions and documents, thereby allowing the parties to make an informed determination as to their substantive rights. See Ionosphere, 156 B.R. at 432; Apex Oil, 101 B.R. at 99. Often, the information that an examiner provides in his or her report serves as a road map for parties in interest as they evaluate and pursue their substantive rights. A party must prove a cause of action based upon admissible evidence, and though the examiner's report may not be admissible, it is a resource containing information and observations of an independent expert. Bankruptcy courts routinely consider and rely on the testimony and reports of examiners. As Mr. Miller so aptly opined, an examiner's report is helpful to the court in understanding facts, but is not intended to establish evidence (doc. # 1667). In essence, an examiner's report paints a picture, his or her image of what happened in the case, and ends with that expert's opinion of what that story means, in legal terms. The report puts the story on paper and provides a context for debate. It is the duty of the parties to formulate a fuller version of the debate using the rules of evidence.

The Debtors have referred the Court to dozens of cases in which bankruptcy courts have considered an examiner's written report and testimony in contested matters. The Debtor asks this court to rely on these cases and find that it is the "regular practice in the bankruptcy courts for examiner's reports to be received into evidence and considered as part of the evidentiary record" (doc. # 2155, at 4). As Chanin correctly indicated, and the Debtors conceded however, none of the cited precedent holds that hearsay in an examiner's report is admissible. None of the case law relied upon by the Debtors addresses the salient issue of the admissibility of an examiner's full report.

Moreover, most of the cited cases involve situations where the nature of the investigation and report were markedly different than Mr. Miller's and do not raise the same issues of reliability as are introduced by the out-of-court statements set forth in Mr. Miller's Report. It appears that the examiners in the cases cited by the Debtors were appointed either to conduct an analysis of objective issues that experts in a field of business routinely rely on, or the examiner's report was not in dispute. See e.g., In re 22 Acquisitions Corp., 2004 WL 870813, *1 (E.D. Penn. 2004) (court appointed an independent examiner to evaluate whether debtor's employment of consultant was appropriate); Apex Oil, 118 B.R. at 688 (court relied on an examiner's report that analyzed causes of action available to the estate); In re Best Products Co., Inc., 168 B.R. 35, 45 (Bankr. S.D.N.Y. 1994) (examiner appointed to examine potential legal claims of the estate); In re Concept Clubs, Inc., 125 B.R. 634, 636 (Bankr. C.D. Utah 1991) (examiner analyzed the reasonableness of real estate broker fees); DeLorean v. Allard (In re Delorean Motor Co. Litigation), 59 B.R. 329, 336 (E.D. Mich. 1986) (the court admitted the examiner's report as it was undisputed); In re General Dev. Corp., 147 B.R. 610, 615-617 (Bankr. S.D.Fla. 1992) (court relied on examiner who conducted an investigation as to the proper interest rates of claims under a plan); In re Granite Partners,

L.P., 219 B.R. 22, 26 (Bankr. S.D.N.Y. 1998) (the examiner's report was not disputed by the parties); In re Industrial Commercial Electrical, Inc., 304 B.R. 24 (Bankr. D.Mass. 2004), rev'd, 319 B.R. 35 (D.Mass. 2005) (court appointed an examiner with an expertise in accounting to analyze tax issues); In re Medical Software Solutions, 286 B.R. 431, 437 (Bankr. D. Utah 2002) (examiner appointed to evaluate the sale of debtor's assets outside of plan); Paul Ruth Trading Co. v. Royal Yarn Dyeing Corp. (In re Royal Yarn Dyeing Corp.), 114 B.R. 852, 856 (Bankr. E.D.N.Y. 1990) (real estate specialist appointed as examiner to evaluate the condition of property); In re PWS Holding Corp., 228 F.3d 224, 231 (3d Cir. 2000) (court appointed independent examiner to evaluate legal claims of the debtor); In re Revco D.S., Inc., 118 B.R. 468, 470 (Bankr. N.D. Ohio 1990) (examiner appointed to evaluate causes of action arising out of Michigan corporate statutory law). Since the examiners in the cited cases were appointed to investigate questions that could be answered in purely objective terms, and based upon objective data from their field of expertise, there was little reason to dispute the reliability of the premises upon which those examiners based their conclusions.

By contrast, Mr. Miller produced the Report at issue by examining over 650,000 pages of documents, correspondence and emails (doc. # 1885, at 16), the vast majority of which were created without expectation of public inspection. Mr. Miller and his attorneys also conducted nineteen Rule 2004 Examinations, resulting in 4,425 pages of testimony (Id). After his analysis of these materials, Mr. Miller reached a conclusion as to the parties' motives in relation to the dispute among the members of the Committee. By Mr. Miller's own account, the materials upon which he relied to produce the Report constitute out-of-court statements that lack the indices of reliability required for admission into evidence under the Federal Rules (doc. # 1667, at 41). Furthermore, as discussed above, and as found by our sister court in the Southern District of New York, the evidence and findings in an examiner's report that underlie the examiner's conclusions are not binding. Chief Judge Bernstein, in addressing a situation similar to the one now before the Court, found that while an examiner is employed to conduct an investigation, "he [is] not charged – nor could he be – with the duty to 'hear and determine' any claims in a case."[1] Rickel & Associates, Inc. v. Smith (In re Rickel & Associates, Inc.), 272 B.R. 74, 87-88 (Bankr. S.D.N.Y. 2002). Judge Bernstein held that an examiner's report was hearsay, and a party could not rely on such a report to prevail on his or her motion without more. Id. at 88. This Court finds the Rickel holding to be well reasoned and will follow it. Thus, if the FiberMark parties wish to "prove" the accuracy of the Examiner's conclusions they must do so with admissible evidence. The facts, as found by the

---

[1] In Rickel & Associates, the plaintiffs had attached a copy of the examiner's report to their complaint alleging that the defendant, who was a member of the committee of unsecured creditors, had defrauded the debtor and the committee into selling stock warrants to the defendants for much less than their fair market value. Rickel & Associates, 727 B.R. at 81. The court held that while a document attached to a pleading becomes part of that pleading, it does not mean the party adopts every statement in the Report as true. Id. The attached exhibit will be read to be what it appears to be. Id. at 91-92. In essence, the attaching of the report clearly indicated that the report had been created, but it did not make the facts in the report true and reliable.

6

Examiner, are not "true" just because they are in the Report. They explain and justify the Examiner's conclusions. That is all. The Examiner's rendition of the facts may not be relied upon to prove the truth of the matter asserted.

The Debtors attempt to overcome the hearsay argument, such as espoused by the Rickel court, by urging this Court to adopt the entire Examiner's Report as an expert report under Fed.R.Evid. 706. This Court has recognized, and the Parties have acknowledged, Mr. Miller's status as an expert in the field of bankruptcy and reorganization law. Mr. Miller's status as an expert however does not change the fact that the factual portions of his report contain an abundance of statements that are the purest sort of hearsay. Therefore, this Court finds that while Fed.R.Evid. 706 can be used to justify the admission of the Examiner's conclusions, that rule does not permit the underlying rationale, or facts, of the Examiner to be introduced into evidence.

The Federal Rules of Evidence define as hearsay any statement made by an out-of-court declarant that is introduced to prove the truth of the matter asserted. Fed.R.Evid. 801(c). Generally, hearsay evidence is not admissible. Fed.R.Evid. 802. The hearsay rule is premised on the theory that-out of-court statements are subject to particular hazards. Williamson v. United States, 512 U.S. 594, 598 (1994). The Report produced by Mr. Miller represents the findings of his investigation into the affairs and motives of the members of the Committee and their professionals. The Report is a one-sided presentation of the facts in that the people who were investigated did not have the opportunity to respond to Mr. Miller's findings. See In re Gitto/Global Corp., 321 B.R. 367, 376-377 (Bankr. D. Mass. 2005). The Court appointed an expert in whom it had confidence, an expert the parties respected as competent and disinterested. There is no basis to find that Mr. Miller did not do his very best in gathering all pertinent data, considering the information presented in an objective fashion, and reaching well founded conclusions that were wholly supported by the record he had created. However, that does not make the facts, as he defines them, true. They are still hearsay.

## CONCLUSION

For the reasons set forth above, the Court finds that the conclusions and opinions of the Examiner are admissible as an expert opinion and the balance of the Report is inadmissible hearsay.

March 10, 2006                                                              Colleen A. Brown
Rutland, Vermont                                          United States Bankruptcy Judge